Dennis P. Riordan (SBN 69320)
Donald M. Horgan (SBN 121547)
Riordan & Horgan
523 Octavia Street
San Francisco, CA  94102
Telephone: (415) 431-3472

Gary K. Dubcoff (SBN 168089)
2370 Market Street, #461
San Francisco, CA  94114
Telephone: (415) 934-8800

Counsel for Petitioner
DANA JAMES EWELL

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

(Fresno Division)

| DANA JAMES EWELL, | Case No. |
|---|---|
| Petitioner, | **NOTICE OF PETITION AND PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY UNDER 28 U.S.C. § 2254** |
| v. | |
| A. K. SCRIBNER, Warden | |
| Respondent. | |

TO:    A. K. SCRIBNER, WARDEN, RESPONDENT; AND BILL LOCKYER, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, COUNSEL FOR RESPONDENT

        PLEASE TAKE NOTICE that petitioner Dana James Ewell (hereinafter "Ewell"

or "petitioner"), by and through his counsel, will and hereby does petition this Court,

pursuant to 28 U.S.C. § 2254, for a writ of habeas corpus.

**Petition for Writ of Habeas Corpus**                    1

Ewell, California Prisoner No. P-04759, is presently in custody at the California State Prison, Corcoran.  He is confined pursuant to a judgment of the Fresno County Superior Court in case no. 546222-1, imposed on July 20, 1998.  On May 12, 1998, a jury had found Ewell guilty of three counts of first-degree murder, in violation of California Penal Code § 187; found true three alleged special circumstances, namely, multiple murder (§ 190.2(a)(3)), murder for financial gain (§ 190.2(a)(1)), and murder while lying in wait (§ 190.2(a)(15)); and found true arming allegations as to each count (§ 12022(a)(1)).  After the jury could not reach a verdict in the penalty phase, the superior court imposed a sentence of incarceration of three consecutive terms of life without the possibility of parole on the murder counts plus a total of two years on the arming enhancements.

Ewell timely appealed the judgment of conviction to the California Court of Appeal, Fifth Appellate District, in case no. F031391.  He raised the following five federal grounds on his direct appeal: (1) the trial court erred in failing to suppress the fruits of a warrantless search of his home that had been obtained in violation of his Fourth Amendment rights; (2) the state appellate court erred, in an interlocutory writ proceeding, in reversing the trial court's suppression of evidence obtained by police through use of a clone pager in violation of the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* ("Title III"); (3) his Sixth Amendment rights were violated when inculpatory, extrajudicial

**Petition for Writ of Habeas Corpus**                    2

statements of his non-testifying codefendant were adduced at trial in contravention of the rule of *Bruton v. United States,* 391 U.S. 123 (1968); (4) his constitutional rights to due process and a fair trial were violated by the admission of opinion testimony as to his bad character, which the state impermissibly used to argue his commission of the charged crimes; and (5) his Sixth Amendment rights to the assistance of counsel and trial by an impartial jury were violated by the trial court's providing, without notice to the defense, a tape recorder to the deadlocked jury, which it then used to listen to a tape recording, the greatest part of which had not been admitted into evidence.

On May 4, 2004, the California Court of Appeal, Fifth Appellate District, in a 202-page unpublished decision, affirmed the judgment of conviction.  Ex. A.  On June 14, 2004, in case no. S125516, Ewell timely filed a petition for review in the California Supreme Court, raising the same federal grounds.  On August 25, 2004, that court summarily denied review without comment.  Ex. B.  Ewell filed a petition for writ of *certiorari* in the United States Supreme Court in case no. 04-7926, raising the search-and-seizure issues that he had raised on direct appeal.  The Court denied that petition on February 22, 2005.  Ex. C.

Ewell was represented at trial by Ernest S. Kinney and Peter M. Jones of Fresno. Since that time, he has been represented by Riordan & Horgan of San Francisco.

Ewell was sentenced on three counts of one information and has no other sentence to serve other than the one imposed by the judgment under attack.  He has no

**Petition for Writ of Habeas Corpus**                    3

other petition or appeal now pending in any court, either state or federal, as to the judgment under attack.  Pursuant to L.R. 81-190(e)(1)(A) & (2), and as noted above, Ewell asserts that all issues raised in this petition have been raised before the highest state tribunal in which the issues could be heard, thereby exhausting his state remedies, and he has not previously sought relief arising out of these same claims from this Court.

The instant petition is being filed within one-year of the Supreme Court's denial of certiorari, and therefore is timely under the period of limitation imposed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See* 28 U.S.C. § 2244(d)(1)(A) (one-year period of limitation begins to run from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review"); *Clay v. United States*, 537 U.S. 522, 527 (2003) (in cases where petition for *certiorari* filed, finality attaches for purposes of postconviction relief when Court denies petition).

By this petition, Ewell states five grounds on which he claims he is being held unlawfully. Ewell intends to supplement this petition with a supporting memorandum of points and authorities, which he will file shortly.  For purposes of this petition, it is sufficient to state that petitioner was convicted of the murders of his parents and sister, who were shot to death in the family home in Fresno. The state's theory of liability as to petitioner was not that he personally murdered his parents and sister – indisputably, petitioner was many miles from the scene when the murders were committed – but rather

**Petition for Writ of Habeas Corpus**                    4

that the Ewells were shot by Joel Radovcich ("Radovcich"), a friend of petitioner, in furtherance of a conspiracy between petitioner and Radovcich to obtain and share the inheritance petitioner would receive from the family estate.

### Claim No. One

Ewell's federal constitutional right to be free from unreasonable searches and seizures, guaranteed him by the Fourth and Fourteenth Amendments, was violated by police officers who conducted an exhaustive, four-day, warrantless search of his home. This claim is based on the following:

1. Early on the morning of April 21, 1992, Dana Ewell, who was out of town, telephoned a neighbor, Jesse Knapp, and asked him to check on his house – petitioner stated he was concerned because he could not reach his family by telephone. Ex. A at 42.

2. Knapp and housekeepers employed by the Ewells entered the house at about 9:10 a.m. and discovered the body of Tiffany Ewell. Ex. A at 42. They called 911; responding Fresno patrolmen entered the house and discovered two additional bodies, those of Dale and Glee Ewell. *Id*.; RT 10716. Knapp informed petitioner of his discovery of Tiffany's body, who responded by repeating, "Oh my God," several times. Ex. A at 42; RT 10886.

3. After arriving at the scene at approximately 9:40 a.m., Fresno detectives were informed by the patrolmen and by paramedics who had been called that there were three

homicide victims in the house and that there were neither additional victims nor any other people anywhere in the residence.  CT4 192;[1] CT 1941; Ex. A at 42.

4.   That morning, petitioner also paged FBI Agent John Zent ("Zent"), the father of his girlfriend Monica Zent, and informed him, following up on a conversation of the day before, that he had still not been able to contact his parents.  RT 20792.  Zent contacted a local FBI agent, who contacted the Fresno Sheriff's Department on Zent's behalf.  Ex. A at 43 n.32.  The Sheriff Department's dispatcher informed the responding detectives that Zent had called in an effort to find out what was going on at the Ewell house.  Ex. A at 42-43.

5.   Rather than secure a warrant once the house had been swept and secured, the Fresno detectives promptly began an in-depth, multi-day, crime-scene investigation. CT4 193.

6.   At about 12:30 p.m., Zent informed petitioner of the deaths.  CT4 191. Detectives Burk and Souza interviewed petitioner at around 3:00 p.m..  *Id.*  They did not ask for his consent to search the home.

7.   The crime-scene investigation lasted four days.  It was comprehensive, covering every inch of the interior and exterior of the house.  CT4 193 *et seq.*.  Among

_____

[1] The state clerk's transcript on appeal was supplemented several times.  Petitioner will reference herein only one of these multiple supplements, which consists of five volumes, is numbered 1 to 1772, and is labeled "Clerk's Transcript Supplement."  It will be referenced as CT4 to maintain consistency with the designations used on direct appeal.

the items located and seized were the "murder bullets" that the prosecution used to tie

the alleged murder weapon in this case to the killings.  CT4 194.  Also seized was

evidence used to prove the robbery at the Ewell residence was staged, evidence that

there was no forced entry into the house, evidence that it was an "inside job" (*viz.*, a box

of Winchester .9 millimeter bullets in the master bedroom), evidence the prosecution

used to suggest the skylights were not used as points of entry, evidence derived from an

inspection of the house's alarm and electrical systems, and a host of documents related

to the Ewell family finances and businesses.

8.   During the nearly four days that the Fresno police personnel were in the Ewell

house, at least eighteen officers took part in the investigation.  CT4 197.  No officer

asked for petitioner's consent to search the home; he at no time volunteered such

consent.  At no time did any officer seek a search warrant.

9.   Despite the clarity of the Fourth Amendment violation, following an

evidentiary hearing (CT 982), the trial court denied petitioner's motion to suppress (CT

1904).  Among that court's various justifications for its result was that, by asking his

neighbor to check on his parents and by failing to explicitly refuse police access to the

house, Ewell had impliedly consented to the search.

10.   The implied-consent justification became the sole basis for the state appellate

court's affirmance of the refusal to suppress the fruits of the warrantless search of the

Ewell home.  That court cited six indicia of implied consent:

(1) petitioner had called his neighbor Knapp to check on the house, who then called the police (Ex. A at 72); (2) petitioner had called FBI Agent Zent, who then caused an FBI contact with the sheriff's department seeking information on Ewell's behalf (*id.*); (3) petitioner proceeded directly to the sheriff's department rather than his house, "strongly suggest[ing] he was aware that police activity was and had been occurring at the residence" (*id.* at 73); (4) petitioner stated a willingness to cooperate fully and did not object when made aware of the investigation that was underway at the house (*id.*); (5) when, several days after the search began, petitioner went to the house to obtain funeral clothes, "he actively participated in the ongoing search by pointing out a handgun" (*id.*); and, (6) when the house was turned back over to him, the only complaint he made was to the cutting of a padlock on the back gate (*id.*).

11.   The state appellate court unreasonably applied clearly established federal law and unreasonably found clearly erroneous facts in reaching its result.  The Supreme Court has expressly rejected a murder-scene exception to the warrant requirement (*e.g., Mincey v. Arizona,* 437 U.S. 385 (1978)), but the state court nonetheless sanctioned it. The Supreme Court has expressly held that acquiescence to an already demonstrated, implied claim of independent authority to search by the police is constitutionally insufficient as a basis for implying consent (*Bumper v. North Carolina,* 391 U.S. 543 (1968)), but the state appellate court nonetheless relied on precisely such after-the-fact acquiescence by Ewell to imply consent.  The Supreme Court has expressly held that the

reasonableness of officers' actions for Fourth Amendment analysis must be assessed in light of the facts then known to them (*e.g., Illinois v. Rodriguez,* 497 U.S. 177 (1990)), but the state appellate court nonetheless retroactively applied facts to justify the prohibited search.  The Supreme Court has expressly held in one case that a defendant's telephone call for help to a third party cannot serve to justify a warrantless house search (*Thompson v. Louisiana,* 469 U.S. 17 (1984) (*per curiam*)), and in another that a defendant's telephone call for help to the police cannot either (*Flippo v. West Virginia,* 528 U.S. 11 (1999) (*per curiam*)), but the state appellate court relied upon just such a call to a third party and third party calls to the police in precisely the manner held impermissible.  The foregoing represents just some of the transparent problems with the state appellate court's application of clearly established federal law.  This misapplication radically interpreted the implied-consent doctrine in an unprecedented manner to circumvent the Supreme Court's stricture forbidding murder-scene exceptions to the warrant requirement.

12.  The state appellate court also erred in an objectively unreasonable manner when it found facts in support of its implied-consent holding that had not been found or relied on by the superior court, and were manifestly wrong.  The appellate court, perhaps aware of the problem that the retroactive application of facts posed for its analysis – that is, the use of subsequent facts to justify a search that was unlawful in its inception is contrary to Supreme Court precedent – shortened the time between the search's onset

and Ewell's first meeting with the police.  Thus, the court found that the investigating detectives "entered the house around 10:30 a.m." (Ex. A at 43), but they did so at 9:55 a.m., as found by the trial court (CT 1959).  The appellate court also found that a detective interviewed Ewell "beginning around noon" (Ex. A at 44), but this interview occurred at 3:00 p.m. (CT 1944).  It was over five hours, not the hour and one-half found by the appellate court, that transpired between the start of the home search and Ewell's first opportunity to consent.

13.  This erroneous failure to suppress all fruits of the search of the Ewell home had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993).  The police observations inside the home and the items seized therein formed the foundation of their three-year investigation.  The investigators found critical evidence pointing to the likelihood that (a) the killer or killers had access to the house (evidence relating to alarms, skylights, absence of forced entry), (b) the killer or killers attempted to cover up that access (staged-robbery evidence) and, perhaps most importantly, (c) the killer used bullets owned by Ewell to commit the murders (box of bullets and weapons found in master bedroom), and thus planned the murder with someone who was aware those bullets were in the house.  It is impossible to separate any of the eventual police investigatory findings – derived from subsequent surveillances and interviews – from the evidence developed from the crime scene.  In short, had the evidence observed and seized during

the unlawful house search, and their fruits, been properly suppressed, Ewell would not

have been convicted.

14.   The bar created by *Stone v. Powell,* 428 U.S. 465 (1976), against litigating

Fourth Amendment claims in federal habeas proceedings is inapplicable herein, either

because it is no longer good law following the enactment of AEDPA (*see, e.g., Carlson*

*v. Ferguson,* 9 F.Supp.2d 654 (S.D.W.Va. 1998) (so holding); *accord Lawhorn v. Haley*,

323 F.Supp.2d 1158, 1185 n.4 (N.D.Ala. 2004)), or because this case fits within the

bar's exception – Ewell did not have a full and fair opportunity to litigate his claim in

state court because the state appellate court (1) willfully refused to apply controlling

Supreme Court law, transmogrifying controlling precedent in a manner that cannot even

be deemed "colorable"; and (2) *sua sponte* found clearly erroneous, critical facts in

direct contradiction to the record and the trial court's correct factual findings, without

affording an evidentiary hearing by which these newly found "facts" could be contested

(*cf. Cabrera v. Hinsley*, 324 F.3d 527, 531 (7th Cir. 2003) (no full and fair opportunity

in "circumstances that imply refusal by the state judiciary to take seriously its obligation

to adjudicate claims under the fourth amendment"); *id.* (not full and fair where "the

mechanism was in some way a sham"); *Gamble v. Oklahoma,* 583 F.2d 1161, 1165

(10th Cir. 1978) ("Deference to state court consideration of Fourth Amendment claims

does not require federal blindness to a state court's wilful refusal to apply the

appropriate constitutional standard."); *id.* (full and fair opportunity requires "at least

colorable application of the correct fourth amendment constitutional standards"); *Miranda v. Leibach,* 394 F.3d 984, 998 (7th Cir. 2005) (no full and fair opportunity unless, upon clear presentation of Fourth Amendment claim and supporting factual bases by petitioner, both state trial and appellate courts "carefully and thoroughly analyzed the facts" and "applied the proper constitutional case law to those facts"); *id.* ("when a state court's Fourth Amendment analysis turns on factual determinations that lack the fair support of the record, we cannot say that the court carefully and thoroughly analyzed the facts")).

### Claim No. Two

Ewell's federal statutory privacy rights guaranteed him by Title III and his federal constitutional right to be free from unreasonable searches and seizures guaranteed him by the Fourth and Fourteenth Amendments were violated by police officers' interception of Ewell's electronic communications to Radovcich's pager.  This claim is based on the following:

1.  On April 12, 1993, and April 22, 1993, detectives from the Fresno County Sheriff's Office obtained from a municipal court judge warrants to intercept communications that Joel Radovcich was receiving on his pager.  CT 2912-13, 2928-29.  Law enforcement officials then used a "clone" or duplicate pager to surveill the contents of communications received by Radovcich.

2.  Ewell moved in the superior court to suppress all evidence obtained pursuant

to these warrants, and all fruits derived therefrom.  CT 2912.  He contended that the electronic seizures violated both Title III and the Fourth Amendment.

3.  The superior court granted the motion to suppress.  CT 2913.  That court ruled that Title III applied to the clone pager evidence, that it was "apparent, from the face of the warrants, that they were issued as routine warrants and not under Title III," and that the *Leon* good-faith exception did not apply "when there is a complete unexplained and unjustified failure to comply with the provisions of Title Three in obtaining a warrant." CT 2913-14.

4.  The state challenged the suppression order by way of an interlocutory writ proceeding.  The state appellate court granted the requested writ and reversed the suppression order.  CT 2919; Ex. D.  Although that court agreed that Title III was applicable to the interceptions at issue (CT 2927) and that "most of the requirements of Title three were not met" (CT 2928), it relied first on the ground that Title III provided no statutory suppression remedy for the violation of its provisions at issue (CT 2928-39), a contention that the state had not raised in the trial court (CT 2923-25).  Regarding the Fourth Amendment claim, a majority of the appellate court found that no constitutionally protected privacy interest of Ewell was violated by the seizure of his communications because the pager belonged to Radovcich (CT 2939-43) and that, although Radovcich's constitutional rights had been violated by the seizure pursuant to a defective warrant, the *Leon* good-faith exception applied and the illegally seized evidence was therefore

admissible at trial (CT 2968-78).

5.  The Supreme Court summarized the relevant provisions of Title III as follows:

Section 2518(8)(a) requires that "the contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device" and that recording "shall be done in such way as will protect the recording from editing or other alterations."

The section further provides that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." Section 2518(8)(a) has an explicit exclusionary remedy for noncompliance with the sealing requirement, providing that "[t]he presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517."

*United States v. Ojeda Rios*, 495 U.S. 257, 259-60 (1990).  The state appellate court in its interlocutory ruling agreed, as it had to, that section 2518(8)(a) contains its own suppression remedy when the statute's sealing provisions are violated, but declined to apply that suppression remedy on the ground that no pager communications were recorded in this case and, impliedly, that no such recording was "possible" within the meaning of section 2518(a) (CT 2935), factual contentions that had never been raised by the prosecution at the suppression hearing and were thus "facts" that Ewell had never been afforded an opportunity to contest.  In the trial court, the state had opposed Ewell's Title III claim *solely* on the grounds that a pager was not controlled by the statutory scheme and that, even if it were, *United States v. Leon,* 468 U.S. 897 (1984), would,

**Petition for Writ of Habeas Corpus**                          14

nonetheless, mandate the admission of the evidence.  CT 2913.  In light thereof, there

was absolutely no reason for Ewell to adduce any evidence as to the reasonable

availability to the surveilling officers of equipment capable of recording the intercepted

communications, or to determine whether, in fact, the officers had used such equipment.

6. Following his conviction on direct review, Ewell again challenged the failure

to suppress the seized electronic-surveillance evidence and its fruits.  The state appellate

court rejected the claim.  Ex. A at 76-91.  The court invoked "the law of the case

doctrine" and refused to reconsider its prior clone-pager rulings, rejecting Ewell's claim

that additional factual matters and new case law justified such reconsideration.  *Id.*

7. The failure to suppress the electronic-surveillance evidence violated the

federal law clearly established by the Supreme Court in *United States v. Ojeda Rios*, 495

U.S. 257 (1990).  The Court there held that the sealing provisions of 18 U.S.C. §

2518(8)(a) are so important to the statutory scheme of Title III that their violation

requires suppression of the fruits of electronic surveillance, even if the violation involves

only a *delay* in sealing and even if the government were able to prove that the

information obtained was not tampered with.  Of particular relevance to the instant case,

the Court remanded in *Ojeda Rios* for a determination of whether the government had

any satisfactory explanation of the delay in sealing, which the Court deemed to be a

question of historical fact on which evidence had to be taken.  *Id.* at 267.  Here, the

electronic communications intercepted from Radovcich's pager were not only not timely

sealed, they were not sealed at all.  No "satisfactory" explanation could exist for this failure, because, given the apparent availability of recording equipment, there is only one explanation – the investigating officers, like the issuing court, were simply ignoring Title III entirely.  That being so, *Ojeda Rios* compelled suppression of the seized electronic communications and their fruits.

8.  The state appellate court's error is inconsistent with the rudimentary demands of fair procedure and presents exceptional circumstances where the need for a habeas remedy is apparent.  Again, Ewell was denied the opportunity to establish at an evidentiary hearing that the fruits of the electronic surveillance should have been suppressed because the surveilling officers either recorded or readily could have recorded their interceptions.  Again, *the state raised the issue for the first time in the appellate court.*  The state appellate court's rejecting of Ewell's repeated requests for such an opportunity and then rejecting his claim on the merits based on assumed facts that were clearly erroneous is shocking.  Again, the Supreme Court in *Ojeda Rios* held that the failure to seal intercepted electronic communications as required by section 2518(8)(a) violates the core concerns of Title III and mandates suppression.

9.  This Court must hold an evidentiary hearing on the issue because the state appellate court reached its conclusions that no sealing violation occurred, and thus no statutory suppression remedy was available, without affording Ewell a full and fair hearing on dispositive, predicate factual issues in dispute.  The state appellate court

found as fact that no pager communications were, or could have been, electronically recorded by the police herein, but it did so as a matter of assumption. There was simply no evidentiary basis to permit the determination whether or not the clone pager utilized by the police interceptors in this case  had the capability to permanently record and store the numbers received or whether such equipment were reasonably available to them because the state did not raise the issue in the superior court. Ewell repeatedly contended that he must be afforded an opportunity to contest the "facts" found by the appellate court at a hearing in the superior court, but was repeatedly denied.

In these circumstances, Ewell does not have to meet the threshold for an evidentiary hearing contained in 28 U.S.C. § 2254(e)(2). As construed by the Supreme Court in *Williams v. Taylor,* 529 U.S. 420 (2000), that subsection applies to a habeas petitioner *only* if "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432. Where, as here, the petitioner did not contribute to the absence of a full and fair hearing in state court through a lack of due diligence, he does not have to meet the strictures of section 2254(e)(2) in order to obtain a hearing in federal court to develop the relevant claims. *Id.* at 437. Instead, Ewell must demonstrate only that his "allegations, if proved, would entitle him to relief, and no state court trier of fact has, after a full and fair hearing, reliably found the relevant facts." *Tinsley v. Borg,* 895 F.2d 520, 530 (9th Cir. 1990); *see also Miller v. Champion,* 161 F.3d 1249, 1253 (10th Cir. 1998) (where habeas petitioner did not fail to develop factual

basis in state court through any fault of his own, he is entitled to evidentiary hearing if

he meets pre-AEDPA standards); *Lawson v. Borg,* 60 F.3d 608, 610 (9th Cir. 1995)

("Where the facts are in dispute, the federal court in habeas corpus must hold an

evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary

hearing in a state court, either at the time of the trial or in a collateral proceeding.")

(internal quotation marks omitted).

    10.   Available information presented to the state appellate court, which will form

part of Ewell's showing at an evidentiary hearing in these proceedings, proves the error

in the state court's factfinding based on uncontested assumption that, if properly

resolved, would entitle him to relief.  An affidavit of an FBI agent who utilized a

recording device in the interception of pager communications established, *inter alia,*

that, in April 1993, the FBI in Northern California obtained Title III intercept orders for

digital pager communications in a drug investigation in San Francisco; that those pager

communications were intercepted by means of a "pager receiver"; that the intercepted

data stream was stored in a "Capture" and "Archive" file in the FBI computer; that the

data from both files were printed out and forwarded to the lead investigator; and that "in

each instance these computer printouts were presented to the Court for sealing in a

timely manner."  *See* Appellant's Opening Brief on direct appeal, Appendix A.  Thus,

Ewell could have proven in state court had he been afforded the opportunity, and will

prove in these proceedings, that, contrary to the state appellate court's implicit

assumption, the recording of pager communications was indeed possible in 1993 at the time of the Ewell intercepts in this case.  Moreover, in an opinion issued after the state appellate court's interlocutory writ opinion, but before the subsequent affirmance of that opinion by the same court as "law of the case," the Ninth Circuit found that this very same evidence proved that, *during the same time period as the Ewell investigation*, "there was a device [capable of recording pager communications] available that the government intentionally or otherwise failed to use."  *United States v Hermanek,* 289 F.3d 1076, 1089-90 (9th Cir. 2002).  Again, at the time of its interlocutory writ opinion, the state appellate court could not know if the officers who conducted the interceptions in this case did or did not have such equipment readily available, either within their own department or through a cooperating agency like the FBI, because the state never put that factual issue into play in the trial court.

11.  The bar created by *Stone v. Powell,* 428 U.S. 465 (1976), is inapplicable to Title III claims.  *See, e.g., Cruz v. Alexander,* 477 F.Supp. 516, 519 (S.D.N.Y. 1977) (so holding, citing cases).  Stone thus does not apply to the claim of a violation of the statute's sealing requirement at issue here.

12.  As to Ewell's claim that his Fourth Amendment rights were also violated by the failure to suppress the fruits of this electronic surveillance, it is as clear in this context as in all the others raised by this petition that the state appellate court erred grievously in permitting a glaring constitutional violation to go unremedied, again

utilizing federal law in an objectively unreasonable manner.

13.  The majority of the appellate court found that Ewell had no reasonable expectation of privacy in his pager communications with his codefendant and thus no standing to challenge on constitutional grounds the seizure of those communications. That is an objectively unreasonable application of federal statutory and constitutional law.  The controlling test for the reasonableness of a defendant's subjective expectation of privacy is whether that expectation has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. . . ."  *Rakas v. Illinois,* 439 U.S. 128, 144 n.12 (1978).  The majority ignored the fact that federal statutory law is as protective of the privacy interests of those who send electronic communications to the pager owner as it is of those of the owner himself.  Title III not only criminalizes the interception of pager communications (*see* 18 U.S.C. § 2511), but it also provides civil remedies for *both* the sender and receiver of such communications which had been intercepted without authorization.  *See, e.g., Brown v. Waddell,* 50 F.3d 285, 294 (4th Cir. 1995) (unauthorized interception of pager communications gives rise to civil claim for damages).

Specifically, Title III defines an "aggrieved party" as "a person who was a party to any intercepted wire, oral, or electronic communication . . ." (18 U.S.C. § 2510(11)) and gives "any person whose . . . electronic communication is intercepted,

disclosed, or intentionally used in violation of this chapter" a right to recover monetary

damages (§ 2520).  Ewell and Radovcich, therefore, had an *equal* right to sue the

investigators in this case for money damages under 18 U.S.C. § 2520, and Radovcich's

expectation of privacy was no greater in the pager communications sent by Ewell to him

than was Ewell's.

Where the law endows a party with a right to privacy in a particular context, the

party's expectation of privacy in that context is reasonable, as recognized by society.

Federal statutes represent society's express determination of the legitimacy of

individuals' expectations of privacy based thereon.  *See, e.g.,* 18 U.S.C. § 1702 (crime to

intercept letter sent by U.S. mail); *United States v. Jacobaea,* 466 U.S. 109, 114 (1984)

(individual has a reasonable expectation that first-class letter will not be intercepted

without a warrant).

Indeed, Congress made clear when it amended certain provisions of Title III in

1986 through enactment of the Electronic Communications Privacy Act that it was doing

so *precisely* to legitimize the expectation of privacy in electronic communications.  *See,*
*e.g.,* 131 Cong. Rec. 24396, 24396 (1985) (Congressman Kastenmeier stating that,

"without legislation addressing the problems of electronic communications privacy,

emerging industries may be stifled," and that the then-existing uncertainty over whether

certain communications are truly private "may unnecessarily discourage potential

customers from using such systems").  Motivated by such concerns, Congress placed

**Petition for Writ of Habeas Corpus**                          21

electronic communications in precisely the same position as wire and oral

communications with respect to private interception.

14.   The state appellate court's reliance on the *Leon* good-faith exception is an

even more egregious misapplication of federal law.   The warrants in this case were

obtained by officials barred by law from applying for them from a magistrate barred by

law from issuing them.   *Leon* "requires officers to have a reasonable knowledge of what

the law requires."   *Leon,* 468 U.S. at 919-20 n.20.   Under Title III, no police officer *in

the country* is permitted to apply for a warrant to intercept wire, oral, or electronic

communications.   *United States v. Giordano,* 416 U.S. 505, 515-16 (1974).   Moreover,

in the year in question, 1993, *no municipal court judge in California* was permitted to

issue a warrant to intercept electronic communications – under federal law, only a judge

of general criminal jurisdiction, which a municipal court judge is not, could issue such

an order, and California did not enact until 1995 the enabling legislation required to

empower *any* state court judge to sign the intercept order in question.   In addition, the

issuing court wholly abandoned its judicial role by failing to enforce a single provision

of Title III.   In such circumstances, the state appellate court's invoking *Leon* represents a

paradigmatic objectively unreasonable application of clearly established federal law.

15.   The refusal to suppress had a substantial and injurious effect on the jury's

verdict.   "On at least four occasions, intercepted pages led surveilling officers to Ewell."

Ex. A at 78.   Moreover, "the prosecution presented evidence of intercepted pager

communications obtained by sheriff's detectives' use of a 'clone' or duplicate pager." *Id.* at 76.  The state appellate court detailed this evidence (*id.* at 14-23).  For example, almost immediately after investigating officers informed Ewell of their belief that Radovcich was responsible for the murder of Ewell's family members, the officers intercepted a page to Radovcich and then confirmed through visual surveillance that it came from Ewell.  *Id.* at 16-17.  No state court has ruled that, were the fruits of the electronic surveillance improperly admitted, this would be harmless error in any event. No court could plausibly do so.

**Claim No. Three**

Ewell's federal constitutional right to confront the witnesses against him, guaranteed by the Sixth and Fourteenth Amendments, was violated when a state witness related out-of-court statements of Ewell's non-testifying codefendant that explicitly inculpated him, in contravention of the trial court's redaction rulings.  This claim is based on the following:

1.  It was clear from the outset of the proceedings that the prosecution intended to seek admission at trial of inculpatory statements made by Ewell's codefendant Radovcich to Jack Ponce.  The parties' positions were made clear in pretrial pleadings – Ewell contended that the statements were hearsay, the admission of which at a joint trial would violate his constitutional right to confrontation (CT 350, 1440); the prosecution sought to admit the statements as coconspirator statements or statements against penal

interest.  Ewell also sought a severance of his trial from that of Radovcich, in part on the ground that he would be unfairly prejudiced by the admission of those of Radovcich's statements that would be inadmissible against him in a separate trial.  CT 1752.  The trial court denied the severance motion, but acknowledged the need to carefully examine the impact of the admission of each of the Radovcich statements upon Ewell's confrontation rights.  CT 1819-20.

2.  In its pretrial filing on the issue of the admissibility of the Radovcich statements to Ponce, the prosecution characterized them as "the cornerstone of the People's case against Dana Ewell."  CT 2066, 2370.  It dissected Ponce's testimony at the preliminary examination and derived some 136 statements made by Radovcich to Ponce that it claimed should be admitted.  Ewell, statement-by-statement, explained that no theory of admission could avoid the applicable evidentiary and constitutional proscriptions.  CT 2031-38.  Following oral argument (RT 1218 *et seq.*), the trial court issued a comprehensive, written, tentative ruling (CT 2368).  The court deemed some statements admissible against both defendants under various California Evidence Code sections; some, admissible only against Radovcich; some, admissible only after the prosecution introduced *prima facie* evidence of the existence of a conspiracy and proof that the statement was in furtherance of it; and some, inadmissible under any circumstances as violative of Ewell's confrontation rights.

3.  Regarding a particular Radovcich statement to Ponce – "He [Radovcich] said

it [the charged killings] had to do with eight million dollars and he and the other guy were going to split it in half" – the trial court ruled that it would have to be redacted to protect Ewell's confrontation rights:

> [The statement] is admissible against Radovcich only under Evidence Code section 1220 and 1230, and is redacted to delete 'and he and the other guy were going to split it in half' as not being either in furtherance of an alleged conspiracy or any admission against penal interest under Evidence Code section 1230. Moreover, it would violate Ewell's Sixth Amendment rights.

CT 2422. The court similarly ruled that the prosecution could not admit statements by Radovcich that (a) he was going to split the eight-million-dollar inheritance with Ewell, and (b) "they would get the money when Dana turned twenty-five." CT 379, 2426.

4. At his first opportunity – opening statement – the prosecutor violated the rulings:

> Jack Ponce also tells us about what Joel Radovcich said about why he committed these murders. He – Joel Radovcich says he committed the Ewell murders in order to split the $8 million inheritance: Admissible only against Joel Radovcich. He stated that he expected to collect his half of the proceeds when Dana turned 25 due to a stipulation in the will.

RT 10462. This prosecutorial disdain for the trial court's efforts to protect Ewell's confrontation rights would be manifested repeatedly through the trial.

5. Prior to Ponce's taking the stand, the parties again took up the question of the admissibility of the Radovcich statements. The court ruled that the prosecution had, by that point in its case, made the requisite *prima facie* showing that a conspiracy between Radovcich and Ewell had existed (RT 19141), that the goal of the conspiracy was to

obtain the Ewell inheritance (RT 19141), and that the Radovcich statements to Ponce in which he explained and detailed the Ewell killings, as redacted to remove all references to Ewell, were made in furtherance of the conspiracy (RT 19142).  Ewell objected to the rulings.  RT 19145 *et seq.*.  In making these rulings, the court made abundantly clear that all references to Ewell by Radovcich were not themselves in furtherance of the conspiracy, and were otherwise inadmissible under *Bruton v. United States,* 391 U.S. 123 (1968).  RT 19143.

6.  Ponce took the stand near the end of the state's case.  He first described at great length his close relationship with Radovcich.  RT 19232 *et seq.*.  He then detailed the assistance he had provided to Radovcich both before and after the killings, including purchasing a gun and disposing of a variety of items used in the crime.  RT 19300 *et seq.*, 19344.  He further testified that, after Easter 1992, Radovcich called and asked to meet with him.  The two drove around and Radovcich talked about the situation in which he found himself.

7.  Virtually everything that happened thereafter in front of the jury could not help but indelibly print on its mind precisely the fact that the *Bruton* rule had been fashioned to preclude, namely, that Radovcich had implicated Ewell in the charged offenses.  *The testimony did so explicitly.*  As soon as Ponce turned to his discussions with Radovcich, the following colloquy occurred:

Q. . . . "Did Joel Radovcich tell you why he committed this murder"?

A. Yes, he did.

Q. And what was the answer?

A. It was to split the inheritance.

Q. And then did he tell you how much he believed the inheritance to be?

A. Yes, he did.

Q. And how much?

A. Eight million dollars.

Q. Did Joel Radovcich tell you when he expected to be able to collect any money?

A. *He expected to be able to collect it when Dana turned 25 years old.*

RT 19418 (emphasis added).  The trial court immediately intervened, making clear that

this was precisely the testimony it had ruled would violate Ewell's Sixth Amendment

rights if introduced at the joint trial (RT 19418) and directing the jurors to disregard it

(*id.*).  The precise colloquy between the court and the prosecutor, played out in front of

the jury, was the following:

> The Court: Just a moment.  Just a moment.  I've ruled that to be inadmissible.
> The jury is admonished to disregard it.
>
> Mr. Oppliger: (Negative headshake.)
>
> The Court: Oh, yes.
>
> Mr. Oppliger: No, you didn't.
>
> The Court: That's the Court's ruling now.

And it's to be disregarded, ladies and gentlemen.  I'm not implying that counsel did anything wrong, but . . .  It's to be disregarded for rulings that I've previously made.  Maybe I didn't make that one clear, but it's clear that the law makes it inadmissible and the jury's admonished to disregard it.

Mr. Oppliger: My next question also concerns – possibly concerns a change in the Court's ruling.  Should I wait?

The Court: Well, no.  Just proceed according to the – we've spent a great deal of time to save the jury time on pretrial rulings, and they stand.  And let's proceed.

*Id.*  No juror listening to this exchange would conclude anything other than there were many Radovcich statements identifying Ewell by name as a participant in the criminal scheme and that the trial court had tried, albeit unsuccessfully, to keep these from the jury.

8.  Unchastened by the trial court's admonition, the prosecutor immediately returned to the impermissible subject:

Q.  Did Mr. Radovcich say anything about, um, a stipulation in a will?

A.  Yes, he did.

Q.  And what, if anything, did he state?

A.  There was an age stipulation in the will.

Q.  And what was that?

A.  That the –

RT 19419.  At this point the court again intervened, not permitting the witness to answer:

[I]t is a question that I ruled on that it was admissible with respect to . . .

Mr. Radovcich . . . the time he, Mr. Radovcich, expected to receive any money, not when some – not relating to anyone else.  So you can elicit that question by carefully –  a carefully phrased question, you may proceed.  If you can't carefully phrase it, then follow the Court's rulings.

*Id.*  The prosecutor continued, "Did . . . Mr. Radovcich state to you that he expected to receive his money at a point in time when . . . strike that.  Did he – Mr. Radovcich, state his understanding that there was a stipulation in the will – ."  The court intervened yet again: "[I]f you cannot frame them the way I've ruled . . . then go to another subject and we'll take it up at the next recess."  RT 19420.  Finally losing patience, the court simply went ahead and posed the question itself: "Yes, Mr. Ponce, did Mr. Radovcich say at what time, what age he, Mr. Radovcich, expected to receive the money?"  RT 19420-21.  Having already reported that Radovcich put it in terms of Ewell's turning twenty-five (RT 19418), Ponce now answered that Radovcich said it would be three years (RT 19421).

9.   During Ponce's cross-examination, the trial court again made clear that, despite its ruling that some statements by Radovcich were admissible as in furtherance of a conspiracy, statements that described the existence of a plan to split the Ewell inheritance were inadmissible against Ewell.  Ponce testified that "he had heard from Joel about splitting some money"; "half of some figure"; he guessed "it was a 50-50 split."  RT 19701.  The court, enforcing its earlier rulings, admonished the jurors:

Ladies and Gentlemen, the last several questions pertaining to splitting some money is received only with respect to Mr. Radovcich.  It is not received and may not be considered by you with respect to or against the

Defendant Dana Ewell.  Do not consider this evidence in any way against
the Defendant Dana Ewell.

RT 19701.  The court stated again later on, "[W]hat Radovcich may have said about a

deal . . . as a statement of fact that he had a deal.  And that is . . . clearly not admissible

against Mr. Ewell."  RT 19722.

     10.  Finally, the trial court attempted to cure the *Bruton* error through an

additional, comprehensive instruction:

> [E]vidence was received of a statement made by the defendant, Joel
> Patrick Radovcich.  At the time the evidence of any such statement was
> received, you were instructed that it could not be considered by you
> against the defendant Dana James Ewell, and do not consider the evidence
> of the statement against the other defendant, as you have been instructed.

RT 22299-300.

     11.  Despite the trial court's ruling on the offending Ponce testimony, and its

repeated admonitions that testimony regarding references by Radovcich to Ewell

amounted to a Sixth Amendment error, the prosecutor, doubtlessly still driven by his

perception that the Radovcich statements were the "cornerstone" of his case against

Ewell (CT 2066, 2370) and necessary to secure his conviction, heavily relied on the

statements in his closing:

> In answer to either my question or Mr. Cherney's question as to "Did Joel
> Radovcich tell you why he committed these murders?"  Mr. Ponce stated
> that it was to split the inheritance.  And to the question of, "When did he"
> – or – and then, "Did he tell you how much he believed the inheritance to
> be?"  "Yes.  Eight million dollars."

There was then some testimony on how long Joel Radovcich expected to

wait until the money came.  And his answer was something to the effect, "About three years."  Do you remember that?

That part, that last part, how long he expected to wait, was admissible only against Joel Radovcich and not against Dana Ewell.  And it would be unfair and illegal, not to mention, to use the three-year thing against Mr. . . . Ewell.

The first part about did he tell you why he committed murders and what was the – what was the expected benefit to Mr. Radovcich, that was admissible against both Defendants.

RT 21470.

12.   The foregoing facts establish a prejudicial Sixth Amendment violation.  The jury heard an out-of-court statement from Ewell's non-testifying codefendant that implicated him by name in the charged offenses, and the only response by the trial court was to give instructions to the jury that the Supreme Court has held, as a matter of law, cannot cure the error.

13.   The state appellate court rejected this claim on several grounds, none of which can withstand scrutiny.  Among other things, the court found the evidence at issue – that Radovich was going to split with Ewell the inheritance that motivated his killing when the latter turned twenty-five years old – cumulative and harmless by expressly relying on evidence elsewhere in the record that the trial court had ruled *inadmissible* against Ewell.  Because of the objective unreasonableness of the state appellate court's resolution of the issue, Ewell meets the gateway tests of 28 U.S.C. § 2254(d).

**Claim No. Four**

Ewell's federal constitutional rights to due process and a fair trial, guaranteed by the Fourteenth Amendment, were violated when the trial court permitted the prosecution to introduce unduly prejudicial, inadmissible character evidence in the form of lay opinion testimony in its case-in-chief.  This claim is based on the following:

1.  The prosecution introduced at trial devastating testimony in its case-in-chief that Ewell was pathologically greedy and obsessed with success and money to support its theory that Ewell committed a monstrous crime because he was a monstrous person. In arguing for its admission, the prosecution conceded that this evidence at issue was character evidence in the form of opinion and reputation testimony.  RT 3324, 3340.

2.  Bettina Goolkasian, a woman Ewell knew since he was a child, testified as follows:

> I have never known anybody like Dana [Ewell] in the respect that when one judges their life's worth or life's value, nobody has come close to Dana, in the people that I have come in contact with and have been friends with, to where money has been the most – the single most important determining factor of one's value.

RT 18104.  She stated that Ewell's interest in money was first noticeable in the *third grade.*  RT 18106.

3.  Mario Tapia knew Ewell since they were freshmen in high school in 1985.  RT 18189.  He testified that money "was a very large motivation" for Ewell; that, in comparison with other people, on a scale of one to ten, Ewell's interest in money "was

like an eleven"; and that "money made him very happy, or the impression he had a lot of

money."  RT 18192-93.  Although the answer was stricken following a defense

objection, Tapia also testified that there was a "darker" side to Dana and those with

whom he associated.  RT 18225.

4.  Michael Poindexter, who testified that he was Dana's best friend in high

school (RT 18822), testified that Ewell is "the greediest person I've ever met in my life"

(RT 18829).  His testimony continued:

> Q.  In your opinion, or based on your observations, did Mr. Ewell seek to
> convey a position of money or being from money?
>
> A.  Oh, yes.  He wanted to be very flashy with his money.
>
> Q.  Did you ever describe that character as Dana Ewell wanting you to
> think that he was as rich as God.?
>
> A.  Rich or richer.

RT 18830.  The trial court sustained an objection to the final statement, but permitted the

witness to testify as follows about Ewell's "flashiness" with money:

> You'd want to show everyone how much money you have, talk about
> money, dress in the nicest clothes, make sure everyone knows you've got
> the most expensive car, the expensive house, come from a well-to-do
> family, let people know you always have cash.  It would be completely in
> line to say you would always pay with big bills, because it makes you look
> like you have more money when you go to buy a candy bar.  "Can you
> break a hundred?  That's the smallest I have."  That was the type of
> flashiness.

RT 18830.

5.  The prosecutor *began* his closing argument by focusing on this opinion

evidence as to character, arguing that it proved Ewell was the greediest person in the history of mankind: "I submit to you that Dana Ewell wanted to be rich like no one that has come before him or no one who will come again." RT 21412. He then quoted Tapia's comment that, as to a passion for money Ewell was an eleven on a scale of ten; Goolkasian's description of Ewell as the person who most judged life by money; and Poindexter's comments that Ewell was the greediest person he had ever met in his life, that he paid for candy with hundred dollar bills, and that he would do anything he could to acquire money. RT 21414-15; *see also* RT 21422 ("the guy behind me here is absolutely ill when it comes to his . . . love of money"). The prosecutor repeated this line of attack later in his closing, again discussing the inadmissible opinion evidence. He described Poindexter, Tapia, and Goolkasian "as the three people closest to Mr. Ewell from high school to the time of the murder," and again read into the record Goolkasian's description of Ewell as more obsessed with money than anyone she had ever known. RT 22192.

6. The aforecited opinion testimony as to Ewell's character was barred by the California Evidence Code. *See* Evidence Code § 1101(a) ("[E]vidence of a person's character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.").[2] *See also People v. Alcala*, 36 Cal.3d 604, 631

---

[2] The statute delineates several exceptions, none of which are applicable herein.

(1984); *People v. Walkey*, 177 Cal.App.3d 268 (1986) (evidence that defendant had been beaten as a child was invalid character evidence where it was introduced to prove defendant suffered from "battering parent syndrome"); *People v. Wagner* 13 Cal.3d 612, 618-619 (1970) (evidence of bad acts inadmissible simply to impugn defendant's character); *People v. Terry*, 2 Cal.3d 362, 400 (1970) (attempt by codefendant to introduce evidence that defendant was found unfit to have custody of her child and that she was guilty of welfare fraud was "plainly impermissible").

This categorical bar is consistent with the longstanding common-law rule on the subject. *See Michelson v. United States,* 335 U.S. 469, 475-76 (1948) ("Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt."). More to the point herein, the admission of such testimony in this case violated Ewell's constitutional rights to due process and a fair trial. *See, e.g., McKinney v. Rees,* 993 F.2d 1378 (9th Cir. 1993) (holding that erroneously admitted bad character evidence violated not only California rules of evidence, but Due Process Clause and *Brecht* standard as well).

7. There are several indicia of the devastating impact this error had on the jury's verdicts, which also represent the reasons why the error rises to the level of a federal constitutional violation. First, the character evidence is inherently prejudicial and inflammatory by its nature – opinions that Ewell was the greediest man in the history of

mankind could not be anything but.  Second, it necessarily had a substantial effect on the verdict in this case in which no direct evidence tied Ewell to the charged crimes and the jury announced a deadlock as to his culpability.  Third, as outlined above, the prosecutor enhanced the prejudice by his use of the evidence in his closing argument.  Fourth, the prosecutor himself characterized the import to his case of this character evidence.  *See, e.g.,* CT 8 ("Ewell's love of money . . . is central to the prosecution's theory of the murder").  Fifth, the *admissible* evidence was wholly at odds with the prosecutor's stated purpose for introducing the character evidence, namely, to prove a love of money so grotesque as to overcome the human disinclination to murder one's parents.  The admissible evidence established that Ewell, by all appearances, had a happy relationship with his father and mother and that they were generous with him, including providing him substantial funds for his upkeep and setting up a trust in his name.  *There was no proof of the slightest conflict regarding money between the parents and Ewell.*

Moreover, even if the error is not so prejudicial, standing alone, to constitute a due process violation, it served to render the trial fundamentally unfair in combination with the other cited errors.  *See* Claim No. 6, *infra.*

8.  Despite the clarity of California's absolute bar against negative character evidence in the form of opinion or reputation testimony in the prosecution's case-in-chief, the state appellate court rejected this claim of error.  That court advanced two procedural grounds to avoid addressing the claim on its merits, neither of which can

withstand habeas scrutiny.  First, it purported to find a procedural default because "[t]here was no timely and specific objections on [California Evidence Code] section 1102 grounds."  Ex. A at 132.  It is section *1101*, however, that renders the opinion evidence concerning character inadmissible, and the state court implicitly conceded the preservation of that claim.  *See id.* ("discussion between the court and counsel centered on the requirements of . . . section 1101").  Section 1102 is an exception to the blanket rule of exclusion, providing that certain opinion and reputation evidence "is not made inadmissible by section 1101" under certain circumstances.  Thus, if the prosecution wished to overcome Ewell's proper section 1101 objection by invoking section 1102, it was *its* burden to do so (which it could not have done in any event because the circumstance under which the section 1102 exception applies to the prosecution – permitting it to introduce opinion and reputation evidence of character to rebut defense character evidence – was plainly inapplicable herein, where Ewell introduced no character evidence).  Thus, this claimed waiver cannot constitute an adequate state ground such as to trigger a federally cognizable default.  Quite obviously, there is no firmly established and regularly followed state procedural rule that requires a defendant to expressly cite the wrong statutory authority in support of his claim of error.[3]

_____

[3] It is instructive to contrast the state appellate court's discerning a waiver in these circumstances with its decision to permit the state to argue a new theory for the first time in its interlocutory challenge to the trial court's suppressing the clone pager evidence, discussed above in Claim No. 2.  Although a California procedural rule prevents the state from advancing a new theory upon which to uphold a search

The state appellate court's second procedural justification for avoiding the presented issue on its merits was that Ewell made a tactical choice "that, if evidence of greed and passion for money was going to be admitted from Tapia, Goolkasian, and Poindexter, it be elicited in the form of an opinion and *not* specific acts." Ex. A at 133. Since, in that court's view, evidence of greed in the form of specific acts was admissible, the issue, again, was waived. *Id.* Ewell, however, properly objected to *all* evidence of his purported greed, expressly including opinion evidence. His global objection having been overrruled, the fact that he succeeded in negotiating a limitation of some of that objectionable evidence cannot fairly and reasonably be held to constitute a waiver of his global objection, particularly when, as the Court of Appeal noted, Ewell's counsel stated that there were no "agreements" as to what was admissible between the prosecutor and himself. *Id.* at 118. In short, it was objectively unreasonable to discern a waiver in these circumstances, and this Court should not recognize it to defeat review of the merits of this claim.

### Claim No. Five

The trial court violated Ewell's federal constitutional rights, guaranteed by the

---

for the first time on appeal (*People v. Hamilton*, 71 Cal.2d 176, 182 (1969)), the appellate court permitted the state to argue for the first time that Title III's suppression remedy was inapplicable herein because that issue had been "at least in the air" below. Ex. A at 82. Although it should hardly need repeating, "We should not have one rule for the prosecution and another rule for the defense." *United States v. James*, 169 F.3d 1210, 1214 (9th Cir. 1999).

Fifth, Sixth, and Fourteenth Amendments, to the assistance of counsel, due process, and a trial by an impartial jury when, without notice to the defense, it provided a tape recorder to the jury after it had announced that it was deadlocked with respect to one of the two codefendants (whom we now know was Ewell), the jurors then listened to a tape recording, the greatest part of which had not been admitted into evidence, and, thereupon, convicted Ewell.  This claim is based on the following:

1.  During the state's investigation, police officers both overheard and tape recorded statements made by Radovcich as he spoke on pay telephones.

2.  Prior to trial, Ewell moved to exclude all of the tape recordings on the ground that they were insufficiently intelligible and, consequently, unreliable.  CT 3024.  The trial court denied the omnibus motion, ruling that the admissibility question would be answered on a tape-by-tape basis as the issues arose in the course of trial.  RT 10342-43.

3.  In admitting a tape of a Radovcich phone conversation of April 1, 1993, the trial court ordered that, should the jury desire to review its contents during deliberations, "it will be done in the courtroom."  RT 16308.  The court was unambiguous about this ruling with respect to the jury's listening to tape recordings during deliberations, articulating it on three other occasions.  *See also* RT 12119, 17329, 19730.

4.  The state's theory was that, on May 14, 1993, the police overheard a lengthy phone conversation between Radovcich and Ewell.  RT 10435-36, 16930, 16933, 16940.  Officers testified that they overheard Radovcich say, among other things, "Don't worry

about it. She doesn't know anything. She's about to burst. She can't say anything. She won't"; "I miss you. They think they got something, you know, evidence. They need to make an arrest. Politically they need it. Just play the game. I think it's going well. I advise you not to talk to them. They blew it. They blew it at the first"; "They can't tap your phone. It's against the law in this country. If you love me, you won't say anything. They spread lies. They hope to trip you up. They try to catch you in a lie. If you talk to them, they'll mix you up and twist your words"; "They need to make an arrest to take the political heat off of them. They don't have evidence. They will try to catch you in a lie. They might try to plant evidence. They plant marijuana"; and "They are going to lock you up. I can't be around you." RT 16937-38, 17007-11.

5. Ewell contested the notion that it was he speaking to Radovcich when the latter made those statements. One of the officers testified that she had heard three telephone conversations in the course of that surveillance. RT 16931, 16965. Another indicated in his report that there were four conversations. RT 17079. Phone records indicated that two calls were placed from the phone being used by Radovcich to other locations connected to him, at which surveilling police understood Ewell was not present at the time. RT 16882, 16908-10.

6. Radovcich's attorney played a short portion of the tape recording of May 14, 1993 during his cross-examination of one of the surveilling officers. RT 16988. He had the tape, which contained about an hour's recording, marked as Exhibit 633. RT 16986-

87.  Following his playing of the short excerpt, the tape was marked as follows: "Exhibit No. 633, Tape-recording, marked for identification and received into evidence."  RT 16987.  No counsel at any point in the trial claimed that the remainder of the tape other than the played short excerpt was relevant or admissible, nor was any other portion of this tape played for the jury in the courtroom during the taking of evidence.

7.  Ewell's attorney prepared a separate tape composed of portions of the May 14th recordings and played portions of it during cross-examination of one of the surveilling officers. RT 16699, 17029, 17030, 17049.  This tape was marked as Exhibit 634.  RT 16996-97.

8.  Deliberations began on April 28, 1998.  CT 5062.  On May 8th, following eight full days of deliberations, the jury foreman requested to speak with the trial judge. RT 22473.  The foreman recounted for the judge a statement made by another, unidentified juror – "'I have felt from day one that this case never should have come to trial.  There was insufficient evidence to have a trial.  I would have done more investigation.'" (RT 22492) – and indicated that another juror had felt that this statement was a problem (*id.*).  Because the foreman expressed his own belief that it was no longer a problem, the court rejected the prosecution's request for further inquiry (RT 22516), and deliberations continued.  Shortly after 9:00 a.m. on the morning of May 12th, the eleventh day of deliberations, the jury returned a note, informing the court that it had reached a verdict as to one defendant, but was unable to reach one as to the other.  RT

22521.  Shortly before 11:00 a.m., as the court was discussing with counsel how to proceed in light of the note, the bailiff sought to approach the bench and an unreported bench conference ensued between the bailiff and judge.  RT 22526.  The court then made the following statement on the record:

> There's one thing I would like to mention to the parties, that . . . shortly after receiving the note from the jury, they did ask for a tape recorder, which was sent in to them.

RT 22527.  This was the first that defense counsel heard of this event, which had occurred at the most critical and delicate juncture of the jury's deliberations.

9.  At 11:40 a.m., the court convened again to consider an additional note: "If we find that a principle [sic] used a firearm in the commission of the crimes and another was not present can the Defendant that was not present be equally guilty of using a firearm, if found to be a co-conspirator and aider and abettor?"  CT 5079-80.  At 11:45 a.m. the court responded by rereading various instructions.  CT 5080; RT 22530.  The court then addressed the foreman: "[A]fter I received the [note indicating a verdict as to one defendant and a deadlock as to the other] the jurors asked for a tape recorder, which was sent in.  Is that functioning – did that function properly?"  The foreman stated that the recorder functioned (RT 22533) and the jurors returned to deliberate.  At 12:10 p.m., the jurors returned to the courtroom with guilty verdicts against the two codefendants.  CT 5080.

10.  Following a declaration of mistrial as to the penalty phase, and discharge of

the jury, the court examined the jury foreman as to the circumstances of the deadlock:

> COURT: Juror Number 32 [the foreman], the day the verdict was reached, with respect to the guilt phase of the trial, as I recall, it was about 10:00, or a little before, we received a note from the jurors that they were unable to – that they had reached a verdict on one Defendant and unable to reach a verdict on the other. Do you recall that?

> JUROR: Yes, your Honor.

> COURT: And then while we were timely summoning the attorneys, we then received a request from the jury to explain the distinction between personally using a firearm and being armed with a firearm. And then after that, the jurors wanted some additional time. And then they rendered verdicts on the guilt phase.

> I just wanted to make this inquiry, which I couldn't make, or shouldn't make, at any earlier time, as to whether there was a change in the – in the vote as to pertaining to one of the Defendants between when that note was sent in and the verdicts rendered.

> * * *

> JUROR: It came down to there at the end, and we had the impression that the juror – that there was, yes, only one holdout. Everyone was very respectful of that juror. So we felt that any more pressure, any more discussion, probably would not be productive. And, in essence, we decided to return it to the Court, that we had a situation where we couldn't make a decision.

> But as the note was being passed to the Bailiff, the juror in question said that, no, he was not comfortable with his vote, and if he could have a little more time to talk, that it appeared through his conversation that he was not comfortable with his vote.

> So we decided that we'd take whatever time he wanted.

> *And what it basically amounted to was he, we, needed to listen to a tape. We listened to that tape. We had some more discussion. And that individual decided that that individual wanted to change his vote.*

RT 24148-51 (emphasis added). In this colloquy, the foreman also revealed that the

original votes as to Ewell were 9-3 for a guilty verdict, which then narrowed to 11-1 at the time that the jury reported the deadlock.  RT 24152.  The foreman also made clear that the tape they had listened to following the deadlock was of the May 14th conversations.  RT 24155.

11.  The trial court's sending the tape recorder into the jury room without notice to defense counsel, after the jury had announced it was deadlocked, and permitting the jury to listen in an unsupervised manner to a tape, of which only the smallest portion had been admitted into evidence, violated Ewell's Sixth Amendment right to the assistance of counsel during deliberations and his due process right to be present at every critical stage of the proceedings.  The jury's listening to the tape, the vast majority of which had not been admitted into evidence, violated Ewell's Sixth Amendment rights to confront the evidence against him and to a trial by impartial jurors.  The record proves that these violations had a substantial and injurious effect or influence in determining the jury's verdict – the jury foreman explained, unambiguously, that the holdout juror listened to the tape, and that caused him to change his mind.

12.  The state appellate court rejected this claim on both procedural and substantive grounds, but, yet again, these cannot withstand habeas scrutiny.  The state procedural rule upon which the court relied to find waiver was not "firmly established and regularly followed" in California and, therefore, cannot predicate a federally cognizable default (*see Ford v. Georgia,* 498 U.S. 411, 423-24 (1991) (setting standard))

because the claim of violation of a defendant's right to assistance of counsel at critical stage of proceeding, has been held non-waivable by California courts (*see, e.g., People v. Knighten,* 105 Cal.App.3d 128, 132, 164 Cal.Rptr. 96 (1980) (so holding where critical stage at issue was discussion as to what testimony was to be re-read to the jury)). The court treated the misconduct of the jury's listening to evidence that had not been admitted at trial as if it were an ordinary trial evidentiary error, and not as the constitutional violation it was.  Its reasoning was logically untenable in several additional respects, including its (1) treating the sending of the tape to the jury, rather than the tape recorder, as the critical moment for purposes of its analysis; and (2) relying on the presumption that jurors follow instructions, specifically, the one admonishing them to decide the case based upon the evidence received at trial, despite the fact that the jury had no way of determining that only a portion of the tape was evidence.  The court unreasonably placed the burden on Ewell to prove the portions of the tape to which the jury listened, though federal law established no such burden.  The court's harmless-error analysis was, perhaps, the most unreasonable of all – it found "manifestly" harmless the listening to the tape that the record unequivocally revealed *caused* the jury to convict. Finally, the court unreasonably and contrary to the record found as fact that the entire tape had been admitted into evidence.

13. Ewell's constitutional rights were violated by the precipitous action taken by the trial court in countermanding its rulings regarding the jury's proper use of the

1  evidentiary portion of the tape, and the jury's resolving the question of Ewell's guilt in

2  reliance thereon.  Because of the unreasonableness of the state appellate court's

3
4  resolution of the issue, Ewell meets the gateway tests of section 2254(d).

5                               **Claim No. Six**

6          As a result of the combined prejudicial effect of the errors cited in the five claims,

7
8  *supra*, Ewell's constitutional rights to due process and a fair trial, guaranteed him by the

9  Due Process Clause of the Fourteenth Amendment, were violated.  This claim is based

10  on the following:

11
12          1.  This Court may grant Ewell habeas relief even should it conclude that none of

13  the cited errors, standing alone, constitutes a sufficient basis to do so.  *Cf. Phillips v.*

14  *Woodford,* 267 F.3d 966 (9th Cir. 2001) (colorable claim of such combined effect in

15  habeas petition warrants evidentiary hearing).  As stated in *United States v. Kladouris*,

16
17  739 F.Supp. 1221, 1230 (N.D.Ill. 1990), in the context of an ineffective assistance claim

18  based on numerous alleged errors of counsel:

19
20          [N]one of the errors made during the trial stand by themselves.
            Sometimes, no single specific error of counsel is sufficiently bad to justify
21          a new trial.  But, when considered cumulatively, enough "not-too-bad"
            errors can amount to one very bad trial.  See *Kubat v. Thieret*, 867 F.2d
22          351, 370 (7th Cir. 1989) (it is appropriate to consider combined effect of
            counsel's errors in determining whether counsel's representation was
23          constitutionally ineffective).

24          2.  The Ninth Circuit court found such a very bad trial in *Harris By and Through*

25
26  *Ramseyer v. Wood*, 64 F.3d 1432 (9th Cir. 1995).  After affirming the notion that

27
28  **Petition for Writ of Habeas Corpus**              46

"prejudice may result from the cumulative impact of multiple deficiencies," the court

found such cumulative prejudice in affirming the grant of habeas relief, obviating the

need "to analyze the individual prejudicial effect of each deficiency." *Id.* at 1438-39; *cf.*

*Mak v. Blodgett,* 970 F.2d 614, 622-25 (9th Cir. 1992) (refusing to decide whether

individual errors alone meet prejudice standard since cumulative errors of counsel's

failure to introduce mitigating evidence, trial court's refusal to admit exculpatory

evidence, and instructional error entitled petitioner to habeas relief).

 3.  The prejudicial impact of the cited errors rendered Ewell's trial fundamentally

unfair.  In determining whether it agrees, this Court should consider *all* the prejudicial

circumstances of the case, including not only those it may not deem individually

prejudicial, but also those it may not even deem individually cognizable on collateral

review and those it may not even deem rise to the level of "error."  *Cf. Taylor v.*

*Kentucky*, 436 U.S. 478 (1978) (reversing due to cumulative errors denying defendant a

fair trial without assessing harmfulness of each individual error, without determining

whether particular error was of constitutional dimension, and, with regard to at least one

issue – the trial court's refusing to instruct that indictment is not evidence – without

determining whether it was even error at all); *United States v. Wallace,* 848 F.2d 1464,

1476 n.21 (9th Cir. 1988) (considering error not preserved at trial and itself not plain

error under cumulative error analysis); *United States v. Berry,* 627 F.2d 193, 201 (9th

Cir. 1980) (considering, for purposes of cumulative error analysis, whether errors and

**Petition for Writ of Habeas Corpus**                    47

misconduct already held not to amount to reversible error nonetheless denied defendant

a fair trial, stating, "If we find a residue of prejudice, we will take it into account");

*United States v. Rivera,* 900 F.2d 1462, 1470 n. 6 (10th Cir. 1990) (when aggregating

errors, if *any* error is constitutional, then aggregate error should be reviewed under

harmless beyond a reasonable doubt standard).

4. For *all* the reasons stated above, Ewell was not afforded a constitutionally fair

trial. In such circumstances, "a balkanized, issue-by-issue harmless error review would

[not] be very enlightening in determining whether [he was] prejudiced by the errors."

*United States v. Wallace,* 848 F.2d at 1476. It suffices that the accumulation of

prejudicial circumstances denied him a fair trial. There is, most assuredly, such an

accumulation herein.

//

//

//

//

//

WHEREFORE, this Court should (1) issue a writ of habeas corpus to have Ewell brought before it to the end that he may be discharged from his unconstitutional confinement and restraint; (2) conduct an evidentiary hearing; and (3) grant such additional relief as may be appropriate and dispose of the matter as law and justice require.

Dated: February 17, 2006                    Respectfully submitted,

                                            RIORDAN & HORGAN
                                            GARY K. DUBCOFF


                                            _____/s/_____
                                            By: Dennis P. Riordan

                                            Counsel for Petitioner
                                            DANA JAMES EWELL

## VERIFICATION

I, Dennis P. Riordan, hereby declare under penalty of perjury that I am counsel for petitioner Dana James Ewell, that I am authorized to file the instant petition for writ of habeas corpus on his behalf, that I have reviewed the factual assertions contained herein, and that I believe them to be true.

Executed this 17th day of February, 2006, in San Francisco, California.


                                            _____/s/_____
                                            Dennis P. Riordan

1

2

**PROOF OF SERVICE BY MAIL -- 1013(a), 2015.5 C.C.P.**

3

**Re: Ewell v. Scribner No.**

4

    I am a citizen of the United States; my business address is 523 Octavia Street, San

5

Francisco, California 94102.  I am employed in the City and County of San Francisco,

6

where this mailing occurs; I am over the age of eighteen years and not a party to the

7

within cause.  I served the within:

8

**NOTICE OF PETITION AND PETITION FOR
WRIT OF HABEAS CORPUS BY A PERSON IN STATE
CUSTODY UNDER 28 U.S.C. § 2254; EXHIBITS**

9

10

on the following person(s) on the date set forth below, by placing a true copy thereof

11

enclosed in a sealed envelope with postage thereon fully prepaid, in the United States

12

Post Office mail box at San Francisco, California, addressed as follows:

13

14

Connie A. Procter                          Dana Ewell, P-04759
Deputy Attorney General              Corcoran California State Prison

15

2550 Mariposa Mall, Room 5090   P.O. Box 3476; 4A4R-57L
Fresno, CA 93721                          Corcoran, CA 93212-3476

16

17

**[x] BY MAIL:**   By depositing said envelope, with postage thereon fully prepaid, in the

18

United States mail in San Francisco, California, addressed to said party(ies);

19

**[ ] BY PERSONAL SERVICE:** By causing said envelope to be personally served on

20

said party(ies), as follows:   **[ ] FEDEX      [ ] HAND DELIVERY**

21

    I certify or declare under penalty of perjury that the foregoing is true and correct.

22

Executed on February 17, 2006 at San Francisco, California.

23

24

25

_____/s/_____

26

Jocilene Yue

27

28