COURT OF APPEAL
FIFTH APPELLATE DISTRICT
FILED

MAY 4 - 2004

KAY FRAUENHOLTZ
CLERK/ADMINISTRATOR

By_____
                            Deputy

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DANA JAMES EWELL et al.,<br><br>Defendants and Appellants. | F031391<br><br>(Super. Ct. No. 546222-1)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Frank Creede, Judge.

Dennis P. Riordan, Dylan L. Schaffer and Donald M. Horgan, for Defendant and Appellant Dana James Ewell.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant Joel Patrick Radovicich

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves. Assistant Attorney General, Robert P. Whitlock and Leah Ann Alcazar and Connie A. Proctor, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellants Dana James Ewell and Joel Patrick Radovcich stand convicted, following a jury trial, of the first-degree murders of Glee, Tiffany, and Dale Ewell (Pen.

Code, § 187; counts one-three).[1] Radovcich was found to have personally used a firearm (Pen. Code, § 12022.5, subd. (a)), and Ewell to have been armed with a firearm (Pen. Code, § 12022, subd. (a)(1)), during commission of the offenses. Financial-gain, multiple-murder, and lying-in-wait special circumstances (Pen. Code, § 190.2, subds. (a)(1), (a)(3), (a)(15)) were found true as to each appellant. The prosecution originally sought the death penalty, but, after the jury deadlocked on the issue, elected to forgo retrial of the penalty phase. Accordingly, Ewell was sentenced to three consecutive terms of life in prison without the possibility of parole plus two consecutive one-year terms for the arming enhancements, while Radovcich was sentenced to three consecutive terms of life in prison without the possibility of parole plus two consecutive five-year terms for the firearm use enhancements. Both were ordered to pay restitution fines of $10,000. Both filed timely notices of appeal and now raise various claims of error. We will affirm.

## FACTS

### I

### THE HOMICIDES AND CRIME SCENE

Dale and Glee Ewell and their children, Dana and Tiffany, spent Easter weekend of 1992 at the family beach house at Pajaro Dunes, near Watsonville. They arrived at varying times on Thursday and Friday, as Tiffany and Glee drove over from Fresno; Dale, who, with Glee, owned an aircraft sales business at the Fresno Air Terminal called Western Piper, flew over from Fresno; and Ewell drove down from Santa Clara University, where he attended school.

---

[1]    For the sake of clarity, members of the Ewell, Radovcich, and Zent families sometimes will be referred to by their first names. No disrespect is intended. Appellants will be referred to as Ewell and Radovcich or, collectively, appellants.

2.

On Easter Sunday, April 19, Ewell and Dale played tennis together in the morning, then the family had lunch and took a walk on the beach. Ewell left around 2:15 or 2:30 p.m. and drove to the Morgan Hill home of girlfriend Monica Zent. He remained there with Monica and her family until sometime that evening, when he and Monica returned to school.

Ewell assumed his mother and sister left the beach house shortly after he did. Dale returned to Fresno by plane, arriving at the Fresno Air Terminal just before 3:30 p.m. He telephoned Marlene Reid, Western Piper's business manager, from the office sometime around 4:00 p.m. However, when Ewell telephoned his family at home that evening, no one answered. He was unable to reach anyone when he telephoned again on Monday, and Dale neither appeared at his office that day nor maintained his usual contact with Reid.

On Monday, Ewell expressed concern to John Zent (Monica's father and an FBI agent) and Marlene Reid about his inability to contact his family. However, despite Reid's advice that he contact his parents' neighbor and ask that person to check the house, he did not do so until Tuesday morning, when Reid insisted after Dale again failed to arrive at work.

Shortly after 9:00 a.m. on Tuesday, April 21, the bodies of Dale, Glee, and Tiffany were discovered in their residence on East Park Circle Drive, in the Sunnyside area of Fresno. Tiffany was lying face down on the kitchen floor. She had been shot once in the back of the head with the bullet exiting her forehead. Dale was lying face down in the hallway. He had been shot once in the back of the neck with the bullet exiting below his right eye. Glee was lying partially on her back and partially on her left side in the office. She had been shot four times, including once just below the eye with the bullet exiting the back of her head. Rigor mortis and lividity had set in as to all three victims, each of whom appeared to have been shot at the location at which he or she fell. Although the pathologist could not determine the order in which Glee's wounds were inflicted or in

3.

which the victims were killed, authorities theorized that the women had returned home first and entered the house together or one right after the other. Tiffany was shot first, having been taken by surprise when she passed the killer's location; the killer then emerged and shot and wounded Glee, who retreated into the office, where she was killed. Dale was killed last, and later than the women. Times of death were estimated at between approximately 5:00 and 6:00 p.m.

Law enforcement personnel suspected that the murder weapon was a nine-millimeter firearm. As such weapons are usually automatics, shell casings should have been ejected and found at the scene. None were. However, a box of nine-millimeter Winchester cartridges, containing 18 rounds of ammunition, was found in the master bedroom, and an unexpended round was located on the master bedroom floor. Analysis of the lead bullets and tool marks showed that the bullets recovered from the crime scene almost certainly came from this box of cartridges.[2]  Subsequent investigation revealed that Dale had purchased the box of ammunition, together with a nine-millimeter Browning pistol, in 1971. The pistol, which should have been in the residence, was missing.

While there did not appear to have been any struggle, the house had been ransacked, as if burglarized. However, law enforcement authorities concluded the burglary had been staged and the victims killed for a reason. There were no signs of forced entry, and all doors and windows were secured, with the exception that the front and back doors were unlocked when sheriff's personnel arrived. The skylights did not

---

[2]     The bullet which killed Dale was never recovered. Marks at the scene indicated it most likely was a nine millimeter, although it could have been a .380.

appear to have been disturbed.  The alarm, which was normally armed, was not on and had not been triggered.[3]

## II

## INVESTIGATION AND SURVEILLANCE OF APPELLANTS

The Ewell estate was worth between $7 and $8 million.  Ewell was aware of this, as he had typed a statement of net worth for Dale on or about April 1, 1992.  Had Tiffany lived, she and Ewell each would have inherited half of the estate.  With her dead, Ewell, who was 21 years old at the time of the homicides, was the sole beneficiary.

Under Dale's and Glee's wills, the estate was distributed to a trust.  Until Ewell turned 25, the amount paid out to him was discretionary with the trustee, who was obligated to pay enough, from income or principal or both, to support and educate Ewell.  Between ages 25 and 30, all income would be paid to Ewell, although any payment from the principal would remain discretionary with the trustee.  At age 30, one-half of the principal would be distributed to Ewell, with the remaining half distributed to him at age 35.  When his uncle obtained a copy of the will shortly after the bodies were found and informed Ewell that it contained no burial instructions, Ewell said something like "'Well, okay, but what about the money?'"  When informed of the basic provisions, including the age stipulations, Ewell became visibly shaken and angry.  He pounded on a table as he lurched or lunged out of his chair, and asked why his father had done that.

Immediately after the homicides, Ewell resided with one of his uncles.  He moved out of the house within a couple of weeks and told Michael Dowling, the estate's executor, that he was staying with a friend in the neighborhood.  He specifically said he

---

[3]     On the Friday following the homicides, the house was turned over to Ewell.  He was seen retrieving what he later admitted was a house key from a shed in the back yard.  Habitually, only a key to the shed was kept there.

was not living in the Park Circle Drive house. Within a month after the funeral, however, Ewell gave friend Michael Poindexter a tour of the Park Circle Drive residence. Ewell was living in the house at the time, despite the fact only some cleanup work had been done and bullet holes, blood, and possible brain splatterings were still visible. Referring to the investigators assigned to the case, Ewell told Poindexter, "'They will never solve this case. They're a bunch of dummies.'" Ewell also advised Poindexter that he (Poindexter) did not have to talk to the detectives.

As part of their investigation, Sheriff's Detective John Souza and his team set out to obtain background information on Ewell, as well as to look at other possible suspects. In the course of this investigation, Radovcich's name was mentioned as being a friend of Ewell's from college. Souza and Detective Burk contacted Radovcich on May 7, 1992, while they were in the Los Angeles area. When Souza identified himself and advised that he was working a triple homicide case in which the parents of a Santa Clara student were victims, Radovcich acknowledged that he knew Ewell and had heard about the murders. When Radovcich asked why Souza wanted to talk to him, Souza explained that he understood Radovcich to be a good friend of Ewell's, and that he was conducting a background investigation on Ewell. Radovcich asked, "'Are you going to arrest me?'" When Souza said no, Radovcich agreed to the interview.

The meeting took place the next day. Almost immediately, Radovcich brought up his prior question about being arrested. He explained that he had thought they were cops from Santa Clara and were harassing him. Radovcich related that he first met Ewell in fall of 1990, when they lived in the same dormitory at Santa Clara University. Radovcich said they were friends and would "hang out" together, but that their friendship was limited to school and they did not communicate outside of the school setting. Radovcich said he had been to Fresno one time, in spring of 1991, and that he had met Ewell's parents at the Park Circle Drive residence. Radovcich also related that he had spent a couple of days at the beach house with the Ewell family. He said that his last contact

with Ewell was in the winter quarter of 1991, and that he had not been to Fresno since his graduation from college in December 1991. When asked his whereabouts on Easter Sunday, April 19, 1992, Radovcich replied that he was at Hamrick's Paint and Body Shop. Radovcich related that Ewell had once said he had his own airplane business, although Radovcich knew Dale was the true owner of that business.

Further investigation revealed a much more extensive, long-standing relationship between Radovcich and Ewell than Radovcich revealed. According to school records, Radovcich began attending Santa Clara University in the fall of 1988, while Ewell's attendance began in fall of the following year. Prior to spring quarter of 1991, their course loads were within the normal range. Beginning that quarter, however, both took much heavier unit loads than normal. On February 6, 1991, Ewell exercised his right under federal law and requested permanent nondisclosure of all academic records. On June 10, 1991, Radovcich made a similar request. Fewer than one percent of enrolled students request nondisclosure in either temporary or permanent form. Radovcich graduated in December 1991. Ewell withdrew from the university on April 30, 1992, but returned in the spring quarter of 1993 and graduated in June of that year. Although Ewell requested that his name appear in the commencement program, he had the university maintain his nondisclosure status until October 11, 1994.

During the first week of June 1992, Radovcich was seen at the Park Circle Drive residence when Ewell was not present. He appeared to be living there and had his clothing in the master bedroom.

Sheriff's Department surveillance of Ewell began on June 25, 1992 and continued, off and on, until Radovcich's arrest. Surveillance conducted in June 1992 revealed that Ewell was living at the Park Circle Drive residence, and that Radovcich stayed there at least part of the time. When the men went somewhere together, Ewell drove his Mercedes or one of the family vehicles. Places they went together included banks, Michael Dowling's office, Western Piper, and property that was part of the Ewell estate.

Ewell also went to some of those places alone. At times, he employed countersurveillance driving techniques. Ewell and Radovcich were also observed separately going to Corporate Air for helicopter lessons.

In order for Ewell to assist in compiling family financial records, Michael Dowling gave Ewell access to an office in Dowling's building and provided a telephone there that Ewell was authorized to use for business affairs. During the first couple of months following the homicides, Ewell was at the office almost every day. Telephone records for the office for May through July 1992 showed telephone calls to the residences of Radovcich's mother, brother, friends, and Hamrick's Paint and Body.

On November 20, 1992, Ewell came to the sheriff's department to retrieve a handgun that had been removed from the Park Circle Drive residence during the initial investigation. During the course of the conversation, detectives said they were concerned about Radovcich and wanted to talk to Ewell about him. Ewell responded, "'I'm out of here. I got what I want.'" He then jumped up from his chair. When Detective Burk told Ewell they needed his cooperation, Ewell replied, "'I have been.'" He then left.[4]

That same month, an article appeared in the Fresno newspaper which talked about authorities attempting to find a certain person in connection with the homicides. At the time this article appeared, housekeepers noted that Radovcich was staying at the Park Circle Drive residence with Ewell. It appeared Radovcich was staying in the master bedroom, while Ewell occupied his own room. There was a pistol on one of the nightstands in Ewell's room, and another handgun on a nightstand in the master bedroom.[5] At this time, Radovcich's hair was a dark color and fairly short.

---

[4]     Detectives were aware that Ewell was represented by Attorney Rick Berman, who had requested that any questioning of Ewell occur in his presence.

[5]     It was unclear whether both handguns were seen on the same occasion.

Housekeepers found empty hair dye bottles, latex gloves, and hair trimmings in the master bathroom, and what appeared to be paper ashes in a pot on the stove in the kitchen. They also observed Radovcich and Ewell looking at a map. After the article appeared, Ewell told his head housekeeper that he would no longer need her services, as he was going to sell the residence. Sometime later, he asked her to resume cleaning the home. When she did, Radovcich and his clothes were gone.

In early May 1992, bank accounts and insurance proceeds in the amount of $317,888.47, which were not part of the probate estate, were turned over to Ewell, as were a portion of Tiffany's approximately $119,000 in assets and some $375,000 in certificates of deposit. There was also a preliminary distribution from the estate, from which Ewell received various effects worth approximately $65,000 and his Mercedes. Although Michael Dowling did not permit Ewell to run Western Piper Sales as Ewell desired, Ewell was hired as vice president of the company at a salary of $2,000 per month. He held this position from May or June of 1992 until January 1994, when the business was sold.

Ewell's financial records revealed that, between April 1992 and March 1995, he withdrew a total of $124,153 in unaccounted-for cash from various accounts. This was cash which could not be traced to a specific expenditure or transaction. One bank's records revealed that most of Ewell's withdrawals from that bank were in $100 bills, with, secondarily, $50 bills. The other banks' records did not provide information concerning the denominations of withdrawals.

During the time Radovcich stayed at the Park Circle Drive residence, he and Ewell took helicopter lessons from Mazzei Flying Service. Ewell paid for both men's lessons with checks totaling $16,377.94. In addition, the flight school received cash payments from Radovcich totaling $3,400. Radovcich expressed an interest in pursuing his instrument rating and possibly his commercial rating. The minimum cost to obtain both would have exceeded $20,000. Although Radovcich started on the second part of his

9.

training, his last flight with Mazzei was on November 8, 1992. He subsequently informed the company that he was going to the Los Angeles area, and asked for a refund of the balance on his account. A check, which was made payable to Radovcich, was sent to the Park Circle Drive address. It was endorsed by Radovcich and Ewell and deposited into one of Ewell's bank accounts. Payments made to Mazzei on Radovcich's account totaled $11,489.61.

Between January 1993 and February 1995, Radovcich took airplane and additional helicopter lessons from various flight schools in the Los Angeles area. The cost of the lessons exceeded $21,000 and may have exceeded $33,000. Radovcich always paid cash, usually in $100 bills. It would have cost a minimum of $43,000 for Radovcich to obtain all of the flight certifications he possessed.

Radovcich had no known source of steady income. Prior to his graduation, his mother bought him a car. In December 1991, following his graduation, he moved back to the West Hills area and sporadically resided in the family home on Bobbyboyar. Radovcich's mother paid him for doing construction-type projects around the house, and also deposited small amounts of money into his checking account for food and similar items. Other than these amounts, she did not provide him with money from December 1991 to the time of his arrest. She heard he was working piecemeal at places during that time, but did not personally know if he had a job. To her knowledge, he had no other money available, except for a trust fund over which she exercised some control. Other than for his car, she did not provide any money to him out of that trust fund during the time in question. Friends and other family members did not know him to have a job aside from the work he did for his mother.

Despite his lack of funds, however, Radovcich was interested in finance while in college and frequently talked about being a millionaire. During the summer of 1991, he had books sent to the home of college acquaintance Thomas Duong. Some of the books, which were from Paladin Press, concerned building silencers and similar subjects.

10.

Radovcich asked Duong if he knew anyone who had a gun for sale. Radovcich said something along the lines of wanting an AK-47, but he did not want to go to a gun shop. Not long after, in October or November of 1991, Ewell began dating Monica Zent, who lived in the same school dormitory and with whom he had become friends during the fall quarter of 1990. It was common knowledge within the dormitory that Monica's father was an FBI agent.

As the authorities' interest in Ewell and Radovcich grew, they conducted extensive surveillance and investigation of the pair over the course of the years following the homicides. We present here a highly condensed version.

Surveillance of Radovcich was conducted in Southern California from February 1-4, 1993, and again from March 27-April 10, 1993. Ewell was not seen during either period. While under surveillance, Radovcich occasionally exhibited erratic driving habits which caused surveilling officers to believe he was trying to make sure he was not being followed.

During the course of their surveillance, officers learned that Radovcich frequently used pay telephones, especially those at the 7-Eleven at the intersection of Saticoy and Fallbrook in Canoga Park. While not far from his mother's residence, these were not the pay telephones closest to the house. On occasion, surveilling officers pretended to use the telephone next to the one being used by Radovcich, in an attempt to overhear his conversations. On at least one occasion, Radovcich's actions were consistent with his calling a pager.

Commencing April 1, 1993, sheriff's detectives obtained telephone records in conjunction with their surveillance operation. On April 1, during which time Ewell was living in a dormitory at Santa Clara University, Radovcich used one of the telephones at the Saticoy and Fallbrook 7-Eleven to make a brief call to Ewell's dormitory number. Several minutes later, he made a call to the pay telephone at a Shell station on The Alameda in Santa Clara.

11.

Approximately midway through Radovcich's conversation, which lasted around 30 minutes, Sheriff's Sergeant Hollis went to the pay telephone next to the one Radovcich was using and attempted to overhear the conversation. Radovcich expressed concern about staying there too long, as all "'they'" had to do was drive by and "'they'" might see him. He also asked whether the person to whom he was speaking was "'getting any heat yet.'" Later in the conversation, Radovcich said, "'Get this lawyer down here so it doesn't look like the buddy/buddy system, or something'"; "'I didn't tell them anything'"; and "'Can't you find anyone cheaper in Los Angeles, Fresno, or San Francisco?'" Portions of the conversation concerned flying, and at one point Radovcich mentioned a commercial license and asked the other person whether he or she wanted him to get his "'fixed wing'" while he had the time.

Later that day, Radovcich returned to the same telephone. He appeared to dial a pager number, then waited in his car. Telephone company records showed a call to Ewell's dormitory room. Approximately 10 minutes later, Radovcich returned to the telephone and placed a call to the Shell station on The Alameda in Santa Clara. Detective Lee pretended to use the telephone next to Radovcich in order to overhear the conversation. In addition, detectives attempted to record the conversation.[6] Lee heard Radovcich say that something was going to blow up; that there was going to be a news blitz; and that he had seen a newsman from Fresno whom he recognized and that he had had to drop out of sight and had stayed at his brother's house. At one point, Radovcich

---

[6]     Authorities attempted to tape-record a number of conversations. There was a great deal of background noise on many of the tapes, and efforts to enhance the sound quality were unsuccessful. For instance, Detective Lee described the April 1, 1993 tape as being mostly background noise, and of poor to fair quality. Many of the statements Lee recalled could not be heard on the tape, although he distinctly remembered Radovcich making them.

stated either that he did not want stock options or that he did not care. He also said something about "'[o]ne quarter million'" and that he wanted it now or needed it now or expected it by now. He also said, "'I want to go around the world.'" Radovcich appeared angry or frustrated at the end of the conversation.

Further surveillance during this time showed calls from Radovcich to Ewell's dormitory room and a pay telephone near the location of Ewell's classes. On April 5, Radovcich telephoned the office of Fresno attorney E. Terrence Woolf. Radovcich was overheard to say that he was a referral from Mr. Berman and needed to see Mr. Woolf about a homicide. Radovcich subsequently made a short call to Ewell's dormitory room. That afternoon, a call was made from Ewell's dormitory room to a general reception number for several attorneys, including Woolf. On April 8, three telephone calls, which were too long to represent the checking of answering machine messages, were made from Ewell's dormitory telephone to the Park Circle Drive house. On or about April 8, Radovcich personally paid Woolf $3,000 for attorney services. Woolf did not know where Radovcich obtained the money. Radovcich's parents did not directly provide these funds to Radovcich, although they did pay Woolf for legal services after Radovcich's arrest.

On the morning of April 12, 1993, Detectives Moore and Lyons spotted Radovcich in his vehicle in downtown Fresno. Radovcich's hair was radically altered from how he had worn it in Southern California; it was cut shorter and was now almost jet black instead of a lighter brown. The detectives followed him to the Park Circle Drive residence and then to the Santa Clara area. Radovcich tended to be a fast driver, and his highway speeds varied from 75-100 miles per hour or better. Upon arrival in Santa Clara, Radovcich used pay telephones to make various calls, including to Ewell's dormitory telephone. A short time later, Ewell arrived at Radovcich's location and they drove off together in Ewell's Mercedes.

13.

No visual surveillance was conducted on Ewell or Radovcich between April 12 and April 29, 1993, although telephone company records for the pay telephone at the Saticoy and Fallbrook 7-Eleven revealed several calls to Ewell's dormitory room during this time. In addition, on April 16, a call was made to Jack Ponce's pager in which the number dialed was followed by the number of Radovcich's pager. Radovcich and Ponce did not page each other often, and this was the first detectives knew of Ponce's existence.

Investigation revealed that on November 24, 1992, Radovcich obtained a pager, with statewide coverage, from Communication Headquarters in Los Angeles.[7] In April 1993, Detective Souza served a search warrant on the company which caused it to issue him a duplicate ("clone") pager so he could receive duplicates of the pages Radovcich was receiving. On April 21, Souza intercepted a page to Radovcich from the San Jose Jet Center, which was not far from Santa Clara University. Telephone company records for April 22 showed calls made from pay telephones at the Ranch Market at the intersection of Mesa and Irvine in Costa Mesa, to Ewell's dormitory telephone. The April 27 records for those telephones showed calls to a telephone booth at the San Jose Jet Center.

Souza did not utilize the clone pager between April 21 and April 27 because Radovcich returned to Communication Headquarters and expressed concern that someone might be receiving his pages. He inquired whether any police had been asking about him and was told no. Radovcich subsequently requested that the name on his account be changed to "Mike Smith" and that he be given a new pager number. This was done and, after Souza obtained a new search warrant, the new pager number was also

---

[7] Radovcich was carrying a pager by the beginning of his senior year in college. He obtained a pager and service from a Sunnyvale company on October 18, 1991. When service was terminated on July 15, 1992, Radovcich's refunded deposit was mailed to the Park Circle Drive address, per instructions given to the pager company. The refund check, which was made payable to Radovcich, was endorsed by Radovcich and Ewell.

transferred to him.  Souza maintained this clone pager through November 1993.  During April 1993, he intercepted pages to Radovcich from various pay telephones in Santa Clara and at the San Jose Jet Center.  Telephone company records showed that from April through June 1993, numerous calls were placed from pay telephones near Radovcich's various abodes in Southern California, to pay telephones in the Santa Clara area and to Ewell's dormitory room.

On April 29, detectives began further visual surveillance on Radovcich in the Southern California area.  On a number of occasions, he was seen using pay telephones at various locations.  On May 3, the surveillance team returned to Fresno, except for Detective Burk.  On one occasion, Burk, who had been provided with the clone pager by Souza, intercepted a page from the San Jose Jet Center.  He then saw Radovcich, who had been at his apartment, go to a particular 7-Eleven and use the pay telephone there. Telephone company records for the pay telephones at this location showed that on May 5, a call was placed to Ewell's dormitory room.  Approximately two hours later, Souza intercepted a page from a business center at 1520 The Alameda, Santa Clara.  On May 8, Souza intercepted pages from the same business center and another pay telephone in Santa Clara.

On May 12, 1993, detectives went to Santa Clara University to confirm Ewell's class schedule and see if he attended classes that day.  At approximately 1:45 that afternoon, Ewell spotted Detectives Curtice and Osborn and proceeded to follow them around campus in a very brazen manner.  Shortly after 2:30 that afternoon, Souza intercepted a page to Radovcich from a pay telephone in the San Jose Jet Center, and he asked detectives in the area to check the location.  At some point that afternoon, Ewell was observed using a telephone inside the San Jose Jet Center.

Around 8:05 that evening, Curtice and Burk, accompanied by Public Safety (campus police) Officers Scott and Molina, went to Ewell's dormitory room to speak to

Ewell. When Molina knocked, a voice asked who it was, and Molina identified himself. Ewell opened the door; Monica Zent was seated on the bed.

Burk told Ewell that they had information on who might have killed his parents. Ewell said he did not want to speak to them. When Burk again said they had information, Ewell responded that he felt it was not the right time to be bothering him in regard to this incident. After further conversation along the same lines, Burk asked whether Ewell was interested in finding out who killed his parents. Ewell said yes, but that he needed to make some telephone calls. Burk asked whom he was going to call; Ewell replied that he was going to call his attorney. After further conversation, Ewell reiterated that he did not wish to speak to Burk and Curtice there. He then asked Curtice whether he had enjoyed the campus, and when Curtice said yes, Ewell said he had made a report at the police department against the detectives for following him. When Curtice told Ewell to call when he was ready to hear their information, Ewell repeated that it was not the appropriate time or place, and asked how they would like it if somebody came banging on their door at 11:00 at night. Burk pointed out that it was only 8:00, and noted that they did this kind of thing all the time and that people generally want to get information about who killed their family members. Ewell then turned his attention back to the campus police officers and said he did not want to talk to Burk or Curtice, but wanted to talk to Scott and Molina.

Ewell started to shut the door, at which time Curtice said, "'By the way, just so you know, the information we have leads us to believe that Joel Radovcich is responsible for killing your family.'" Ewell immediately became quiet and appeared stunned. He then seemed to collect himself and said he still felt it was not appropriate to be discussing it at this particular time of the evening. He then shut the door, pretty much during the middle of that statement.

Approximately 15 minutes later, Burk and Curtice watched Ewell and Monica Zent exit the building and enter Ewell's Mercedes. Ewell drove to the public safety

16.

office and went inside for a few minutes, then got back in his car and left the area. A few minutes later, the Mercedes was observed entering the 880 freeway from The Alameda. Curtice followed Ewell into the far left lane. As they neared the first exit, Ewell suddenly pulled across the other two lanes of traffic and took the exit. Curtice could not follow safely, so he continued on the freeway.

At approximately 9:00 p.m., Souza intercepted a page to Radovcich that originated from the business complex at 1520 The Alameda. Detective Osborn responded to that location and observed Ewell hanging up the receiver on the pay telephone. His vehicle was parked alongside with the lights on. Monica Zent was seated in the passenger side of the vehicle. When Ewell hung up, he went directly to his car, exited the parking lot, and ultimately was seen driving northbound on The Alameda.

Two days later, on May 14, Detective Souza intercepted a page which originated from the Airport Holiday Inn, in Fresno.[8]  Radovcich was found at a pay telephone in Costa Mesa, telephone company records for which showed a 45-minute call to the Fresno Airport Holiday Inn.

Detective Knight, who was wearing a transmitting device called a wire, approached Radovcich's location and was able to place herself at the telephone around the corner from, but within three feet of, Radovcich, who was already on the telephone when the surveillance team arrived. Knight was only able to hear small patches of Radovcich's side of the conversation due to the telephone being located under an airport's jet take-off flight path. As a consequence, the tape recordings made from her body wire did not turn out well, and there were matters she could hear in person that could not be heard on the tapes.

---

[8]     Ewell's pilot logbook showed him flying from "SJC" to the Fresno Air Terminal and back on that day.

All told, Knight was able to hear portions of three conversations in which Radovcich was involved.[9] As she was unable to take notes while she was listening, it was possible she took sentences and attributed them to the wrong telephone call. As best as she could recreate the conversations, Radovcich said he was a little worried and was "'going to dis this place'" during the first conversation. The discussion turned to money; she heard the words "'stock market'" and "'values,'" as well as the sums $25 million and $1 million. This was over a period of several minutes, and then the conversation turned to an unrelated subject. Knight heard change go into the telephone on several occasions and then what she believed to be a hang-up and another number dialed. She had been there for approximately 20 minutes at that point.

During the second conversation, Knight heard Radovcich say, "'Don't worry about it. She doesn't know anything. She's about to burst. She can't say anything. She won't'"; "'I miss you. They think they got something, you know, evidence. They need to make an arrest. Politically they need it. Just play the game. I think it's going well. I advise you not to talk to them. They blew it. They blew it at the first'"; and something like, "'We have everything to lose and nothing to gain.'" During this conversation, Radovcich put money into the telephone several times, and Knight again heard what she believed to be a hang-up and a redial.

During the third conversation, Radovcich appeared to be pleading with the other person. Knight heard him say, "'They can't tap your phone. It's against the law in this country. If you love me, you won't say anything. They spread lies. They hope to trip you up. They try to catch you in a lie. If you talk to them, they'll mix you up and twist

---

9       Telephone company records showed a call to the Radovcich home on Bobbyboyar, followed by two calls to the apartment of Peter and Danielle Radovcich, Radovcich's brother and sister-in-law. Sergeant Dadian, who arrived at the location after Radovcich was already on the telephone, saw Radovcich make four telephone calls.

your words. Go have breakfast with Pete. I love you.'" He then hung up. Knight was there for a total of just under an hour.

In his vehicle, Sergeant Jones had a unit that recorded transmissions from Knight's body wire. In addition, Jones was listening to the transmissions and taking notes. At various times, he heard: "'They need to make an arrest to take the political heat off of them. They don't have evidence. They will try to catch you in a lie. They might try to plant evidence. They plant marijuana'"; "'Nothing to gain, everything to lose'"; "'You just don't think you'll win the game. If you care about me, I advise you not to talk to them'"; "'They are going to lock you up. I can't be around you'"; and "'My life is fucked. You need to keep on repeating it. They will play on your fear. And I love you, too.'"

On May 18, officers overheard portions of several conversations between Radovcich and Jennifer Nunnikhoven McDonald, a friend of his who was living in a dormitory at Santa Clara University. When McDonald informed Radovcich that she had been contacted by Fresno County Sheriff's detectives, he expressed a great deal of concern and advised her not to speak to them. He told her to get a lawyer and gave her Terrence Woolf's telephone number. He begged her to take the situation seriously and expressed guilt over her being involved in the investigation.[10]

The following afternoon, Souza intercepted a page via the clone pager. About the same time, Radovcich ran from his apartment to his vehicle and drove to a store, where he used a pay telephone. Telephone company records showed he called a pay telephone at the San Jose Jet Center. At that time, detectives conducting surveillance in the San Jose-Santa Clara area observed Ewell using that telephone. Sergeant Dadian attempted to

---

[10]     Eventually, Radovcich contacted McDonald's parents and warned them about the situation, of which they had been unaware.

overhear Ewell's end of the conversation, but was unsuccessful because the booths were enclosed and insulated. Detective Haroldsen attempted to monitor Radovcich's end of the conversation. In part, Radovcich stated, "'Okay, Dana, okay. After I call, okay, tell her to call me; and I'll talk to her. Right? Okay. Okay. I'll do that. So I call her back. Right?'" Haroldsen also heard him say, among other things, "'Would be a mistake. So I called her parents and told them what kind of deep shit she's getting into. And so her mom called, which was this morning. I called her. And then I called my Woolf guy.'" Radovcich expressed concern that either the telephones were tapped or there were snitches, and suggested "'someone is running around listening to us or something ....'"

No visual surveillance was conducted on Radovcich from May 22 to June 2. However, telephone company records and clone pager intercepts revealed frequent contact between Radovcich and Ewell's dormitory room telephone, as well as between Radovcich and pay telephones at the San Jose Jet Center, the business complex at 1520 The Alameda, and other Santa Clara locations.

From June 3-June 15, 1993, detectives again conducted visual surveillance on Radovcich, who was then residing at his mother's residence on Bobbyboyar in West Hills. On the afternoon of June 3, Radovcich received a page bearing Jack Ponce's pager number and a numeric code. He also received a page with a numeric code from a pay telephone at the San Jose Jet Center. Approximately 10 minutes later, Ewell was seen conversing on that telephone. Detective Avila attempted to overhear Radovcich's conversations. During one, Radovcich asked, "'Then why don't they just pick us up?'"; "'I call him like, I just called him. Now, uh, uh, I – I got to talk to my guy and see, uh – see if they can actually charge, charge me with something in that, uh, uh, three shirt deal. I don't know how far that goes. Yeah. Yeah, no problem. Right'"; that he wanted "'us'" to be "'extra careful'"; and "'It's just we got to hang tough.'" Avila could make out little or nothing with respect to Radovcich's other calls.

Surveillance over the next few days showed Radovcich's continued use of pay telephones and occasional contact with the San Jose Jet Center and Ewell's dormitory room. On June 10, he was observed to terminate his call if another individual came to use one of the telephones at his location.

Authorities found no evidence of contact between Radovcich and the Santa Clara-San Jose area from June 12-15.[11] On June 12, Radovcich went to his brother Peter's apartment in Reseda. Radovcich and Peter were in separate vehicles. Radovcich's vehicle was placed inside the garage, while Peter's vehicle was placed up against the closed garage door. Peter entered the apartment, which was on the second story of the complex, while a female stood at the door. She looked toward the street, then made a "Come on" motion with her arm. Radovcich then ran into the apartment. Several times after that, Peter or the female came outside and looked around as if attempting to see whether anyone was in the area.

The intense Southern California surveillance ended on June 15, 1993. Contact between Ewell and Radovcich continued, however. In September 1993, Radovcich was seen walking from between the cars at the end of the hangar at the Fresno Air Terminal, where Ewell maintained a single-engine airplane. Ewell, who was performing a preflight check, looked back at Radovcich and said something to the effect of, "'I didn't tell you you could come out. Get back.'" Radovcich walked back in between the cars and ducked down. Ewell then finished the preflight check, got into the plane, started the engine, and waved to Radovcich, who ran to the plane. He entered but, when Ewell took off, only Ewell was visible. On a couple of occasions, Radovcich was seen inside

---

[11]   Ewell and Monica Zent were in Cancun, Mexico from June 13 through 20, 1993, Ewell having graduated and moved out of the dormitory on June 12.

Ewell's hangar. On March 16, 1994, Ewell and Radovcich both exited Ewell's plane when it landed at the Fresno airport.

On November 15, 1993, Ewell and Radovcich enrolled with Aqua Sports, in Fresno, for scuba diving lessons. Each gave the Park Circle Drive residence as his address. They selected the same classes, took their classes and pool sessions at the same times, and performed their open-water dives and received their certifications on the same date.

On December 2, 1993, Ewell, who was already insured by Blue Shield, requested that insurance applications be sent to the Park Circle Drive address. Blue Shield subsequently received an application for coverage from Radovcich, which was dated December 9, 1993, and which gave his address as the Park Circle Drive residence. The address was subsequently changed to a post office box in Los Angeles.

On February 14, 1994, a person who looked like Radovcich and who gave his name as Mike Johnson purchased a pager and paging service for one year in advance from The Original Pager Company in Canoga Park. On January 29, 1995, this person extended the service for six months. On March 3, 1995, a search was conducted of Radovcich's vehicle. Among the items seized was a receipt in the name of "Mike Johnson" for the pager and service from February-July, 1995. A search of his mother's home revealed a Kenwood two-way radio and hand-held scanner in one of the bedrooms. A plastic manufacturer's bag which bore the name "Kenwood" and contained a brochure for a Kenwood transceiver hand-held radio, a credit card receipt, and two warranties, was found in the office closet of the Park Circle Drive residence during execution of a search warrant there on March 3, 1995. The search also revealed a box of latex gloves in the master bathroom, which may have been there at the time of the homicides; Radovcich's passport; and maps and aircraft paperwork relating to a March 1994 trip to Mexico.

From July 3, 1994-March 26, 1995, Ewell rented an apartment at the Broadcast Center Apartments in Los Angeles. The gas account was in the name of "Dan James."

22.

Payment was made by cashier's checks, one of which bore the name "Dana Ewell" as the purchaser. Following Ewell's arrest, a defense investigator moved property from the apartment to a mini-storage unit in Fresno. The pager belonging to "Mike Johnson" was subsequently retrieved from the mini-storage unit. A gun-cleaning kit bearing Radovcich's fingerprint was also seized from the mini-storage unit, as were two pistols. A box that matched one of the weapons, which was purchased in 1993, was found during the March 1995 search of the Park Circle Drive house. Also found in the mini-storage was a Kenwood receiver which was consistent with the brochures found during the search of the Park Circle Drive residence.

### III

### THE PHYSICAL EVIDENCE

During the period between the homicides and the arrests, extensive investigation of the physical evidence took place. Unusual scratches on the bearing surfaces of the six bullets recovered from the crime scene and autopsies led Allen Boudreau, a firearms expert, to determine that all six bullets were fired by the same weapon, that the weapon had a ported barrel (a barrel in which holes had been drilled), and that a homemade sound suppressor (silencer) was used. He also determined that the weapon was not a revolver or the Browning that was missing from the Park Circle Drive residence. Further investigation led him to conclude the weapon used was an AT-9 manufactured by Feather Industries, with a barrel made by Green Mountain Barrels.[12]

---

[12]   An AT-9 is a semiautomatic nine-millimeter carbine-style rifle. It ejects shell casings when fired. Such guns were manufactured by Feather Industries during the early 1990's, with the barrel blanks built by Green Mountain Rifle Barrel Co., Inc. Feather Industries specified a one-in-twelve twist rate for the barrel, which is very rare for that caliber. The AT-9 was designed with a collapsible stock and removable barrel so that it could be a very compact, portable firearm. It had two available magazines, one (the more common) which held 25 rounds and the other which held 32 rounds.

During the March 2, 1995, search of the home of Radovcich's mother, a container of drill bits (called a drill bit index) was seized from the garage. In the drill bit index, Boudreau found particulate matter which included larger white particles, drill turnings, and small pieces of what appeared to be steel wool. He also found a lot of particulate matter on the clothes Glee was wearing when she was killed, including small metallic particles, particles of what appeared to be a dark, rubbery-type substance, and fluorescing yellow fibers which were consistent with the nap on tennis balls.

Boudreau obtained an AT-9 and various barrels; constructed a silencer out of PVC pipe, tennis balls, and steel wool (as shown in a book on how to make silencers); used the porting configuration contained in a barrel whose location was revealed by Jack Ponce; and conducted test-firings.[13] He concluded that tennis ball particles, such as those found on Glee's clothing and in the piece of carpet which had been under Glee's body, would have been ejected had a bullet been fired through a sound suppressor made with tennis balls; and that steel wool particles, again such as those found on Glee's clothing, would also have been ejected from a homemade sound suppressor. Boudreau also determined that the piece of carpet contained particles of chrome molybdenum steel, of like composition to drilled metal specimens from Green Mountain barrels.

Boudreau cleaned the recovered barrel, which was packed with dirt, and removed the rust from the bore. In the course of cleaning the barrel, Boudreau discovered steel wool fibers inside. The movement of gases which occurs when a weapon is fired would move steel wool used in a sound suppressor from the outside of the barrel to the inside.

---

[13]     Radovcich and Jack Ponce were arrested in connection with this case on March 2, 1995, while Ewell was arrested on March 5. On March 4, Ponce led detectives to a gun barrel that was buried in a vacant lot in Reseda. Ponce's testimony will be discussed at greater length, *post*.

Boudreau conducted test-firings with the barrel, and concluded that all six crime-scene bullets were fired through it.[14]

### IV

### PETER RADOVCICH'S TESTIMONY

On March 8, 1995, Peter Radovcich, Radovcich's older brother, was arrested for three counts of murder in connection with this case. He testified at trial pursuant to an immunity agreement with the district attorney's office.

Peter became friends with Jack Ponce when both were in high school. They remained friends following Peter's 1989 marriage to Danielle. Peter, who was employed by Sketchley Mason as a plumber and had a workshop set up in his garage, occasionally accompanied Ponce to a shooting range called Firing Line. Ponce was a good shot. Radovcich, who knew Ponce, did not accompany them, nor did Peter know him to go to shooting ranges. Peter and Ponce would either rent weapons at the range or use a weapon belonging to Ponce. Ponce had a Llama semiautomatic pistol which belonged to his stepfather. The gun tended to jam.

At some point, possibly in the summer of 1991, Peter unsuccessfully attempted to solder a barrel extension that Radovcich gave him onto a .22-caliber firearm which belonged to Ponce but was in Radovcich's possession. Following Radovcich's

---

[14]     Lucien Haag, a criminalist with his own consulting firm who is an expert in firearms with a special emphasis on reconstruction, also examined the evidence. He confirmed that one gun – possibly an AT-9 – had fired all six bullets; that the gun's barrel had been ported in a crude attempt to make a silenced weapon; and that a homemade silencer had, in fact, been used. He also determined that a metal particle recovered from Glee's clothing was comparable in composition to the barrel recovered from Ponce. However, a portion of that barrel was corroded from being in the ground. Because of the effect of this corrosion on test-fired bullets, Haag was able to conclude only that the barrel was "'entirely consistent'" with having fired the bullets recovered from the scene and autopsy.

25.

graduation from college, he had Peter braze an extension tube, which Radovcich provided, onto the end of the barrel of Ponce's Llama. Peter understood the work was being done in order to build a silencer. Peter performed the work inside his parents' garage and later heard a weapon being fired inside, although he did not see a finished silencer. He did not see the Llama again until after the homicides.

Two to four months or more before the killings, Peter learned that Radovcich wanted a gun. At some point, Peter became aware that Ponce had purchased a weapon for Radovcich.

Approximately two to three weeks after he worked on the Llama, and before his and Danielle's Easter weekend trip to Knott's Berry Farm, Peter brazed a washer onto the barrel of an AT-9 at Radovcich's request. Peter assumed the modification was to accommodate a silencer. He did not believe the barrel was ported at the time he worked on it, and he never saw the finished product. Later, however, he heard what he believed to be Radovcich firing a silenced weapon in their parents' garage. During this period of time, Peter did not see Ponce at the Radovcich family home on Bobbyboyar.[15]

On April 18, 1992, Peter and Danielle celebrated Danielle's birthday by visiting Knott's Berry Farm and other Southern California attractions. Because they were staying the night, Peter and Danielle arranged for Radovcich to watch their dog. The next morning, which was Easter Sunday, they returned to the apartment. Radovcich's car was parked in front of their garage, and he was in the apartment. This was between 9:00 and 11:00 a.m.[16] By the time Peter and Danielle left about noon (according to Peter) or

---

[15]    Danielle frequently saw Radovcich spending time with Ponce.

[16]    According to Danielle, she and Peter left the apartment between 8:00 and 9:00 on Saturday morning. She could not remember whether Radovcich was already there. She assumed she telephoned Radovcich at the apartment that evening to check on the dog, as

between 1:00 and 3:00 p.m. (according to Danielle) to go to Danielle's mother's house for lunch, Radovcich and his vehicle were gone. Danielle and Peter returned home between 1:30 and 2:00 p.m. (according to Peter) or late that afternoon (according to Danielle). Radovcich was not there and did not return to the apartment until between 9:00 and 11:00 that night. Radovcich appeared calm when Peter saw him that night.

Sometime after Easter Sunday, a panicked Radovcich unexpectedly came to the apartment one night and told Peter that he had gotten a code – Peter assumed he meant on his pager – and needed to get out of town. He said Peter might see his face on "America's Most Wanted." When Peter refused to help him, Radovcich left and Peter did not see him again for one to two weeks.[17]

In Peter's garage was a large box in which Radovcich stored a variety of items. At some point, Peter saw a backpack there that had not been present before. Sometime after dark on April 22, 1992, Peter was in his garage when either Ponce or Radovcich handed him the backpack, a cardboard box which contained a "Soldier of Fortune" magazine as

---

it would bark all the time if she and Peter were gone. She received no complaints about the dog barking on this occasion.

Yolanda Wright, who lived in the same apartment complex, saw Radovcich at Peter's and Danielle's apartment no later than 10:00 a.m. on the Saturday before Easter. His car was parked in front of their garage. She did not see him again that weekend, although she saw the car there on Easter Sunday when she went to church, around 9:30 a.m., and again when she returned home around 11:30 a.m. or 12:00 noon.

[17]    According to Susan Ewell, Dale's sister-in-law, John Zent stayed at her home for approximately four or five days after the bodies were discovered. During the time Zent was there, the family discussed the possibility of offering a reward. Zent telephoned the sheriff's office to check on the status of the investigation, then told Ewell and other family members that he had spoken to Lieutenant White and an arrest would probably be made within 48 hours. John Zent denied making such a statement, but admitted contacting White and also conveying to Ewell his own opinion that this was a staged burglary and that the family had been "hit."

well as five to ten paperback books with pictures of guns on the covers, and a pair of gray Nike tennis shoes.  Peter was told to dispose of the items.[18]

Peter took the items to his shop at Sketchley Mason, where he was joined by Ponce.  Radovcich was not present.  At the shop, Peter looked inside the backpack and discovered gun parts.  He believed that three guns, all of which were in pieces, were in the backpack.  One was the Llama, which still had the extension welded onto it.  Peter broke it off.  Also in the backpack was the barrel onto which Peter had welded the washer.  The washer was off and the barrel was full of holes.  The barrel and stock, which was also in the backpack, were consistent with a photograph of an AT-9 which Souza subsequently showed Peter.  The other weapon in the backpack was a semiautomatic pistol of some sort.  It also had holes in it.  None of the weapons was a revolver, and all had holes where the serial numbers used to be.  Also in the backpack were a lot of brass shell casings, tennis balls that were cut in half, and a cylindrical object with PVC caps at the ends.  Peter believed this to be the silencer for the AT-9.

Peter and Ponce were at the shop for about half an hour.  During this time, Ponce sprayed the bag's contents with WD-40 to take care of any fingerprints.  When they left, Peter drove and stopped at various locations.  He then remained in the vehicle while Ponce got out and threw things away.  At one point, Peter asked Ponce whether the gun – he did not specify which one – had ever been used.  Ponce said no.

---

[18]     Peter was able to establish the date because of the earthquake that struck Southern California that night.  This occurred after Radovcich had said his face was going to be on "America's Most Wanted."  Peter believed it was approximately one to one and a half months after he worked on the AT-9.  On cross-examination, Peter said he could not recall exact dates, and so could not remember when Radovcich came over in a state of panic.  It could have been a couple of weeks, not days, after Easter, and it could have been two to three weeks before the disposal took place.

Ponce suggested their general route, which took them to a commercial district in the San Fernando Valley, the Santa Susana Pass in Chatsworth, Mulholland Drive, Ventura Boulevard in Woodland Hills, and an industrial district in Reseda, among other places. Eventually, all Ponce had left was the backpack, which contained the barrel. Peter was in a hurry to get home because Danielle had been paging him, and it was decided Ponce would dispose of the barrel.[19] They then returned to Peter's residence; Peter went to his apartment, while Ponce left in his own vehicle. Peter did not see Radovcich there. Peter later learned from detectives that the barrel had been recovered two fields away from Peter's apartment.

Over time, it became clear to Peter that authorities considered Radovcich a suspect in the Ewell homicides.[20] Peter never asked Radovcich his whereabouts on Easter Sunday of 1992, nor did Radovcich ever tell him that he had been at Hamrick's Paint and Body on that date.

## V

## JACK PONCE'S TESTIMONY

Ernest Jack Ponce was arrested for three counts of murder in connection with this case on March 2, 1995. He testified pursuant to an immunity agreement with the district attorney's office.

---

[19]   After the earthquake struck at 9:50 p.m., Danielle repeatedly paged Peter, but he did not respond. She knew Peter was with Ponce that evening, and unsuccessfully paged him as well. According to Danielle, Peter and Ponce were gone from the apartment for quite some time.

[20]   According to Danielle, Detectives Burk and Souza spoke to Peter in July 1992. Radovcich disappeared for eight months after that. When Radovcich visited the apartment prior to 1992, he usually parked in front of Danielle's and Peter's garage. Later, however, he parked inside the garage because he did not want anyone to know he was there.

29.

Ponce became friends with Peter Radovcich when they attended high school together. During this time, he also met Radovcich. Ponce attended UCLA from January 1987 to his graduation in December 1992, during which time he lived in a dormitory for the first year and then in various apartments. He maintained his permanent residence at his mother's house in San Bernardino and resided there following his graduation. In early April of 1992, Ponce (who already had a car) purchased an old van from Sketchley Mason Plumbing. During this same time, he obtained a pager from his mother so that she would be able to contact him.[21]

Ponce's interest in guns dated back to his childhood. In 1987 or 1988, he came into possession of a Llama .380 semiautomatic that had belonged to his ex-stepfather. The gun did not work well. Ponce purchased his first gun, a .44-caliber Charter Arms revolver, in July 1990. He next bought a .22-caliber Beretta semiautomatic in October 1990. In 1993 or 1994, he purchased a Bryco .380-caliber weapon. During the times which were relevant to this case, Ponce did most of his shooting at a place called The Firing Line. Peter frequently accompanied him, but Radovcich never did. Ponce termed himself "a fair shot," but described Peter as not being very good.

Ponce and Peter fell out of frequent contact when they both went off to college, then renewed their association around 1990, after Peter's marriage to Danielle. Ponce and Radovcich began to associate during the summer of 1991. They stole two motorcycles together, and Ponce was present when Radovcich stole, and he helped Radovcich take parts from, a car.

During the summer of 1991, Ponce saw a box of books among Radovcich's belongings. The books showed how to make silencers, contained information about

---

[21]     Ponce's mother, Sali Alsop, obtained the pager for him on or before April 17, 1992. The account was in her name and she paid the monthly service charge.

poisons, and told how to be a spy or commando. Radovcich was learning to make silencers for weapons and needed a gun with a barrel that protruded. Ponce gave him the Beretta .22. In Peter's garage, Ponce saw a completed silencer on the end of the Beretta. As there was no barrel extension, the silencer had to be held on or else it would fall off. It was about the size of a soda can and was made of PVC pipe. Tennis balls cut out in the shape of a circle made the baffle. It muffled the sound of the weapon. Shortly after the gun was fired, it was returned to Ponce, who fired it himself a few times in his back yard and then threw away the silencer.

During the summer of 1991, Ponce learned that Radovcich was "looking for a gun that he didn't have to put his name on." Radovcich wanted to experiment further with making silencers. Ponce did not want the Llama, which still did not work right, and it was not registered to him, so he sold it to Radovcich.

On March 1, 1992, Radovcich and Ponce went to a gun show in Anaheim. There, Radovcich looked at a Feather-Light AT-9. He wanted to purchase it from a private seller as opposed to a vendor, but the seller wanted him to present identification. Radovcich declined. Ponce was aware Radovcich wanted a weapon with an extended barrel that could be ported. The AT-9 had such a barrel and could be broken down. At the gun show, Radovcich purchased for the Llama a piece of metal tubing that would accommodate a .380-caliber shell. It was Ponce's understanding that this was for the purpose of silencing the weapon, as there needed to be an extension which could be ported.

Prior to the gun show, Radovcich had expressed a general desire to obtain a weapon. After the gun show, he started referring specifically to an AT-9, and he told Ponce that he needed to purchase one immediately. In March, Radovcich said Ponce could make money off a purchase of an AT-9. Ponce, who needed money in order to purchase the Sketchley Mason van in which he intended to live, agreed to buy the gun.

31.

Radovcich did not say why he wanted an AT-9 or why he needed it immediately. He wanted Ponce to purchase it instead of himself because he did not want his name on it.

Sometime later, Ponce received $1,500 in $100 bills from Radovcich. On March 23, 1992, Ponce purchased an AT-9 from National Gun Sales in Reseda for $437. At Radovcich's request, he later also purchased an extra clip and some subsonic ammunition.[22] Radovcich paid Ponce $500 for making the purchases, and Ponce returned the rest of the cash to him. On April 8, after the mandatory waiting period, Ponce picked up the weapon from the gun store. He and Radovcich made arrangements to meet at Peter's garage, which was down the street from the gun shop, to transfer the weapon to Radovcich.[23] When Ponce turned over the gun, Radovcich told him to report it stolen after a while. Ponce did so about six months later when his car was burglarized; Radovcich criticized this as being too soon. In making his report to the police, Ponce falsely named a friend's roommate as a suspect.

Ponce next saw the AT-9 not too long after April 8. The gun, which was in the garage of the Radovcich residence on Bobbyboyar, now had a silencer on it that looked like PVC pipe. Ponce saw Radovcich fire the gun into a block of wood. The silencer muffled the sound. Ponce, who believed Radovcich was going to sell the weapon, asked if Radovcich was going to make a lot of money off the gun. Radovcich replied, "'Oh, yeah.'" At some point, Radovcich told Ponce that the silencer was a series of baffles made of cut-out tennis balls. He later said he had found that steel mesh worked better.

---

[22]   At some point, Radovcich explained to Ponce that subsonic ammunition travels at a rate less than the speed of sound, so it does not make a cracking noise.

[23]   Telephone records for April 9, 1992, showed a brief call from a pay telephone Radovcich was known to frequent to a pay telephone in Santa Clara.

At some point, Ponce saw a shell catcher in the garage. Radovcich said he had fired the weapon once and then spent half an hour finding the shell, so he constructed a shell catcher. It was a small plastic box that was glued on the outside of the slide to catch the shell casings when they were ejected.

Ponce, who denied ever being to the Park Circle Drive residence or even hearing of Ewell before the homicides, spent the night before Easter at his mother's house. On Easter Sunday of 1992, he was with his family, spending part of the day with his mother, part with his father, and part with his brother-in-law's family.[24]

Some time after Easter (Ponce believed it was the night of Tuesday, April 21), Ponce received a telephone call from Radovcich, who said that something was wrong and he needed to come over. Ponce, who was staying at a girlfriend's condominium, let Radovcich into the closed parking structure, where Radovcich parked his car and then covered it. He said he did not want anyone to see it. He appeared nervous and worried and was looking around a lot. He kept his hood up over his head.

Radovcich kept frantically repeating that he did not know what had gone wrong. He said he needed to get as far away as possible. As Radovcich and Ponce entered the

---

[24]    According to Ed Hewitt, he was visiting the house next door to the Park Circle Drive residence on the night of April 18-19. Between 2:30 and 3:00 Easter morning, he heard noises at the house and two men talking. The light in the Ewell garage, which was normally on all night, was off. He later saw a faint light inside the Ewell house, and it appeared a sliding door may have been slightly open. According to Detective Curtice, however, Hewitt told him on April 21 that he had not seen or heard anything unusual. In November 1992, Hewitt told Detective Souza about hearing voices on the night in question, and said they could have come from the Ewell residence. He also said he had had five or six double shots of vodka that night.

Members of Ponce's family confirmed that Ponce spent all day Saturday, April 18, and that night at Sali Alsop's house in San Bernardino. The two attended Mass on Easter morning. Ponce spent the remainder of Easter with various family members, then returned to Alsop's house between 8:30 and 9:00 that night.

33.

elevator to proceed to the condominium, Ponce asked what was wrong. Radovcich replied, "'It has to do with a triple homicide and me.'" Ponce told Radovcich not to tell him any more. That was the last thing he let Radovcich say for a while.

The two later went for a drive. Radovcich was pondering places he might go. Ponce suggested that if he did not know what was going to happen, he could get a lawyer. When Radovcich said no, he could not do that, Ponce began to think Radovcich might be more than just accidentally involved in whatever was going on. With respect to the reason for what happened, Radovcich said something to the effect that it had to do with $8 million, and that "'We were gonna assume the throne.'"

Sometime after this evening (Ponce believed it was the next day), Radovcich told Ponce that he needed to get rid of some things. Ponce contacted Peter and then went to his apartment; from there, they went to Sketchley Mason and met Radovcich. Ponce was concerned that the weapon he had purchased might have been involved in whatever had taken place, and he was aware he might be doing something wrong by assisting Radovcich.

When Ponce and Peter arrived at Sketchley Mason, Radovcich handed one of them a backpack. Inside, among other items, was the Llama pistol Ponce had sold to Radovcich. An extended barrel was welded onto it. Peter went inside the shop and broke it off. Ponce asked Radovcich if anything was wrong with the Llama; Radovcich said it was fine and wasn't used. That is what Ponce subsequently told Peter. He did not tell Peter about the statements Radovcich had previously made to him. Ponce told Peter not to ask questions because he did not want Peter to become more involved.

In addition to the Llama (which Ponce kept and later resold), the backpack contained parts from the AT-9. The weapon had had the identification numbers drilled out and was disassembled. There were some black and red tennis shoes, as well as a Browning semiautomatic pistol which had been disassembled. The backpack also contained a shell catcher, a paper bag with empty shell casings, and cut-out tennis balls.

34.

Radovcich said the shell catcher had broken at the Ewell home and had not worked properly. The silencer Ponce had seen in the garage of the Bobbyboyar residence was also in the backpack. In addition, the box of spy-type books, which Ponce previously had seen in Radovcich's possession, was in Peter's vehicle. Ponce did not know how it came to be there.

Ponce and Peter began to drive around in Peter's vehicle and dispose of the backpack's contents. Peter drove; Ponce got out of the vehicle at various locations and got rid of the items. During this time, Danielle paged Peter a number of times. This made Peter want to get home quickly.

Eventually, all they had left was the AT-9 barrel. Ponce was aware that a bullet from an individual barrel could be identified. Since Peter needed to get back to his apartment, they drove to that location and Ponce said he would dispose of the barrel. Peter ran upstairs to see Danielle; Ponce ran across a field to a neighboring field and shoved the barrel into the ground. Ponce could not recall whether he wore gloves, but he would have made an effort not to leave fingerprints on anything. When he realized he had touched the barrel while trying to shove it into the ground, he became angry because he had touched the surface after the fingerprints had been removed.[25] He then kicked it as hard as he could until it went into the ground. He could not recall what happened to the backpack.

Ponce later met up with Radovcich. They took Radovcich's car to a North Hollywood area, parked it, and covered it so it would not be seen. Radovcich asked if he had gotten rid of everything; Ponce said yes, but explained that he had had to bury the

---

[25]     Ponce remembered WD-40 being on the barrel he buried. He did not recall whether he actually sprayed the substance on anything, although he did not see Peter do so. Ponce was aware at the time that WD-40 could be used to remove fingerprints.

barrel. This concerned Radovcich. Shortly after, Ponce took Radovcich to a hotel in the Santa Monica area. Radovcich did not remain at the first hotel chosen because he did not want to produce the required photographic identification. Ponce then took him to the Half Moon Hotel, dropped him off, and left. Radovcich mentioned that he had a certain amount of money – Ponce believed around $1,500 – to last him, and that he could not afford to stay at a hotel for very long.[26]

While Radovcich was staying at the hotel, he and Ponce maintained telephonic contact. Radovcich asked Ponce to keep an eye out in the newspapers for a homicide case. The name he gave was the Ewell family. During the time Radovcich was at the hotel, Ponce took him back to North Hollywood to retrieve his car. Radovcich said it was okay to get it, that there was no problem with it. Radovcich later came to the condominium at which Ponce was staying and began sleeping in Ponce's van.

The Rodney King riots began in Los Angeles on April 29, 1992, and continued for several days thereafter. During this time, which was while Radovcich was using Ponce's van, Radovcich and Ponce drove to the Malibu area. There, they sat down on the beach. Because Radovcich had not officially heard what, if anything, had happened, he was trying to figure out what had gone wrong. Ponce invited him to explain what had happened.[27]

---

[26]    On April 23, 1992, a room was rented at the Half Moon Hotel in Culver City under the name of Thomas Christopher Reardon, with a check-out date of April 26. Handwriting analysis showed that the guest registration was filled out by Radovcich.

[27]    Radovcich related most of the events of Easter 1992 during the conversation at the beach, although he added bits and pieces of information during conversations which took place both before and after that one. Ponce's memory of Radovcich's statements included both the beach conversation and the information he otherwise gleaned from Radovcich, and he could not always recall which information came from what conversation.

Radovcich related that he had shot three people with the AT-9, and that it had been done to split $8 million as part of an inheritance.  Ponce already knew it was the Ewell family, although Radovcich did not tell him the name at that time.  Radovcich said the shootings took place in Fresno, and that he had been to the home prior to the homicides. He said he knew the family would be away at the time he arrived, and he knew roughly the time they would return.  He said that he had previously removed all of his body hair, as he was going to be at the Ewell home long enough that he would have to use the bathroom and he did not want to leave any kind of hair.

Radovcich related that he drove his car to Fresno, but he did not say how he gained entry into the Ewell house.  He said he knew there was a window leading into the garage that did not have an alarm on it, but did not say whether he used that window.  He said he arrived before the family did, and got the AT-9 into the house by loading it in his backpack.  Once inside, he took the gun out and assembled it.  He related that he brought some plastic sheets to lie on, although he did not say where he waited for the family.  He said he had to sleep on the plastic, and also that he wore rubber latex gloves.

Radovcich, who described the Ewell home as "'[l]ush digs,'" said the mother and daughter arrived first.  He said the daughter walked by the laundry room, in which he was waiting, and he shot her in the back of the head.  She fell straight down.  Radovcich said the mother must not have heard it, because she kept talking.  He said he went and shot her, and that she possibly was the only person who saw him.[28]  He said he shot multiple times and had to put in a new clip after that.  He said he also put on another pair of gloves.  He then waited for the father to come home.  He did not say how long he had to wait.  When the father came in the door, Radovcich waited until he closed it and walked

---

[28]     During this part of the conversation, Radovcich drew in the sand with his finger showing where the daughter was and how he turned a corner to get the mother.

past the room in which Radovcich was located. Radovcich then stepped out and shot him. The father, who was in a hallway, was shot in the throat area and something came out of his eye. Radovcich said he heard a gurgling sound and there was something oozing out of the eye, which is why Radovcich thought he was probably dead.[29]

Radovcich told Ponce that after the shootings, he tried to check the victims' pulses by digging his gloved forefingers into the people's forearms to try to get a pulse. Ponce told him that probably would not have worked very well, and demonstrated how to check a pulse in the wrist. Radovcich further related that he took a cover weapon and some money – Ponce believed it was the $1,500 Radovcich had at the hotel – from the house. Radovcich said he took a weapon because he had learned that a cover weapon is taken to throw people off concerning what gun actually was used.

Radovcich said that after the shootings, he disassembled the AT-9 on a desk in an office and he took off the gloves. He said he thought he might have left one of the gloves, as he was wearing multiple pairs, and that was the only thing he could think of that went wrong. He said he put the disassembled weapon in the backpack. He also related that the shell catcher had malfunctioned. He said he had to wait awhile so he could leave when it was dark outside.

Radovcich told Ponce that he had committed the murders to split the inheritance, which he believed to be $8 million. Radovcich said he would have to wait approximately three years for the money. Several times during the discussion, Ponce castigated Radovcich for using the gun Ponce had supplied. Each time, Radovcich apologized. On the way home, Radovcich stated, "'If there's a God, I'm – I'm fucked.'"

---

[29]   Ponce denied personally seeing a bullet exit Dale's eye and picking up the bullet because it was from a different weapon than was used to kill the women.

Sometime later, Ponce asked Radovcich what he would do or say if the police asked him his whereabouts on Easter Sunday of 1992. Radovcich responded that he might say he was at Hamrick's, because it was open 24 hours a day and it was hard to tell who was there at any given time.

After the conversation at the beach, Ponce continued to have contact with Radovcich, although they did not openly associate. Instead, they used pay telephones and pagers. Ponce distanced himself from Radovcich because he did not want to be involved in what had happened or have anyone make a connection between them, given his role in acquiring and disposing of the murder weapon.

Ponce first learned law enforcement authorities were interested in him in October 1993, when he met Souza and Curtice for the first time. When they asked about his friendship with Radovcich, Ponce said only that he was Ponce's best friend's little brother. Ponce lied throughout the interview and denied ever buying a gun for Radovcich. With respect to the weapons he owned, Ponce admitted having purchased a nine-millimeter rifle, although he did not reveal it was an AT-9. Ponce continued to lie in subsequent contacts with authorities in an attempt to distance himself from Radovcich. However, he kept in touch with Radovcich and Peter concerning the investigation and the interviews. Ponce paged Radovcich if he wanted to make contact. They used codes to identify themselves and also to communicate by pager without needing to speak to each other.

At some point during this period of the investigation, Radovcich showed up unexpectedly at Ponce's place of employment and offered him $1,000 in $100 bills. Ponce said he did not need it. When Radovcich insisted, Ponce took it because he wanted Radovcich to leave. In addition, Radovcich gave Ponce $200 sometime after the murders, and subsequently paid him $100 for a term paper Ponce wrote for one of Radovcich's friends.

On February 18, 1994, Ponce admitted to detectives that he had purchased an AT-9. He untruthfully maintained he had bought it for himself for his birthday; that Radovcich had never even seen it; and that the gun had been stolen. In an interview on February 28, Ponce continued to lie and denied it was his gun which was used in the homicides. Even when Souza said he believed Ponce had given or loaned the gun to Radovcich but had had nothing to do with the killings, Ponce kept to his story of not knowing anything because he had heard of a case in which the person who supplied the gun received a long prison term.

Ponce's next contact with authorities was on March 2, 1995, when they arrested him on three counts of murder. The next day, he was transported to Fresno. That evening, after speaking with his father and the prosecutor, he gave a statement despite not yet having an attorney. The March 3 interview was the first time he had talked, to anyone not involved with the case, about any illegal thing he had done. He basically told the truth in this interview, although he may have been confused on some event sequences and dates. He did not mention the conversation at the beach until a later interview in which detectives noticed him drawing on a table and questioned how he knew the layout of the Ewell home so well.

Following the March 3 interview, Ponce and members of the Fresno County Sheriff's Department took a trip to the Los Angeles area, at which time Ponce showed them around different areas in the San Fernando Valley. He also directed them to the vacant field from which the AT-9 barrel was recovered.

## DISCUSSION

### I

### SUPPRESSION ISSUES

#### A.    Warrantless Search of Ewell Residence

Ewell claims the four-day, warrantless search of the Park Circle Drive residence, undertaken by law enforcement authorities immediately following discovery of the

40.

victims' bodies, was unlawful.  Since evidence seized as a result thereof was admitted against him at trial, he claims, he is entitled to reversal of the judgment.

      1.     Procedural History

     Prior to trial, Ewell moved to suppress all evidence seized from the Park Circle Drive residence during the warrantless search and crime scene investigation which took place there on April 21-24, 1992, together with all fruits thereof.  He conceded the lawfulness of the initial entry by his neighbor, Jesse Knapp (based on consent), as well as of the initial entry by sheriff's deputies (based on exigent circumstances).  Ewell acknowledged that items observed in plain view and seized during the period of exigency were not subject to suppression, but contended that any further search of the premises could only be conducted pursuant to a warrant.  In response, the People conceded there was no warrant.  They contended Ewell had failed to establish standing, and sought to justify the search based on exigent circumstances, implied consent, and inevitable discovery.

     Evidence before the court[30] showed that on Tuesday, April 21, 1992, Sheriff's Detective Ybarra was assigned crime scene responsibilities with respect to the Ewell homicides.  She and Sergeant Caudle arrived at the Park Circle Drive residence at approximately 9:40 that morning.  Upon arrival, they were met by Sergeant Huerta and Deputy Nielsen, who were already on the scene and who were outside the front of the home.  Patrol personnel were in the process of blocking off intersections, and entry onto the premises was restricted.

---

[30]     The parties stipulated that the trial court could consider the preliminary hearing transcript, and also presented testimony at the hearing.  (Cf. *Wilder v. Superior Court* (1979) 92 Cal.App.3d 90, 94)

Huerta and Nielsen related to Ybarra that they had responded to a call for service from Jesse Knapp, who lived across the street. Knapp told Nielsen that he had gone to the Ewell home in response to a telephone call from Ewell. Ewell had been concerned because he could not reach his family by telephone, and had asked Knapp to go over and check it out. When Knapp arrived at the house around 9:10 a.m., Rose Avitia, the housekeeper, and her crew were there. Avitia had a key to the house and so they entered the residence. They noticed several things out of place, and Knapp discovered Tiffany in the kitchen. Knapp then returned home to call 911, and he also contacted Ewell to inform him of what he had seen.

Ybarra interviewed Rose Avitia before entering the house. Avitia told Ybarra that Glee, Dale, and Tiffany lived in the house, and that they had a son, but he had moved out and was attending a university up in San Jose. Ybarra subsequently determined, from her examination of the premises and later conversation with Ewell, that Ewell maintained a bedroom in the home.[31]

Also prior to Ybarra's entry, Nielsen informed her that he had made a brief entry into the house and had located two additional bodies, and that paramedics had also entered and had determined the victims were deceased. Nielsen and Huerta had both noted the ransacking Ybarra subsequently observed; neither commented on any belief there was a suspect in the area, nor were they looking for one. They had secured the crime scene. Ybarra spoke to the paramedics; they informed her that they had gone through the entire house and were unable to locate any other victims, and that rigor mortis had set in. The paramedics' arrival time was approximately 9:16 a.m. Before entering the house, Ybarra also learned, from her dispatcher, that the sheriff's department

---

[31]    The parties stipulated that Ewell had lived in the Park Circle Drive residence his entire life, until he went off to college.

was being contacted by John Zent, an FBI agent Ewell had called in an attempt to find out what was going on at his home.[32]

Ybarra and the other officers awaited the arrival of Identification Bureau personnel, then entered the house around 10:30 a.m. During the initial walk-through, Ybarra was aware there were no other victims or suspects in the home, and so she was scrutinizing the residence for investigative purposes.

As they walked through, Ybarra observed that the house appeared to have been ransacked. Given the possibility a burglary had occurred, Ybarra was alert to any signs of forced entry. Based on her observations of the bodies, as well as information given to her by paramedics prior to her entry, she concluded death was caused by gunshot wounds. There were holes in the walls which appeared to be bullet holes (some of which she saw initially and some which she noted later on) and, in the case of Dale's body, a blood spatter pattern that suggested high-velocity gunshot evidence. Ybarra determined that a search needed to be made for the bullets themselves. She also needed to inspect underneath the bodies, but was prohibited from disturbing them in any way until the coroner arrived and took possession of them. A deputy coroner and pathologist arrived about 5:45 that afternoon, and inspected the scene and the position of the bodies in order to help determine the cause of death. The bodies were removed sometime after 8:00 p.m.

During her initial walk-through, Ybarra went to each room in the house, noting the layout and looking for items that might have been associated with the bodies. She was specifically looking for signs of forced entry, details concerning the ransacking (the appearance of which was present in virtually every room), blood evidence, firearms evidence, fiber evidence, and latent fingerprints. Her walk-through included the master

---

[32]   Zent contacted the local FBI agent, who contacted the sheriff's department dispatcher on Zent's behalf.

bedroom, where she observed two rifles and a shotgun; several boxes of ammunition; a handgun shipping box; a gun-carrying case; and a loose, nine-millimeter bullet.[33] In Ybarra's experience, this was a very complicated crime scene.

Some homicide scene evidence is perishable. Trace evidence, such as lint or gunshot residue, is very easily disturbed or destroyed. Similarly, bodily fluids, such as blood, need to be collected as soon as possible. In addition, other possible signs in the house or around the crime scene that might help determine time and cause of death, need to be noted prior to contamination or deterioration of the scene. Also of concern is the immediate apprehension of suspects. Where, as here, it appears bullets may have penetrated the walls of the residence, an inspection of the outer perimeter of the crime scene must be done prior to contamination by sprinklers coming on, or gardeners or other people coming through. In Ybarra's assessment of this crime scene, the blood, trace evidence, and gunshot residue were all very critical items of evidence that had to be collected in order to perform a proper investigation, and all were extremely fragile and perishable. In addition, authorities were already about 48 hours behind the killer. All the evidence had been in the house for that time, unsecured and unpreserved, and was losing its value, hour by hour. As far as Ybarra knew, only three people were residents of that house: Dale, Glee, and Tiffany Ewell. All three were homicide victims.

Detective Souza interviewed Ewell on April 21 and 22, 1992, with the April 21 interview beginning around noon. Ewell had already been advised that it appeared his family had been murdered. During the course of the interviews, Ewell was made aware

---

[33]   Ybarra could not say with certainty that she saw these items on her first trip into the master bedroom, although she felt "confident" that is what occurred. The box of bullets was "[e]xtremely obvious."

44.

that an investigation was underway.  At no time did he state any opposition to the investigation occurring at the house.

Sometime around 2:00 or 3:00 p.m. on April 21, while detectives were conducting an investigation at the crime scene, Sheriff's Lieutenant White met with Ewell and John Zent in White's office.  Ewell and Zent were very curious and wanted information about what had happened at the scene.  While White did not have much at the time, he was aware detectives were conducting an investigation of the crime scene.  White informed Ewell that his family had been murdered.  This probably occurred between 3:00 and 4:00 p.m., when White received telephonic notification after a positive conclusion had been reached that the deceased persons were, in fact, Ewell's parents and sister.  Ewell and Zent were still in White's office at the time.  At some point during this meeting, Ewell stated a willingness to fully cooperate with the investigative efforts of the sheriff's department.

On April 23, Ewell and other family members came to the house in order to obtain funeral clothing for the deceased.[34]  Ewell pointed out to Ybarra a .357 handgun lying on a shelf in Dale's closet.  Ybarra caused it to be collected by an Identification Bureau technician.

On Friday, April 24, Ybarra had representatives from the alarm company come to the house and inspect the system.  Processing of the crime scene concluded around 10:30 that evening.  From Ybarra's initial arrival to the conclusion of the scene processing, officers were assigned to remain outside the residence around the clock for security, although the crime scene investigators did not work 24 hours straight.  While much of the

---

[34]    Although this was the first contact Ybarra had had with Ewell, she believed he had walked through the house earlier with Detective Souza in order to see whether anything had been stolen.

45.

most important processing was done on April 21, blood spatter interpretation and crime reconstruction in the hallway took additional time, as did recovery of the bullets in the walls.

Upon completion of the crime scene processing on April 24, the residence was turned over to Ewell. He had the locks changed that evening. Ewell and Ybarra walked through the house and discussed what had been found. Ewell requested an inventory of everything that had been removed from the home. During Ybarra's contacts with Ewell on April 23 and 24, Ewell did not indicate any resistance to or problem with the investigation, except that he was upset about a padlock being cut off the back gate. Ewell showed Ybarra where a key to the lock was hidden, but she apologized and explained that sheriff's personnel had been unaware of the key and so had cut off the lock so they could do their jobs. Ewell later apologized as Ybarra was leaving. He never made any request to have the house turned over to him at any earlier time.

Carol Badgley had been Dale's and Glee's next-door neighbor since approximately 1970 and had known Ewell since he was a baby. At some point – Badgley estimated more than a year before the homicides – Ewell went away to attend college out of town. During the period in which Ewell attended college, Badgley saw him around the house for a few days at Christmas. In addition, he came back home and stayed there for a while during at least one summer. On other occasions, she saw him coming and going. Sometimes she would see him and then, a few days later, she would see him again.

The trial court denied the motion to suppress. It rejected the prosecution's characterization of Ewell as a "'nonresident family member'" and instead determined he was a university student living temporarily at college. Accordingly, it found Ewell had standing to contest the search and the scope thereof, but found no evidence he had any expectation of privacy beyond his own room. The court noted that the owners of the house and contents were Dale and Glee, who were dead and unable to give consent. No will had been probated, and there was no showing Ewell had immediate control over the

46.

house and contents. Under these circumstances, the court concluded, there could be no invasion of the Fourth Amendment rights of Dale, Glee, and Tiffany, who presumably "would have wanted their execution-type killing[s] vindicated through prompt action by law enforcement." The court noted Ewell's concession that there was consent for the neighbor to enter and that the police could operate under the doctrine of exigent circumstances, and found Ewell was the one who prompted the initial inquiry, which ultimately resulted in law enforcement being contacted. The court balanced the various interests involved and concluded "the omission of law enforcement to obtain a warrant under the unusual facts of this case" was justified.

The court found that the emergency nature of the situation confronting the officers extended beyond a brief, initial walk-through, and rejected as unreasonable under the circumstances Ewell's attempt to limit the period of exigency to the initial sweep of the house to confirm the absence of suspects, other victims, or weapons. The court further found it reasonable to conclude that Ybarra and other officers observed items in plain sight at an early time in the investigation, while exigent circumstances still existed. However, the exigency no longer existed when the bullets were extracted from the walls and bullet holes and other evidence were examined.

The court questioned why such experienced law enforcement officers would "not take the basic, rudimentary precaution" of obtaining a search warrant, whether telephonic or not, and concluded the officers believed they had implied consent to enter and process the home for evidence. It noted that, while Detective Souza testified that a surviving heir to family wealth is always a suspect, at the time of the search Ewell was viewed as a bereaved survivor. The court concluded that, under all the circumstances – including Ewell's being accompanied by an FBI agent who established his whereabouts at the time of the killings, and his offer of cooperation and lack of expression of a state of mind other than desire to have the perpetrator identified and apprehended – officers' conduct was

47.

objectively reasonable, and this was not a case involving mere silence and acquiescence on Ewell's part.

As an independent ground for denying the motion, the court found the doctrine of inevitable discovery to apply. The court determined that this was "one of the exceedingly rare cases where it can be said, with absolute confidence, that no magistrate or judge anywhere … would not have immediately issued a search warrant."

    2.   Analysis

A trial court hearing a motion to suppress evidence acts as the finder of fact. Under standard principles of appellate review, we uphold its factual findings, whether express or implied, if they are supported by substantial evidence. (Cf. *People v. Johnson* (1980) 26 Cal.3d 557, 578.) In so doing, we view the facts in the light most favorable to the trial court's ruling (*In re Frank V.* (1991) 233 Cal.App.3d 1232, 1237, fn. 1) and resolve any factual conflicts in favor of the disposition of the motion to suppress (*People v. Martin* (1973) 9 Cal.3d 687, 692). We then exercise our independent judgment and "measure the facts, as found by the trier, against the constitutional standard of reasonableness" to determine whether the search or seizure was lawful. (*People v. Lawler* (1973) 9 Cal.3d 156, 160.)

The People first contend Ewell lacks standing to challenge the search and seizure. In this regard, "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. [Citations.]" (*Rakas v. Illinois* (1978) 439 U.S. 128, 130-131, fn. 1.) We must decide "whether the disputed search and seizure has infringed an interest *of the defendant* which the Fourth Amendment was designed to protect." (*Id.* at p. 140, italics added; see *United*

*States v. Payner* (1980) 447 U.S. 727, 731.)[35] As the California Supreme Court recently explained, "'The touchstone of Fourth Amendment analysis is whether a person has a "constitutionally protected reasonable expectation of privacy."' [Citation.] The analysis consists of a two-part inquiry: 'first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 384.) "'The legitimate expectation of privacy must exist in the *particular area searched or thing seized* in order to bring a Fourth Amendment challenge. [Citation.].'" (*People v. McPeters* (1992) 2 Cal.4th 1148, 1171.)

Courts have recognized that "'private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable.' [Citation.] Indeed, 'the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."' [Citations.] A central principle of the Fourth Amendment is that a person may 'retreat into his own home and there be free from unreasonable governmental intrusion.' [Citation.]" (*People v. Camacho* (2000) 23 Cal.4th 824, 831.)

Here, of course, Ewell was not physically living in the residence at the time of the search. Accordingly, our initial question is, did Ewell establish that he had an expectation of privacy in the Park Circle Drive residence that society is prepared to

---

[35]    The United States Supreme Court has discarded the concept of "standing" as a separate inquiry. (*Rakas v. Illinois, supra,* 439 U.S. at p. 133; see *United States v. Salvucci* (1980) 448 U.S. 83, 87, fn. 4.) We thus use the word "standing" as a term of art, recognizing that the question is not really one of standing, but whether the proponent of the motion to suppress had his or her own Fourth Amendment rights infringed by the search and seizure he or she seeks to challenge. (*Rakas v. Illinois, supra,* at p. 133; *People v. Leonard* (1987) 197 Cal.App.3d 235, 239.)

recognize as justifiable? "No one circumstance is talismanic to [this] inquiry. 'While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of (the) inquiry.' [Citation.] Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises. [Citations.]" (*United States v. Haydel* (5th Cir. 1981) 649 F.2d 1152, 1154-1155; accord, *People v. Roybal* (1998) 19 Cal.4th 481, 507; *People v. Ybarra* (1991) 233 Cal.App.3d 1353, 1360; *People v. Hernandez* (1988) 199 Cal.App.3d 1182, 1189.) "While generally one of these factors alone is insufficient to establish standing of a third party on the premises of another [citations], the greater the number of these factors and the greater their strength shown by the facts of a particular case, the more likely a protectable expectation of privacy will be found." (*People v. Koury* (1989) 214 Cal.App.3d 676, 686.)

In determining whether Ewell had a "legitimate expectation of privacy" in the Park Circle Drive premises so that he could "claim the protection of the Fourth Amendment with respect to a governmental invasion of those premises" (*Rakas v. Illinois, supra,* 439 U.S. at p. 143), we are not controlled by "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like ...." (*Ibid.*) While a person must be more than merely "'legitimately on premises,'" he or she "can have a legally sufficient interest in a place other than his [or her] own home so that the Fourth Amendment protects him [or her] from unreasonable governmental intrusion into that place. [Citation.]" (*Id.* at p. 142.)

A number of cases are instructive with respect to the issue before us. For example, in *Minnesota v. Olson* (1990) 495 U.S. 91, police made a warrantless,

nonconsensual entry into a home to arrest Olson, who was an overnight guest. (*Id.* at p. 93.) The Supreme Court concluded that Olson's status as such was "alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable," despite the fact he was never left alone in the house or given a key thereto. (*Id.* at pp. 96, 98.) In part, the court reasoned:

> "That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises. The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest. On the other hand, few houseguests will invite others to visit them while they are guests without consulting their hosts; but the latter, who have the authority to exclude despite the wishes of the guest, will often be accommodating. The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household. If the untrammeled power to admit and exclude were essential to Fourth Amendment protection, an adult daughter temporarily living in the home of her parents would have no legitimate expectation of privacy because her right to admit or exclude would be subject to her parents' veto." (*Id.* at pp. 99-100.)

In *Minnesota v. Carter* (1998) 525 U.S. 83, by contrast, no legitimate expectation of privacy was found where the defendants were not overnight guests, but instead were only in the home a few hours to participate in what amounted to a business transaction – packaging cocaine. (*Id.* at pp. 90-91.)

In *United States v. Long* (9th Cir. 2002) 301 F.3d 1095, the evidence was found to be insufficient to establish standing where it merely consisted of photographs of the defendant and his family, and men's clothing that could have belonged to any male. (*Id.* at p. 1100.)