In *United States v. Haydel, supra*, 649 F.2d 1152, evidence was seized from a box kept under the bed of Haydel's parents. Haydel had unlimited access to his parents' home, stayed there on occasion, and kept the records at issue in the box under his parents' bed to prevent access by his children and because he believed that to be the safest and most private place. (*Id.* at p. 1155, fns. 2-3.) In concluding, from the totality of the circumstances, that Haydel had a legitimate expectation of privacy in the area searched, the Court of Appeals reasoned: "Haydel's parents had given him permission to use their home and had given him a key. His access, therefore, was for all practical purposes unencumbered. Although he did not reside regularly at his parents' home, he kept clothing there and had occasionally remained overnight. Moreover, he conducted a significant portion of his gambling activities at the home and owned the records that were seized. Although the district court did not explicitly so hold, it is reasonable to assume that Haydel had the authority to exclude persons other than his parents and their guests from the home. Finally, it is clear from his actions that Haydel exhibited a subjective expectation that the contents of the box stowed under his parents' bed were to remain private." (*Id.* at p. 1155, fns. omitted.)

In *People v. Hernandez, supra*, 199 Cal.App.3d 1182, the court concluded the defendant had no legitimate expectation of privacy in the northeast bedroom where, although he apparently had lived in the house for three days, he occupied the northwest bedroom, had never been inside the northeast bedroom, kept no property in that location, did not know what was inside because the door was closed, and had never received permission to enter that bedroom. The court noted that not only was he unable to exclude others from that room, he himself had no permission to enter it. (*Id.* at pp. 1189-1190.)

In *People v. Koury, supra*, 214 Cal.App.3d 676, Koury's primary residence was in Hemet, while his wife (from whom he was separated) and children lived at the residence searched, in Anaheim. Koury stayed at the Anaheim home a few nights a week in order to visit with his children, kept some clothing and personal papers there, and had spent the

52.

night before the search at that residence. (*Id*. at pp. 680, 683.) The Court of Appeal reviewed a number of authorities and concluded: "[I]t cannot be said that a person is only protected by the Fourth Amendment at his or her 'principal' home; it is possible for a person to have a family-member type of standing by residing regularly but yet not continuously upon the premises. [Citation.] [¶] Moreover, once a person establishes a family-member type interest in the residence searched, there is no need to further show an interest in the particular items which were seized by the police. [Citations.]." (*Id*. at p. 687.) The court noted that Koury, although estranged from his wife, was still her legal husband and the father of the children who resided at the house that was searched; he regularly visited overnight; he had a key to the residence; his comings and goings were unrestricted; and there was some evidence from which a right of joint control of the residence could be inferred. He was not a mere casual visitor, but instead had a substantial possessory interest in the premises. Accordingly, the court determined he had a legitimate expectation of privacy in the premises searched. (*Id*. at p. 688.)

In *People v. Henderson* (1990) 220 Cal.App.3d 1632, the court found standing, based on the totality of the circumstances, where the evidence showed the defendants were authorized to stay at the searched condominium for several days, enjoyed unencumbered access to the premises, stayed overnight there, had joint control and supervision of the room in which contraband was located, and, by their actions, exhibited a subjective belief they would be free from governmental intrusion. (*Id*. at pp. 1641-1642.)

In *People v. Moreno* (1992) 2 Cal.App.4th 577, this court determined that a baby-sitter had a reasonable expectation of privacy in his brother's residence while he was baby-sitting in the brother's absence. We observed that, as a general rule, a baby-sitter "is in exclusive charge of the child and the premises," and that "[t]his exclusive control distinguishes the baby-sitter from the overnight guest.... The normal purpose of baby-sitting is to free the parent from the child and the house. Thus, the baby-sitter who comes

to the child's home will likely have, unlike the overnight guest, the exclusive right to 'determine who may or may not enter the household.' [Citation.] [¶] Control alone brings the baby-sitter within the *Rakas* principle that '[o]ne of the main rights attaching to property is the right to exclude others, ... and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.' [Citation.]" (*People v. Moreno, supra*, at p. 584, fns. omitted.)

In *People v. Cowan* (1994) 31 Cal.App.4th 795, the appellate court found no standing where the defendant was a visitor to the apartment searched but did not establish he had authority to be in the apartment alone, to enter without permission, to store anything there, to invite anyone, or to visit without advance notice, and where the evidence did not show he had ever stayed at the apartment for an extended time. Assuming the defendant established his legitimate presence on the premises by invitation, the court concluded, such a showing was insufficient. (*Id*. at pp. 798-801.)

In *People v. Dimitrov* (1995) 33 Cal.App.4th 18, no standing was found where the defendant testified he did not live in the apartment searched, had no key to it, had no clothes there, had no possessions there, and did not have an expectation of privacy while he was in the apartment because people were always coming and going. (*Id*. at pp. 27-28.)

We conclude, based on the totality of the circumstances, that Ewell had an expectation of privacy in the Park Circle Drive residence which society is prepared to recognize as reasonable. He was more than a mere casual or overnight visitor; although he was not physically residing in or present on the premises at the time of the search, he clearly had a "family-member type interest" in the home. (*People v. Koury, supra,* 214 Cal.App.3d at p. 687.) He had grown up there; the residence had been his principal place of abode for years. He maintained living quarters in the house and, as a student living in

a dormitory, plainly had not established a permanent residence elsewhere.[36]  During school breaks, he resided regularly, albeit not continuously, on the premises.  Under such circumstances, the law recognizes "a family-member type of standing." (*Ibid.*; see also *State v. Vinuya* (Hawaii App. 2001) 32 P.3d 116, 127; 5 La Fave, Search & Seizure: A Treatise on the Fourth Amendment (3d ed. 1996) Standing, § 11.3(a), pp. 124, 130.)

Moreover, that Ewell maintained a particular room in the house as his specific living quarters does not mean he had no legitimate expectation of privacy in the remainder of the house.  A common living arrangement in a family home involves a child having his or her own room and yet still having unencumbered access to the remainder of the premises.  The evidence showed that while on the premises during school breaks, Ewell apparently came and went without restriction.  (See *United States v. Haydel, supra,* 649 F.2d at p. 1155.)  That his parents, had they lived, may have possessed greater rights with respect to the house, does not mean Ewell possessed no rights outside his bedroom door.  (See *Minnesota v. Olson, supra,* 495 U.S. at pp. 99-100.)  Whether the evidence would have been sufficient to establish standing as to presumably non-common areas of the house such as the master bedroom and Tiffany's room had other members of the family lived, is immaterial:  such was not the situation.[37]

---

[36]     Rosa Avitia's statement to Ybarra that Ewell had moved out of the home and was attending a university in San Jose, and Carol Badgley's testimony that he had gone away to attend college out of town, must be considered in light of the fact Ewell was residing in a dormitory at the time of the homicides.  Since residency in a college dormitory is, by its very nature, temporary, the fact Ewell did not physically reside in the Park Circle Drive house full-time does not negate its being his home for purposes of our analysis.

[37]     We cannot help but suspect that, had Ewell consented to the search and a challenge subsequently been raised by someone with standing to do so, the People would have urged – successfully – that Ewell possessed actual authority to consent to a search of the entire house.

The fact that, at the time of the search, no will had been probated pursuant to which ownership of the house passed to Ewell, is also immaterial: it was his family home. It was he who possessed all the indicia of ownership and control until such time, if ever, as the house passed to someone else. The authorities implicitly recognized this when they released the premises to him at the end of the search. His conduct evidenced ownership and control and the right to exclude others when he promptly changed the locks. In short, at the time of the search, Ewell had "a substantial possessory interest in both the house searched and the [items] seized." (*Rakas v. Illinois, supra,* 439 U.S. at p. 136; see *People v. Koury, supra,* 214 Cal.App.3d at p. 687.)

There remains, however, a second question: whether Ewell maintained a subjective expectation of privacy in the premises once he asked a neighbor to check on his family. (See *Smith v. Maryland* (1979) 442 U.S. 735, 740 [subjective expectation of privacy as "discrete" question]; *People v. Thomas* (1995) 38 Cal.App.4th 1331, 1334 [to invoke Fourth Amendment protection, defendant must have both subjective and objectively reasonable expectation of privacy]; *People v. Madrid* (1992) 7 Cal.App.4th 1888, 1896 [defendant, by conduct, must have exhibited actual (subjective) expectation of privacy].) We recognize that, ordinarily speaking, one subjectively expects one's home and its contents to be free from governmental intrusion. (*People v. Camacho, supra,* 23 Cal.4th at p. 831.) Indeed, "privacy interests are especially strong in a private residence." (*Michigan v. Clifford* (1984) 464 U.S. 287, 296.) This general proposition does not mean, however, that the specific facts of a particular case are to be ignored, since standing is determined under the totality of the circumstances of each individual case. (See, e.g., *Rawlings v. Kentucky* (1980) 448 U.S. 98, 104.)

It seems logical to us to find no subjective expectation of privacy in the present matter. Entry into the house and the subsequent search were set in motion when Ewell

telephoned a neighbor because he was concerned when he could not reach his family.[38] Ewell asked the neighbor to check on things. The fact Ewell was concerned necessarily means he realized something could be wrong. If something was wrong, the next step would have been to summon the appropriate authorities and assistance, and Ewell cannot have expected otherwise. Moreover, if it turned out a crime had been committed, Ewell cannot have expected anything but that the authorities would investigate to the extent and in the manner necessary to apprehend the perpetrator(s), even if that meant removing evidence from the walls and floor of the house. In short, Ewell subjectively cannot have anticipated anything other than what occurred: a thorough search and investigation. This is especially true in light of the fact the neighbor promptly informed Ewell that he had seen Tiffany lying in the kitchen. Logically speaking, under the circumstances it cannot be said that Ewell "took normal precautions to maintain his privacy" (*Rawlings v. Kentucky, supra,* 448 U.S. at p. 105) or "through [his] actions exhibited a subjective belief [the premises] would be free from governmental intrusion." (*People v. Henderson, supra,* 220 Cal.App.3d at p. 1642; *Rawlings v. Kentucky, supra,* at p. 105.) Accordingly, were we writing on a clean slate, we would find he lacks standing to challenge the search at issue.

The United States Supreme Court has determined otherwise, albeit without extensive discussion or analysis. In *Thompson v. Louisiana* (1984) 469 U.S. 17, Thompson shot and killed her husband and then ingested pills in a suicide attempt. Changing her mind, she telephoned her daughter, informed her of the situation, and asked for help. The daughter then contacted police and, upon their arrival, admitted them to the home. Homicide investigators arrived on the scene a short time after Thompson was

---

[38]   For purposes of our analysis, we accord Ewell the presumption of innocence to which he was entitled at the time of the search.

transported to the hospital, and they entered the residence and conducted a two-hour-long search for evidence of a crime. (*Id.* at pp. 18-19.) In a per curiam opinion, the high court found that Thompson's attempt to obtain medical assistance did "not evidence a diminished expectation of privacy on her part. To be sure, this action would have justified the authorities in seizing evidence under the plain-view doctrine while they were in [her] house to offer her assistance.... However, the evidence at issue here was not discovered in plain view while the police were assisting [Thompson] to the hospital, nor was it discovered during the 'victim-or-suspect' search that had been completed by the time the homicide investigators arrived. *[Thompson's] call for help can hardly been seen as an invitation to the general public that would have converted her home into the sort of public place for which no warrant to search would be necessary.*" (*Id.* at p. 22, fn. omitted, italics added.)

The situation before us is legally analogous. Accordingly, we find that Ewell properly may challenge the search of the Park Circle Drive residence on the merits. Nevertheless, as we will explain, we conclude the suppression motion was properly denied.

The Fourth Amendment prohibits only unreasonable searches and seizures. (*United States v. Arvizu* (2002) 534 U.S. 266, 273; *New York v. Class* (1986) 475 U.S. 106, 116; *Bell v. Wolfish* (1979) 441 U.S. 520, 558.) Warrantless searches are presumptively unreasonable, subject only to a few carefully delineated exceptions. (*United States v. Karo* (1984) 468 U.S. 705, 717; *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 454-455.) The burden is on the prosecution to establish the reasonableness of a warrantless search (*id.* at p. 455; *People v. Jenkins* (2000) 22 Cal.4th 900, 972); it must "demonstrate that the circumstances surrounding the entry and search were so exceptional as to excuse noncompliance with the Fourth Amendment's requirement of prior judicial approval. [Citations.]" (*People v. Hill* (1974) 12 Cal.3d 731, 753, overruled on other grounds in *People v. DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5.)

58.

As Ewell conceded during the suppression hearing, the initial entry and walk-through by Sergeant Huerta and Deputy Nielsen were justified by exigent circumstances.[39] "In this context, 'exigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*People v. Ramey* (1976) 16 Cal.3d 263, 276; see *Mincey v. Arizona* (1978) 437 U.S. 385, 392-393.) An important consideration in determining whether an exigency exists is the gravity of the underlying offense. (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 753; *People v. Higgins* (1994) 26 Cal.App.4th 247, 252.) Here, officers responded to a call for service involving an apparent burglary and a dead body. They would have been remiss in their duties had they not entered the home and looked for other victims.[40] Since the initial entry clearly was proper, the question becomes whether law enforcement

---

[39]   Although the People now assert only lack of standing, consent, and inevitable discovery as bases on which to uphold the search, other theories were relied on in the trial court and raised in Ewell's opening brief, and we believe they merit discussion.

[40]   This is true whether we consider the initial entry and walk-through under the law relating to exigent circumstances or that relating to the emergency aid doctrine, which itself is a subcategory of the community caretaking exception to the warrant requirement. (*People v. Ray* (1999) 21 Cal.4th 464, 471.) "'When the police act pursuant to the exigent circumstances exception, they are searching for evidence or perpetrators of a crime. Accordingly, in addition to showing the existence of an emergency leaving no time for a warrant, they must also possess probable cause that the premises to be searched contains such evidence or suspects. [Citations.] In contrast, the community caretaker exception is only invoked when the police are not engaged in crime-solving activities.' [Citations.]" (*Ibid.*)

authorities lawfully could remain in the house without a warrant while they conducted their search for evidence and investigation.[41]

Although exigent circumstances may justify a warrantless entry and search, once the exigency has passed, a search warrant is required. (*People v. Bradley* (1982) 132 Cal.App.3d 737, 745.) "'[I]f the exigent circumstance being responded to is the possibility that there may be other persons within the premises who might destroy evidence, then the logical first step is a "sweep" of those premises to see if in fact anyone else is present. If no one is found, then the exigency has ended and the police should then merely maintain control of the premises while a search warrant is obtained ....' [Citation.]" (*People v. Seaton* (2001) 26 Cal.4th 598, 632.) Here, Huerta and Nielsen made sure no one was inside the Park Circle Drive residence who needed assistance or might destroy evidence. They then began to secure the premises.

In our view, the exigency/community caretaking function which justified the warrantless entry and initial walk-through ended at this point. Law enforcement authorities had assured that no one was inside the house who needed assistance or might destroy evidence, and had controlled any access thereto. They apparently did not believe there was a suspect in the immediate area, and in fact concluded they were about 48 hours behind the perpetrator(s). Unless degradation of the crime scene due to the passage of time constitutes threatened destruction of evidence under the Fourth Amendment, the exigent circumstances exception to the warrant requirement did not excuse failure to

---

[41] Leaving aside whether a warrant was required, we do not find a four-day-long search to be unreasonable in duration given the complexity of the crime scene in this case. It is apparent from Ybarra's testimony at the suppression hearing that the crime scene was processed as efficiently as practicable. Hence, the question is whether law enforcement authorities could search without a warrant once the initial entry was made and the premises secured, not whether they could search for four days.

obtain a search warrant for the intensive search which followed the initial entry and walk-through. As the California Supreme Court has noted, "'[t]he privilege to enter to render aid does not ... justify a search of the premises for other purposes. [Citation.] To the contrary, the warrantless search of a dwelling must be suitably circumscribed to serve the exigency which prompted it. [Citations.]' [Citation.] 'The officer's post-entry conduct must be carefully limited to achieving the objective which justified the entry – the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance [or property is at risk] and to provide that assistance [or to protect that property].' [Citations.]" (*People v. Ray, supra,* 21 Cal.4th at p. 477; see *People v. Justin* (1983) 140 Cal.App.3d 729, 736 [no continuing exigency where challenged search occurred after other officers determined there were no intruders and appellant was disarmed and secured]; compare *United States v. Young* (8th Cir. 1977) 553 F.2d 1132, 1134 [warrantless search by evidence technicians not within exigent circumstances exception where technicians were looking for evidence, not suspects, at time when dwelling secured and appellant arrested] with *United States v. Martin* (9th Cir. 1985) 781 F.2d 671, 674-675 [where police had report of injury from explosion and saw smoke, warrantless search of apartment for further victims and cause of explosion proper due to need to guard against additional explosions or fire].)

At the suppression hearing, the People presented substantial testimony concerning the perishable nature of this crime scene and how evidence can deteriorate fairly quickly over time. We are aware of no authority, however, which equates such routine changes, which are brought about by naturally-occurring processes or the effect of police presence itself, with the threatened destruction of evidence which constitutes an exigent

circumstance for Fourth Amendment purposes.[42]  If such naturally-occurring deterioration constituted exigent circumstances, the need for a search warrant would be obviated in virtually every homicide case.  Yet that is not the law.

In *Mincey v. Arizona, supra*, 437 U.S. 385, an undercover narcotics officer was killed during a raid on Mincey's apartment.  After the shooting, other officers quickly checked the apartment for, and located, other victims, and they requested emergency assistance.  Pursuant to a police department directive that officers not investigate incidents in which they were involved, however, the narcotics officers neither searched further nor seized any evidence, but instead merely guarded the suspects and premises. Within 10 minutes, homicide detectives arrived and took charge of the investigation. Their search lasted four days and included the digging of bullet fragments out of walls and floors, and the removing of sections of carpet for examination.  (*Id.* at pp. 387-389.) No warrant was ever obtained.  (*Id.* at p. 389.)  On appeal, the Arizona Supreme Court held that a warrantless search of a homicide scene is constitutionally permissible under certain delineated circumstances.  (*Id.* at pp. 390-391.)

The United States Supreme Court disagreed, rejecting the argument that a possible homicide presents an emergency situation demanding immediate action.  It stated:

---

[42]     Assuming we might conceive of a situation in which rapid decomposition of a body could constitute exigent circumstances, nothing in the record suggests this was such a case and, in fact, those investigating the homicides did not treat it as such.  The bodies were found shortly after 9:00 a.m. on April 21.  They could not be disturbed or examined, other than visually, until the coroner arrived and took possession of them.  This did not occur until approximately 5:45 that afternoon, and the bodies were not removed from the scene until after 8:00 that evening.  Such a time frame does not suggest a sense of urgency on the part of investigators to forestall deterioration of evidence, and we suspect it would have taken less time to obtain a search warrant – even without use of the telephonic warrant procedure – than it did to remove the bodies from the house.

"We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. [Citation.]... And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. [Citations.]

"But a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation,' [citation] and it simply cannot be contended that this search was justified by any emergency threatening life or limb. All the persons in Mincey's apartment had been located before the investigating homicide officers arrived there and began their search. And a four-day search that included opening dresser drawers and ripping up carpets can hardly be rationalized in terms of the legitimate concerns that justify an emergency search. [¶] ... [¶]

"Except for the fact that the offense under investigation was a homicide, there were no exigent circumstances in this case .... There was no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant. Indeed, the police guard at the apartment minimized that possibility. And there is no suggestion that a search warrant could not easily and conveniently have been obtained. We decline to hold that the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search." (*Mincey v. Arizona, supra,* 437 U.S. at pp. 392-394, fns. omitted; see also *Flippo v. West Virginia* (1999) 528 U.S. 11, 12-24 [invalidating 16-hour-long search]; *Thompson v. Louisiana, supra,* 469 U.S. at pp. 18-21 [invalidating two-hour-long search].)

Contrary to the trial court's suggestion, we do not believe *Mincey* and its progeny can be distinguished from the facts of this case on the ground that in those instances, the victim and assailant were both known to police and the suspected perpetrator had been arrested or detained at the time of the challenged search. Although the *Mincey* court mentioned that fact (*Mincey v. Arizona, supra,* 437 U.S. at p. 393), it was not determinative, but simply a circumstance to be considered in determining whether the search in question "was justified by any emergency threatening life or limb." (*Ibid.*) In

the present case, although the authorities did not know the identity of the perpetrator(s) and reasonably were concerned with the community's safety, they *did* know they were approximately 48 hours behind the killer(s). There is absolutely nothing in the record to suggest the time taken to secure a search warrant would have mattered or potentially endangered other persons. (See *People v. Mitchell* (1990) 222 Cal.App.3d 1306, 1312-1313 & cases cited [in determining whether exigent circumstances existed, courts may consider gravity of underlying offense and whether delay would have posed threat to police or public safety].)

Cases such as *Michigan v. Tyler* (1978) 436 U.S. 499 (*Tyler*) do not change our analysis. There, the United States Supreme Court "consider[ed] the applicability of the Fourth and Fourteenth Amendments to official entries onto fire-damaged premises" (*id.* at p. 501) and determined that "[a] burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.'" (*Id.* at p. 509.) Once in a building for the purpose of extinguishing the blaze, "firefighters may seize evidence of arson that is in plain view. [Citation.]" (*Ibid.*) The court rejected the notion that the exigency ends, and the need for a warrant begins, "with the dousing of the last flame." (*Id.* at p. 510.) The court observed: "Fire officials are charged not only with extinguishing fires, but with finding their causes. Prompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of continuing dangers such as faulty wiring or a defective furnace. Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction. And, of course, the sooner the officials complete their duties, the less will be their subsequent interference with the privacy and the recovery efforts of the victims. For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished." (*Ibid.*, fn. omitted.) The court further held that fire officials did not need a warrant to reenter the premises a few hours after they curtailed their investigation because darkness, steam, and smoke severely hindered

64.

visibility. The court made it clear, however, that subsequent entries were detached from the initial exigency and, hence, required search warrants. (*Id.* at p. 511.)

The possibility a fire will recur if its cause is not determined and the difficulty in securing a burned building so as to preserve evidence, present exigencies which do not generally exist in non-fire-related cases. In the instant case, the crime scene was secured so as to preserve the evidence for the period of time it would have taken to obtain a warrant, and authorities knew there was no immediate danger to life or limb once they determined there were no living victims or any suspects inside the house. Accordingly, *Tyler* does not stand for the proposition that a warrantless search for evidence was permissible simply because the authorities were charged with solving the crimes and remained in the house for a reasonable time, given the complexity of the crime scene, with only short breaks for sleep. (See *People v. Bradley, supra,* 132 Cal.App.3d at p. 745 [in contrast to situation in *Tyler*, exigency created by presence of possible burglar disappears when officers determine there was no intruder or he or she has departed].)

In *People v. Boragno* (1991) 232 Cal.App.3d 378, this court dealt with a situation in which officers undertook a one-minute sweep of an apartment for additional suspects or victims, but then cordoned off the dwelling and undertook further investigation, without a search warrant, for approximately 13 hours. (*Id.* at p. 385.) We observed: "This was not a situation where the initial entry was terminated because the officers were concerned for their safety [citations] or the physical condition of the premises prevented the officers from completing their initial inspection and eliminating the source of danger or the risk of destruction of evidence. [Citations.] Rather, here ... there was an initial emergency which ceased to exist before the warrantless reentry. There is no 'murder scene exception' to the warrant requirement. [Citation.]" (*Id.* at pp. 386-387.)

We then reviewed numerous cases involving exigent circumstances, the so-called "murder scene exception" to the warrant requirement, and reentry by firefighters. (*People v. Boragno, supra,* 232 Cal.App.3d at pp. 387-393.) We paid careful attention to

65.

*People v. Amaya* (1979) 93 Cal.App.3d 424, wherein the first officer on the scene searched for victims or suspects, then evidence was seized by investigators who arrived later. (*Id.* at pp. 427-428.) The Third District Court of Appeal upheld the investigators' reentry and search since, had the items seized – which were in plain sight – been collected by the first officer to enter the premises, their seizure would have been permissible as being in the course of a lawful search for suspects or victims. The court reasoned that subsequent seizure by a homicide investigator was constitutional, as, between the initial entry and the physical seizure, the premises were under exclusive police control such that the first officer's physical withdrawal from the apartment did not terminate an uninterrupted police presence therein. (*Id.* at pp. 430-431.) We found that "[t]he *Amaya* opinion stands alone in California case law in authorizing reentry on the basis of an uninterrupted control over the premises." (*People v. Boragno, supra,* 232 Cal.App.3d at p. 390.) We concluded that in the case before us, "the search of the premises by the investigators after the initial sweep was invalid as unconstitutional under the Fourth and Fourteenth Amendments and any evidence seized or observed after the initial sweep should have been suppressed ...." (*Id.* at p. 393.)

The present case did not start with a fire and then evolve into a criminal investigation. (Contrast *People v. Boragno, supra,* 232 Cal.App.3d at pp. 392-393 with *Michigan v. Clifford, supra,* 464 U.S. 287; *Tyler, supra*, 436 U.S. 499.) Investigators were not forced to leave the scene; there was no imminent threat of destruction of evidence. Moreover, whatever the continued validity of *People v. Amaya, supra*, 93 Cal.App.3d 424, the case before us involved an exhaustive search which included digging into walls and pulling up pieces of carpet – intrusions which far exceed the limits of plain

view.[43]  In sum, the exigency which justified the initial entry and sweep of the premises

had ended by the time Ybarra and other investigators arrived and began their search. No

longer was there an emergency which left no time to obtain a warrant. (See *People v.*

*Coddington* (2000) 23 Cal.4th 529, 580, overruled on other grounds in *Price v. Superior*

*Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *People v. Ray, supra,* 21 Cal.4th at p. 471;

*People v. Koch* (1989) 209 Cal.App.3d 770, 782-783, disapproved on other grounds in

*People v. Weiss* (1999) 20 Cal.4th 1073, 1075, 1083.)

Without question, a search warrant could have been obtained based on Huerta's

and Nielsen's observations:  given the presence of three dead bodies and what appeared

to be gunshot wounds, no judge would have refused to issue such a warrant. Contrary to

the trial court's ruling, however, this fact does not render the evidence admissible upon a

theory of inevitable discovery.[44]

---

[43]     The court in *People v. Justin, supra,* 140 Cal.App.3d 729, recognized a limited
right of reentry involving the observation or seizure of evidence previously observed
during lawful entries. (*Id.* at p. 736.) It is likely that Nielsen and/or Huerta observed
items with evidentiary value during their time in the house.  Such items were subject to
warrantless seizure since "objects falling in the plain view of an officer who has a right to
be in the position to have that view are subject to seizure and may be introduced in
evidence. [Citations.]" (*Harris v. United States* (1968) 390 U.S. 234, 236.)
Unfortunately, neither officer testified at the suppression hearing, so we are unable to
discern what items of evidence may have been seizable on this basis.  Only their
observations of the ransacking were elicited through Ybarra's testimony and, since they
entered the home to look for victims, we cannot assume they necessarily took note of the
same items Ybarra did when she walked through the residence specifically looking for
evidence.  Moreover, even if we were to consider, as the basis for plain view, what
Ybarra saw during her walk-through, she observed holes in the walls which appeared to
be bullet holes, and not the bullets themselves.

[44]     The People initially conceded this point.  In light of our analysis, we need not
determine the propriety of their attempt to withdraw the concession, less than one week
before oral argument, based on authority more than 15 years old.

Under the doctrine of inevitable discovery, as adopted in *Nix v. Williams* (1984) 467 U.S. 431, the exclusionary rule does not bar evidence which the prosecution can establish "ultimately or inevitably would have been discovered by lawful means ...." (*Id.* at p. 444; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1040.) The California Supreme Court has observed that certain evidence inevitably would have been discovered in part because no judge would have failed to issue a warrant on the facts of the case. (*People v. McDowell* (1988) 46 Cal.3d 551, 564.) However, this statement has been criticized as "unfortunate dicta" (*People v. Acevedo* (1989) 216 Cal.App.3d 586, 594, judg. revd. and cause remanded on other grounds *sub nom. California v. Acevedo* (1991) 500 U.S. 565, 581) and has apparently since been repudiated, albeit without extended analysis and based upon various concessions and omissions by the People. (*People v. Robles* (2000) 23 Cal.4th 789, 801.) In any event, "'to excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment.'" (*United States v. Reilly* (9th Cir. 2000) 224 F.3d 986, 995, quoting *United States v. Echegoyen* (9th Cir. 1986) 799 F.2d 1271, 1280, fn. 7.)

While the inevitable discovery doctrine has been held to apply where the evidence sought to be suppressed was seized in a second search pursuant to a warrant which was not invalidated by the initial unlawful search (see, e.g., *Murray v. United States* (1988) 487 U.S. 533, 538, 541-542; *People v. Weiss, supra,* 20 Cal.4th at pp. 1078-1081; *United States v. Merriweather* (9th Cir. 1985) 777 F.2d 503, 506), in the present case the first search of the Park Circle Drive residence pursuant to a warrant did not take place until March 3, 1995, almost three years after the search at issue. We simply cannot say that

search inevitably would have resulted in discovery of the items seized in the search now being challenged.[45]

In sum, Ewell's suppression motion should have been granted unless the search can be justified based on consent, as the People claim. In this regard, the Fourth Amendment's prohibition against the warrantless search of a person's home does not apply where proper consent to the search has been given, as consent is a recognized exception to the warrant requirement. (*Illinois v. Rodriguez* (1990) 497 U.S. 177, 181; *People v. James* (1977) 19 Cal.3d 99, 106; *People v. Oldham* (2000) 81 Cal.App.4th 1, 9.) "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority. [Citations.]" (*Florida v. Royer* (1983) 460 U.S. 491, 497; *Bumper v. North Carolina* (1968) 391 U.S. 543, 548-549; *People v. James, supra*, at p. 106.) "The voluntariness of the consent is in every case 'a question of fact to be determined in the light of all the circumstances.' [Citations.]" (*Ibid.*; *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 249.)

The People contend Jesse Knapp, Ewell's neighbor, had the apparent authority to consent to the entry and search. "[A] search is not unreasonable if made with the consent of a third party whom the police reasonably and in good faith believe has authority to consent to their search ...." (*People v. Hill* (1968) 69 Cal.2d 550, 554, affd. *sub nom. Hill v. California* (1971) 401 U.S. 797.) "As with other factual determinations bearing upon search and seizure, determination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment ... "warrant a

---

[45]     For instance, by the time of the March 1995 search, portions of carpeting and the walls in the house had been repaired or replaced.

party had authority over the premises? [Citation.] If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid." (*Illinois v. Rodriguez, supra,* 497 U.S. at pp. 188-189; *People v. Hoxter* (1999) 75 Cal.App.4th 406, 413.)

This standard is met with respect to officers' initial entry. Based on what Knapp told Huerta and Nielsen, Ewell contacted him specifically to ask him to check on things at the house, as Ewell had been unable to reach his parents. Ewell's concern indicates a recognition on his part that something could be amiss. Officers reasonably could have believed that Knapp had the authority to take appropriate steps when Ewell's concerns were realized, including contacting the sheriff's department and permitting entry to check for victims or suspects. However, the record does not demonstrate that Knapp was ever asked to consent to the ensuing search of the residence for evidence, nor does it suggest it would have been reasonable for sheriff's personnel to believe he had the authority to consent to an exhaustive search in any event. He was simply a neighbor who had been asked to check on the Ewell family, not a cotenant or, for example, someone who was in charge of the house.[46] (See, e.g., *People v. Oldham, supra,* 81 Cal.App.4th at pp. 9-10 [father had authority to consent to search of apartment shared with adult son, and apparent authority to consent to search of son's room]; *People v. Hoxter, supra,* 75 Cal.App.4th at pp. 411-414 [16-year-old had apparent authority to consent to entry of father's house]; *People v. Wilcox* (1969) 276 Cal.App.2d 414, 418 [person listed as

---

[46] Similar reasoning leads us to reject the People's reliance on the housekeepers' apparent authority. Insofar as the record shows, the housekeepers had authority to enter to clean house. Even assuming sheriff's personnel reasonably could have believed they possessed the authority to consent to entry once it became apparent something was wrong, the record contains no basis for a conclusion it would have been reasonable to conclude they had authority to consent to a search which involved removing sections of carpet and digging into walls.

emergency contact by resident who requested police make vacation check of house had apparent authority to consent to search thereof in resident's absence].)[47]

The People also contend that, under the circumstances of this case, Ewell's consent to the entry and search may be implied. We agree.

Consent to enter and to search may be express or implied, and may be demonstrated by conduct as well as words. (*People v. Frye* (1998) 18 Cal.4th 894, 990; *People v. Superior Court (Henry)* (1974) 41 Cal.App.3d 636, 639.) However, "'[t]he existence of consent to a search is not lightly to be inferred' [citation], and the government 'always bears the burden of proof to establish the existence of effective consent.' [Citations.] That burden is heaviest when consent would be inferred to enter and search a home, for protection of the privacy of the home finds its roots in clear and specific constitutional terms ...." (*United States v. Shaibu* (9th Cir. 1990) 920 F.2d 1423, 1426.)

Implied consent will not be found based on a mere failure to object to an entry or a search. (*People v. Superior Court (Arketa)* (1970) 10 Cal.App.3d 122, 127; *United States v. Gonzalez* (11th Cir. 1996) 71 F.3d 819, 829-830; *United States v. Shaibu, supra,* 920 F.2d at pp. 1427-1428.) Nor is a stated desire to cooperate, standing alone, sufficient. (*Honeycutt v. Aetna Ins. Co.* (7th Cir. 1975) 510 F.2d 340, 344.) Moreover, summoning police to respond to an emergency – even a homicide – does not imply consent to an unlimited, warrantless search. (*People v. Timms* (1986) 179 Cal.App.3d 86, 92.) On the other hand, failure to object does provide *some evidence* of consent (*People v. Smith* (1962) 210 Cal.App.2d 252, 256), and failure to object to the search of a residence,

---

[47]    In light of our conclusion and the fact the entry was justified by exigent circumstances in any event, we need not determine whether the issue of third party authority was properly raised on appeal.

coupled with an expression of curiosity as to what would be found there, has been held to be "consistent with implied consent to search the premises. [Citations.]" (*People v. Spratt* (1980) 104 Cal.App.3d 562, 568.) Ewell argues that he could not implicitly consent because he had no knowledge, at the time the search began, that a search was underway. However, the fact a search is underway or has already been conducted is not fatal to a finding of consent, especially when the evidence demonstrates the person consenting actually wanted the police to search his or her house. (See *People v. Parrison* (1982) 137 Cal.App.3d 529, 536-537.)

Considering the totality of the circumstances in the present case, we find Ewell implicitly consented to the search of the Park Circle Drive premises. As previously noted, he set events in motion because he became concerned when he could not reach his family. Had he not recognized the possibility that something could be wrong, he would have had no reason to ask Knapp to check things out. Knapp informed Ewell of what he saw with respect to Tiffany immediately after he called 911. Once he was so informed, Ewell had to expect the authorities would enter the residence and undertake an investigation. Prior to Ybarra's entry – i.e., before any search other than the sweep for victims or suspects – Ewell contacted FBI Agent John Zent, a law enforcement officer, for assistance. Zent then had another FBI agent contact the sheriff's department on Ewell's behalf to learn what was going on at the home. Having a law enforcement agent assist him indicates a desire on Ewell's part that the investigation proceed expeditiously and thoroughly. If Ewell's only desire was to learn the fate of his family, he could have contacted the sheriff's department himself. Instead, he used someone who not only might be able to obtain more information than he could, but who also could be expected to be familiar with customary and appropriate procedures in such circumstances, to have a good idea of what was being done to solve the crimes, and who could offer suggestions and advice both to him and to the sheriff's department. Significantly, Ybarra knew Ewell had contacted law enforcement for assistance when she entered the house. Ewell and

72.

Zent had contact with Lieutenant White that afternoon, again desiring information about what had happened. White could not reasonably be expected to possess such information absent an investigation, and an investigation of a homicide scene could not reasonably be expected *not* to include a thorough search. Indeed, the fact Ewell went to the sheriff's department instead of the house following his arrival in Fresno strongly suggests he was aware that police activity was and had been occurring at the residence. Ewell stated to White a willingness to cooperate fully, and he raised no objection during Souza's interview with him even though he was made aware an investigation was underway at the house. Significantly, Ewell not only failed to object but, when he went to the house to obtain funeral clothes, *he actively participated in the ongoing search* by pointing out a handgun in Dale's closet.[48] When the house was turned over to him, he discussed with Ybarra what had been found and requested an inventory of seized items, but his only complaint concerned a padlock that had been cut off of the back gate.

Under the circumstances, Ewell not only failed to object to or hinder the search in any manner, but he actively encouraged and participated in it. The totality of the circumstances shows he had notice a search was occurring from the outset, and the totality of his conduct implied consent to authorities to undertake a thorough search.

As previously noted, California permits entry and, by analogy, search based on implied consent. (See *People v. Frye, supra,* 18 Cal.4th at p. 990.) The Ninth Circuit Court of Appeals, while less open to the concept (see *United States v. Shaibu, supra,* 920 F.2d at p. 1426 ["this court has never sanctioned entry to the home based on inferred consent"]), has made it clear that, where the conduct in question constitutes more than

---

[48]    Evidence adduced at trial, although not at the suppression hearing, established that Ewell also assisted authorities during his April 22 walk-through of the house with Souza and Zent.

73.

mere acquiescence to a claim of authority, an implied invitation to enter may properly be found, depending on the circumstances (*Pavao v. Pagay* (9th Cir. 2002) 307 F.3d 915, 920). Moreover, failure to object once entry has been made, while *alone* an insufficient basis from which to infer consent, is evidence which supports a conclusion that consent has been provided. (*Id*. at pp. 920-921.)[49]

Sister-state authority also lends support to our conclusion that the search was justified on the basis of implied consent. In *Flippo v. West Virginia*, *supra*, 528 U.S. 11, Flippo and his wife were vacationing at a cabin in a state park. Flippo called 911 to report that they had been attacked; the police arrived to find him standing outside the cabin, injured. Inside, they found Mrs. Flippo, fatally wounded. Flippo was taken to the hospital; meanwhile, officers secured the area and searched outside the cabin for footprints or signs of forced entry. When a police photographer arrived, they reentered the cabin and processed the crime scene in what amounted to a 16-hour search. (*Id*. at p. 12.) The United States Supreme Court found the search to fall squarely within its rejection, in *Mincey v. Arizona*, *supra*, 437 U.S. 385, of the "murder scene exception" to the warrant requirement of the Fourth Amendment. (*Flippo v. West Virginia*, *supra*, at p. 14.) Although the state contended that the search was justifiable based on implied consent, the Supreme Court expressed no opinion on the issue – ordinarily a factual one – and left it for resolution upon remand. (*Id*. at pp. 14-15.)

Following remand, the trial court denied Flippo's motion for a new trial, which was based, in part, on the contention that certain evidence introduced at trial had been unlawfully seized. (*State v. Flippo* (W.Va. 2002) 575 S.E.2d 170, 174.) On appeal, the

---

[49]    While they are not binding on us even on federal questions, we consider the decisions of lower federal courts carefully for guidance. (*People v. Avena* (1996) 13 Cal.4th 394, 431.)

Supreme Court of Appeals considered the lower court's ruling that the evidence was
admissible under the implied consent exception to the warrant requirement of the Fourth
Amendment, the existence of such an exception being a matter of first impression for
West Virginia's highest court. (*State v. Flippo*, *supra*, at p. 178.) The court undertook an
extensive review of federal and sister-state authority (*id.* at pp. 178-180), and held that
"consent to search may be implied by the circumstances surrounding the search, by the
person's prior actions or agreements, or by the person's failure to object to the search.
Thus, a search may be lawful even if the person giving consent does not recite the
talismanic phrase: 'You have my permission to search.'" (*Id.* at p. 180.) The court cited
with approval reasoning by other courts that "'[o]ne can hardly expect the police to get a
search warrant for a house or building when the owner is obviously cooperative and gives
every appearance of being the victim, rather than the perpetrator, of a crime'" and that
"['w]hen the owner or occupant of the premises permits the police to make a search
without a warrant at a time when the occupant is not even suspected of complicity in the
crime, the police are lulled into a sense of security, and [therefore] the occupant [can]not
later object if the search led to the discovery of evidence which ultimately resulted in his
being charged with complicity in the crime.[']" (*Ibid.*) The court further held:

> "[W]hen a person summons the police to a dwelling he/she owns,
> possesses, or controls, and that person states that a crime was committed
> against him/her or others by a third person at the premises, he/she implicitly
> consents to a search of the premises reasonably related to the routine
> investigation of the offenses and the identification of the perpetrator .... As
> long as the person summoning the police is not a suspect in the case or does
> not affirmatively revoke his/her implied consent, the police may search the
> premises without a warrant for the purposes of investigating the reported
> offenses and identifying the perpetrator, and evidence obtained thereby is
> admissible...." (*Id.* at p. 183; fns. omitted; accord, *Brown v. States*
> (Tex.Crim.App. 1993) 856 S.W.2d 177, 182; *State v. Fleischman*
> (Ariz.App. 1988) 754 P.2d 340, 344; *Thompson v. State* (Minn. 1986) 384
> N.W.2d 461, 463.)

Ultimately, the court found the police had implied consent to search the cabin during their initial response to Flippo's call for assistance. (*State v. Flippo, supra*, 575 S.E.2d at p. 183.) Subsequently, however, Flippo was taken to the police station in order to make a formal statement; there, he was informed he was a suspect and advised of his rights. As of that point, the court determined, the police were required to stop searching the cabin and obtain a search warrant. Evidence seized afterward without a warrant was subject to suppression. (*Id.* at p. 186.)

In the present case, the authorities were summoned to the scene on Ewell's behalf, and Ewell certainly suggested, in his interview with detectives, that the murders were committed by a third party. Moreover, as the trial court found, while Detective Souza apparently considered any surviving heir to family wealth a suspect, this generalized suspicion was not communicated to Ewell at the time of the search, and he was viewed as a bereaved survivor. He voiced no opposition to the investigation that he knew was occurring at the house, and instead gave every appearance of a desire to cooperate and to have that investigation continue. In fact, he went so far as to actively participate in the search. Under the circumstances, and as discussed *ante*, he implicitly consented to the April 1992 search of the Park Circle Drive residence.

As previously noted, the Fourth Amendment prohibits only unreasonable searches and seizures. Under the totality of the circumstances, the search of the Park Circle Drive residence was reasonable. Ewell's motion to suppress the evidence seized as a result of that search was properly denied.

**B.    Clone Pager Evidence**

As set out in the statement of facts, *ante*, the prosecution presented evidence of intercepted pager communications obtained by sheriff's detectives' use of a "clone" or duplicate pager. The trial court originally suppressed this evidence, but we reversed that ruling by pretrial writ of mandate. Appellants now contend the trial court's order of

suppression should be affirmed and they should receive new trials at which such evidence is not admitted.

1.    Procedural History

Inasmuch as we have set out the trial court proceedings relevant to this issue in our opinion in the writ proceedings (*People v. Superior Court (Ewell)* (July 10, 1997, F27396, F27534, F27543 [nonpub. opn.], pp. 24-29), we adopt that portion of our prior opinion as the opinion of this court.[50]  That portion of the opinion (with appropriate deletions and additions) is as follows:[51]

On September 4 and September 6, 1996, respectively, Ewell and Radovcich moved to quash various search warrants and to suppress evidence. [ ]  In conjunction with his motion, Ewell presented a detailed statement of facts setting out, among other things, the post-homicide surveillance on Ewell and Radovcich.[1]

In brief, and insofar as is relevant to the issues before us, law enforcement surveillance began on Ewell's house in Fresno on June 25, 1992.  Surveillance on Radovcich commenced on February 1, 1993.  During this time, Radovcich was observed making a number of calls from pay telephones.  At least some appeared to be long distance, given the amount of money Radovcich put into the telephones.  Law enforcement officers attempted to eavesdrop on some of Radovcich's conversations.

---

[50]    Pursuant to Evidence Code section 452, subdivisions (a), (d) and section 459, and in conformity with California Rules of Court, rule 977(b), we take judicial notice of our records and opinion in the consolidated proceedings of *People v. Superior Court (Ewell)*, F27396; *Radovcich v. Superior Court*, F27534; and *Ewell v. Superior Court*, F27543.

[51]    Empty brackets [ ] indicate deletions from our prior opinion.  Brackets with material enclosed indicate our current insertions or additions, unless otherwise specified. (See *Municipal Court v. Superior Court (Gonzalez)* (1993) 5 Cal.4th 1126, 1128-1129 & fn. 1.)

On April 8, 1993, law enforcement officers obtained a search warrant to seize digital pager information from Radovcich's account with Pagenet Pager Company and Communications Headquarters Company. On April 12, 1993, law enforcement officers obtained a search warrant to get a "clone" (duplicate) pager, to allow them to receive the pages Radovcich was receiving. On April 22, 1993, they obtained a second search warrant, after Radovcich had his pager number changed. Surveillance continued; Radovcich was observed making more long distance calls from pay telephones. On at least four separate occasions, intercepted pages led surveilling officers to Ewell.

Both [appellants] moved to suppress the clone pager evidence and any evidence gathered as a result of or derived therefrom. The People opposed the motions, arguing (1) a pager which transmits only numbers does not "intercept" the contents of a communication and so does not fall within 18 United States Code section 2510 et seq. (hereafter Title III or the Act); [ ] (2) a digital pager constitutes a "tone-only paging device" which is specifically exempted from Title III; and (3) even if Title III applies, no exclusion is warranted under *United States v. Leon* (1984) 468 U.S. 897 (*Leon*). Both [appellants] disagreed with regard to the application of federal statutes to this case, in addition to which Ewell argued that the municipal court judge who signed the search warrants lacked jurisdiction to issue Title III warrants.

The motions were heard beginning October 8, 1996. No testimony was presented on the issues with which we are concerned.

The trial court issued its written ruling on November 27, 1996. After an extensive review of state and federal law, the trial court determined that digital pagers are not exempt from federal law as "tone-only" pagers and that the transmission of telephone numbers through a digital pager constitutes a "communication" under federal law. The court found various violations of Title III. The court also found it apparent, from the face of the warrants, that they were issued as routine warrants and not under Title III or corresponding California law (Pen. Code, § 629 et seq.). The court determined that

78.

California law was inapplicable at the time the warrants were issued; hence, whether issuance was lawful had to be determined pursuant to federal law. The court further held that *Leon*'s good faith exception does not apply when there is a complete unexplained and unjustified failure to comply with the provisions of Title III in obtaining the warrant. In part, the court stated:

> "Here the issue is not whether there was probable cause to obtain a search warrant for a clone pager, but a total failure both on the part of law enforcement and the magistrate to comply with the essential terms of Title III. The Court cannot assume that a reasonably well-trained officer would not know about Title III. Moreover, no excuse for noncompliance has been offered other than that a digital pager is essentially the same as a 'pen register' and the equivalent of a 'tone-only' pager."

[Pursuant to Penal Code section 1538.5,] [t]he trial court suppressed evidence derived from use of the clone pager [for failure to comply with 18 United States Code section 2518(10)].[52] [ ] [However, it denied the motions to suppress other search and arrest warrants, finding sufficient probable cause for issuance thereof after deletion from the affidavits of the information obtained by use of the clone pager.]

The People subsequently moved for reconsideration pursuant to Code of Civil Procedure section 1008. The People asked to present testimony by Detective Souza relating to the issue of good faith. Ewell and Radovcich both opposed the request.

A hearing was held on the motion on December 16, 1996. The trial court clarified that it had accepted that Detective Souza and other officers were acting conscientiously in performing their responsibilities, but that the ultimate question involved an objective standard. The People argued, in essence, that it was objectively reasonable for officers to

---

52   Section 2518(10) of 18 United States Code provides who may move for suppression (18 U.S.C. § 2518(10)(a)) and what remedies and sanctions are available regarding the interception of electronic communications (18 U.S.C. § 2518(10)(c)).

believe that what they sought to intercept fell outside the purview of the federal and California statutes. The court responded that, from an objective standpoint, this was not a technical defect in a warrant. Instead, it was a total failure, both by law enforcement and the magistrate, to deal differently with this issue than they did with all of the other search warrants. The court continued:

> "So I will accept what your declaration and offer of proof – and I can say I assumed in rendering the decision that the – that that is what happened, that the officer was acting without recognizing that it was potentially in violation of the federal statute, and that certainly the magistrate, being the conscientious judge, thought that this was a routine search warrant application.

> "But then this [Title III][53] is binding on the states. And it isn't just taking a federal statute that may apply to federal agencies, and so it is sufficiently, widely known, that what I would be doing is just reading legislation off the books. And maybe there should not be a distinction between pagers that just give a digital telephone number with no other message. And Congress may have anticipated that, with the progress of technology, that pagers would carry, as some of them do, more than telephone numbers but additional brief messages.

> "But that is what they did...."

After the defense argued the court had no jurisdiction to reconsider its prior decision, the trial court ruled:

> "First of all, I think Mr. Cherney [Radovcich's defense attorney] correctly points out that, in a 1538.5 motion, that the decision, once made, it then becomes an appellate issue. However, assuming for purposes of argument that the Court is able to reconsider it, and assuming that the offer of proof is correct, the offer of proof is what I assumed was the situation at the time of the issuance of the warrant, certainly Detective Souza went to the magistrate in the same usual way that search warrants are issued. And perhaps it isn't a question of fault or a challenge to integrity or professionalism. As Mr. Jones [Ewell's defense attorney] pointed out in his

---

53    Brackets in original opinion.

opposition, the – there is no lack of integrity; there is no intentional effort to circumvent essential requirement of law. It is – had perhaps, if anything, it is a question of the depth to which those dealing with the – a sensitive area, in the sense that Congress had passed the law relatively recently but long enough that where everyone should have known of its existence. And perhaps the fault lies with the magistrate not to have done more research on what was required. But it isn't a question of fault-finding. It's a question of: Was the statute complied with?

"And here there is a total noncompliance with the statute. A proceeding on the basis as if it didn't exist. And certainly the warrant issued by the magistrate didn't have the findings required. And one can conclude that it probably would have been issued with the findings if the declaration had been sufficient and if the magistrate had included in the order the requisite findings. And it is not because of the delay in filing the return. I have dealt with that and did not find that to be fatal. It is that it is just a noncompliance with a federal statute that has preempted the field. And once you have a federal statute that preempts the subject matter, it is necessary to comply with it.

"And if this were a warrant under the general principles of – under the Fourth Amendment, the good-faith exception should be applicable. But this is proceeding in a preempted area where the Congress, in its wisdom, has made a distinction between clone pagers and digital pagers and other forms of communication, and has required certain procedures to be followed, and has said that there is a remedy to suppress the evidence if there is noncompliance. And, therefore, I'm merely following the guidelines of the statute and the federal decisions on the subject.

"And one may argue Congress was wrong in making a distinction without a difference, or that the federal decisions are wrong because a clone digital pager, that does not carry messages other than the number, shouldn't be put in the same category as a tone pager or trap. But that isn't what they did. And it isn't what they said.

"And so, both on the procedural grounds and assuming – and also assuming that the Court has authority to reconsider the motion, I do not find any fault, as does Mr. Cherney, with the People making a motion for reconsideration. Certainly could feel more attention should have been given to the good-faith issue. Well, I assumed basically good faith, and that there is no willful intentional deprivation of rights. It was just proceeding without complying with a federal act and by which I feel bound to follow. So the motion for, all grounds, the motion for reconsideration is denied."

[We end our quotation from our prior opinion.]

In our opinion, we first reviewed the relevant statutory scheme, i.e., Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520). (*People v. Superior Court (Ewell)*, *supra*, at pp. 30-33 [nonpub. opn.].) We then turned to the parties' contentions with respect to Title III. In this regard, the People claimed that Title III provided no statutory suppression remedy for interceptions of electronic communications obtained in violation of the Act; hence, admissibility was governed by Fourth Amendment principles, including *Leon*. The People further argued that there was no expectation of privacy in the telephone numbers a person dialed or in the numbers transmitted to a pager. Last, the People contended the good faith exception of *Leon* applied to the circumstances of this case. Appellants countered that the availability of suppression under Title III was not presented in the trial court and so could not be raised on the appellate level. They also argued that some requirements under the Act were strictly statutory, while others embodied Fourth Amendment principles. They conceded that 18 United States Code section 2518(10)(c) limited remedies for nonconstitutional violations of Title III with respect to electronic communications, but claimed a full range of statutory and Fourth Amendment remedies were available for violations of constitutional magnitude. They further argued that *Leon* does not override an exclusionary remedy enacted by Congress, and, in any event, does not excuse objectively unreasonable violations of the Fourth Amendment. (*People v. Superior Court (Ewell)*, *supra*, at pp. 33-35 [nonpub. opn.].)

We first determined that the People could properly argue the issue of Title III's statutory suppression remedy to this court since the issue was "'at least in the air'" by virtue of their argument that *Leon* was applicable; construction of a statute and its applicability present questions of law; the underlying facts were uncontroverted; and appellants pointed to no evidence which could have been introduced on the issue. Hence, we concluded, appellants were not prejudiced by the People's failure expressly to rely on

82.

the theory below. (*People v. Superior Court (Ewell)*, *supra*, at pp. 35-36 [nonpub. opn.].)[54]

We next turned to the substantive issues.[55] Insofar as is relevant to the current appeal, we determined:

- Title III governs interceptions of communications involving the clone pager used in this case, and most of its requirements were not met with respect to the warrants at issue. (*People v. Superior Court (Ewell)*, *supra*, at pp. 37-40 [nonpub. opn.].)

- Some of the violations were merely statutory, while others were of constitutional magnitude; insofar as interceptions of electronic communications are concerned, violations of Title III which are not of constitutional magnitude will not result in suppression of evidence unless the particular statute violated contains its own specific suppression remedy, but if the violation rises to a level of constitutional magnitude, suppression is available under the Fourth Amendment and a determination must be made whether *Leon* applies. (*People v. Superior Court (Ewell)*, *supra*, at pp. 40, 43-46 [nonpub. opn.].)

- A specific suppression remedy is contained in 18 United States Code section 2518, which, at all times pertinent, provided in part:

> "(8)(a) The contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, *if possible*, be

---

[54] We agreed with appellants' other procedural argument – that a trial court lacks jurisdiction to reconsider a ruling granting a suppression motion – but pointed out that in the present case, the trial court denied the motion for reconsideration. Given this point, we viewed the trial court's comments during the hearing on that motion as merely clarifying its written order. (*People v. Superior Court (Ewell)*, *supra*, at p. 37 [nonpub. opn.].)

[55] Appellants do not challenge the portion of our ruling which addressed whether suppression was warranted under California statutes. (*People v. Superior Court (Ewell)*, *supra*, at pp. 90-92 [nonpub. opn.].)

recorded on tape or wire or other comparable device. The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, *such recordings* shall be made available to the judge issuing such order and sealed under his directions.... The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom ...." (*People v. Superior Court* (*Ewell*), supra, at p. 47 [nonpub. opn.].)

- Insofar as the record showed, the clone pager utilized in the present case had no capability to permanently record or store the numbers received; since 18 United States Code section 2518(8)(a) applies only when the contents of the intercepted communication can be recorded on tape or wire or other mechanical device, no statutory suppression remedy was available to appellants under Title III. (*People v. Superior Court (Ewell)*, *supra*, at pp. 48-51 [nonpub. opn.].)

- Ewell's Fourth Amendment rights were not violated by the interception of numbers he dialed on a telephone; since there was no Fourth Amendment violation and no suppression remedy available to him under Title III, the trial court erred by suppressing the clone pager and derivative evidence as to him. (*People v. Superior Court (Ewell)*, *supra*, at pp. 51-56, 61-66 [nonpub. opn.].)

- As to Radovcich, whose Fourth Amendment rights we assumed were implicated by interception of his pager messages since the People failed to contend otherwise (*People v. Superior Court (Ewell)*, *supra*, at pp. 56, 66-69 [nonpub. opn.]),[56] the warrants violated 18 United States Code section 2518(5) with respect to the

---

[56]   In response to the concurring and dissenting opinion's election to discuss the matter, we noted that were we to analyze the issue, we would conclude Radovcich possessed a legitimate expectation of privacy in the communications sent to his pager. (*People v. Superior Court (Ewell)*, *supra*, at pp. 69-80 [nonpub. opn.].)

minimization requirement, but, since the nature of the surveillance in the present case did not readily lend itself to minimization and the officers did not act unreasonably at the time they made the interceptions, there was no Fourth Amendment violation with respect to minimization. (*People v. Superior Court (Ewell)*, *supra*, at pp. 56-57 [nonpub. opn.].)

- The warrants violated the requirements of 18 United States Code sections 2518(1)(c) and 2518(3)(c) with respect to necessity/investigatory exhaustion, but the affidavit was sufficient to allow the issuing magistrate reasonably to conclude that reasonable efforts to succeed without use of a clone pager had been tried and failed, so there was no Fourth Amendment violation. (*People v. Superior Court (Ewell)*, *supra*, at pp. 57-59 [nonpub. opn.].)

- The search warrants contained no temporal limits on use of the clone pager, nor did the affidavits explain why open-ended interception was needed or that probable cause exited for an unspecified length of time; this violation of the particularity requirement was of constitutional magnitude. (*People v. Superior Court (Ewell)*, *supra*, at pp. 59-60 [nonpub. opn.].)

- *Leon*'s good faith exception to the Fourth Amendment's exclusionary rule applied, as (1) there was no suggestion the magistrate who issued the warrants abandoned his detached and neutral role (*People v. Superior Court (Ewell)*, *supra*, at p. 81 [nonpub. opn.]); (2) there was no issue before us concerning false affidavits (*ibid.*); (3) despite violation of the particularity requirement, the warrants at issue were not so facially deficient under the Fourth Amendment (as opposed to under Title III) that executing officers could not reasonably presume them to be valid (*id.* at pp. 81-84); (4) the affidavits provided probable cause for the magistrate to issue a warrant authorizing use of a clone pager for some reasonable period of time, and the magistrate's failure to determine what constituted a reasonable duration was judicial error for which the law enforcement officer should not be penalized (*id.* at pp. 84-86); (5) whether the

officer's failure to realize Title III was applicable could be objectively reasonable, under *Leon*, was irrelevant as it erroneously merged what are separate issues (*id.* at p. 87); and (6) under the circumstances of this case and as a policy matter, the exclusionary remedy should not be extended to cover a situation where, as here, there was an unintentional failure to comply with applicable statutory requirements (*id.* at pp. 87-88).

2.    Analysis

Appellants now challenge our previous ruling on the matter.  We find the law of the case doctrine applicable and so decline to revisit the clone pager suppression issue.

> """"The doctrine of the law of the case is this:  That where, upon an appeal, the [reviewing] court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal, …, and this although in its subsequent consideration [the reviewing] court may be clearly of the opinion that the former decision is erroneous in that particular."'  The principle applies to criminal as well as civil matters [citations], and it applies to [the Supreme Court] even though the previous appeal was before a Court of Appeal [citation].
>
> "The principal reason for the doctrine is judicial economy.  'Finality is attributed to an initial appellate ruling so as to avoid the further reversal and proceedings on remand that would result if the initial ruling were not adhered to in a later appellate proceeding.' [Citation.]  Because the rule is merely one of procedure and does not go to the jurisdiction of the court [citations], the doctrine will not be adhered to where its application will result in an unjust decision, e.g., where there has been a 'manifest misapplication of existing principles resulting in substantial injustice' [citation], or the controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations [citation].  The unjust decision exception does not apply when there is mere disagreement with the prior appellate determination. [Citation.]."  (*People v. Stanley* (1995) 10 Cal.4th 764, 786-787.)

The doctrine of law of the case applies to proceedings involving motions to suppress evidence pursuant to Penal Code section 1538.5 (see, e.g., *People v. Ramos*

(1997) 15 Cal.4th 1133, 1161-1162; *People v. Stanley, supra,* 10 Cal.4th at pp. 786-790; *People v. Scott* (1976) 16 Cal.3d 242, 246-247), and it extends to appellate court opinions in original proceedings which are equivalent to an intermediate appeal, i.e., where, as here, the opinion in question constitutes a decision on the merits which has been considered by, and acquiesced in by a majority of, a panel of three justices (*People v. Medina* (1972) 6 Cal.3d 484, 491, fn. 7 [disapproved on other grounds in *Kowis v. Howard* (1992) 3 Cal.4th 888, 895-899]; *Delmonico v. Laidlaw Waste Systems, Inc.* (1992) 5 Cal.App.4th 81, 83, fn. 1). "When the appellate court issues an alternative writ [or, as here, an order to show cause], the matter is fully briefed, there is an opportunity for oral argument, and the cause is decided by a written opinion. The resultant holding establishes law of the case upon a later appeal from the final judgment. [Citations.]" (*Kowis v. Howard, supra,* 3 Cal.4th at p. 894.)

Appellants urge us not to apply the law of the case doctrine because, they say, the scope of federal review will be greater if we fail fully to discuss their claims. (See, e.g., *Stone v. Powell* (1976) 428 U.S. 465, 481-482; *Hochstein v. Hopkins* (8th Cir. 1997) 113 F.3d 143, 147; *Adams v. Lankford* (11th Cir. 1986) 788 F.2d 1493, 1495-1497.) Appellants' claims were fully discussed in our prior opinion.

Appellants take issue with this conclusion and argue that the issue of whether suppression was mandated due to violation of the sealing requirement was never "actually presented or decided" in the writ proceedings. They say that because the People did not offer an explanation for the failure to seal the interceptions, the defense had no opportunity to challenge the adequacy of that explanation. In tandem with this contention, appellants argue the People should not have been permitted to claim that Title III does not provide a statutory suppression remedy for illegal electronic surveillance, as that claim was never raised in the trial court. Appellants say they could have presented persuasive evidence supporting their position on the issue had they not been deprived of the opportunity to do so by the People's failure to raise the claim in a timely manner.

87.

Contrary to appellants' argument, our prior opinion dealt with the violation of the sealing requirement. (*People v. Superior Court (Ewell)*, *supra*, at pp. 47-50 [nonpub. opn.].)[57] As for the evidence appellants now say they could have presented, as we noted in our prior opinion, the issue sought to be raised by the People "was 'at least in the air' by virtue of their argument that *Leon* was applicable. [Citation.]" (*Id.* at p. 36.) Moreover, it is apparent from the argument and comments at the suppression hearing that the court and parties were aware of the issue.[58] In addition, our prior opinion acknowledged the existence of mechanical devices capable of recording intercepted electronic communications. (*People v. Superior Court (Ewell)*, *supra*, at p. 50 & fn. 27 [nonpub. opn.].)[59] Appellants fail to convince us that the law of the case doctrine does not or should not apply, or that our prior opinion constitutes a "'manifest misapplication of existing principles resulting in substantial injustice[.]'" (*People v. Stanley, supra,* 10 Cal.4th at p. 787.)

---

[57]   In their reply brief, the People asked us to reconsider our finding that 18 United States Code section 2518(8)(a) provides a statutory exclusionary remedy. They subsequently argued that we are precluded from reconsidering our earlier opinion pursuant to the law of the case doctrine. In light of the more recent argument, we assume they have withdrawn their initial request for reconsideration. In any event, they have failed to establish why the law of the case doctrine should not apply equally to them.

[58]   We note that Radovcich did not raise this particular issue either in his petition for rehearing with this court, or in his petition for review with the state Supreme Court. While Ewell argued, at pages 24-25 of his petition for review, that we improperly shifted the burden to him to show the pertinent law enforcement agency had recording technology as opposed to requiring the agency or People to demonstrate why the interceptions were not recorded and sealed, at no time did he claim he was precluded from presenting evidence on the issue.

[59]   In light of our previous recognition of this fact, we deny appellants' request for judicial notice of the affidavit of FBI Agent Jeffrey Iverson contained in appendix A to Ewell's opening brief. Were we to grant the request, our analysis would be the same.

Appellants next say the law of the case doctrine should not be applied because there has been an intervening change to or clarification of the controlling rules of law, based on the recent federal appellate opinion in *United States v. Hermanek* (9th Cir. 2002) 289 F.3d 1076 (*Hermanek*). In that case, which involved two investigations, the intercepted pager communications in one were recorded in a handwritten log, while attempts were made in both to record the intercepted data through the use of a pager receiver computer. Neither the handwritten logs nor the pager receiver records were sealed. Relying on 18 United States Code section 2518(8)(a), the defendants contended suppression was required. (*Hermanek*, *supra*, at p. 1088.) The Ninth Circuit agreed with the reasoning in *United States v. Suarez* (4th Cir. 1990) 906 F.2d 977, 983, that "'transcribing by hand in a log book the images appearing on a display pager is not recording on a comparable device within the meaning of' subsection (8)(a) [citation]" (*Hermanek*, *supra*, at pp. 1088-1089 & fn. 5), and rejected the notion that sealing was required in any event since the statute only requires sealing of recordings, which the handwritten logs were not.

With respect to the pager receivers, the court noted that such devices were "relatively new technology in 1994," although they were successfully employed by the San Francisco office of the FBI – the same office leading one of the investigations involved in the *Hermanek* case – both before and during those investigations. (*Hermanek*, *supra*, 289 F.3d at p. 1089.) The appellate court determined that the trial court erred in concluding recordation through the use of the pager receivers was not possible, but went on to find that the prosecution offered a satisfactory explanation for its omissions because the government's belief that pager receivers were not recorders within the meaning of the federal statute was objectively reasonable in light of existing decisional law. (*Id*. at pp. 1089-1090.)

We fail to see how the controlling rules of law have been altered or clarified by the *Hermanek* opinion so as to warrant nonapplication of the law of the case doctrine. (See

89.

(*People v. Stanley, supra,* 10 Cal.4th at p. 787.) We discussed *United States v. Suarez, supra,* 906 F.2d 977 at some length in our prior opinion (see *People v. Superior Court (Ewell), supra,* at pp. 48-50 [nonpub. opn.]), and the *Hermanek* court's conclusion that recordation was possible *under the circumstances of the case before it* does not change or clarify the applicable law.[60]

Appellants next contend that failure to address the Title III issue "now that it has been fully and fairly presented to this Court" will result in an unjust decision. In our view, the Title III issue was fully and fairly presented and ruled on in our prior opinion. Appellants essentially argue that that opinion is wrong. We disagree; in any event, appellants fail to persuade us that "there has been a 'manifest misapplication of existing principles resulting in substantial injustice'" (*People v. Stanley, supra,* 10 Cal.4th at p. 787) such that the law of the case doctrine does not apply.

Appellants next contend the law of the case doctrine does not bar reconsideration of Ewell's privacy interest in the electronic communications he sent to Radovcich, because the effect of both appellants' right to sue under 18 United States Code section 2520 was not actually presented and determined in our earlier opinion. Regardless of whether we specifically discussed that statute, we extensively discussed the concept of "standing" for Fourth Amendment purposes and noted that the concept appeared to be broader under Title III than under the Fourth Amendment. (*People v. Superior Court (Ewell), supra,* at p. 69, fn. 41 [nonpub. opn.].) The law of the case doctrine extends to questions that were implicitly determined because they were essential to the prior decision (*Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 309) and, in any event, the existence of a civil remedy does not affect our Fourth Amendment analysis.

---

[60]    The People's assertion that *Hermanek* has been withdrawn, is patently incorrect.

Last, appellants contend consideration of their arguments on appeal concerning the applicability of *Leon* is not barred by the law of the case doctrine because those arguments were not actually presented and determined in the writ proceedings. In our view, they fall within the arguments which were presented, and were either explicitly or implicitly determined. (See *Yu v. Signet Bank/Virginia, supra,* 103 Cal.App.4th at p. 309.)

In sum, our prior decision in the writ proceedings is the law of the case, and we decline to address appellants' renewed arguments concerning suppression of the clone pager evidence. (See *People v. Stanley, supra,* 10 Cal.4th at p. 790.)

## II

## TRIAL ISSUES

### A.   *Batson-Wheeler*

Radovcich contends the trial court committed reversible error by denying his *Batson-Wheeler*[61] motion. He claims the court failed to undertake the requisite evaluation of the prosecutor's stated reasons for excusing certain prospective jurors, and that inter-juror comparison demonstrates some of those reasons were not bona fide.

1.   Procedural History

Due chiefly to pretrial publicity in the case, a large number of persons were called as prospective jurors. Those not excused for hardship reasons filled out a lengthy questionnaire, underwent individual voir dire concerning their exposure to publicity and views on the death penalty, and then, if not excused for cause, underwent further questioning in general voir dire. We are concerned with the four prospective jurors

---

[61]   *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

whose peremptory dismissal by the prosecution resulted in the defense's *Batson-Wheeler* motion. They were:

### Prospective Juror No. 65

The questionnaire revealed prospective juror No. 65 to be an African-American female who had completed some college. With respect to question 13, which asked her views on the death penalty, she checked "Will consider"[62] and wrote, "I could consider, but I do not believe in an eye for eye. Persons will have to be found guilty to me beyond a doubt." She related that she held this opinion "very" strongly and felt the death penalty was used too randomly. When asked, in question 26A, to what extent she agreed or disagreed with the statement, "Any person who intentionally kills another person, unless the killing was in self-defense or the defense of another, deserves the death penalty," she checked "It depends on the circumstances."[63] When asked, in question 26B, to what extent she agreed or disagreed with the statement, "Convicted murders should be swiftly executed once they are convicted," she checked "Strongly Disagree."[64] When asked, in question 26C, whether she believed in the saying "'an eye for an eye,'" she checked "No."[65] She related that she had consulted a psychiatrist, psychologist, or counselor to help her with raising her grandchildren; felt that people who have psychological disorders should not be punished the same as people who do not; and would consider a mental

---

[62] Question 13 asked, "What are your views on the death penalty?" and gave the options, "Strongly support," "Support," "Will consider," "Oppose," and "Strongly oppose."

[63] Question 26A gave the options, "Strongly Agree," "Somewhat Agree," "Neutral," "Somewhat Disagree," "Strongly Disagree," and "It depends on the circumstances."

[64] The optional responses to question 26B were, "Strongly Agree," "Somewhat Agree," "Neutral," "Somewhat Disagree," and "Strongly Disagree."

[65] The options for question 26C were, "Yes," "Sometimes yes and sometimes no," "It depends on the circumstances," and "No."

disorder in mitigation of punishment. She had previously served on a jury in a special
circumstance murder case; when asked whether she thought she was the kind of person
who could hold firmly to her own opinion even if all eleven other jurors disagreed with
her, she checked "No," but then wrote, "I sat on case & all eleven jurors was against me."
She further related that her son was arrested in 1993 on a drug charge and sentenced to
three years in prison, but denied this would affect her attitude toward law enforcement
witnesses.

During individual voir dire, the prospective juror stated she was open-minded
concerning penalty. With respect to her prior jury service, she related that she was the
only African-American on the jury despite the fact trial was held in Compton, which she
described as being "predominantly black." She felt her fellow jurors did not really listen
to all the evidence, and that the defendant in the case was not guilty. She held firmly to
her opinion and "it worked" in that the jury returned a verdict of life without parole. It
was the facts of the case, not any personal philosophy against the death penalty, that led
to her decision.

### *Prospective Juror No. 92*

The questionnaire revealed prospective juror No. 92 to be an African-American
male who had completed some college. In response to question 13, regarding his views
on the death penalty, he checked "Will consider" and wrote, "I'm not sure if it resolves a
case and I do not feel it is a preventive means as a deterrent to crime." He related that he
had held this opinion for a lengthy period and was not sure of the practicality of the death
penalty, which he felt was used too randomly. In response to question 26A, about
whether an intentional killer deserves the death penalty, he checked "It depends on the
circumstances." For question 26B, regarding swift execution, he checked "Somewhat
Disagree." For question 26C, regarding his belief in "'an eye for an eye,'" he checked "It
depends on the circumstances." He opined that it would be difficult to distinguish each
defendant in this case and determine an individualized punishment, as generally, if two or

93.

more people are involved in a crime, they should receive the same penalty. The prospective juror had completed one semester of psychology in college; did not think people who have psychological disorders should be punished the same as people who do not; and would be able to consider a mental disorder in mitigation of punishment. He had no prior jury experience. He related that he had been arrested for failure to appear on traffic tickets and his brother had been arrested for disturbing the peace, but denied this would affect his attitude toward law enforcement witnesses.

During individual voir dire, the prospective juror stated he was open-minded with respect to penalty, and that he could consider each defendant individually. During general voir dire, prospective jurors were asked whether they had any matter pending which involved the district attorney's office. There were no affirmative responses. The prosecutor subsequently revealed that, according to his office's records, prospective juror No. 92 originally had some failures to appear, but then had a new 1997 case which involved possession of a crack pipe. He was supposed to appear the day before; when he did not, a bench warrant was issued. When questioned further about the matter, the prospective juror admitted having a pending misdemeanor charge which involved possession of a drug pipe, and said he did not appear in court on the charge the day before because he was in the process of jury selection. He did not know what the outcome of his case would be, although he had been told he would receive a fine. He did not believe it would affect his ability to be a fair juror. Arguing that the prospective juror had withheld information and that it was inappropriate to have the same office prosecuting a juror and a defendant at the same time, the prosecutor challenged him for cause. The challenge was denied.

### Prospective Juror No. 122

The questionnaire revealed prospective juror No. 122 to be an African-American female who had a masters degree in social work. In response to question 13, she checked "Will consider" with respect to her views on the death penalty and wrote, "AFTER I HERE

94.

THE WHOLE CASE, THE WHYS OF IT ALL MOST OF THE TIME 2 WRONGS DON'T MAKE A RIGHT." [*Sic.*] She related that her opinion on the death penalty had remained the same over a period of time; put a question mark when asked whether she felt it was used too often, not often enough, about the right amount, or too randomly; and wrote that she felt a person suffered more by receiving life in prison without the possibility of parole. For question 26A, regarding the death penalty for an intentional killer, she checked "It depends on the circumstances." For question 26B, regarding swift execution, she checked "Somewhat Disagree." For question 26C, regarding her belief in "'an eye for an eye,'" she checked "No." When asked how she felt about psychologists or psychiatrists, she opined that it was an excellent career. She related that she had been in counseling at various times and found it to be very helpful; felt that adult behavior is affected "quite a lot" by childhood experiences; and did not think people who had psychological disorders should be punished the same as people who did not. She had previously served as a juror in a criminal trial that involved a credit card. She further related that she had been arrested a number of years earlier for a bounced check, and her brother had been arrested and the charges dropped, but she did not believe this would affect her attitude toward law enforcement witnesses.

In individual voir dire, the prospective juror stated she could consider the death penalty, although if she had been asked before the Oklahoma City bombing, she probably would have said she could not. When asked whether she felt the death penalty was used too often or not often enough, she replied that she did not believe "more and more death" solved anything. She related that her brother's arrest had been for murder, that the matter was thrown out by the judge at the preliminary hearing, and that – although she believed her brother was not guilty – it would not affect her concerning the present matter.

### *Prospective Juror No. 138*

The questionnaire revealed prospective juror No. 138 to be an African-American male who had completed some college and technical schooling. In response to question

95.

13, he checked "Will consider" with regard to his views on the death penalty and wrote, "Only after all options and alternatives have been consider and as a last and final Measure should a penalty of death be applied to any circumstance." [*Sic*.] He related that he had given the issue a lot of thought since being called as a prospective juror on this case, and that his opinion had changed. He explained: "Modified opinion based upon Death as a vengeful tool or as a santamonius Rue for Revenge." [*Sic*.] He felt that the death penalty was too random; when asked how strongly he held that view and why, he wrote, "Death is a finality. Should it be applied to remove or resolve problems of and for society or should it be considered as an act of Natural Selection. Sparing some while claiming others." [*Sic*.] In response to question 26A, regarding the death penalty for an intentional killer, he checked "Neutral." For question 26B, regarding swift execution, he checked "Neutral." For question 26C, regarding whether he believed in "'an eye for an eye,'" he checked "No." He believed he could make a separate determination as to each defendant, explaining, "Evidence is given against Two individuals – I don't believe two individuals can discharge the same pistol at the same exact time. Nor can a person view the earth and the moon as one body but only as individual enterreacting perhaps as one." [*Sic*.] He related that he had no particular feelings about psychologists or psychiatrists; believed adult behavior is affected somewhat by childhood experiences; and did not believe people who have psychological disorders should be punished the same as people who do not. Although his answer was somewhat contradictory, he appeared to be willing to consider a mental disorder in mitigation of punishment. He had no prior jury experience. He related that he had previously been arrested in Los Angeles for lewd conduct, but denied this would affect his attitude toward law enforcement witnesses.

During individual voir dire, the prospective juror said he would consider the death penalty, but that it "would be with a lot of thought ...." He believed the death penalty might apply in certain areas but should be used sparingly, and that there were other options before using it. He could visualize it being used "for instances of traitorship to

one's country or something that is truly diabolical in dimensions to the population itself," and possibly other situations. While he stated that he would be willing to keep an open mind and weigh and consider both penalties before deciding which was appropriate, he also stated that he viewed the death penalty as a last resort. The prosecution challenged the prospective juror for cause with regard to his views on the death penalty, but the challenge was denied.

The prosecutor used four of his peremptory challenges to excuse the foregoing prospective jurors. After the fourth one was excused, the defense asked to reserve a motion. Ewell subsequently asserted, with Radovcich joining, that under *Batson-Wheeler*, the prosecutor was systematically excluding African-Americans. He argued that the prosecutor had exercised nine peremptory challenges, of which four had been exercised against African-Americans. Although Ewell conceded there was some cause with respect to prospective juror No. 92 due to his criminal record, he claimed that excusing four out of the six African-Americans on the panel, with three of the four being good potential jurors, demonstrated a systematic exclusion and established a prima facie case such that the prosecutor should be required to justify his challenges.

The trial court correctly recognized that African-Americans are a cognizable group for *Batson-Wheeler* purposes (see, e.g., *People v. Wright* (1990) 52 Cal.3d 367, 399), then asked the prosecutor to address the issue of whether a prima facie case had been established. The prosecutor replied that he was selecting a jury which was not "soft" on the death penalty, and that every prospective juror, no matter what his or her color, was being excused by the prosecution based on his or her position on the death penalty or the use of mitigating evidence. The court noted its observation that the prosecution had been removing African-Americans from the jury and, while the court could perceive a legitimate basis for some of the challenges, it determined that a prima facie case existed. Accordingly, it directed the prosecutor to state his reasons for the challenges.

The prosecutor explained that he had excused prospective juror No. 65 because she "was an 11-to-1 hold-out juror. And that was on the basis that she accepted the Defendant's story or testimony." Ewell conceded that he understood the challenge to prospective juror No. 92, so the prosecutor proceeded to prospective juror No. 122. The prosecutor explained:

> "Juror number 122, had this very strange questionnaire that the two boys were gay lovers; that Dana loved Tiffany but was jealous of his father; that Joel is crazy.... There was a strangeness that – but her – my main reason for her is that she's been into some serious counseling. She has some matters that tend to make me feel she associates with – I hate to use this word. I don't know of a good substitute for it – but people of the liberal persuasion, people with AIDS. She's very much the social worker type. Very heavy into what Prosecutors sometimes call the 'abuse excuse,' that is, I think, the questionnaire will bear me out on her answers on that, that she is – would be extremely accepting, or too accepting, to me, of psychiatric testimony, and excuses for what we're – what we are stating is willful deliberate behavior.

> "I concluded there is no way that she could vote for the death penalty. And I just think she's far too – far too liberal for my liking."

As to prospective juror No. 138, the prosecutor explained his reasons as "[s]ort of the same thing. He's the – he's a creative writer. He describes himself as a liberal thinker. His hobbies, not necessarily bad, but not what I'm looking for, is creative writing, music ...." The prosecutor felt he was still struggling with his views on the death penalty, and that he had "[v]ery considered opinions on the death penalty but more anti than pro." The prosecutor also noted his arrest for lewd conduct. He concluded: "I just felt that this – this gentleman is very liberal and ... I don't consider liberals very good death penalty jurors."

Ewell responded that not one of the prospective jurors at issue had opposed the death penalty in their questionnaire; instead, all checked "'will consider,'" as did six of the twelve jurors remaining. He conceded the issue as to prospective juror No. 92, but argued that prospective juror No. 65 had no leanings either way, based on her

98.

questioning, and could be fair. As to prospective juror No. 122, Ewell acknowledged she had a master's degree and a supervisory position with the Department of Social Services, but argued that being a social worker did not make one "a bleeding liberal." He described prospective juror No. 138 as fair and "a reader." He asserted that prospective jurors who might be considered liberal remained, and that the prosecutor did not want African-Americans on the panel and had exercised 40 percent of his challenges toward 6 percent of the population. Radovcich agreed that the prosecutor wanted Caucasians on the jury, and emphasized that prospective juror No. 138 was "a very intelligent man."

The court determined the prosecutor had made as good-faith, persuasive explanation, and had rebutted the prima facie showing. It stated:

> "Now with regard to juror number 65 .... Certainly she seems like a very nice lady. But being an 11-to-1 hold-out ... – in a previous case – is a legitimate reason for ... excusing a juror, just like it would be a legitimate reason for excusing a juror if that juror were critical of a hold-out, they being the majority in the past case.

> "Now, of course, juror number 92, ... we don't need to talk about.

> "Now, with regard to juror number 122, ... I find the reasons for excusing her to be persuasive, that it is not based on race. Certainly as has been said, everyone works for the Department of Social Services ... is not disqualified as a juror either by – on one way or the other. But she has a Master's Degree. She is active in many of the programs. And I ... was not surprised when a challenge was exercised, a peremptory challenge, not because of her color but because of ... the programs in which she had been engaged and her attitude toward psychological testimony.

> "And then ****138 said he was an independent thinker and creative writer and very intelligent man. But ... an independent creative writer is a legitimate reason for exercising the peremptory challenge. Certainly intelligence is not in question. But ... considering whether the reason given is an honest, legitimate, and understandable exercise of a peremptory challenge for reasons other than ... race, I think ... as to these challenges the People have satisfied their burden to persuade the Court ... by a standard of beyond a reasonable doubt that the challenges were not based on ... race and were for the honest, bonafide, legitimate reasons dealing

with the person themselves, rather than their ethnic background or color to exclude a recognized group in the community."

2.    Analysis

    "Although a presumption exists that peremptory challenges are exercised in a constitutional manner, those used to remove prospective jurors solely on the basis of membership in a cognizable racial group violate both the federal and state Constitutions. [Citations.]

    "The rules governing a *Wheeler* challenge are settled. If a defendant believes the prosecution is improperly using peremptory challenges for a discriminatory purpose, he or she must raise a timely objection and make a prima facie showing that jurors are being excluded on the basis of racial or group identity. [Citations.] To establish a prima facie case, the defendant should first make as complete a record as possible [Citations.] Second, the defendant must establish that the persons excluded are members of a cognizable group. [Citations.] Third, the defendant must show a strong likelihood or reasonable inference that such persons are being challenged because of their group association. [Citations.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 134-135.)[66]

    "Once the trial court finds that the [defendant] has made a prima facie case, the burden shifts to the [prosecutor] to provide an explanation for the peremptory challenges that is race or group neutral and related to the particular case being tried. [Citations.]" (*People v. McDermott* (2002) 28 Cal.4th 946, 970.) "The prosecutor need only identify facially valid race-neutral reasons why the prospective jurors were excused. [Citations.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122.)

    """If a race-neutral explanation is tendered, the trial court must then decide … whether the opponent of the strike has proved purposeful racial discrimination."" [Citation.] 'This demands of the trial judge a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined

---

[66]    "In California, a 'strong likelihood' means a 'reasonable inference.' [Citations.]" (*People v. Box* (2000) 23 Cal.4th 1153, 1188, fn. 7.)

members of the venire and has exercised challenges for cause or peremptorily ....' [Citation.] '[A] truly "reasoned attempt" to evaluate the prosecutor's explanations [citation] requires the court to address the challenged jurors individually to determine whether any one of them has been improperly excluded. In that process, the trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge.' [Citation.] 'Preferably, in ruling on a *Wheeler* motion, the trial court should state expressly its determination as to the adequacy of the justification proffered with respect to each peremptory challenge.' [Citation.]

"The trial court's ruling on this issue is reviewed for substantial evidence. [Citation.] However, 'we apply this deferential standard of review only when "the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror." [Citations.]' [Citation.]" (*People v. McGee* (2002) 104 Cal.App.4th 559, 569.)

Substantial evidence supports the trial court's ruling in the present case. Moreover, to the extent we independently review that court's conclusion concerning whether the prosecutor stated adequate neutral grounds for the challenges in question (*People v. Alvarez* (1996) 14 Cal.4th 155, 198, fn. 9), we conclude the prosecutor succeeded.

Radovcich does not challenge the prosecutor's reasons per se, implicitly conceding that the prosecutor stated facially valid race-neutral reasons why the prospective jurors were excused. Indeed, "[t]he explanations need not justify a challenge for cause. [Citation.] 'Jurors may be excused based on "hunches" and even "arbitrary" exclusion is permissible, so long as the reasons are not based on impermissible group bias. [Citation.]' [Citation.]" (*People v. Gutierrez, supra,* 28 Cal.4th at p. 1122.) Moreover, skepticism or reservations about the death penalty, or a potential bias in favor of defense experts such as psychologists, constitute valid race-neutral grounds for excusal. (*Id.* at pp. 1123-1125; *People v. McDermott, supra,* 28 Cal.4th at p. 970; *People v. Ochoa* (2001) 26 Cal.4th 398, 432-433; *People v. Mendoza* (2000) 24 Cal.4th 130,

101.

169-170.)  Instead, Radovcich assails "the prosecutor's demonstrably-hyperbolic, 'categorical' assertion as to his reason for 'every' challenge; the trial court's seeming acceptance of reasons not supported by the record; and the trial court's omission to conduct inter-juror comparison."

We turn first to Radovcich's claim that the trial court accepted reasons not supported by the record.  This is based on his contention that prospective juror No. 138 never described himself as a "liberal thinker;" hence, the trial court must not have conducted the requisite inquiry and examination of reasons, or it would have noted the record did not support the prosecutor on this claim.  To the contrary, the record fully supports the prosecutor.  In his questionnaire, prospective juror No. 138 related that his hobbies included creative writing.  During general voir dire, Ewell asked him to describe himself.  In part, he replied, "As a writer, I project myself as humanitarian, *liberal thinker.*"  (Italics added.)

Radovcich deems "demonstrably implausible" the prosecutor's claim that every juror was being excused based on his or her position on the death penalty or use of mitigating evidence.  To the extent this assertion is based on inter-juror comparison, we discuss it *post.*  To the extent it is based on the prosecutor's allegedly abandoning his assertion with respect to prospective juror No. 65, we reject it.  While the prosecutor simply mentioned the prospective juror's having been an 11-to-1 holdout juror based on her belief of the defendant's story or testimony, the prospective juror's questionnaire and voir dire made it clear that the trial in which she previously served was a capital case, and that she held out for life in prison without the possibility of parole and, apparently, was ultimately successful in convincing her fellow jurors.  The trial court was aware of this information, and the prosecutor was not required to repeat it.  While perhaps not implicating the prospective juror's philosophical position on the death penalty, these circumstances certainly suggest that a prosecutor seeking a jury which was not "soft" on the death penalty would not want this person on that jury.  In short, we find nothing with

102.

respect to prospective juror No. 65 that causes us to take issue with the prosecutor's claim that he was excusing prospective jurors based on their positions on the death penalty and use of mitigating evidence.

Radovcich says, however, that inter-juror comparison would have revealed non-African-American trial and alternate jurors who were indistinguishable from the challenged prospective jurors in terms of their positions on the death penalty, prior arrests, and acceptance of psychiatric testimony. He acknowledges the California Supreme Court's views on the issue of inter-juror comparison, but says that court has recently reopened the door to such analysis, in addition to which the issue has federal constitutional implications.

In *People v. Johnson* (1989) 47 Cal.3d 1194, 1220-1222, the California Supreme Court rejected the notion that appellate courts should undertake inter-juror comparisons when reviewing a trial court's ruling on a *Batson-Wheeler* motion. The high court discussed, at length, "the variety of factors and considerations that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar" (*id.* at p. 1220), and concluded that "the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention of another juror which on paper appears to be substantially similar." (*Id.* at p. 1221.) Hence, "[i]f [as here] the trial court makes a 'sincere and reasoned effort' to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. In such circumstances, an appellate court will not reassess good faith by conducting its own comparative juror analysis. Such an approach would undermine the trial court's credibility determinations and would discount "'the variety of [subjective] factors and considerations,"' including 'prospective jurors' body language or manner of answering questions,' which legitimately inform a trial lawyer's decision to exercise peremptory challenges. [Citations.]" (*People v. Montiel* (1993) 5 Cal.4th 877, 909.)