Radovcich contends, nonetheless, that *People v. Silva* (2001) 25 Cal.4th 345 reopened the door to inter-juror comparative analysis with its discussion of prosecutorial reasons that are both inherently plausible and supported by the record (*id*. at p. 386), and how one demonstrates a reason is either implausible or unsupported by the record. Whatever the implications of *Silva*, and however one makes the showing under discussion in that case, it is not done by means of inter-juror comparison undertaken for the first time on appeal. The California Supreme Court has made this clear on several occasions since *Silva* was decided. (See, e.g., *People v. Burgener* (2003) 29 Cal.4th 833, 865; *People v. Boyette* (2002) 29 Cal.4th 381, 423; *People v. Catlin* (2001) 26 Cal.4th 81, 119, fn. 5.)

In *People v. Johnson* (2003) 30 Cal.4th 1302 (cert. dism. *sub nom. Johnson v. California* (2004) ___ U.S. ___ [___ S.Ct. ___, 2004 WL 936628]), the California Supreme Court clarified its position. It noted: "We have observed that engaging in comparative juror analysis *for the first time on appeal* is unreliable and inconsistent with the deference reviewing courts necessarily give to trial courts, but we have never prohibited trial courts from doing so or the party objecting to the challenges from relying on such analysis in seeking to make a prima facie case." (*People v. Johnson, supra*, 30 Cal.4th at p. 1318.) In part, this is because "[a] comparison of the jurors' answers is unreliable when divorced from the context of the trial. A trial court, but not a reviewing court, is able to place the answers into context and draw meaning from *all* the circumstances, including matters not discernable from the record." (*Id*. at p. 1320.) The court reviewed the recent United States Supreme Court decision in *Miller-El v. Cockrell* (2003) 537 U.S. 322, and noted it involved "a reviewing court considering evidence of comparative juror analysis *after* it had been presented to the trial court." (*People v. Johnson, supra,* 30 Cal.4th at p. 1321, italics added.) It found nothing in that decision to

suggest a reviewing court must engage in comparative juror analysis for the first time on appeal (*id.* at p. 1322), and went on to state its belief that, whatever procedures might be adopted by other courts (such as federal courts which do engage in comparative juror analysis), comparative juror analysis for the first time on appeal is not constitutionally compelled (*id.* at p. 1324).

The court went on to explain that "[w]e have … said that comparative juror analysis is 'largely beside the point' because of the legitimate subjective concerns that go into selecting a jury. [Citation.] But it is not *irrelevant.* Although such analysis, by itself, proves little, properly presented to the trial court, it can be among the 'all relevant circumstances' [citation] or 'all the circumstances of the case' [citation] that the trial court must consider in making its determination." (*People v. Johnson, supra,* 30 Cal.4th at p. 1323.) "Certainly, the trial court should consider obvious matters, and it can consider any other circumstances it finds relevant in the particular case. But, midtrial, we cannot expect, and do not demand, trial courts to engage sua sponte in the sort of comparative juror analysis that appellate lawyers and courts can do after scouring the often lengthy appellate record during the appeal. And, given the inability of reviewing courts to reliably conduct such analysis on a cold record, those courts are not required to do so for the first time on appeal." (*Ibid.*) The court concluded: "Accordingly, we maintain our long-standing practice. When the objecting party presents comparative juror analysis in the trial court, the reviewing court must consider that evidence, along with everything else of relevance, in reviewing, deferentially, the trial court's ruling. When such an analysis was not presented at trial, a reviewing court should not attempt its own comparative juror analysis for the first time on appeal …. While we decline to prohibit the practice outright, we are hard pressed to envision a scenario where

comparative juror analysis for the first time on appeal would be fruitful or appropriate."
(*Id.* at pp. 1324-1325.)

The record before us shows that, assuming any comparative juror analysis was presented in the trial court, it was minimal at best. At most, mention was made that not a single prospective juror strongly opposed the death penalty, six of the twelve people remaining in the jury box at the time of the *Batson-Wheeler* motion checked "Will consider" in response to question 13, and other prospective jurors could be considered "of liberal persuasion." We presume the trial court considered these arguments and assessed them in light of the information (such as the remaining prospective jurors' questionnaires) available to it. The trial court was never asked to undertake the detailed comparison Radovcich now seeks to have us make, nor was it required to undertake such analysis sua sponte. (*People v. Johnson, supra,* 30 Cal.4th at p. 1323; see *People v. Arias* (1996) 13 Cal.4th 92, 136, fn. 16.) As the Court of Appeal aptly explained in *People v. Dunn* (1995) 40 Cal.App.4th 1039, 1051:

> "It is the defendant's burden to establish that the prosecutor's stated reasons
> for excusing a prospective juror are pretextual and that the prosecutor acted
> with a discriminatory intent. [Citation.] '[T]he ultimate burden of
> persuasion regarding racial motivation rests with, and never shifts from, the
> opponent of the strike.' [Citation.] As such, it was defendant's burden in
> the trial court to bring forth evidence of inconsistencies in the prosecutor's
> exercise of peremptory challenges if this is the basis of a claim that the
> prosecutor's reasons for excusing certain prospective jurors were
> pretextual. [Citation.] Defendant failed to do so in his *Wheeler* motions.
> Not having been alerted to any need for an explanation of why he accepted
> the ... jurors which defendant now contends have similar characteristics to
> the Black prospective jurors who were excused, the prosecutor was
> deprived of the opportunity to create a record on this point. Without such
> an explanation, any attempt at comparative juror analysis is questionable."

Since neither appellant presented an extensive comparative juror analysis to the trial court, we decline to undertake such an analysis for the first time on appeal. (*People*

*v. Yeoman* (2003) 31 Cal.4th 93, 116.)  Even if we were to do so, however, Radovcich would not prevail.  (See *People v. Jones* (1997) 15 Cal.4th 119, 162, overruled on other grounds in *People v. Hill* (1998) 17 Cal. 4th 800, 823, fn. 1.)  We have examined the questionnaires of the trial jurors and alternates, and find their responses to be qualitatively distinguishable from the four prospective jurors at issue on this appeal, especially in terms of the strength of their support for the death penalty.  This is true even of the jurors and alternates who checked "Will consider" in response to question 13.[68]

**B.    Character Evidence**

Ewell contends he was deprived of a fair trial when the trial court admitted prejudicial character evidence in the form of lay opinions.  He specifically attacks the trial court's ruling permitting opinion evidence as to Ewell's purported greed, whereby, he says, "the prosecution succeeded in placing before the jury a piece of evidence that is a strong candidate for the title of the most prejudicial testimony ever introduced in an American courtroom."  Hyperbole aside, Ewell contends the trial court erred by permitting the prosecution to present what amounted to evidence of bad character in order to prove the commission of a particular crime and disposition to commit the charged crimes, a violation of Evidence Code section 1101.[69]

1.    Procedural History

Prior to trial, Ewell made a number of in limine motions.  In pertinent part, he sought to exclude, pursuant to section 352, evidence concerning his claims, as reported in

---

[68]    Since Radovcich has not directed our attention to any portions of the trial jurors' and alternates' voir dire, we assume it is not relevant to the comparative analysis he seeks.  (See *People v. Robles, supra,* 23 Cal.4th at p. 796, fn. 2.)  We will not comb the record – which, we note, is approximately 30,000 pages in length – for evidence which supports his contention, nor do we interpret his argument as asking us to do so.

[69]    Further statutory references are to the Evidence Code unless otherwise stated.

a 1990 San Jose Mercury News article and the 1990 Santa Clara University yearbook, of being a self-made millionaire, together with any similar personal representations to others. He also sought to exclude testimony portraying him as greedy or obsessed with money, or that he tried to start an investment business when he was in high school.

In response, the People argued that evidence concerning Ewell's obsession with money and riches was relevant to show motive, and asserted that Ewell's desire to be rich was the sole motive posited by the People for the killings. The People alleged that Ewell's obsession with money led him to create a false persona whereby he presented himself as a self-made millionaire, and claimed that "[a]ny witness who knows Dana will state he is obsessed with becoming rich." The People further asserted that Ewell's love of money carried little danger of collateral prejudice and was central to the prosecution's theory of the murders, and would be highly probative to overcoming concerns of whether a son could kill his family. Ewell countered that the evidence sought to be introduced was neither immediate nor specific, and that the proffered evidence simply did not establish a motive to kill several years later.[70]

During the hearing on the motion, the prosecutor acknowledged that evidence of claims of being a self-made millionaire to some extent crossed over into character and veracity, which could not be addressed until it was determined whether Ewell would testify. The prosecutor confirmed that Ewell's desire to be rich was the only motive being offered by the People, and told the court: "[T]he reason why this crime occurred is this obsession of Mr. Ewell's with money and his desire not to only to [sic] have it but to look like he has it, to live this fantasy that he lived for four years, this fantasy that in all

---

[70]   Ewell's request that we correct the record, pursuant to California Rules of Court, rule 12(b), to include his reply (which he has attached as Appendix B to his opening brief), is denied as moot. The document is contained at pages 3298-3299 of the 20-volume clerk's transcript on appeal.

likelihood was going to have to come to an end upon his graduation and his being removed from the lap of luxury, so to speak, that was his college years. [¶] So this, to us, is probably one of our main evidences of motive evidence [*sic*]." The prosecutor claimed he was not offering evidence of greed per se, but instead the proffered evidence was "more focused on obsession with money and the various opinions and/or statements that focus on an obsessive love of money." He conceded he was "essentially admitting that this is character evidence," but argued that – because it constituted evidence of motive – it was admissible as an exception, under section 1101, to the general prohibition against character evidence. The prosecutor contended Ewell planned the homicides while he was a sophomore in college – hence, his high school days were not in the distant past – and noted that Ewell's holding himself out as a millionaire carried over into college, as shown by the yearbook and newspaper article. According to the prosecution's theory, Ewell succeeded in defrauding everyone into thinking he was a millionaire, thereby creating a fantasy which he did not have the means to sustain. However, in his mind, if he could obtain the fortune he was set to inherit, he could reinvest it and make more money, and be able to live the fantasy. The prosecutor again emphasized that he was "talking about character in terms of motive ...."

The court recognized that, particularly in homicide cases, motive is highly relevant and may be a dispositive issue. However, it questioned whether the People could present the issue of a desire for money through other evidence, without resorting to articles in which Ewell held himself out as a self-made millionaire. The court noted that there appeared to be substantial evidence, apart from what seemed to show a character trait, to demonstrate that someone committed or arranged for multiple homicides, and observed that a lot of people try to make themselves more important than they are. The prosecutor acknowledged that everyone has a desire to be rich and that self-aggrandizement is not unusual, but argued he could prove Ewell's love of money and fantasy of being rich were so obsessive and unusual that Ewell was not like anyone else, and that the obsession was

109.

so great as to overcome the basic human instinct that one does not kill one's parents. The prosecutor argued motive was critical to the People's case, as the People had to overcome jurors' normal disinclination to believe someone could kill his or her parents.

The court recognized that preoccupation with success and money could constitute evidence of motive in a homicide case, but was wary of getting into collateral issues concerning personality defects. It assumed the People would have considerable other evidence that would be relevant to motive, such that the probative value of the self-made millionaire claim would be diminished. Accordingly, it granted the motion in limine that there be no reference to the evidence in opening statement; however, it gave the People permission to reraise the issue outside the jury's presence if, during their case-in-chief, they felt themselves so lacking in evidence of motive that this evidence became highly probative.

The court then turned to the prosecution's desire to present evidence of Ewell's alleged obsession with money, which the court assumed would be in the form of lay opinions. The prosecutor argued that the only other evidence of motive, aside from what the court had just addressed, was that persons who knew or grew up with Ewell were of the personal opinion that he was obsessed with money. He argued that the most probative means of proving a person's obsession with money was the opinion of that person's associates, but acknowledged the need to establish that the witness(es) possessed a sufficient foundation to render such an opinion. The court observed that, depending on the evidence, obsession with money could be an opinion on someone's state of mind, based on that person's declarations, or it could be an opinion as to a character trait. The

110.

court ruled that the prosecutor would be permitted to present his witness(es) outside the jury's presence, at the appropriate time, in order to establish the necessary foundation.[71]

The subject of Ewell's representation that he was a self-made millionaire, as well as his having held himself out as an owner of his father's business, was revisited during trial. The prosecutor contended that, contrary to Ewell's representations, there was no corporation called "Ewell & Company"; while Ewell owned some stocks, the value of his portfolio was well under $100,000; there was no business whereby student funds were pooled and invested with profitable results; and Ewell did not attempt to sell aircraft through his father's business and only became extensively involved after the murders. The court found that if Ewell held out his father's business as his own, such evidence would be relevant to a motive to acquire that business. When it questioned the probative value of the other evidence, the prosecutor responded that the critical point was the extent to which Ewell would go in order to fulfill his dream. Within the Santa Clara college community, he argued, Ewell was the successful businessman he desired to be, as he had created a false persona and was accorded the status of that persona by the community in which he then lived. That persona would end with graduation, however, unless Ewell obtained "a whole lot of money quickly," either by legitimate or illegitimate means. The prosecutor asserted that what mattered was not so much Ewell's desire to have his father's business, but his "unbridled desire" to be rich and, beyond that, to be accorded the status and power that comes with money. He reiterated that killing one's parents "is an incredibly unusual act," and argued that in order to prove it, he needed to establish an unusually strong, unique motive. He pointed to Ewell's unbridled love of money and

---

[71]     The court explained that it generally did not use motions in limine as final rulings, and that any party could offer a foundation in a hearing outside the jury's presence, at which time the court would evaluate the proffered evidence in light of the then-existing posture of the case.

desire to succeed financially, as well as the false persona which demonstrated the intensity of Ewell's focus on money and need to be rich. The prosecutor went on to argue that, to the extent Ewell was the same as other people (for example, successful Wall Street traders), his desire for money still had probative value, but no prejudicial effect. The prosecutor recognized that creation of the false persona carried collateral prejudice in that it showed a character trait for lying or exaggeration, but pointed out that motive evidence often has collateral prejudice. He argued that, given the critical nature of the motive evidence, the prejudicial effect "simply pale[d]" in comparison to the probative value. The prosecutor asserted that if he was not permitted to present motive evidence in his case-in-chief, the fact Ewell's parents were generous with him and he was well-off could be used by the defense to argue lack of motive, as the jury would be left with a false impression of the true state of affairs. Radovich joined the People's motion.

The court recognized that relevant motive evidence was admissible, but questioned whether it was relevant to motive that Ewell had "a character trait for the need to be admired for financial success achieved by prevarication, exaggeration, and just fiction as to his accomplishments[.]" Ewell responded that the prosecution had presented nothing new since the issue was addressed in limine, "at that 352 hearing." He agreed that a different issue would arise were he to testify, but claimed the evidence in question was extremely prejudicial and noted that evidence showing he was a liar was impeachment evidence. He conceded that greed was an arguable motive, but contended the People could present it through other evidence, without having "to delve into highly speculative psychological profiles ...." Ewell offered to stipulate that he wanted to be rich and that he was the sole heir, but contended that "all this other highly speculative, highly prejudicial, psychological type evidence, which we've already talked about and dealt with ... is irrelevant and ... should not be admitted." He went on to assert that any probative value was marginal at best and was totally outweighed by the prejudicial effect.

112.

After further argument, the court ruled that evidence concerning Ewell's purported acquisition of an aircraft dealership and holding himself out as having developed his father's dealership or owning it could be presented, as it constituted evidence of a potential anxiety to acquire that dealership either by inheritance or otherwise. As such, it was relevant to motive and more probative than prejudicial. The court subsequently permitted the People to introduce a portion of Ewell's résumé, which, although undated, he submitted with his application to Santa Clara University. In the résumé, Ewell claimed to own Western Piper Sales. The court found it relevant to show long-standing motive. The court also overruled Ewell's objection to a box of materials Ewell had collected, which included copies of various financially-oriented magazines and articles on very wealthy people. Despite Ewell's concern the materials would be argued more as character evidence than as evidence of motive – the character trait being obsession with or passion for money – the court ruled the People would be permitted to argue that there was a mindset or focus on being successful in business and becoming a very wealthy person through business, and that the materials constituted circumstantial evidence of a desire to succeed in the same path as those profiled in the articles. The court found no prejudice in someone having a very focused interest in billionaires and how they accumulated their money.

When the prosecution sought to call Francisco Reinoso as a witness, Ewell objected on the grounds of relevance, foundation, hearsay, and minimal value.[72] After a foundational hearing, the court ruled it would allow Reinoso to testify that, based on conversation, Ewell had a definite interest in money and business, business was

---

[72] Although on appeal Ewell appears to challenge the trial court's rulings only with respect to witnesses Goolkasian, Tapia, and Poindexter, additional motions and rulings must be summarized in order to give a full procedural history of the matter.

113.

something he loved, and he talked about having a company. The court also stated that the prosecutor could lay the groundwork for bringing in the witness who conducted the interview, who could testify that Ewell talked about owning an aircraft company in Fresno, which detail Reinoso was unable to recall. The court found the evidence to bear on motive to achieve the family business. The prosecutor subsequently elicited, over the same objections, testimony from Michael Dibono that Ewell told him that he had bought a Piper company which was in bad shape, turned it around, and then sold it, making $2-$3 million in the deal; and that Ewell said his father was a vice president for Shearson and Lehman, a major stock brokerage company.

Outside the presence of the jury, Ewell argued that evidence permitted under the court's rulings, concerning claims of being a self-made millionaire, was now becoming cumulative and very prejudicial, and requested that the court hold hearings before allowing any more such witnesses. The court observed that the conversation related by Dibono did not characterize anyone as being preoccupied with money, but instead was a statement from Ewell himself instead of someone else's conclusion or opinion. Ewell then filed a motion reiterating the various rulings on the subject and setting out his concern the prosecutor, in the guise of motive evidence, was seeking to present evidence that Ewell was a liar.[73] He moved to exclude the yearbook article as cumulative or for specification of precisely which portions would be allowed into evidence, and he

---

[73]    Ewell has attached the motion to his opening brief as Appendix C, as it apparently was omitted from the clerk's transcript on appeal. At Ewell's request, and there being no opposition from the People, we deem the record on appeal augmented to include said motion to the extent it was filed or lodged below. We note that, although the copy contained in Appendix C is not file-stamped, it is signed by one of Ewell's trial attorneys and dated February 4, 1998, and is referred to in the reporter's transcript of proceedings for that date.

114.

requested that a hearing on this motion be held prior to the testimony of Alicia Williams, the person who interviewed him for the article.

Alicia Williams ultimately testified, without a foundational hearing, that in the course of her studies as a journalism student at Santa Clara University, she profiled Ewell, who was then a freshman, for the yearbook. Ewell told her that he was an aircraft salesman and president of his own aircraft dealership, and that he owned the company. He stated that his company was so successful, he was thinking of starting a new dealership in San Jose. Williams authenticated a photocopy of the article she wrote, as well as the photograph which accompanied it and which was provided to her by Ewell. However, beyond Ewell's statements, she did not testify as to the contents of the article other than to say it accurately reflected his statements.

Ewell subsequently objected that, pursuant to the court's previous ruling, only statements he was an aircraft salesman and president of his own aircraft dealership were to have been elicited. The court agreed and pointed out that the ruling did not cover testimony about the success of Ewell's business or his starting a new dealership. The court explained, however, that it did not intervene sua sponte because the testimony was not far removed from the ruling, and it noted defense counsel could have objected by simply referring to the in limine ruling.

Later, the prosecutor sought to call Shelby Grad, a reporter who interviewed Ewell for the 1990 article in the San Jose newspaper. According to the article, Ewell and his investors purchased a bankrupt airplane dealership in Fresno and built it into what Ewell described as "'the Cal Worthington of planes,'" worth more than $4 million when he sold it in 1990. The article also related that when Ewell was head of the dealership, he had to "'shuttle'" between Fresno and Santa Clara to take care of business. Ewell objected that the proffered evidence was cumulative and anything about an airplane business that was not his father's fell outside the court's prior rulings. When the court pointed to the inference that Ewell had in mind his father's business and stated it found nothing

115.

prejudicial or cumulative about the proffered evidence, Ewell argued that the asserted motive was "bologna" and contended it was "all a guise by the D.A. ... to get in character." The court determined it could be inferred that the business Ewell was describing was, in fact, his father's business, and that the trier of fact could find Ewell's prior comments in the yearbook interview were not isolated or casual statements, but that he truly did "have a mindset on coveting his father's aircraft business, not 25 years from now, when one might normally expect to inherit, but right then." Accordingly, it found the evidence relevant to the issue of motive, more probative than prejudicial, and not cumulative. Grad subsequently testified in conformity with the article's contents.

Ewell subsequently objected to the People calling Sean Shelby, a friend of his in junior high school, and he also raised issues with respect to Michael Poindexter. During argument about whether the People could present Shelby's opinion concerning Ewell's greed or obsession with money, the prosecutor observed that he had interpreted the court's prior rulings to mean he could not go into specific acts, but could simply present an opinion. On behalf of Ewell, Attorney Kinney stated that was also his understanding.[74] The court disagreed, explaining that someone's opinion about someone else's state of mind was a conclusion, and that what the person said or did was what was relevant. As a result, the prosecutor decided not to schedule Shelby or Poindexter until a later time, in order to allow the attorneys to assess those witnesses' interviews in terms of specific acts.

---

[74]    At trial, Ewell was represented by Attorneys Jones, Castro, and Kinney. Radovcich was represented by Attorney Cherney, while the People were represented by Attorneys Oppliger and Hammerschmidt. While we usually refer to appellants as raising points which were, of course, actually raised by their attorney(s), we occasionally find it appropriate to differentiate between counsel, in which event we will refer to the attorney by name.

The prosecutor then sought clarification of the court's rulings with respect to whether the People could offer opinion evidence by individuals who knew Ewell well as a means of establishing the proffered motive of Ewell's unusually strong passion for money and desire to be wealthy. The court responded that it was trying to find out "what specifically the witness is going to say about the foundational matters for the opinion they're going to express." Kinney stated he understood the ruling to be that the prosecution would have to establish the foundation for the witness's testimony; prejudicial matter would be excluded, but the witness then would be permitted to state Ewell had a lust for money. He asked that the matter be deferred to permit the attorneys to examine the witnesses' statements, and the trial court agreed to defer a foundational hearing.

Later, the prosecutor announced that, with respect to prospective witnesses Poindexter and Goolkasian, he and the defense attorneys were attempting to negotiate an agreement whereby the prosecution would not be presenting specific acts, but simply the personal opinions of the witnesses. The court was agreeable to such an arrangement if it could be worked out. Still later, the prosecutor stated that with respect to prospective witnesses Tapia, Goolkasian, and Poindexter, he and Ewell had agreed that specific facts or instances concerning Ewell's passion for money would not be presented, but only the witnesses' opinions or reputation evidence. Shelby would not be called to testify. Kinney responded, "Generally what Mr. Oppliger said is correct as to those witnesses." He then clarified that if the prosecutor made an offer of proof as to what the witness would say and the court found it sufficient, the matter would not need to be gone into in front of the jury and the witness could give his or her opinion. The prosecutor agreed with the court's observation that that did not sound like a stipulation, so he and defense counsel agreed to consult further.

At the beginning of the court session in which Poindexter, Tapia, and Goolkasian were scheduled to testify, the prosecutor stated that he and Kinney had agreed on what

117.

was going to be admissible in the way of opinion evidence, and that they had decided to limit their foundational issues to the state of knowledge or the state of closeness between individuals as opposed to acts which supported the opinion, because there were specific acts about which the defense did not want the prosecution to elicit testimony.  Kinney did not dispute the representation, but, following Cherney's argument about Radovcich's ability to inquire into prior bad acts by Ewell and his statement that he was not party to any agreements between Oppliger and Kinney, Kinney replied, "We haven't got any agreements, counsel."

Bettina Goolkasian subsequently testified that she had known Ewell since they were in kindergarten.  Based on her relationship with Ewell over the years, Goolkasian had formed an opinion concerning his interest in money.  She stated, "I have never known anybody like Dana in the respect that when one judges their life's worth or life's value, nobody has come close to Dana, in the people that I have come in contact with and have been friends with, to where money has been the most – the single most important determining factor of one's value."  On cross-examination, Ewell elicited that the witness's earliest recollection of his having an interest in money was in third grade.

Prior to the testimony of Mario Tapia, Ewell secured a limitation, pursuant to section 352, concerning post-homicide contact between Tapia and Ewell, and Tapia's opinion of Ewell's state of mind at that time.  Tapia then testified concerning how long he had known Ewell and the closeness of their relationship.  When asked whether he had formed an opinion with respect to Ewell's interest in money, Tapia began to recount a course Ewell took concerning stocks and how he wanted to start his own small mutual fund.  The prosecutor stopped him and asked if he had an opinion as to Ewell's interest in

money, compared to other people Tapia had known.[75] Tapia responded, "It was a very large motivation for him. Uhhm, he was very ambitious. Uhhm, he -- he wanted to, uh -- I think he wanted to be successful in life. And, uh, he tried very hard at it. Uhhm, I guess academically, you know, he wanted to get into an Ivy League school, so he studied very hard in high school and to get into one. But I think at the end he didn't get into one. [¶] But he majored in finance. And I think money kind of revolved around him." When Tapia then testified to seeing Ewell handing out $100 bills during his freshman year, the testimony was stricken as nonresponsive and the jury was admonished to disregard it. When the prosecutor asked Tapia to compare the relative degree of Ewell's interest in money to other people Tapia knew, Tapia responded, "Like, uhhm, scale of one to ten, it was like an 11. To him it was, uh – I don't know – he didn't feed on it. It was just a high – a big interest in him. Like money makes things go round. And people – you know, money won't necessarily make you happy. But it can buy you the Porsche you want; it can buy you the ski lodge that you want. And, uh – and, I don't know, to him – I think money made him very happy, uhhm, or the impression that he had a lot of money." On redirect examination, the prosecutor elicited, over objection that it was an opinion, Tapia's statement to investigators that some people say money makes the world go round, and he thought that to Ewell, money did make the world go round.

Before Poindexter testified, Ewell clarified that he was not to be questioned concerning, inter alia, Joe Hunt, the Billionaire Boys Club, Ivan Boesky, or Michael Milken-type material. Poindexter subsequently testified that he first met Ewell in fall of

---

[75] Ewell subsequently cross-examined Tapia about the mutual fund, which Tapia said was called Ewell Company. Ewell also elicited that Tapia was aware of an article that came out during their time in high school concerning Ewell owning an aircraft business, that Tapia knew it was "bogus," and that there were many articles in high school in which Ewell made it look as if he had achieved more than he did.

1984, during their first year of high school. During high school, he and Ewell were best friends. After they went to different colleges, they continued to maintain contact. On direct examination, Poindexter testified, in part, as follows:

"Q Now, based on this association with Mr. Ewell over these years, did you have an occasion to come to an opinion as to what his – strike that. Were you in – were you in a position to be able to determine what his interest or degree of interest in money or wealth was?

"A Yes, I was.

"Q In your own words, could you describe the degree of Dana Ewell's interest in – in money as compared to other people?

"A He's the greediest person I've ever met in my life.

"Q In your opinion, or based on your observations, did Mr. Ewell seek to convey a position of money or being from money?

"A Oh, yes. He wanted to be very flashy with his money.

"Q Did you ever describe that character as Dana Ewell wanting you to think that he was as rich as God?

"A Rich or richer.

"THE COURT: Just a moment. That's not an admissible personal – that's not an admissible opinion.

"MR. KINNEY: Also leading, suggestive.

"THE COURT: The objection is sustained.

"MR. KINNEY: Mr. Oppliger is testifying.

"THE COURT: Being a witness is not a forum for going beyond what the Evidence Code allows.

"MR. OPPLIGER: Q How – would you describe Mr. Ewell's – when you used the word 'flash' – 'flashy' with money, how would you describe it in your own words.

"A Well you'd want to show everyone how much money you have, talk about money, dress in the nicest clothes, make sure everyone knows

you've got the expensive car, the expensive house, come from a well-to-do-family, let people know you always have cash. It would be completely in line to say you would always pay with big bills, because it makes you look like you have more money when you go to buy a candy bar, 'Can you break a hundred? That's the smallest I have.' That was the type of flashiness."

Oppliger subsequently asked how Poindexter would characterize Ewell's motivation for money based on Poindexter's knowledge of Ewell from 1984 to 1994. Poindexter replied, "I think that he would do anything he can to acquire more money."

The next day, when Ewell complained about the "richer than God" testimony, the court reminded the parties that it was not receiving character evidence, but only personal opinion evidence concerning the focus on money.

During his opening argument to the jury, the prosecutor talked at length about motive. He suggested that everyone dreamed of being rich, but that for most people, it was merely an idle and harmless fantasy. By contrast, Ewell "wanted to be rich like no one that has come before him or no one who will come again." The prosecutor asked, rhetorically, "What it is that made Mr. Ewell tick?" He then argued that the People had tried to present Ewell's friends – those who were in a position to know him best in high school and college – and argued that these people held no grudges against Ewell and their testimony was uncontradicted. He recapped the testimony of Tapia, Goolkasian, and Poindexter,[76] then reviewed Ewell's collection of magazine articles concerning wealthy people and suggested it showed Ewell was obsessive about his passion for money. The prosecutor also noted the various articles and testimony concerning Ewell being a self-made millionaire and turning around a bankrupt aircraft company. He then told the jury:

"So what happens here with all this scheming? Dana Ewell finds himself kind of the toast of the town there in Santa Clara, running around in his suits and driving his gold Mercedes.

---

[76]    He did not mention the "[r]ich or richer" than God testimony.

"... Have you ever seen how very, very rich people, men, get treated by their – by their fellow men?  Have you ever seen that?  It's – I know not all of us treat them that way, but there is a great deal of power, admiration, respect, even sexual attraction that is accorded to ... the so-called rich.  All these things come to the person perceived to be – or actually be wealthy.

"That's picture number one.  I would like you to think about in this community how the college students are treating Dana Ewell based on the false persona.

"Picture number two is I would like you to kind of think or picture what you have come to know about Mr. Ewell.  How do you think Dana Ewell, with his character that we've learned, how do you think he felt about this new-found position?

"Really the point being that Dana Ewell was no longer just the son of a rich man at San Joaquin Memorial.  He was now in Santa Clara, his own man, rich, successful, and powerful.  I submit or venture to say that you'd have to actually see him strut around campus and savor that attention to really appreciate his love of this position.

"So there he is at Santa Clara, living this life all based on fantasy, all based on a situation where you're in control, in essence, of your environment because nobody knows your history.  But as you're in college, college comes to an end, as you know.  And with his devotion to – to money and flashing money, graduation must have posed a significant dilemma to him.  I mean, graduation, the real world loomed.  And I submit that it looked distressingly real.

"To this person, this person that I've just described, I'd like you to add something that you can see in this article.  You can see it and hear it on the tape that I played for you.  And I submit that Dana Ewell was fully convinced that he was gifted.  All you had to do for Mr. Ewell was give him a stake, and he could go out and turn it into millions and millions.  After all, for Dana Ewell, the competition in the financial world were mere mortals compared to his abilities.

"I submit to you that based on what you have seen and heard, that he had no bones about right and wrong.  And I bet you that even Michael Milken or Ivan Boesky wouldn't go as far in making a buck as to go for murder.

"I submit to you that based on what you have heard and known, that the guy behind me here is absolutely ill when it comes to his – his love of money.

"I submit to you that his love of money knows no bounds and it is perverted in the sense that one can love money, but one cannot love money to the extent that it becomes a perversion. His perversion is the motive behind these crimes.

"When you come back to that question, 'Who could kill their own parents?' Well, not the man that you've come to know through this trial. He is the manipulator: The mastermind. But that brings us to the question of who in the world could have their parents killed? And I submit to you that that would be a spoiled, perverted, obsessive man, who has tasted the trappings of wealth and will not give them up.

"To top off this section on motive, I think that you need only go to his reactions to the reading of the will....

"He knew and expected to come into his own at age 25. And, when it came to the reading of the will, and in a typical will by a rich man, where it sets out stages, Mr. Dana Ewell simply could not contain himself. His well-planned, rehearsed reaction to post-murder events simply failed in the face of the bitterness of this news."

On behalf of Ewell, Kinney countered the prosecutor's argument with his own, essentially ridiculing the prosecutor's references to Michael Milken and Ivan Boesky and labeling the prosecution's assessment of motive as "garbage." He also reminded the jurors that questions asked by the attorneys were not evidence and could not be used to imply evidence, and gave as an example the prosecutor asking if Ewell wanted to be richer than God. Kinney noted that the court excluded that evidence, but argued: "You think that wasn't a planned question?  [¶]  No, not going to be richer than God; but he's going to be richer than Moses or something.  He's not going to have that kind of an answer.  Part of that garbage evidence.  Throw it against the wall and see what sticks."

The trial court subsequently instructed the jury, in pertinent part, that statements made by the attorneys are not evidence; that questions are not evidence and not to assume to be true any insinuation suggested by a question; and not to consider for any purpose

any evidence that was stricken by the court, and to treat it as if they never heard it.  In addition, the jury was instructed:  "Certain evidence has been admitted for a limited purpose.  At the time this evidence was admitted, you were instructed that it could not be considered by you for any purpose, other than the limited purpose for which it was admitted.  Do not consider this evidence for any purpose, except the limited purpose for which it was admitted."  The jury was further instructed:  "Evidence has been introduced relating to Dana Ewell's statements concerning his success in business while in high school.  This evidence, if believed, may not be considered by you to prove that Dana Ewell is a person of bad character.  It may be considered by you only for the limited purpose of determining, if it tends to show, the existence of intent or motive."[77]

      2.    Analysis

Ewell claims the evidence of his obsession with money was inadmissible pursuant to section 1101 because it constituted evidence of bad character that was being offered to prove his disposition to commit the charged crimes.  He also complains that the character evidence was wrongly admitted in the form of lay opinions in the prosecution's case-in-chief.  In addition, he asserts the character evidence concerning greed was cumulative to evidence of conduct (for instance, his claims that he owned his father's business) and inflammatory.  Ewell specifically points to the "richer than God" testimony and argues that, while the trial court struck "this particular description of avarice, ... given the lurid opinion testimony left before the jury, such as that Ewell was the greediest person the witnesses had ever met, the damage was done."

---

[77]    This instruction was proffered by the trial court during the jury instruction conference.  Although recognizing it highlighted the area in question, Ewell asked that it be given.

We turn first to the allegation that the challenged testimony should have been excluded as being evidence of disposition or propensity.[78] "We review the admission of evidence under Evidence Code section 1101 for an abuse of discretion. [Citation.] [¶] Character evidence is admissible in this state unless barred by a particular statute. (Evid. Code, § 1100.) Evidence Code section 1101, subdivision (a), creates an exception to that rule. It generally forbids introducing character evidence to 'prove ... conduct on a specified occasion.' Subdivision (b) of Evidence Code section 1101 in turn creates an exception to subdivision (a): evidence of conduct may be admitted to prove motive or intent, although it may not be admitted to show a disposition to do the type of conduct shown by the evidence." (*People v. Memro* (1995) 11 Cal.4th 786, 864.)[79] As Justice Jefferson explained in *People v. Gibson* (1976) 56 Cal.App.3d 119, 128,

---

[78]   Ewell initially objected solely on section 352 grounds; it was the prosecutor who raised the issue of section 1101. Only belatedly did Ewell challenge the evidence on the ground that it was "character" evidence. "[A] defendant may not complain on appeal that evidence was inadmissible on a certain ground if he did not rely on that ground in a timely and specific fashion in the trial court." (*People v. Mickey* (1991) 54 Cal.3d 612, 689; § 353.) Since the court and prosecutor recognized the existence of the section 1101 issue, however, we will deem Ewell's objection to character evidence to have encompassed that statute and to have been timely raised. We note that Ewell does not claim the evidence was irrelevant; indeed, it has been stated that an inquiry into an accused's character or propensity "'is [deemed] objectionable, not because it has no appreciable probative value, but because it has too much.'" (*People v. Alcala* (1984) 36 Cal.3d 604, 631, italics omitted; accord, *Michelson v. United States* (1948) 335 U.S. 469, 475-476.)

[79]   Section 1100 states: "Except as otherwise provided by statute, any otherwise admissible evidence (including evidence in the form of an opinion, evidence of reputation, and evidence of specific instances of such person's conduct) is admissible to prove a person's character or a trait of his character."

Section 1101 provides, in pertinent part:

"(a) Except as provided in this section and in Sections 1102 [opinion and reputation evidence of character of criminal defendant to prove conduct], 1103 [character evidence of crime victim to prove conduct], 1108 [evidence of another sexual offense by

125.

"[O]ther-crimes evidence, relevant as circumstantial evidence to prove conduct, generally falls into two broad categories. One category is that of character trait or propensity evidence. The relevancy rationale for this category is that, through logic and experience, we accept the circumstantial-evidence-reasoning process that a person generally tends to act in conformity with his character trait. The second broad category for relevancy of such other-crimes evidence is that such evidence tends to establish a state-of-mind or state-of-emotion fact. Here, again, we accept the rationale of relevancy that one tends to act in conformity with whatever state of mind or emotion he possesses.

"Evidence Code section 1101 makes the distinction in admissibility between the two categories. Section 1101, subdivision (a) makes *inadmissible* other-crimes evidence when the relevancy theory is that of character trait or propensity use of such evidence to prove that defendant committed the crime charged. On the other hand, Evidence Code section 1101, subdivision (b) makes *admissible* the other-crimes evidence when relevancy is predicated on a state-of-mind or state-of-emotion fact which, in turn, leads to an inference of the existence of that same state-of-mind fact at the time of the charged offense, or, that defendant acted in accordance with his state of mind and committed the charged offense."[80]

In the present case, motive was particularly important to the People's case against Ewell: as the prosecutor recognized, the People had to present evidence to overcome jurors' natural inclination to disbelieve that someone would have his own family

---

defendant], and 1109 [evidence of defendant's other acts of domestic violence], evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

[80]   Although cases construing section 1101 most often are concerned with the admissibility of uncharged crimes, the statute is not so limited and encompasses "other act[s]" in general. (§ 1101, subd. (b); *People v. Harris* (1978) 85 Cal.App.3d 954, 958.)

126.

murdered. The People's position was that Ewell's motive was supplied by his passion for, and obsession with, money.

It has been broadly stated that "[w]hen 'the motive of the crime is sought to be established before a jury, the whole conduct, life, and character of the parties as affecting this question, is open to inquiry.' [Citation.]." (*People v. Helfend* (1969) 1 Cal.App.3d 873, 880.) "Motive is itself a state-of-mind or state-of-emotion fact. Motive is an idea, belief or emotion that impels or incites one to act in accordance with his state of mind or emotion. Evidence of motive, therefore, meets the test of relevancy by virtue of the circumstantial-evidence-reasoning process that accepts as valid the principle one tends to act in accordance with his motive." (*People v. Gibson, supra,* 56 Cal.App.3d at p. 129.)

We recognize that "[o]ther-crimes evidence, admitted to prove a defendant's motive, is much closer to its use as character trait evidence than when it is offered solely to prove defendant's intent." (*People v. Gibson, supra,* 56 Cal.App.3d at p. 129.) Nevertheless, the "absolute rule of exclusion [contained in section 1101, subdivision (a)] does not apply to prior conduct ... which is relevant to prove more than mere criminal predisposition." (*People v. Alcala, supra,* 36 Cal.3d at p. 631.) Greed can furnish a motive (see, e.g., *United States v. Meling* (9th Cir. 1995) 47 F.3d 1546, 1557) and, under the circumstances of this case, the trial court did not abuse its discretion, under section 1101, in admitting evidence of greed and obsession with money in order to show motive. Ewell's conduct (claims such as those concerning his father's business and of turning around an airplane company, as well as his collection of magazine articles) was relevant to establish his motive and, although it was not discussed in as great a detail, his intent.

The California Supreme Court has stated that before other crimes evidence may be admitted, "three conditions ... must be met: (1) the ultimate fact sought to be proved must be material; (2) the evidence of the uncharged crimes must tend to prove or disprove the material fact; and (3) there must be no extrinsic policy requiring exclusion. [Citations.]" (*People v. Anderson* (1987) 43 Cal.3d 1104, 1136.) Assuming these

127.

requirements apply where, as here, a defendant's uncharged *criminal* conduct is not at issue (see *People v. Anderson, supra,* 43 Cal.3d at p. 1136), the trial court did not abuse its discretion in implicitly determining the first two were met.

We turn now to the third. In this regard, "three interrelated extrinsic policies tend to limit admissibility of other-crime evidence. First, Evidence Code section 1101, subdivision (a), requires exclusion of evidence of an uncharged offense if the *only* theory of relevance is that the accused has a disposition to commit the crime charged, and that this disposition is circumstantial evidence that he behaved accordingly on the occasion of the charged offense. [Citation.] Second, even if evidence of the uncharged offense is relevant on some theory other than disposition to commit the crime charged, it is excluded under a rule of necessity if it is merely cumulative with respect to other evidence that the prosecution may use to prove the same issue. [Citation.] Finally, under Evidence Code section 352, the probative value of the other-crime evidence must outweigh its prejudicial effect; due to the inherently prejudicial nature of such evidence, it must be excluded unless its probative value is substantial. [Citation.]" (*People v. Johnson* (1991) 233 Cal.App.3d 425, 444, italics added, citing *People v. Thompson* (1980) 27 Cal.3d 303, 317-318.)[81]

First, as we have discussed, the evidence in issue was relevant to motive. It was not introduced to show, nor did the prosecutor argue that the evidence showed, merely that Ewell had a disposition or propensity to commit the crimes charged.

Second, the evidence was not "'merely cumulative'" to other evidence the prosecution could have used to prove motive. (*People v. Thompson, supra,* 27 Cal.3d at

---

[81]    *Thompson* was "all but expressly disapproved" on another ground in *People v. Williams* (1988) 44 Cal.3d 883, 907, footnote 7. (*People v. Rowland* (1992) 4 Cal.4th 238, 260.)

p. 318.) Simply put, there *was* no other evidence of motive.  To the extent the argument may be made that the opinion evidence was cumulative to the evidence of specific conduct, we are not prepared to conclude the trial court erred in at least implicitly concluding otherwise. (See *People v. Gallego* (1990) 52 Cal.3d 115, 172.) "[T]rial courts are not required to exclude all cumulative evidence and if evidence has substantial relevance to prove material facts which are hotly contested and central to the case, it is not 'merely cumulative.' [Citations.]" (*People v. Lang* (1989) 49 Cal.3d 991, 1016.)

Third, the trial court did not abuse its discretion by overruling the defense objections under section 352.[82]  Under that statute, "the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time.  Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124, citations & italics omitted.)

"Generally, evidence of a defendant's poverty or indebtedness is inadmissible to establish a motive to commit robbery or theft, 'because reliance on poverty alone as evidence of motive is deemed unfair to the defendant, and the probative value of such evidence is considered outweighed by the risk of prejudice.' [Citation.]" (*People v. McDermott* (2002) 28 Cal.4th 946, 999; accord, *People v. Koontz* (2002) 27 Cal.4th 1041, 1076; *People v. Wilson* (1992) 3 Cal.4th 926, 939; *United States v. Bensimon* (9th

---

[82]    Section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

129.

Cir. 1999) 172 F.3d 1121, 1129; *United States v. Mitchell* (9th Cir. 1999) 172 F.3d 1104,
1107-1109.) Assuming the converse would hold true – that evidence of a defendant's
wealth or financial status generally would be inadmissible – the cases do not announce a
blanket rule of exclusion and do permit such evidence under certain circumstances.
(*People v. Koontz, supra*, at p. 1076; *People v. Wilson, supra*, at p. 939.)

In the present case, the challenged evidence was admitted to show not mere
acquisition of or desire for money, but an extraordinary obsession with money and being
rich. Other evidence established that Ewell had access to money and enjoyed the
trappings of wealth before his family was murdered; the challenged evidence was
probative of the People's claim that he so lusted after wealth and the status it afforded
that he chose to have his own family killed in order to satisfy his obsessive, abnormal
passion. As the Ninth Circuit Court of Appeals has observed, "There is a distinction
between an interest, in the sense that it is in anyone's interest to be richer rather than
poorer, and an inclination." (*United States v. Mitchell, supra,* 172 F.3d at p. 1109.)
Here, the evidence went well beyond showing a mere interest in having money, which the
prosecutor candidly recognized is shared by virtually everyone.

In light of the probative value of the challenged evidence, "the trial court acted
well within its broad discretion under section 352 in concluding that the potential for
prejudice was outweighed." (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214.) In this
regard, "[e]vidence is substantially more prejudicial than probative ... if, broadly stated,
it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the
outcome.' [Citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) "'The prejudice
which exclusion of evidence under Evidence Code section 352 is designed to avoid is not
the prejudice or damage to a defense that naturally flows from relevant, highly probative
evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the
defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice'
referred to in Evidence Code section 352 applies to evidence which uniquely tends to

evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.'" [Citation.]' [Citation.]" (*People v. Gionis, supra*, at p. 1214, italics omitted.)

The evidence at issue was not inflammatory; did not carry with it a great possibility of confusing the issues; did not, for the most part, involve times that were remote from the charged offenses; and did not consume undue amounts of time to present and refute. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 282.) It did not uniquely tend to evoke an emotional bias against Ewell as an individual; in this regard, "'evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' [Citation.]" (*Id.* at p. 286.) The evidence here was simply not of such a nature; moreover, any danger the jury might rely on the evidence for an improper purpose (for example, to show propensity or disposition or that Ewell was a "bad person") was minimized by the trial court's giving of a limiting instruction. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1119 & fn. 53; *People v. Garceau* (1993) 6 Cal.4th 140, 178; *People v. Daniels* (1991) 52 Cal.3d 815, 858.)

The record shows the trial court weighed prejudice against probative value, as it was required to do when ruling under section 352. (*People v. Riel* (2000) 22 Cal.4th 1153, 1187-1188; *People v. Hayes* (1990) 52 Cal.3d 577, 617.) As its decisions were reasonable, with respect to the requirements of both section 1101 and section 352, we find no abuse of discretion and, consequently, no error. (See *People v. Memro, supra,* 11 Cal.4th at p. 865.)

131.

Ewell complains, however, that the testimony of Tapia, Goolkasian, and Poindexter should have been excluded because it constituted improper opinion evidence. In this regard, section 1102 provides: "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is:  [¶]  (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character.  [¶] (b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)."  As Ewell points out, the challenged evidence was presented during the prosecution's case-in-chief, and was neither offered by Ewell nor offered to rebut character evidence adduced by him.  (See *People v. McFarland* (2000) 78 Cal.App.4th 489, 494 [§ 1101, subd. (b) permits evidence of uncharged specific acts for certain purposes, but does not authorize opinion testimony about defendant's character].)

We question whether Ewell preserved this issue for appeal.  (§ 353, subd. (a).) The only pertinent record reference to which we are directed is the category VI heading in Ewell's written motion in limine, "OPINIONS THAT THE DEFENDANT IS GREEDY, ETC." That portion of the motion states: "Any testimony that seeks to portray Dana Ewell as 'spoiled,' 'greedy,' 'inconsiderate,' 'arrogant,' [']manipulative;' or 'obsessed with money;' and any testimony that he had supposedly asked someone to burglarize his parents['] home when he was in Jr. High; or other similar claims; that he tried to start an investment business when he was in high school, or that he wrote a letter to Joe Hunt and supposedly was fascinated with the Billionaires [*sic*] Boys Club, should be excluded." Nothing in the written motion specifies the grounds for exclusion of the evidence.  Ewell emphasized during argument on the motion that he was seeking exclusion pursuant to section 352, and discussion between the court and counsel centered on the requirements of that statute and section 1101.  There was no timely and specific objection on section 1102 grounds, nor were the objections or ensuing discussions such that the court should have been alerted to that particular basis upon which exclusion was sought or so as to

132.

afford the prosecution an opportunity to respond accordingly. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1124 [isolated references to evidence being "inflammatory," coupled with argument evidence was irrelevant and immaterial, insufficient to preserve § 352 claim]; *People v. Carpenter, supra,* 21 Cal.4th at p. 1053 [objections to evidence as showing defendant was a "'criminal'" and "'bad person'" sufficient to preserve § 1101 claim where statute was expressly cited in objections to other items of evidence]; *People v. Ramos, supra,* 15 Cal.4th at p. 1172 [no particular form of objection required, but objection must sufficiently specify evidence and legal grounds for response by opposing party, determination by trial court, and adequate record on appeal]; *People v. Felix* (1999) 70 Cal.App.4th 426, 431 [objection during trial sufficient to preserve § 1102 claim where reference made to in limine objection on that specific ground].)

In any event, the record clearly establishes Ewell ultimately preferred that, if evidence of greed and passion for money was going to be admitted from Tapia, Goolkasian, and Poindexter, it be elicited in the form of an opinion and *not* specific acts. Given this tactical choice and the propriety of admitting evidence of greed and monetary obsession with respect to motive under section 1101, Ewell cannot establish grounds for reversal under section 1102.[83]

In light of our conclusion that the challenged evidence was properly admitted, we need not discuss the issue of prejudice. We reject Ewell's contention that his rights to due process and a fair trial were violated by admission of the challenged evidence. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 913-922 [§ 1108, permitting admission of propensity evidence, constitutional]; *People v. Steele* (2002) 27 Cal.4th 1230, 1246 [no

---

[83]    In his reply brief, Ewell contends the Attorney General "essentially concedes" the reputation and opinion evidence was barred by section 1101, subdivision (a). However accurate the assertion, we are not bound by a party's concessions. (*People v. Clark* (1993) 5 Cal.4th 950, 979, fn. 4; *Desny v. Wilder* (1956) 46 Cal.2d 715, 729.)

due process violation where evidence supports permissible inference]; *People v. Catlin,*
*supra,* 26 Cal.4th at pp. 122-123 [no constitutional violation where disputed evidence
material to legitimate issues].)

**C.    *Aranda-Bruton***

Ewell contends that Jack Ponce's testimony contravened the principles enunciated
in *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968)
391 U.S. 123 (*Bruton*) and, hence, violated his rights under the Sixth Amendment to the
United States Constitution.  He says Ponce did not follow the trial court's redaction
rulings, thereby allowing the prosecution to bring before the jury statements by
Radovcich which should not have come in at a joint trial, and that the prosecutor then
focused on this evidence in his closing argument.  He acknowledges the trial court gave a
curative instruction, but claims it was insufficient.  The error was prejudicial, he argues,
because the offending testimony was the only evidence which directly tied Ewell to the
scheme to kill his family in order to gain access to the Ewell estate.

1.    Procedural History

Prior to trial, the People successfully resisted appellants' motions for separate
trials.  The People subsequently sought admission against Ewell of statements made by
Radovcich to Ponce, in part on the grounds they were declarations against interest and
coconspirator statements.  Ewell strenuously objected.  Following a hearing, the trial
court issued a detailed written decision concerning the admission of hearsay statements.
It examined 136 statements which Ponce could testify were made by Radovcich, and
issued a tentative ruling thereon.[84]  In pertinent part, the court ruled:

---

[84]    The statements were gleaned by the prosecutor from Ponce's testimony at the
preliminary hearing.

134.

- Statement No. 32 ("He said it had to do with eight million dollars and he and the other guy were going to split it in half. He was saying reasons for the homicides"): admissible against Radovcich only, pursuant to sections 1220 and 1230; "and he and the other guy were going to split it in half" was redacted as not being in furtherance of a conspiracy or an admission against penal interest, and as being violative of Ewell's Sixth Amendment rights.

- Statement No. 33 ("He said we were going to assume the throne"): admissible (presumably against Radovcich, although the court did not specify) for a limited purpose under section 1250 as a statement of intent and motive, but not under section 1223 or section 1230; it did not sufficiently refer to Ewell so as to require redaction.

- Statement No. 60 ("Did Joel tell you why he committed this murder? Yes, to split the inheritance"): admissible against both appellants under section 1223.

- Statement No. 61 ("Did he tell you how much he believed the inheritance to be? Yes, eight million dollars"): admissible against both appellants under section 1223.

- Statement No. 62 ("Who did he say he was going to split the money with? Dana Ewell"): inadmissible as to both appellants pursuant to section 352; Ewell's Sixth Amendment objection sustained.

- Statement No. 69 ("He said that Dana had proved to him there was that much money there to be split and it had been proved through liquid assets that he'd shown Joel"): inadmissible under sections 1223 and 1230; excluded pursuant to section 352.

- Statement No. 81 ("Did Radovcich tell you when he expected to be able to collect his half of the proceeds or the inheritance, at what age? When Dana turned twenty-five"): admissible against Radovcich under sections 1220 and 1250; inadmissible against Ewell under sections 1223 and 1230; more probative as to Radovcich's state of mind, plan, intent, and motive than prejudicial to Ewell under section 352.

- Statement No. 82 ("Joel explained – There was a stipulation in the will that he wasn't to receive a large part of the money until he was 25 years old"): admissible against

135.

Radovcich under sections 1220 and 1250; inadmissible against Ewell under sections 1223 and 1230; more probative as to Radovcich's state of mind, plan, intent, and motive than prejudicial to Ewell under section 352.

- Statement No. 114 ("Now, you said Joel told you that he had a deal, there was going to be something like 8 million dollars and a 50/50 split, is that right? Yes"): the court's tentative ruling is unclear. The court first found the statement admissible under section 1223, assuming there was prima facie evidence of a conspiracy and that the statement was made in furtherance thereof, and section 1230. In the very next portion of the ruling, however, the court determined that statement No. 114 and statement No. 132 ("Joel told you that they would get the money when Dana turned twenty-five? Yes") would be highly prejudicial to Ewell due to deprivation of his Sixth Amendment rights, and were "admissible against neither party" pursuant to section 352.

In conclusion, the court rejected Ewell's contention that much of what Radovcich told Ponce was inadmissible, assuming presentation of prima facie evidence of a conspiracy. The court further found that, upon prima facie evidence of a conspiracy and a threshold showing of trustworthiness, Radovcich's statements against penal interest would become statements made in furtherance of the conspiracy "in the context of an intent to induce silence and noncooperation with law enforcement by Ponce who already knew how the gun was obtained, modified, and later disposed of.... While coordinating alibis or advising co-conspirators to keep quiet alone may not be in furtherance of an alleged conspiracy, securing Ponce's silence by informing him of all the details of a triple homicide in which he was an aider and abetter [*sic*] or accessory, and holding out the attainment of a part of the inheritance by Joel's confiding in him, are admissible under 1223. But it would be a strained interpretation to include references to Dana Ewell that were clearly not offered to enhance the goal, but under 1223 because they are not

136.

inculpating as to Radovcich are otherwise admissible under Evidence Code section 1223 and 1230 with appropriate redaction."

Renewed motions to sever were denied. This court upheld the denials based on the showing made as of that point, but noted that the propriety of the trial court's preliminary rulings concerning the 136 statements was not before us and, hence, we made no determination whether those rulings were correct. The trial court subsequently reiterated its belief that, while not all of the 136 statements would be admissible under section 1223 or survive scrutiny under *Aranda-Bruton*, appropriate evidentiary rulings – involving redaction or exclusion – could be made so as to protect Ewell's Sixth Amendment rights. The court also reiterated its understanding of the law that a declaration against penal interest was independently admissible against both defendants if it met the guarantee of trustworthiness, and was not excludable as hearsay under the Sixth Amendment because it was a firmly rooted exception which satisfied the confrontation clause.

During his opening statement to the jury, the prosecutor asserted, without objection:

> "Jack Ponce also tells us about what Joel Radovcich said about why he committed these murders. He – Joel Radovcich says he committed the Ewell murders in order to split the $8 million inheritance: Admissible only against Joel Radovcich. He stated that he expected to collect his half of the proceeds when Dana turned 25 due to a stipulation in the will.

> "Finally, against both, admissible against both, Joel Radovcich tells Jack Ponce, 'We were going to assume the thrown [*sic*].' And he tells him, 'I hope there is no God, because, if there is, I'm screwed.'"

In his opening statement on behalf of Ewell, Kinney returned to the concept of splitting the inheritance, and stated:

> "Two, the evidence will show that Joel and Dana were good friends. Did you notice a few minutes ago, the Prosecutor started to bring up promissory notes? That's correct, promissory notes. They got the case, and material, and all this money turned over. You heard the evidence that

137.

Mr. Ponce is going to say. Mr. Ponce is going to say that Joel's going to get four million bucks of the $8 million estate. A man who is going to get $4 million has to sign promissory notes to Mr. Businessman, Dana Ewell, to repay back $16,000. Think of that in your inferences and in your evidence. That's why he wanted to bring it up now.

"Yes, there was some money given to him. He made him sign promissory notes, the man that has $4 million coming."

Kinney also discussed the statement concerning assuming the throne, and argued it was "ludicrous," because Ewell "was already on the thrown [*sic*] in the apex of life. He was already on the thrown [*sic*]."

Prior to Ponce's testimony, the court stated that its view concerning admissibility of Radovcich's statements to Ponce had not changed. It found a prima facie showing that a conspiracy existed and was continuing at the time of the conversation at the beach, and that the statements were in furtherance of the conspiracy by way of assuring Ponce's lack of cooperation with law enforcement and his misstatements to the police before he himself was arrested. The court noted, however, that those statements which specifically related to Ewell were not in furtherance of the conspiracy.

During direct examination, Ponce testified to a conversation he had with Radovcich during a drive they took on a particular evening. The prosecutor elicited the following:

"Q During the course of that evening's activities, ... did [Radovcich] make any other statement with respect to his possible involvement?

"A Yes, he did.

"Q And what, if anything, did he say?

"A He said, 'We were gonna assume the throne.'

"Q Do you remember how that came up?

"A It – it came up when – he was saying the reason for what happened.

138.

"Q  What did he say with respect to the reason for what happened?

"A  He stated a sum of money.

"Q  What sum did he mention?

"A  Eight million dollars.

"Q  Was his statement something to the effect that it had something to do with eight million dollars?

"A  Yes, that's correct."

Later during direct examination, Ponce testified to the conversation he had with Radovcich at the beach.  This took place:

"Q  Did – did Joel Radovcich tell you why that he had committed these murders?

"A  Yes, he did.

"Q  What did he say?

"A  He said to split $8 million.

"Q  I'd like to show you exhibit – referring you to item number 60.[85]  I'd like you to read that for just a second.

"A  Uh-huh.

"Q  And does that refresh your recollection?

"A  Yes, it does.

"Q  Okay.  I will reask the question. [¶] … [¶]  And the question would be, 'Did Joel Radovcich tell you why he committed this murder'?

"A  Yes, he did.

"Q  And what was the answer?

---

85    The prosecutor apparently was referring to the list of 136 hearsay statements which the trial court had utilized as the basis of its in limine rulings.

139.

"A  It was to split the inheritance.

"Q  And then did he tell you how much he believed the inheritance to be?

"A  Yes, he did.

"Q  And how much?

"A  Eight million dollars.

"Q  Did Joel Radovcich tell you when he expected to be able to collect any money?

"A  He expected to be able to collect it when Dana turned 25 years old.

"Q  And did he say anything about –

"THE COURT:  Just a moment.  Just a moment.  I've ruled that to be inadmissible.  The jury is admonished to disregard it.

"MR. OPPLIGER:  (Negative headshake.)

"THE COURT:  Oh, yes.

"MR. OPPLIGER:  No, you didn't.

"THE COURT:  That's the Court's ruling now.

"And it's to be disregarded, ladies and gentlemen.  I'm not implying that counsel did anything wrong, but … it's to be disregarded for rulings that I've previously made.  Maybe I didn't make that one clear, but it's clear that the law makes it inadmissible and the jury's admonished to disregard it.

"MR. OPPLIGER:  My next question also concerns – possibly concerns a change in the Court's ruling.  Should I wait?

"THE COURT:  Well, no.  Just proceed according to the – we've spent a great deal of time to save the jury time on pretrial rulings, and they stand.  And let's proceed.

"MR. OPPLIGER:  Okay.

140.

"Q Did Mr. Radovcich say anything about, um, a stipulation in a will?

"A Yes, he did.

"Q And what, if anything, did he state?

"A There was an age stipulation in the will.

"Q And what was that?

"A That the –

"THE COURT: Let's see.... [¶] ... [¶]

"MR. OPPLIGER: Item 81 – 82. [¶] ... [¶]

"THE COURT: Well, it is a question that I ruled on that it was admissible with respect to ... Mr. Radovcich was at the time he, Mr. Radovcich, expected to receive any money, not ... relating to anyone else.

"So you can elicit that question by ... a carefully phrased question, you may proceed. If you can't carefully phrase it, then follow the Court's rulings.

"BY MR. OPPLIGER:  Q  Did – did Mr. Radovcich state to you that he expected to receive his money at a point in time when – let's see. Strike that.

"Did he – Mr. Radovcich state his understanding that there was a stipulation in the will –

"THE COURT: The – if you cannot frame them the way I've ruled ... then go on to another subject and we'll take it up at the next recess. [¶] ... [¶]  Yes, Mr. Ponce, did Mr. Radovcich say at what time, what age he, Mr. Radovcich, expected to receive the money? If he didn't, why, that's ....

"THE WITNESS: He said how long he had to wait for the money, Your Honor – oops.

"THE COURT: All right. Let's go ahead.

"BY MR. OPPLIGER:  Q  And how long was that?

"A  It was approximately three years."

141.

Outside the jury's presence, the court clarified that testimony Radovcich said they would receive the money when Ewell turned 25 was admissible as to Radovcich's expectations under sections 1230 and 1250, but the objection was sustained as to Ewell's expectations as it would be highly prejudicial to Ewell because of his Sixth Amendment rights, and so the testimony was inadmissible as to either defendant.  The court accepted responsibility for any uncertainty in the ruling, but noted it had expected the testimony would concern Radovcich responding as to when he expected to receive the money, without any reference to Ewell.  Recognizing the ambiguity, the court proposed to give a limiting instruction.  While Ewell stated he was not asking for one at that point, he later changed his mind, as he wanted to cross-examine Ponce on the subject because Ponce had testified, at the preliminary hearing, that he could not recall when Radovcich made the statement.  Ewell asked that the instruction be given if and when such evidence came in.

During Kinney's cross-examination of Ponce, this took place:

"Q  Now, ... did you testify to the jury the other day, according to you, that you had heard, from Joel, about splitting some money?  Is that correct?

"A  That's correct.

"Q  Look – and you said half of something?  Half of some figure?

"A  That's correct.

"Q  At page 30, when they asked you about any split or deal, did you say, 'I guess it was a 50-50 split'?

"A  That's correct.  I said that.

"Q  Now – (Pause)

"THE COURT:  All right.  Ladies and Gentlemen, the last several questions pertaining to splitting some money is received only with respect to Mr. Radovcich.  It is not received and may not be considered by you

142.

with respect to or against the Defendant Dana Ewell. Do not consider this evidence in any way against the Defendant Dana Ewell."

Kinney subsequently questioned Ponce about his testimony that Radovcich had said he would receive some money in about three years, and his statements on the subject at the preliminary hearing. The court told the jury that the same limitation applied – the evidence was received only with respect to Radovcich, and it could not be considered with respect to Ewell.

2.    Analysis

Ewell identifies as Sixth Amendment error Ponce's testimony that Radovcich expected to be able to collect the money "when Dana turned 25 years old." He claims this statement "identifies Dana Ewell as the person who joined with [Radovcich] in a scheme to kill the Ewell family and split the inheritance ...." He says its impact was "devastating" because the jury could not help but connect the identification to Radovcich's statements in which he explained to Ponce that he committed the murders to split an inheritance of $8 million, but that he would have to wait for the money because of a stipulation in the will. Ewell says that although those statements were admitted solely against Radovcich because they did not directly implicate Ewell, once Ponce ignored the redaction ruling and mentioned Ewell's name, all such statements explicitly incriminated Ewell, thereby violating his rights under the Sixth Amendment to the United States Constitution.

In *People v. Fletcher* (1996) 13 Cal.4th 451, 455-456, the California Supreme Court set out the applicable law as follows:

> "The confrontation clause of the Sixth Amendment to the federal Constitution, made applicable to the states through the Fourteenth Amendment, provides that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.' The right of confrontation includes the right of cross-examination. [Citation.]

"A recurring problem in the application of the right of confrontation concerns an out-of-court confession[86] of one defendant that incriminates not only that defendant but another defendant jointly charged. Generally, the confession will be admissible in evidence against the defendant who made it (the declarant). (See Evid. Code, § 1220 [hearsay exception for party admissions].) But, unless the declarant submits to cross-examination by the other defendant (the nondeclarant), admission of the confession against the nondeclarant is generally barred both by the hearsay rule (Evid. Code, § 1200) and by the confrontation clause (U.S. Const., 6th Amend.). If the two defendants are tried together, the trial court may instruct the jury to consider the confession in determining the guilt only of the declarant, but it may be psychologically impossible for jurors to put the confession out of their minds when determining the guilt of the nondeclarant. The United States Supreme Court has held that, because jurors cannot be expected to ignore one defendant's confession that is 'powerfully incriminating' as to a second defendant when determining the latter's guilt, admission of such a confession at a joint trial generally violates the confrontation rights of the nondeclarant. (*Bruton v. United States*[, *supra*,] 391 U.S. 123, 126-137.) Earlier, this court had reached a similar conclusion on nonconstitutional grounds. (*People v. Aranda*[, *supra*,] 63 Cal.2d 518, 528-530.)

"More recently, however, the United States Supreme Court has stated that the positive authority of *Bruton v. United States*, *supra*, 391 U.S. 123 (holding that the admission, at a joint trial, of a nontestifying defendant's confession implicating a codefendant, even with an appropriate limiting instruction, violates the codefendant's rights under the confrontation clause) extends only to confessions that are not only 'powerfully incriminating' but also 'facially incriminating' of the nondeclarant defendant. (*Richardson v. Marsh* (1987) 481 U.S. 200, 207-208 [*Richardson*].) The court held that a defendant's rights under the confrontation clause are not violated by the admission in evidence of a codefendant's confession that has been redacted 'to eliminate not only the defendant's name, but any reference to his or her existence,' even though the confession may incriminate the defendant when considered in

---

86    "The problem is not limited to confessions but extends also to partial admissions of guilt. We use the term 'confession' in the text, rather than the more cumbersome 'extrajudicial statement,' purely for convenience."

conjunction with other evidence properly admitted against the defendant. (*Id.* at p. 211, fn. omitted.)" (Parallel citations omitted.)[87]

Ewell claims that in the statement at issue here, Radovcich "identifies Dana Ewell as the person who joined with him in a scheme to kill the Ewell family and split the inheritance ...." We do not find the inference that strong or direct. The testimony was not, for example, that Radovcich said Ewell was going to pay him the money when Ewell turned 25, or that Radovcich said he was going to split the inheritance with Ewell. Nevertheless, the statement facially incriminated Ewell by expressly naming him. It was also "substantially (or 'powerfully') incriminating" (*People v. Fletcher, supra,* 13 Cal.4th at p. 456) because it linked Radovcich's motivation for the killings to Ewell's receipt of the inheritance. Accordingly, its admission was error which, under the *Aranda-Bruton* line of authorities, *supra,* was not cured despite the trial court's immediate and forceful admonition to the jury.

The People argue to the contrary. They say redaction was not required because the challenged testimony was admissible both as a declaration against interest and as the statement of a coconspirator. Ewell counters that to allow evidence excluded at trial to be admitted on appeal would violate his rights to due process and a jury trial. He points out

---

[87] The state Supreme Court went on to discuss redacting confessions by replacing the nondeclarant's name with a symbol or neutral pronoun, which it found insufficient to avoid a confrontation clause violation if "reasonable jurors could not avoid drawing the inference that the defendant was the coparticipant designated in the confession ...." (*People v. Fletcher, supra,* 13 Cal.4th at p. 456.) The United States Supreme Court subsequently decided that replacing a name with an "obvious indication[] of alteration ... leave[s] statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that" admission or exclusion is controlled by *Bruton* and not by *Richardson* (*Gray v. Maryland* (1998) 523 U.S. 185, 192). The court noted that "*Richardson*'s inferences involved statements that did not refer directly to the defendant himself and which became incriminating 'only when linked with evidence introduced later at trial.' [Citation.]" (*Id.* at p. 196.)

145.

that, due to the trial court's ruling excluding the testimony, he had no occasion to –
indeed, could not properly – challenge it in cross-examination or address it in his
argument to the jury.

   We fail to see how we could properly deem the excluded evidence admissible on
appeal, as the People ask us to do. This is not a situation where, for example, evidence
was erroneously admitted on one basis (for instance, pursuant to one exception to the
hearsay rule) and we are being asked to determine that it was, in fact, admissible, but on a
different basis (for instance, pursuant to a different hearsay exception). Nor is it a
situation in which evidence was tentatively excluded in limine, then came in at trial
without a contemporaneous objection. Here, the trial court immediately admonished the
jury to disregard the statement, thereby precluding the defense from addressing it. For us
to rely on it now would be unfair. (See *McCormick v. United States* (1991) 500 U.S. 257,
269-270.)

   Moreover, assuming we could properly review the trial court's ruling under the
circumstances of this case, we would uphold it. A trial court's decision on the admission
of hearsay evidence is reviewed for abuse of discretion. (*People v. Martinez* (2000) 22
Cal.4th 106, 139; *People v. Jones* (1998) 17 Cal.4th 279, 308; see *People v. Roberts*
(1992) 2 Cal.4th 271, 304 [inquiring whether substantial evidence supported trial court's
implied finding, in overruling *Aranda-Bruton* objection, that challenged statements made
during and in furtherance of conspiracy].) "[D]iscretion is abused whenever the court
exceeds the bounds of reason, all of the circumstances being considered. [Citations.]"
(*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

   "Where nontestimonial hearsay is at issue, it is wholly consistent with the
Framers' design to afford the States flexibility in their development of hearsay law .…
Where testimonial evidence is at issue, however, the Sixth Amendment [to the United
States Constitution] demands what the common law required: unavailability and a prior
opportunity for cross-examination." (*Crawford v. Washington* (2004) ___ U.S. ___, ___

146.

merely a "gratuitous rambling[]" (*People v. Hardy, supra,* at p. 147) or "'idle chatter'" or a "superfluous casual remark[]" (*U.S. v. Johnson* (7th Cir. 1991) 927 F.2d 999, 1002 [construing Fed. Rules Evid., rule 801(d)(2)(E), 28 U.S.C.]). Accordingly, the trial court did not err in excluding the challenged statement, as to Ewell, under section 1223.

With respect to the statement's admissibility pursuant to section 1230 as a declaration against interest,[90] the United States Supreme Court in *Ohio v. Roberts* (1980) 448 U.S. 56 conditioned the admissibility of hearsay evidence, vis-à-vis the confrontation clause, on whether such evidence fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." (*Id.* at pp. 65-66.) A plurality of that court subsequently determined that, insofar as it encompasses "accomplices' confessions that inculpate a criminal defendant," the hearsay exception for declarations against penal interest is not a firmly-rooted one. (*Lilly v. Virginia* (1999) 527 U.S. 116, 134 (*Lilly*).) Courts and commentators addressing the issue since *Lilly* reached varying conclusions about that opinion's import (see authorities collected in *People v. Schmaus* (2003) 109 Cal.App.4th 846, 857), although most California courts continued to assume that out-of-court declarations against interest implicating a defendant could be admitted, without violating the confrontation clause, where the evidence "contain[ed] 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability." (*Lilly, supra,* at p. 125, quoting *Ohio v.*

---

[90]    Section 1230 provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

*Roberts, supra,* 448 U.S. at p. 66; see *People v. Brown* (2003) 31 Cal.4th 518, 538; *People v. Schmaus, supra,* at p. 859.)

In *Crawford, supra,* ___ U.S. ___ [124 S.Ct. 1354], the United States Supreme Court eschewed the test of *Ohio v. Roberts, supra,* 448 U.S. at page 66, as being at once too broad and too narrow. (*Crawford, supra,* at p. ___ [124 S.Ct. at p. 1369].) Instead, the high court made clear that what matters, for confrontation clause purposes, is whether the statement is "testimonial."[91] "This focus ... suggests that not all hearsay implicates the Sixth Amendment's core concerns.   An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the ... abuses the Confrontation Clause targeted.   On the other hand, *ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them." (*Id.* at p. ___ [124 S.Ct. at p. 1364].)

The statement at issue here is clearly nontestimonial within the meaning of *Crawford*: it is neither the functional equivalent of in-court testimony nor was it made under circumstances where it reasonably could be expected to be available for use at a later trial. (*Crawford, supra,* ___ U.S. at p. ___ [124 S.Ct. at p. 1364].)   This does not mean, however, that the trial court (which, of course, did not have the benefit of the *Crawford* opinion) was bound to admit the statement.

---

[91]   "Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]." (*Crawford, supra,* ___ U.S. at p. ___ [124 S.Ct. at p. 1364].)