In *People v. Fuentes* (1998) 61 Cal.App.4th 956 (*Fuentes*), we discussed the interrelationship between section 1230 and a defendant's Sixth Amendment rights to confrontation and cross-examination, and we explained that declarations against pecuniary, proprietary, or penal interest are admitted because they are unlikely to be false. (*Fuentes, supra*, at p. 961.) To this end, the California Supreme Court has "construe[d] the exception to the hearsay rule relating to evidence of declarations against interest set forth in section 1230 of the Evidence Code to be *inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant*." (*People v. Leach* (1975) 15 Cal.3d 419, 441, italics added, fn. omitted.) We are required to adhere to this statement (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), regardless of what effect, if any, *Crawford* may ultimately have upon it.

In the present case, the trial court reasonably could conclude that while Radovcich's statements to Ponce overall were distinctly disserving to Radovcich, the reference to Ewell itself was not. Section 1230 applies only to a statement or portion thereof which is specifically disserving to the declarant's interest; it does not apply to collateral assertions within declarations against penal interest. (*People v. Lawley* (2002) 27 Cal.4th 102, 153.) Moreover, a statement may not be found sufficiently reliable for admission *solely* because it includes an admission of criminal liability. (*Ibid.*; *People v. Duarte* (2000) 24 Cal.4th 603, 611.) "'"[A] self-serving statement lacks trustworthiness whether it accompanies a disserving statement or not"'" (*ibid.*); "'[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory nature. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.' [Citation.]" (*People v. Lawley, supra*, at p. 153, quoting *Williamson v. United States* (1994) 512 U.S. 594, 599-600; see also *People v. Wilson* (1993) 17 Cal.App.4th 271, 276 ["'The basis of this exception is not that a declarant is in

151.

a general trustworthy frame of mind. The probability of trustworthiness comes from the facts asserted being disserving in character'"].)

The trial court's decision to exclude the challenged statement was within the bounds of reason. Nothing about *who* needed to turn 25 before Radovcich could collect any money "made [Radovcich] more culpable than did the other portions of his statement." (*People v. Lawley, supra,* 27 Cal.4th at p. 154 [holding trial court did not abuse its discretion in admitting hearsay statement that declarant was hired and paid to kill one Stewart and did kill him, but excluding statement concerning who hired declarant].) Accordingly, the trial court did not err in excluding the challenged statement under section 1230.

Having determined the challenged statement was erroneously placed before the jury, we must now decide whether the error requires reversal. *Aranda-Bruton* error is evaluated under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18. (*Lilly, supra,* 527 U.S. at pp. 139-140; *People v. Anderson, supra,* 43 Cal.3d at p. 1128.) Under this test, "[t]he inquiry ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)

Based on our exhaustive review of the entire record (see *Schneble v. Florida* (1972) 405 U.S. 427, 432; *United States v. Parks* (9th Cir. 2002) 285 F.3d 1133, 1139), we conclude the guilty verdict rendered against Ewell "was surely unattributable to the error." (*Sullivan v. Louisiana, supra,* 508 U.S. at p. 279.) First, contrary to Ewell's argument, the properly-admitted evidence was overwhelming. (*People v. Anderson, supra,* 43 Cal.3d at p. 1129.) We have set out at length the evidence adduced at trial, *ante*, and shall not repeat it here, except to draw special attention to the clandestine communications between Ewell and Radovcich, Ewell's reaction to the news Radovcich was a suspect, and especially the lack of any actual evidence to suggest Radovcich had a

motive for the killings absent Ewell's involvement.[92] Second, the challenged testimony was cumulative. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1016; *People v. Anderson, supra,* 43 Cal.3d at p. 1129.) The jury knew, from evidence unrelated to Radovcich's statements to Ponce, appellants' approximate ages; that the Ewell estate was worth around $8 million; and that dispersal of the bulk of the estate was controlled by age stipulations contained in Dale's and Glee's wills. The jury also properly heard that Radovcich told Ponce he committed the murders to split an inheritance which he believed to be worth $8 million. Under these circumstances, the challenged reference to Ewell added nothing.

Ewell contends that the testimony concerning splitting the inheritance cannot be relied upon because it was admitted solely against Radovcich. Ewell has misread the record. The testimony on that subject which was elicited on direct examination of Ponce was admitted against both defendants pursuant to section 1223.[93] It was the testimony elicited by Ewell's attorney on cross-examination – concerning a 50-50 split – that was admitted solely against Radovcich because of the way in which the questions were framed, as the trial court expressly clarified.

We also reject Ewell's claim that, during the giving of instructions, the trial court informed the jury it had now ruled the entirety of Radovcich's statement inadmissible as to Ewell.[94] Nothing in the instructions suggests the court was referring to the *entirety* of

---

[92]   For reasons we will discuss *post*, we disagree with Ewell's contention that the jury was forced to resort to invalid extrajudicial evidence in order to reach a verdict.

[93]   Testimony concerning when Radovcich expected to receive the money was limited to Radovcich.

[94]   During instructions, the trial court reminded jurors: "Evidence has been admitted against one of the defendants and not admitted against the other. At the time this evidence was admitted, you were instructed that it could not be considered by you against the other defendant. Do not consider this evidence against the other defendant. [¶] For

Radovcich's statement to Ponce, especially in light of the reference to limiting instructions which were given when the specific evidence was presented. Moreover, the parties' arguments to the jury made it clear that some evidence was of limited admissibility and some was not.

Ewell further contends the prosecutor improperly relied on the offending evidence in closing argument, when he told the jury:

> "Some hearsay in this case – and this is where we get a little tricky – was specifically ruled admissible against only one Defendant. And you have been alerted to that as we progressed through the trial. And you will be reminded by the general instruction when Judge Creede reads instructions later.

> "Now, that poses some problems, I guess; because, as good jurors, you need to follow the law. And you need to not apply hearsay that was admissible only against Joel Radovcich against Dana Ewell and consider that evidence against him.

> "An example that I'm going to use is – has to do with the testimony of Jack Ponce. In answer to either my question or Mr. Cherney's question as to, 'Did Joel Radovcich tell you why he committed these murders?' Mr. Ponce stated that it was to split the inheritance. And to the question of, … 'Did he tell you how much he believed the inheritance to be?' 'Yes. Eight million dollars.'

---

example, evidence was received of a statement made by the defendant, Joel Patrick Radovcich. At the time the evidence of any such statement was received, you were instructed that it could not be considered by you against the Defendant Dana James Ewell, and do not consider the evidence of the statement against the other defendant, as you have been instructed." The court subsequently instructed: "Evidence has been received of a statement made by defendant, Joel Patrick Radovcich, which at the time the evidence of the statement was received, you were instructed that it could not be considered by you against the other defendant, Dana James Ewell. [¶] Do not consider the evidence of any statement received for a limited purpose against the other defendant in accordance with the limiting instruction of the Court."

> "There was then some testimony on how long Joel Radovcich expected to wait until the money came. And his answer was something to the effect, 'About three years.' Do you remember that?
>
> "That ... last part, how long he expected to wait, was admissible only against Joel Radovcich and not against Dana Ewell. And it would be unfair and illegal, not to mention, to use the three-year thing against ... Mr. Ewell.
>
> "The first part about did he tell you why he committed murders and ... what was the expected benefit to Mr. Radovcich, that is admissible against both Defendants."

Ewell complains that the prosecutor's argument violated the trial court's earlier instruction which limited use of the "splitting the inheritance" evidence to Radovcich. As we have seen, however, this contention is based on a misinterpretation of the record. Ewell further says that telling the jury the "three-year thing" could not be used against him simply drew the jury's attention to that evidence. We will not fault the prosecutor for emphasizing to the jury the various limitations that were placed on certain items of evidence.[95]

In short, the prosecutor's argument was fully in line with the trial court's rulings and the limiting instructions given. (Contrast *People v. Fletcher, supra,* 13 Cal.4th at p. 471.) Oppliger made clear he was not referring to testimony elicited during Kinney's cross-examination of Ponce, and we have no doubt that, by closing argument, jurors were well aware of which attorney was which. If Ewell felt there was any ambiguity, he should have objected or sought clarification. (See *People v. Carter* (2003) 30 Cal.4th

---

[95]     *In re Rodriguez* (1981) 119 Cal.App.3d 457, upon which Ewell relies, is distinguishable, as it did not involve a situation in which the prosecutor had a right to argue his views of evidence admitted against one of multiple defendants. In *Rodriguez,* in contrast to the situation here, the prosecutor's references were to the failure of the lone defendant to testify. Viewed in toto, the appellate court determined, they constituted error under *Griffin v. California* (1965) 380 U.S. 609. (*In re Rodriguez, supra,* at pp. 460-461, 468.)

1166, 1209, fn. 13; *People v. Turner* (1994) 8 Cal.4th 137, 192.) He did not, most likely because he recognized the argument was proper.

**D.   Derivative Liability Instructions**

As set out in detail in the statement of facts, *ante*, Peter Radovcich and Jack Ponce both testified for the prosecution. Ponce's testimony included his procurement of the murder weapon at Radovcich's behest, as well as Radovcich's description to him of the murders and statements that the homicides were committed to split an $8 million inheritance. Peter's testimony included his assisting in construction of a silencer, as well as various admissions made by Radovcich to him. Peter and Ponce both testified to disposing of the weapon and other evidence at Radovcich's behest.

The trial court gave standard accomplice instructions with respect to both Peter and Ponce. Radovcich now says the court erred by failing to give instructions explaining how the two could have been "subject to prosecution" for the homicides through operation of the "natural and probable consequences" doctrine as it relates to aiders and abettors of, and coconspirators in, lesser offenses. He says the trial court had a sua sponte duty to so instruct, but, if it did not, then his attorney's performance was deficient because he failed to make appropriate requests.

1.   Procedural History

Peter and Ponce were each arrested and charged with three counts of murder in this case. At trial, both testified for the prosecution under grants of immunity. Appellants sought to have the jury instructed that Ponce was an accomplice as a matter of law, while the prosecutor contended the men might be accessories but neither was an accomplice as a matter of law because neither had the requisite intent. The court determined the issue was a factual one for the jury since both Ponce and Peter denied any knowledge, concerning the intended use of the weapon, which would make them aiders and abettors. Accordingly, it decided to submit the question to the jury with the full panoply of accomplice instructions. The court also stated it would instruct on aiding and

abetting and conspiracy, and would give an instruction which distinguished between corroboration requirements for accessories versus accomplices. With respect to the natural and probable consequences language contained in CALJIC No. 3.02 (principals – liability for natural and probable consequences), appellants both stated they were "[r]easonably satisfied" with the language contained in the standard instruction.[96] There was no discussion of so-called "target offenses" with respect to the natural and probable consequences doctrine as set forth in any of the instructions, and neither appellant sought a pertinent modification of said instructions.[97]

During discussion of the various instructions on murder and related issues, Ewell noted he had withdrawn his initial request for instructions concerning felony murder based on burglary or robbery. The court observed that the evidence in support of the People's theory "would make murder during the commission of robbery or the result of

---

[96]     CALJIC No. 3.02 (1997 rev.) (6th ed. 1996) read: "One who aids and abets [another] in the commission of a crime [or crimes] is not only guilty of [that crime] [those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted. [¶] In order to find the defendant guilty of the crime[s] of ___, [as charged in Count[s] ___,] you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime [or crimes] of ___ [was] [were] committed; [¶] 2. That the defendant aided and abetted [that] [those] crime[s]; [¶] 3. That a co-principal in that crime committed the crime[s] of ___; and [¶] 4. The crime[s] of ___ [was] [were] a natural and probable consequence of the commission of the crime[s] of ___. [¶] [You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of (charged crime) was a natural and probable consequence of the commission of that target crime.]"

[97]     During the instructional conference, the court alerted the parties to the then-recent California Supreme Court opinion in *People v. Prettyman* (1996) 14 Cal.4th 248 (*Prettyman*), which, it noted, dealt extensively with the natural and probable consequences doctrine, as well as aiding and abetting and accomplice liability.

burglary, really incidental." Radovcich concurred that while Ewell could argue a theory of criminal activity by others which sought to raise a reasonable doubt in jurors' minds as to his own liability, that did not mean the jury should be instructed on burglary or robbery.

In argument, the prosecutor asserted that Peter and Ponce were not accomplices because they were not liable to prosecution for the identical offense as the perpetrators. He argued that they did not have the requisite knowledge and intent, even assuming they knowingly aided in the commission of an intermediary crime such as producing a silenced weapon. At no point in his argument did he rely on the natural and probable consequences doctrine, either with respect to Peter or Ponce, or with respect to either appellant. In his argument on behalf of Ewell, Kinney suggested that no one knew whether what occurred was a failed burglary, a robbery, or an assassination, any of which was possible. However, his overriding theme was that Ponce was not merely an unwitting participant, but instead was a liar and a murderer, either as an aider and abettor or as the actual killer. Under Ewell's theory of the case, while Peter may have been an accessory, Ponce was fully involved in the killings. For his part, Cherney suggested, on behalf of Radovcich, that if jurors believed Ponce masterminded what took place, they could also believe he was the shooter, and that if this was a burglary and Radovcich had no idea Ponce was going to shoot anyone, Radovcich would not be guilty of first degree murder. Cherney also attacked Ponce's credibility, but did not raise the issue of natural and probable consequences in terms of Ponce's status. Instead, while he challenged the prosecution's case to a certain extent, the thrust of his argument was mitigation with respect to Radovcich, either in terms of obtaining a second degree murder verdict or, implicitly, in setting the stage for a favorable result at penalty phase.

During the course of Cherney's summation, the prosecutor contended that, if Cherney was going to argue that Ponce and Radovcich went to the Ewell residence to commit a burglary and Ponce then killed the family, so that Radovcich would be guilty

only under the theory of the natural and probable consequences of aiding and abetting a burglary, then the prosecution was entitled to burglary-felony-murder instructions. The trial court denied the request, finding that to allow such a change in theory at so late a date would be prejudicial.

Later, again during the course of Cherney's summation, the trial court inquired whether any party thought it was necessary to amplify what was meant by natural and probable consequences, particularly with regard to aiding and abetting. During discussion of the issue, this occurred:

> "THE COURT: My main question is whether, under [CALJIC No.] 3[.]02, ... which states one who aids and abets in the commission of a crime is not only guilty of that crime but also is guilty of any other crime committed by a principal, which is a natural and probable consequence of the crime originally aided and abetted.

> "And so really the question is whether ... that language ... needs any amplification or should rest the way it is, or whether we have an offense that is a reasonably foreseeable consequence of an act aided and abetted.

> "MR. CHERNEY: Well, such as?

> "THE COURT: I'm asking you. I really don't see it. But ... my issue is whether we have some language that requires further definition, or whether it would be a misapplication if it's, itself, very clear.

> "MR. CHERNEY: The only alternative I can think of, if the concern is generated by the Codefendant theory of the case, would be to add language that's very specific, that says something along the lines of, 'But this instruction does not apply to any acts committed, if you believe Jack Ponce committed any acts.'

> "THE COURT: Well, this is dealing with aiding and abetting. You see, ... that's one of the problems. In other words, even taking Ewell's theory, there is still the question ... as to whether any Defendant ... was an aider and abettor.

> "In other words, furnishing the gun, if you know the unlawful purpose of the perpetrator, no direct evidence of Mr. Ponce's knowledge,

159.

but the knowledge and mental state can often by shown by circumstantial evidence.

"So I just raise the question. But in the cases that deal with it, ... there are usually some target crime [*sic*] ....

MR. CHERNEY: Well, but even if – even if – I mean, it's a little confusing, because I'm not sure whether the Court means that if there were some language that applied to Jack Ponce. This jury certainly could believe, under a theory, that Jack Ponce did, in fact, supply the weapon, knew what was going on, intended to obtain consideration later for having furnished the weapon. The jury can believe that if they want to. But how does that affect these Defendants in this particular instruction?

"I would – I would not submit any new language or amplification of this.

"MR. KINNEY: On behalf of Mr. Ewell ... I agree with Mr. Cherney."

The prosecutor similarly had no request for amplification.

In pertinent part, the trial court subsequently instructed the jury:

"Now, Ladies and Gentlemen, the next series of instructions define who are principals in the commission of a crime:

"Persons who are involved in committing a crime are referred to as 'principals' in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include: Those who directly and actively commit the act constituting the crime; or, two, those who intentionally aid and abet the commission of the crime with knowledge of the unlawful purpose of the perpetrator and with the intent of encouraging or facilitating the commission of the crime.

"A person aids and abets the commission of a crime when ... he or she: One, with knowledge of the unlawful purpose of the perpetrator, and with the intent or purpose of committing or encouraging or facilitating the commission of the crime, and, by act or advice, intentionally aids, promotes, encourages, or instigates the commission of the crime.

"A person who intentionally aids and abets the commission of a crime need not be present at the scene of the crime.

160.

"Mere presence at the scene of a crime, which does not itself amount to the commission of the crime, does not amount to aiding and abetting.

"Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.  [¶] ... [¶]

"One who intentionally aids and abets another in the commission of a crime or crimes with knowledge of the unlawful purpose of the perpetrator is not only guilty of that crime but is also guilty of any other crime committed by the principal which is a natural and probable consequence of the crime originally, intentionally aided and abetted.

"In order to find the Defendant guilty of the crimes of murder as an aider and abettor, as charged in Counts One, Two, and/or Three, you must be satisfied beyond a reasonable doubt that:  One, the crimes of murder were committed; and that the Defendant intentionally aided and abetted those crimes with knowledge of the unlawful purpose of the perpetrator and with the intent of encouraging or facilitating the commission of the crime; and that a co-principal in that crime committed the crime or crimes of murder; and that the crime of murder in Counts One, Two, and/or Three were a natural and probable consequence of the commission of the crimes of murder, intentionally aided and abetted with knowledge of the unlawful purpose of the perpetrator, and with the further intent of encouraging or facilitating the commission of such crime.

"Now, the next series of instructions, Ladies and Gentlemen, defines who an accomplice is.

"An accomplice is a person who is subject to prosecution for the identical offense of murder charged in Counts One, Two, and Three, against the Defendant on trial by reason of intentionally aiding and abetting or being a member of a criminal conspiracy.

"To be an accomplice, the person must have aided, promoted, encouraged, or instigated, by act or advice, the commission of such offense with knowledge of the unlawful purpose of the person who committed the crime, or who was a co-conspirator, as that crime will be defined for you.

"You cannot find a Defendant guilty based upon testimony of an accomplice unless that testimony is corroborated by other evidence which tends to connect such Defendant with the commission of the offense. [¶] ... [¶]

161.

"Merely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator and without the intent or purpose of committing, encouraging, or facilitating the commission of the crime is not criminal. Thus, a person who assents to or aids or assists in the commission of a crime without knowledge and without the intent or purpose and – without knowledge and without that intent or purpose is not an accomplice in the commission of the crime.

"You must determine whether Jack Ponce and Peter Radovcich were accomplices, as I have defined that term."

The court further told the jury that a person who was an accessory after the fact to murder was not an accomplice, and defined accessory. The court also instructed: "Even though a person may be subject to prosecution for some other crime, for having done some act of cooperation with, or assistance to, the accused, if he is not prosecutable for the same crime as the accused, he is not an accomplice to that crime, and his testimony requires no corroboration." The court then turned to the subject of conspiracy, instructing in part:

"A conspiracy is an agreement between two or more persons with the specific intent to agree to commit the crime of murder, and with the further specific intent to commit that crime followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement.

"Conspiracy is a crime but is not charged ... as such in this case.

"In order to find a Defendant to be a member of a conspiracy, in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of at least one overt act. It is not necessary to such a finding as to any particular Defendant that Defendant personally committed the overt act, if he was one of the conspirators when the overt act was committed. [¶] ... [¶]

"Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if that act or declaration is in furtherance of the object of ... the conspiracy.

"The act of one co-conspirator pursuant to, or in furtherance of, the common design of the conspiracy is the act of all conspirators.

"A member of a conspiracy ... is not only guilty of the particular crime that, to his knowledge, his confederates agreed to and did commit, but he is also liable for the natural and probable consequences of any crime of a co-conspirator to further the object of the conspiracy, even though that crime was not intended as part of the agreed-upon objective, and even if he was not present at the time of the commission of that crime.

"You must determine whether the Defendant is guilty as a member of a conspiracy to commit the originally agreed-upon crime or crimes, and, if so, whether the crime alleged in Counts One, Two, and Three were perpetrated by a co-conspirator in furtherance of that conspiracy and was a natural and probable consequence of the agreed-upon objective of that conspiracy."

2.   Analysis

Radovcich says the instructions given were incomplete because the trial court failed to instruct on target crimes other than murder which would have allowed the jury to find Peter and/or Ponce to be accomplices under the natural and probable consequences doctrine. Those target offenses, he says, should have included robbery, since Ponce admitted knowing the gun was for the purpose of obtaining money, and violations of various weapons offenses. He says that when two persons help another secretly obtain a firearm and construct a silencer for that firearm, robbery and murder come within the foreseeable consequences. Because jurors never understood these principles, the argument runs, they never understood that Peter and Ponce could be "subject to prosecution" for murder even if they did not know there was to be a murder. He claims the trial court's failure to carry out, sua sponte, its instructional duty caused error of federal constitutional dimension and was prejudicial under any standard; alternatively, he asserts that, if there was no sua sponte duty, defense counsel was ineffective for failing to request appropriate instructions.

"'An accomplice is ... defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' ([Pen. Code,] § 1111.) If sufficient evidence is presented at trial to justify the conclusion that a witness is an accomplice, the trial court must so instruct the

163.

jury, even in the absence of a request. [Citation.] Of course, an accomplice has a natural incentive to minimize his own guilt before the jury and to enlarge that of his cohorts; accordingly, the law requires an accomplice's testimony be viewed with caution to the extent it incriminates others. [Citations.] Moreover, an accomplice's testimony must be corroborated before a jury may consider it. ([Pen. Code,] § 1111)." (*People v. Brown, supra,* 31 Cal.4th at p. 555.)[98]

"In order to be chargeable with the identical offense, the witness must be considered a principal under [Penal Code] section 31. That statute defines principals to include '[a]ll persons concerned in the commission of a crime ... whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission ....' [Citations.]" (*People v. Horton* (1995) 11 Cal.4th 1068, 1113-1114.)[99] Thus, a direct perpetrator, aider and

---

[98]    Penal Code section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial on the cause in which the testimony of the accomplice is given."

"'Testimony,' as used in [Penal Code] section 1111, includes "'all out-of-court statements of accomplices ... used as substantive evidence of guilt which are made under suspect circumstances. The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police."' [Citation.]" (*People v. Brown, supra,* 31 Cal.4th at p. 555, italics omitted.)

[99]    "A 'person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 40; *People v. Beeman* (1984) 35 Cal.3d 547, 561.) A conspiracy, which need not be separately charged in order to form a basis of liability or foundation for various evidentiary matters (see *People v. Brigham*

abettor, or coconspirator can be an accomplice. On the other hand, that the witness was prosecuted (or, by analogy, arrested) for the same offenses as the defendant does not alone establish him or her to be an accomplice. (*People v. Gordon* (1973) 10 Cal.3d 460, 467.) "A mere accessory … is not liable to prosecution for the identical offense, and therefore is not an accomplice. [Citations.]" (*People v. Horton*, *supra*, at p. 1114.)

The natural and probable consequences doctrine applies both to aiding and abetting and to conspiracy. (See, e.g., *Prettyman. supra,* 14 Cal.4th at pp. 260-261; *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5; *People v. Kauffman* (1907) 152 Cal. 331, 334.) Under that doctrine as it applies to aiding and abetting, a person may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the natural and probable consequence of the target offense. (*People v. Croy*, *supra*, at p. 12, fn. 5.) Under the doctrine as it applies to conspiracy, a person may be held criminally responsible as an accomplice not only for the crime he or she conspired to commit (the target crime), but for any deed of his or her coconspirator which was done in furtherance of the object of the conspiracy or which was the natural and probable consequence of any act of a coconspirator done in furtherance of the object of the conspiracy. (*People v. Hardy, supra,* 2 Cal.4th at p. 189; *People v. Kauffman*, *supra*, at p. 334.) The determination whether one criminal act was a natural and probable consequence of another criminal act "is a factual question to be resolved by the jury in light of all of the circumstances surrounding the incident. [Citations.]" (*People v. Nguyen* (1993) 21 Cal.App.4th 518,

---

(1989) 216 Cal.App.3d 1039, 1049), """is an agreement between two or more persons with the specific intent to agree to commit a public offense …, and with the further specific intent to commit such offense, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement." [Citations.]' [Citation.]" (*People v. Pitts* (1990) 223 Cal.App.3d 606, 890.)

531.) The test to be applied is an objective one; "the issue does not turn on the [actor's] subjective state of mind, but depends upon whether, under all of the circumstances presented, a reasonable person in the [actor's] position would have or should have known that the charged offense was a reasonably foreseeable consequence" of the target offense. (*Ibid.*)

"A trial court must instruct the jury 'on the law applicable to each particular case.' [Citations.] '[E]ven in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) In *Prettyman*, *supra*, 14 Cal.4th 248, the California Supreme Court confronted the issue "whether, when a trial court instructs a jury on the 'natural and probable consequences' doctrine, the identification and description of potential target offenses are 'general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case' [citation], thus triggering the trial court's duty to so instruct the jury on the court's own initiative. [Citations.]" (*Id.* at p. 264.) The court concluded that an instruction identifying and describing uncharged target offenses for the jury "is necessary and should be given whenever uncharged target offenses form a part of the prosecution's theory of criminal liability and substantial evidence supports the theory. When these conditions are satisfied, an instruction identifying and describing potential target offenses is necessary to minimize the risk that the jury, generally unversed in the intricacies of criminal law, will 'indulge in unguided speculation' [citation] when it applies the law to the evidence adduced at trial." (*Id.* at pp. 266-267.)

In *Prettyman*, the court determined that where an aiding and abetting case involves application of the natural and probable consequences doctrine, "identification of the target crime will facilitate the jury's task of determining whether the charged crime allegedly committed by the aider and abettor's confederate was indeed a natural and

probable consequence of any uncharged target crime that, the prosecution contends, the defendant knowingly and intentionally aided and abetted." (*Prettyman, supra,* 14 Cal.4th at p. 267.)[100]  As the court recognized,

> "To apply the 'natural and probable consequences' doctrine to aiders and abettors is not an easy task. The jury must decide whether the defendant (1) with knowledge of the confederate's unlawful purpose, and (2) with the intent of committing, encouraging, or facilitating the commission of any target crime(s), (3) aided, promoted, encouraged, or instigated the commission of the target crime(s); whether (4) the defendant's confederate committed an offense *other than* the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated. Instructions describing each step in this process ensure proper application by the jury of the 'natural and probable consequences' doctrine.

> " ... [T]o convict a defendant of a crime under this doctrine, the jury need not unanimously agree on the particular target crime the defendant aided and abetted. [Citations.]  In many cases in which the doctrine is applicable, the defendant is not charged with the target crime, but with another crime that was allegedly committed by the defendant's confederate. Nevertheless, at trial each juror must be convinced, beyond a reasonable doubt, that the defendant aided and abetted the commission of a *criminal act*, and that the offense actually committed was a natural and probable consequence of that act. ... [A] conviction may not be based on the jury's generalized belief that the defendant intended to assist and/or encourage unspecified 'nefarious' conduct. To ensure that the jury will not rely on such generalized beliefs as a basis for conviction, the trial court should identify and describe the target or predicate crime that the defendant may have aided and abetted." (*Id.* at pp. 267-268, fns. omitted.)

The court concluded that "when the prosecution relies on the 'natural and probable consequences' doctrine to hold a defendant liable as an aider and abettor, the trial court

---

[100]    As the causation principles of aider and abettor liability also apply where conspiracy liability is concerned (see *People v. Brigham, supra,* 216 Cal.App.3d at p. 1052), *Prettyman*'s reasoning extends, by analogy, to situations in which liability is predicated upon a conspiracy theory.

must, *on its own initiative*, identify and describe for the jury any target offense allegedly aided and abetted by the defendant." (*Prettyman*, *supra*, 14 Cal.4th at p. 268.) However, it went on to state: "We recognize that the workload of our already heavily burdened trial courts is increased whenever we impose on trial judges an obligation to provide a particular jury instruction sua sponte. We also recognize that 'the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly.' [Citation.] *But the sua sponte duty to instruct that is imposed here is quite limited.* It arises only when the prosecution has elected to rely on the 'natural and probable consequences' theory of accomplice liability and the trial court has determined that the evidence will support instructions on that theory. The trial court, moreover, need not identify all potential target offenses supported by the evidence, but only those that the prosecution wishes the jury to consider.[101]" (*Id.* at p. 269, original italics omitted, italics added.)

In *People v. Gonzalez* (2002) 99 Cal.App.4th 475 (*Gonzalez*), Division Five of the Second District Court of Appeal applied *Prettyman* to a case in which the defendant argued, for the first time on appeal, that the trial court should have instructed, sua sponte, on the target offense of assault as a predicate for a finding that a prosecution witness was an accomplice on a natural and probable consequences aiding and abetting theory. In *Gonzalez*, the prosecution's theory was that the defendant personally shot and killed the victim. In part, the prosecutor relied on the testimony of one Lopez, who testified the defendant fired the fatal shot. By contrast, the defendant testified that Lopez was the killer. (*Gonzalez*, *supra*, at pp. 477-478.)

---

[101]    "If the prosecutor requests that the jury be instructed on the 'natural and probable consequences' doctrine, but fails to identify potential target crimes, the trial court should inquire about the particular target offenses on which instruction is desired."

[124 S.Ct. 1354, 1374 (*Crawford*).) "Whatever else the term ['testimonial'] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."[88] (*Ibid.*)

Statements made in furtherance of a conspiracy are, by their nature, not testimonial. (*Crawford, supra*, ___ U.S. at p. ___ [124 S.Ct. at p. 1367].) The *Aranda-Bruton* rule is inapplicable to statements which fall within the hearsay exception for statements of coconspirators. (*People v. Sanders* (1995) 11 Cal.4th 475, 517, fn. 8.)

For a statement to be admissible as that of a coconspirator, it must have been made, inter alia, while the declarant was participating in, and in furtherance of, a conspiracy.[89] (*People v. Sanders, supra*, 11 Cal.4th at p. 516.) Here, the trial court accepted the theory that the object of the conspiracy was to obtain the Ewell family fortune, and so any such conspiracy did not end with the homicides, but continued until the proceeds of the estate were obtained. The trial court also determined a trier of fact could find that Radovcich's admissions to Ponce were intended to cause Ponce to fear prosecution as an accessory or accomplice and so to secure his silence and motivate untruthful statements to law enforcement authorities. However, the trial court found that

---

[88]    The term "interrogations" is used "in its colloquial, rather than any technical legal, sense. [Citation.]" (*Crawford, supra*, ___ U.S. at p. ___, fn. 4 [124 S.Ct. at p. 1365, fn. 4].)

[89]    Section 1223 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

those portions of Radovcich's statements which could be characterized as "'gratuitous ramblings'" could not be deemed to be in furtherance of the conspiracy.

The trial court acted well within its discretion in finding that Radovcich's statements to Ponce were made while the conspiracy was ongoing. (See, e.g., *People v. Noguera* (1992) 4 Cal.4th 599, 625-626 [where conspiracy embraced "successive but interdependent objectives," one of which was securing life insurance proceeds and other property, statements made after homicide but before attainment of proceeds and property were made during conspiracy]; *People v. Hardy* (1992) 2 Cal.4th 86, 143-144 [where primary goal of conspiracy was acquisition of insurance benefits, conspiracy continued until coconspirators received insurance proceeds or were disabled from legally collecting same]; *People v. Saling* (1972) 7 Cal.3d 844, 852 [statements made following homicide but before payment to killer made during conspiracy where payment was one of main objectives of conspiracy as far as defendant was concerned].) The trial court also acted well within its discretion in determining that, generally speaking, statements made by Radovcich to Ponce were in furtherance of the objective of the conspiracy because they were intended to secure his silence and lack of cooperation with law enforcement authorities. (See, e.g., *Grunewald v. United States* (1957) 353 U.S. 391, 405 [distinguishing between acts of concealment done in furtherance of main objectives of conspiracy and those done after objectives attained, merely to cover up after crime]; *People v. Hardy, supra,* 2 Cal.4th at pp. 145-147 [where attainment of conspiracy's objective hinged on ability to avoid being blamed for homicides, statements made to maintain secrecy and avoid discovery of conspiracy furthered criminal objective]; *People v. Sully* (1991) 53 Cal.3d 1195, 1231 [statements were made in furtherance of conspiracy where they reasonably could be viewed as attempt to commit potential witness to silence].) However, the trial court reasonably also could conclude – as it did – that the specific reference to Dana Ewell was *not* in furtherance of the conspiracy because it added nothing to the attempt to obtain Ponce's silence or prevarication, and instead was

In *Gonzalez*, the prosecutor did not ask that the jury be instructed pursuant to CALJIC No. 3.02 (principals – liability for natural and probable consequences) or for instructions on any target offenses, although accomplice instructions vis-à-vis Lopez were requested and given. Aside from the defense's request that the jury be instructed to view accomplice testimony with "distrust" instead of "caution," no modification of the standard accomplice instructions was sought. On appeal, the defendant claimed the trial court failed adequately to instruct on accomplice liability, and that its failure to instruct on assault as a target offense prevented the jury from finding Lopez to be an accomplice based on the aiding and abetting of an assault on the victim, with homicide as the natural and probable consequence thereof. (*Gonzalez, supra*, 99 Cal.App.4th at pp. 481-482.)

The Court of Appeal observed that typically, a trial court has a sua sponte duty to give standard accomplice instructions. When such an instruction is given without objection, however, a defendant cannot complain on appeal that it was too general or incomplete. (*Gonzalez, supra*, 99 Cal.App.4th at p. 483.) The court then reviewed the *Prettyman* opinion, and noted that the sua sponte duty imposed in that case was, by the Supreme Court's own terms, "'quite limited.'" (*Gonzalez, supra*, 99 Cal.App.4th at p. 484, quoting *Prettyman, supra*, 14 Cal.4th at p. 269.) The appellate court concluded that, under *Prettyman*, "there is no sua sponte duty to give instructions on target offenses unless the prosecutor relies on a natural and probable consequences theory. If the prosecutor fails to identify any potential target crimes, then no instruction may be given pursuant to CALJIC No. 3.02 on a natural and probable consequences aiding and abetting theory." (*Gonzalez, supra*, at p. 485.) The court went on to state:

> "No doubt, *Prettyman* involves instructions on the liability of a charged offense – murder. [Citation.] Defendant attempts to distinguish *Prettyman*, which concludes no sua sponte duty existed under the circumstances, by arguing that the present case involves a potential target offense which relates to possible aiding and abetting liability and cautionary accomplice testimony instructions. But we fail to distinguish any meaningful difference between this case and [the] holding in *Prettyman*

169.

as to the 'quite limited' sua sponte duty to instruct on a target offense. [Citations.] If there is no sua sponte duty to instruct on target offenses as it relates to an element of charged crime, then no justification in reason or law warrants imposing such a responsibility on a trial court to act on its own initiative in connection with accomplice testimony.... Instructing on a target offense to support a CALJIC No. 3.02 natural and probable consequences aiding and abetting theory as a basis for potential accomplice liability falls within the scope of an exception to the normal sua sponte obligation to instruct in this area ...." (*Gonzalez, supra*, at p. 485.)

Our situation falls somewhere between *Prettyman* and *Gonzalez* in that here, the trial court did give CALJIC No. 3.02, but only identified murder as a target offense, and even then only in that portion of the instruction which referred to a defendant's liability. Construing those cases together, however, we find no error, either with respect to CALJIC No. 3.02 or, by parity of reasoning, the conspiracy instructions. The prosecutor did not rely on a natural and probable consequence theory of accomplice liability. More importantly – and assuming, in terms of accomplice instructions, a sua sponte duty would exist under the *Prettyman* rationale if a defendant relied on the natural and probable consequences doctrine to determine who was an accomplice – appellants exhibited no such reliance. Additionally, the trial court raised the question with defense counsel, in terms of a defendant's liability, but also with respect to Ponce's having furnished the murder weapon. Counsel for both appellants expressly declined to submit any new language or amplification. "'[A] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 666; cf. *Gonzalez, supra*, 99 Cal.App.4th at p. 483-485.)

Assuming we were to find error, moreover, we would find no prejudice. We reject Radovcich's contention that the asserted error was of federal constitutional dimension because it impacted his rights to a fair trial and to present a defense. The cases he cites are inapposite and concern the blanket exclusion, under state evidentiary rules, of testimony on a defendant's behalf (*Rock v. Arkansas* (1987) 483 U.S. 44; *Green v.*

170.

*Georgia* (1979) 442 U.S. 95; *Chambers v. Mississippi* (1973) 410 U.S. 284; *Washington v. Texas* (1967) 388 U.S. 14); the preclusion of evidence of a particular defense or its submission to the jury with appropriate instructions (*Mathews v. United States* (1988) 485 U.S. 58; *United States v. Hicks* (4th Cir. 1984) 748 F.2d 854); and a defendant's liberty interest where sentencing is concerned (*Hicks v. Oklahoma* (1980) 447 U.S. 343). Even *Prettyman* rejected the argument that failure to identify and describe target crimes when instructing on the natural and probable consequences rule with respect to a defendant's *own* liability violated the defendant's right to due process. (*Prettyman, supra*, 14 Cal.4th at p. 270.) Instead, the California Supreme Court found the instructional error resulted in instructions which were "somewhat ambiguous, because they left open the possibility that the jury might engage in unguided speculation." (*Id.* at p. 272.) Accordingly, the court reviewed the instructions to see whether there was a reasonable likelihood the jury misapplied the trial court's instructions on the natural and probable consequences doctrine. Finding none, the court concluded that no federal constitutional error occurred. (*Ibid.*)

*Prettyman* states the standard of prejudice where the alleged instructional error concerns application of the natural and probable consequences doctrine vis-à-vis a *defendant's* liability. In our opinion, it is not the standard that applies where, as here, the alleged error concerns application of the doctrine vis-à-vis *accomplice* liability. In determining the appropriate standard, we look instead to cases which specifically concern accomplice instructions. In that regard, a trial court's erroneous failure to instruct on accomplice liability *at all* "'is harmless if there is sufficient corroborating evidence in the record. [Citation.]'" (*People v. Brown, supra*, 31 Cal.4th at p. 556; *People v. Lewis* (2001) 26 Cal.4th 334, 370; see *People v. Bevins* (1960) 54 Cal.2d 71, 77-78 [applying standard of *People v. Watson* (1956) 46 Cal.2d 818, 836].) We fail to see why the standard should be any more exacting under the circumstances before us. In this regard, "[c]orroborating evidence may be slight, may be entirely circumstantial, and need not be

sufficient to establish every element of the charged offense. [Citations.]" (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271.) "The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Lewis, supra*, 26 Cal.4th at p. 370.)

Here, Peter's and Ponce's testimonies were amply corroborated, and Radovcich does not contend otherwise. Moreover, unlike the *Prettyman* situation, in which a jury's "'unguided speculation'" could wrongly lead to a conviction "based on the jury's generalized belief that the defendant intended to assist and/or encourage [or conspired to commit] unspecified 'nefarious' conduct" (*Prettyman, supra*, 14 Cal.4th at pp. 267-268), here such speculation could only have been to Radovcich's advantage by allowing jurors to base a finding of accomplice status on conduct the natural and probable consequence of which may or may not have been murder. In addition, jurors were given myriad reasons to distrust both witnesses. Under the circumstances, any error was manifestly harmless.[102]

Radovcich contends that if, as we have found, the trial court had no sua sponte duty to instruct on target offenses other than murder, then his trial attorney rendered ineffective assistance of counsel by failing to request such instructions. We disagree.

Briefly stated, the burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) In order to establish such a claim, "a defendant must show that counsel (1) performed at a level below an objective standard of reasonableness under prevailing professional norms; and thereby

---

[102]    We would reach the same result if we applied *Prettyman*'s standard as, given the arguments and theories of all parties, we would find no reasonable likelihood the jury misapplied the trial court's instructions on the natural and probable consequences doctrine, nor any reasonable probability the outcome would have been different absent the error. (See *Prettyman, supra*, 14 Cal.4th at 272-274.)

(2) subjected the defense to prejudice, i.e., in the absence of counsel's failings a more favorable outcome was reasonably probable." (*People v. Hamilton* (1988) 45 Cal.3d 351, 377.) "A defendant who raises the issue on appeal must establish deficient performance based upon the four corners of the record. 'If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; accord, *People v. Catlin, supra,* 26 Cal.4th at p. 163; *People v. Lewis, supra,* 25 Cal.4th at pp. 674-675.) Here, defense counsel made a tactical decision not to ask for instructions on other target offenses. He was not asked to explain that decision, and we cannot say there could be no satisfactory explanation. Accordingly, Radovcich has failed to demonstrate counsel's performance was deficient, or that he suffered prejudice in any event.

## E.    Jurors' Receipt of Extrajudicial Evidence

Appellants contend they were deprived of their federal constitutional rights to the assistance of counsel and a jury trial when, without notice to counsel, the trial court provided the deliberating jury with a tape recorder and jurors then listened to a tape recording, some of which had not been admitted into evidence.

1.    Procedural History

As set out in the statement of facts, *ante,* law enforcement officers conducted lengthy surveillance of appellants, which included attempts to overhear and, if possible, record, appellants' side of various telephone conversations. Prior to trial, Ewell moved to exclude, pursuant to section 352, the contents of various telephone calls, including those of May 14, 1993. He asserted that "[b]oth the recollected versions of the officers who were privy to co-defendant Radovcich's statements and the intelligible portions of tape recordings made of the conversations are too fragmentary to be meaningful or reliable." He further objected to any references in which Radovcich spoke to his attorney about

Jennifer Nunnikhoven McDonald taking a lie detector test, or in which he attempted to convince her not to take such a test. Radovcich joined in Ewell's motion, and also objected to admission of any communications between himself and his then-attorney, E. Terrence Woolf, as well as polygraph references.

A fairly lengthy argument was held with respect to the tape recordings. In part, appellants argued that the recordings were very hard to understand and could be quite misleading because of how fragmentary some of the sentences were, and that the People could not establish Radovcich was speaking to Ewell. Ewell reserved the issue of the May 14 telephone calls, as his position was that if the other calls were admitted into evidence, he also wanted the May 14 calls admitted.

The court sustained Radovcich's objection to the introduction of any portion of monitored conversations in which he had discussions with his attorney. The court also barred any reference to a polygraph examination, but denied the motion to exclude the various telephone calls, subject to a foundational hearing to determine the quality of the taped conversations. The court commented that the tapes varied in quality, and that in some places, they were "absolutely unintelligible" so that only "fragmentary parts of the conversation" could be discerned. The court stated that if a tape was of such poor quality that it would lead the jury to speculate as to what was said, such would be the basis for not receiving the tape into evidence.

In his opening statement, the prosecutor candidly admitted to the jury that many of the tape recordings were of poor quality. Nevertheless, he gave his view of what he expected the May 14 tape to show.[103] Kinney also discussed the May 14 tape, disputed the prosecutor's assertion that only one telephone call was involved and claimed instead

---

[103]    As the parties focus on the tape of May 14, we will do the same except when necessary for a complete procedural history.

174.

there were four calls, and told jurors the evidence would show that only the first of the calls involved Ewell.

During trial, the court brought up the issue of the tapes outside the jury's presence. It wanted the tapes subjected to any foundational hearings, and to deal with any objections based on quality, as soon as practicable "so we don't end up with a jury in the jury room and an objection to the quality of the tape." Ewell reiterated his position that the various tapes should be excluded, but only if the conversations, as recalled by the officers, also were excluded.

Later, an issue arose with respect to the April 1 tape. The prosecution intended to present testimony from the detectives who overheard the conversations on that date, while Radovcich sought to play the tape recording itself to show a discrepancy between what one of the detectives said he heard and what the tape contained. The prosecution did not dispute the defense's right to play the tape, even if it was unintelligible, given the purpose for which it was being presented. Ewell agreed with that position. Cherney stated he wanted to have the tape played. When asked by the court about the other tapes, he replied, "Well, I think that that's the critical tape, as far as I'm concerned, because there are alleged statements in there that I don't think happened.... [¶] ... [¶] But later on, I believe that the quality of the tapes may be – are very good. And you can hear exactly what's being said. [¶] I don't think there are any more that are going to be in controversy. And if there are, I certainly will let the Court know. But I don't think that any of the transcripts of those are materially in controversy." The court then noted it had recently read a case from the Ninth Circuit Court of Appeals which determined it was error to send tapes into the jury room, and that "what should be done is the way we do it, is to have the jury come back into the room and have what they want replayed."

Cherney later informed the court that he had no objections to the other tapes, "other than what Mr. Jones has already outlined and we've done in previous 402 hearings." He felt that most of the conversations on the tapes had "no meaning," and that

the only ones of import were the April 1 conversation and the ones concerning

Nunnikhoven and Woolf, upon which the court had already ruled. When Jones inquired

about the tapes of May 14 and other dates, the prosecutor stated his intent to produce the

overheard conversations by way of live testimony and leave it up to defense counsel

whether to utilize the tapes for impeachment purposes.

The prosecutor did, in fact, have various detectives testify concerning what they

overheard on different dates, including May 14. With respect to the April 1 surveillance,

Cherney had the entire tape played for the jury and established that various statements,

which the surveilling officer testified hearing, were not audible on the tape. That tape

(court's exh. O) was subsequently received into evidence, with the understanding, as

stated by the court, "that if the jury wants it replayed, they will have to – it will be done

in the courtroom."

Later during trial, Sheriff's Sergeant Dadian testified that on May 14, 1993, he

was involved in surveillance. One call was made earlier that day from the Irvine Ranch

Market at Irvine and Mesa. Another call was made about 5:30 that evening from the 7-

Eleven at Bristol and Baker. The prosecutor then interrupted Dadian's testimony to call

Detective Souza, who testified to receiving information on the clone pager, at

approximately 5:30 that evening, from a pay telephone at the Airport Holiday Inn in

Fresno. He notified Detectives Dadian, Knight, Mosier, and Jones.

The prosecutor next called Sergeant Mosier, who was also involved in surveillance

on May 14. Mosier testified that after receiving information about the page from Souza,

he located Radovcich's vehicle at the market at Irvine and Mesa. He relayed the

information to other detectives and asked them to respond to the location with

surveillance equipment. Mosier directed Detective Knight, who was wearing a wire, to

approach Radovcich at the pay telephone. She did so, while Mosier moved to a listening

post. Mosier was able to receive transmissions from Knight's wire, but did not record

them or attempt to take notes. He believed surveillance began a little before 6:00 p.m. Detective Jones tape-recorded the transmissions from the wire, as did Sergeant Dadian.

The prosecutor next called Detective Knight. Knight testified that she received information sometime after 5:30 p.m. on May 14, 1993, to proceed to the Irvine Ranch Market at Irvine and Mesa. She actually arrived at the telephone at 6:00 p.m. She was wearing a wire and placed herself at a telephone around the corner from, but within three feet of, Radovcich, who was already on the telephone when she arrived. In part, Knight testified:

> "Q Were you able, your own self, to hear the conversation that was occurring?
>
> "A I heard only small patches of conversation, because we're near the John Wayne Airport, and we're right under the jet take-off flight path. So I heard parts of the conversation, but small parts.
>
> "Q This was a – based on what you've mentioned, this was a particularly difficult location to overhear conversation.
>
> "A Terribly difficult, yes.
>
> "Q You have, later on in your efforts in this case, you have listened to the various tape-recordings that were made from the body wire that you were wearing?
>
> "A Yes. I've gone over both tapes.
>
> "Q And this was in an effort to attempt to reconstruct above and beyond the matters that you placed in your report?
>
> "A That is correct.
>
> "Q And ... how were those tapes, Detective Knight?
>
> "A They're Excedrin headache No. 10. It's two hours of buzzing, with a few words in between.
>
> "Q The jets come across fairly nicely, don't they?
>
> "A The jets sound quite well.

"Q All right. Okay. Now, in respect to the portions – well, let me ask you this. Are – having listened to the tapes and having been there in person, are there – are there matters that you were able to hear in person that you cannot hear on the tapes?

"A Yes. [¶] ... [¶]

"Q ... Were you able to hear more than one conversation that Mr. Radovcich was involved in?

"A Yes, I did.

"Q And what do you base that on in terms of either hearing or observations that you make?

"A Well, I didn't get to see very much, but it's on hearing. I heard a telephone hang up and another number dialed. And two times during that hour I heard the phone hang up and another number being dialed.

"Q And so that led you to believe that there was more than one phone call that you were dealing with.

"A That, and the change in the tone of voice and the manner in which he was carrying on a conversation."

Knight then related what she recalled from the three conversations. She testified that she subsequently listened to the tapes, one of which had an introduction by Detective Jones and the other by Detective Dadian. She was able to hear a few more words than were in her report, and there were some portions of her report which reflected parts of conversations she overheard that were not in the transcript prepared from the tapes.

Outside the jury's presence, Cherney clarified that Knight did not overhear anything which she believed to be a conversation between attorney and client. During his cross-examination of Knight, Cherney asked for, and was granted, permission "to play a very short portion of the tape [exhibit 633] just before what sounds like a hang-up." The parties stipulated that the court reporter need not attempt to take down the part played.

At this point, the record becomes somewhat murky concerning how much of the tape was played for the jury, and what was admitted into evidence. The minutes of

March 10, 1998, show exhibit 633 (the tape of May 14, 1993) and exhibit 634 (excerpts of that tape) marked for identification only. The reporter's transcript for March 10 shows that after Cherney received permission to play a portion of the tape, he questioned Knight further before doing so. This ensued:

"Q [by Cherney]  If I play this for you, maybe it will refresh your recollection [concerning differences between the two tapes to which Knight previously listened].

"May I do that, your Honor?

"A [by Knight]  Yes, it will help.

"THE COURT:  All right.  The exhibit number of the tape is –

"MR. CHERNEY:  It hasn't been marked, your Honor.  [¶] … [¶]

"THE COURT:  633.  It will be marked as 633.

"(Exhibit No. 633, Tape-recording, marked for identification and received into evidence.)

"*(Tape marked as Exhibit 633 played for the jury)*

"MR. CHERNEY:  *Let me stop right there.*

"Q  Is that you?  Do you recognize that voice?

"A  It sounds like my voice, but I can't tell you what I said.

"Q  *I was actually playing the other side of the tape.  That would be tape A – or side A.*

"Were you carrying on a made-up telephone conversation?

"A  At some points I was, yes.  The people behind me in line were not happy I was at the phone booth an hour.

"(Laughter)

"Q  *This would be side B, the end – the end of the tape.*

"*(Tape marked Exhibit 633 played for jury)*"  (Italics added.)

179.

Upon further examination by Cherney, Knight testified that the quality of the two May 14 tapes was poor. Radovcich could clearly be heard at the end of one tape, saying, "'I love you,'" and there were other places a few words could be discerned. During his cross-examination of Knight, Jones used exhibit 634, which he described as excerpts of Detective Jones's tape recording. The reporter's transcript reflects that tape being played on four occasions, with questioning in between, but does not show whether the entire exhibit was played. Knight mentioned that when she listened to the tapes, she wore earphones and had a tape recorder that would slow down the tape, making for better listening conditions. Jones also played portions of exhibit 634 during his cross-examination of Detective Jones.

Outside the presence of the jury, Jones noted that the defense had received three tapes from the prosecution concerning this single surveillance, and that he felt the varying length of the tapes and discrepancies in time were important as far as reassembling what happened, how many conversations took place, and what statements fell within each. He observed: "The only thing I can suggest to accomplish that is play some very long, loud, offensive tape-recordings for the jury and then try and stop it at certain points and replay certain sounds so that the jury knows we're not playing hide the ball .... [¶] And I hesitate to sit down by the tape player for – for almost two and a half, three hours, and play what for the great majority of that time would be what we're hearing, loud, offensive and irritating sounds, but I don't know any other way around it unless we can reach some stipulations regarding that – that information." Cherney pointed out that playing the tape to the jury provided jurors with the opportunity to hear tape recordings that were unclear. Eventually, the parties submitted a document with respect to exhibit 633 which bore Detective Dadian's name, transcribed his introduction of the tape (which set forth the date and place of recording and the parties thereto), and then stated the remainder of the recording was not subject to a complete literal transcription because many sections were

inquiries concerning the potential deadlock with respect to the remaining defendant. This ensued:

> "THE BAILIFF:  May I approach, Your Honor?
>
> "THE COURT:  Yes, sure.
>
> "(Conference held between the bailiff and the Court, not reported.)
>
> "THE COURT:  All right.  All counsel are present ... and the defendants are present.
>
> "There's one thing I would like to mention to the parties, that ... shortly after receiving the note from the jury, they did ask for a tape recorder, which was sent in to them.  And I propose to inquire of the foreperson as to whether the written message they gave us is still the status of their deliberations."

The court asked the bailiff to bring in the jurors, but was told they wanted a few minutes as they were still filling out some forms.  Court stood in recess from 11:00-11:40 a.m., at which time the trial court and counsel took up a new note from the jury, which asked a question about one of the firearm enhancement allegations.  The trial court instructed the jury on the point, then asked whether the tape recorder that was sent in had functioned properly.  The foreperson replied that it had, whereupon the court inquired whether the jury was still engaged in deliberations or whether the first message represented its status.  The foreperson replied that they needed to return to the jury room. Jurors returned to the jury room to resume deliberations at 12:05 p.m.

The jurors returned to the courtroom at 12:10 p.m., stating they had reached a verdict as to both defendants.  Radovcich's verdicts were dated May 11, while Ewell's were dated May 12.  Kinney subsequently asked the court to ascertain the numerical division as of the time the jury appeared to have been deadlocked with respect to the one defendant.  The court denied the request, as the jurors had not been discharged and penalty phase remained, but told Kinney he could renew it at the conclusion of penalty phase.

On June 5, during penalty phase deliberations, the court was informed of, and inquired of jurors concerning, potential juror misconduct. That same day, the jury declared itself hopelessly deadlocked. As a result, a mistrial was declared and the jury discharged. The court did, however, ask the foreperson to remain for a matter of law and procedure.

During the ensuing hearing, the foreperson was asked whether, during guilt phase deliberations, there was a change in the vote pertaining to one of the defendants between the time of the two notes. This occurred:

"JUROR NUMBER 32 [jury foreperson]: Okay. Contrary to what seems to be the prevalent thought, we did not take a vote until eight days into deliberations. [¶] ... [¶] We were concerned about the length of the trial, how many witnesses, how much testimony. Some of us had two binders worth of notes.

"Uhhm, the very first day was, with all due respect, was a venting day, where people were able to speak their mind and their problems and their concerns and those things.

"The second day was basically a less-focused day of expressing concerns and opinions and things like that.

"And the third day ... we decided that it was in the best interest to review the entire testimony.

"As we were proceeding through the testimony, ... everybody was reading. If there was any discrepancy or any discussion, we would then review that to determine whether we needed to come back to court and have it read or whether we all understood. It was not whether each one necessarily believed it, but that that was the testimony.

"We did that. I think it was a Friday that we took a vote. And that was right before we went home. That was more of a straw vote to get an idea where we stood, where we needed to go, and what more it would take.

"We had some concerns that we gave you about wanting to see Mr. Ponce's testimony. [¶] ... [¶] The purpose in that was not any more than it was such a long period of time and we wanted to make sure that we had everything down properly.

184.

inaudible or unintelligible, together with the parties' stipulation that transcriptions need not be prepared.

During a further discussion of transcription of exhibit 633, Oppliger asked the court whether it was contemplated that the various tapes would be provided to the jury. The court replied: "Well, certainly they've heard them. And the tapes they've heard will be in evidence. But if they wish them replayed, the procedure is to have – even during deliberations, to have them come into the courtroom and have them replayed ... in the courtroom."

On March 25, 1998, the following occurred:

"MR. CHERNEY: I've got a real quick [matter of law and procedure] here. We've got an agreement signed by all parties as to the very beginning of the transcript, which is ... Exhibit 633 in this case, which has been marked. I'm not sure if it's been admitted. But I ... it's been signed by all the parties, and I'm submitting it to the Clerk now.

"*(Exhibit No. 633*, previously marked for identification, *received into evidence.)*

"THE COURT: Okay. [¶] ... [¶] Let's see. 633.

"MR. CHERNEY: It's Dadian's tape of May 14, 1993, Cynthia Knight overhearing conversation.

"THE COURT: Yes. Do you show it as being received, Miss Perez? 633?

"THE CLERK: No, I don't show it as being received.

"THE COURT: The stipulation is – all right. *Then it will be received as 633.*" (Italics added.)

During his summation to the jury, Kinney discussed the May 14 surveillance at length. At one point, he told jurors, "Listen to those tapes, if you have them." At another point, he stated, "[Knight] said she reviewed the tape, you check it out in the evidence, and the word 'political' was in the second call. You can listen. She could hear the hang-

181.

ups, the same call that 'She's about ready to burst.'" In his summation, Cherney also told jurors they were welcome to listen to the tape that had been provided in evidence.

In pertinent part, the trial court instructed the jury to determine the facts from the evidence received in the trial and not from any other source.[104] The court further instructed that if jurors had a question or request during deliberations, it should be addressed to the court on a form which would be provided, and that counsel would be contacted before a response could be formulated. The court warned that it might take time to provide a response, and instructed jurors to continue deliberating until they were called back into the courtroom. Jurors were also told they could have most of the exhibits brought in to them, upon request.

Outside the jury's presence, the court discussed the matter of the exhibits with counsel. Kinney requested that the exhibits all be sent in. When Castro suggested sending in the exhibits without an exhibit list and letting jurors request such a list if desired, Cherney stated that procedure was fine with him. The prosecutor voiced no objection.

Deliberations began on April 28, 1998. That same day, the clerk informed the court and counsel that the jurors had all of the exhibits, except for a box the contents of which the bailiff was checking.

On the morning of May 12, the jury sent out a note stating they had reached a verdict as to one defendant, but were unable to reach a verdict concerning the other one. With the parties' concurrence, the court decided to have the foreperson seal in an envelope the verdicts that had been reached, after which the court would make standard

---

[104]    This was at least the third time jurors had heard this admonition, as the court also gave it to all prospective jurors, and to the sworn jurors and alternates at the commencement of opening statements.

"Uhhm, that being done, ... we then proceeded to other testimony and other points of interest.

"We had another one or two votes.  Still not ... any one person.

"It came down to there at the end, and we had the impression that the juror – that there was, yes, only one holdout.  Everyone was very respectful of that juror.  So we felt that any more pressure, any more discussion, probably would not be productive.  And, in essence, we decided to return it to the Court, that we had a situation where we couldn't make a decision.

"But as the note was being passed to the Bailiff, the juror in question said that, no, he was not that comfortable with his vote, and if he could have a little more time to talk, that it appeared through his conversation that he was not comfortable with his vote.

"So we decided that we'd take whatever time he wanted.

"And what it basically amounted to was he, we, needed to listen to a tape.  We listened to that tape.  We had some more discussion.  And that individual decided that that individual wanted to change his vote.

"However, at that time we had more discussion to make sure that – we didn't want that – the individual to feel that they had to change their vote.  It was very important to all the jurors.  So we asked specifically, on five different times, whether that was his 'conviction' or his 'acquiescence.'  And we wanted to make sure that was very clear before we came back with a verdict.  And then we came back with a verdict."

After a discussion of what went on during penalty phase, the attorneys were permitted to question the foreperson.  Kinney elicited that the initial votes on Ewell were in the range of nine to three.  This ensued:

"MR. KINNEY:  Just one more.  I'm not asking for any names at all, but was it – there is something – when it was 9 to 3, would it be correct that ... it was a situation where we had one male and two females?

"JUROR NUMBER 32:  Uh, yes.  Can I ... explain something about that, too, if I may, your Honor?

"THE COURT:  Certainly.  Go right ahead.

"JUROR NUMBER 32:  The other two involved, which, as you pointed out, were female, ... the problem was that in their heart they could

not render a guilty verdict, and that was very hard for them to overcome. And no one pressured them to overcome it. But that was really in those two cases where that came from. It's just trying to be as honest as I can to explain that.

"I'm not so sure personally that … they had a change of verdict, as more realization – the law was very important in that room. I was very proud of everybody. They – the jury instructions must have been reread 50 times in different parts, to make sure no one was making a mistake and no one was doing something that was not in accordance with the law.

"And they had a lot of problems with that portion of it, removing that sympathy. And that was hard for them to overcome. And it was on their own. It was not … the rest of the jurors doing it.

"MR. KINNEY: One last question. When you listened to a tape, was that Dana's statement? Or was that a phone record?

"JUROR NUMBER 32: No. Uhhm, we asked at one point to have all the evidence brought in. And when we said, 'We don't believe this is all the evidence,' we were informed it was. We only had one tape. And that was a telephone conversation. We did not have any other tapes.

"MR. KINNEY: Do you recall which telephone conversation that was? April 1st?

"JUROR NUMBER 32: No. I don't believe so. I think it was – the 14th, I think. I – in all honesty, I'm not sure I could tell you right now. It's – but it was a telephone conversation. It was the one that was very noisy, involved the three to four different phone calls that were in exchange there. It was that phone call."[105]

2.   Analysis

Appellants say the trial court committed federal constitutional error by sending a tape recorder into the jury room without notice to counsel, and that jury misconduct occurred when jurors listened to the May 14 tape, most of which was not in evidence. We conclude that, assuming error occurred, no cause for reversal has been shown.

---

[105]   That was, in fact, the May 14 tape, as the parties have addressed in their briefs.

We turn first to the act of providing the tape recorder to the jury without notice to counsel.[106] Appellants rely to a large extent on *People v. Hogan* (1982) 31 Cal.3d 815 (*Hogan*).[107] There, the California Supreme Court addressed a situation in which the trial court responded to jury requests to see various trial exhibits during deliberations. Without notifying counsel, the court sent all the requested exhibits into the jury room, including a tape recording which contained inadmissible portions. On appeal, the defendant claimed he was denied the right to counsel by the trial court's action. (*Hogan, supra*, at pp. 848, 850.) In an opinion authored by then-Chief Justice Bird, the court held that providing the exhibits without notice to counsel constituted "serious error," as all communications between a trial court and jurors should be made in open court, with notification to counsel, so that the parties are afforded the opportunity to make timely objections. (*Id.* at p. 848.) The court further found that the trial court's failure to notify counsel of the requests for exhibits violated Penal Code section 1138.[108] (*Hogan, supra*, at p. 849.) The high court concluded that, since exhibits are evidence, a jury's request for them during deliberations is "a critical stage of the prosecution during which the right to counsel applies." (*Ibid.*) Denying a defendant and his or her attorney the opportunity to

---

[106]   Our reading of the record suggests it was the bailiff who provided the jury with the tape recorder and not the trial court, but our analysis and conclusion are the same in either case.

[107]   *Hogan* was disapproved on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.

[108]   Penal Code section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

participate in decisions concerning the provision of evidence to a deliberating jury deprives the defendant of the right to assistance of counsel at a critical stage. (*Ibid.*)

Here, contrary to the situation in *Hogan*, the exhibits were sent in to the jury near the commencement of deliberations with the knowledge and agreement of all parties.[109] Ewell suggests the agreement merely covered the physical and documentary evidence and not the tape recording, but we find no such limitation in the record. It is true that when the court inquired whether jurors had all the exhibits, the clerk replied, "Yes," while the bailiff qualified, "Except for this box here. We were checking on this." The clerk agreed with that proviso. The box's contents are unclear from the record, although earlier the clerk had noted that she had separated the exhibits into boxes marked "'received' and 'not received.'" Certainly the box's contents would have been apparent to counsel, and it is clear from the jury foreperson's subsequent statements that the jury received the tape of the May 14 conversations along with the rest of the exhibits.[110] The trial court did not send exhibits into the jury room without the knowledge of counsel, and counsel were clearly afforded an opportunity to object to any of the exhibits being so

---

[109]    This factor and others differentiate the present case from *United States v. Brown* (9th Cir. 1987) 832 F.2d 128, on which appellants rely. In that matter, the tape recording was replayed for the deliberating jury before it was admitted into evidence; the prosecutor was notified that the jury had requested a replay, but defense counsel was not; defense counsel did not become aware of what had transpired until sometime prior to the sentencing hearing (and, by implication, after the jury returned its verdict); and the issue on appeal concerned whether the trial court's actions violated rule 43 of the Federal Rules of Criminal Procedure (18 U.S.C.). (*United States v. Brown, supra,* 832 F.2d at pp. 129-130.) Subsection (a)(2) of that rule requires a defendant's presence at "every trial stage ...."

[110]    It is clear from the record that the AT-9 was *not* sent in with the other exhibits, and the jury specifically had to request it. It is also clear, from the foreperson's statements, that jurors did not have to make a separate, specific request for the May 14 tape recording.

188.

provided.  They did not do so, either during the initial discussion, when they learned jurors had been given a tape recorder, or when they learned the jury had listened to the May 14 tape.

In light of the foregoing, *Hogan* is distinguishable on its facts, as are cases which find error in the rereading of testimony to the jury without notice to counsel, or other ex parte communications between judge and jurors.  (See, e.g., *People v. Jenkins, supra,* 22 Cal.4th at pp. 1026-1028; *People v. Jennings* (1991) 53 Cal.3d 334, 384; *People v. Garcia* (1984) 160 Cal.App.3d 82, 88; *People v. Stewart* (1983) 145 Cal.App.3d 967, 972.)

Appellants do not contend the trial court here had ex parte communications with jurors about any subject, including the use of a tape recorder, as they recognize the record is insufficient to support such a claim.  Moreover, they recognize that in this state, a deliberating jury is permitted to listen to tape recordings which have been properly admitted, and that this does not necessarily have to occur in the courtroom.  (See, e.g., *People v. Douglas* (1977) 66 Cal.App.3d 998, 1006; *People v. Walker* (1957) 150 Cal.App.2d 594, 602-603.)  They point, however, to the trial court's determination, which was stated several times during trial, that if the jury wished to have a tape recording replayed, the procedure would be to have jurors come into the courtroom and to have the tape replayed there.[111]

By its own terms, Penal Code section 1138 refers to a jury being provided with "information."  "A statutory or constitutional violation occurs only where the court actually provides the jury with instructions or evidence during deliberations without first

---

[111]    They also insist that the bulk of exhibit 633 was not in evidence.  We will address this contention *post*, in conjunction with our discussion of appellants' claim that jurors wrongfully considered extrajudicial information.

consulting counsel. [Citations.]." (*People v. Mickle* (1991) 54 Cal.3d 140, 174.)  The tape recorder was not information or evidence and, as previously discussed, the exhibits were provided to the jury with counsel's knowledge and agreement.  Accordingly, no statutory or constitutional violation took place.  The procedure used, however, did violate the court's previous determination as to how any replaying of a tape recording would be handled.  Such a determination was well within the trial court's discretion (see *People v. Walker, supra,* 150 Cal.App.2d at p. 603); absent notification to counsel of any proposed change, the announced procedure should have been followed.  Failure to do so constituted error.

The error – whether deemed statutory, constitutional, or simply a violation of the trial court's ruling – was waived by appellants' failure to object.  Appellants disagree on the basis that, by the time counsel was informed of what had occurred, jurors had already listened to the tape and they reached a verdict a short time later.

Although they are distinguishable factually, cases involving ex parte communications between judge and juror, or violation of Penal Code section 1138 and implicated constitutional rights, provide guidance in this area.  In *People v. Price* (1991) 1 Cal.4th 324, the trial court admitted certain tape recordings into evidence.  The tapes were not played for the jury on the record, although counsel played portions during argument.  When the jury requested the tapes during deliberations, the court sent the tapes and a tape player into the jury room.  On appeal, the defendant challenged the trial court's failure to notify counsel of the jury's request for the tapes.  The California Supreme Court stated: "When a jury during deliberations requests an exhibit, the trial court must notify counsel of the request before giving the exhibit to the jury, because the request 'is a critical stage of the prosecution during which the right to counsel applies.' [Citations.]  Although the record does not show that the trial court advised defense counsel before sending the interview tapes to the jury, the record does show that the next day, in response to a jury request to hear testimony ..., the court told the jury in open

court, with counsel present, that this matter was mentioned in one of the interview tapes 'on the second side near the beginning.' Counsel was therefore made aware by the next day at the latest that the jury had been given the interview tapes. Because counsel did not object to the court's failure to provide earlier notice or to the manner in which the court responded to the jury's request, we conclude that the defense waived the trial court's apparent error in failing to notify counsel before sending the interview tapes to the jury. [Citation.]" (*Id.* at p. 414.)

In *People v. Jennings, supra*, 53 Cal.3d 334, there was an ex parte communication between the trial court and the deliberating jury. That same morning, the court informed the prosecutor and defense counsel of what had occurred. Defense counsel failed to object on this ground. On appeal, the state Supreme Court reasoned:

> "By failing to object or move for a mistrial based on the ex parte communication, defendant waived the error. [Citations.] Although defendant argues the error impinged on his constitutional right to counsel and should thus be nonwaivable and reversible per se, both the United States Supreme Court [citation] and this court [citation] have held that unauthorized ex parte communications with the jury need not result in reversal if the improper contact was harmless beyond a reasonable doubt. [Citation.] 'While denial of counsel at the critical stage of a criminal proceedings is not prejudicial as a matter of law, prejudice will be presumed if the denial may have affected the substantial rights of the accused. Only the most compelling showing to the contrary will overcome the presumption. The court must be able to declare a belief the denial of counsel was harmless beyond a reasonable doubt.' [Citations.]
>
> "Moreover, it is questionable 'whether a defendant should be permitted to sit back, await a jury verdict, and then assert error based on the court's improper communication with the jury' [citation], at least when the improper communication was relatively minor. [Citation.]
>
> "In this case the ex parte communication occurred as the result of an informal question by the jury concerning the possible outcome if the jury should deadlock as to a single count. Although the trial court should have deferred answering the question until both the prosecutor and defense counsel could be notified, its response was a correct statement of law and it gave the parties prompt notice of its misstep. Under such circumstances,

the 'potential significance of the error' was slight and the failure to object precludes assertion of the error on appeal." (*Id.* at pp. 383-384, fn. omitted.)

We will discuss the potential significance of the error when we address appellants' claim of jury misconduct, *post.* Clearly, however, that a possible misstep is not known until after the fact does not preclude a finding of waiver based on failure to object.

In *People v. Garcia, supra,* 160 Cal.App.3d 82, the trial court held an unreported oral communication with members of the jury outside the presence of defendant and his attorney. On appeal, the defendant contended he was thereby deprived of his right to the assistance of counsel at a critical stage of the proceeding, his right to be present at all stages of the trial, and his right to be tried by an impartial jury. The appellate court found the error harmless, as nothing in the communication could have prejudiced the defendant. (*Id.* at p. 88 & fn. 3.) The court observed: "Furthermore, on this record, we find a sufficiently compelling showing that defendant waived any claim of error. A number of courts have questioned whether a defendant should be permitted to sit back, await a jury verdict, and then assert error based on the court's improper communication with the jury. [Citations.] Although in the instant case defendant's counsel signified that he was objecting to the court's refusal to question other members of the jury about what they observed, counsel *never objected* to the trial court's privately communicating with the two jurors with whom the judge spoke. When the court offered to make the jurors available so that defendant's counsel could question them about their communication with the court, counsel refused the offer. Under these circumstances, defendant may not now be heard to complain that this court cannot evaluate the prejudicial effect of the error, because '[t]here was no record made of the conversations between the judge and jurors at the time they occurred ....' Any error was effectively waived." (*Id.* at p. 89, fn. omitted.)

In *People v. Chagolla* (1983) 144 Cal.App.3d 422, unreported communications took place between the judge and deliberating jury, and the record consisted of the

192.

judge's recollection thereof. The appellate court noted that this made the task of determining prejudice difficult. (*Id*. at p. 432.) The court went on to state: "There is also authority, however, that an error of this kind is waived if it could have been but was not raised before verdict by objection or motion for mistrial. [Citations.] The waiver rule which is applied to prosecutorial misconduct is equally appropriate here. Under that rule, the failure to object or to move for mistrial is deemed a waiver unless the prejudice could not have been cured by a timely objection and admonition. [Citation.] [¶] The trial judge informed defense counsel of the communications while the jury was deliberating and long before the verdicts were returned. If there was anything improper in the substance of the communications, as related by the judge from memory, counsel could have requested that the error be corrected by further instructions to the jury. If counsel entertained any doubts about the accuracy or completeness of the judge's recollection, the jurors could have been summoned and questioned regarding their recollection of the communications. If counsel wished to inspect the written instructions, this could have been arranged. Counsel did not object or request that any of these obvious steps be taken. Accordingly, failure to object constituted a waiver unless the substance of the communications was so prejudicial that it could not have been cured by further instructions." (*Id*. at p. 433.)

In *People v. House* (1970) 12 Cal.App.3d 756, disapproved on other grounds in *People v. Beagle* (1972) 6 Cal.3d 441, 451-452, the trial judge replied to questions from a deliberating jury without prior notification to counsel. He did, however, advise counsel later as to what had transpired, but no assignment of error or motion for mistrial was made. (*People v. House, supra*, at p. 765.) The appellate court stated: "The failure of defendant's counsel to object or move for a mistrial upon the court frankly informing him of the court's action might ... be construed to be a tacit approval. Approval of the court's action, even though it might have been a technical violation of section 1138 of the Penal Code, cures any possible error. [Citation.]" (*Id*. at pp. 765-766, fn. omitted.)

In the present case, counsel was informed of the purported irregularity before the jury reached final verdicts.[112] Even though time was fairly short, there was ample opportunity for counsel to object or seek further information concerning what transpired. Under the circumstances, any error was waived. Even assuming it was not (see *People v. Knighten* (1980) 105 Cal.App.3d 128, 132), there is no cause for reversal absent a showing of prejudice (*People v. Jennings, supra,* 53 Cal.3d at pp. 383-384). We will discuss the issue of prejudice as we analyze appellants' claim the jury considered extrajudicial information, *post,* as a determination of whether prejudice exists under the standard applicable to jury misconduct will be dispositive of whether prejudice exists assuming error occurred with respect to providing the tape recorder to the jury.[113]

With respect to jury misconduct, the California Supreme Court has explained:

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been

---

[112]    Although a verdict had been reached as to Radovcich, it had not yet been returned and so was subject to reconsideration by the jury. (*People v. Castro* (1986) 184 Cal.App.3d 849, 856; see *People v. Green* (1995) 31 Cal.App.4th 1001, 1009-1010.)

[113]    For the first time in a footnote in Ewell's reply brief, appellants contend we must reach the issue because any waiver would deprive them of their right to counsel. As a general proposition, points raised for the first time in a reply brief will not be considered unless good reason is shown for failure to present them earlier. (*People v. Adams* (1990) 216 Cal.App.3d 1431, 1441, fn. 2; *People v. Jackson* (1981) 121 Cal.App.3d 862, 873.) Appellants have not attempted to show any reason here. Moreover, "'[w]here a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion.'" (*People v. Dougherty* (1982) 138 Cal.App.3d 278, 282; see also *People v. Hardy, supra,* 2 Cal.4th at p. 150; *People v. Wharton* (1991) 53 Cal.3d 522, 563.) Beyond a bare citation of *People v. Ledesma* (1987) 43 Cal.3d 171, appellants have provided no argument of or authority for their proposition. Accordingly, we decline to address it, but would reject it in any event.

194.

improperly influenced [citations] and every member is "'capable and willing to decide the case solely on the evidence before it'" [citations].

"However, with narrow exceptions, evidence that the internal thought processes of one or more jurors were biased is not admissible to impeach a verdict. The jury's impartiality may be challenged by evidence of 'statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly,' but '[n]o evidence is admissible to show the [actual] effect of such statement, conduct, condition, or event upon a juror ... or concerning the mental processes by which [the verdict] was determined.' [Citations.] Thus, where a verdict is attacked for juror taint, the focus is on whether there is any overt event or circumstance, 'open to [corroboration by] sight, hearing, and the other senses' [citation] which suggests a likelihood that one or more members of the jury were influenced by improper bias.

"When the overt event is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror conceals bias on voir dire, consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors, the event is called juror misconduct. [Citations.] A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require similar examination for probable prejudice. Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation. [Citations.]. [¶] ... [¶]

"Misconduct by a juror, or a nonjuror's tampering contact or communication with a sitting juror, usually raises a rebuttable 'presumption' of prejudice. [Citations.] This presumption aids parties who are barred by statute from establishing the actual prejudicial effect of the incident under scrutiny [citations] and accommodates the fact that the external circumstances of the incident are often themselves reliable indicators of underlying bias [citation].

"Still, whether an individual verdict must be overturned for jury misconduct or irregularity "''is resolved by reference to the substantial likelihood test, an objective standard.'"" [Citations.] Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more

jurors were actually biased against the defendant. [Citations.]" (*In re Hamilton* (1999) 20 Cal.4th 273, 293-296, fn. & italics omitted.)

"We assess the effect of out-of-court information upon the jury in the following manner. When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. [Citation.] Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant. If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard. [Citation.]" (*People v. Nesler* (1997) 16 Cal.4th 561, 578-579.)

As an initial matter, we question whether appellants' failure to object or to raise the issue of jury misconduct in the trial court constitutes a waiver of the claim for purposes of appeal. There is some authority for the proposition (*People v. Wisely* (1990) 224 Cal.App.3d 939, 947-948; *People v. McIntyre* (1981) 115 Cal.App.3d 899, 906), but, to our knowledge, the state Supreme Court has not invoked the waiver doctrine under circumstances similar to those we confront here (see *People v. Jenkins, supra,* 22 Cal.4th at p. 1047 [finding of waiver appropriate where defense counsel "vigorously opposed" further examination of juror allegedly unable to deliberate and follow instructions].) Since here misconduct, if any existed, did not come to light until the jury had been discharged, thereby precluding any possible remedy other than a new trial, we find it appropriate to address the issue on the merits. (Compare *People v. Wisely, supra,* 224

196.

Cal.App.3d at pp. 947-948 [contemporaneous objection would have allowed for immediate inquiry and possible remedy].)

Appellants' contention that jury misconduct occurred is premised on the notion that only small parts of exhibit 633 were in evidence. We disagree. Although the record could be clearer concerning what portions actually were played in open court, it is apparent to us that the trial court ultimately admitted the entire exhibit into evidence, without objection. Our reading of the record is strongly supported by the fact that when the jury foreperson informed the parties that jurors had listened to the tape, there was absolutely no mention that part of the exhibit was not in evidence. Since the entire exhibit was in evidence, jurors were entitled to listen to it, regardless of the fact only portions had been played in open court. (See *People v. Price, supra,* 1 Cal.4th at p. 414.) As jurors received no extrajudicial information, there was no misconduct, nor was any prejudice occasioned by provision of the tape recorder.

Even assuming our reading of the record is incorrect and only portions of the tape were in evidence, it is appellants' burden to show that misconduct actually occurred. (See *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 355.) Nothing in the record before us establishes jurors listened to portions of the tape recording which were not in evidence. "[W]e will not 'presume prejudice' absent a threshold showing that some jurors had, in fact," listened to nonevidentiary portions of the exhibit. (*People v. Prieto* (2003) 30 Cal.4th 226, 273; see *In re Carpenter* (1995) 9 Cal.4th 634, 657.) Jurors were instructed on several occasions, including just prior to deliberations, that they were to determine the facts from the evidence received in the trial and not from any other source. There being an "absence of proof of specific juror misconduct" (*People v. Ervin* (2000) 22 Cal.4th 48, 77), "'we must presume [the jurors] followed the court's admonition.' [Citation.]" (*People v. Prieto, supra,* at p. 273.) Nor will we remand the matter for a hearing to determine to which portions jurors actually listened, as appellants suggest; it

197.

was their burden to develop a sufficient record on the point (*People v. Carter, supra,* 30 Cal.4th at p. 1215), and they were given ample opportunity to do so through further questioning of the jury foreperson.

Moreover, even assuming jurors listened to portions of the tape which had not been admitted into evidence, no misconduct occurred. The receipt of out-of-court information, even if inadvertent and not blameworthy, is treated as misconduct and gives rise to a presumption of prejudice. (*People v. Nesler, supra,* 16 Cal.4th at p. 579.) However, a distinguishable situation is present where, as here, court officials furnished jurors with material that should not have been transmitted to them. (*Id.* at pp. 579-580 & fn. 4.)

In *People v. Clair* (1992) 2 Cal.4th 629, the trial court ruled that a tape-recorded conversation was generally admissible, but excluded certain portions as irrelevant and unduly prejudicial, as they contained references to two crimes allegedly committed by the defendant. The redacted recording and accompanying transcript were received into evidence, while the unredacted recording and transcript were offered as exhibits for identification only. Subsequently, however, the court clerk mistakenly sent the unredacted exhibits in to the jury room. (*Id.* at p. 665.) The defendant's resultant motion for new trial was denied, as the trial court determined that any presumption of prejudice had been rebutted. (*Id.* at p. 667.)

In analyzing the defendant's contention on appeal that this ruling was erroneous, the California Supreme Court stated:

> "We observe at the outset that the trial court mischaracterized the jury's receipt of the unredacted audiotape recording and transcript ... as misconduct. 'When, as in this case, a jury innocently considers evidence it was inadvertently given, there is no misconduct.' [Citation.] Rather, all that appears is ordinary error. [Citation.] Certainly, there was no 'improper *outside* influence [].' [Citation.]

"Of course, the question of characterization is potentially significant. With misconduct, prejudice is presumed and reversal is required unless there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment. [Citations.] By contrast, with ordinary error, prejudice must be shown and reversal is not required unless there is a reasonable probability that an outcome more favorable to the defendant would have resulted. [Citation.] Manifestly, the standard is stricter for misconduct than for ordinary error. [Citation.]" (*People v. Clair, supra,* 2 Cal.4th at pp. 667-668.)

A number of cases are in accord, and they control the situation before us. (See, e.g., *People v. Jackson* (1996) 13 Cal.4th 1164, 1213-1214 [where record did not establish which version of transcript sent to jury, clerk presumed to have regularly performed duty under § 664; even assuming clerk's error, no misconduct but merely ordinary error]; *People v. Cooper, supra,* 53 Cal.3d at pp. 835-836 [no misconduct where jury read and considered transcript which had been inadvertently admitted into evidence]; *People v. Horowitz* (1945) 70 Cal.App.2d 675, 704 [prejudice not presumed where exhibits marked for identification only were mistakenly given to jury]; *People v. Horiuchi* (1931) 114 Cal.App. 415, 437-438 [burden on appellant to show injury from inadvertent inclusion, in exhibits sent into jury room, of exhibits received only for identification]; compare *People v. Nesler, supra,* 16 Cal.4th 579-580 [juror's receipt of information from woman in bar constituted misconduct which raised presumption of prejudice]; *People v. Lucas* (1995) 12 Cal.4th 415, 486 [same re: juror's inadvertent receipt of information from person in hallway outside courtroom]; *People v. Zapien* (1993) 4 Cal.4th 929, 994 [same re: juror's inadvertent exposure to television news report].) Cases treating the inadvertent transmission to the jury of unadmitted exhibits as misconduct giving rise to a presumption of prejudice (*People v. Hogan, supra,* 31 Cal.3d at p. 846 [tape recording containing inadmissible portions]; *People v. Hill* (1980) 110 Cal.App.3d 937, 942 [exhibit containing inadmissible information]; *People v. Boyd* (1979) 95 Cal.App.3d 577, 584 [police report face sheet attached to exhibit]; *People v.*

199.

*Kitt* (1978) 83 Cal.App.3d 834, 849-850 [photographs not admitted into evidence]) have been disapproved (*People v. Cooper, supra,* 53 Cal.3d at p. 836).[114]

We find manifestly no prejudice in the present case, even under the higher standard applicable to jury misconduct. In this regard, "[t]he presumption of prejudice may be rebutted by an affirmative evidentiary showing '*or* by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct.' [Citations.]" (*In re Carpenter, supra,* 9 Cal.4th at p. 657.)

Appellants say Ewell, at least, would not have been convicted had the May 14 tape not reached the jury; the record, they contend, makes clear the effect of consideration of the tape: the jury was deadlocked before listening to it, and reached a verdict after. In other words, appellants would have us find the presumption unrebutted because one juror changed his vote after listening to the tape.

We recognize that, depending upon the circumstances, lengthy deliberations preceding jury misconduct, followed by a relatively quick verdict afterward, may strongly suggest prejudice. (See *Sassounian v. Roe* (9th Cir. 2000) 230 F.3d 1097, 1110.) We might find appellants' argument more persuasive if the tape recording in issue

---

[114]     In *Eslaminia v. White* (9th Cir. 1998) 136 F.3d 1234, the prosecution introduced a tape recording of an interview with the defendant. The tape, with the interview recorded on one side, was admitted into evidence. Following the verdict, defense counsel learned that the jury also listened to the reverse side of the tape, which contained an interview with the defendant's brother. That interview was not admitted into evidence and the brother did not testify at trial. (*Id.* at pp. 1236-1237.) The Court of Appeals found it "clear that the jury's consideration of the tape is a serious error of constitutional dimensions." (*Id.* at p. 1237.) To the extent the opinion is inconsistent with those of our state Supreme Court, we decline to follow it.

contained audible prejudicial material. We have listened to the tape (see *People v. Stewart, supra,* 145 Cal.App.3d at p. 973 [reviewing court examined note and instructions sent by judge to jury without notice to counsel]) and find it painfully inaudible and unintelligible – which was, of course, the main point of presenting it to the jury in the first place. No areas of exhibit 633 were ruled inadmissible; for instance, that tape contained no attorney conversations or references to polygraph examinations. Indeed, counsel for both appellants invited jurors to listen to the tape. As for any prejudice which might have resulted from the prosecutor's implication, in his opening statement, that the tape was of a single conversation, Detective Knight testified to hearing several conversations, the prosecutor conceded in closing argument that there were four different telephone calls on May 14, and the jury foreperson referred to the tape as containing three or four conversations. Under the circumstances, were we to find jury misconduct, we would find no substantial likelihood of juror bias because the extraneous information, judged objectively, is neither inherently prejudicial nor, considering the nature of the misconduct and the surrounding circumstances, is it substantially likely any juror was actually biased against appellants. (See *People v. Nesler, supra,* 16 Cal.4th at pp. 578-579.) Were we to find denial of the assistance of counsel or deprivation of other constitutional rights based on the giving of the tape recorder to the jury without notice, we would similarly find any presumption of prejudice overcome by a "'most compelling showing'" that appellants' substantial rights were not affected. (See *People v. Hogan, supra,* 31 Cal.3d at p. 849.)[115]

---

[115]    Lastly, "we declare that 'Whether or not expressly discussed, we have considered and rejected ... all of the assignments of error presented in all of [appellants'] briefs.' [Citation.]" (*People v. Clair, supra,* 2 Cal.4th at p. 691, fn. 17.) Any motions or requests not previously ruled upon are hereby denied.

## DISPOSITION

The judgments are affirmed.

_____
Ardaiz, P.J.

WE CONCUR:

_____
Vartabedian, J.

_____
Buckley, J.

_Calendared for:_
MAY 1 9 2004 _Rule_ ____

_Calendared for:_
JUN 1 4 2004 _Rule_ ____

MAY - 6 2004