2889

This copy of the deci~~~ has been forwarded to
the expiration of the time for granting a rehearing in t~~ C~
or a hearing in the Supreme Court, and it is not to be l~~~~~ ~~ ~~~~
decision on appeal.

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
F I L E D

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA   JUL 1 0 1997

FIFTH APPELLATE DISTRICT

Eve Sproule Court Administrator/Clerk

By_____ Deputy

THE PEOPLE,

    Petitioner,

    v.

THE SUPERIOR COURT OF FRESNO COUNTY et al.,

    Respondents;

DANA JAMES EWELL et al.,

    Real Parties in Interest.

F027396

(Super. Ct. No. 546222-1)

OPINION

JUL 1, 1997

FRESNO COUNTY SUPERIOR COURT
By_____
M.M. DEPUTY

---

JOEL PATRICK RADOVCICH,

    Petitioner,

    v.

THE SUPERIOR COURT OF FRESNO COUNTY et al.,

    Respondents;

THE PEOPLE et al.,

    Real Parties in Interest.

F027534

(Super. Ct. No. 546222-1)

---

DANA JAMES EWELL,

    Petitioner,

    v.

THE SUPERIOR COURT OF FRESNO COUNTY et al.,

    Respondents;

THE PEOPLE et al.,

    Real Parties in Interest.

F027543

(Super. Ct. No. 546222-1)

347
343
349
345
350
346

**SEE SEPARATE CONCURRING AND DISSENTING OPINION**

Case 1:06-cv-00186-AWI-MJS    Document 1-7    Filed 02/17/06    Page 2 of 50.

2890

**ORIGINAL PROCEEDINGS:** Petitions for Writs of Mandate and/or Prohibition

Edward W. Hunt, District Attorney, James Oppliger and Jeffrey T. Hammerschmidt,
Deputy District Attorneys, for Petitioner and Real Party in Interest, People of the State of
California.

Phillip H. Cherney for Petitioner and Real Party in Interest Radovcich.

Charles P. Dreiling, Public Defender and Pete Jones, Deputy Public Defender, for
Petitioner and Real Party in Interest Ewell.

There was no appearance for Respondents.

-ooOoo-

By information filed September 29, 1995, Dana James Ewell (Ewell) and Joel
Patrick Radovcich (Radovcich) were charged with the April 19, 1992, murders of Ewell's
mother Glee (count one), his sister Tiffany (count two), and his father Dale (count three),
in violation of Penal Code section 187. Three special circumstances were alleged:
multiple murders (Pen. Code, § 190.2, subd. (a)(3)), killing for financial gain (Pen. Code,
§ 190.2, subd. (a)(1)), and lying in wait (Pen. Code, § 190.2, subd. (a)(15)). As to each
count, it was further alleged that Radovcich personally used a firearm in commission of
the offense (Pen. Code, § 12022.5, subd. (a)), and that Ewell was armed with a firearm
during the commission of the offense (Pen. Code, § 12022, subd. (a)(1)).[1] The
prosecution is seeking the death penalty against both defendants.

The case has engendered extensive pretrial proceedings. Insofar as is relevant
here, defense motions for separate trials were heard and denied by Judge Creede (the trial
court); renewed motions were heard and denied by Judge Nunez. Defense motions to
suppress evidence (Pen. Code, § 1538.5) were denied in part, but were granted as to the

---

[1]     Pursuant to Evidence Code sections 452, subdivision (d) and 459, we take judicial
notice of our records in case No. F026145 (*Ewell* v. *Superior Court*).

2

clone pager evidence. In addition, the trial court denied defense motions for a change of venue and motions for a continuance.

In case No. F027396, the People have petitioned for a writ of mandate (Pen. Code. § 1538.5, subd. (o)) to reverse the partial suppression grant. In case No. F027534, Radovcich seeks a writ of mandate or prohibition to overturn the denials of a continuance. severance, and change of venue. In case No. F027543, Ewell seeks a writ of mandate or prohibition to overturn the denial of a venue change, and joins Radovcich's petition in seeking severance and a continuance. We have consolidated the three cases, denied the petitions insofar as the change of venue is concerned, and issued an order to show cause as to the remaining issues. We also ordered that trial be stayed pending a determination of these issues or further order of this court. We now deny the petitions as to the issues of severance and continuance, but reverse the trial court's order granting suppression of the clone pager evidence.

## FACTS[2]

### A.   Evidence Compiled by Law Enforcement

On April 21, 1992, the bodies of Dale, Glee, and Tiffany Ewell were found in their Sunnyside area home.[3] All had been shot to death. Tiffany had been shot once in the back of the head; Glee had been shot four times, including once in the face; and Dale had been shot once in the back of the neck. Dale and Tiffany apparently were taken unaware. Although some expended bullets were recovered, no shell casings were found.

The house had been ransacked to make it look like a burglary took place. In the master bedroom was an empty carrying case for a .9 mm. Browning handgun. No such

---

[2]     The facts are taken from the preliminary hearing transcript. We recognize that questions have since been raised about the content of certain statements, made by Radovcich, which officers overheard. Any such potential inaccuracies are not germane to the issues before us.

[3]     For sake of clarity, we will refer to Dale, Glee, and Tiffany Ewell, and to Peter Radovcich, by their first names. No disrespect is intended.

3

2892

weapon was found in the house. There were no signs of forced entry to the house; all doors were locked except for the door leading to the garage. The residence was equipped with a functioning alarm system and motion detectors; someone entering the house had 45 seconds to enter the alarm code into the control box in the entryway closet, or the alarm company would receive an activation notification. The alarm company received no such notification during April 16 through April 21.

The newspaper for April 19 was found near Dale's body, as were a fax dated the previous Friday and some mail. Dale telephoned an employee between 4 and 5 p.m. on April 19 from Western Piper, the business he owned.

Fresno County Sheriff's Detective Souza interviewed Ewell on April 21 and 22, 1992. Ewell said he had last seen his parents alive at about 2 or 2:15 p.m. on Sunday, April 19. The family was leaving their beach house in Pajaro Dunes. Glee and Tiffany were driving back to Fresno, and Dale was driving to Watsonville Airport to fly back. Ewell spent the evening with his girlfriend, Monica Zent, and her family in Morgan Hill. He and Ms. Zent returned to Santa Clara University that evening.[4] Ewell said his parents were "religious" about setting the burglar alarm when they were going to be away for any period of time.

During the April 22 interview, Ewell related that his father owned a 9 mm. handgun. Ewell also told Souza that in January 1992, he had prepared a financial portfolio for his father. The family's net worth was over $7 million. Souza was provided with a copy of the will by the attorney for the estate. Ewell was the sole surviving heir and was to inherit in stages, with all income from the trust to be distributed to him at age 25, one-half of the principal at age 30, and the other half of the principal at age 35.

---

[4]     Ewell had been enrolled at Santa Clara University since 1989. He and Radovcich, who had graduated from Santa Clara in 1991, had lived in the same dormitory and were extremely close friends.

4

On April 24, Ewell was present at the house with Fresno County Sheriff's Detective Ybarra. Ybarra saw him retrieve and pocket something from under the awning of a metal shed in the back yard. When questioned later, Ewell admitted he had taken a house key from the shed. He had the locks changed the evening of April 24.

Souza interviewed Radovcich on May 8, 1992. During that conversation, Radovcich said he had been to Fresno twice, and that on one of those occasions, he was at the Ewell residence. Radovcich said the last time he had talked to Ewell was in December 1992. Radovcich stated that on April 19, 1992, he was staying at Hamrick's Auto Body Repair in Canoga Park.

On June 3, 1992, a floral company telephoned the Ewell residence with regard to a delivery. The person who answered the phone identified himself as "Joel." When the plant was delivered to the residence, Radovcich signed for the plant.

On June 25, 1992, Ewell and Radovcich began taking helicopter flight lessons from a Fresno company. The cost was $5,660 for each student. Ewell paid for both of them. Ewell stopped taking lessons once he received his private license in approximately September of 1992, but Radovcich wanted to continue instructions for a commercial rating. Ewell paid more than $1,400 for Radovcich's lessons.

Also on June 25, law enforcement surveillance began on Ewell's Fresno residence. On that morning, Ewell was observed leaving the residence in his Mercedes. During a portion of the drive, Ewell used counter-surveillance-type driving. Surveillance revealed that Radovcich had uncontrolled access to the house.

From early 1993 through January 1994, Radovcich took helicopter lessons from various companies in southern California. He always paid cash consisting primarily of $100 bills. During this time frame, Radovcich apparently had no job and, except for payment for odd jobs done for his mother, was not receiving any money from his parents.

In February of 1993, Souza instituted surveillance of Radovcich in southern California. On the morning of April 1, 1993, Radovcich made a call from the pay

5

telephone at the 7-11 near his parents' house to a pay telephone at the Shell station located behind Santa Clara University. Sergeant Hollis, who had Radovcich under surveillance, walked up to the adjoining telephone and overheard Radovcich's side of the conversation. That afternoon, Radovcich placed a short call from the pay telephone to the telephone in Ewell's dormitory room. Detective Lee, who had Radovcich under surveillance at the time, believed Radovcich made a pager call. A few minutes later, Radovcich made a longer call to the pay telephone at the Shell station. Lee, who was at the adjoining telephone at the 7-11, was able to overhear a portion of Radovcich's conversation. Radovcich said, in part, "'There's gonna be a news blitz. This thing's gonna blow up;'" "'No, I don't want no fucking stock options. Quarter million dollars. I want it now'" or "'I need it now'" or "'I expected it by now'" (Lee was not sure); "'I want to go around the world;'" and "'Tell this guy to step on it.'"

On April 12, 1993, officers conducting surveillance of Radovcich saw Radovcich enter the garage of Ewell's Fresno residence. Radovcich subsequently drove to Santa Clara, where he stopped at a 7-11 and used the pay telephone. He then drove around Santa Clara University, then used the pay telephone at another 7-11. A short time later, a gold Mercedes, driven by Ewell, arrived. Radovcich got in and they drove off to the San Jose airport area. They spent several hours together that afternoon.

On April 12, pursuant to a search warrant, Souza obtained a clone pager for Radovcich's pager, thereby allowing Souza to receive the pages Radovcich received. The original clone or duplicate pager did not function correctly; it was reprogrammed on April 21, 1993. Souza subsequently learned that a short time after he left the communications company, Radovcich came in and was very concerned that someone was receiving his pages. He was persuaded to change the telephone number for his pager, although—unbeknown to him—Souza would continue to receive his pages. When Radovcich noticed his name listed on the communication company's computer screen, he wanted it changed to "Mike Smith."

6

On May 12, 1993, Souza was in Los Angeles, while Detectives Curtice and Burk were assigned to the Santa Clara area. All were equipped with pagers and cellular telephones. On that evening, Burk and Curtice contacted Ewell at Santa Clara University. They and two campus police officers arrived at Ewell's dormitory about 8 p.m. When Burk told Ewell that the detectives wanted to talk to him in reference to who they felt had killed his family, Ewell responded that this was not the right time or place, and that he had to call someone before talking with them. When Burk asked who he was going to call, Ewell said he was going to call his attorney. He then started talking with the campus police officers about the protocol for the detectives getting into a private dormitory. He was angry with the fact that they had even gotten into the dorm and told the campus police officers that he did not want to be bothered or to talk to the detectives. Just before leaving, Curtice told Ewell that the person the sheriff's department suspected was Radovcich. Ewell "looked like he had been punched in the gut." He said "'okay'" and shut the door. At some point, he left with Monica Zent.

Later, Curtice and Burk saw Ewell drive to the campus police office. From that point on, they and Detectives Moore and Osborn attempted to maintain surveillance of him. Curtice spotted Ewell as the latter was getting onto the 880 freeway. Ewell was in the number one lane with Curtice behind him; as they approached the Chapman Avenue exit, at the very last possible second Ewell cut across all three lanes and exited. Not wanting to endanger anyone, Curtice did not follow.

A short time later, Burk radioed the other units to advise that he had received a telephone call from Souza, who said that Radovcich had received a page from the Santa Clara area.[5] Souza gave Burk the number received on the clone pager. Detective Moore obtained the address of the telephone from the telephone company; the telephone was

---

[5] Although the preliminary hearing testimony is not completely clear on this point, the parties appear to agree that Radovcich received the page a short time after Ewell was informed that Radovcich was a suspect.

located in Santa Clara, and surveillance units proceeded to that address. The location was a business complex; when Moore was getting ready to pull into the parking area, he saw Ewell's vehicle, containing Ewell and Monica Zent, exiting the parking area.

On May 19, 1993, Souza was conducting surveillance in Los Angeles. Late that afternoon, he received a page on the clone pager from a telephone in the San Jose airport area, a mile or less from Santa Clara University. Officer Dadian, who was conducting surveillance on Ewell, saw Ewell on that particular telephone at that time. Detective Haroldsen was the undercover officer who went up to the telephone next to Radovcich. The telephone was at a market in Newport Beach. Just prior to this date, detectives had been investigating Jennifer Nunnikoven, a friend of Radovcich's from college. She was scheduled to take a polygraph examination on May 20. Haroldsen overheard Radovcich say that he had called her mother and told her that she was getting "in deep shit." Radovcich also said that "'someone must be running around listening to us or there's snitches,'" and "'They must have a phone tap.'"

In March of 1995, the Ewell residence was searched pursuant to warrant. Radovcich's passport was located during the search.

## B.   Testimony of Peter Radovcich and Jack Ponce[6]

In December 1991, Peter Radovcich (Radovcich's brother) and his wife lived in Reseda, a few miles from his brother and their parents. From December 1991 to his arrest in March 1995, Radovcich did not have a job. Despite the fact he had no source of income other than doing odd jobs for his mother, Peter sometimes saw him with cash.

Peter and Jack Ponce had known each other since 1983. Ponce also knew Radovcich; in fact, during the summer of 1991, Ponce and Radovcich engaged in three motorcycle and automobile thefts. Neither Ponce nor Peter ever met Ewell.

---

[6]     Peter and Ponce were both given immunity in return for truthful testimony.

8

2897

During the summer of 1991, Radovcich asked Ponce about purchasing a gun. Radovcich did not want to have his name on it. Ponce provided a .380 Llama. Later on that summer, Ponce became aware that Radovcich was building a silencer for it. At Radovcich's request, Peter helped modify the pistol by welding a pipe extension onto the barrel. During this summer, Ponce also provided Radovcich with a .22. The Llama was not working correctly, and Radovcich wanted to find out if he could make a silencer work. He successfully made a silencer for the .22. It had a steel tube through the middle with duct tape around it, and had tennis balls and metal washers inside. During this time, Ponce saw some books on silencers in Radovcich's room.

In early 1992, at Radovcich's direction, Peter also welded a large washer onto the barrel of a second gun. This barrel was not attached to a weapon. Peter believed the washer to be for a silencer.

Radovcich wanted to purchase an AT9. One was available at a gun show he and Ponce attended, but Radovcich was unable to purchase it because he did not want to furnish identification. In March 1992, he asked Ponce about purchasing an AT9 because he (Radovcich) did not want his name on it. Radovcich said he would give Ponce extra cash for buying the gun. Radovcich was more urgent this time than he had been in his previous requests for the gun. He subsequently gave Ponce $1,500 in $100 bills and had Ponce purchase an extra clip and ammunition as well as the gun. Ponce purchased the gun and, after the 15-day waiting period, turned it and the ammunition over to Radovcich on April 8, 1992. At Radovcich's direction, he later reported the gun stolen.

Ponce later saw Radovcich fire the AT9 with a silencer on it. The gun was 9 mm.: the silencer was black PVC pipe. Radovcich said there were tennis balls and washers inside. The gun also had a shell collector on it to catch spent shell casings as they left the gun.

On April 18, 1992, Peter and his wife took an overnight trip to Knotts Berry Farm. They returned home between 9 and 11 a.m. on Easter Sunday, April 19. Radovcich was

9

2898

there; he had stayed overnight to watch their dog. He left when they returned; they next saw him between 9 and 11 that night. At no time did Radovcich tell Peter that he was at Hamrick's auto body shop on April 19. Peter admitted that Radovcich, who drove a black Honda CRX, was in the habit of driving fast.

At some point, Radovcich came to Peter's apartment. He said he had gotten a code and that he needed to go. He left when Peter said he could not or would not take him anywhere. Peter was scared because Radovcich, usually a calm person, was unnerved. At the time, Radovcich had a pager. The number stood for KILLAJR, the "JR" being Radovcich's initials. Radovcich said he would not be surprised if his face was on "America's Most Wanted."

Ponce next saw Radovcich when the latter came to Ponce's girlfriend's apartment and asked to park his car in the apartment complex's underground lot. Radovcich was nervous and wanted to cover the car, which was unusual. Radovcich talked about leaving and said he did not know what went wrong. He said it had to do with a triple homicide and himself. During the course of the evening, Radovcich said he had received a code on his pager to get as far away as he could.

Radovcich and Ponce went to Peter's apartment and then to the plumbing shop. Radovcich gave Peter a backpack containing disassembled gun parts and told the two other men to get rid of it. The guns were the AT9, the Llama, and a Browning handgun. Also in the bag were some shell casings and tennis balls that had been cut in half, as well as the shell catcher and a piece of PVC pipe that had been painted or blackened with tape. Peter was also given a pair of tennis shoes and some gun books. He was asked to dispose of everything. Peter and Ponce drove around and Ponce disposed of the items. He buried the AT9 barrel. He later led sheriff's detectives to it.

Sometime after disposal of the items, Radovcich told Ponce that the homicides had to do with $8 million and that he and the other guy were going to split it in half. Radovcich said they were going to assume the throne.

10

Ponce subsequently went to the beach with Radovcich. Ponce asked Radovcich to tell him. Radovcich told him about the triple homicide, describing the scene and how it happened. Radovcich said it was a family. (At a later point in time, he told Ponce to look for the name "Ewell.") Radovcich said he got into the house and shot the people as they arrived home. He used the AT9. He drove his car to Fresno. He arrived first, used an office to assemble the gun, and slept on some pieces of plastic while he was waiting. He said he had shaved his whole body so he would not leave any hairs behind. He diagrammed the house in the sand for Ponce. He said nothing about a key or an alarm.

Radovcich said the daughter and mother arrived first. He was waiting in the laundry room; when the daughter turned a corner, he shot her in the back of the head. He turned down a hallway; the mother was facing him and he shot her several times. He told Ponce that he then changed latex gloves, changed clips, and waited for the father to come home. When the father came in the front door, Radovcich shot him through the throat and he went down. Radovcich then tried to take the victims' pulses to make sure they were dead. At the time of the beach conversation, Radovcich was unsure whether he had been successful, as he had gotten the pager message to leave. Radovcich said he did it to split the inheritance, which was $8 million.

Radovcich said he had been to the Ewell house prior to the homicides, and that he had seen paperwork concerning the Ewell family's assets. He said he had a certain amount of money from the residence that he had to make last. He also said he had taken the Browning as a cover weapon. He explained that someone looking for the weapon would look for the wrong one, as the Browning was not the one he used in the killings. Radovcich said he expected to be able to collect his half of the inheritance when Ewell turned 25.

Ponce would see Radovcich with $100 bills. Radovcich said he was getting money from Ewell. He also related to Ponce that he was going to say that on the date of

the homicides, he was at Hamrick's auto body shop. It was open 24 hours a day, and he reasoned that no one could tell if he was there or not.

## DISCUSSION

### I.

### Separate Trials

#### A.    Procedural History

Ewell and Radovcich both moved to sever trials. Ewell claimed they should be tried separately because the case against Radovcich was overwhelming, while evidence against himself was relatively weak; there were *Aranda/Bruton* issues;[7] and, most importantly, the two would be presenting mutually exclusive defenses. According to Ewell, acceptance of his defense would preclude Radovcich's acquittal. Ewell asserted that his defense required that Radovcich must be portrayed "as a pathological liar, a chronic thief and an opportunistic killer [and] must be exposed as a truly manipulative psychopath .... The opportunistic Joel must be exposed." To do this, Ewell wanted to present evidence of Radovcich's history as a thief. Radovcich sought separate trials for much the same reasons, pointing out that a joint trial would require him to defend against two separate prosecutors, and that prior bad acts evidence would be extremely prejudicial and would be inadmissible against him in a separate trial. Radovcich also expressed concern that introduction of a redacted version of Radovcich's statements to Ponce would be prejudicial to Radovcich in terms of a penalty phase determination. The People opposed the motions.

A hearing was held on October 8, 1996, and the trial court issued its written ruling denying the motions on October 23. In part, the court determined that any declarations by Radovcich which were inadmissible against Ewell could readily be redacted or excluded;

---

[7]    *People* v. *Aranda* (1965) 63 Cal.2d 518; *Bruton* v. *United States* (1968) 391 U.S. 123.

statements made during and in furtherance of a conspiracy would be admissible even in separate trials; and evidence presented at the preliminary hearing did not lead to the conclusion that the evidence against one defendant would overwhelm or inextricably implicate the other defendant. The court further found that evidence of Radovcich's uncharged crimes probably would be inadmissible, or in any event, the offenses were not particularly serious. It also found that Radovcich's prior crimes were trivial in a triple homicide case, so that the likelihood of either defendant being prejudiced by admission of such evidence had not been established, and that uncharged crimes against Radovcich were not likely to be misused as nonstatutory aggravating factors.

In addition, the court found there was no likelihood of a finding of guilt by mere association, as any guilt by association would come from evidence the People used to establish a conspiracy and not from the defendants' presence at a joint trial. Moreover, the court noted that the case involved common events and victims; that no inflammatory evidence was likely to be admissible at a joint trial but not in separate trials; and that, since similar evidence would be admissible in separate trials under a conspiracy theory, it was unlikely that evidence against Radovcich would impermissibly bolster circumstantial evidence against Ewell in a joint trial. Due to this similarity of evidence, and taking into account witness and judicial economy, the trial court found this to be a "classic case" for a joint trial.

The court additionally found no showing that either defendant was likely to provide exonerating testimony for the other in a separate trial, as well as no showing either was likely to testify against the other. With regard to the claim of antagonistic defenses, the court found no showing of a conflict so antagonistic or adverse as to deprive either defendant of a fair trial, as there was no showing of inconsistency beyond a natural tendency to shift the blame. The court rejected the notions that acceptance of Ewell's assertion of innocence would preclude acceptance of Radovcich's defense or that the jury would infer that the conflict meant both were guilty. The court found it had not been

13

established that the defendants were likely to place blame on each other as opposed to vigorously attacking the credibility of Ponce and Peter Radovcich, and it determined this was not a case in which either defendant was likely to turn into a second prosecutor or where, if one defendant raised a reasonable doubt as to his own guilt, responsibility inexplicably fell on the other defendant. In short, the court concluded "that the extent of 'antagonistic' defenses is not as great as defendants claim in their zeal to secure separate trials."

Both defendants subsequently renewed their motions to sever and requested an in camera hearing regarding defense strategy. Despite opposition by the People, the severance issue was transferred to Judge Nunez for in camera hearings to allow defense counsel to present new or supplemental information.

Prior to the hearing before Judge Nunez, the trial court issued its written preliminary rulings concerning the admissibility of Ponce's hearsay testimony. Also prior to the hearing, Radovcich filed a supplemental memorandum in which he claimed the trial court's rulings on and redactions of the Ponce hearsay statements would allow the jury in a joint trial "to view [Ewell's] involvement through rose-colored glasses; excision and redaction fails [sic] to give the trier of fact a complete, unabridged picture of Ewell's influence upon Radovcich, which would be admissible in a separate trial." In addition, Ewell's attorney submitted a confidential declaration and exhibits in support of his request for severance. Counsel for Radovcich also submitted a confidential declaration. We have examined these materials.

A hearing on the renewed severance motions was held before Judge Nunez on December 30, 1996. Proceedings commenced with separate in camera hearings for each defendant, then arguments and ruling in open court.[8]

---

[8]    The reporter's transcript provided to each party was excised accordingly. A complete transcript has been provided to this court. We have examined the entire transcript. We deny the People's request to unseal the confidential portions.

14

In open court, Radovcich argued that under the trial court's preliminary evidentiary rulings, the jury in a joint trial would only get the partial story. If Radovcich was convicted and Ewell acquitted and Radovcich moved on to penalty phase, the jury would then not believe him when he presented the remainder of the excluded or redacted statements. For a death penalty to withstand Eighth Amendment analysis, he contended, it had to be reliable and based on the totality of the circumstances. In a joint trial, Radovcich would be unable to present a full case.

Ewell argued that it was "critical" to his defense to permit him to pursue the thefts. Evidence seen in a joint trial as too prejudicial to Radovcich would be prejudicial to Ewell to whatever extent it was disallowed. Ewell then would not be able to mount his defense, as the excluded evidence would be "part and parcel" of that defense.

The prosecutor argued that Evidence Code section 1101 prevented Ewell from introducing character evidence against Radovcich.[9] He suggested that any such evidence could be redacted to specifically address the character trait of truth and veracity without allowing Ewell to try to prove character, i.e., that Radovcich was a manipulating mastermind. The prosecutor asserted that Ewell and Radovcich are coconspirators who have allegedly committed a crime together; hence, they should be tried by the same jury to accurately determine who was more responsible.

In ruling on the motions, Judge Nunez noted that there is a legislative preference for joint trials. With respect to Radovcich, Judge Nunez said he believed a jury could reach a fair decision at a penalty phase concerning additional information which might be presented such as Ponce's unredacted statements. With respect to Ewell, Judge Nunez felt that some evidence might not be admissible due to a lack of foundation, but if it became admissible, it might be such that its probative value with regard to Ewell's

---

[9]    Ewell responded that the evidence would be admissible under Evidence Code section 1101, subdivision (b) to show motive and intent.

defense would require granting Ewell a separate trial if there was any prejudicial effect as to Radovcich. Judge Nunez ruled that at this point, Judge Creede could conduct a joint trial that was fair to both defendants. While he cautioned that he might reach a different conclusion regarding Ewell if Ewell laid more foundation for the probable receipt of certain evidence, he stated: "[Ewell's attorneys] know there's work to be done if they plan to even offer that evidence. At this point my conclusion would be they don't have it."

### B.   Analysis

In determining whether Ewell and Radovcich should be tried separately,

"We begin with [Penal Code] section 1098, which states that, 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they *must* be tried jointly, unless the court order separate trials.' (Italics added.) Our Legislature has thus 'expressed a preference for joint trials.' (*People* v. *Boyde* (1988) 46 Cal.3d 212, 231, affd. on other grounds *sub nom. Boyde* v. *California* (1990) 494 U.S. 370.) Separate trials are permitted in the discretion of the trial court, however, and whether a trial court's denial of a severance motion constitutes an abuse of that discretion is judged on the facts as they appeared at the time the court ruled on the motion. (*People* v. *Boyde, supra,* at p. 232; *People* v. *Turner* (1984) 37 Cal.3d 302, 312.)[10]

"A trial court's discretion to order separate trials is guided by principles first set down in *People* v. *Massie* (1967) 66 Cal.2d 899. Thus, 'The court should separate the trial of codefendants "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony."' (*Turner, supra,* 37 Cal.3d at p. 312, quoting *Massie, supra,* at p. 917, fns. omitted.)" (*People* v. *Hardy* (1992) 2 Cal.4th 86, 167, parallel citations omitted.)

---

10    *Turner* was overruled on other grounds in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1149.

2905

    ·     In the present case, no possibility has been shown that either defendant would give exonerating testimony for the other at a separate trial.[11] Nor is there likely confusion from evidence on multiple counts. As for possible prejudicial association, we agree with the trial court's analysis that any guilt by association will come from evidence the People use to establish a conspiracy and not from the defendants' presence at a joint trial. We also agree with the trial court that, while the strength of the evidence against both defendants is not necessarily equal, a joint trial will not permit the People impermissibly to bolster a weak case with a strong one. Moreover, there is no showing that insurmountable *Aranda/Bruton* issues will exist at guilt phase. Many of Radovcich's alleged statements to Ponce can be redacted to prevent violation of Ewell's Sixth Amendment rights of confrontation and cross-examination. Many others will be admissible against both defendants assuming the People present prima facie evidence of a conspiracy or otherwise lay an appropriate foundation for exceptions to the hearsay rule.[12] (See, e.g., *People* v. *Sanders* (1995) 11 Cal.4th 475, 517, fn. 8; *People* v. *Roberts* (1992) 2 Cal.4th 271, 304; *Bourjaily* v. *United States* (1987) 483 U.S. 171, 181-184.)

    As for Radovcich's concern that redaction might prejudice him if the case proceeds to penalty phase, we recognize that redaction will not prevent severance if the redaction is prejudicial to the declarant (in this case, Radovcich) because it will distort the statement and cause it to become misleading with regard to the declarant's purported involvement. (See, e.g., *People* v. *Douglas* (1991) 234 Cal.App.3d 273, 284-287; *People* v. *Matola* (1968) 259 Cal.App.2d 686, 692-693.) Given the showing made thus far, however, it would be purely speculative to assume that a jury could not or would not

---

[11]    Although these are writ proceedings we will refer to Ewell and Radovcich as "defendants" when referring to them jointly.

[12]    Nothing we say here should be read as a determination whether the trial court was correct in its preliminary evidentiary rulings of December 13, 1996. The propriety of those rulings is not before us at this time.

fairly consider additional information or unredacted statements which Radovcich might present. In light of the legislative preference for joint trials (Pen. Code, § 1098), mere speculation is not a sufficient basis for severance (see *People* v. *Gatlin* (1989) 209 Cal.App.3d 31, 42-43; *People* v. *Isenor* (1971) 17 Cal.App.3d 324, 333-334).

This leaves the heart of defendants' claims — antagonistic and mutually exclusive defenses. We hold that, based on the showings made by both defendants in open court and in camera, neither Judge Creede nor Judge Nunez abused his discretion by denying the motions.

In *People* v. *Hardy, supra*, 2 Cal.4th 86, three defendants (Hardy, Reilly, and Morgan) were jointly charged with capital murder. The prosecution proceeded on a conspiracy theory. Prior to trial, all three sought severance. Concerned with possibly conflicting or antagonistic defenses, the trial court held separate in camera hearings with each defense counsel, who informed the court of the expected defense theory. Reilly's attorney stated he would assert that Reilly withdrew from the conspiracy. Hardy's counsel stated he would argue that Hardy was not present at the crime scene, did not participate in the conspiracy, and that Reilly and Morgan must have committed the murders. Morgan's attorney said he would argue that Reilly and some unknown third person killed the victims in order to blackmail Morgan. The trial court denied the motions for severance, and a joint trial was held. (*Id.* at pp. 167-168.)

In upholding the denial of severance, the California Supreme Court stated:

> "Because defendants were charged with having committed 'common crimes involving common events and victims' [citation], this was a 'classic case' for a joint trial. Although there was some evidence before the trial court that defendants would present different and possibly conflicting defenses, a joint trial under such conditions is not necessarily unfair. [Citation.] 'Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis*.' [Citation.] If the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for

18

joint trials and separate trials 'would appear to be mandatory in almost every case.' [Citation.]

"Moreover, although it appears no California case has discussed at length what constitutes an 'antagonistic defense,' the federal courts have almost uniformly construed that doctrine very narrowly. Thus, '[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other.' [Citation.] 'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' [Citations.] Stated another way, '"mutual antagonism" only exists where the acceptance of one party's defense will preclude the acquittal of the other.' [Citations.]

"Here, although their expected defenses were technically 'conflicting' in that all three defendants denied culpability and speculated that one or both of the other defendants was responsible, their defenses were not particularly 'antagonistic,' as that term is used in the federal courts....

"Moreover, despite the specter of conflicting defenses, there also existed 'realistic benefits from a consolidated trial.' [Citation.] The trial court ruled that the three defendants, as well as ... others, were coconspirators. As a result, their respective statements were admissible against the others whether joint or separate trials were held. The evidence thus presented in the joint trial would largely mirror that presented in separate trials....

"In light of these facts, we conclude the potential for jury confusion was low. Each defendant presented a theory of the case that absolved himself of guilt and focused blame on the others. The jury was thus presented with a straightforward choice regarding the credibility of the various defendants.[13] Significantly, no defendant confessed and

---

13    In a footnote at this point, the court observed: "As the Supreme Court of Kentucky opined: '[N]either antagonistic defenses nor the fact that ... one defendant incriminates the other amounts, by itself, to unfair prejudice.... That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they participated in it, vel non, is a reason for rather than *against* a joint trial. If one is lying, it is easier for the truth to be determined if all are required to be tried together.' [Citation.]" (*People* v. *Hardy, supra,* 2 Cal.4th at p. 169, fn. 19.)

implicated another defendant. [Citations.] Nor did one defendant present a defense that necessarily implicated another defendant. [Citation.] Considering all the circumstances of this case, we conclude the trial court did not abuse its discretion by denying Reilly's severance motion." (*People v. Hardy, supra,* 2 Cal.4th at pp. 168-169.)

After *Hardy* was decided, the United States Supreme Court issued its own opinion concerning severance, under Federal Rules of Criminal Procedure, rule 14, based on conflicting defenses. In *Zafiro* v. *United States* (1993) 506 U.S. 534 [113 S.Ct. 933], four defendants were accused of distributing illegal drugs. They sought severance based on mutually antagonistic defenses. Soto's defense was that he knew nothing about a conspiracy. Garcia's defense was that a box in question belonged to Soto and Garcia was ignorant of its contents. Zafiro said she knew nothing; she was merely Martinez's girlfriend and did not know there were drugs in the suitcase Martinez kept in her closet. Martinez's defense was that he was only visiting Zafiro and did not know she was a drug distributor. (*Id.* at p. 536 [113 S.Ct. at p. 936].)

In affirming the denial of severance, the United States Supreme Court noted that mutually antagonistic defenses are not prejudicial per se. (*Zafiro* v. *United States, supra,* 506 U.S. at p. 538 [113 S.Ct. at p. 938].) Accordingly, severance should be granted under rule 14

"only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in ´ some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. [Citation.] Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. [Citation.] Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. [Citation.] The risk of prejudice will vary with the facts in each case ....

20

"Turning to the facts of this case, we note that petitioners do not articulate any specific instances of prejudice. Instead they contend that the very nature of their defenses, without more, prejudiced them. Their theory is that when two defendants both claim they are innocent and each accuses the other of the crime, a jury will conclude (1) that both defendants are lying and convict them both on that basis, or (2) that at least one of the two must be guilty without regard to whether the Government has proved its case beyond a reasonable doubt.

"As to the first contention, it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials....

"As to the second contention, the short answer is that petitioners' scenario simply did not occur here. The Government argued that all four petitioners were guilty and offered sufficient evidence as to all four petitioners; the jury in turn found all four petitioners guilty of various offenses. Moreover, even if there were some risk of prejudice, here it is of the type that can be cured with proper instructions, and 'juries are presumed to follow their instructions.' [Citation.]" (*Id.* at pp. 539-540 [113 S.Ct. at pp. 938-939].)

Ewell has asserted that the acceptance of his defense will preclude Radovcich's acquittal. The existence of sharply polarized defenses, however, does not necessarily compel severance. For instance, in *People* v. *Wallace* (1992) 9 Cal.App.4th 1515, 1517-1520, a drive-by shooting took place. The car from which the shots were fired was owned and driven by the defendant. The codefendant was his passenger. Witnesses were not clear on who did the shooting; one witness saw the driver's arm extended out of the window, but thought the codefendant was driving. At trial, the defendant claimed the codefendant reached across him and fired out of the driver's window. The codefendant testified that the defendant fired the gun. The defendant was convicted; the codefendant was acquitted. Denial of severance was affirmed under *Hardy*. More importantly, in our view of this case, if indeed Radovcich is convicted, it will not be Ewell's defense which precludes his acquittal, but instead it will be the evidence presented *by the prosecution*.

21

Moreover, we agree with Judge Nunez that Ewell has not sufficiently shown his ability to present evidence which would be prejudicial to Radovcich. As Judge Nunez noted, foundational and other problems exist.

*People* v. *Keenan* (1988) 46 Cal.3d 478 is instructive. In that case, the codefendant (Kelly) claimed Keenan was the actual killer and that he (Kelly) participated because he was afraid of Keenan, who had beaten and kidnapped a mutual acquaintance. That person testified for Kelly and confirmed Kelly's account of Keenan's other offenses. (*Id*. at pp. 493-494.) On appeal, Keenan argued that Kelly did not merely seek to exculpate himself by blaming Keenan, but that his defense of duress or menace allowed him to present prejudicial evidence of uncharged conduct by Keenan which would not have been admissible against Keenan in a separate trial. The California Supreme Court nonetheless concluded the trial court did not abuse its discretion by denying Keenan's severance motion. (*Id*. at p. 500.) The court reasoned:

> "Recent decisions addressing the analogous problem of severance of counts (see [Pen. Code,] § 954) are instructive. When ruling on a motion to sever counts for which the statute allows joint trial, the court must decide whether the realistic benefits from a consolidated trial are outweighed by the likelihood of 'substantial' prejudice to defendant.
>
> "In determining the degree of potential prejudice, the court should evaluate whether (1) consolidation may cause introduction of damaging evidence not admissible in a separate trial, (2) any such otherwise-inadmissible evidence is unduly inflammatory, and (3) the otherwise-inadmissible evidence would have the effect of bolstering an otherwise weak case or cases. Severance motions in capital cases should receive heightened scrutiny for potential prejudice. [Citations.] The balancing process is a 'highly individualized exercise' [citation], and the propriety of a trial court ruling depends on the facts as they appeared when the motion was decided. [Citation.]
>
> "Here, such a balance hardly required severance. Defendant insists that the prosecutor never asserted any benefits from a joint trial. However, judicial economy was obviously paramount in this case, since separate trials would have required selection of two juries, ... , and presentation of much the same evidence and witnesses to each. Defendant demonstrated no

22

potential prejudice sufficiently 'substantial' to justify this duplication of resources even in the context of a capital case.

"We assume arguendo, as defendant suggests, that the Stevenson shooting, and certain other evidence presented by Kelly which suggested defendant's violent nature, would have been inadmissible in his separate guilt trial for the Opel murder. Defendant urges that, apart from its usefulness to Kelly, such evidence merely suggested defendant's criminal propensity and did not go directly to such issues as identity or intent. [Citations.]

"'Other crimes' evidence which would not be admissible against an accused in his separate trial holds a well-understood potential for prejudice. However, *the likelihood of its admission in an otherwise proper joint trial does not alone justify severance*. [Citation.]" (*People* v. *Keenan, supra,* 46 Cal.3d at pp. 500-501, original italics omitted, italics added; see also *People* v. *Goodall* (1982) 131 Cal.App.3d 131, 129, 141 [joint trial proper where each defendant charged in each count; fact that evidence of other incidents was admissible against some defendants and not others did not require separate trials, and limiting instructions were sufficient to prevent prejudice].)

It is settled that discretion is abused whenever a trial court exceeds the bounds of reason, all of the circumstances being considered. (*People* v. *Giminez* (1975) 14 Cal.3d 68, 72.) There was no abuse of discretion here; based on the showings made at the time the motions for separate trials were ruled upon, severance was not compelled.[14] Accordingly, we rejected Ewell's and Radovcich's claims that Judge Creede and/or Judge Nunez erred by denying their motions for separate trials.

---

[14]   Judge Nunez left open the possibility that a further showing could establish sufficient grounds for separate trials. We do not pass upon that point, as we are concerned only with the showings made at the time of the rulings on the severance motions.

## II.

## Suppression of Clone Pager Evidence

### A.    Procedural History

On September 4 and September 6, 1996, respectively, Ewell and Radovcich moved to quash various search warrants and to suppress evidence.[15] In conjunction with his motion, Ewell presented a detailed statement of facts setting out, among other things, the post-homicide surveillance on Ewell and Radovcich.[16]

In brief, and insofar as is relevant to the issues before us, law enforcement surveillance began on Ewell's house in Fresno on June 25, 1992. Surveillance on Radovcich commenced on February 1, 1993. During this time, Radovcich was observed making a number of calls from pay telephones. At least some appeared to be long distance, given the amount of money Radovcich put into the telephones. Law enforcement officers attempted to eavesdrop on some of Radovcich's conversations.

On April 8, 1993, law enforcement officers obtained a search warrant to seize digital pager information from Radovcich's account with Pagenet Pager Company and Communications Headquarters Company. On April 12, 1993, law enforcement officers obtained a search warrant to get a "clone" (duplicate) pager, to allow them to receive the pages Radovcich was receiving. On April 22, 1993, they obtained a second search warrant, after Radovcich had his pager number changed. Surveillance continued; Radovcich was observed making more long distance calls from pay telephones. On at least four separate occasions, intercepted pages led surveilling officers to Ewell.

Both defendants moved to suppress the clone pager evidence and any evidence gathered as a result of or derived therefrom. The People opposed the motions, arguing

---

[15]    The search warrants with which we are concerned are before us as exhibits to the People's petition for writ of mandate.

[16]    For purposes of this proceeding, the People have adopted Ewell's statement of facts. We do likewise.

24

(1) a pager which transmits only numbers does not "intercept" the contents of a communication and so does not fall within 18 United States Code section 2510 et seq. (hereafter Title III or the Act);[17] (2) a digital pager constitutes a "tone-only paging device" which is specifically exempted from Title III; and (3) even if Title III applies, no exclusion is warranted under *United States* v. *Leon* (1984) 468 U.S. 897 (*Leon*). Both defendants disagreed with regard to the application of federal statutes to this case, in addition to which Ewell argued that the municipal court judge who signed the search warrants lacked jurisdiction to issue Title III warrants.

The motions were heard beginning October 8, 1996. No testimony was presented on the issues with which we are concerned.

The trial court issued its written ruling on November 27, 1996. After an extensive review of state and federal law, the trial court determined that digital pagers are not exempt from federal law as "tone-only" pagers and that the transmission of telephone numbers through a digital pager constitutes a "communication" under federal law. The court found various violations of Title III. The court also found it apparent, from the face of the warrants, that they were issued as routine warrants and not under Title III or corresponding California law (Pen. Code, § 629 et seq.). The court determined that California law was inapplicable at the time the warrants were issued; hence, whether issuance was lawful had to be determined pursuant to federal law. The court further held that *Leon*'s good faith exception does not apply when there is a complete unexplained and unjustified failure to comply with the provisions of Title III in obtaining the warrant. In part, the court stated:

> "Here the issue is not whether there was probable cause to obtain a search warrant for a clone pager, but a total failure both on the part of law enforcement and the magistrate to comply with the essential terms of Title III. The Court cannot assume that a reasonably well-trained officer would

---

17    Undesignated statutory references are to title 18 of the United States Code.

25

not know about Title III. Moreover, no excuse for noncompliance has been offered other than that a digital pager is essentially the same as a 'pen register' and the equivalent of a 'tone-only' pager."

The trial court suppressed evidence derived from use of the clone pager. It stated:

"Defendant Dana Ewell's motion to quash warrant No. 290570-1 ... and 290571-9 ... issued April 12, 1993 at 4:45 p.m. and April 22, 1993 at 2:05 p.m. on Communication Headquarters Company ... by Judge Putnar with respect to numbers listed in the Return dated December 7, 1993, which were obtained from the 'duplicate' by digital pager for telephone numbers [ ] and [ ], and the inventory of telephone numbers attached to the return is granted, having been obtained in violation of 18 U.S.C. 2518(10).

"............................................................................................................

"In contrast, search warrant 282817-6 ... directed to Communication Headquarters Company ... , with respect to telephone pager No. [ ] and access code 9911 on pager telephone [ ] .... (Sic.)

"To the extent that any of these numbers were obtained from the use of the digital pager, the numbers and information obtained from them is ordered suppressed under Penal Code section 1538.5 for failure to comply with 18 U.S.C. 2518(10).

"Except with respect to the search and evidence obtained from the use of the 'clone digital pager,' the motions to suppress other search and arrest warrants is [sic] denied. It is recognized that California wire tapping law now includes digital pagers but this amendment was not in effect at the time the warrants were issued.

"Although the various affidavits contain evidence and information obtained from the unlawful use of the 'clone digital pager,' the Court has reviewed all other affidavits ... without regard to and deleting the illegally obtained information, and ... there is an abundance remaining of facts that are far more than sufficient to establish probable cause for the issuance of the search and arrest warrants. As to those search and arrest warrants, the motions of defendants Ewell and Radovcich to quash and suppress evidence are denied."

The People subsequently moved for reconsideration pursuant to Code of Civil Procedure section 1008. The People asked to present testimony by Detective Souza relating to the issue of good faith. Ewell and Radovcich both opposed the request.

26

A hearing was held on the motion on December 16, 1996. The trial court clarified that it had accepted that Detective Souza and other officers were acting conscientiously in performing their responsibilities, but that the ultimate question involved an objective standard. The People argued, in essence, that it was objectively reasonable for officers to believe that what they sought to intercept fell outside the purview of the federal and California statutes. The court responded that, from an objective standpoint, this was not a technical defect in a warrant. Instead, it was a total failure, both by law enforcement and the magistrate, to deal differently with this issue than they did with all of the other search warrants. The court continued:

> "So I will accept what your declaration and offer of proof — and I can say I assumed in rendering the decision that the — that that is what happened, that the officer was acting without recognizing that it was potentially in violation of the federal statute, and that certainly the magistrate, being the conscientious judge, thought that this was a routine search warrant application.

> "But then this [Title III] is binding on the states. And it isn't just taking a federal statute that may apply to federal agencies, and so it is sufficiently, widely known, that what I would be doing is just reading legislation off the books. And maybe there should not be a distinction between pagers that just give a digital telephone number with no other message. And Congress may have anticipated that, with the progress of technology, that pagers would carry, as some of them do, more than telephone numbers but additional brief messages.

> "But that is what they did...."

After the defense argued the court had no jurisdiction to reconsider its prior decision, the trial court ruled:

> "First of all, I think Mr. Cherney correctly points out that, in a 1538.5 motion, that the decision, once made, it then becomes an appellate issue. However, assuming for purposes of argument that the Court is able to reconsider it, and assuming that the offer of proof is correct, the offer of proof is what I assumed was the situation at the time of the issuance of the warrant, certainly Detective Souza went to the magistrate in the same usual way that search warrants are issued. And perhaps it isn't a question of fault

27

or a challenge to integrity or professionalism. As Mr. Jones pointed out in his opposition, the — there is no lack of integrity; there is no intentional effort to circumvent essential requirement of law. It is — had perhaps, if anything, it is a question of the depth to which those dealing with the — a sensitive area, in the sense that Congress had passed the law relatively recently but long enough that where everyone should have known of its existence. And perhaps the fault lies with the magistrate not to have done more research on what was required. But it isn't a question of fault-finding. It's a question of: Was the statute complied with?

"And here there is a total noncompliance with the statute. A proceeding on the basis as if it didn't exist. And certainly the warrant issued by the magistrate didn't have the findings required. And one can conclude that it probably would have been issued with the findings if the declaration had been sufficient and if the magistrate had included in the order the requisite findings. And it is not because of the delay in filing the return. I have dealt with that and did not find that to be fatal. It is that it is just a noncompliance with a federal statute that has preempted the field. And once you have a federal statute that preempts the subject matter, it is necessary to comply with it.

"And if this were a warrant under the general principles of — under the Fourth Amendment, the good-faith exception should be applicable. But this is proceeding in a preempted area where the Congress, in its wisdom, has made a distinction between clone pagers and digital pagers and other forms of communication, and has required certain procedures to be followed, and has said that there is a remedy to suppress the evidence if there is noncompliance. And, therefore, I'm merely following the guidelines of the statute and the federal decisions on the subject.

"And one may argue Congress was wrong in making a distinction without a difference, or that the federal decisions are wrong because a clone digital pager, that does not carry messages other than the number, shouldn't be put in the same category as a tone pager or a trap. But that isn't what they did. And it isn't what they said.

"And so, both on the procedural grounds and assuming — and also assuming that the Court has authority to reconsider the motion, I do not find any fault, as does Mr. Cherney, with the People making a motion for reconsideration. Certainly could feel more attention should have been given to the good-faith issue. Well, I assumed basically good faith, and that there is no willful intentional deprivation of rights. It was just proceeding

without complying with a federal act and by which I feel bound to follow. So the motion for, all grounds, the motion for reconsideration is denied."

### B.   Analysis

#### 1.   Introduction

The standard of review with regard to a motion to suppress evidence is well settled:

> "In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. 'The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review.'
>
> "The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, viz., the reasonableness of the challenged police conduct, is also subject to independent review. The reason is plain: 'it is "the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness."'" (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1301, citations omitted.)

In reviewing the trial court's ruling suppressing the clone pager evidence, we are called upon to make various determinations concerning the scope and application of both Title III and the Fourth Amendment to the United States Constitution. Because of the complexity of the subject matter, before proceeding with our analysis we will review the statutory scheme.[18]

---

[18]    Portions of the Act have been amended since 1986, most notably in 1994, when the Act was amended to cover cordless telephone communications. We review the validity of the search warrants, of course, in light of the statutes as they existed when the challenged warrants were issued in this case. None of the post-1986 amendments affect our analysis in this regard.

29

"The basic standards for a wiretap [or other interception of communications] are similar to those for a search warrant, but there also must be strict compliance with Title III of the Omnibus Crime Control and Safe Street Act of 1968, 18 U. S. C., §§ 2510-2520. [Citations.]" (*U. S.* v. *Alfano* (6th Cir. 1988) 838 F.2d 158, 161.) As the United States Supreme Court has explained, "In 1968, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which deals with wiretapping and other forms of electronic surveillance. 18 U.S.C. §§ 2510-2520 [ ]. In this Act Congress, after this Court's decisions in *Berger* v. *New York* [(1967)] 388 U.S. 41 [ ], and *Katz* v. *United States* [(1967)] 389 U.S. 347 [ ], set out to provide law enforcement officials with some of the tools thought necessary to combat crime without unnecessary infringing upon the right of individual privacy." (*Scott* v. *United States* (1978) 436 U.S. 128, 130.)[19] Thus, the legislation had as its purpose protection of the privacy of covered communications and the delineation on a uniform basis of the circumstances and conditions under which interceptions might be authorized. (*Halpin* v. *Superior Court* (1972) 6 Cal.3d 885, 898.)

"Title III provides a 'comprehensive scheme for the regulation of wiretapping and electronic surveillance.' [Citation.]" (*People* v. *Otto* (1992) 2 Cal.4th 1088, 1097, cert. den. *sub nom. California* v. *Otto* (1992) 506 U.S. 956.) As summarized by the United States Supreme Court,

"Title III authorizes the interception of private wire and oral communications, but only when law enforcement officials are investigating specified serious crimes and receive prior judicial approval, an approval that may not be given except upon compliance with stringent conditions. If a wire or oral communication is intercepted in accordance with the provisions of Title III, the contents of the communication may be disclosed and used under certain circumstances. Except as expressly authorized in

---

[19]   In *Berger*, the Supreme Court held that authorization for eavesdropping must be narrowly drawn. (*Berger* v. *New York, supra,* 388 U.S. at pp. 53-60, 63-64.) In *Katz*, the court discussed the need for a search warrant in cases involving wiretapping or electronic surveillance. (*Katz* v. *United States, supra,* 389 U.S. at pp. 353-359.)

Title III, however, all interceptions of wire and oral communications are flatly prohibited. Unauthorized interceptions and the disclosure or use of information obtained through unauthorized interceptions are crimes, and the victim of such interception, disclosure, or use is entitled to recover civil damages. Title III also bars the use as evidence before official bodies of the contents and fruits of illegal interceptions, and provides procedures for moving to suppress such evidence in various proceedings." (*Gelbard* v. *United States* (1972) 408 U.S. 41, 46, statutory citations omitted; see also *United States* v. *Giordano* (1974) 416 U.S. 505, 514-516.)

As originally enacted and as it existed at the time *Gelbard* was decided, Title III only covered "wire" and "oral" communications. In 1986, however, portions of Title III were amended by the Electronic Communications Privacy Act of 1986 (Pub. L. No. 99-508, 100 Stat. 1848) (hereafter the ECPA) to cover "electronic" communications. Congress's principal purpose in enacting the ECPA was to extend to electronic communications the same protections against unauthorized interceptions that Title III had been providing for oral and wire communications. The reason for the amendment was to keep abreast of new computer and telecommunications technologies. (*Brown* v. *Waddell* (4th Cir. 1995) 50 F.3d 285, 289.)

The definitions applicable under Title III are found in section 2510. In part, that statute excludes electronic communication from the definition of "oral communication." (§ 2510(2).) It defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device;" and "contents" as including "any information concerning the substance, purport, or meaning of that communication[.]" (§ 2510(4), (8).)[20] An "electronic communication" includes "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any natures transmitted ... by a wire, radio, electromagnetic,

---

[20]    Prior to the 1986 amendment, section 2510(8) defined "contents" as "any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication[.]"

31

photoelectronic or photooptical system," but excludes "any communication made through a tone-only paging device[.]" (§ 2510(12), (12)(b).)

"The statute broadly prohibits wiretaps '[e]xcept as otherwise specifically provided in this chapter.' § 2511(1)." (*U. S.* v. *Moore* (8th Cir. 1994) 41 F.3d 370, 374.) Section 2511 provides for imposition of a fine or prison term or both upon those who unlawfully intercept any wire, oral, or electronic communication, or who disclose the contents of any unlawfully intercepted communication. (§ 2511(1).) Exceptions to Title III's blanket proscription against electronic wiretapping and surveillance are found in section 2511(2). "The enumerated exceptions define the only circumstances in which surreptitious electronic surveillance is permissible under the Act. 'Unless there is a specific section of the statute which excepts a particular interception, all willful interceptions of wire and oral communications are prohibited by the Act.' [Citations.]" (*People* v. *Otto, supra,* 2 Cal.4th at p. 1097.) Section 2511(2)(h)(i) excepts the use of pen registers and trap and trace devices from the provisions of Title III.

A general suppression remedy for unlawful interception of wire and oral communications is contained in section 2515. Who may authorize interception of wire, oral, or electronic communications, and for what offenses, is set forth in section 2516. Section 2517 describes permissible disclosure of intercepted communications between law enforcement officers, in the course of testimony, and so forth.

The procedure for obtaining a warrant permitting interception of communications is set out in section 2518. In part, that statute does not permit a court to authorize interceptions for more than 30 days, and contains very specific requirements for any extension of that period. (§ 2518(5).) It also requires that the contents of any intercepted communication be recorded, if possible on tape or other comparable device, and that the recording be sealed. (§ 2518(8)(a).) Section 2518 also provides the means by which an "aggrieved person" may seek suppression of the contents of any wire or oral communication intercepted pursuant to Title III, or evidence derived therefrom.

32

(§ 2518(10)(a).)  Finally, section 2520 provides to anyone whose communication is unlawfully intercepted or disclosed the right to sue for civil damages.  Good faith reliance on a court warrant or order is a complete defense against any civil or criminal action brought under Title III or under any other law.  (§ 2520(d).)

"[A] violation of the federal statute renders the illegally obtained evidence inadmissible in state court proceedings.  [Citation.]  The Act, in effect, establishes minimum standards for the admissibility of evidence procured through electronic surveillance; state law cannot be less protective of privacy than the federal Act.  [Citations.]"  (*People* v. *Otto, supra*, 2 Cal.4th at p. 1098.)  Courts will not create unenumerated exceptions to the Act; the United States Supreme Court has stated that all covered interceptions are flatly prohibited except as expressly authorized in Title III.  (*Id.* at p. 1100.)

### 2.   The parties' contentions

The People take the position that Title III, as amended in 1986, does not provide a statutory suppression remedy for interceptions of electronic communications obtained in violation of the Act.  They say that section 2515 does not include electronic communications within its scope, while section 2518(10)(a) codifies the methods of seeking suppression of evidence for failure to comply with Title III.  The People argue that the ECPA did not amend section 2515 or section 2518(10)(a) to include electronic communications, but instead added subdivision (10)(c) to section 2518.  The intent of Congress was thus not to apply the statutory exclusionary rule of Title III to the interception of electronic communications, but, in case of a violation of the law of constitutional magnitude, to have the trial court apply existing constitutional law with regard to the exclusionary rule.  (See S. Rep. No. 541, 99th Cong., 2d Sess. 23 (1986).)

The People go on to say that since there is no statutory suppression remedy, admissibility in this case is governed by Fourth Amendment principles, including *Leon*.  In other words, the sole basis for any exclusion of evidence is not the federal statute, but

the United States Constitution. Rights are not infringed under the Fourth Amendment unless the person invoking that amendment's protection has exhibited a subjective (actual) expectation of privacy and it is one society is prepared to recognize as reasonable. A person has no actual, reasonable, or legitimate expectation of privacy, the argument runs, in the telephone numbers a person dials, or in the numbers transmitted to a pager.

In any event, the People say, *Leon*'s good faith exception should have been applied here. The detective obtaining the search warrant acted in subjective good faith; moreover, a reasonable and well-trained officer would not have known he or she should not apply for the warrant. The People argue that the fault lies with the magistrate who · issued the warrant, but under *Leon* the exclusionary rule is not to be used to punish the officer for the magistrate's error. The People apply a balancing test under *Leon*; they note that the cost to the prosecution of suppression would be to impede the prosecution's ability to show a close and covert relationship between Ewell and Radovcich, and to show the telephone call between the two that took place right after Ewell was told Radvcich was a suspect; there would be little deterrent value in suppression because it was the magistrate's error and — because this was a developing area of the law and not an actual wiretap, and the detective was not an attorney — it would have been virtually impossible for the detective to have known the search pursuant to the warrant was illegal; and they look to the nature of the constitutional infringement, as only telephone numbers and not actual conversations were intercepted.

On procedural grounds, defendants respond[21] that the argument concerning the availability of suppression under Title III was not presented in the trial court, and that the People were barred jurisdictionally from obtaining reconsideration of the grant of suppression. Substantively, defendants argue that the legal requirements for obtaining a

---

[21]     We treat all arguments as having been made by both defendants.

valid court order for interception are the same for wire, oral, or electronic communications, but the statutory remedies for violations differ. Thus, some requirements under section 2510 are strictly statutory, while others embody Fourth Amendment principles. Defendants agree with the People that section 2518(10)(c) limits remedies for nonconstitutional violations of Title III with regard to electronic communications. However, defendants argue that when a violation is of constitutional magnitude, the full range of statutory and Fourth Amendment remedies are available. Defendants also point out that sections 2518(8) and 2518(9) contain their own suppression remedies for failure to seal electronic communications or provide discovery, but concede that application is problematic when digital pagers are concerned.

With regard specifically to *Leon*, defendants assert that when Congress enacts a statutory exclusion, that exclusionary rule or remedy will not be overridden by *Leon*. Additionally, *Leon* does not excuse objectively unreasonable violations of the Fourth Amendment. The ECPA took effect in 1986, and states were given two years to pass conforming laws which were at least as restrictive. Cases clearly indicating that numeric digital pagers fell within Title III's definition of electronic-communications were established precedent as early as 1989; hence, the detectives' (and magistrate's) ignorance as to the applicability of the law should not be rewarded or excused.

### 3.   Procedural issues

We turn first to procedural matters. It is the general rule that the People will not be allowed to raise a new theory upon which to uphold a search for the first time on appeal. (See, e.g., *People* v. *Hamilton* (1969) 71 Cal.2d 176, 182.)[22] The danger in late introduction of a new theory is that the defendant may be prevented from developing relevant facts in the superior court. (*People* v. *Limon* (1993) 17 Cal.App.4th 524, 539.)

---

[22]   We will assume this same rule applies where, as here, the People seek pretrial review of a ruling on a suppression motion.

Thus, a theory which depends on a determination of facts not presented to the trial court cannot be raised for the first time on appeal (*People* v. *Chapman* (1990) 224 Cal.App.3d 253, 259-260), nor can a theory which involves controverted questions of fact or mixed questions of law and fact (*Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 340-341). On the other hand, the prosecution will be permitted to assert the new theory where the issue was fully litigated in the trial court and the defendant is not prejudiced by the prosecution's failure expressly to rely on the theory (*People* v. *Wright* (1990) 52 Cal.3d 367, 392), where no further evidence could have been introduced to defeat the theory so that the question of application of the new ground to a given set of facts is one of law (*People* v. *Gorak* (1987) 196 Cal.App.3d 1032, 1039), and where only a question of law is presented on facts appearing in the record (*Panopulos* v. *Maderis, supra,* 47 Cal.2d at pp. 340-341).

Here, the issue the People seek to raise was "at least in the air" by virtue of their argument that *Leon* was applicable. (*Green* v. *Superior Court* (1985) 40 Cal.3d 126, 137, fn. 8.; see *People* v. *Clark* (1993) 5 Cal.4th 950, 993, fn. 19.) More importantly, the construction of a statute and question of whether it is applicable present solely questions of law to be determined by the court. (*Estate of Madison* (1945) 26 Cal.2d 453, 456; *Dean W. Knight & Sons, Inc.* v. *State of California* ex rel. *Dept. of Transportation* (1984) 155 Cal.App.3d 300, 305.) The same holds true regarding whether a type of surveillance is governed by Title III. (*U. S.* v. *Chen* (9th Cir. 1992) 979 F.2d 714, 716; *U. S.* v. *Carrazana* (11th Cir. 1991) 921 F.2d 1557, 1562.) Here, the underlying facts are uncontroverted, as the People have accepted defendants' (specifically, Ewell's) statement of facts, both here and in the trial court, for purposes of the suppression motion: Although no evidence was presented in the trial court concerning this portion of the suppression motion, defendants point to no evidence which could have been introduced and our review of the record suggests none. Under these circumstances, defendants have not been prejudiced by the People's failure expressly to rely on the theory below. Accordingly, the People may present the theory to this court.

36

With regard to the question of reconsideration, a trial court lacks jurisdiction to reconsider its ruling *granting* a motion to suppress evidence. (Pen. Code, § 1538.5, subd. (j); *Madril* v. *Superior Court* (1975) 15 Cal.3d 73, 75, 77-78; see *People* v. *Jackson* (1996) 13 Cal.4th 1164, 1202-1203.) Here, however, the trial court denied the motion for reconsideration. Given this denial of the People's request for reconsideration, we view the court's comments of December 16 as merely clarifying its written order, and we will treat its remarks accordingly.

### 4.   Applicability of Title III

We turn now to the substantive issues. As previously noted, section 2511(2)(h)(i) specifically exempts pen registers and trap and trace devices from Title III. "A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed." (*United States* v. *New York Telephone Co.* (1977) 434 U.S. 159, 161, fn. 1; *People* v. *Larkin* (1987) 194 Cal.App.3rd 650, 653, fn. 2.) "Pen registers do not 'intercept' because they do not acquire the 'contents' of communications, as that term is defined by" Title III." Instead, they disclose only the telephone numbers dialed — a means of establishing communication. (*New York Telephone Co.*, *supra*, at p. 167.) A "trap and trace device" is a "device which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted." (*U. S.* v. *Fregoso* (8th Cir. 1995) 60 F.3d 1314, 1320.) Both devices are exempt from Title III because that legislation "'is not designed to prevent the tracing of phone calls .... [It] is intended to protect the privacy of the communication itself and not the means of communication.'" (*United States* v. *Seidlitz* (4th Cir. 1978) 589 F.2d 152, 157, quoting S. Rep. No. 1097, p. 90.) Moreover, use of a pen register has been held not to constitute a search within the meaning of the Fourth Amendment. (*Smith* v. *Maryland* (1979) 442 U.S. 735, 745-746.)

37

Although the People argued to the contrary in the trial court, it seems settled that Title III governs interceptions of communications involving a "clone" digital pager of the type used in the present case.[23]  In *Brown* v. *Waddell, supra,* 50 F.3d 285, the officer used a pager clone to receive and record numeric messages being simultaneously received by the defendant's leased digital pagers. The prosecution argued this was effectively the use of a pen register. (*Id.* at p. 289.) The Fourth Circuit Court of Appeals disagreed, noting that under the definition set forth in 18 United States Code section 3127(3), a "pen register" is a device which is attached to a telephone line. A digital display pager clone does not fit this definition because it is attached to no transmission device. (*Brown, supra,* at pp. 290-291.) In a comprehensive review of the issue, the court continued:

> "Neither as a matter of plain textual meaning is [a digital display pager clone] effectively defined *out* of the category of devices presumptively subject to the stringent authorization requirements of §§ 2516 and 2518. The type communication it receives fits perfectly into the general definition of the 'electronic communications' that are subject to those provisions, for a digital display pager (primary or 'clone') unmistakably receives a 'transfer of ... signals, ... images, ... data, or

---

[23]  "Pagers take on one of three basic forms: 'tone only,' 'display' and 'tone and voice pagers.' The 'tone only' device emits a 'beep' or other signal to inform the user that a message is waiting, and where that message can be retrieved by the user's making a phone call to a predetermined number (usually an office or answering service). 'Display' pagers are equipped with screens that can display visual messages, usually the telephone number of the person seeking to reach the person being paged. The party seeking to make contact with the user is instructed to provide a message, usually by pushing the buttons of a touch-tone telephone; this message is stored by the paging company's computer until it can be transmitted to the user's pager, where the message can then be read directly by the user, obviating the need for the user to make a telephone call to retrieve the message. The most sophisticated type of pager is the 'tone and voice' mode. It can receive a spoken message that the paging company's computer has taken from the party seeking to contact the unit's user. After the beep tone is made, the device 'repeats' the recorded message. This requires that a radio signal containing voice communications be sent in from the paging company's base to the mobile unit." (S.Rep. No. 541, 99th Cong.2d Sess. 9-10 (1986), reprinted in 1986 U.S.Code Cong. & Admin. News 3555, 3563-64.)

38

2927

intelligence of [some] nature transmitted in whole or part by a ... radio, electromagnetic ... system.' 18 U.S.C. § 2510(12). And the type communication it receives is not, as is that received by a 'tone-only paging device,' specifically exempted by the definitional statute from the protections of these provisions. *See id.* § 2510(12)(c)." (*Brown, supra,* 50 F.3d. at p. 291.)

The court reached the same result based on the legislative history of the ECPA, and noted that, in contrast to a pen register which is only capable of intercepting telephone numbers, a digital display pager can also receive number-coded substantive messages. (*Brown* v. *Waddell, supra,* 50 F.3d at pp. 291-292.) The court concluded:

"Because of these strong indications from statute and legislative history that interceptions by 'cloned' digital display pagers should not be equated with interceptions by pen register, this is the interpretation accepted by the Justice Department's Criminal Division, by commentators, and by the few courts that have addressed the issue directly." (*Brown* v. *Waddell, supra,* 50 F.3d at p. 292, fns. omitted; accord, *State* v. *Jackson* (Fla. 1995) 650 So.2d 24, 27-28; see also *U. S.* v. *David* (1st Cir. 1991) 940 F.2d 722, 727 [assumes without discussion that "beeper clone" is subject to Title III]; *U. S.* v. *Suarez* (4th Cir. 1990) 906 F.2d 977, 979-980 [same re: digital display pager clone]; *U. S.* v. *Paredes-Moya* (N.D.Tex. 1989) 722 F.Supp. 1402, 1406-1407 [same].)

Although the decision in *Brown* was not yet in existence at the time of issuance of the warrants in the present case, it is apparent from the foregoing that those courts which had considered the issue had at least assumed that Title III applied to digital display pager clones of the type involved here. Based on the legislative history of the Act, we cannot say they are incorrect. Thus, we will proceed from the premise — upon which all parties now appear to agree — that Title III was applicable to the interceptions at issue. We note, however, that the terminology used in the various statutes is deceptive, and that it is only through resort to federal case law and especially to the legislative history of the ECPA that Title III's applicability becomes clear.

39

### 5.    Availability of statutory suppression remedy

In examining the warrants at issue here, it is significant that no one claims probable cause was lacking.[24] It is apparent, however, that most of the requirements of Title III were not met. In determining whether suppression is required as a result, the issue does not "turn on the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights," but upon "the provisions of Title III ...." (*United States* v. *Donovan* (1977) 429 U.S. 413, 433, fn. 22; *United States* v. *Giordano, supra,* 416 U.S. at p. 524.) Because of this, it has been held that *Leon*'s good faith exception to the exclusionary rule does not override the statutorily-imposed suppression remedy contained in Title III. (*United States* v. *Orozco* (S.D.Cal. 1986) 630 F.Supp. 1418, 1522; *County of Oakland by Kuhn* v. *City of Detroit* (D.C.Mich. 1984) 610 F.Supp. 364, 369-370, fn. 10; see *United States* v. *Spadaccino* (2d Cir. 1986) 800 F.2d 292, 296; contrast *U. S.* v. *Moore, supra,* 41 F.3d at pp. 375-377 [*Leon* applied to "technical defect" in Title III warrant].) As a result, we must first determine what statutory violations occurred, and whether the Act affords suppression as a remedy therefor. If it does, evidence of, and derived from, the clone pager interceptions must be suppressed. If there is no statutory suppression remedy, we must determine whether the violation is of constitutional magnitude and, if so, whether the interceptions nevertheless were valid under *Leon*.

Interpreted in light of the facts of this case, section 2516(2) requires that application to a state judge for an order authorizing or approving the interception of wire, oral, or electronic communications be made by the Fresno County District Attorney. This provision was violated, as both search warrants were sought by Fresno County Sheriff's

---

[24]    Defendants' arguments concerning probable cause have to do with particularity as to time and the interplay between probable cause and the lack of time limits on the authorization, not with whether probable cause existed in the first place.

detectives.[25] The record before us contains no indication a member of the district attorney's office had any hand in the applications. However, the warrants do involve investigation of an offense enumerated in the statute.

Section 2518, which sets out the procedure for intercepting wire, oral, and electronic communications, was violated in several respects. Subdivision (1)(c) requires "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" Subdivision (1)(d) requires "a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, [the application must also contain] a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter[.]" The search warrant affidavits are sufficient to establish probable cause to justify continuation of the authorization beyond the initial interception. However, statements concerning other investigative procedures and the time period are totally missing. The warrants themselves do not comply with section 2518(4), which requires the authorization order to specify, inter alia, the identity of the person whose communications are to be intercepted and the period of time during which interception is authorized.

Section 2518(5) provides in part:

"(5) No order entered under this section may authorize ... the interception of any ... electronic communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days.... Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3)

---

[25]    This fact also appears to have resulted in a violation of section 2518(1), which requires the application to state the applicant's authority to make such application.

41

of this section. The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty days. Every order and extension thereof shall contain a provision that the authorization to intercept ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days...."

The warrants here contained no reference to minimization, nor is there any time limit. Warrant No. 290570-1 was issued and served on April 12, 1993, while warrant No. 290571-9 (which was obtained after Radovcich obtained a new pager number because he believed someone was intercepting his calls) was issued on April 22, 1993. The return (the same for each warrant) was presented to the magistrate on December 7, 1993. The inventory of telephone numbers attached to the return shows that pages were intercepted from April 21, 1993 through November 9, 1993. Thus, section 2518(5) was violated.

Section 2518(8)(a) provides in part:

"(8)(a) The contents of any ... electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents ... shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions.... The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any ... electronic communication or evidence derived therefrom ...."

The warrants here bear a written order, signed by the issuing judge, which states that the search warrant, affidavit in support thereof, and the return thereto are to be "sealed and kept in the custody of the court until further order by this court or any other competent court." Assuming this constitutes the seal contemplated by subdivision (8)(a) of section 2518, the documents (which included the telephone number inventory) were not sealed until December 7, 1993.

42

Section 2518(8)(d) requires that an inventory which includes notice of interceptions and the authorizing order must be served on the persons named in the order (and such other parties to intercepted communications as the judge discretionarily determines) "[w]ithin a reasonable time but not later than ninety days after ... the termination of the period of an order or extensions thereof[.]" It is unclear when — if ever — the requisite inventory was served in the present case, but, given the period of time during which the interceptions occurred, it obviously was not within 90 days after the 30 days for which the initial authorization should have been in effect, or the additional 30 days' extension which presumably could have been authorized.

Some of the foregoing requirements are strictly statutory, while others embody Fourth Amendment principles. For example, the requirement under section 2516(1) that an application be authorized by a designated official, while intended to play a central role in the statutory scheme (and the violation of which will result in suppression under section 2515), is a statutory, not a constitutional, requirement. (See *United States* v. *Giordano, supra,* 416 U.S. at pp. 508, 525-528; *United States* v. *Chavez* (1974) 416 U.S. 562, 574-575.) So are the recording and sealing requirements contained in section 2518(8)(a). (See, e.g., *United States* v. *Ojeda Rios* (1990) 495 U.S. 257, 264-265; *United States* v. *Clerkley* (4th Cir. 1977) 556 F.2d 709, 718-719; *United States* v. *Gigante* (2d Cir. 1976) 538 F.2d 502, 505-507; *U. S.* v. *Paredes-Moya, supra,* 722 F.Supp. at pp. 1407-1408.) In contrast, requirements of necessity (or, as it is sometimes termed, investigatory exhaustion, i.e., the showing as to whether other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous; section 2518(1)(c), (3)(c)) and minimization (i.e., the requirement that interception be conducted in such a way as to minimize interception of communications not otherwise subject to interception; section 2518(5)) appear to be not only statutory provisions, but to implicate constitutional concerns as well. Particularity (including as to time, i.e., the stringent time limits placed on interception orders and

43

extensions, which in turn are related to probable cause requirements; section 2518(5)) clearly touches on the constitutional requirement of probable cause. (See, e.g., *Scott* v. *United States, supra,* 436 U.S. at pp. 137-139 [minimization]; *Berger* v. *New York, supra,* 388 U.S. at pp. 59-60 [particularity, minimization]; *U. S.* v. *Falls* (8th Cir. 1994) 34 F.3d 674, 680 [necessity, particularity, minimization]; *U. S.* v. *Petti* (9th Cir. 1992) 973 F.2d 1441, 1444 [particularity]; *U. S.* v. *Koyomejian* (9th Cir. 1992) 970 F.2d 536, 542, cert. den. *sub nom. Koyomejian* v. *United States* (1992) 506 U.S. 1005 [necessity, particularity, minimization]; *U. S.* v. *Carrazana, supra,* 921 F.2d at pp. 1565-1566 [particularity]; *United States* v. *Ippolito* (9th Cir. 1985) 774 F.2d 1482, 1486 [necessity]; *United States* v. *Clerkley, supra,* 556 F.2d at pp. 715-716 & fn. 3 [minimization]; *United States* v. *Tortorello* (2d Cir. 1973) 480 F.2d 764, 779-780 [particularity].)

The determination of whether a violation of Title III is simply statutory or also rises to constitutional magnitude is not merely an academic one. Unless the statute itself specifies exclusion as a remedy, mere statutory violations do not justify exclusion of evidence. (*U. S.* v. *Thompson* (11th Cir. 1991) 936 F.2d 1249, 1251.)

Title III contains several suppression provisions. Section 2515 provides:

> "Whenever any *wire or oral communication* has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court ... if the disclosure of that information would be in violation of this chapter." (Italics added.)

Section 2518(10)(a) provides the mechanism for suppression:

> "(10)(a) Any aggrieved person in any ... proceeding in or before any court ... may move to suppress the contents of any *wire or oral communication* intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—
>
> "(i) the communication was unlawfully intercepted;
>
> "(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

44

"(iii) the interception was not made in conformity with the order of authorization or approval...." (Italics added.)

Unlike other portions of Title III, neither section 2515 nor section 2518(10)(a) was amended by the ECPA to include electronic communications. "'The failure of the Legislature to change the law in a particular respect when the subject is generally before it and changes in other respects are made is indicative of an intent to leave the law as it stands in the aspects not amended.' [Citations.]" (*Estate of McDill* (1975) 14 Cal.3d 831, 837-838.) "Where a statute on a particular subject omits a particular provision, the inclusion of such a provision in another statute concerning a related matter indicates an intent that the provision is not applicable to the statute from which it was omitted. [Citation.]" (*Marsh* v. *Edwards Theatres Circuit, Inc.* (1976) 64 Cal.App.3d 881, 891; accord, *Stickel* v. *Harris* (1987) 196 Cal.App.3d 575, 591.)

While not amending sections 2515 or 2518(10)(a) to include electronic communications, the ECPA added subparagraph (c) to subdivision (10) of section 2518. That provision states: "The remedies and sanctions described in this chapter with respect to the interception of electronic communications are the only judicial remedies and sanctions for nonconstitutional violations of this chapter involving such communications."

In *U. S.* v. *Ferrara* (D.Mass. 1991) 771 F.Supp. 1266, 1304, the District Court stated that "[t]he 'remedies and sanctions' in Title III include subsection (10)(a), which was not explicitly amended to cover electronic as well as oral and wire communications." It is unclear whether the court meant that the suppression remedy contained in section 2518(10)(a) is available for statutory violations involving electronic communications. To the extent the opinion may be read that way, we disagree. Subparagraph (c) of section 2518(10) clearly refers to the remedies and sanctions described in Title III "*with respect to the interception of electronic communications*[.]" (Italics added.) Neither section 2515 nor section 2518(10)(a) sets out a remedy or sanction with respect to the interception of *electronic* communications. Accordingly, where interceptions of electronic

45

communications are concerned, violations of Title III which are not of constitutional magnitude will not result in suppression of evidence based on the Act unless the particular statute which is violated contains its own specific suppression remedy. (See *U. S.* v. *Suarez, supra,* 906 F.2d at p. 982, fn. 11 [Congress intended to extend statutory exclusionary remedy in § 2518(8)(a) to electronic communications].) If no such specific exclusionary remedy exists, an aggrieved person is left to his or her other remedies under the Act, such as civil or criminal penalties imposed upon the violator. Where, however, the violation rises to a level of constitutional magnitude, suppression is available under the Fourth Amendment.

Defendants would have us read section 2518(10)(c) as making those statutory suppression remedies available with respect to wire and oral communications, available for "constitutional" violations involving electronic communications. Defendants say that "[b]y expressly delineating statutory violations of a 'non constitutional' nature as not being entitled to the same suppression remedy available to wire and oral communications, it is made clear that where the violation of the statute rises to a constitutional level electronic communications are clearly included with wire and oral communications in warranting suppression." We disagree. As the Circuit Court of Appeals explained in *U. S.* v. *Suarez, supra,* 906 F.2d at page 982, footnote 11:

> " ... Title III ... contains a general statutory exclusionary rule, codified at 18 U.S.C. § 2515, which prohibits the admission into evidence of the contents of intercepted wire or oral communications if disclosure of that information 'would be in violation' of Title III. Section 2518(10)(a) complements § 2515, providing explicit grounds on which an 'aggrieved person' may move to suppress certain intercepted wire or oral communications. 18 U.S.C. § 2518(10)(a). Neither section was amended to include 'electronic communications' within its scope; rather, § 2518(10)(c) was added to define the *exclusive* remedies with respect to electronic communications." (Italics added.)

46

The legislative history is clear on this point. As explained in the section-by-section analysis of the ECPA contained in Senate Report No. 99-541 (99th Cong., 2d Sess. (1986)),

"Subsection 101(e) of the Electronic Communications Privacy Act amends subsection 2518(10) of title 18 to add a paragraph (c) which provides that with respect to the interception of electronic communications, the remedies and sanctions described in this chapter are the only judicial remedies and sanctions available for nonconstitutional violations of this chapter involving such communications. *In the event that there is a violation of law of a constitutional magnitude, the court involved in a subsequent trial will apply the existing Constitutional law with respect to the exclusionary rule.*

"The purpose of this provision is to underscore that, as a result of discussions with the Justice Department, *the Electronic Communications Privacy Act does not apply the statutory exclusionary rule contained in title III of the Omnibus Crime Control and Safe Streets Act of 1968 to the interception of electronic communications.*" (Italics added; see also *U. S.* v. *Ferrara, supra,* 771 F.Supp. at p. 1304 [with respect to electronic communications, judicially crafted exclusionary rule governs conduct which violates both Fourth Amendment and provisions of Title III which implement its requirements].)

Section 2518 contains its own suppression remedy:

"(8)(a) The contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, *if possible*, be recorded on tape or wire or other comparable device. The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, *such recordings* shall be made available to the judge issuing such order and sealed under his directions.... *The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom ....*" (Italics added.)[26]

---

[26]    Section 2518(9) also contains its own suppression remedy, excluding from evidence any intercepted communication unless each party has been furnished with a

Here, it does not appear that the intercepted pager communications were recorded except to be written down by the officer doing the intercepting. As previously noted, the last interception was made on November 9, 1993. The return to the search warrant was made on December 7, 1993. That same day, the issuing magistrate ordered the search warrant, affidavit in support thereof, and return thereto sealed and kept in the custody of the court.

We recognize that, for purposes of section 2518(8)(a), a tardy seal "has no greater legal suasion than no seal at all ...." (*U. S.* v. *Mora* (1st Cir. 1987) 821 F.2d 860, 865.) However, application of the requirements of section 2518(8)(a) is problematic where, as here, the intercepting device consists not of a wiretap or something similar, but of a digital clone pager. This is because, insofar as the record shows, the clone pager involved received and displayed the same information transmitted to Radovcich's pager, but had no capability to permanently record or store the numbers received. Consequently, we assume officers maintained a written log of the numbers transmitted to Radovcich's pager.

In *U. S.* v. *Suarez, supra,* 906 F.2d 977, officers kept a written log of intercepted telephone numbers. (*Id.* at p. 979.) In discussing the requirements of section 2518(8)(a), the federal appellate court stated:

> "The primary thrust of § 2518(8)(a) 'is to ensure the reliability and integrity of evidence obtained by means of electronic surveillance.' [Citations.] Congress explicitly distinguished in § 2518(8)(a) the act of intercepting a communication from the act of recording the intercepted communication. [Citations.] The language of the statute makes clear Congress' recognition that recording the contents of an intercepted communication may not in all circumstances be possible. Thus the mandate to seal, required in order to protect the reliability and integrity of the evidence, is initially contingent upon the possibility of recording the

---

copy of the authorizing court order and accompanying application at least 10 days before the trial, hearing, or other proceeding at which the evidence is to be introduced. This provision does not appear to have been violated here.

intercepted communication. The possibility, or practicability, of recording is measured by the capabilities of 'tape, wire or other comparable device' to record the intercepted communication." (*Suarez, supra*, at pp. 981-982, fns. omitted.)

*Suarez* determined that the sealing requirements of section 2518(8)(a) are not invoked if recording the contents of the intercepted communications was not possible. (*U. S.* v. *Suarez, supra*, 906 F.2d at p. 983.) The court explained:

"The term 'record' is not defined in Title III, but the language of § 2518(8)(a) and the legislative history of the Act compel the conclusion that transcribing by hand in a log book the images appearing on a display pager is not recording on a comparable device within the meaning of that section. [Citation.] Recording by hand simply cannot be done, as the statute requires, 'in such way as will protect the recording from editing or alteration.' [Citations.] Rather than mechanically capturing the electronic communication as received, manual transcription interposes an agent and produces inherent problems of editing or alteration. Though the meaning of 'other comparable device' must be determined in the absence of a statutory definition, we conclude, based on the phrase's context, that a log book simply cannot be considered a 'comparable device' to a tape or wire recorder.

"The statute's whole premise is that the evidentiary reliability of particular electronic communications can be ensured by two means: (1) their mechanical recordation as received, which ensures their original integrity; followed by (2) the relatively prompt sealing of the mechanical recordation. In this way, the opportunity for human alterations is completely avoided at the point of interception and minimized thereafter. That premise, hence the statute's intended application, is completely undercut where simultaneous mechanical recordation is impossible, and human alteration made possible in the very act of manual 'recordation.' The complete futility of any sealing requirement in that closing-of-the-barn-door situation is the best indication that the statute imposes none.

"Appellants contend that such a construction defeats the underlying purpose of § 2518(8)(a) to preserve the integrity and reliability of electronic communications offered as evidence. Since 'recording' by hand was 'possible,' as shown by the log book transcriptions that were made, appellants argue that, such as it was, this 'record' should have been sealed to preserve its reliability and integrity. The failure to seal, following their line of reasoning, therefore violated the statute.

49

2938

"The initial premise of this line of argument, however, is faulty —
here there was no recording, nor was one possible, by a device comparable,
in the critical way above noted, to a tape or wire recorder. Sealing can only
prevent the later alteration of a communication recorded as received; it
cannot preserve what is inherently subject to alteration in the very act of
recording." (*U. S.* v. *Suarez, supra,* 906 F.2d at pp. 983-984, fns. omitted;
see also *U. S.* v. *Paredes-Moya, supra,* 722 F.Supp. at p. 1407 [recording
not "possible" within meaning of statute where electronic recording device
failed and officer was compelled to maintain interception records by hand].)

We agree with *Suarez.* There is nothing before us to suggest that, in the present
case, the intercepted telephone numbers could have been recorded other than by hand.[27]
When read as a whole, section 2518(8)(a) logically applies only when the contents of the
intercepted communication can be recorded on tape or wire or other comparable
*mechanical* device. In order to protect the integrity of the evidence, those types of
recordings must be immediately sealed. "Congress apparently realized that testimony by
monitoring agents of what they heard would be open to attack on grounds of hearsay,
failure of recollection and bias. Tape recordings, on the other hand, would be the best
evidence and would be almost irrefutable if their authenticity and physical integrity were
guaranteed." (*United States* v. *Clerkley, supra,* 556 F.2d at p. 719.) Even so, "[t]ape
recorded evidence is uniquely susceptible to manipulation and alteration. Portions of a
conversation may be deleted, substituted, or rearranged. Yet, if the editing is skillful,
such modifications can rarely, if ever, be detected. The judicial sealing requirement,
therefore, provides an external safeguard against tampering with or manipulation of
recorded evidence." (*United States* v. *Gigante, supra,* 538 F.2d at p. 505.) Something
recorded by hand, however, does not carry the same aura of accuracy as a tape or wire
recording; it is inherently subject to impeachment. (See *U. S.* v. *Suarez, supra,* 906 F.2d
at pp. 983-984.)

---

[27]   The fact that federal Drug Enforcement agents may have had access to an
electronic recording device in *U. S.* v. *Paredes-Moya, supra,* 722 F.Supp. 1402, does not
mean all agencies are required to have such equipment.

50