In light of the foregoing, we conclude that under the circumstances of the present case, there is no statutory suppression remedy available to defendants under Title III. Accordingly, we must now determine whether the violations of the Act apparent here mandate suppression under Fourth Amendment principles. In this regard, it is important to keep the requirements of Title III separate from the requirements of the Fourth Amendment. It may well be that every interception which violates the Fourth Amendment necessarily also violates Title III. (See *United States* v. *Reyes* (S.D.N.Y. 1996) 922 F.Supp. 818, 837.) However, the converse is not automatically true: not every interception which violates Title III necessarily also violates the Fourth Amendment.

### 6.    Availability of Fourth Amendment exclusionary remedy

The People assert that Ewell's Fourth Amendment rights were not violated by the interception of numbers he dialed on a telephone.[28] We agree.

In *Smith* v. *Maryland, supra*, 442 U.S. 735, the victim of a robbery began receiving threatening telephone calls from a man identifying himself as the robber. After other evidence suggested Smith as the culprit, the telephone company, at police request, installed a pen register to record the numbers dialed from the telephone at Smith's home. The police did not get a warrant or court order before having the pen register installed. The register revealed that a telephone call was made from Smith's home to the victim's telephone; ultimately, this led to additional evidence which resulted in Smith's conviction for robbery. (*Id.* at p. 737.)

The United States Supreme Court granted certiorari to resolve conflicts concerning the restrictions imposed by the Fourth Amendment on the use of pen registers. (*Smith* v. *Maryland, supra,* 442 U.S. at p. 738.) Relying on *Katz* v. *United States, supra,* 389 U.S. 347 as the "lodestar" for determining whether a particular form of government-initiated

---

[28]    Despite the fact this theory was only tangentially raised in the trial court, we conclude the People may properly present it for the reasons discussed earlier in this opinion.

electronic surveillance constitutes a search within the meaning of the Fourth Amendment
(*Smith, supra,* at p. 739), the court stated:

> "Consistently with *Katz,* this Court uniformly has held that the
> application of the Fourth Amendment depends on whether the person
> invoking its protection can claim a 'justifiable,' a 'reasonable,' or a
> 'legitimate expectation of privacy' that has been invaded by governmental
> action. This inquiry, as Mr. Justice Harlan aptly noted in his *Katz*
> concurrence, normally embraces two discrete questions. The first is
> whether the individual, by his conduct, has 'exhibited an actual (subjective)
> expectation of privacy,'— whether, in the words of the *Katz* majority, the
> individual has shown that 'he seeks to preserve [something] as private.'
> The second question is whether the individual's subjective expectation of
> privacy is 'one that society is prepared to recognize as "reasonable."'—
> whether, in the words of the *Katz* majority, the individual's expectation,
> viewed objectively, is 'justifiable' under the circumstances." (*Smith, supra,*
> at p. 740, citations and fn. omitted.)

The court noted that the activity at issue took the form of installing and using a pen

register, a device that does not acquire the contents of communications. A pen register

discloses only the telephone numbers that have been dialed. (*Smith* v. *Maryland, supra,*

442 U.S. at p. 741.) Thus, Smith's argument that *its* use constituted a "search"

necessarily rested upon a claim that he had a legitimate expectation of privacy in the

numbers he dialed on his telephone. The court stated:

> "This claim must be rejected. First, we doubt that people in general
> entertain any actual expectation of privacy in the numbers they dial. All
> telephone users realize that they must 'convey' phone numbers to the
> telephone company, since it is through telephone company switching
> equipment that their calls are completed. All subscribers realize, moreover,
> that the phone company has facilities for making permanent records of the
> numbers they dial, for they see a list of their long distance (toll) calls on
> their monthly bills.... Telephone users, in sum, typically know that they
> must convey numerical information to the phone company; that the phone
> company has facilities for recording this information; and that the phone
> company does in fact record this information for a variety of legitimate
> business purposes. Although subjective expectations cannot be
> scientifically gauged, it is too much to believe that telephone subscribers,

52

under these circumstances, harbor any general expectation that the numbers they dial will remain secret.

"Petitioner argues, however, that, whatever the expectations of telephone users in general, he demonstrated an expectation of privacy by his own conduct here, since he 'us[ed] the telephone *in his house* to the exclusion of all others.' [Citation.] But the site of the call is immaterial for purposes of analysis in this case. Although petitioner's conduct may have been calculated to keep the *contents* of his conversation private, his conduct was not and could not have been calculated to preserve the privacy of the number he dialed. Regardless of his location, petitioner had to convey that number to the telephone company in precisely the same way if he wished to complete his call. The fact that he dialed the number on his home phone rather than on some other phone could make no conceivable difference, nor could any subscriber rationally think that it would.

"Second, even if petitioner did harbor some subjective expectation that the phone numbers he dialed would remain private, this expectation is not 'one that society is prepared to recognize as "reasonable."' [Citation.] This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties....

"This analysis dictates that petitioner can claim no legitimate expectation of privacy here. When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business. In so doing, petitioner assumed the risk that the company would reveal to police the numbers he dialed." (*Smith, supra,* at pp. 742-744.)

Because digital display pagers are capable of transmitting messages as well as telephone numbers, clone digital pagers — unlike pen registers — can intercept more than just the number dialed.[29] While these differences may be crucial to a determination of the applicability of Title III, however (see *Brown* v. *Waddell, supra,* 50 F.3d at pp. 292-293), we are not convinced they matter for Fourth Amendment purposes, at least insofar as Ewell is concerned.

---

[29]   In fact, the returns to the search warrants show detectives intercepted what appear to be codes, in addition to telephone numbers.

In *U. S.* v. *Meriwether* (6th Cir. 1990) 917 F.2d 955, agents executed a search warrant at a particular residence. The warrant authorized the seizure, among other things, of all evidence of narcotics use, including telephone numbers of customers. Upon executing the search warrant, agents seized an electronic digital display-type pager which was capable of receiving and storing messages from touch-tone telephones. Pressing a button resulted in stored numbers being displayed. The pager was seized in the "on" position. From the time of its seizure, it was frequently activated by incoming telephone calls. Agents monitoring the pager recorded 40 incoming telephone numbers, several of which were followed by a "911" code. One of the numbers, which appeared repeatedly with the "911" code, was chosen at random and called by an agent. Meriwether — the person called — ultimately arranged a narcotics transaction with the agent and was arrested. He moved to suppress evidence of his telephone number and his telephone conversations with the agent. (*Id.* at p. 957.)

The Court of Appeals held that neither Meriwether's Fourth Amendment rights nor Title III were violated. (*U. S.* v. *Meriwether, supra,* 917 F.2d at p. 957.) With regard to Meriwether's Fourth Amendment claim, the court relied on *Smith* v. *Maryland, supra,* 442 U.S. 735, and its own cases interpreting *Smith,* and stated:

> "Here, appellant fails to show that he has sought to preserve a message as private by transmitting it into a paging receiver over which he has no control. Indeed, the Court 'consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.' *Smith, supra,* 442 U.S. at 743-44. We have followed the general theory set forth in *Smith.* In *United States v. Passarella,* 788 F.2d 377 (6th Cir. 1986), an agent, armed with an arrest warrant, entered the defendant's home. While there the agent answered several telephone calls for the defendant. Apparently believing that the agent was the defendant, the callers made incriminating statements about the sale of drugs. We held that the Fourth Amendment does not protect a wrongdoer's misplaced trust that the one intended to receive a communication will actually receive it. [Citation.] We held that the district court properly admitted evidence of the phone conversations. [Citation.]

"A party sending a message to a pager has expressed his subjective desire to preserve his privacy even less than in the telephone situation. When one transmits a message to a pager, he runs the risk that the message will be received by whomever is in possession of the pager. Unlike the phone conversation where a caller can hear a voice and decide whether to converse, one who sends a message to a pager has no external indicia that the message actually is received by the intended recipient. Accordingly, when a person sends a message to a pager, he runs the risk that either the owner or someone in possession of the pager will disclose the contents of his message. Since the actual confidentiality of a message to a pager is quite uncertain, we decline to protect appellant's misplaced trust that the message actually would reach the intended recipient. [Citations.]" (*Meriwether, supra,* 917 F.2d at p. 959.)

We fail to ascertain why simultaneous interception would be analyzed differently for Fourth Amendment purposes, or why it should make a difference if, as in the present case, officers drove to the location of the telephone at which the message originated instead of simply calling that telephone back. Nor do we find it constitutionally significant that, at least on some occasions (maybe all), Ewell sought to keep his identity private (more, perhaps, than the numbers he dialed) by using a pay telephone. Assuming he harbored some subjective expectation that his identity would remain private, we cannot say this expectation is "'one that society is prepared to recognize as "reasonable."'" (*Smith* v. *Maryland, supra,* 442 U.S. at p. 743, quoting *Katz* v. *United States, supra,* 389 U.S. at p. 361.) There is no indication the pay telephones used were other than public telephones. By using a public telephone to send a telephone number to a pager, Ewell ran the risk that he would be seen, that the telephone company would reveal the number he dialed, or that the pager message would be obtained by someone for whom it was not intended.

Under *Smith* and *Meriwether,* Ewell's Fourth Amendment rights were not violated.[30]  Since there was no Fourth Amendment violation and no suppression remedy

[30]    In *U. S.* v. *Suarez,* two codefendants moved to suppress evidence seized as a result of the interception of the electronic communications made to one defendant's pager. Although the trial court ruled that both defendants had standing to assert a Fourth

available to him under Title III, the trial court erred by suppressing the clone pager and derivative evidence as to him unless, as will be discussed *post*, suppression was warranted under the applicable California statutes.

The People do not make this argument with regard to Radovcich.  Accordingly, we will assume that Radovcich's Fourth Amendment rights were implicated by interception of his pager messages.  (See *People* v. *Bullock* (1990) 226 Cal.App.3d 380, 385-387 [defendant had reasonable expectation of privacy in contents of pager which received and stored callers' codes and telephone numbers, where someone listening to a scanner set to that frequency might hear tones produced by telephone but not spoken messages], distinguishing *People* v. *Medina* (1987) 189 Cal.App.3d 39, 43-45 [no objectively reasonable expectation of privacy where paging system used single radio frequency and all transmissions could be heard by anyone listening to that frequency, so that anyone with type of pager involved could receive pages for anyone else with a similar pager].)

We first consider minimization, which "requires that the government adopt reasonable measures to reduce the interception of conversations unrelated to the criminal activity under investigation to a practical minimum while permitting the government to pursue legitimate investigation." (*U. S.* v. *Torres* (9th Cir. 1990) 908 F.2d 1417, 1423.) The warrant in the present case violated section 2518(5), as it did not contain a provision requiring that the interception be conducted "in such a way as to minimize the interception of communications not otherwise subject to interception ...." In order to determine whether a Fourth Amendment violation occurred, however, we look to whether minimization did, in fact, occur. (See *Torres*, *supra*, at p. 1423.)

The requirement of minimization "does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations. Whether the

Amendment claim, this ruling was neither challenged nor discussed on appeal. (*U. S.* v. *Suarez*, *supra*, 906 F.2d at p. 980, fn. 3.)

56

agents have in fact conducted the [surveillance] in such a manner will depend on the facts and circumstances of each case." (*Scott* v. *United States, supra,* 436 U.S. at p. 140.) "[W]hat is reasonable under the Fourth Amendment necessarily varies from case to case." (*U. S.* v. *Falls, supra,* 34 F.3d at p. 680.) The ultimate question to be decided is whether the agents acted unreasonably at the time they made the interceptions. (See *Scott, supra,* at p. 143.)

Unlike cases involving interception of conversations (e.g., *Scott*) or even utilizing video surveillance (e.g., *Falls*), the nature of the surveillance in the present case does not readily lend itself to minimization.[31]  Given the use of pay telephones, it is unreasonable to expect officers to be able to tell, at the time of an interception, whether the communication being intercepted was or was not relevant to the investigation.  That agents may have intercepted telephone numbers which were unrelated to the alleged conspiracy between defendants does not indicate a failure to meet the minimization requirement. (*Scott* v. *United States, supra,* 436 U.S. at p. 140; *U. S.* v. *Torres, supra,* 908 F.2d at p. 1423.)  Under the particular circumstances of this case, we conclude the officers were unable to particularly tailor their surveillance efforts (see *United States* v. *Clerkley, supra,* 556 F.2d at p. 717); hence, they did not act unreasonably at the time they made the interceptions (see *Scott* v. *United States, supra,* 436 U.S. at p. 143). Thus, we find no Fourth Amendment violation with regard to minimization.

With regard to necessity/investigatory exhaustion, again the warrants failed to fulfill statutory requirements, as the affidavits failed to contain a statement as to whether other investigative procedures had been tried and failed or why they would be unlikely to succeed or would be too dangerous (§ 2518(1)(c)), and there is no showing the magistrate who issued the warrant made the requisite findings (§ 2518(3)(c)).

---

[31]     In this regard, it is important to note that the issue before us concerns interception of the pager communications, and not, for example, officers' eavesdropping on Radovcich's telephone conversations with his attorney.

The Fourth Amendment requires that searches be reasonable. Moreover, "courts should authorize 'no greater invasion of privacy ... than necessary under the circumstances.' [Citations.]" (*U. S.* v. *Ferrara, supra,* 771 F.Supp. at p. 1303.) The basis for the necessity requirement is the idea that the government should make a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to a means of investigation as intrusive as electronic interception. (*U. S.* v. *David, supra,* 940 F.2d at pp. 727-728.) "Although generally a wire intercept should not constitute the first step in an investigation [citation], the government need not exhaust every conceivable investigative technique in order to show necessity." (*U. S.* v. *Torres, supra,* 908 F.2d at p. 1422.) In this regard, appellate review is limited to the question of whether the court issuing the interception authorization reasonably could have concluded that normal investigatory procedures reasonably appeared unlikely to succeed. (*David, supra,* at p. 728.) In making this determination, we may look to the contents of the affidavit to see whether sufficient facts are alleged so as to demonstrate necessity. (*Torres, supra,* at p. 1423.)

The affidavit in support of search warrant No. 290570-1 set out the various steps authorities had taken in the investigation, including prior search warrants that had been obtained for telephone records.[32] Two of the three previous warrants, together with supporting affidavits, were attached.[33] The affidavit also detailed Radovcich's use of pay telephones and pagers. Although a greater showing of necessity could have been made

---

[32]    Since search warrant No. 290571-9 merely amended the initial warrant to cover Radovcich's new pager number, we look to the original affidavit with regard to both warrants.

[33]    .Although the affidavit refers to an April 8, 1993, search warrant and affidavit, the copy of the affidavit at issue which is contained in the record before us contains no such attachment. We note, however, that the April 8 warrant was presented to, and issued by. the same magistrate who issued the April 12 warrant with which we are concerned. It is reasonable to assume the magistrate was aware of the contents of the April 8 documents.

2947

(see, e.g., *U. S.* v. *Petti, supra,* 973 F.2d at pp. 1445-1446, fn. 7),[34] the affidavit was sufficient to allow the issuing magistrate reasonably to conclude that reasonable efforts to succeed without use of a clone pager had been tried and failed, and that the clone pager was "a suitable next step in a plausible progression." (*U. S.* v. *David, supra,* 940 F.2d at p. 729.) Accordingly, we find no Fourth Amendment violation with regard to necessity.

The main problem here is lack of particularity as to time. The search warrants contain no temporal limits on use of the clone pager, nor do the affidavits explain why open-ended interception is needed (assuming such an authorization could be made under the Fourth Amendment), or that probable cause exists for an unspecified length of time.

"Particularity in an eavesdrop or wiretap application and order is critical to the constitutionality of a surveillance. The Fourth Amendment does not permit law enforcement offices to engage in lengthy surveillance of a suspected, or even a known, criminal regarding his associations and areas of legal and illegal operations, in the hope of obtaining evidence of some unspecified crime." (*United States* v. *Tortorello, supra,* 480 F.2d at p. 779.) "A difficult question is the degree of particularity required by the Fourth Amendment .... [T]he exact boundaries of a constitutionally valid electronic surveillance thus far have not been delineated." (*Id.* at p. 780.) In this regard, courts take "a pragmatic approach ... with respect to the particularity requirement." (*Ibid.*)

Guidance can be found in decisions concerning the particularity required for a warrant under Title III. As previously described, the Act requires that all applications for

---

[34]     In that case, "[t]he affidavits explained that agents had obtained and analyzed telephone toll records and 'pen registers' recording the numbers dialed from a particular telephone, but this data did not provide the kind of information necessary to establish the offenses suspected; that the agents had tried to 'wire' Benjamin to record his conversations with Petti but failed because of steps Petti took to avoid surveillance; and that they had tried to obtain the necessary information from Benjamin's oral reports of these conversations, but Benjamin was not privy to many of the crucial conversations and in any event, given his criminal record, would not be a sufficiently credible trial witness without corroborating evidence."

interception authorization contain a statement of the period of time for which the interception is required to be maintained and, if the nature of the investigation is such that the authorization should not automatically terminate when a communication is first obtained, facts establishing probable cause to believe additional communications of the same type will occur. (§ 2518(1)(d).) Where the application is for an extension of an order of authorization, it must set out the result obtained thus far or a reasonable explanation for the failure to obtain results. (§ 2518(1)(f).) The order authorizing the interception must specify the period of time during which the interception is authorized. (§ 2518(4)(e).) No authorization may be given for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than 30 days. (§ 2518(5).) Extensions of the authorization can only be granted upon further application of the type required for the initial intercept, and upon the court making the findings required with regard to the initial intercept. No extension can be granted for longer than 30 days. (*Ibid.*)

It is apparent that the stringent time limits contained in Title III both protect the privacy of the subject of the interception, and ensure continuing probable cause. Whether a lapse of time precludes a determination of probable cause depends on the facts of the particular case. (See *Andresen* v. *Maryland* (1976) 427 U.S. 463, 478-479, fn. 9.) Here, inasmuch as the warrant specified *no* time limits on the interception and the People implicitly concede the existence of Fourth Amendment violations by their argument that *Leon* applies, we need not determine whether, and if so, under what circumstances, the Fourth Amendment would permit an interception authorization to exceed the time limits set forth in Title III. Given the existence of this violation of "constitutional magnitude," we must determine whether exclusion is required under the Fourth Amendment.

Before turning to our analysis under *Leon*, however, we feel constrained to respond to the concurring and dissenting opinion. That opinion would hold that neither defendant has a reasonable expectation of privacy in the intercepted communications.

This conclusion proceeds from the premise that because the pager communications were intercepted while in transit, either both defendants have a legitimate expectation of privacy or neither does. This analysis is flawed, not only in its treatment of defendants as having identical privacy interests, but also in its reasoning as to each defendant. Moreover, as to Radovcich, the conclusion is improperly based on an issue which the parties have neither raised in this proceeding nor been afforded an opportunity to address in this court.

### a.    Defendants' privacy interests must be analyzed separately.

A fundamental premise of the concurring and dissenting opinion is that because this case involves communications intercepted in transit, defendants' privacy interests are the same. We do not see why this is necessarily so.

Fourth Amendment rights are personal rights which may not be vicariously asserted. (*Rakas* v. *Illinois* (1978) 439 U.S. 128, 133-134.) Thus, "[t]he proponent of a motion to suppress has the burden of establishing that *his own* Fourth Amendment rights were violated by the challenged search or seizure." (*Id.* at p. 131, fn. 1, italics added.) Because of this, the concept of "standing" is more properly subsumed under substantive Fourth Amendment doctrine. (*Id.* at p. 139.)[35] "Analyzed in these terms, the question is whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed on an interest of the defendant which the Fourth Amendment was designed to protect." (*Id.* at p. 140.)

Fourth Amendment jurisprudence is rife with examples of codefendants being treated differently for standing purposes despite the fact their circumstances are virtually

---

[35]    Thus, we use the word "standing" simply as a term of convenience. (See *People* v. *Leonard* (1987) 197 Cal.App.3d 235, 239.)

61

identical. For instance, an automobile's driver and passenger both may be subjected to the same detention and search and the prosecution may seek to use the same results of the search against both, but the driver may have standing to challenge the search while the passenger does not. (See, e.g., *Rakas* v. *Illinois, supra,* 439 U.S. at pp. 130-131.)

Citing *In re Askin* (4th Cir. 1995) 47 F.3d 100, 104, the concurring and dissenting opinion says, "'[C]ommunication is by definition not a one-way street.... If it takes two to tango, it assuredly takes at least two to communicate....'" (P. 10.) However, it also takes at least two to conspire,[36] yet this fact does not mean the Fourth Amendment privacy interests of coconspirators are treated the same. As the United States Supreme Court has explained:

> "It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure. [Citations.] We applied this principle to the case of coconspirators in *Alderman* [v. *United States* (1969) 394 U.S. 165, 171-172], in which we said: 'The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Co-conspirators and codefendants have been accorded no special standing.' [Citation.]" (*U. S.* v. *Padilla* (1993) 508 U.S. 77, 81-82 [113 S.Ct. 1936, 1939].)

*Askin* does not lead to a different result. In that case, government agents monitored telephone calls between Askin and a named coconspirator. Askin used a traditional land-based telephone or cellular car phone, while the other party used a cordless telephone. In pressing his Fourth Amendment claim, Askin took what the Court of Appeals termed a "bifurcated view of his conversations," asserting that because he

---

[36]    "[O]ne cannot conspire with oneself." (*People* v. *Mata* (1978) 85 Cal.App.3d 233, 238; § 182; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 167, p. 188.)

spoke on allegedly protected telephones, his conversations were entitled to Fourth Amendment protection. (*In re Askin, supra,* 47 F.3d at p. 104.)

The Court of Appeal found that viewing the communications in isolated segments was problematic. After explaining that it takes at least two to communicate, the court reasoned:

> "Generally, then, it makes little conceptual sense to treat conversations as a series of discrete and independent parts rather than as a unified whole. Moreover, in terms of the admissibility of intercepted communications, a bifurcated approach to the Fourth Amendment makes even less sense: one half of a conversation is not readily separable at trial from the other.
>
> "The Supreme Court's Fourth Amendment jurisprudence supports the view that a conversation should be seen in its entirety rather than in segments. In *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), the Court allowed government agents to testify at trial to conversations between a defendant and a government informant that were monitored without a warrant. In reaching this conclusion, the Court rejected a view of the conversations which focused exclusively upon the defendant. [Citation.] Rather, the Court considered the additional (and ultimately dispositive) fact that when the defendant made the statements in question, he shared them with another person — a person who happened to be an unreliable confidant. [Citation.] The person to whom one is speaking was deemed as critical for Fourth Amendment purposes as the person who speaks." (*In re Askin, supra,* 47 F.3d at pp. 104-105.)

*Askin* only addresses situations involving conversations. It does not purport to state a rule for the type of communication present here — numbers dialed into a telephone and sent to a pager. Thus, we do not read *Askin* as suggesting there can never be circumstances under which the privacy interests and expectations of parties to the same communication are different.[37] Under the circumstances of the present case, the fact both defendants were parties to the communications, while not irrelevant, does not

---

[37]    We implicitly recognized that conversations are different than one-way messages and that portions of a communication may sometimes be viewed as discrete parts in *People v. Medina, supra,* 189 Cal.App.3d at pages 47-48.

mandate that they be treated as one for purposes of analyzing their privacy interests and expectations.

This is especially apparent when analyzing the first part of the expectation of privacy inquiry. We all acknowledge that this inquiry has two prongs under *Katz*. The first (an actual, subjective expectation of privacy) necessarily involves looking at the circumstances of the conduct of each defendant separately. The fact that one person to a communication does not expect it to be private does not necessarily mean the other also lacks that expectation, especially in one-way communication situations such as we have here.

Although there are probably other examples that can be imagined, one illustrates our point. Assume A learns on the street that a certain telephone number is one to call for obtaining drugs. While in the presence of other people (maybe including an informant), and without trying to keep the others from hearing what he says, A calls the number and hears a typical answering machine message. A leaves a message to call him, giving his telephone number. Since A does not really have any idea who he is calling and who might have access to the telephone or the answering machine, and since others saw him place the call and heard his message, his conduct does not show that he sought to preserve the message as private. Thus, as to A the first prong of the *Katz* test is not satisfied. Assume further that B, the drug dealer, has taken great pains to preserve the confidentiality of his telephone and the answering machine, no one else has access to it, he screens each call before answering or returning the call, and he immediately erases the answering machine tape after hearing the message. In our opinion, B's conduct satisfies the first prong, although A's does not.

We fail to see how B's subjective expectation of privacy is affected by the manner in which the unauthorized search or seizure is accomplished. If the telephone call is intercepted in transit (e.g., by an illegal wiretap), his subjective expectation would be as great as, if not greater than, if the police illegally broke into his home and confiscated the

64

answering machine before he had an opportunity to erase the message. We doubt he would be denied Fourth Amendment standing in the first instance simply because he did not show a possessory interest in the communication while in transit.

Carrying the hypothetical a step further, assume that C is B's partner and is very familiar with the steps B has taken to preserve confidentiality. In a private setting, C telephones B and leaves a message. In our view, a court could reasonably conclude C satisfied the first prong of the *Katz* test. In other words, because of the different circumstances surrounding the telephone calls placed by A and C, there would be a different result as to whether each met the first prong, but in neither case would that result turn on the finding as to B. If both A's and C's telephone calls were intercepted, or if the answering machine was confiscated when both messages were on it, we see no reason why B's and C's motions to suppress could not be granted while A's would be denied because he lacks standing.[38]

### b.    Ewell lacks standing.

The concurring and dissenting opinion erroneously claims we analogize the use of a clone pager to the use of a pen register in concluding that Ewell had no legitimate expectation of privacy in his calls to Radovcich's pager. To the contrary, we have never taken such a position. We recognize that the pen register at issue in *Smith* v. *Maryland, supra,* 442 U.S. 735, upon which we relied, did not acquire the contents of any communications. (*Id.* at p. 740.)[39] Nevertheless, the fact remains that the

---

[38]    We have deliberately constructed this hypothetical so it does not involve use of radio transmissions. In our opinion, that factor may impact the second *Katz* prong, which we discuss, *post.*

[39]    The concurring and dissenting opinion says the mere number to which Ewell placed his telephone calls would have been useless since detectives already knew the telephone number — that of Radovcich's pager. What detectives did not know until the calls were placed and surveillance undertaken, however, was that it was Ewell making those telephone calls.

"communications" in the present case consisted of numbers dialed (or entered by touch-tone) into a telephone—in other words, conveyed to the telephone company. "[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties...." (*Id.* at pp. 743-744.) That the "information" here consisted of a numeric code intended as a communication does not give Ewell any greater expectation of privacy since what matters is that he voluntarily conveyed the communication to and through a third party. Moreover, as pointed out in *U. S. v. Meriwether, supra*, 917 F.2d at page 959, Ewell had no control over the pager and no assurance the message would reach its intended recipient — much as A in our hypothetical, *ante*.

c.    **The People have not claimed Radovcich lacks standing.**

The concurring and dissenting opinion argues we assume Radovcich possessed a legitimate expectation of privacy in the intercepted communications, then proceeds to attack our analysis as if we had addressed the issue and found Radovcich had standing. The concurring and dissenting opinion ultimately concludes Radovcich lacks the legitimate expectation of privacy needed to permit him to challenge the interceptions.

The simple answer is that we assumed, for purposes of our analysis, that Radovcich possessed a legitimate expectation of privacy in his pager messages *because no one has contended otherwise*. The People have raised the standing issue only with respect to Ewell.

It would be improper for this court to base its decision in this matter on a finding that Radovcich lacked standing to challenge interception of the communications to his pager. Government Code section 68081 provides:

"Before ... a court of appeal ... renders a decision in a proceeding other than a summary denial of a petition for an extraordinary writ, based upon an issue *which was not proposed or briefed by any party to the proceeding*, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing. If the court fails to afford that opportunity, a rehearing shall be ordered upon timely petition of any party." (Italics added.)

66

2955

At no time in this court has any party proposed that Radovcich lacked standing, nor has that issue been briefed. The concurring and dissenting opinion recognizes this fact, but says the issue was raised and ruled upon in the trial court with respect to both defendants. The concurring and dissenting opinion confuses raising the issue in the trial court with raising an issue in a proceeding *in this court*. Raising the issue in the trial court preserves the issue so it may be raised on appeal or in a writ proceeding in this court. It does not, of itself, raise the issue in this court.[40]

In support of its conclusion the issue was raised in the trial court, the concurring and dissenting opinion quotes a brief portion of the People's argument at the hearing on the suppression motion. When read in context, however, it is readily apparent that the People were alleging a lack of standing under Title III, i.e., that the interceptions did not fall within the purview of that Act:

"[MR. HAMMERSCHMIDT:] *Next is the issue of whether the digital pagers fall within the Act.* Defense counsel cite numerous cases regarding that issue; however, none of them with holdings, except for Brown versus Waddell, and that case did hold that a digital pager falls within Title III. However, that decision is in direct conflict with the New York Telephone case, in that, as I pointed out in my first argument, the Brown versus Waddell court did not analyze the issue whether there was no interception, they just assumed there was an interception. That is what happened in some of the other cases, too, where it was merely dicta. That is really completely understandable. It would not be unusual for someone to refer to the interception of digital pager numbers. And, at first glance, that is what one would think, is that that is an interception. However, the legislature had the opportunity to define that term and they chose to define that term. *It is clear that the way they defined that term, that the idea was to control the contents of communications, to have that fall within Title Three*, where you have telephone conversations, and a person is listening to

---

[40]   Thus, for example, we had to determine, as a threshold matter, whether the People were precluded from taking the position that Title III does not provide a statutory suppression remedy for interceptions of electronic communications by virtue of their failure to raise that argument in the trial court.

67

2956

the contents of this phone conversation, or otherwise listening to the contents of a conversation or obtaining the contents of the conversation.

"*Certainly a pager transmits letters, or a voice pager, that's going to transmit the contents of the translation.* The ordinary and customary use of a digital pager is merely to transmit phone numbers, and that is really no different than the case that was cited regarding trap-and-trace devices which pick up -- which phone numbers are dialed from one phone to another.

"In this case, when there is an interception of digital pagers, at that point law enforcement would not know for sure who dialed -- who was holding the pager or who was dialing the number, it was subsequent investigation which led them to see who was doing that by legal means.

"So if the defendants want to claim that the pager was used in other than its normal and customary manner, in other words, to communicate, which possibly could be done by something like putting numbers after the phone number to constitute a communication, then arguably, in that circumstance only, *the pager could be being used to communicate. And for that instance, it may fall within Title III. But if that is the case, and since all the digital pager can do is deal with numbers and not letters, then it would be the defendants' burden to prove standing: To be able to say, 'I received that communication and numbers were used to communicate. In this case the pager was not used for its normal and customary usage of transmitting numbers, it was used to communicate.* And by that, when we put in the numbers 911, or whatever numbers, we meant to communicate by doing that.'

"If the Court did find that, then, if there was a suppression, the appropriate suppression would only be to suppress the part that is a communication, which would be the numbers afterwards. So even in that case, the only thing that would be suppressed would be, for example, the 911 afterwards, and not the fact that there was a phone number transmitted, because the phone number being transmitted is not a communication -- *is not an interception because it doesn't communicate the contents of the conversation.* And, of course, the most important thing to look at, although there are cases discussing it, is the language *of the statute itself,* and that is what makes it clear." (Italics added.)

That the trial court's ruling may have blurred the distinctions between Title III and the Fourth Amendment does not alter the nature of the People's argument.[41]  Moreover, for purposes of Government Code section 68081, what matters is what issues are raised *in this court*.  Radovcich's purported lack of standing simply was not raised here.  Aside from the statutory preclusion, it would be eminently unfair to Radovcich for this court to decide such a fundamental issue against him without affording him the opportunity to address the matter.

Nonetheless, in light of the concurring and dissenting opinion's election to discuss this issue were we to analyze the issue of Radovcich's standing we would conclude he possessed a legitimate expectation of privacy in the communications sent to his pager.

> "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.' [Citation.] *Katz* posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search?  Second, is society willing to recognize that expectation as reasonable?  [Citation.]" (*California* v. *Ciraolo* (1986) 476 U.S. 207, 211.)

There is some evidence in the record of Radovcich's conduct meeting the first prong.  He used pay telephones, not his own telephone or that of his parents, to return calls to his pager.  The return to the warrant shows that many of the messages sent to the pager were coded.  In addition, Radovcich took steps to obtain a new pager, under a false name, after he suspected the police were getting messages to the first one.  Under the circumstances, we cannot say the first prong of *Katz* was not met.

As for the second prong, "we must keep in mind that '[t]he test of legitimacy is not whether the individual chooses to conceal assertedly "private" activity,' but instead

---

[41]    The concept of standing appears to be broader under Title III than under the Fourth Amendment, as section 2510(11) defines "'aggrieved person'" as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed[.]"

'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.' [Citation.]" (*California* v. *Ciraolo, supra,* 476 U.S. at p. 212.) Thus, "[w]hat expectations are legitimate varies ... with context ...." (*Vernonia School Dist. 47J* v. *Acton* (1995) ___ U.S. ___, ___ [115 S.Ct. 2386, 2391.) Property ownership is a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, but it is neither the beginning nor the end of the inquiry. (*United States* v. *Salvucci* (1980) 448 U.S. 83, 91.)

> "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.... Expectations of privacy protected by the Fourth Amendment ... need not be based on a common-law interest in real or personal property, or on the invasion of such an interest.... But by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment." (*Rakas* v. *Illinois, supra,* 439 U.S. at p. 144, fn. 12.)

Given the foregoing, we cannot accept an argument which would render irrelevant Radovcich's possessory interest in the pager. The fact that he lawfully possessed the pager is a factor which bears on the circumstances under which the communications were made and, ultimately, the reasonableness of Radovcich's expectation of privacy in those communications.

The concurring and dissenting opinion focuses on the nature of radio transmissions and their broadcast. However, the fact the communications were transmitted over the airways does not destroy the legitimacy of an expectation of privacy if, absent use of sophisticated technology, the transmissions could only be intercepted and interpreted by using Radovcich's pager.

To hold otherwise would mean that a person in possession of a pager or other means of electronic communication, which used a coding or encryption device so that its messages could be intercepted only by a person using some sort of specialized

70

technology, would have no legitimate expectation of privacy in his or her communications. Such a concept would be startling. After all, "[w]hat a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection. [Citations.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [Citation.]" (*Katz* v. *United States, supra*, 389 U.S. at pp. 351-352.) "It is the exploitation of technological advances that implicates the Fourth Amendment, not their mere existence." (*United States* v. *Karo* (1984) 468 U.S. 705, 712.)

From the record before us, it is evident that Radovcich's pager had a "cap code." Therefore, in order to intercept Radovcich's messages, it was not enough for law enforcement officers to have a pager tuned to the same frequency and to know the assigned telephone number of Radovcich's pager. Instead, they needed the cap code. (See *People* v. *Pons* (1986) 133 Misc.2d 1072, 1074 [509 N.Y.S.2d 450, 452].) It is the cap code that controls who receives the page. The cap code receives the message signal from the pager company, then directs that signal to the designated pager. If someone has the same cap code, he or she receives the signal regardless of the telephone number assigned to the intended pager. Thus, even assuming the police knew Radovcich's pager number and frequency, they could not have simply gone to a radio or electronics store, purchased a like pager, programmed it for that telephone number, and intercepted the pages. Instead, they had to have the cap code programmed in by the pager company, just as it was programmed into Radovcich's pager. *There is absolutely no suggestion in the record that the cap code, or a device which would have allowed someone to figure out that code, was generally available to the public or could be readily duplicated.* (See *Dow Chemical Co.* v. *United States* (1986) 476 U.S. 227, 231, 238-239 [no constitutional concerns raised by taking of aerial photographs which could readily be duplicated by anyone with an airplane and aerial camera; surveillance by use of highly sophisticated equipment not generally available to public raises different question].) Moreover, since

71

the cap code converts the message signal received from the pager company, someone seeking to leave a message on Radovcich's pager does not use the cap code. He or she simply dials the pager's designated telephone number, thereby sending a message to the pager company, which then converts the signal to the cap code. In other words, while Radovcich obviously gave out the telephone number assigned to his pager, neither he nor those who used the pager to communicate with him had any cause to use—or even know—the cap code, which is an internal device of the pager company.

Given this state of technology, the authorities relied upon by the concurring and dissenting opinion are simply inapplicable. For instance, in *United States* v. *Hall* (9th Cir. 1973) 488 F.2d 193, no right of privacy was found where Hall

> "had radio-telephones installed in two automobiles. In early April, 1971, a Tucson housewife, who listens to her radio while doing housework, intercepted the appellants' conversations on her eight-band, 150-170 megacycle radio. The radio is not unique. The public may purchase similar sets on the open market and can listen to police and fire broadcasts, calls placed over the telephone companies' mobile telephone network, etc." (*Id.* at pp. 194-195.)

Under those circumstances, the Court of Appeal concluded:

> "Broadcasting communications into the air by radio waves is more analogous to carrying on an oral communication in a loud voice or with a megaphone than it is to the privacy afforded by a wire. As with any broadcast into the air, the invitation to listen is afforded to all those who can hear. *In the instant case, the eavesdroppers merely tuned their radio receivers to the proper station.*" (*Id.* at p. 196, italics added.)

In *United States* v. *Rose* (1st Cir. 1982) 669 F.2d 23, the challenged interception was of "a point-to-point communication transmitted on the 'ham' radio operator's band[.]" (*Id.* at p. 24.) In finding no reasonable objective expectation of privacy, the appellate court observed:

> "Appellants were broadcasting on the ham radio frequency, commonly known to be a means of communication to which large numbers of people have access as receivers. A reasonable person would not expect that words uttered over the ham radio frequency would be heard only by those few

72

individuals for whom the communication was specifically intended. [Citations.] Although we acknowledge that *circumstances justifying an expectation of perfect privacy are not necessary for protection to attach,* [citation], the objective expectation of privacy *in these circumstances* is too minimal to deserve recognition." (*Id.* at p. 26, italics added.)

In *U. S.* v. *Smith* (5th Cir. 1992) 978 F.2d 171, the defendant's neighbor used a Bearcat scanner to eavesdrop on the defendant's conversations over a cordless telephone. The Court of Appeals described the scanner as "a type of radio receiver which allows the user to monitor a number of radio frequencies. The scanner sequentially monitors all programmed frequencies. When a conversation on one of these frequencies is picked up, the scanner locks in on that frequency to allow the user to listen in. Bearcat scanners, along with similar scanners made by competitors, *are commercially available at most radio and electronics stores.*" (*Id.* at p. 173, fn. 1, italics added.) In holding that the defendant failed to carry his burden of showing that his Fourth Amendment rights were violated, the appellate court noted that a court could not conclude there was no expectation of privacy simply because a cordless telephone was used. (*Id.* at p. 180.) In determining that the particular circumstances of the case—including the particular telephone— must be considered (*ibid.*), the court reasoned:

"The essential holding of [the authorities examined] was that, based upon the particular characteristics of the cordless phone in question, there could have been no reasonable expectation of privacy in the cordless phone transmissions *due to the ease with which they could be monitored.* In other words, although the individual communication at issue would normally be subject to Fourth Amendment protection, the defendants had 'knowingly exposed' the communication to the public by using a technology that could be so easily intercepted. Nonetheless, these cases should not be read to stand for the proposition that a communication loses Fourth Amendment protection simply because it is not transmitted by wire. There is nothing magical about a telephone line. The significant difference between land line telephone conversations and conversations carried out over early versions of the cordless phone was *the ease with which the cordless phone conversations could be intercepted. It was so easy to overhear early cordless phone conversations that a user could never have a reasonable expectation of privacy.*

73

"While we completely agree with these earlier decisions, it is important to note that since those cases were decided cordless technology has continued to evolve. Today's cordless phone are very different .... *Surely the reasonableness of an expectation of privacy becomes greater when the conversation can only be intercepted using specialized equipment not possessed by the average citizen.* ... [C]ordless phones now appearing on the market actually scramble the radio signal so that even radio scanners cannot intercept the communication.

"Courts should bear in mind that the issue is not whether it is conceivable that someone could eavesdrop on a conversation but whether it is reasonable to expect privacy. [Citation.] No matter how technologically advanced cordless communication becomes, some people will always find a way to eavesdrop on their neighbors.... [I]t should be obvious that as technological advances make cordless communications more private at some point such communication will be entitled to Fourth Amendment protection.... Application of the Fourth Amendment in a given case will depend largely upon the specific technology used ...." (*United States* v. *Smith, supra,* 978 F.2d at pp. 179-180, italics added, original italics & fn. omitted.)

In *In re Askin, supra,* 47 F.3d 100, one party to the conversation used a cordless telephone. The Court of Appeals described the technology thus: "Cordless telephone communications are transmitted between the cordless phone handset and its base unit by AM/FM radio signals. *These signals can be intercepted with relative ease by standard AM radios.* Government agents ... used a radio scanner to intercept and record the radio waves emitted from [the] cordless phone." (*Id.* at p. 101.)

In *Dorsey* v. *State* (Fla. 1981) 402 So.2d 1178, the interception was of "'beeper communications.'" (*Id.* at p. 1182.) As described by the state court,

"These 'beepers' were a type of pocket pager that one carries on his person and through which he may receive messages. This is accomplished when another person dials the telephone number of the company that distributes the beepers. The calling party hears a tone and thereafter has ten seconds in which to announce his message. This message is then converted into radio waves and transmitted to the party with the beeper *and to any member of the public who has a radio tuned to this frequency.* The receiving party can only listen to the message, since the beeper is a receiver and not a transmitter.

74

> "A 'bearcat scanner,' *capable of receiving any programmed*
> *frequency*, was used by police to intercept these beeper messages." (*Id.* at
> pp. 1182-1183, italics added.)

While finding no expectation of privacy because "one who sends beeper messages should

know ... that such communications are open to any members of the public who wish to

take the simple step of listening to them" (*id.* at pp. 1183-1184), the court did "not reach

any hypothetical questions involving more sophisticated methods of intercepting

communications which in fact engender a reasonable expectation of privacy, such as

land-line telephone messages transmitted in part by wireless signals." (*Id.* at p. 1184, fn.

4.)

In *People* v. *Chavez* (1996) 44 Cal.App.4th 1144, the informant "explained he had

a multichannel scanner which allowed him to monitor the radio portion of cordless

telephone conversations." (*Id.* at p. 1147.) At the time of the interceptions (1991), the

Fourth Amendment did not protect the radio portion of a cordless telephone conversation,

as that portion was not deemed to encompass a reasonable expectation of privacy. (*Id.* at

p. 1153.)

The focus of all of the foregoing authorities is not the fact that the communication

was transmitted by radio waves over the airways per se, *but the ease of interception of the*

*communication.* The concurring and dissenting opinion asserts that no unique or highly

sophisticated equipment was necessary to intercept Radovcich's pager messages, and that

there is no reason to conclude equipment not reasonably available to the general public

was needed or that anyone with a radio receiver operating on the same frequency as the

pager could not have intercepted the communications. The record belies these assertions.

*Insofar as the record shows*,[42] but for the pager company's having provided authorities

---

[42]     Assuming some source of information exists which addresses cap codes and the
technology of the type of pager used in this case, or which theoretically would permit
someone to break or bypass a cap code, and further assuming this information existed and
was available in 1993 when the duplicate pagers were issued in this case, it is unclear
how this information — not being contained in the record — could properly be brought

with the sophisticated technology needed to allow interception of the communications to Radovcich's pager — in essence, to "seize" Radovcich's pager by duplicating it — any interception of the communications (assuming interception was possible) would have been meaningless. A series of numbers that might be picked up during transmission have no value if one cannot identify to whom they are sent or from whom they are sent.[43] As for the opinion's observations about the purported ease with which officers obtained a clone pager from the paging company, it is sufficient to note that the officers possessed a search warrant which *ordered* the company to provide them with the technology, and that nothing in the record suggests the cap code was readily available to them otherwise.

It bears reemphasizing that the fact interception is possible from a technological standpoint does not mean there is no legitimate expectation of privacy for purposes of the Fourth Amendment. As stated in *United States* v. *Rose, supra,* 669 F.2d at page 26. "circumstances justifying an expectation of *perfect* privacy are not necessary ...." (Italics added.) Instead, "[c]ourts should bear in mind that the issue is not whether it is

---

before this court. It cannot be said such information constitutes "[f]acts and propositions of generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute," so as to require judicial notice under Evidence Code section 451. subdivision (f). Nor is it clear that such information constitutes "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy" so as to permit judicial notice to be taken pursuant to Evidence Code section 452, subdivision (h). The fact information exists does not automatically mean a court can judicially notice the *truth* of such information. (See *Sosinsky* v. *Grant* (1992) 6 Cal.App.4th 1548, 1564-1569 [judicial notice of judge's factual finding].) Moreover, assuming such information could be the subject of judicial notice pursuant to Evidence Code section 452, subdivision (h). we would have to afford the parties a reasonable opportunity to meet it before we properly could take judicial notice of it. (Evid. Code, §§ 455, subd. (a); 459, subds. (c), (d).) As in the case of Government Code section 68081. the parties have not been afforded such an opportunity here.

[43]    This assumes that the signal was discrete, as opposed to being simply one of hundreds — even thousands — of similar signals being sent.

*conceivable* that someone could eavesdrop on a conversation but whether it is *reasonable* to expect privacy.... [S]ome people will always find a way to eavesdrop ...." (*U.S.* v. *Smith, supra,* 978 F.2d at p. 179, original italics.) Thus, the issue does not turn on whether it is *possible* to break the code, but on whether the expectation of privacy in information protected by the code is *reasonable*.

Moreover, the concurring and dissenting opinion's authorities rest on the absence of some statutory provision encompassing the particular type of radio transmission involved. They are inapplicable in this case because there is no similar absence of statutory provision regarding digital display pagers. In section 2510(12), Congress defined "electronic communication" as including radio transmissions, subject to certain exceptions. The only exception for pagers is for "a tone-only paging device," which Radovcich's pager was not. In section 2511, Congress declared it unlawful to intercept electronic communications. The only exceptions are set forth in subsection (g); radio communications from the paging company to Radovcich's pager do not fall within any of these exceptions. Thus, Congress has made it a crime to intercept the communications and has provided an elaborate procedure for law enforcement agencies to obtain warrants authorizing such interceptions. This extension of privacy protection to digital pager communications constitutes a policy determination by our nation's elected officials that society is prepared to recognize the pager owner's expectation of privacy in his or her digital pager communications as reasonable.

If the concurring and dissenting opinion's conclusion is correct, then Radovcich had no Fourth Amendment protection, regardless of how the police intercepted the messages. If they had somehow been able to obtain a clone pager from the paging company without even obtaining a warrant, Radovcich would still be without remedy. In effect, the concurring and dissenting opinion holds that *all* radio transmissions are outside the Fourth Amendment, apparently based on the supposition that interception is always a technological possibility. We cannot agree.

77

The concurring and dissenting opinion criticizes us for "eschew[ing]" the "succinct analysis" (conc. & dis. opn., *post*, at p. 16) of this court's decision in *People* v. *Medina*, *supra*, 189 Cal.App.3d 39. In that case, the surveilling detectives

> "monitored radio transmissions on the pager frequency. The paging system *uses a single radio frequency and all of the transmissions can be heard by anyone listening to this radio frequency.* To monitor the transmissions, [the detective] used a radio scanner and pagers provided by [the pager company]. These pagers were duplicates of the ones rented by [the defendant's wife].

> "[The detective] explained the use of the pagers as follows: Each individual pager is given a designated phone number. When that number is dialed from a telephone, the caller hears a tone and then has 10 seconds to record a message. When the caller hangs up the phone, the message is then relayed to a switching unit. The message is broadcast over the communication airways in the order received preceded by a signal for the particular pager. With the signal, the pager is activated and the speaker automatically opens up so the message can be heard by the individual in possession of the pager. *If the red button on the pager is not depressed immediately following receipt of the message, that individual receives pages meant for other pagers. In other words, anyone who has this type of pager can receive the pages belonging to anyone else who has a similar pager.*

> "The duplicate pagers provided [the detective] the advantage of isolating the individual messages being broadcast on that common frequency that were intended for the particular pagers rented to [the defendant's wife]. *There was a possibility of 3,000 pagers on that frequency at a time.*" (*Id.* at pp. 43-44, italics added.)

The pagers in *Medina* were like Radovcich's pager only insofar as they each had a designated telephone number. In *Medina*, however, "the evidence establishe[d] that any of the persons with similar pagers could listen in to communications by simply failing to press the button which would cease the onflow of messages being transmitted over the speaker of the individual pager." (*People* v. *Medina, supra*, 189 Cal.App.3d at p. 45.) Such is most assuredly not the situation here. Moreover, at the time of the investigation in *Medina*, Title III did not yet cover electronic communications. Thus, the only statutory provisions for the *Medina* court to deal with in determining standing were those relating

to wire or oral communications. In addition, the court expressly noted the lack of evidence of the appellants' subjective intent as to an expectation of privacy (*Medina, supra*, at p. 45), so the first *Katz* prong was not satisfied and there was no need to consider the second. Thus, *Medina* is not on point.

The technology is much more similar in *People* v. *Bullock* (1990) 226 Cal.App.3d 380. There,

> "[a]n employee of the paging company testified that each of its subscribers is assigned a dedicated telephone number which he or she provides to persons wishing to contact the subscriber. To leave a message, a person calls that number, waits for a recorded message directing him or her to enter a numerical message, and then enters an identifying code number or telephone number where the caller can be reached. When the pager receives a message, it will beep or vibrate. At the push of a button, the caller's code number of telephone number will appear on its display screen. *Messages intended for a particular pager cannot be received by other units unless they are specially programmed to do so.* Persons listening to a radio tuned to the frequency used by the pagers would not hear spoken messages but might hear the tone produced by the caller's touch-tone telephone." (*Id.* at p. 385.)

Although at issue in *Bullock* was the officer's physical seizure of the defendant's pager and activation of its display mechanism rather than interception of messages in transit, the court's rationale regarding the defendant's expectation of privacy applies equally to interception. The court concluded:

> "This search constituted an invasion of defendant's Fourth Amendment interests because ... defendant established a reasonable expectation of privacy in the information housed in his pager. The pager was unlike those which receive verbal messages that can be heard and understood by someone possessing a duplicate pager or anyone listening to a radio scanner tuned to the broadcast frequency. (Cf. *People* v. *Medina* (1987) 189 Cal.App.3d 39, 45-49 [ ] — the possessor of a pager which receives verbal messages broadcast by radio frequency has no reasonable expectation of privacy in the messages transmitted to the pager.) Granted, one listening to a radio scanner on the frequency of defendant's pager might hear tones produced by the caller's use of a touch-tone telephone to leave a coded message. However, because such tones are not commonly

79

> understood by persons untrained or unequipped to decode them, defendant
> had a reasonable expectation that the messages were not exposed to the
> public. (Cf. *Katz* v. *United States* (1967) 389 U.S. 347, 351 [ ].)" (*People*
> v. *Bullock, supra,* 226 Cal.App.3d at p. 386-387.)

If this is dicta, as the concurring and dissenting opinion claims, it is persuasive dicta. In

the present case, Radovcich had a reasonable expectation of privacy in the information

being sent to his pager.

### 7.  *Leon*

In *United States* v. *Leon, supra,* 468 U.S. 897, the United States Supreme Court

described the exclusionary rule as a judicially created remedy designed to safeguard

Fourth Amendment rights through its deterrent effect. (*Id.* at p. 906.) Thus, "suppression

of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis

and only in those unusual cases in which exclusion will further the purposes of the

exclusionary rule." (*Id.* at p. 918, fn. omitted.) It should not be applied to deter

objectively reasonable law enforcement activity, since where the officer's conduct is

objectively reasonable, excluding evidence will not further the ends of the exclusionary

rule. (*Id.* at pp. 919-920.) The court stated:

> "This is particularly true, we believe, when an officer acting with
> objective good faith has obtained a search warrant from a judge or
> magistrate and acted within its scope. In most such cases, there is no police
> illegality and thus nothing to deter. It is the magistrate's responsibility to
> determine whether the officer's allegations establish probable cause and, if
> so, to issue a warrant comporting in form with the requirements of the
> Fourth Amendment. In the ordinary case, an officer cannot be expected to
> question the magistrate's probable-cause determination or his judgment that
> the form of the warrant is technically sufficient. '[O]nce the warrant issues,
> there is literally nothing more the policeman can do in seeking to comply
> with the law.' [Citation.] Penalizing the officer for the magistrate's error,
> rather than his own, cannot logically contribute to the deterrence of Fourth
> Amendment violations." (*Id.* at pp. 920-921, fns. omitted.)

Of course, this presupposes that the officer's reliance on the magistrate's probable

cause determination and decision as to the technical sufficiency of the warrant is

objectively reasonable. (*United States* v. *Leon, supra,* 468 U.S. at p. 922.) In some

circumstances, an officer will have no reasonable grounds for believing the warrant was properly issued, even though a warrant issued by a magistrate normally is sufficient to establish that the officer acted in good faith in conducting the search. (*Id.* at pp. 922-923.) As the Supreme Court explained,

> "Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. The exception ... will also not apply in cases where the issuing magistrate wholly abandoned his judicial role ... ; in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient — i.e., in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid." (*Id.* at p. 923, citations omitted.)

Thus, "[i]n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." (*Id.* at p. 926.)

Here, there is no suggestion the magistrate who issued the warrants abandoned his detached and neutral role. Nor is there any issue before us concerning false affidavits. Accordingly, we are concerned only with the third and fourth situations in which *Leon* holds that suppression is appropriate: lack of probable cause and facial deficiency. We will address the last exception first.

### a.    The particularity requirement

There can be no question that the warrants at issue here failed to comply with the provisions of Title III. However, we must separate Fourth Amendment from statutory requirements. The question is whether these warrants were so facially deficient *under the Fourth Amendment* that executing officers could not reasonably presume them to be

81

valid. *Leon* is a Fourth Amendment case; its good faith exception is an exception to the Fourth Amendment's exclusionary rule.

The primary authority with regard to the requirement of particularity is *Berger* v. *New York, supra*, 388 U.S. 41. In that case, the United States Supreme Court invalidated New York's permissive eavesdrop statute, which permitted issuance of an eavesdrop warrant upon oath or affirmation of a specified person that there was reasonable ground to believe evidence of crime could be thus obtained, and particularly describing the person or persons whose communications were to be overheard and identifying the particular telephone number involved. (*Id.* at p. 54.) Certainly one of the defects the Supreme Court found in the statute was that it authorized continuous searches for up to two months pursuant to a single showing of probable cause, permitted extensions on a mere showing they were in the public interest, and did not place a termination date on the eavesdrop once the conversation sought was seized. (*Id.* at p. 59.) However, although the court concluded those defects violated the Fourth Amendment, it is not clear to us in exactly which part of the Fourth Amendment the court found this new requirement.

In *Berger*, the Supreme Court had already concluded that the statute was unconstitutional because it did not require the Fourth Amendment's particularity as to the things to be seized and the place to be searched. (*Berger* v. *New York, supra*, 388 U.S. at p. 57.) The court then discussed the historical reasons for the Fourth Amendment's particularity requirement, which was a response to "general warrants" giving customs officials blanket authority to conduct general searches for goods imported in violation of Britain's tax laws. In this discussion we find nothing regarding the time factor with which we are concerned here. The court then concluded that the New York statute was "equally offensive," and again referred to the failure to particularize the conversations sought, stating that "as with general warrants this leaves too much to the discretion of the officer executing the order." (*Id.* at p. 59.) Only at this point did the court begin to discuss the time factor, but it did so without expressly stating that the failure to state

82

reasonable time limits offends the Fourth Amendment's probable cause requirement, the particularity requirement, or both. (*Ibid.*) *United States* v. *Cady* (5th Cir. 1981) 651 F.2d 290, 291 does not answer the question; there the court, in dictum and without citing any authority, simply suggests that a warrant unrestrained as to time is a general warrant.

Assuming that the time factor was adopted by the Supreme Court as part of the particularity requirement, we then have to see how *Leon*, which was decided nearly 20 years after *Berger*, deals with that requirement. The *Leon* court said that "a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." (*United States* v. *Leon, supra,* 468 U.S. at p. 923.) Because this is stated as an exception to the newly-restated exclusionary rule, we believe it should be narrowly construed, consonant with the Supreme Court's command that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis *and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule.*" (*Id.* at p. 918, italics added.)

In this exception, the Supreme Court described only two facial defects which would require evidence exclusion—failure to particularize the place to be searched, and failure to particularize the things to be seized. Significantly, the court did not mention failure to specify a time limitation as a facial defect sufficient to preclude reliance on the *Leon* modification. If *Berger* incorporated the time factor into the Fourth Amendment's particularity requirement, we would expect the court, in articulating the fourth exception in *Leon*, to have mentioned it. It did not.

It appears the Supreme Court was purposely careful in choosing its words. It specified what it meant by "facially deficient" through specific reference to words appearing in the Fourth Amendment itself, not to some principle encrusted onto the Fourth Amendment by judicial action. Moreover, it did so with the restrictive Latin phrase *id est* (that is), rather than the more inclusive *exempli gratia* (for example). In

83

other words, absent some other compelling authority, we are inclined to be strict constructionists of the Supreme Court's articulation of the last exception in *Leon*.

We acknowledge that in *Leon*, the Supreme Court cited *Berger* in its footnote 8. But in doing so, it described *Berger* as a case dealing with statutes "purporting to authorize searches and seizures without probable cause or search warrants." (*United States* v. *Leon, supra,* 468 U.S. at p. 912, fn. 8.) We do not see that reference as shedding any light on whether the *Berger* time limitation requirement was included in the last *Leon* exception. If anything, the express reference to probable cause without a similar reference to particularity could indicate that the Court did not consider *Berger* as an engraftment on the particularity clause.

Post-*Leon* cases do not help answer the question. For example, *U.S.* v. *Kow* (9th Cir. 1995) 58 F.3d 423 and *Center Art Galleries-Hawaii, Inc.* v. *U.S.* (9th Cir. 1989) 875 F.2d 747 involved warrants which were facially overly broad in failing to describe with particularity the things to be seized. Those warrants fell within the literal language of the fourth *Leon* exception, but neither case involved a warrant without time limitation.

In sum, we conclude the fourth *Leon* exception does not apply either because the *Berger* holding was not derived from the Fourth Amendment's particularity clause, or, if it was, the *Leon* court excepted it when formulating the fourth situation in which exclusion of evidence obtained pursuant to a warrant is required.

### b.    The probable cause requirement

In its third exception, the *Leon* court said: "Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' [Citations.]" (*United States* v. *Leon, supra,* 468 U.S. at p. 923.)[44] The court's earlier

---

[44]    "[T]he term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation.... It imports a seizure made under circumstances which warrant suspicion.... While an effort to fix some general,

84

discussion indicates that this exception applies to warrants supported by only a "bare bones" affidavit. (*Id.* at p. 914.) The cases cited at that point in the opinion involved warrant affidavits containing no facts, just conclusions. In any event, the focus of inquiry as to this exception is on the contents of the affidavit dealing with probable cause, rather than on some facial defect of the warrant. Not every affidavit failing to state probable cause falls within the exception. The court's language suggests that only extreme cases are outside the *Leon* umbrella.

The California Supreme Court considered this exception in *People* v. *Camarella* (1991) 54 Cal.3d 592. The court there stated its understanding of the principle:

> "If a well-trained officer should reasonably have *known* that the affidavit failed to establish probable cause (and hence that the officer should not have sought a warrant), exclusion is required under the third situation described in *Leon*, and a court may not rely on the fact that a warrant was issued in assessing objective reasonableness of the officer's conduct in seeking the warrant. But in all other cases, unless one of the other limited *Leon* situations is triggered, *Leon*'s 'general' rule of nonexclusion will apply." (*Camarella, supra*, at p. 596, original italics.)

Whatever else might be said of the affidavits in this case, they are not "bare bones." They contain much factual information justifying issuance of a warrant for a clone pager. They outline the investigation which had been ongoing for over a year and provide much information concerning the activities of both Ewell and Radovcich, particularly including the latter's apparently secretive use of pay telephones and a pager. In our opinion, they provide probable cause for the magistrate to issue a warrant authorizing use of the clone pager for some reasonable period of time. (See *U.S.* v. *Carrazana, supra*, 921 F.2d at p. 1566 [probable cause to believe more than "limited and discrete series of relevant conversations" would take place].)

---

numerically precise degree of certainty corresponding to 'probable cause' may be helpful, it is clear that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." (*Illinois* v. *Gates* (1983) 462 U.S. 213, 235, internal quotation marks omitted.)

Does the failure of the officers to specify that time limitation in the affidavit make the affidavit "'so lacking in indicia of probable cause'" that the officers could not then rely on the warrant at all? Would this case really be any different if the affidavits, in addition to giving all the factual information they contained, said, "We want a warrant for a clone pager for X number of days," but the magistrate signed a warrant which contained no time limitation? We do not think so. We have found no constitutionally-based authority that an officer, in order to show probable cause, has to decide how long the warrant should last, as long as he or she provides facts from which the magistrate can so decide. *Berger* does not support such a proposition because there the court struck down an entire statute and did not concern itself with the probable cause contents of any particular affidavit.

We suggest that when the officer has provided the magistrate with sufficient factual information from which the magistrate can determine what constitutes a reasonable duration, the latter's failure to make that determination is judicial error. "Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." (*United States* v. *Leon, supra,* 468 U.S. at p. 921, fn. omitted; .) "Where 'the exclusionary rule does not result in appreciable deterrence, then, clearly, its use ... is unwarranted.'" (*Arizona* v. *Evans* (1995) 514 U.S. 1, ___ [115 S.Ct. 1185, 1191].) Application of the exclusionary rule here, with regard to probable cause, would not result in appreciable deterrence.[45]

Our view of the case is not affected by the fact the police obtained pen register warrants, with proper time limitations, during the same time period in which they obtained the clone pager warrants. While this fact tends to debunk the People's argument that the police reasonably believed clone pagers were akin to pen registers, it is irrelevant

---

[45]   The same reasoning and result would apply to any problems related to minimization or necessity.

86

to the *Leon* issue, which utilizes an objective, not a subjective, standard. (See *United States* v. *Leon, supra,* 468 U.S. at pp. 919-920, 922; *People* v. *Camarella, supra,* 54 Cal.3d at p. 596.) To us, the pen register warrants and supporting affidavits illustrate that the detectives were simply unaware that Title III applied to pagers. We assume applications for pen registers are much more common, to the extent the officers had a familiar, systemized procedure, including preprinted forms for those warrants, but they did not realize similar procedures were required for a clone pager warrant. In any event, this only reflects on the officers' actual, subjective state of mind.

The trial court and the parties all seem to have concentrated on the question of whether an officer's failure to realize that Title III applied could be objectively reasonable under *Leon.* The confusion is understandable, as is the tendency to wonder how a total failure to follow applicable statutory requirements could be excused. The question is irrelevant, however, because it erroneously merges what are, in reality, separate issues. Since any Fourth Amendment violations which exist as to Radovcich do not warrant suppression under *Leon,* exclusion of evidence is not an available remedy for those violations. It is also not an available remedy under Title III since, as we have explained, suppression for violation of Title III "does not turn on the judicially fashioned exclusionary rule aimed at deterring violations of the Fourth Amendment rights, but upon the provisions of Title III ...." (*United States* v. *Giordano, supra,* 416 U.S. at p. 524.) Accordingly, and leaving aside for the moment California law, Radovcich was not entitled to suppression of the clone pager evidence or evidence derived therefrom.[46]

The question then becomes whether, as a policy matter, the exclusionary remedy should be extended to cover a situation where, as here, there has been an unintentional failure to comply with applicable statutory requirements. By not amending section 2515

---

[46]    The same reasoning and result would apply if we were to determine that Ewell's Fourth Amendment rights were violated.

and section 2518(10)(a) to cover electronic communications, Congress has determined the exclusionary remedy should not be so extended in the absence of Fourth Amendment violations. We have determined that any possible Fourth Amendment violations here do not require suppression under *Leon*'s good faith exception. Accordingly, we see no reason to extend the exclusionary remedy to the circumstances before us.

By so holding, do we encourage ignorance of the law on the part of our law enforcement officers? We think not. The objective standard announced in *Leon* requires officers to have a reasonable knowledge of what the law prohibits. (*United States* v. *Leon, supra,* 468 U.S. at p. 919, fn. 20; *People* v. *Maestas* (1988) 204 Cal.App.3d 1208, 1221.) The flip side, of course, is that officers are required to have a reasonable knowledge of what the law requires. The officers' unintentional failure to recognize Title III's applicability here does not result in suppression because of the interplay and distinctions between the Fourth Amendment and the Act. The dearth of authority involving similar circumstances strongly suggests such cases will be rare.

"The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures by police officers and other government officials. (*New Jersey* v. *T.L.O.* (1985) 469 U.S. 325, 335 [ ].)" (*In re Tyrell J.* (1994) 8 Cal.4th 68, 75.) The searches and seizures here were not unreasonable under the Fourth Amendment: they were conducted pursuant to warrants issued by a detached and neutral magistrate upon a showing of probable cause. (See *Mincey* v. *Arizona* (1978) 437 U.S. 385, 390.) A statutory violation does not necessarily require suppression of evidence. (*People* v. *Tillery* (1989) 211 Cal.App.3d 1569, 1580.) "Where, despite statutory violations, the search is 'reasonable' in the constitutional sense, exclusion of the evidence is not warranted." (*Ibid.*) Such is the situation here. To the extent that Title III's provisions may be seen as "part of Fourth Amendment reasonableness" (see *People* v. *Gonzalez* (1989) 211 Cal.App.3d 1043, 1048), any violations do not warrant exclusion of evidence under *Leon*.

88

The concurring and dissenting opinion's analysis of the *Leon* issue would result in a holding that a warrant which failed to specify duration could *never* be saved by *Leon's* good faith exception. We decline to endorse such a sweeping proposition, preferring instead to judge each case on the particular circumstances presented therein. According to the concurring and dissenting opinion's argument, the officers could not have relied on the warrant for even one hour, even though their affidavits supported probable cause for as much as 60 days. In our view, this subverts the whole purpose of the *Leon* modification, which was to avoid penalizing the police for judicial errors. Moreover, it stretches the language of the third *Leon* exception, as interpreted in *Camarella*. Under the concurring and dissenting opinion's approach, the officer not only has to make sure his or her affidavit supports probable cause before he or she presents it to the magistrate, he or she then has to make sure that the warrant which the magistrate has decided to issue is precisely tailored to the probable cause shown in the affidavit. *Leon* does not require that such a burden be placed on the officer: "It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, *to issue a warrant comporting in form with the requirements of the Fourth Amendment*." (*United States* v. *Leon, supra,* 468 U.S. at p. 921, italics added.)

We are not called upon here to resolve the factual situations to which *Leon* may not apply. Thus, we need not decide whether a reasonably well-trained peace officer would have realized the warrants were not valid beyond some point in time in the future and, if so, what would constitute a reasonable length of time beyond which officers could no longer objectively rely on the warrants so that interceptions beyond that point would be suppressed. Similarly, we need not decide what would constitute a principled standard by which that would be determined. But simply saying that at some point probable cause ceases to exist does not support the concurring and dissenting opinion's claim that the affidavits were unreliable *ab initio*.

89

Moreover, the concurring and dissenting opinion places much reliance on law enforcement officers' awareness of requirements with regard to the obtaining of pen registers. In so doing, however, the opinion allows a subjective element to intrude upon what is an objective test. (See *United States* v. *Leon, supra*, 468 U.S. at pp. 919-920, 922; *People* v. *Camarella, supra*, 54 Cal.3d at p. 596.)

### 8.   California law

Defendants contend that notwithstanding any of the above, the municipal court "lacked jurisdiction, power, and authority to issue a search warrant. The court's acts were null and void and the searches should be treated as either searches without a warrant or searches that would have to meet California's then existing statute regulating similar communications i.e. Penal Code section 629 (1993), state 'wire tap' laws." Defendants argue that this is so because pursuant to Title III, state judges had no power to issue interception orders unless the state had enacted an enabling statute. Defendants say California did not do so until 1995.

Section 2510(9) defines "[j]udge of competent jurisdiction" in part as a state court judge "who is authorized by a statute of that State to enter orders authorizing interceptions of wire, oral, or electronic communications[.]" Under specified circumstances, section 2516(2) permits a state court judge to issue an order, under Title III, authorizing interception.

> "The ECPA gave the states a grace period of two years within which they might make conforming amendments to their laws governing interceptions of electronic communications by state officials. During that period or until conforming amendments were earlier made, extant state law was allowed to remain in effect. At the end of two years, if no such amendments had been made, the federal law took effect and prohibited interceptions of electronic communications except by federal authorization." (*Brown* v. *Waddell, supra,* 50 F.3d at pp. 289-290, fn. 3; see *U. S.* v. *Suarez, supra,* 906 F.2d at pp. 980-981.)

"Since Title III requires a state enabling statute and California did not immediately enact such a statute following Title III's adoption in 1968, court-ordered nonconsensual

90

electronic surveillance was initially barred in California *under Title III.*" (*People* v. *Chavez*, *supra*, 44 Cal.App.4th at p. 1158, fn. 7, italics added; see *People* v. *Conklin* (1974) 12 Cal.3d 259, 270, fn. 10; *People* v. *Larkin*, *supra*, 194 Cal.App.3d at p. 655.) In 1988, California enacted enabling statutes with regard to wire communications. (Stats. 1988, ch. 111, § 2; Pen. Code, §§ 629-629.48.) (*People* v. *Chavez, supra,* 44 Cal.App.4th at p. 1158, fn. 7.)

Sections 629 through 629.48 of the Penal Code expressly apply only to interception of wire communications. It was not until 1995 that California enacted legislation expressly covering electronic digital pager communications. (See Pen. Code, §§ 629-50-629.98.) This latter legislation was enacted to provide the state enabling statute required under Title III. (*People* v. *Chavez, supra,* 44 Cal.App.4th at p. 1158; see Assem. Com. on Pub. Safety, Analysis of Sen. Bill No. 1016 (1995-1996 Reg. Sess.) as amended June 27, 1995.)

Since California lacked enabling legislation with regard to electronic digital pager communications at the time the challenged warrants were issued, those warrants were unauthorized and unlawful. However, they were unauthorized and unlawful *due to Title III, not due to the Fourth Amendment.* Accordingly, for reasons previously explained with regard to other statutory violations of Title III, suppression is not an available remedy under Title III. Since the Fourth Amendment was not violated, exclusion of evidence is likewise not warranted under that provision.[47]

Defendants say the interceptions had to meet the requirements of applicable California statutes. This is true. (*U. S.* v. *Moore, supra,* 41 F.3d at p. 373, fn. 1; § 2516(2).) However, we are unable to find any state statute which was violated. As

---

[47]   It is important to note that *Brown* v. *Waddell, supra,* 50 F.3d 285 dealt solely with "the suspect's statutory action seeking monetary and injunctive relief for allegedly unauthorized use of" a clone pager. (*Id.* at p. 286.) It thus dealt with a civil action brought pursuant to section 2520, and not with whether suppression of evidence was warranted under section 2518(10)(c).

noted, Penal Code sections 629 through 629.48 expressly apply only to the interception of wire communications. Interceptions involving electronic digital display pagers do not fall within that category.[48]

---

[48]    Defendants do not expressly cite California's Invasion of Privacy Act (Pen. Code. §§ 630-637.6). At most, Radovcich makes a passing reference to Penal Code section 629 et seq. without delineating the statutes cited. Penal Code section 631 prohibits more than the wiretapping referenced in its title (*Ribas* v. *Clark* (1985) 38 Cal.3d 355, 360), but "was aimed at one aspect of the privacy problem—eavesdropping. or the secret monitoring of *conversations* by third parties. [Citation.]" (*Id.* at p. 359, italics added.) Conversations are not monitored or intercepted by digital display pagers. nor were conversations monitored or intercepted under the warrants with which we are concerned. Manifestly, there was no wiretapping.

Penal Code section 632 prohibits eavesdropping on or recording confidential communications. It does not apply because a digital display pager is not an "electronic amplifying or recording device" as that phrase is used in subdivision (a) of the statute. (See, e.g., *U. S.* v. *Meriwether, supra,* 917 F.2d at p. 958 ["The digital display pager, by its very nature, is nothing more than a contemporary receptacle for telephone numbers."]; *Bohach* v. *City of Reno* (D.Nev. 1996) 932 F.Supp. 1232, 1234, fn. 1 [digital display pagers are equipped with screens that display visual messages; actual message is stored by paging company's computer until read directly by user].)

Moreover, under Penal Code section 633, nothing in Penal Code section 632 prohibits law enforcement officers "from overhearing or recording any communication that they could lawfully overhear or record prior to the effective date of this chapter." Prior to the effective date of Penal Code section 632, electronic eavesdropping was covered by Penal Code section 653j. Subdivision (a) of that statute prohibited eavesdropping on or recording confidential communications carried on essentially by any device *except a radio*. Pagers are radio devices. (See Oxford English Dictionary (2d ed.) on Compact Disc, pager, n.3.) Subdivision (h) of Penal Code section 653j stated that nothing in the section was to be construed as prohibiting law enforcement officers from doing that which they were otherwise authorized by law to do. Aside from those practices outlawed by the enactment of Penal Code section 653j, evidence obtained by electronic eavesdropping was admissible. (See 4 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Exclusion of Illegally Obtained Evidence, § 2466, p. 2936.) Thus, assuming that a digital display pager would somehow fall within the ambit of Penal Code section 632, interception would not be prohibited under the exception contained in Penal Code section 633.

## III.

### Denial of Continuance

Any issues concerning the trial court's denial of defense and/or prosecution requests for continuance of trial have become moot based on our order staying trial in this matter.

### DISPOSITION

As to the issues of severance and continuance, the writ petitions are denied and the order to show cause discharged. As to the partial suppression grant, let a writ issue directing the superior court to vacate its order granting suppression of the clone pager evidence and evidence derived therefrom, and to enter an order denying suppression. Stay of trial previously ordered is vacated upon finality of this court's decision herein.

Ardaiz, P. J.

I CONCUR:

Thaxter, J.

93