2982

THE PEOPLE v. SUPERIOR COURT, COUNTY OF FRESNO;
Dana James Ewell et al.   Case No. F027396

JOEL PATRICK RADOVCICH v. SUPERIOR COURT, COUNTY OF FRESNO;
The People.   Case No. 27534

DANA JAMES EWELL v. SUPERIOR COURT, COUNTY OF FRESNO;
The People.   Case No. 27543

## CONCURRING AND DISSENTING OPINION

### BY WISEMAN, J.

I concur in the majority's opinion in Part I that the trial court did not err in denying

defendants' motion for separate trials.  Additionally, I concur that the order of the trial

court suppressing the evidence obtained by the use of the "clone pagers" be vacated.  I

base my opinion on the fact the use of clone pagers by law enforcement officers violated

neither Ewell's nor Radovcich's constitutional expectation of privacy under the Fourth

Amendment.  However, I respectfully dissent from the majority's conclusion that the

"good-faith" exception of *United States* v. *Leon* can be applied to the facts of defendants'

case.

*I. Ewell and Radovcich have no reasonable expectation of privacy to radio
transmissions intercepted by law enforcement agents between Ewell and Radovcich's
pager.*

    *a. Federal statutory law does not mandate suppression.*

As the majority recognize, any consideration of defendants' case begins with a

determination of how Title III of the Omnibus Crime Control and Safe Streets Act of

1968 (Title III) applies to the interception of the communications to Radovcich's pager.

Although the majority engage in an extended discussion of the various provisions of this

act, the analysis can be reduced to the answer to three questions.  First, what is the nature

of the communications as defined by Title III?  Second, does Title III provide a statutory

suppression remedy for interception of the communications? Finally, does interception of the communications violate the Fourth Amendment?

The communications from Ewell to Radovcich's pager were radio transmissions of data. (Sen.Rep. No. 99-541, 99th Cong., 2d Sess., p. 9 (1986), reported in 1986 U.S. Code Cong. Admin. News, at p. 3563 ["Electronic pagers are radio activated devices ...."].) I agree with the majority that under Title III, these radio communications are properly characterized as "electronic communications."

Addressing the second question, I concur with the majority that none of the statutory remedies provided in Title III mandate suppression of the evidence obtained as a result of the interception of the radio transmissions from Ewell to Radovcich. Thus, the critical question is whether the interception by law enforcement officers violated the Fourth Amendment.

> "(c) The remedies and sanctions described in this chapter with respect to the interception of electronic communications are the only judicial remedies and sanctions for nonconstitutional violations of this chapter involving such communications." (18 U.S.C. § 2518, subd. (10)(c).)

### b. Standard of review

Basic to any analysis of whether there has been a violation of the Fourth Amendment is deciding whether an individual has a legitimate expectation of privacy in a communication. Making this decision requires a two-step analysis:

> "This inquiry ... normally embraces two discrete questions. The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,' [citation]--whether, in the words of the *Katz* majority, the individual has shown that 'he seeks to preserve [something] as private.' [Citation.] The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable,"' [citation]--whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is 'justifiable' under the circumstances. [Citations.]" (*Smith* v. *Maryland* (1979) 442 U.S. 735, 740-741.)

2

Thus, even if a person has an actual expectation of privacy in a communication, it is not entitled to the protection of the Fourth Amendment unless it is one that society is prepared to recognize as "reasonable." (*Id.* at p. 743.) "Whether a party has manifested a subjective expectation of privacy is a question of fact, reviewed under the clearly erroneous standard [substantial evidence]. [Citation.] Whether that subjective expectation is objectively reasonable is a matter of law subject to *de novo* review. [Citation.]" (*Tri-State Steel* v. *Occupational Safety & Health* (D.C. Cir. 1994) 26 F.3d 173, 176; accord *U.S.* v. *Smith* (5th Cir. 1992) 978 F.2d 171, cert. den. 507 U.S. 999.)

  *c. Ewell's and Radovcich's expectations of privacy are identical.*

  The majority conclude that Ewell had no reasonable expectation of privacy in the intercepted radio communications. On the other hand, they "assume" Radovcich did have a reasonable expectation of privacy in the same communications. The majority's conclusion is apparently based on the fact Radovcich possessed the pager to which Ewell's radio transmission was sent. In my view, the majority's analysis is flawed since it improperly focuses on a possessory interest in the pager. Instead, the proper focus must be on the interception of the communication--a radio transmission. As will be explained, radio transmissions can be intercepted by all types of receivers readily available to the public. The radio transmission Ewell sent to Radovcich's pager was intercepted by law enforcement while in transit. As a result, in deciding whether Ewell or Radovcich had a reasonable expectation of privacy to the intercepted information, it is irrelevant who actually possessed or owned the pager. Under these facts, Ewell and Radovcich either both have a reasonable expectation of privacy in the intercepted information, or neither do. For the reasons discussed below, I conclude neither of them do.

  I begin with a consideration of how the majority reach their conclusion that Ewell had no reasonable expectation of privacy in the communications. They relied on two cases: *Smith* v. *Maryland* (1979) 442 U.S. 735, and *United States* v. *Meriwether* (6th Cir. 1990) 917 F.2d 955. Neither of them support the majority's position.

3

misguided.[1]

Having concluded the use of a clone pager was analogous to use of a pen register, the majority next consider whether Ewell had an expectation of privacy in the contents of Radovcich's pager. Relying on *Meriwether*, *supra*, they find he did not and conclude suppression of the evidence obtained from the use of the clone pager is not required under the Fourth Amendment. Relying on their belief the People did not make the same argument with respect to Radovcich, the majority "assume" that the interception implicated Radovcich's Fourth Amendment rights. Apparently, the majority's assumption is that Radovcich had a legitimate expectation of privacy in the communications. There are several flaws in this analysis.

First, if a clone pager is equivalent to a pen register or a trap and trace device, there is no need to analyze whether either party had an expectation of privacy in the contents of the pager. If a clone pager does not intercept the *contents* of a communication, then neither the person dialing the number nor the person whose number is dialed has a legitimate expectation of privacy that has been violated by its use. In fact, the majority's analysis is antithetical to the basic assumption underlying the finding that pen registers do not violate the Fourth Amendment. In other words, there is no logical reason why Radovcich would have any expectation of privacy in the contents of his pager and Ewell would not, unless the messages contained in it were communications.

Second, there is no basis for the majority to "assume" that Radovcich had a reasonable expectation of privacy. The People argued that neither of the defendants had an expectation of privacy in the communications. This is apparent based on the People's

---

[1] The majority's claim that the distinction between a clone pager and a pen register is only "crucial to a determination of the applicability of Title III ..." and not for purposes of a Fourth Amendment analysis is incorrect. The fact the contents of a communication are intercepted versus monitoring the location from which or to which a communication is made is a crucial distinction for purposes of a Fourth Amendment analysis.

5

In *Smith*, the United States Supreme Court held there is no expectation of privacy in telephone numbers a person dials. (442 U.S. 735 at p. 742.) Although an individual may have a subjective expectation of privacy in the telephone numbers dialed, it is not one that society is prepared to recognize as reasonable. (*Id.* at pp. 744-745.) The numbers which the petitioner dialed were obtained by use of a pen register, which is a "'mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released.'" (*Id.* at p. 736, fn. 1.) However, a pen register "*does not* overhear oral communications and does not indicate whether calls are actually completed." (*Ibid.*, italics added.) The inability of a pen register to intercept the contents of a communication was the most significant factor in the court's decision that use of such a device did not violate the Fourth Amendment. "[A] pen register differs significantly from the listening device employed in *Katz*, for pen registers do not acquire the *contents* of communications." (*Id.* at p. 741, original italics.)

Unlike a pen register, or a trap and trace device (which records the telephone number from which a call is placed) the clone pager used to intercept the communications to Radovcich's pager did not merely record the telephone number to which Ewell placed his telephone calls. In fact, this information would have been useless since the detectives already knew the telephone number to which the calls were placed--Radovcich's pager number. What the clone pagers did was intercept the *contents* of the communications which were in the form of numerical data. The intercepted data could be a telephone number or any other combination of numbers. In fact, it is obvious from the list of intercepted communications attached to the returns of the warrants that they contained both. However, regardless of whether the numbers transmitted represented a telephone number, or any other form of numerical data, they constituted the *contents* of the communication. Therefore, the majority's reliance on *Smith* to conclude that Ewell had no legitimate expectation of privacy in the telephone calls to Radovcich's pager is

4

People have not argued otherwise at the appellate level. I do not agree with the majority for one basic reason: the *issue* of the expectation of privacy of both Radovcich and Ewell was raised and the parties have been given a chance to present their positions on it. The fact they did not do so does not require us to ignore this threshold issue.

In his reply to petition for writ of mandate, Ewell specifically claimed the Fourth Amendment mandated suppression of the evidence derived from use of the clone pager. Radovcich's reply was limited to an argument that the People failed to raise the issue of the remedial distinctions in Title III for electronic communications in the trial court. Radovcich deferred to Ewell on the arguments on other issues surrounding use of clone pagers.

Additionally, Radovcich declined to respond to our order to show cause, stood on his previous brief, and joined in any return filed by Ewell. Ewell, in turn, filed a return to the order to show cause in which he specifically argued there was an expectation of privacy in electronic communications. Therefore, as the majority also conclude, Radovcich has joined in Ewell's argument on this issue. Although the People's reply only addressed Ewell's expectation of privacy in the communications, this does not change the fact that the issue has been raised on appeal with respect to both defendants. The People's failure to affirmatively assert Radovcich lacked any expectation of privacy is best characterized as a concession. However, "[t]his court, of course, is not bound to accept concessions of parties as establishing the law applicable to a case. [Citations.]" (*Desny* v. *Wilder* (1956) 46 Cal.2d 715, 729.)

Additionally, as the majority recognize, an individual's expectation of privacy is an inextricable part of any Fourth Amendment analysis. Therefore, I am at a loss to understand how we *cannot* consider this issue with respect to both Radovcich and Ewell once we undertake to analyze whether the interception of communications to Radovcich's

7

attempt to analogize a clone pager to a pen register and argue based on this comparison, that law enforcement officers had not intercepted any communications:

> "So if the defendants want to claim that the pager was used in other than its normal and customary manner, in other words, to communicate, which possibly could be done by something like putting numbers after the phone number to constitute a communication, then arguably, in that circumstance only, the pager could be being used to communicate. And for that instance, it may fall within Title III. But if that is the case, and since all the digital pager can do is deal with numbers and not letters, then it would be the *defendants' burden to prove standing*: To be able to say, 'I received that communication and numbers were used to communicate. In this case the pager was not used for its normal and customary usage of transmitting numbers, it was used to communicate. And by that, when we put in the numbers 911, or whatever numbers, we meant to communicate by doing that.'" (Italics added.)

Undoubtedly the argument could have been made more clearly. Nevertheless, it is apparent the People were claiming that neither Ewell nor Radovcich had a legitimate expectation of privacy in the transmissions to the pager, because they did not involve "communications." Obviously, the trial court understood this to be the case, specifically ruling that: "Both Parties to a Wire or Electronically Transmitted Conversation Have Standing."[2] Moreover, once we undertake to determine whether there has been a Fourth Amendment violation with respect to the communications from Ewell to Radovcich's pager, it is illogical to consider the expectation of privacy of one without considering that of the other. "[C]ommunication is by definition not a one-way street.... If it takes two to tango, it assuredly takes at least two to communicate...." (*In re Askin* (4th Cir. 1995) 47 F.3d 100, 104, cert. den. ___ U.S. ___ [116 S.Ct. 382].)

Citing Government Code section 68081, the majority claim we *must* assume Radovcich had an expectation of privacy in the communications to his pager because the

---

[2]    Given the People's argument and the trial court's express ruling, it is difficult to understand the majority's claim that the issue was only "tangentially raised."

6



transmission over the system had ceased.  Since the transmission had ceased, the subsequent retrieval of the message was not an 'interception' as contemplated by the drafters of the statute.

"..........................................................................................................

"In the case before us, the agent lawfully had possession of the paging device.  By pressing the digital display button, he became a party to the communication.  Thus, the agent did not 'intercept' appellant's number when he displayed it. [Citation.]" (*U.S.* v. *Meriwether, supra,* 917 F.2d at p. 960.)

Thus, the court recognized its analysis would be different if the communications were intercepted as they were being transmitted to the pager (as was the case with Ewell's communication to Radovcich's pager) as opposed to being obtained after the transmission was complete (which is the analysis embraced by the majority).  This is true whether the issue is the applicability of statutory protections of Title III or the existence of a Fourth Amendment expectation of privacy.

*d. Legal standing does not equate to an expectation of privacy under the Fourth Amendment.*

The majority have hinged their entire analysis of the defendants' expectation of privacy on what possessory interest they had in the pager.  In other words, Radovcich possessed the pager and had "standing" to seek to have the evidence suppressed.  On the other hand, Ewell did not possess the pager and, therefore, could not make the same request--end of discussion.  The majority's position is flawed because it fails to recognize that as a party to the communications that were intercepted, Ewell has the same "standing" to seek suppression of the evidence as does Radovcich.

In *Rakas* v. *Illinois* (1978) 439 U.S. 128, the United States Supreme Court did away with the notion of "standing" as a concept that is theoretically separate from a Fourth Amendment claim.

"[T]he better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any

9

pager violated the Fourth Amendment.[3]

Finally, in reaching their conclusion with respect to the defendants' expectation of privacy, the majority incorrectly focus on the relative possessory interests of Ewell and Radovcich in Radovcich's pager, rather than on their interests in the communication to the pager. This is evident from their reliance on *Meriwether, supra*, as authority for their position.

*U.S.* v. *Meriwether* involved seizure of a pager by police executing a warrant at a residence. (917 F.2d at p. 957.) Agents activated the pager and monitored the calls as they came in. One of the calls was from Meriwether. On appeal, the court held Meriwether did not have a legitimate expectation of privacy in the contents of the pager and, therefore, could not assert a valid Fourth Amendment claim. (*Id.* at pp. 958-959.)

Citing the holding in *Meriwether*, the majority conclude: "We fail to ascertain why simultaneous interception would be analyzed differently for Fourth Amendment purposes, ...." However, included within the *Meriwether* decision is the very reason why the use of a clone pager to simultaneously intercept the communications between the defendants *must* be analyzed differently. The majority do not mention that the *Meriwether* court distinguished the seizure of a pager and its contents from the "interception" of a communication under Title III. Although the analysis revolves around whether there was an "interception" under Title III, it is significant because it highlights the nature of the seizure involved and that the result may have been different if it had involved an "interception" of a communication.

"In the instant case, once the agent heard the pager emit a signal, the

---

[3]     The majority claim it is improper to address whether Radovcich had an expectation of privacy in the subject communication without giving him an opportunity to address the issue through supplemental briefing. If the majority are truly concerned that the parties have not had an opportunity to present their views on this issue, that problem could have been easily resolved by allowing them to present supplemental briefs.

8

expectation of privacy in an electronic repository for personal data is therefore analogous to that in a personal address book or other repository for such information." (*U.S.* v. *Chan* (N.D. Cal. 1993) 830 F.Supp. 531, 534; accord *U.S.* v. *Ortiz* (7th Cir. 1996) 84 F.3d 977.) Thus, the owner's reasonable expectation of privacy in a pager is rooted in personal property law. Similarly, the person who transmits the communication to the pager has no property interest in the pager and thus has no reasonable expectation that the owner of the pager will not disclose the communication to a third person. "The clear inference is that one entitled to receive the communication may use it for his own benefit or have another use it for him. The communication itself is not privileged, and one party may not force the other to secrecy merely by using a telephone." (*Rathbun* v. *United States* (1957) 355 U.S. 107, 110.; see *Hoffa* v. *United States* (1966) 385 U.S. 293, 302 ; *People* v. *Malotte* (1956) 46 Cal.2d 59, 63; *U.S.* v. *Baranek* (6th Cir. 1990) 903 F.2d 1068, 1071 .)

If the law enforcement agents had seized Radovcich's pager and monitored it for calls from Ewell, the majority's analysis concerning the relative expectations of privacy of the two defendants would have been correct. However, the defendants' case is strikingly different from this scenario, and consequently any attempt to force it to fit this model is doomed to failure.

As previously stated, the communications from Ewell to Radovcich's pager were seized while in transit--they were *intercepted*. The law recognizes that both parties to a communication may have a legitimate expectation of privacy in its transmission if done under circumstances which are reasonably intended to maintain its private character. "[Our previous decisions] found 'conversation' was within the Fourth Amendment's protections, and that the use of electronic devices to capture it was a 'search' within the meaning of the Amendment, and we so hold." (*Berger* v. *New York* (1967) 388 U.S. 41, 51.)

The reasonableness of the defendants' expectation of privacy depends upon the circumstances under which the communications were made. "What a person knowingly

11

theoretically separate, but invariably intertwined concept of standing." (*Id.* at p. 139.)

The court went on to say:

> "Analyzed in these terms, the question is whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." (*Id.* at p. 140.)

Citing *Katz, supra,* the court noted that a "'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered.... Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." (*Id.* at pp. 143-144, fn. 12; see also *Rawlings* v. *Kentucky* (1980) 448 U.S. 98, 105-106 [ownership interest in the thing seized one factor to consider when determining legitimate expectation of privacy].)

Law enforcement agents did not seize Radovcich's pager and then monitor the calls made to it in order to determine if Ewell was the person making the calls. Rather, they surreptitiously intercepted the transmissions as they were being made. The distinction between the two situations is critical.

> "While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device. [Citation.]" (*Ribas* v. *Clark* (1985) 38 Cal.3d 355, 360-361.)

Seizure of an individual's pager and review of the information contained in it or monitoring a transmission as it is completed is like seizing an individual's address book or answering machine. The pager is nothing more than an electronic version of these devices. It receives communications and stores them for later review by the owner. "The

did they voluntarily disclose them to the police after they had been received. Therefore, any reasonable expectation of privacy that they may have had in the communications must be analyzed the same way.

### e. There is no reasonable expectation of privacy in radio transmissions under the Fourth Amendment.

Having shifted the focus of the inquiry from the physical seizure of a pager to the interception of communications in transit, the legitimacy of defendants' expectation of privacy hinges on the method they used to communicate. In other words, the reasonableness of a "person's expectation that his communication is or is not subject to 'interception' ... is thus to be gathered and evaluated from and in terms of all the facts and circumstances." (Sen.Rep. No. 1097, 90th Cong., 2d Sess., § 802 (1968), reported in 1968 U.S. Code Cong. Admin. News, at p. 2178.) Although stated earlier, it bears repeating that the electronic communications involved here were *radio transmissions*. The fact the radio transmissions carried data rather than an audio signal does not change their fundamental character.

Radio transmissions are capable of carrying audio and video signals as well as pure data. Regardless of the information transmitted on the radio transmission, they share a common feature; they are broadcast on the airwaves. It is this characteristic which has resulted in radio transmissions not being accorded the same protection under the Fourth Amendment as other forms of communication. "Broadcasting communications into the air by radio waves is more analogous to carrying on an oral communication in a loud voice or with a megaphone than it is to the privacy afforded by a wire. As with *any broadcast into the air*, the invitation to listen is afforded to all those who can hear." (*U.S. v. Hall* (9th Cir. 1973) 488 F.2d 193, 196, italics added.)

The existence of a legitimate expectation of privacy in a radio transmission has been addressed by courts most frequently in the realm of a "ham" radio transmission or

13

exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [Citations.]" (*Katz* v. *United States* (1967) 389 U.S. 347, 351-352.) Here, neither of the defendants consented to the interception of the communications by law enforcement agents. Therefore, if one had a legitimate expectation of privacy in those communications, both did. Conversely, if one of the defendants did not have a legitimate expectation of privacy in the communications, neither did.

I agree with the majority that it is possible for different parties in the same case to have different expectations of privacy to the same communication. However, this is not one of those cases. What the majority do not recognize is that under the circumstances of this case, the expectation of privacy of Ewell and Radovcich in the communications to the pager is identical. The majority's confusion is evident in their hypotheticals dealing with drug dealers and answering machines. The flaw in their analysis is illustrated by looking at communications made in other mediums. For example, an individual who seals a letter in an envelope and places it in first-class mail, has a reasonable expectation of privacy that it is private and not subject to interception by law enforcement officers without a warrant based on probable cause. (*United States* v. *Jacobsen* (1984) 466 U.S. 109,114; *People* v. *Brophy* (1992) 5 Cal.App.4th 932, 936.) However, once the letter is received by its intended recipient, disclosure of its contents lies in the absolute discretion of the recipient, and the sender cannot prevent its dissemination, absent some legal privilege. (*United States* v. *King* (6th Cir. 1995) 55 F.3d 1193, 1195.)

Similarly, an individual who places a telephone call has a reasonable expectation that law enforcement officers will not intercept and monitor his or her conversation. On the other hand, inherent in the conversation is the risk that one of the participants will reveal its contents. It is this distinction which has escaped the majority. Neither Ewell nor Radovcich consented to the monitoring of Ewell's communications to the pager. Nor

12

the court noted:

> "Neither the Fourth Amendment nor Title III [applicable version] protected the radio portion of cordless telephone conversations in 1991; that portion was not deemed to encompass a reasonable expectation of privacy and had been completely excluded from federal statutory protection." (*Id.* at p. 1153.)

The court held that prior to the 1990 amendment to the Invasion of Privacy Act known as the "Cordless and Cellular Radio Telephone Privacy Act, the "'United States Supreme Court ha[d] failed to guarantee persons a reasonable expectation of privacy in conversations with or to a person using a cordless telephone unit;...'" (*Id* at p. 1153.)

Absent a statutory provision, federal courts have been nearly unanimous in finding there is no reasonable expectation of privacy in communications by cordless or cellular telephones, because they involve radio transmissions. (*In re Askin, supra,* 47 F.3d at p. 105 [cordless phone not entitled to Fourth Amendment protection because communication broadcast over radio waves to all within range]; *U.S.* v. *Smith, supra,* 978 F.2d at p. 177 ["pure radio communications" are afforded little or no protection because of the potential for anyone to receive them]; *U.S.* v. *Hall, supra,* 488 F.2d at p. 196.)

Although the cases cited address radio transmissions made in the context of a cordless or cellular telephone, the analysis is equally applicable to a pager which receives radio transmissions. In *People* v. *Medina* (1987) 189 Cal.App.3d 39, certiorari denied 484 U.S. 929, we specifically applied the same analysis to a case involving a clone pager. Using a radio scanner and duplicate pagers provided by the company which provided them to appellant, agents monitored calls being made to appellant. (*Id.* at p. 43.) The pager system used by appellant involved a radio message with a signal coded to his particular pager that automatically activated its speaker and played the oral message. If an individual who had the pager did not depress a button on the pager after the message, he or she would receive messages meant for other individuals since all the other pagers were on the same frequency. (*Id.* at pp. 43-44.) The duplicate pagers issued to detectives

15

the use of cordless and cellular telephones. In *United States* v. *Rose* (1st Cir. 1982) 669 F.2d 23, Federal Communications Commission officials intercepted point-to-point radio transmission on the "ham" radio operator's band. The appellant claimed interception of his radio communications violated Title III. The court held it did not, analyzing the issue in terms of whether it was an "oral communication" in which the appellant had a reasonable expectation of privacy. (*Id.* at pp. 25-26.) The court found the appellant had neither a subjective nor an objective expectation of privacy in the broadcasts.

> "The manner in which the communications were transmitted indicates that appellants were aware that their communications were likely to be intercepted.... Appellants make the obvious argument that the very extent of the precautions taken by them to hide their identity and message denotes their subjective expectation of privacy. But so to conclude would confuse *expectation and hope*. Faced with the only available, rather exposed means of communication, appellants chose to take precautions because they did not expect privacy but hoped for the best.
>
> "Even if the subjective expectation had been proven, that expectation would not have been reasonable when judged by an objective standard. Appellants were broadcasting on the ham radio frequency, commonly known to be a means of communication to which large numbers of people have access as receivers. A reasonable person would not expect that words uttered over the ham radio frequency would be heard only by those few individuals for whom the communication was specifically intended. [Citations.]" (*Id.* at pp. 25-26, italics added.)

Similarly, courts have held there is no legitimate expectation of privacy in telephone conversations on cordless or cellular telephones, prior to the amendment of Title III to include them within the statutory definition of "wire communications." In *People* v. *Chavez* (1996) 44 Cal.App.4th 1144, certiorari denied ___ U.S. ___ [117 S.Ct. 279], the appellants' conversation on a cordless telephone involving narcotics transactions were monitored and recorded by a citizen who did so with the knowledge and encouragement of law enforcement agents. (*Id.* at p. 1147.) The appellants' motion to suppress the evidence from the monitored conversations at trial was denied. On appeal,

14

While being booked, Bullock's pager signaled on at least 20 occasions that it had received messages. Each time it signaled, the officer who had it in his custody activated it and recorded the telephone numbers displayed. (226 Cal.App.3d at p. 385.) On appeal, the court found first that activating the pager was a "search" within the meaning of the federal and state Constitutions. (*Id.* at p. 386.) The court concluded the appellant did have "a reasonable expectation of privacy in the information housed in his pager." (*Ibid.*) But, rather than simply relying on the defendant's property interest in the pager as the basis for its holding, the court felt compelled to distinguish our holding in *Medina, supra,* because the information transmitted to Bullock's pager was not an audio communication.

> "The pager was unlike those which receive verbal messages that can be heard and understood by someone possessing a duplicate pager or anyone listening to a radio scanner tuned to the broadcast frequency. (Cf. *People* v. *Medina* (1987) 189 Cal.App.3d 39, 45-49 [234 Cal.Rptr. 256]--the possessor of a pager which receives verbal messages broadcast by radio frequency has no reasonable expectation of privacy in the messages transmitted to the pager.) Granted, one listening to a radio scanner on the frequency of defendant's pager might hear tones produced by the caller's use of a touch-tone telephone to leave a coded message. However, because such tones are not commonly understood by persons untrained or unequipped to decode them, defendant had a reasonable expectation that the messages were not exposed to the public. [Citation .]" (*Id.* at pp. 386-387.)

The *Bullock* court's analysis suffers from the same defect as that of the majority. It failed to recognize the difference between seizure of the pager and interception of the transmission. Bullock's expectation of privacy in the pager or any other repository for telephone numbers or information he maintained was separate from any expectation of privacy he may have had in the transmission of the information contained in the pager. Thus, the court's discussion in *Bullock, supra,* concerning the expectation of privacy in the transmissions is dicta.

In addition, the distinction *Bullock* attempts to make between the transmission of an audio signal to a pager and the transmission of data, indicates the court did not

17

had the advantage of isolating individual messages that were meant only for appellant. (*Id.* at p. 44.) Otherwise, just using the scanner, the law enforcement agents would have to cull through 3,000 pagers operating on the same frequency. (*Ibid.*)

On appeal, we correctly noted the case turned on whether the appellant had a legitimate expectation of privacy in the pager messages. We found the appellant failed to establish either a subjective or objective expectation of privacy in the communications. (189 Cal.App.3d at p. 45.)

> "There is no evidence before this court of appellants' subjective intent as to an expectation of privacy. Appellants' covert activity with the assistance of the pagers merely suggests an *intention and hope* of not being found out. Furthermore, the evidence establishes that any of the persons with similar pagers could listen in to communications by simply failing to press the button which would cease the onflow of messages being transmitted over the speaker of the individual pager." (189 Cal.App.3d at p. 45, italics added.)

We then concluded: "No reasonable person would expect a conversation that could be intercepted by anyone with a radio scanner or another pager to be private. [Citation.]" (*Id.* at p. 49; see also *Dorsey* v. *State* (Fla. 1981) 402 So.2d 1178, 1184 ["by the very nature of being broadcast, [pager] communications [are] unprotected by any constitutional right ..."].)

Although the majority note our decision in *Medina* in passing, they do not rely on it. Neither do they explain why they eschew its succinct analysis which is firmly grounded on widely accepted Fourth Amendment principles with respect to radio transmissions. Rather, the majority cite *People* v. *Bullock* (1990) 226 Cal.App.3d 380, to support their assumption that Radovcich had a legitimate expectation of privacy in the communications to his pager. However, the majority's reliance on *Bullock* is misplaced because that court also blurred the distinction between the expectation of privacy involved in the seizure of a pager and that implicated by the interception of a radio communication.

16

privacy is evident in the United States Supreme Court's decision in *Dow Chemical Co.* v. *United States* (1986) 476 U.S. 227.

In *Dow Chemical*, the question was whether aerial photography of Dow's plant by the Environment Protection Agency (EPA) constituted a search under the Fourth Amendment. (476 U.S. at p. 229.) The court held it was not, noting the fact the government used a precision aerial mapping camera to take the photographs did not change what was otherwise a valid observation of the open areas around defendant's plant into a search under the Fourth Amendment. (*Id.* at p. 239.) In reaching the decision, however, the court did suggest that if the government had used "highly sophisticated surveillance equipment not generally available to the public, such as satellite technology," the search "might be constitutionally proscribed absent a warrant." (*Id.* at p. 238.)

> "The mere fact that human vision is enhanced somewhat, at least to the degree here, does not give rise to constitutional problems. An electronic device to penetrate walls or windows so as to hear and record confidential discussions of chemical formulae or other trade secrets would raise very different and far more serious questions; ...." (*Id.* at p. 239, fn. omitted.)

It is significant that the camera used by the EPA was not one commonly used by the general public. It cost in excess of $22,000; was described as the "'finest precision aerial camera available,'" and was capable of taking several photographs in rapid succession. (*Dow Chemical Co.* v. *United States, supra*, 476 U.S. at p. 242, fn. 4 (dis. opn. by Powell J.).) However, the fact the camera used was rare and probably beyond the means of most individuals, did not result in the court finding that its use violated Dow's reasonable expectation of privacy. Instead, the key factor is whether the technology, regardless of cost, is available to the public, thus making its warrantless use a violation of an individual's reasonable expectation of privacy.

Although unstated, the majority's reluctance to follow our previous decision in *Medina* seems to be based on the distinction they make between the type of pager employed in that case and that used by Radovcich. However, this factual distinction does

19

understand the technical nature of a radio transmission. The court's decision assumes that only radio transmissions carrying audio signals can be readily intercepted and understood. This assumption is not correct.

Radio communications are incapable of being detected by use of any of the human senses. Regardless of the nature of a radio transmission, a piece of electronic equipment is always necessary to receive it and convert it into an understandable form. The receiver used must be designed to interpret the particular radio transmission which is sought. For example, if the radio transmission contains an audio signal, the receiver used must be able to convert the transmission to an aural signal. If the radio transmission carries a video signal, the receiver must be designed to convert it to a visual depiction. Put in everyday parlance, an individual would not turn on a radio and expect to tune in a television picture. However, this fact clearly does not mean that a person transmitting a video signal has an increased expectation of privacy in the radio transmission of the signal.

> "Radio signals to be received by paging devices can be intercepted by obtaining a similar device operating on the same frequency; once intercepted, the signals will reflect the content of any message. The message may take the form of either a digital display or an aural communication depending on the kind of pager used by the subscriber." (Note, *Does A Part Equal The Whole: Is The Interception Of Paging Device Communications Governed By Title III?* (1984) 7 Geo. Mason. U.L. Rev. 237, 241.)

The question is not whether one type of receiver is capable of receiving and interpreting a radio transmission. Instead, the critical question in determining whether there is a reasonable expectation of privacy to a communication is whether the transmission can be intercepted with an appropriate receiver using technology reasonably available to the general public. "Application of the Fourth Amendment in a given case will depend largely upon the specific technology used, and a trial court must be prepared to consider that technology in a hearing on a motion to suppress." (*U.S.* v. *Smith, supra,* 978 F.2d at p. 180.) This approach to analyzing the reasonableness of an individual's expectation of

18

3001

not negate the underlying basis of our decision in *Medina*, i.e., the existence of a legitimate expectation of privacy in a communication is determined by considering the circumstances of its transmission. It is not determined by looking to who physically possessed the device which received and stored the communication.

> "[B]ecause display pagers are transmitted only by radio waves, they should be regarded as 'electronic communications.' The radio wave portion of the communication from a paging company to the paging device is no different than the radio wave portion of a cordless telephone communication which is specifically exempted from the 'electronic communication' definition. Moreover, it is as easy to intercept pager radio waves and cordless telephone radio waves as it is to receive ordinary AM or FM radio waves." (Burnside, *The Electronic Communications Privacy Act of 1986: The Challenge of Applying Ambiguous Statutory Language to Intricate Telecommunication Technologies.* (1987) 13 Rutgers Computer and Tech. L.J. 451, 501.)

There is nothing in the record to indicate any unique or highly sophisticated equipment was necessary to intercept communications to Radovcich's pager. Neither is there anything to indicate the police used any exotic equipment not reasonably available to the general public to intercept the communications. To the contrary, they readily obtained a clone pager from the same commercial business that provided the pager to Radovcich. Indeed, the ease with which they were able to obtain the clone pager belies any argument that it involved use of technology which was not otherwise available. Additionally, there is no reason to conclude that anyone with a radio receiver operating on the same frequency as Radovcich's pager, which is capable of converting radio transmissions carrying data to a visual display, could not have intercepted the communications. Consequently, there is no reason to treat the interception of data carried in radio transmissions utilizing commercially available means differently from the interception of an audio signal in radio transmissions using similar means.

*f. Cap codes versus encryption devices*

The majority have seized on the existence of a "cap code" in Radovcich's pager as

20

3002

evidence that communications to it could not be intercepted. Their reliance is misplaced. The sum total of evidence in the record concerning the function of a cap code on a pager is the following statement by Detective Souza during the preliminary hearing:

> "A  I was told the cap code controlled who got the page. If you had the same cap code, regardless what number you have that's assigned to you, you would get that signal."

The majority couple this brief statement with the 1986 published decision of a New York trial court judge in *People* v. *Pons* (N.Y. Sup. Ct. 1986) 133 Misc.2d 1072, 509 N.Y.S.2d 450. The entire explanation of the function of a cap code in that case is:

> "The order enabled ADA Haskel to procure an NEC display telephone pager, have it tuned to 152.84 Megahertz and have its 'CAP Code' set at 0002219, thereby enabling the monitoring of signals transmitted to the pager's assigned telephone number []." (*Id*. at p. 452.)

From these two bits of information, the majority conclude:

> "The cap code receives the message signal from the pager company, then directs that signal to the designated pager. If someone has the same cap code, he or she receives the signal regardless of the telephone number assigned to the intended pager. Thus, even assuming the police knew Radovcich's pager number and frequency, they could not have simply gone to a radio or electronics store, purchased a like pager, programmed it for that telephone number, and intercepted the pages. Instead, they had to have the cap code programmed in by the pager company, just as it was programmed into Radovcich's pager.... Moreover, since the cap code converts the message signal received from the pager company, someone seeking to leave a message on Radovcich's pager does not use the cap code."

It is apparent from their analysis that the majority view the cap code on a pager as functioning as some form of "encryption" of the message or blocking device that precludes others from receiving the transmission to a particular pager. It is neither. First, encryption involves changing the *content* of a transmission in order to protect it from unwanted listeners.

> "To 'encrypt' or to 'scramble' means to convert the signal into

21

unintelligible form by means intended to protect the contents of a
communication from unintended recipients. Methods which merely change
the form of a plain text message, e.g., a device which converts an *analog
signal to a digital stream, does not provide 'encryption' within the meaning
of this bill....* Examples of scrambling techniques which are currently
available include the data encryption standard (DES)." (Sen. Rep. No. 99-
541, 99th Cong., 2d Sess. p. 15 (1986), reported in U.S. Code Cong. &
Admin. News at p. 3569, italics added.)

There is nothing in the record to indicate a cap code functions to scramble a transmission
to any given pager. Despite the majority's conclusion to the contrary, there is no
evidence a cap code "converts" anything.[4]

Second, the evidence does not establish that a cap code *precludes* anyone other
than the person who has the pager with that cap code programmed into it from receiving a
signal. A more reasonable interpretation of the evidence, is that the cap code functions as
a discriminating device. In other words, it is nothing more than a code added to a
transmission that selectively alerts a particular pager that a discrete message in the stream
of messages on that frequency is for that pager. (See Legislative Survey, *What Is A
Private Communication?: An Analysis Of The New Jersey Wiretap Act.* (1994) 19 Seton
Hall. Legis. J. 386, 398, fn. 6.) However, this does not mean that someone with a
receiver tuned to the same frequency cannot receive that transmission. There is nothing
preventing a third person from utilizing the same type of scanner described in the cases
involving the interception of radio transmissions from monitoring a frequency and
intercepting *all* of the transmissions on that frequency. The fact a communication
involves transmission of data rather than an audio signal does not change the universal

---

[4]   Undoubtedly it is their misunderstanding of the function of a cap code which leads
the majority to find the idea that a person has no legitimate expectation in a radio
transmission "startling." Because there is no evidence the communications were
encrypted or that they could not be intercepted using basic electronic equipment available
on the commercial market, the lack of any reasonable expectation of privacy in them is
merely a logical extension of long accepted principles of constitutional law.

3004

truth that radio transmissions can be intercepted by a radio receiver tuned to the appropriate frequency.[5]

Moreover, the use of cap codes or a similar means of discriminating messages is not a revolutionary development. As noted by the majority, it is apparent from the decision in *Medina* that the pagers involved incorporated some form of signaling or alerting mechanism to let the owner of the pager know that a message was intended for him or her. (*People* v. *Medina, supra*, 189 Cal.App.3d at pp. 43-44.) What Medina's pager apparently lacked was a means of automatically turning it off after the message was received. Thus, contrary to the impression given by the majority's opinion, the use of some means to signal an individual pager that a particular message is designated for it, is not a new technological development. (See also *People* v. *King* (1991) 231 Cal.App.3d 493, 496 [discussing the fact that a pager utilized in 1989 had its "own unique cap code and serial number"].)

I do agree with the majority that someone using only a scanner to intercept transmissions would have a difficult time determining for whom the message was intended. Therefore, it would make a law enforcement officer's task easier if, in addition to a scanner, he or she had a pager that registered only the messages intended for the suspect's pager. However, this is not a problem unique to digital display pagers such as Radovcich's, or, for that matter, pagers in general. *Medina* identified the same problem.

---

[5]     In a footnote, the majority have admonished against going outside the record to supplement the evidence on cap codes. Based on their analysis, it appears that is exactly what they have done. They have engrafted their own understanding of the operation of pagers upon the short snipit of testimony and a *factual statement* in the decision of a New York trial court to support their dissertation on the operation of pagers.

Consideration of any reputable source of information reveals the majority's conclusion concerning the function of a cap code is confused. However, I have not relied on this information in reaching my conclusion. Rather, I have relied on the evidence contained in the record and how courts have historically treated radio transmissions.

Without the use of the clone pager in that case, the officers would have been faced with a difficult task of identifying which messages (even though they involved audio transmissions) were intended for the defendant. Similarly, someone listening to a radio transmission does not necessarily know the identity of the parties to the transmission. However, this fact does not affect the parties' reasonable expectation of privacy in the communication itself. Rather, it goes to the parties' attempt to maintain anonymity. Anonymity, however, is not synonymous with an expectation of privacy. It is a *hope* that the identities of parties to a communication will not be discovered, nothing more. (See *U.S.* v. *Rose, supra*, 669 F.2d 23.)

I conclude once the defendants elected to communicate by means of an electronic pager that utilized radio transmissions, they had no objective expectation of privacy which society is prepared to recognize as reasonable.[6] If anything, the objective expectation of privacy in data communications is less than that of oral communications which have consistently been held to lack Fourth Amendment protection when made by way of radio transmissions. Thus, I would hold the motion to suppress the evidence obtained by use of the clone pagers should have been denied.[7]

---

[6]   Interestingly, Radovcich's concern that his pager was being monitored and his request for a new pager number demonstrate that he also did not have a subjective expectation of privacy in the communications. (See *United States* v. *Rose, supra*, 669 F.2d at p. 25-26 [attempts to avoid detection of radio communications by changing frequencies, omitting identifying information and using code to disguise nature of communications indicative of a lack of a subjective expectation of privacy; merely a "*hope*" the communications will not be detected].)

[7]   As the majority correctly point out, California did not enact statutes addressing interception of electronic communications until 1995. Therefore, defendants' claim that the interceptions were prohibited by California law is without any statutory basis and the issue still turns on whether they had any constitutionally recognized expectation of privacy. (See Pen. Code, § 633.)

24

## *II. The good-faith exception under United States v. Leon[8]*

Because the majority "assume" Radovcich had a legitimate expectation of privacy in the communications to his pager, they are forced to consider whether the warrants authorizing use of the clone pagers pass constitutional muster. The majority then consider the three requirements of the warrant which they believe to be constitutionally based: minimization; necessity; and duration. They conclude, however, there was a Fourth Amendment violation only with respect to "particularity as to time." They note the search warrants contain no time limits on the use of the clone pagers and the affidavits fail to establish probable cause for their use for an unspecified period of time.

The majority's failure to recognize the difference between the *interception* of a radio communication and the physical seizure of a pager that stores the communications inexorably leads them to their *Leon* analysis. However, application of *Leon* to these facts is inappropriate and far beyond any scenario reasonably contemplated by the *Leon* court for two reasons. First, the affidavits are totally lacking in probable cause for what are essentially "endless" searches. Second, the warrants are so facially deficient because of the absence of *any* time limits for the search that an officer could not reasonably assume them to be valid.

As correctly pointed out by the majority, *Leon* holds that evidence obtained through the use of a constitutionally deficient warrant need not be suppressed where the law enforcement officers conducting the search relied in good faith on its validity. However, the court stressed the good faith reliance must be *objective*, and the subjective belief of the officers is irrelevant.

> "We emphasize that the standard of reasonableness we adopt is an
> objective one. Many objections to a good-faith exception assume that the

---

8      *United States v. Leon* (1984) 468 U.S. 897.

25

exception will turn on the subjective good faith of individual officers. 'Grounding the modification in objective reasonableness, however, retains the value of the exclusionary rule as an incentive for the law enforcement profession as a whole to conduct themselves in accord with the Fourth Amendment.' [Citations.] The objective standard we adopt, moreover, requires officers to have a *reasonable knowledge of what the law prohibits*. [Citation.]" (*United States* v. *Leon, supra*, 468 U.S. at pp. 919-920, fn. 20, italics added.)

There are four situations when the good-faith exception of *Leon* does not apply:

1) When the magistrate is misled to issue the warrant based on information the affiant knows is false or would have known is false "except for his reckless disregard of the truth;"

2) When the magistrate "wholly abandoned his judicial role;"

3) When the warrant is based on an affidavit "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;'" or

4) When a warrant is so "facially deficient--*i.e.*, *in failing to particularize the place to be searched* or the things to be seized--that the executing officers cannot reasonably presume it to be valid." (*United States* v. *Leon, supra*, 468 U.S. at p. 923, italics added.)

Neither of the first two exceptions apply here. There is no evidence the law enforcement officers intentionally or recklessly included false information in their affidavits. Similarly, there is no indication the magistrate abandoned his neutral and detached role in issuing the warrants. However, the same cannot be said with respect to the last two exceptions.

Thirty years ago the United States Supreme Court addressed the need for some limitation on the duration on the interception of communications. In *Berger* v. *New York, supra,* 388 U.S. 41, the court considered the constitutionality of a New York statute which authorized wiretaps based on an order issued by a state supreme court judge (equivalent to superior court in California) upon a showing of probable cause. (*Id.* at p. 54.) The statute authorized wiretaps for a period not to exceed 2 months, unless extended

26

3008

by the court upon finding "extension or renewal is in the public interest." (*Id.* at p. 43, fn. 1.) The court found the statute unconstitutionally deficient on its face. (*Id.* at p. 55.)

The court determined the statute authorized the type of "general" warrant condemned by the Fourth Amendment. (388 U.S. at p. 55.) Among the defects found by the court was the fact that a two month authorization for a wiretap was too long. (*Id.* at pp. 58-59.) The court held:

> "[A]uthorization of eavesdropping for a two-month period is the equivalent of a series of intrusions, searches, and seizures pursuant to a single showing of probable cause.... During such a long and continuous (24 hours a day) period the conversations of any and all persons coming into the area covered by the device will be seized indiscriminately and without regard to their connection with the crime under investigation." (*Id.* at p. 59.)

Finally, the court noted the statute placed no termination date on the eavesdrop, once the conversation sought was seized. Thus, the issues were "left entirely in the discretion of the officer." (*Id.* at p. 60.) "As with general warrants this leaves too much to the discretion of the officer executing the order." (*Id.* at p. 59.)

Justice Harlan dissented, finding that the New York statute did satisfy the requirements of the Fourth Amendment. However, even he noted the need for *some* limit on the duration of such a warrant:

> "I do not doubt that searches by eavesdrop must be confined in time precisely as the search for tangibles is confined in space, but the actual duration of the intrusion here, or for that matter the total period authorized by the order, was not, given the character of the offenses involved, excessive. All the disputed evidence was obtained within 13 days, scarcely unreasonable in light of an alleged conspiracy involving many individuals and a lengthy series of transactions." (*Berger* v. *New York, supra*, 388 U.S. at p. 100.)

It is with the principles stated in *Berger* firmly in mind that I consider the warrants in defendants' case.

### a. The probable cause requirement

27

As previously mentioned, *Leon*'s good-faith exception does not apply when a warrant is issued based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." The majority describe the affidavits in this case as containing "much factual information justifying issuance of a warrant for a clone pager." They ignore the fact there is more involved in determining whether affidavits establish probable cause than looking to a recitation of events that occurred during an investigation followed by a law enforcement officer's educated conclusions about their meaning.

Probable cause is a complex concept integral to any Fourth Amendment analysis.

> "The fourth amendment is our sole guide and concern here. It is too
> familiar to require citation that resistance to the issuance of general
> warrants, unrestrained as to persons, times, or places, supplied much of the
> incentive for its adoption. Did we contemplate in this case an authorization,
> *unlimited as to even one of these facts--time--*or of such duration as to be
> unlimited as a practical matter, we might well adopt the suggested analysis
> and declare any action taken pursuant to it invalid." (*United States* v. *Cady*
> (5th Cir. 1981) 651 F.2d 290, 291, cert. den. 455 U.S. 919, italics added.)

In other words, the affidavit must establish probable cause for the duration of a search just as it must establish probable cause to search a person or place.

Here, the affidavits fail to provide *any* explanation why an indefinite warrant is necessary. In fact, it is hard to imagine any situation which would justify the issuance of a warrant with no time limits. Despite this glaring omission, the majority conclude that a reasonably well trained officer would not have realized that the affidavits did not provide probable cause for issuance of the warrant. Conspicuous by its absence from the majority's analysis is any indication they believe the information provided to the magistrate established probable cause for an indefinite use of the clone pagers. Rather, they find the affidavits established probable cause for some, unspecified "reasonable period of time." Then, inexplicably, the majority conclude there is no need to decide "what would constitute a reasonable length of time beyond which officers could no longer

28

objectively rely on the warrants so that interceptions beyond that point would be suppressed."

The majority also conclude that the affidavit supporting the application for the warrant was not "bare bones" because it identified the lengthy and complex nature of the investigation. Surely the majority do not mean by this statement that the protections of the Fourth Amendment are abrogated when a criminal investigation is complex or time-consuming. Obviously, if the Fourth Amendment is not suspended with respect to the interception of communications that pose a threat to national security, there is no reason to believe it is suspended with respect to the criminal investigation of the defendants. (See *United States* v. *United States District Court* (1972) 407 U.S. 297, 313.) I am also confident the majority do not intend to suggest that a warrant which authorizes an indefinite search passes constitutional muster.

An affidavit must establish probable cause for the duration of a search just as it must establish probable cause for searching a person or a place. Other than identifying the specific pager to be monitored, the most important aspect of the warrant for the clone pagers was to specify the time period during which the monitoring could occur.

I can only conclude what the majority really mean is that no reasonably well trained officer would have known the affidavits lacked probable cause merely because they failed to include the 30-day limitation required by the provisions of Title III. This is consistent with the majority's conclusion that the officers' ignorance of or failure to comply with the provisions of Title III is irrelevant. There is a serious problem with this analysis.

Even if I were to disregard the officers' ignorance of the 30-day limit on warrants under Title III, I cannot disregard the Fourth Amendment prohibition against general warrants. As previously discussed, the United States Supreme Court's decision in *Berger* makes it clear that an authorization to intercept communications for an unreasonable

29

length of time violates the Fourth Amendment.[9] (*Berger* v. *New York, supra,* 388 U.S. at pp. 58-60.) In this regard, it bears repeating that this is not a case in which we are quibbling about whether probable cause was established for interception of communications for 30, 60, 365 days, or even a "reasonable period of time." We are concerned with whether a law enforcement agent would be objectively reasonable in believing the affidavits established probable cause for interceptions of communications *indefinitely.* Since the Fourth Amendment forbids a search which can be continued indefinitely, subject only to the executing officer's discretion, I do not understand how any law enforcement agent could ever reasonably believe that an affidavit established probable cause for such a search.[10]

The majority recognize that not every affidavit failing to state probable cause falls within the *Leon* exception noting "only extreme cases are outside the *Leon* umbrella." It is hard to imagine any situation more "extreme" than an open-ended warrant authorizing an indefinite search of a person's property. One can only wonder if the majority would find a warrant authorizing a daily search of someone's business or residence for an indefinite period of time falls "outside the *Leon* umbrella."

---

[9]    It is apparent the decision in *Leon* did not signal the court's intention to abrogate this rule:

> "We have held, however, that the exclusionary rule requires suppression of evidence obtained in searches carried out pursuant to statutes, not yet declared unconstitutional, purporting to authorize searches and seizures without probable cause or search warrants. See ... *Berger* v. *New York*, 388 U.S. 41 (1967).... The substantive Fourth Amendment principles announced in those cases are fully consistent with our holding here." (*United States* v. *Leon, supra,* 468 U.S. at p. 912, fn. 8.)

[10]    In this respect, I am at a loss to understand how the majority can conclude the affidavit only establishes probable cause for a "reasonable period of time," but then conclude the officers who prepared it and presented it to the magistrate would be objectively reasonable in believing it established probable cause for an indefinite search.

3012

### b. *The particularity requirement*

Although the majority consider the absence of any time limits on the use of the clone pagers to be a violation of "constitutional magnitude," inexplicably they do so by reference to the very same statutory provisions of Title III which they later conclude are irrelevant for purposes of any Fourth Amendment analysis. I fully agree with the majority's conclusion that the "warrants at issue here failed to comply with the provisions of Title III." However, I base my conclusion not on the provisions of Title III, but on the constitution and the principles of particularity required for a warrant as announced by the United States Supreme Court.

One of the bedrock requirements of the Fourth Amendment is that a warrant must describe with particularity what is subject to search and seizure:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.)

It is this particularity clause upon which the United States Supreme Court based its decision in *Berger* v. *New York, supra,* 388 U.S. 41.

Applying *Berger* to the warrants issued in defendants' case, there is no question they violate the constitution. Simply put, the warrants gave law enforcement absolute discretion to decide how long they would use the clone pagers to intercept communications to Radovcich's pager. Ostensibly, the law enforcement officers could have used them indefinitely. As it was, they were used for a period of approximately seven months. Thus, the warrants authorizing use of the clone pagers fall within the category of general warrants prohibited by the Fourth Amendment.

> "General warrants, of course, are prohibited by the Fourth Amendment. '[T]he problem [posed by the general warrant] is not that of intrusion *per se*, but of a general, exploratory rummaging in a person's belongings.... [The Fourth Amendment addresses the problem] by requiring

31

a "particular description" of the things to be seized.' [Citation.]"
(*Andresen* v. *Maryland* (1976) 427 U.S. 463, 480.)

The majority suggest that *Leon* does not apply to warrants implicating the particularity requirement with respect to the duration of a search. They seem to suggest that *Berger* is no longer controlling because it was decided 20 years before *Leon*. They even go so far to state they are unsure what part of the Fourth Amendment is violated by a warrant which has no time limitations, and question whether it involves particularity.

I do not understand the majority's lack of certainty concerning *Berger's* basis for requiring that a warrant include time limits. The absence of any time limit in a warrant authorizing the interception of communications implicates the particularity requirement of the Fourth Amendment with respect to both the duration of the search and the things (the communications) to be seized. The plain language of the opinion makes it very clear:

> "It is true that the statute requires the naming of 'the person or persons whose communications, conversations or discussions are to be overheard or recorded ....'" But this does no more than identify the person whose constitutionally protected area is to be invaded rather than 'particularly describing' the communications, conversations, or discussions to be seized." (*Berger* v. *New York, supra*, 388 U.S. at p. 59.)

It does not take much of a leap in logic to conclude that the court's discussion concerning the shortcomings of the New York statute, including the duration of the authorization, violated the Fourth Amendment. If this statement is not a reference to the particularity requirement of the Fourth Amendment, I am at a loss to explain to what it does refer.

Second, I cannot accept the majority's position that *Leon* does not extend the particularity requirement to include the length of a search authorized by a warrant. The majority point out that *Leon* only mentioned the failure to particularize the place to be searched or the things to be seized, when referring to facially deficient warrants. Thus, they conclude these are the only possible reasons to not apply the good-faith exception of *Leon*. I would only note in response that the *Leon* court also did not specifically include the failure of a warrant to state with particularity the need to specify the *persons* to be

32

seized. Surely the majority are not suggesting that omission of reference to the person in this exception to *Leon* would make it objectively reasonable for police officers to rely on a warrant that gave them absolute discretion to seize whomever they pleased. Such an interpretation would fly in the face of common sense as well as the Fourth Amendment. Undoubtedly, the *Leon* court did not address the requirement of identifying the person to be seized, for the same reason it did not address the requirement to limit the duration of a search--the issues were not specifically raised. It seems the majority have chosen to engage in an overly literal analysis of *Leon's* particularity requirement. In contrast, the proper focus must be on whether a warrant which authorizes an endless search based on a single showing of probable cause is a general warrant thereby rendering the warrant facially deficient. Approached in this manner, the inescapable conclusion is that reliance upon a warrant which fails to include *any* time limits on its duration is objectively unreasonable.

Third, just as it is not objectively reasonable for a law enforcement officer to believe the affidavits established probable cause for issuance of an indefinite warrant, a law enforcement officer would also not be objectively reasonable in relying on a warrant that authorized an indefinite search. The majority concede that the warrants authorizing the monitoring of the clone pagers were facially deficient with respect to Title III. However, they then conclude the warrants were not so facially deficient "*under the Fourth Amendment*" that an executing officer could not presume them to be valid. The majority reach this conclusion by once again attempting to divorce the requirements of Title III from those of the Fourth Amendment. However, as explained earlier, this attempt fails where the provisions of Title III are intended to embody the requirements of the Fourth Amendment. Chief among these, and the one upon which the majority based their need for an analysis under *Leon* in the first place, is a limit on the duration of the interceptions. Therefore, the omission of a time limit from the warrants cannot be excused as a mere violation of Title III, when the defect also constituted a violation of the

33

Fourth Amendment.

Finally, the objective reasonableness of the law enforcement agents in relying on the warrants must also be considered in the context of the investigation undertaken in the defendants' case. Both at the trial court and during oral argument on appeal, the People argued that because the clone pagers intercepted telephone numbers, the officers were reasonable in assuming they were similar to a pen register or trap and trace device. During oral argument on appeal, the People asserted we should consider the reasonableness of the officers' action in light of their perception of the situation: that the clone pagers served the same function as pen registers and, therefore, should be treated as such. However, the People forthrightly and I believe correctly, conceded that the use of pen registers and trap and trace devices is so common that a reasonably well trained officer would be expected to know the requirements for obtaining them. Assuming the law enforcement agents did believe a clone pager was akin to a pen register, the manner in which they conducted their investigation requires me to reject the People's argument that they were objectively reasonable in dealing with them.

Referenced in the affidavit requesting the warrant for the clone pager of April 12, 1993, and included as Attachment B to the application, is a copy of a search warrant issued by Judge Keyes on April 2, 1993. Attachment B is a warrant for the "subscriber and subscriber credit information from the telephone numbers obtained from Exhibit '1,' on telephone calls made from telephone number (818) 884-2248." Exhibit 1 is a court order directing the telephone company to install the equipment necessary to "capture the number search information for telephone number(s) (818) 884-2248; ...." The affidavit requesting the warrant and court order included as part of Attachment B describes this equipment as a "DIALED NUMBER RECORDER." Thus, it is apparent that Exhibit 1 involves a court order for use of a pen register on the telephone number described. (See *People* v. *Andrino* (1989) 210 Cal.App.3d 1395, 1399, fn. 2 [dialed number recorder is a pen register].) What is significant about this court order is that it specifically limits the

duration for use of the pen register to 10 days.

On April 13, 1993, one day after obtaining the first warrant authorizing use of a clone pager indefinitely from Judge Putnam, the officers obtained a warrant from Judge Keyes authorizing the use of a pen register on the telephone number, (818) 884-2248, for an additional 20 days. On May 3, 1993, the officers obtained a court order signed by Judge Keyes authorizing use of a pen register on two other telephone numbers for a period of 30 days. Finally, on June 3, 1993, the officers obtained another warrant from Judge Keyes authorizing use of a pen register on the original telephone number for a period of 20 days.

As argued by the People, it is obvious the law enforcement agents were aware of the requirement for a court order to obtain a pen register. Similarly, they were also aware there were time limits on the duration for use of these pen registers. The United States Supreme Court expressly held in *Smith* v. *Maryland, supra*, use of pen registers does not affect any legitimate expectation of privacy. Additionally, after enactment of section 28, subdivision (d) to article I of the California Constitution, there is no requirement under California law to obtain a court order to use a pen register. (See *People* v. *Larkin* (1987) 194 Cal.App.3d 650, 653-654.) Therefore, the only limitations on the use of pen registers are a result of *federal statutory law*. The federal statutory law governing use of pen registers and trap and trace devices is contained in Chapter 206 of Title 18 of the United States Code (18 U.S.C. §§ 3121-3127.) These statutes prohibit use of pen registers without a court order; and then only for a maximum of 60 days without additional authorization. (18 U.S.C. § 3123, subd. (c).)

Consequently, at the same time the law enforcement agents were obtaining and utilizing warrants authorizing the use of clone pagers for an indefinite period of time from one judge, they were obtaining authorizations to use pen registers containing specific limitations on their duration from another judge. Also, although unaware of federal law concerning interception of electronic communications, the officers were thoroughly

versed in the federal statutes applying to pen registers. The federal statutes applicable to pen registers were enacted at the same time, and took effect in the same manner, as those pertaining to electronic communications. If, as the People argue, the objectively reasonable law enforcement agent would truly perceive the use of clone pagers to be analogous to the use of pen registers, the failure to follow the same procedures in obtaining both authorizations is inexplicable. Additionally, how can it be said that the officers reliance on the indefinite warrants for use of clone pagers is objectively reasonable when the authorizations they received for pen registers only authorized their use for a limited period of time?[11]

During oral argument on appeal, the People candidly admitted that at some point in time the officers could not be considered objectively reasonable in relying on the warrants for the clone pagers. They suggested, however, that it would not be unreasonable for them to rely on the warrants for at least 60 days--the maximum period of authorization for a pen register. This argument has merit. (Cf. *United States* v. *Long* (11th Cir. 1982) 674 F.2d 848; *United States* v. *Cady, supra,* 651 F.2d 290.) Had the warrants for the clone pagers contained some time limit consistent with the 60-day maximum permissible for pen registers, I would agree with the People and find the officers were objectively reasonable in their reliance on the warrants, at least for 60 days. (Cf. *U.S.* v. *Butz* (9th Cir. 1993) 982 F.2d 1378, 1382-1383, cert. den. 510 U.S. 891 [*Leon* applies when law enforcement officers obtain pen register in reasonable reliance on requirements of statute existing at the time of the request].) However, the lack of any time limits in the clone

---

[11]    The majority claim that consideration of the officers' conduct with respect to the court orders for the dialed number recorders improperly interjects a subjective element into the analysis under *Leon*. This characterization is incorrect. The People argued that the reasonableness of the officers' actions should be considered in light of the idea that a reasonably well trained officer would have considered the clone pagers to be akin to a pen register. We cannot blind ourselves to evidence that such a claim is unwarranted.

36

301S

pager warrants, makes it impossible for me to accept the People's argument.

Although stated previously, it bears repeating that what we are dealing with in defendants' case are warrants that vest complete discretion in the investigating officers to intercept communications for as long as they see fit. Thus, they define the term general warrants. There are undoubtedly cases where the defects in a warrant render it constitutionally invalid, however a police officer would still be reasonable in relying on it. (See *Bay* v. *Superior Court* (1992) 7 Cal.App.4th 1022, 1031 [although warrant deficient for failing to adequately limit items to be seized to those related to a specific crime, officers objectively reasonable in relying on the warrant because it sufficiently described the items to be seized].) However, when the warrant is so defective as to constitute a wholesale abdication of authority to the law enforcement officials to define the scope of the search, *no* officer would be objectively reasonable in relying on it. (See *U.S.* v. *Kow* (9th Cir. 1995) 58 F.3d 423, 428-429 ["Because the warrant in this case was facially invalid, no reasonable agent could have relied on it 'absent some exceptional circumstance.'"]; *Center Art Galleries-Hawaii, Inc.* v. *U.S.* (9th Cir. 1989) 875 F.2d 747, 753 ["The warrants were so overbroad that absent some exceptional circumstance, no agent could reasonably rely on them."].)

I recognize my determination that neither defendant had a legitimate expectation of privacy in the intercepted communications obviates any need to address the majority's *Leon* analysis. However, because the majority have stretched the good-faith exception to the exclusionary rule far beyond the bounds of conduct by police officers it was ever intended to address, I must respectfully dissent. This extension is neither required nor warranted under the facts of defendants' case.

WISEMAN, J.