# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANA JAMES EWELL, | 1:06-cv-00186 AWI MJS (HC) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | **ORDER GRANTING CERTIFICATE OF APPEALABILITY FOR GROUNDS TWO AND FIVE** |
| A.K. SCRIBNER, Warden, | |
| Respondent. | **ORDER DENYING CERTIFICATE OF APPEALABILITY FOR GROUNDS ONE, THREE, FOUR, AND SIX** |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Petitioner and Joel Radovcich (hereinafter "Radovcich") were convicted of first degree murder in the Fresno County Superior Court.  See Pet., 2, ECF No. 1.  The jury found Petitioner guilty of three counts of first-degree murder and found three special circumstances to be true: multiple murder, murder for financial gain, and murder while lying in wait.  Id.  Petitioner was sentenced to three consecutive life sentences, without the possibility of parole, plus two additional years for arming enhancements.  Id.

Petitioner appealed the conviction to the California Court of Appeal, Fifth Appellate District, on September 22, 2000.  See Lodged Doc. 1.  The appellate court affirmed the conviction in a

1   reasoned opinion filed on May 4, 2004.  See People v. Ewell, F031391, 2004 WL 94479

2   (Cal.Ct.App. 2004); see also Lodged Doc. 6.

3        Petitioner filed a petition for review in the California Supreme Court on June 15, 2004.  See

4   Lodged Doc. 7.  The court denied the petition without comment on August 25, 2004.  Id.

5        Petitioner filed a petition for a writ of certiorari with the United States Supreme Court on

6   December 22, 2004.  See Lodged Doc. 8.  The Supreme Court denied the petition on February 22,

7   2005.  See  Ewell v. California, 543 U.S. 1169 (2005).

8        Petitioner filed the instant petition for writ of habeas corpus with this Court on February 17,

9   2006, see Pet., and a memorandum of points and authorities in support thereof on June 1, 2006. See

10  Mem. P. & A., ECF No. 9.   Respondent filed an answer to the petition on October 29, 2007.[1] See

11  Answer, ECF No. 25.  Petitioner subsequently filed a traverse on January 22, 2008.  See Traverse,

12  ECF No. 32.

13                          **FACTUAL BACKGROUND**[2]

14                                      **I**
                        **THE HOMICIDES AND CRIME SCENE**

15

16        Dale and Glee Ewell and their children, Dana[3] and Tiffany, spent Easter
          weekend of 1992 at the family beach house at Pajaro Dunes, near Watsonville. They

17        arrived at varying times on Thursday and Friday, as Tiffany and Glee drove over from
          Fresno; Dale, who, with Glee, owned an aircraft sales business at the Fresno Air

18        Terminal called Western Piper, flew over from Fresno; and Ewell drove down from
          Santa Clara University, where he attended school.

19        On Easter Sunday, April 19, Ewell and Dale played tennis together in the
          morning, then the family had lunch and took a walk on the beach. Ewell left around

20        2:15 or 2:30 p.m. and drove to the Morgan Hill home of girlfriend Monica Zent. He

21  _____

22        [1] Along with the answer, Respondent lodged eighteen boxes of documents that were provided in no discernable order.
    While at first glance it appears this was merely a regrettable oversight on the part of Respondent, a footnote in Respondent's

23  Notice of Lodging suggests otherwise: "[f]or the ease of this Court's reference to the record on appeal and Respondent's duty
    to provide the documents, the Clerk's Transcripts on Appeal and Reporter's Transcript's [sic] on Appeal will be lodged in

24  the order in which they were received following duplication in Sacramento." (Notice of Lodging of Record, 2 n.1.) For future
    reference, the Court would like to emphasize the fact that this method of lodging is unacceptable and makes this Court's

25  review of an already sizable record far more arduous than need be.

26        [2] The facts are derived from the factual summary set forth by the California Court of Appeal, Fifth Appellate District,
    in its opinion of May 4, 2004, and are presumed correct pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1). See People v. Ewell,

27  No. F031391, 2004 WL 944479, at *1-22 (Cal. Ct. App. May 4, 2004).

28        [3] Both "Dana" and "Ewell" refer to Petitioner.

remained there with Monica and her family until sometime that evening, when he and Monica returned to school.

Ewell assumed his mother and sister left the beach house shortly after he did. Dale returned to Fresno by plane, arriving at the Fresno Air Terminal just before 3:30 p.m. He telephoned Marlene Reid, Western Piper's business manager, from the office sometime around 4:00 p.m. However, when Ewell telephoned his family at home that evening, no one answered. He was unable to reach anyone when he telephoned again on Monday, and Dale neither appeared at his office that day nor maintained his usual contact with Reid.

On Monday, Ewell expressed concern to John Zent (Monica's father and an FBI agent) and Marlene Reid about his inability to contact his family. However, despite Reid's advice that he contact his parents' neighbor and ask that person to check the house, he did not do so until Tuesday morning, when Reid insisted after Dale again failed to arrive at work.

Shortly after 9:00 a.m. on Tuesday, April 21, the bodies of Dale, Glee, and Tiffany were discovered in their residence on East Park Circle Drive, in the Sunnyside area of Fresno. Tiffany was lying face down on the kitchen floor. She had been shot once in the back of the head with the bullet exiting her forehead. Dale was lying face down in the hallway. He had been shot once in the back of the neck with the bullet exiting below his right eye. Glee was lying partially on her back and partially on her left side in the office. She had been shot four times, including once just below the eye with the bullet exiting the back of her head. Rigor mortis and lividity had set in as to all three victims, each of whom appeared to have been shot at the location at which he or she fell. Although the pathologist could not determine the order in which Glee's wounds were inflicted or in which [sic] the victims were killed, authorities theorized that the women had returned home first and entered the house together or one right after the other. Tiffany was shot first, having been taken by surprise when she passed the killer's location; the killer then emerged and shot and wounded Glee, who retreated into the office, where she was killed. Dale was killed last, and later than the women. Times of death were estimated at between approximately 5:00 and 6:00 p.m.

Law enforcement personnel suspected that the murder weapon was a nine-millimeter firearm. As such weapons are usually automatics, shell casings should have been ejected and found at the scene. None were. However, a box of nine-millimeter Winchester cartridges, containing 18 rounds of ammunition, was found in the master bedroom, and an unexpended round was located on the master bedroom floor. Analysis of the lead bullets and tool marks showed that the bullets recovered from the crime scene almost certainly came from this box of cartridges. (Footnote omitted.)  Subsequent investigation revealed that Dale had purchased the box of ammunition, together with a nine-millimeter Browning pistol, in 1971. The pistol, which should have been in the residence, was missing.

While there did not appear to have been any struggle, the house had been ransacked, as if burglarized. However, law enforcement authorities concluded the burglary had been staged and the victims killed for a reason. There were no signs of forced entry, and all doors and windows were secured, with the exception that the front and back doors were unlocked when sheriff's personnel arrived. The skylights did not appear to have been disturbed. The alarm, which was normally armed, was not on and had not been triggered.  (Footnote omitted.)

//

//

## II
## INVESTIGATION AND SURVEILLANCE OF APPELLANTS

The Ewell estate was worth between $7 and $8 million. Ewell was aware of this, as he had typed a statement of net worth for Dale on or about April 1, 1992. Had Tiffany lived, she and Ewell each would have inherited half of the estate. With her dead, Ewell, who was 21 years old at the time of the homicides, was the sole beneficiary.

Under Dale's and Glee's wills, the estate was distributed to a trust. Until Ewell turned 25, the amount paid out to him was discretionary with the trustee, who was obligated to pay enough, from income or principal or both, to support and educate Ewell. Between ages 25 and 30, all income would be paid to Ewell, although any payment from the principal would remain discretionary with the trustee. At age 30, one-half of the principal would be distributed to Ewell, with the remaining half distributed to him at age 35. When his uncle obtained a copy of the will shortly after the bodies were found and informed Ewell that it contained no burial instructions, Ewell said something like "'Well, okay, but what about the money?'" When informed of the basic provisions, including the age stipulations, Ewell became visibly shaken and angry. He pounded on a table as he lurched or lunged out of his chair, and asked why his father had done that.

Immediately after the homicides, Ewell resided with one of his uncles. He moved out of the house within a couple of weeks and told Michael Dowling, the estate's executor, that he was staying with a friend in the neighborhood. He specifically said he was not living in the Park Circle Drive house. Within a month after the funeral, however, Ewell gave friend Michael Poindexter a tour of the Park Circle Drive residence. Ewell was living in the house at the time, despite the fact only some cleanup work had been done and bullet holes, blood, and possible brain splatterings were still visible. Referring to the investigators assigned to the case, Ewell told Poindexter, "'They will never solve this case. They're a bunch of dummies.'" Ewell also advised Poindexter that he (Poindexter) did not have to talk to the detectives.

As part of their investigation, Sheriff's Detective John Souza and his team set out to obtain background information on Ewell, as well as to look at other possible suspects. In the course of this investigation, Radovcich's name was mentioned as being a friend of Ewell's from college. Souza and Detective Burk contacted Radovcich on May 7, 1992, while they were in the Los Angeles area. When Souza identified himself and advised that he was working a triple homicide case in which the parents of a Santa Clara student were victims, Radovcich acknowledged that he knew Ewell and had heard about the murders. When Radovcich asked why Souza wanted to talk to him, Souza explained that he understood Radovcich to be a good friend of Ewell's, and that he was conducting a background investigation on Ewell. Radovcich asked, "'Are you going to arrest me?'" When Souza said no, Radovcich agreed to the interview.

The meeting took place the next day. Almost immediately, Radovcich brought up his prior question about being arrested. He explained that he had thought they were cops from Santa Clara and were harassing him. Radovcich related that he first met Ewell in fall of 1990, when they lived in the same dormitory at Santa Clara University. Radovcich said they were friends and would "hang out" together, but that their friendship was limited to school and they did not communicate outside of the school setting. Radovcich said he had been to Fresno one time, in spring of 1991, and

that he had met Ewell's parents at the Park Circle Drive residence. Radovcich also related that he had spent a couple of days at the beach house with the Ewell family. He said that his last contact with Ewell was in the winter quarter of 1991, and that he had not been to Fresno since his graduation from college in December 1991. When asked his whereabouts on Easter Sunday, April 19, 1992, Radovcich replied that he was at Hamrick's Paint and Body Shop. Radovcich related that Ewell had once said he had his own airplane business, although Radovcich knew Dale was the true owner of that business.

Further investigation revealed a much more extensive, long-standing relationship between Radovcich and Ewell than Radovcich revealed. According to school records, Radovcich began attending Santa Clara University in the fall of 1988, while Ewell's attendance began in fall of the following year. Prior to spring quarter of 1991, their course loads were within the normal range. Beginning that quarter, however, both took much heavier unit loads than normal. On February 6, 1991, Ewell exercised his right under federal law and requested permanent nondisclosure of all academic records. On June 10, 1991, Radovcich made a similar request. Fewer than one percent of enrolled students request nondisclosure in either temporary or permanent form. Radovcich graduated in December 1991. Ewell withdrew from the university on April 30, 1992, but returned in the spring quarter of 1993 and graduated in June of that year. Although Ewell requested that his name appear in the commencement program, he had the university maintain his nondisclosure status until October 11, 1994.

During the first week of June 1992, Radovcich was seen at the Park Circle Drive residence when Ewell was not present. He appeared to be living there and had his clothing in the master bedroom.

Sheriff's Department surveillance of Ewell began on June 25, 1992 and continued, off and on, until Radovcich's arrest. Surveillance conducted in June 1992 revealed that Ewell was living at the Park Circle Drive residence, and that Radovcich stayed there at least part of the time. When the men went somewhere together, Ewell drove his Mercedes or one of the family vehicles. Places they went together included banks, Michael Dowling's office, Western Piper, and property that was part of the Ewell estate. Ewell also went to some of those places alone. At times, he employed counter surveillance driving techniques. Ewell and Radovcich were also observed separately going to Corporate Air for helicopter lessons.

In order for Ewell to assist in compiling family financial records, Michael Dowling gave Ewell access to an office in Dowling's building and provided a telephone there that Ewell was authorized to use for business affairs. During the first couple of months following the homicides, Ewell was at the office almost every day. Telephone records for the office for May through July 1992 showed telephone calls to the residences of Radovcich's mother, brother, friends, and Hamrick's Paint and Body.

On November 20, 1992, Ewell came to the sheriff's department to retrieve a handgun that had been removed from the Park Circle Drive residence during the initial investigation. During the course of the conversation, detectives said they were concerned about Radovcich and wanted to talk to Ewell about him. Ewell responded, "'I'm out of here. I got what I want.'" He then jumped up from his chair. When Detective Burk told Ewell they needed his cooperation, Ewell replied, "'I have been.'" He then left. (Footnote omitted.)

That same month, an article appeared in the Fresno newspaper which talked

about authorities attempting to find a certain person in connection with the homicides. At the time this article appeared, housekeepers noted that Radovcich was staying at the Park Circle Drive residence with Ewell. It appeared Radovcich was staying in the master bedroom, while Ewell occupied his own room. There was a pistol on one of the nightstands in Ewell's room, and another handgun on a nightstand in the master bedroom.  (Footnote omitted.) At this time, Radovcich's hair was a dark color and fairly short. Housekeepers found empty hair dye bottles, latex gloves, and hair trimmings in the master bathroom, and what appeared to be paper ashes in a pot on the stove in the kitchen. They also observed Radovcich and Ewell looking at a map. After the article appeared, Ewell told his head housekeeper that he would no longer need her services, as he was going to sell the residence. Sometime later, he asked her to resume cleaning the home. When she did, Radovcich and his clothes were gone.

In early May 1992, bank accounts and insurance proceeds in the amount of $317,888.47, which were not part of the probate estate, were turned over to Ewell, as were a portion of Tiffany's approximately $119,000 in assets and some $375,000 in certificates of deposit. There was also a preliminary distribution from the estate, from which Ewell received various effects worth approximately $65,000 and his Mercedes. Although Michael Dowling did not permit Ewell to run Western Piper Sales as Ewell desired, Ewell was hired as vice president of the company at a salary of $2,000 per month. He held this position from May or June of 1992 until January 1994, when the business was sold.

Ewell's financial records revealed that, between April 1992 and March 1995, he withdrew a total of $124,153 in unaccounted-for cash from various accounts. This was cash which could not be traced to a specific expenditure or transaction. One bank's records revealed that most of Ewell's withdrawals from that bank were in $100 bills, with, secondarily, $50 bills. The other banks' records did not provide information concerning the denominations of withdrawals.

During the time Radovcich stayed at the Park Circle Drive residence, he and Ewell took helicopter lessons from Mazzei Flying Service. Ewell paid for both men's lessons with checks totaling $16,377.94. In addition, the flight school received cash payments from Radovcich totaling $3,400. Radovcich expressed an interest in pursuing his instrument rating and possibly his commercial rating. The minimum cost to obtain both would have exceeded $20,000. Although Radovcich started on the second part of his training, his last flight with Mazzei was on November 8, 1992. He subsequently informed the company that he was going to the Los Angeles area, and asked for a refund of the balance on his account. A check, which was made payable to Radovcich, was sent to the Park Circle Drive address. It was endorsed by Radovcich and Ewell and deposited into one of Ewell's bank accounts. Payments made to Mazzei on Radovcich's account totaled $11,489.61.

Between January 1993 and February 1995, Radovcich took airplane and additional helicopter lessons from various flight schools in the Los Angeles area. The cost of the lessons exceeded $21,000 and may have exceeded $33,000. Radovcich always paid cash, usually in $100 bills. It would have cost a minimum of $43,000 for Radovcich to obtain all of the flight certifications he possessed.

Radovcich had no known source of steady income. Prior to his graduation, his mother bought him a car. In December 1991, following his graduation, he moved back to the West Hills area and sporadically resided in the family home on Bobbyboyar. Radovcich's mother paid him for doing construction-type projects around the house, and also deposited small amounts of money into his checking

account for food and similar items. Other than these amounts, she did not provide him with money from December 1991 to the time of his arrest. She heard he was working piecemeal at places during that time, but did not personally know if he had a job. To her knowledge, he had no other money available, except for a trust fund over which she exercised some control. Other than for his car, she did not provide any money to him out of that trust fund during the time in question. Friends and other family members did not know him to have a job aside from the work he did for his mother.

Despite his lack of funds, however, Radovcich was interested in finance while in college and frequently talked about being a millionaire. During the summer of 1991, he had books sent to the home of college acquaintance Thomas Duong. Some of the books, which were from Paladin Press, concerned building silencers and similar subjects. Radovcich asked Duong if he knew anyone who had a gun for sale. Radovcich said something along the lines of wanting an AK-47, but he did not want to go to a gun shop. Not long after, in October or November of 1991, Ewell began dating Monica Zent, who lived in the same school dormitory and with whom he had become friends during the fall quarter of 1990. It was common knowledge within the dormitory that Monica's father was an FBI agent.

As the authorities' interest in Ewell and Radovcich grew, they conducted extensive surveillance and investigation of the pair over the course of the years following the homicides. We present here a highly condensed version.

Surveillance of Radovcich was conducted in Southern California from February 1-4, 1993, and again from March 27-April 10, 1993. Ewell was not seen during either period. While under surveillance, Radovcich occasionally exhibited erratic driving habits which caused surveilling officers to believe he was trying to make sure he was not being followed.

During the course of their surveillance, officers learned that Radovcich frequently used pay telephones, especially those at the 7-Eleven at the intersection of Saticoy and Fallbrook in Canoga Park. While not far from his mother's residence, these were not the pay telephones closest to the house. On occasion, surveilling officers pretended to use the telephone next to the one being used by Radovcich, in an attempt to overhear his conversations. On at least one occasion, Radovcich's actions were consistent with his calling a pager.

Commencing April 1, 1993, sheriff's detectives obtained telephone records in conjunction with their surveillance operation. On April 1, during which time Ewell was living in a dormitory at Santa Clara University, Radovcich used one of the telephones at the Saticoy and Fallbrook 7-Eleven to make a brief call to Ewell's dormitory number. Several minutes later, he made a call to the pay telephone at a Shell station on The Alameda in Santa Clara.

Approximately midway through Radovcich's conversation, which lasted around 30 minutes, Sheriff's Sergeant Hollis went to the pay telephone next to the one Radovcich was using and attempted to overhear the conversation. Radovcich expressed concern about staying there too long, as all "'they'" had to do was drive by and "'they'" might see him. He also asked whether the person to whom he was speaking was "'getting any heat yet.'" Later in the conversation, Radovcich said, "'Get this lawyer down here so it doesn't look like the buddy/buddy system, or something'"; "'I didn't tell them anything'"; and "'Can't you find anyone cheaper in Los Angeles, Fresno, or San Francisco?'" Portions of the conversation concerned

flying, and at one point Radovcich mentioned a commercial license and asked the other person whether he or she wanted him to get his "'fixed wing'" while he had the time.

Later that day, Radovcich returned to the same telephone. He appeared to dial a pager number, then waited in his car. Telephone company records showed a call to Ewell's dormitory room. Approximately 10 minutes later, Radovcich returned to the telephone and placed a call to the Shell station on The Alameda in Santa Clara. Detective Lee pretended to use the telephone next to Radovcich in order to overhear the conversation. In addition, detectives attempted to record the conversation.[4] Lee heard Radovcich say that something was going to blow up; that there was going to be a news blitz; and that he had seen a newsman from Fresno whom he recognized and that he had had to drop out of sight and had stayed at his brother's house. At one point, Radovcich stated either that he did not want stock options or that he did not care. He also said something about "'[o]ne quarter million'" and that he wanted it now or needed it now or expected it by now. He also said, "'I want to go around the world.'" Radovcich appeared angry or frustrated at the end of the conversation.

Further surveillance during this time showed calls from Radovcich to Ewell's dormitory room and a pay telephone near the location of Ewell's classes. On April 5, Radovcich telephoned the office of Fresno attorney E. Terrence Woolf. Radovcich was overheard to say that he was a referral from Mr. Berman and needed to see Mr. Woolf about a homicide. Radovcich subsequently made a short call to Ewell's dormitory room. That afternoon, a call was made from Ewell's dormitory room to a general reception number for several attorneys, including Woolf. On April 8, three telephone calls, which were too long to represent the checking of answering machine messages, were made from Ewell's dormitory telephone to the Park Circle Drive house. On or about April 8, Radovcich personally paid Woolf $3,000 for attorney services. Woolf did not know where Radovcich obtained the money. Radovcich's parents did not directly provide these funds to Radovcich, although they did pay Woolf for legal services after Radovcich's arrest.

On the morning of April 12, 1993, Detectives Moore and Lyons spotted Radovcich in his vehicle in downtown Fresno. Radovcich's hair was radically altered from how he had worn it in Southern California; it was cut shorter and was now almost jet black instead of a lighter brown. The detectives followed him to the Park Circle Drive residence and then to the Santa Clara area. Radovcich tended to be a fast driver, and his highway speeds varied from 75-100 miles per hour or better. Upon arrival in Santa Clara, Radovcich used pay telephones to make various calls, including to Ewell's dormitory telephone. A short time later, Ewell arrived at Radovcich's location and they drove off together in Ewell's Mercedes.

No visual surveillance was conducted on Ewell or Radovcich between April 12 and April 29, 1993, although telephone company records for the pay telephone at the Saticoy and Fallbrook 7-Eleven revealed several calls to Ewell's dormitory room during this time. In addition, on April 16, a call was made to Jack Ponce's pager in which the number dialed was followed by the number of Radovcich's pager.

---

[4] Authorities attempted to tape-record a number of conversations. There was a great deal of background noise on many of the tapes, and efforts to enhance the sound quality were unsuccessful. For instance, Detective Lee described the April 1, 1993 tape as being mostly background noise, and of poor to fair quality. Many of the statements Lee recalled could not be heard on the tape, although he distinctly remembered Radovcich making them.

Radovcich and Ponce did not page each other often, and this was the first detectives knew of Ponce's existence.

Investigation revealed that on November 24, 1992, Radovcich obtained a pager, with statewide coverage, from Communication Headquarters in Los Angeles. (Footnote omitted.) In April 1993, Detective Souza served a search warrant on the company which caused it to issue him a duplicate ("clone") pager so he could receive duplicates of the pages Radovcich was receiving. On April 21, Souza intercepted a page to Radovcich from the San Jose Jet Center, which was not far from Santa Clara University. Telephone company records for April 22 showed calls made from pay telephones at the Ranch Market at the intersection of Mesa and Irvine in Costa Mesa, to Ewell's dormitory telephone. The April 27 records for those telephones showed calls to a telephone booth at the San Jose Jet Center.

Souza did not utilize the clone pager between April 21 and April 27 because Radovcich returned to Communication Headquarters and expressed concern that someone might be receiving his pages. He inquired whether any police had been asking about him and was told no. Radovcich subsequently requested that the name on his account be changed to "Mike Smith" and that he be given a new pager number. This was done and, after Souza obtained a new search warrant, the new pager number was also transferred to him. Souza maintained this clone pager through November 1993. During April 1993, he intercepted pages to Radovcich from various pay telephones in Santa Clara and at the San Jose Jet Center. Telephone company records showed that from April through June 1993, numerous calls were placed from pay telephones near Radovcich's various abodes in Southern California, to pay telephones in the Santa Clara area and to Ewell's dormitory room.

On April 29, detectives began further visual surveillance on Radovcich in the Southern California area. On a number of occasions, he was seen using pay telephones at various locations. On May 3, the surveillance team returned to Fresno, except for Detective Burk. On one occasion, Burk, who had been provided with the clone pager by Souza, intercepted a page from the San Jose Jet Center. He then saw Radovcich, who had been at his apartment, go to a particular 7-Eleven and use the pay telephone there. Telephone company records for the pay telephones at this location showed that on May 5, a call was placed to Ewell's dormitory room. Approximately two hours later, Souza intercepted a page from a business center at 1520 The Alameda, Santa Clara. On May 8, Souza intercepted pages from the same business center and another pay telephone in Santa Clara.

On May 12, 1993, detectives went to Santa Clara University to confirm Ewell's class schedule and see if he attended classes that day. At approximately 1:45 that afternoon, Ewell spotted Detectives Curtice and Osborn and proceeded to follow them around campus in a very brazen manner. Shortly after 2:30 that afternoon, Souza intercepted a page to Radovcich from a pay telephone in the San Jose Jet Center, and he asked detectives in the area to check the location. At some point that afternoon, Ewell was observed using a telephone inside the San Jose Jet Center.

Around 8:05 that evening, Curtice and Burk, accompanied by Public Safety (campus police) Officers Scott and Molina, went to Ewell's dormitory room to speak to Ewell. When Molina knocked, a voice asked who it was, and Molina identified himself. Ewell opened the door; Monica Zent was seated on the bed.

Burk told Ewell that they had information on who might have killed his parents. Ewell said he did not want to speak to them. When Burk again said they had

information, Ewell responded that he felt it was not the right time to be bothering him in regard to this incident. After further conversation along the same lines, Burk asked whether Ewell was interested in finding out who killed his parents. Ewell said yes, but that he needed to make some telephone calls. Burk asked whom he was going to call; Ewell replied that he was going to call his attorney. After further conversation, Ewell reiterated that he did not wish to speak to Burk and Curtice there. He then asked Curtice whether he had enjoyed the campus, and when Curtice said yes, Ewell said he had made a report at the police department against the detectives for following him. When Curtice told Ewell to call when he was ready to hear their information, Ewell repeated that it was not the appropriate time or place, and asked how they would like it if somebody came banging on their door at 11:00 at night. Burk pointed out that it was only 8:00, and noted that they did this kind of thing all the time and that people generally want to get information about who killed his family members. Ewell then turned his attention back to the campus police officers and said he did not want to talk to Burk or Curtice, but wanted to talk to Scott and Molina.

Ewell started to shut the door, at which time Curtice said, "'By the way, just so you know, the information we have leads us to believe that Joel Radovcich is responsible for killing your family.'" Ewell immediately became quiet and appeared stunned. He then seemed to collect himself and said he still felt it was not appropriate to be discussing it at this particular time of the evening. He then shut the door, pretty much during the middle of that statement.

Approximately 15 minutes later, Burk and Curtice watched Ewell and Monica Zent exit the building and enter Ewell's Mercedes. Ewell drove to the public safety office and went inside for a few minutes, then got back in his car and left the area. A few minutes later, the Mercedes was observed entering the 880 freeway from The Alameda. Curtice followed Ewell into the far left lane. As they neared the first exit, Ewell suddenly pulled across the other two lanes of traffic and took the exit. Curtice could not follow safely, so he continued on the freeway.

At approximately 9:00 p.m., Souza intercepted a page to Radovcich that originated from the business complex at 1520 The Alameda. Detective Osborn responded to that location and observed Ewell hanging up the receiver on the pay telephone. His vehicle was parked alongside with the lights on. Monica Zent was seated in the passenger side of the vehicle. When Ewell hung up, he went directly to his car, exited the parking lot, and ultimately was seen driving northbound on The Alameda.

Two days later, on May 14, Detective Souza intercepted a page which originated from the Airport Holiday Inn, in Fresno. (Footnote omitted.) Radovcich was found at a pay telephone in Costa Mesa, telephone company records for which showed a 45-minute call to the Fresno Airport Holiday Inn.

Detective Knight, who was wearing a transmitting device called a wire, approached Radovcich's location and was able to place herself at the telephone around the corner from, but within three feet of, Radovcich, who was already on the telephone when the surveillance team arrived. Knight was only able to hear small patches of Radovcich's side of the conversation due to the telephone being located under an airport's jet take-off flight path. As a consequence, the tape recordings made from her body wire did not turn out well, and there were matters she could hear in person that could not be heard on the tapes.

All told, Knight was able to hear portions of three conversations in which

Radovcich was involved.[5] As she was unable to take notes while she was listening, it was possible she took sentences and attributed them to the wrong telephone call. As best as she could recreate the conversations, Radovcich said he was a little worried and was "'going to dis this place'" during the first conversation. The discussion turned to money; she heard the words "'stock market' and 'values,'" as well as the sums $25 million and $1 million. This was over a period of several minutes, and then the conversation turned to an unrelated subject. Knight heard change go into the telephone on several occasions and then what she believed to be a hang-up and another number dialed. She had been there for approximately 20 minutes at that point.

During the second conversation, Knight heard Radovcich say, "'Don't worry about it. She doesn't know anything. She's about to burst. She can't say anything. She won't'"; "'I miss you. They think they got something, you know, evidence. They need to make an arrest. Politically they need it. Just play the game. I think it's going well. I advise you not to talk to them. They blew it. They blew it at the first'"; and something like, "'We have everything to lose and nothing to gain.'" During this conversation, Radovcich put money into the telephone several times, and Knight again heard what she believed to be a hang-up and a redial.

During the third conversation, Radovcich appeared to be pleading with the other person. Knight heard him say, "'They can't tap your phone. It's against the law in this country. If you love me, you won't say anything. They spread lies. They hope to trip you up. They try to catch you in a lie. If you talk to them, they'll mix you up and twist your words. Go have breakfast with Pete. I love you.'" He then hung up. Knight was there for a total of just under an hour.

In his vehicle, Sergeant Jones had a unit that recorded transmissions from Knight's body wire. In addition, Jones was listening to the transmissions and taking notes. At various times, he heard: "'They need to make an arrest to take the political heat off of them. They don't have evidence. They will try to catch you in a lie. They might try to plant evidence. They plant marijuana'"; "'Nothing to gain, everything to lose'"; "'You just don't think you'll win the game. If you care about me, I advise you not to talk to them'"; "'They are going to lock you up. I can't be around you'"; and "'My life is fucked. You need to keep on repeating it. They will play on your fear. And I love you, too.'"

On May 18, officers overheard portions of several conversations between Radovcich and Jennifer Nunnikhoven McDonald, a friend of his who was living in a dormitory at Santa Clara University. When McDonald informed Radovcich that she had been contacted by Fresno County Sheriff's detectives, he expressed a great deal of concern and advised her not to speak to them. He told her to get a lawyer and gave her Terrence Woolf's telephone number. He begged her to take the situation seriously and expressed guilt over her being involved in the investigation. (Footnote ommited.)

The following afternoon, Souza intercepted a page via the clone pager. About the same time, Radovcich ran from his apartment to his vehicle and drove to a store, where he used a pay telephone. Telephone company records showed he called a pay telephone at the San Jose Jet Center. At that time, detectives conducting surveillance in the San Jose-Santa Clara area observed Ewell using that telephone. Sergeant

---

[5]Telephone company records showed a call to the Radovcich home on Bobbyboyar, followed by two calls to the apartment of Peter and Danielle Radovcich, Radovcich's brother and sister-in-law. Sergeant Dadian, who arrived at the location after Radovcich was already on the telephone, saw Radovcich make four telephone calls.

Dadian attempted to overhear Ewell's end of the conversation, but was unsuccessful because the booths were enclosed and insulated. Detective Haroldsen attempted to monitor Radovcich's end of the conversation. In part, Radovcich stated, "'Okay, Dana, okay. After I call, okay, tell her to call me; and I'll talk to her. Right? Okay. Okay. I'll do that. So I call her back. Right?'" Haroldsen also heard him say, among other things, "'Would be a mistake. So I called her parents and told them what kind of deep shit she's getting into. And so her mom called, which was this morning. I called her. And then I called my Woolf guy.'" Radovcich expressed concern that either the telephones were tapped or there were snitches, and suggested "'someone is running around listening to us or something . . . .'"

No visual surveillance was conducted on Radovcich from May 22 to June 2. However, telephone company records and clone pager intercepts revealed frequent contact between Radovcich and Ewell's dormitory room telephone, as well as between Radovcich and pay telephones at the San Jose Jet Center, the business complex at 1520 The Alameda, and other Santa Clara locations.

From June 3-June 15, 1993, detectives again conducted visual surveillance on Radovcich, who was then residing at his mother's residence on Bobbyboyar in West Hills. On the afternoon of June 3, Radovcich received a page bearing Jack Ponce's pager number and a numeric code. He also received a page with a numeric code from a pay telephone at the San Jose Jet Center. Approximately 10 minutes later, Ewell was seen conversing on that telephone. Detective Avila attempted to overhear Radovcich's conversations. During one, Radovcich asked, "'Then why don't they just pick us up?'"; "'I call him like, I just called him. Now, uh, uh, I-I got to talk to my guy and see, uh-see if they can actually charge, charge me with something in that, uh, uh, three shirt deal. I don't know how far that goes. Yeah. Yeah, no problem. Right'"; that he wanted "'us'" to be "'extra careful'"; and "'It's just we got to hang tough.'" Avila could make out little or nothing with respect to Radovcich's other calls.

Surveillance over the next few days showed Radovcich's continued use of pay telephones and occasional contact with the San Jose Jet Center and Ewell's dormitory room. On June 10, he was observed to terminate his call if another individual came to use one of the telephones at his location.

Authorities found no evidence of contact between Radovcich and the Santa Clara-San Jose area from June 12-15. (Footnote omitted.) On June 12, Radovcich went to his brother Peter's apartment in Reseda. Radovcich and Peter were in separate vehicles. Radovcich's vehicle was placed inside the garage, while Peter's vehicle was placed up against the closed garage door. Peter entered the apartment, which was on the second story of the complex, while a female stood at the door. She looked toward the street, then made a "Come on" motion with her arm. Radovcich then ran into the apartment. Several times after that, Peter or the female came outside and looked around as if attempting to see whether anyone was in the area.

The intense Southern California surveillance ended on June 15, 1993. Contact between Ewell and Radovcich continued, however. In September 1993, Radovcich was seen walking from between the cars at the end of the hangar at the Fresno Air Terminal, where Ewell maintained a single-engine airplane. Ewell, who was performing a preflight check, looked back at Radovcich and said something to the effect of, "'I didn't tell you you could come out. Get back.'" Radovcich walked back in between the cars and ducked down. Ewell then finished the preflight check, got into the plane, started the engine, and waved to Radovcich, who ran to the plane. He entered but, when Ewell took off, only Ewell was visible. On a couple of occasions,

Radovcich was seen inside Ewell's hangar. On March 16, 1994, Ewell and Radovcich both exited Ewell's plane when it landed at the Fresno airport.

On November 15, 1993, Ewell and Radovcich enrolled with Aqua Sports, in Fresno, for scuba diving lessons. Each gave the Park Circle Drive residence as his address. They selected the same classes, took their classes and pool sessions at the same times, and performed their open-water dives and received their certifications on the same date.

On December 2, 1993, Ewell, who was already insured by Blue Shield, requested that insurance applications be sent to the Park Circle Drive address. Blue Shield subsequently received an application for coverage from Radovcich, which was dated December 9, 1993, and which gave his address as the Park Circle Drive residence. The address was subsequently changed to a post office box in Los Angeles.

On February 14, 1994, a person who looked like Radovcich and who gave his name as Mike Johnson purchased a pager and paging service for one year in advance from The Original Pager Company in Canoga Park. On January 29, 1995, this person extended the service for six months. On March 3, 1995, a search was conducted of Radovcich's vehicle. Among the items seized was a receipt in the name of "Mike Johnson" for the pager and service from February-July, 1995. A search of his mother's home revealed a Kenwood two-way radio and hand-held scanner in one of the bedrooms. A plastic manufacturer's bag which bore the name "Kenwood" and contained a brochure for a Kenwood transceiver hand-held radio, a credit card receipt, and two warranties, was found in the office closet of the Park Circle Drive residence during execution of a search warrant there on March 3, 1995. The search also revealed a box of latex gloves in the master bathroom, which may have been there at the time of the homicides; Radovcich's passport; and maps and aircraft paperwork relating to a March 1994 trip to Mexico.

From July 3, 1994-March 26, 1995, Ewell rented an apartment at the Broadcast Center Apartments in Los Angeles. The gas account was in the name of "Dan James." Payment was made by cashier's checks, one of which bore the name "Dana Ewell" as the purchaser. Following Ewell's arrest, a defense investigator moved property from the apartment to a mini-storage unit in Fresno. The pager belonging to "Mike Johnson" was subsequently retrieved from the mini-storage unit. A gun-cleaning kit bearing Radovcich's fingerprint was also seized from the mini-storage unit, as were two pistols. A box that matched one of the weapons, which was purchased in 1993, was found during the March 1995 search of the Park Circle Drive house. Also found in the mini-storage was a Kenwood receiver which was consistent with the brochures found during the search of the Park Circle Drive residence.

III
THE PHYSICAL EVIDENCE

During the period between the homicides and the arrests, extensive investigation of the physical evidence took place. Unusual scratches on the bearing surfaces of the six bullets recovered from the crime scene and autopsies led Allen Boudreau, a firearms expert, to determine that all six bullets were fired by the same weapon, that the weapon had a ported barrel (a barrel in which holes had been drilled), and that a homemade sound suppressor (silencer) was used. He also determined that the weapon was not a revolver or the Browning that was missing from the Park Circle Drive residence. Further investigation led him to conclude the

weapon used was an AT-9 manufactured by Feather Industries, with a barrel made by Green Mountain Barrels.  (Footnote omitted.)

During the March 2, 1995, search of the home of Radovcich's mother, a container of drill bits (called a drill bit index) was seized from the garage. In the drill bit index, Boudreau found particulate matter which included larger white particles, drill turnings, and small pieces of what appeared to be steel wool. He also found a lot of particulate matter on the clothes Glee was wearing when she was killed, including small metallic particles, particles of what appeared to be a dark, rubbery-type substance, and fluorescing yellow fibers which were consistent with the nap on tennis balls.

Boudreau obtained an AT-9 and various barrels; constructed a silencer out of PVC pipe, tennis balls, and steel wool (as shown in a book on how to make silencers); used the porting configuration contained in a barrel whose location was revealed by Jack Ponce; and conducted test-firings.  (Footnote omitted.) He concluded that tennis ball particles, such as those found on Glee's clothing and in the piece of carpet which had been under Glee's body, would have been ejected had a bullet been fired through a sound suppressor made with tennis balls; and that steel wool particles, again such as those found on Glee's clothing, would also have been ejected from a homemade sound suppressor. Boudreau also determined that the piece of carpet contained particles of chrome molybdenum steel, of like composition to drilled metal specimens from Green Mountain barrels.

Boudreau cleaned the recovered barrel, which was packed with dirt, and removed the rust from the bore. In the course of cleaning the barrel, Boudreau discovered steel wool fibers inside. The movement of gases which occurs when a weapon is fired would move steel wool used in a sound suppressor from the outside of the barrel to the inside. Boudreau conducted test-firings with the barrel, and concluded that all six crime-scene bullets were fired through it. (Footnote omitted.)

## IV
## PETER RADOVCICH'S TESTIMONY

On March 8, 1995, Peter Radovcich, Radovcich's older brother, was arrested for three counts of murder in connection with this case. He testified at trial pursuant to an immunity agreement with the district attorney's office.

Peter became friends with Jack Ponce when both were in high school. They remained friends following Peter's 1989 marriage to Danielle. Peter, who was employed by Sketchley Mason as a plumber and had a workshop set up in his garage, occasionally accompanied Ponce to a shooting range called Firing Line. Ponce was a good shot. Radovcich, who knew Ponce, did not accompany them, nor did Peter know him to go to shooting ranges. Peter and Ponce would either rent weapons at the range or use a weapon belonging to Ponce. Ponce had a Llama semiautomatic pistol which belonged to his stepfather. The gun tended to jam.

At some point, possibly in the summer of 1991, Peter unsuccessfully attempted to solder a barrel extension that Radovcich gave him onto a .22-caliber firearm which belonged to Ponce but was in Radovcich's possession. Following Radovcich's graduation from college, he had Peter braze an extension tube, which Radovcich provided, onto the end of the barrel of Ponce's Llama. Peter understood the work was being done in order to build a silencer. Peter performed the work inside his parents' garage and later heard a weapon being fired inside, although he did not see a

finished silencer. He did not see the Llama again until after the homicides.

Two to four months or more before the killings, Peter learned that Radovcich wanted a gun. At some point, Peter became aware that Ponce had purchased a weapon for Radovcich.

Approximately two to three weeks after he worked on the Llama, and before his and Danielle's Easter weekend trip to Knott's Berry Farm, Peter brazed a washer onto the barrel of an AT-9 at Radovcich's request. Peter assumed the modification was to accommodate a silencer. He did not believe the barrel was ported at the time he worked on it, and he never saw the finished product. Later, however, he heard what he believed to be Radovcich firing a silenced weapon in their parents' garage. During this period of time, Peter did not see Ponce at the Radovcich family home on Bobbyboyar. (Footnote omitted.)

On April 18, 1992, Peter and Danielle celebrated Danielle's birthday by visiting Knott's Berry Farm and other Southern California attractions. Because they were staying the night, Peter and Danielle arranged for Radovcich to watch their dog. The next morning, which was Easter Sunday, they returned to the apartment. Radovcich's car was parked in front of their garage, and he was in the apartment. This was between 9:00 and 11:00 a.m. (Footnote omitted.) By the time Peter and Danielle left about noon (according to Peter) or between 1:00 and 3:00 p.m. (according to Danielle) to go to Danielle's mother's house for lunch, Radovcich and his vehicle were gone. Danielle and Peter returned home between 1:30 and 2:00 p.m. (according to Peter) or late that afternoon (according to Danielle). Radovcich was not there and did not return to the apartment until between 9:00 and 11:00 that night. Radovcich appeared calm when Peter saw him that night.

Sometime after Easter Sunday, a panicked Radovcich unexpectedly came to the apartment one night and told Peter that he had gotten a code-Peter assumed he meant on his pager-and needed to get out of town. He said Peter might see his face on "America's Most Wanted." When Peter refused to help him, Radovcich left and Peter did not see him again for one to two weeks. (Footnote omitted.)

In Peter's garage was a large box in which Radovcich stored a variety of items. At some point, Peter saw a backpack there that had not been present before. Sometime after dark on April 22, 1992, Peter was in his garage when either Ponce or Radovcich handed him the backpack, a cardboard box which contained a "Soldier of Fortune" magazine as well as five to ten paperback books with pictures of guns on the covers, and a pair of gray Nike tennis shoes. Peter was told to dispose of the items. (Footnote omitted.)

Peter took the items to his shop at Sketchley Mason, where he was joined by Ponce. Radovcich was not present. At the shop, Peter looked inside the backpack and discovered gun parts. He believed that three guns, all of which were in pieces, were in the backpack. One was the Llama, which still had the extension welded onto it. Peter broke it off. Also in the backpack was the barrel onto which Peter had welded the washer. The washer was off and the barrel was full of holes. The barrel and stock, which was also in the backpack, were consistent with a photograph of an AT-9 which Souza subsequently showed Peter. The other weapon in the backpack was a semiautomatic pistol of some sort. It also had holes in it. None of the weapons was a revolver, and all had holes where the serial numbers used to be. Also in the backpack were a lot of brass shell casings, tennis balls that were cut in half, and a cylindrical object with PVC caps at the ends. Peter believed this to be the silencer for the AT-9.

1

2          Peter and Ponce were at the shop for about half an hour. During this time,
   Ponce sprayed the bag's contents with WD-40 to take care of any fingerprints. When
3  they left, Peter drove and stopped at various locations. He then remained in the
   vehicle while Ponce got out and threw things away. At one point, Peter asked Ponce
   whether the gun-he did not specify which one-had ever been used. Ponce said no.

4

5          Ponce suggested their general route, which took them to a commercial district
   in the San Fernando Valley, the Santa Susana Pass in Chatsworth, Mulholland Drive,
6  Ventura Boulevard in Woodland Hills, and an industrial district in Reseda, among
   other places. Eventually, all Ponce had left was the backpack, which contained the
7  barrel. Peter was in a hurry to get home because Danielle had been paging him, and it
   was decided Ponce would dispose of the barrel. (Footnote omitted.) They then
8  returned to Peter's residence; Peter went to his apartment, while Ponce left in his own
   vehicle. Peter did not see Radovcich there. Peter later learned from detectives that the
   barrel had been recovered two fields away from Peter's apartment.

9

10         Over time, it became clear to Peter that authorities considered Radovcich a
   suspect in the Ewell homicides. (Footnote omitted.) Peter never asked Radovcich his
11 whereabouts on Easter Sunday of 1992, nor did Radovcich ever tell him that he had
   been at Hamrick's Paint and Body on that date.

12                                      **V**
                           **JACK PONCE'S TESTIMONY**
13

14         Ernest Jack Ponce was arrested for three counts of murder in connection with
   this case on March 2, 1995. He testified pursuant to an immunity agreement with the
15 district attorney's office.

16         Ponce became friends with Peter Radovcich when they attended high school
   together. During this time, he also met Radovcich. Ponce attended UCLA from
17 January 1987 to his graduation in December 1992, during which time he lived in a
   dormitory for the first year and then in various apartments. He maintained his
18 permanent residence at his mother's house in San Bernardino and resided there
   following his graduation. In early April of 1992, Ponce (who already had a car)
19 purchased an old van from Sketchley Mason Plumbing. During this same time, he
   obtained a pager from his mother so that she would be able to contact him. (Footnote
20 omitted.)

21         Ponce's interest in guns dated back to his childhood. In 1987 or 1988, he came
   into possession of a Llama .380 semiautomatic that had belonged to his ex-stepfather.
22 The gun did not work well. Ponce purchased his first gun, a .44-caliber Charter Arms
   revolver, in July 1990. He next bought a .22-caliber Beretta semiautomatic in October
23 1990. In 1993 or 1994, he purchased a Bryco .380-caliber weapon. During the times
   which were relevant to this case, Ponce did most of his shooting at a place called The
   Firing Line. Peter frequently accompanied him, but Radovcich never did. Ponce
24 termed himself "a fair shot," but described Peter as not being very good.

25         Ponce and Peter fell out of frequent contact when they both went off to
   college, then renewed their association around 1990, after Peter's marriage to
26 Danielle. Ponce and Radovcich began to associate during the summer of 1991. They
   stole two motorcycles together, and Ponce was present when Radovcich stole, and he
27 helped Radovcich take parts from, a car.

28

During the summer of 1991, Ponce saw a box of books among Radovcich's belongings. The books showed how to make silencers, contained information about poisons, and told how to be a spy or commando. Radovcich was learning to make silencers for weapons and needed a gun with a barrel that protruded. Ponce gave him the Beretta .22. In Peter's garage, Ponce saw a completed silencer on the end of the Beretta. As there was no barrel extension, the silencer had to be held on or else it would fall off. It was about the size of a soda can and was made of PVC pipe. Tennis balls cut out in the shape of a circle made the baffle. It muffled the sound of the weapon. Shortly after the gun was fired, it was returned to Ponce, who fired it himself a few times in his back yard and then threw away the silencer.

During the summer of 1991, Ponce learned that Radovcich was "looking for a gun that he didn't have to put his name on." Radovcich wanted to experiment further with making silencers. Ponce did not want the Llama, which still did not work right, and it was not registered to him, so he sold it to Radovcich.

On March 1, 1992, Radovcich and Ponce went to a gun show in Anaheim. There, Radovcich looked at a Feather-Light AT-9. He wanted to purchase it from a private seller as opposed to a vendor, but the seller wanted him to present identification. Radovcich declined. Ponce was aware Radovcich wanted a weapon with an extended barrel that could be ported. The AT-9 had such a barrel and could be broken down. At the gun show, Radovcich purchased for the Llama a piece of metal tubing that would accommodate a .380-caliber shell. It was Ponce's understanding that this was for the purpose of silencing the weapon, as there needed to be an extension which could be ported.

Prior to the gun show, Radovcich had expressed a general desire to obtain a weapon. After the gun show, he started referring specifically to an AT-9, and he told Ponce that he needed to purchase one immediately. In March, Radovcich said Ponce could make money off a purchase of an AT-9. Ponce, who needed money in order to purchase the Sketchley Mason van in which he intended to live, agreed to buy the gun. Radovcich did not say why he wanted an AT-9 or why he needed it immediately. He wanted Ponce to purchase it instead of himself because he did not want his name on it.

Sometime later, Ponce received $1,500 in $100 bills from Radovcich. On March 23, 1992, Ponce purchased an AT-9 from National Gun Sales in Reseda for $437. At Radovcich's request, he later also purchased an extra clip and some subsonic ammunition. (Footnote omitted.) Radovcich paid Ponce $500 for making the purchases, and Ponce returned the rest of the cash to him. On April 8, after the mandatory waiting period, Ponce picked up the weapon from the gun store. He and Radovcich made arrangements to meet at Peter's garage, which was down the street from the gun shop, to transfer the weapon to Radovcich. (Footnote omitted.) When Ponce turned over the gun, Radovcich told him to report it stolen after a while. Ponce did so about six months later when his car was burglarized; Radovcich criticized this as being too soon. In making his report to the police, Ponce falsely named a friend's roommate as a suspect.

Ponce next saw the AT-9 not too long after April 8. The gun, which was in the garage of the Radovcich residence on Bobbyboyar, now had a silencer on it that looked like PVC pipe. Ponce saw Radovcich fire the gun into a block of wood. The silencer muffled the sound. Ponce, who believed Radovcich was going to sell the weapon, asked if Radovcich was going to make a lot of money off the gun. Radovcich replied, "'Oh, yeah.'" At some point, Radovcich told Ponce that the silencer was a

series of baffles made of cut-out tennis balls. He later said he had found that steel mesh worked better.

At some point, Ponce saw a shell catcher in the garage. Radovcich said he had fired the weapon once and then spent half an hour finding the shell, so he constructed a shell catcher. It was a small plastic box that was glued on the outside of the slide to catch the shell casings when they were ejected.

Ponce, who denied ever being to the Park Circle Drive residence or even hearing of Ewell before the homicides, spent the night before Easter at his mother's house. On Easter Sunday of 1992, he was with his family, spending part of the day with his mother, part with his father, and part with his brother-in-law's family. (Footnote omitted.)

Some time after Easter (Ponce believed it was the night of Tuesday, April 21), Ponce received a telephone call from Radovcich, who said that something was wrong and he needed to come over. Ponce, who was staying at a girlfriend's condominium, let Radovcich into the closed parking structure, where Radovcich parked his car and then covered it. He said he did not want anyone to see it. He appeared nervous and worried and was looking around a lot. He kept his hood up over his head.

Radovcich kept frantically repeating that he did not know what had gone wrong. He said he needed to get as far away as possible. As Radovcich and Ponce entered the elevator to proceed to the condominium, Ponce asked what was wrong. Radovcich replied, "'It has to do with a triple homicide and me.'" Ponce told Radovcich not to tell him any more. That was the last thing he let Radovcich say for a while.

The two later went for a drive. Radovcich was pondering places he might go. Ponce suggested that if he did not know what was going to happen, he could get a lawyer. When Radovcich said no, he could not do that, Ponce began to think Radovcich might be more than just accidentally involved in whatever was going on. With respect to the reason for what happened, Radovcich said something to the effect that it had to do with $8 million, and that "'We were gonna assume the throne.'"

Sometime after this evening (Ponce believed it was the next day), Radovcich told Ponce that he needed to get rid of some things. Ponce contacted Peter and then went to his apartment; from there, they went to Sketchley Mason and met Radovcich. Ponce was concerned that the weapon he had purchased might have been involved in whatever had taken place, and he was aware he might be doing something wrong by assisting Radovcich.

When Ponce and Peter arrived at Sketchley Mason, Radovcich handed one of them a backpack. Inside, among other items, was the Llama pistol Ponce had sold to Radovcich. An extended barrel was welded onto it. Peter went inside the shop and broke it off. Ponce asked Radovcich if anything was wrong with the Llama; Radovcich said it was fine and wasn't used. That is what Ponce subsequently told Peter. He did not tell Peter about the statements Radovcich had previously made to him. Ponce told Peter not to ask questions because he did not want Peter to become more involved.

In addition to the Llama (which Ponce kept and later resold), the backpack contained parts from the AT-9. The weapon had had the identification numbers drilled out and was disassembled. There were some black and red tennis shoes, as

well as a Browning semiautomatic pistol which had been disassembled. The backpack also contained a shell catcher, a paper bag with empty shell casings, and cut-out tennis balls. Radovcich said the shell catcher had broken at the Ewell home and had not worked properly. The silencer Ponce had seen in the garage of the Bobbyboyar residence was also in the backpack. In addition, the box of spy-type books, which Ponce previously had seen in Radovcich's possession, was in Peter's vehicle. Ponce did not know how it came to be there.

Ponce and Peter began to drive around in Peter's vehicle and dispose of the backpack's contents. Peter drove; Ponce got out of the vehicle at various locations and got rid of the items. During this time, Danielle paged Peter a number of times. This made Peter want to get home quickly.

Eventually, all they had left was the AT-9 barrel. Ponce was aware that a bullet from an individual barrel could be identified. Since Peter needed to get back to his apartment, they drove to that location and Ponce said he would dispose of the barrel. Peter ran upstairs to see Danielle; Ponce ran across a field to a neighboring field and shoved the barrel into the ground. Ponce could not recall whether he wore gloves, but he would have made an effort not to leave fingerprints on anything. When he realized he had touched the barrel while trying to shove it into the ground, he became angry because he had touched the surface after the fingerprints had been removed. (Footnote omitted.) He then kicked it as hard as he could until it went into the ground. He could not recall what happened to the backpack.

Ponce later met up with Radovcich. They took Radovcich's car to a North Hollywood area, parked it, and covered it so it would not be seen. Radovcich asked if he had gotten rid of everything; Ponce said yes, but explained that he had had to bury the barrel. This concerned Radovcich. Shortly after, Ponce took Radovcich to a hotel in the Santa Monica area. Radovcich did not remain at the first hotel chosen because he did not want to produce the required photographic identification. Ponce then took him to the Half Moon Hotel, dropped him off, and left. Radovcich mentioned that he had a certain amount of money-Ponce believed around $1,500-to last him, and that he could not afford to stay at a hotel for very long. (Footnote omitted.)

While Radovcich was staying at the hotel, he and Ponce maintained telephonic contact. Radovcich asked Ponce to keep an eye out in the newspapers for a homicide case. The name he gave was the Ewell family. During the time Radovcich was at the hotel, Ponce took him back to North Hollywood to retrieve his car. Radovcich said it was okay to get it, that there was no problem with it. Radovcich later came to the condominium at which Ponce was staying and began sleeping in Ponce's van.

The Rodney King riots began in Los Angeles on April 29, 1992, and continued for several days thereafter. During this time, which was while Radovcich was using Ponce's van, Radovcich and Ponce drove to the Malibu area. There, they sat down on the beach. Because Radovcich had not officially heard what, if anything, had happened, he was trying to figure out what had gone wrong. Ponce invited him to explain what had happened. (Footnote omitted.)

Radovcich related that he had shot three people with the AT-9, and that it had been done to split $8 million as part of an inheritance. Ponce already knew it was the Ewell family, although Radovcich did not tell him the name at that time. Radovcich said the shootings took place in Fresno, and that he had been to the home prior to the homicides. He said he knew the family would be away at the time he arrived, and he knew roughly the time they would return. He said that he had previously removed all

of his body hair, as he was going to be at the Ewell home long enough that he would have to use the bathroom and he did not want to leave any kind of hair.

Radovcich related that he drove his car to Fresno, but he did not say how he gained entry into the Ewell house. He said he knew there was a window leading into the garage that did not have an alarm on it, but did not say whether he used that window. He said he arrived before the family did, and got the AT-9 into the house by loading it in his backpack. Once inside, he took the gun out and assembled it. He related that he brought some plastic sheets to lie on, although he did not say where he waited for the family. He said he had to sleep on the plastic, and also that he wore rubber latex gloves.

Radovcich, who described the Ewell home as "'[l]ush digs,'" said the mother and daughter arrived first. He said the daughter walked by the laundry room, in which he was waiting, and he shot her in the back of the head. She fell straight down. Radovcich said the mother must not have heard it, because she kept talking. He said he went and shot her, and that she possibly was the only person who saw him. (Footnote omitted.) He said he shot multiple times and had to put in a new clip after that. He said he also put on another pair of gloves. He then waited for the father to come home. He did not say how long he had to wait. When the father came in the door, Radovcich waited until he closed it and walked past the room in which Radovcich was located. Radovcich then stepped out and shot him. The father, who was in a hallway, was shot in the throat area and something came out of his eye. Radovcich said he heard a gurgling sound and there was something oozing out of the eye, which is why Radovcich thought he was probably dead. (Footnote omitted.)

Radovcich told Ponce that after the shootings, he tried to check the victims' pulses by digging his gloved forefingers into the people's forearms to try to get a pulse. Ponce told him that probably would not have worked very well, and demonstrated how to check a pulse in the wrist. Radovcich further related that he took a cover weapon and some money-Ponce believed it was the $1,500 Radovcich had at the hotel-from the house. Radovcich said he took a weapon because he had learned that a cover weapon is taken to throw people off concerning what gun actually was used.

Radovcich said that after the shootings, he disassembled the AT-9 on a desk in an office and he took off the gloves. He said he thought he might have left one of the gloves, as he was wearing multiple pairs, and that was the only thing he could think of that went wrong. He said he put the disassembled weapon in the backpack. He also related that the shell catcher had malfunctioned. He said he had to wait awhile so he could leave when it was dark outside.

Radovcich told Ponce that he had committed the murders to split the inheritance, which he believed to be $8 million. Radovcich said he would have to wait approximately three years for the money. Several times during the discussion, Ponce castigated Radovcich for using the gun Ponce had supplied. Each time, Radovcich apologized. On the way home, Radovcich stated, "'If there's a God, I'm-I'm fucked.'"

Sometime later, Ponce asked Radovcich what he would do or say if the police asked him his whereabouts on Easter Sunday of 1992. Radovcich responded that he might say he was at Hamrick's, because it was open 24 hours a day and it was hard to tell who was there at any given time.

1

2

3

After the conversation at the beach, Ponce continued to have contact with Radovcich, although they did not openly associate. Instead, they used pay telephones and pagers. Ponce distanced himself from Radovcich because he did not want to be involved in what had happened or have anyone make a connection between them, given his role in acquiring and disposing of the murder weapon.

4

5

6

7

8

9

Ponce first learned law enforcement authorities were interested in him in October 1993, when he met Souza and Curtice for the first time. When they asked about his friendship with Radovcich, Ponce said only that he was Ponce's best friend's little brother. Ponce lied throughout the interview and denied ever buying a gun for Radovcich. With respect to the weapons he owned, Ponce admitted having purchased a nine-millimeter rifle, although he did not reveal it was an AT-9. Ponce continued to lie in subsequent contacts with authorities in an attempt to distance himself from Radovcich. However, he kept in touch with Radovcich and Peter concerning the investigation and the interviews. Ponce paged Radovcich if he wanted to make contact. They used codes to identify themselves and also to communicate by pager without needing to speak to each other.

10

11

12

13

At some point during this period of the investigation, Radovcich showed up unexpectedly at Ponce's place of employment and offered him $1,000 in $100 bills. Ponce said he did not need it. When Radovcich insisted, Ponce took it because he wanted Radovcich to leave. In addition, Radovcich gave Ponce $200 sometime after the murders, and subsequently paid him $100 for a term paper Ponce wrote for one of Radovcich's friends.

14

15

16

17

On February 18, 1994, Ponce admitted to detectives that he had purchased an AT-9. He untruthfully maintained he had bought it for himself for his birthday; that Radovcich had never even seen it; and that the gun had been stolen. In an interview on February 28, Ponce continued to lie and denied it was his gun which was used in the homicides. Even when Souza said he believed Ponce had given or loaned the gun to Radovcich but had had nothing to do with the killings, Ponce kept to his story of not knowing anything because he had heard of a case in which the person who supplied the gun received a long prison term.

18

19

20

21

22

Ponce's next contact with authorities was on March 2, 1995, when they arrested him on three counts of murder. The next day, he was transported to Fresno. That evening, after speaking with his father and the prosecutor, he gave a statement despite not yet having an attorney. The March 3 interview was the first time he had talked, to anyone not involved with the case, about any illegal thing he had done. He basically told the truth in this interview, although he may have been confused on some event sequences and dates. He did not mention the conversation at the beach until a later interview in which detectives noticed him drawing on a table and questioned how he knew the layout of the Ewell home so well.

23

24

25

Following the March 3 interview, Ponce and members of the Fresno County Sheriff's Department took a trip to the Los Angeles area, at which time Ponce showed them around different areas in the San Fernando Valley. He also directed them to the vacant field from which the AT-9 barrel was recovered.

26

//

27

//

28

//

**DISCUSSION**

**I.  Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the deprivations in question arose out of the Fresno County Superior Court in Fresno, California, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).  Accordingly, this Court has jurisdiction over the action.

**II.  Legal Standard of Review**

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)) (overruled on other grounds by Lindh, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment)); see also Bobby v. Van Hook, __ U.S. __, 130 S.Ct. 13, 16 (2009); Pinholster v. Ayers, 509 F.3d 651, 662 (9th Cir. 2009). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under the AEDPA, an application for writ of habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); see also Williams, 529 U.S. at 412-413 (contrary to or an unreasonable application of clearly established federal law); Wood v. Allen, __ U.S. __, 130 S.Ct. 841, 849 (2010) (unreasonable determination of fact).

As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

(quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this

Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of

the time of the relevant state-court decision." Id.  (quoting Williams, 592 U.S. at 412).  "In other

words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or

involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

(quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant

the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

question of law or if the state court decides a case differently than [the] Court has on a set of

materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court

identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its

independent judgment that the relevant state court decision applied clearly established federal law

erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A

federal habeas court making the "unreasonable application" inquiry should ask whether the state

court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or

involved an unreasonable application of United States Supreme Court precedent.  Woodford v.

Visciotti, 537 U.S. 19, 25 (2002);  Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although

only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive

authority in determining whether a state court decision is objectively unreasonable.  See Arredondo

v. Ortiz 365 F.3d 778, 788 (9th Cir. 2004) (citing Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.

2003).

1    AEDPA requires that this court give considerable deference to state court decisions.  The

2    state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and this Court is bound

3    by a state's interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002); See

4    Miller-El v. Dretke, 545 U.S. 231, 240 (2005).

5    **III.  Review of Petitioner's Claim**

6    **A.  Ground One**

7         Petitioner argues that his Fourth Amendment right to be free from unreasonable search and

8    seizure was violated when police searched his home without his consent or a warrant.  (Mem. P. &

9    A., 8.)  Respondent correctly argues that this claim is not cognizable on federal habeas review.

10   (Answer, 27.)

11        **1.  Background[6]**

12        Prior to trial, Ewell moved to suppress all evidence seized from the Park
     Circle Drive residence during the warrantless search and crime scene investigation
13   which took place there on April 21-24, 1992, together with all fruits thereof. He
     conceded the lawfulness of the initial entry by his neighbor, Jesse Knapp (based on
14   consent), as well as of the initial entry by sheriff's deputies (based on exigent
     circumstances). Ewell acknowledged that items observed in plain view and seized
15   during the period of exigency were not subject to suppression, but contended that any
     further search of the premises could only be conducted pursuant to a warrant. In
16   response, the People conceded there was no warrant. They contended Ewell had failed
     to establish standing, and sought to justify the search based on exigent circumstances,
17   implied consent, and inevitable discovery.

18        Evidence before the court (footnote omitted) showed that on Tuesday, April
     21, 1992, Sheriff's Detective Ybarra was assigned crime scene responsibilities with
19   respect to the Ewell homicides. She and Sergeant Caudle arrived at the Park Circle
     Drive residence at approximately 9:40 that morning. Upon arrival, they were met by
20   Sergeant Huerta and Deputy Nielsen, who were already on the scene and who were
     outside the front of the home. Patrol personnel were in the process of blocking off
21   intersections, and entry onto the premises was restricted.

22        Huerta and Nielsen related to Ybarra that they had responded to a call for
     service from Jesse Knapp, who lived across the street. Knapp told Nielsen that he had
23   gone to the Ewell home in response to a telephone call from Ewell. Ewell had been
     concerned because he could not reach his family by telephone, and had asked Knapp
24   to go over and check it out. When Knapp arrived at the house around 9:10 a.m., Rose
     Avitia, the housekeeper, and her crew were there. Avitia had a key to the house and so
25   they entered the residence. They noticed several things out of place, and Knapp

26   _____

27        [6] The facts are derived from the factual summary set forth by the California Court of Appeal, Fifth Appellate District,
     in its opinion of May 4, 2004, and are presumed correct pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1).  See People v. Ewell,
28   No. F031391, 2004 WL 944479, at *22-25 (Cal. Ct. App. May 4, 2004).

discovered Tiffany in the kitchen. Knapp then returned home to call 911, and he also contacted Ewell to inform him of what he had seen.

Ybarra interviewed Rose Avitia before entering the house. Avitia told Ybarra that Glee, Dale, and Tiffany lived in the house, and that they had a son, but he had moved out and was attending a university up in San Jose. Ybarra subsequently determined, from her examination of the premises and later conversation with Ewell, that Ewell maintained a bedroom in the home. (Footnote omitted.)

Also prior to Ybarra's entry, Nielsen informed her that he had made a brief entry into the house and had located two additional bodies, and that paramedics had also entered and had determined the victims were deceased. Nielsen and Huerta had both noted the ransacking Ybarra subsequently observed; neither commented on any belief there was a suspect in the area, nor were they looking for one. They had secured the crime scene. Ybarra spoke to the paramedics; they informed her that they had gone through the entire house and were unable to locate any other victims, and that rigor mortis had set in. The paramedics' arrival time was approximately 9:16 a.m. Before entering the house, Ybarra also learned, from her dispatcher, that the sheriff's department was being contacted by John Zent, an FBI agent Ewell had called in an attempt to find out what was going on at his home. (Footnote omitted.)

Ybarra and the other officers awaited the arrival of Identification Bureau personnel, then entered the house around 10:30 a.m. During the initial walk-through, Ybarra was aware there were no other victims or suspects in the home, and so she was scrutinizing the residence for investigative purposes.

As they walked through, Ybarra observed that the house appeared to have been ransacked. Given the possibility a burglary had occurred, Ybarra was alert to any signs of forced entry. Based on her observations of the bodies, as well as information given to her by paramedics prior to her entry, she concluded death was caused by gunshot wounds. There were holes in the walls which appeared to be bullet holes (some of which she saw initially and some which she noted later on) and, in the case of Dale's body, a blood spatter pattern that suggested high-velocity gunshot evidence. Ybarra determined that a search needed to be made for the bullets themselves. She also needed to inspect underneath the bodies, but was prohibited from disturbing them in any way until the coroner arrived and took possession of them. A deputy coroner and pathologist arrived about 5:45 that afternoon, and inspected the scene and the position of the bodies in order to help determine the cause of death. The bodies were removed sometime after 8:00 p.m.

During her initial walk-through, Ybarra went to each room in the house, noting the layout and looking for items that might have been associated with the bodies. She was specifically looking for signs of forced entry, details concerning the ransacking (the appearance of which was present in virtually every room), blood evidence, firearms evidence, fiber evidence, and latent fingerprints. Her walk-through included the master bedroom, where she observed two rifles and a shotgun; several boxes of ammunition; a handgun shipping box; a gun-carrying case; and a loose, nine-millimeter bullet. (Footnote omitted.) In Ybarra's experience, this was a very complicated crime scene.

Some homicide scene evidence is perishable. Trace evidence, such as lint or gunshot residue, is very easily disturbed or destroyed. Similarly, bodily fluids, such as blood, need to be collected as soon as possible. In addition, other possible signs in the house or around the crime scene that might help determine time and cause of death,

need to be noted prior to contamination or deterioration of the scene. Also of concern is the immediate apprehension of suspects. Where, as here, it appears bullets may have penetrated the walls of the residence, an inspection of the outer perimeter of the crime scene must be done prior to contamination by sprinklers coming on, or gardeners or other people coming through. In Ybarra's assessment of this crime scene, the blood, trace evidence, and gunshot residue were all very critical items of evidence that had to be collected in order to perform a proper investigation, and all were extremely fragile and perishable. In addition, authorities were already about 48 hours behind the killer. All the evidence had been in the house for that time, unsecured and unpreserved, and was losing its value, hour by hour. As far as Ybarra knew, only three people were residents of that house: Dale, Glee, and Tiffany Ewell. All three were homicide victims.

Detective Souza interviewed Ewell on April 21 and 22, 1992, with the April 21 interview beginning around noon. Ewell had already been advised that it appeared his family had been murdered. During the course of the interviews, Ewell was made aware that an investigation was underway. At no time did he state any opposition to the investigation occurring at the house.

Sometime around 2:00 or 3:00 p.m. on April 21, while detectives were conducting an investigation at the crime scene, Sheriff's Lieutenant White met with Ewell and John Zent in White's office. Ewell and Zent were very curious and wanted information about what had happened at the scene. While White did not have much at the time, he was aware detectives were conducting an investigation of the crime scene. White informed Ewell that his family had been murdered. This probably occurred between 3:00 and 4:00 p.m., when White received telephonic notification after a positive conclusion had been reached that the deceased persons were, in fact, Ewell's parents and sister. Ewell and Zent were still in White's office at the time. At some point during this meeting, Ewell stated a willingness to fully cooperate with the investigative efforts of the sheriff's department.

On April 23, Ewell and other family members came to the house in order to obtain funeral clothing for the deceased. (Footnote omitted.) Ewell pointed out to Ybarra a .357 handgun lying on a shelf in Dale's closet. Ybarra caused it to be collected by an Identification Bureau technician.

On Friday, April 24, Ybarra had representatives from the alarm company come to the house and inspect the system. Processing of the crime scene concluded around 10:30 that evening. From Ybarra's initial arrival to the conclusion of the scene processing, officers were assigned to remain outside the residence around the clock for security, although the crime scene investigators did not work 24 hours straight. While much of the most important processing was done on April 21, blood spatter interpretation and crime reconstruction in the hallway took additional time, as did recovery of the bullets in the walls.

Upon completion of the crime scene processing on April 24, the residence was turned over to Ewell. He had the locks changed that evening. Ewell and Ybarra walked through the house and discussed what had been found. Ewell requested an inventory of everything that had been removed from the home. During Ybarra's contacts with Ewell on April 23 and 24, Ewell did not indicate any resistance to or problem with the investigation, except that he was upset about a padlock being cut off the back gate. Ewell showed Ybarra where a key to the lock was hidden, but she apologized and explained that sheriff's personnel had been unaware of the key and so had cut off the lock so they could do their jobs. Ewell later apologized as Ybarra was

leaving. He never made any request to have the house turned over to him at any earlier time.

Carol Badgley had been Dale's and Glee's next-door neighbor since approximately 1970 and had known Ewell since he was a baby. At some point-Badgley estimated more than a year before the homicides-Ewell went away to attend college out of town. During the period in which Ewell attended college, Badgley saw him around the house for a few days at Christmas. In addition, he came back home and stayed there for a while during at least one summer. On other occasions, she saw him coming and going. Sometimes she would see him and then, a few days later, she would see him again.

The trial court denied the motion to suppress. It rejected the prosecution's characterization of Ewell as a "'nonresident family member'" and instead determined he was a university student living temporarily at college. Accordingly, it found Ewell had standing to contest the search and the scope thereof, but found no evidence he had any expectation of privacy beyond his own room. The court noted that the owners of the house and contents were Dale and Glee, who were dead and unable to give consent. No will had been probated, and there was no showing Ewell had immediate control over the house and contents. Under these circumstances, the court concluded, there could be no invasion of the Fourth Amendment rights of Dale, Glee, and Tiffany, who presumably "would have wanted their execution-type killing[s] vindicated through prompt action by law enforcement." The court noted Ewell's concession that there was consent for the neighbor to enter and that the police could operate under the doctrine of exigent circumstances, and found Ewell was the one who prompted the initial inquiry, which ultimately resulted in law enforcement being contacted. The court balanced the various interests involved and concluded "the omission of law enforcement to obtain a warrant under the unusual facts of this case" was justified.

The court found that the emergency nature of the situation confronting the officers extended beyond a brief, initial walk-through, and rejected as unreasonable under the circumstances Ewell's attempt to limit the period of exigency to the initial sweep of the house to confirm the absence of suspects, other victims, or weapons. The court further found it reasonable to conclude that Ybarra and other officers observed items in plain sight at an early time in the investigation, while exigent circumstances still existed. However, the exigency no longer existed when the bullets were extracted from the walls and bullet holes and other evidence were examined.

The court questioned why such experienced law enforcement officers would "not take the basic, rudimentary precaution" of obtaining a search warrant, whether telephonic or not, and concluded the officers believed they had implied consent to enter and process the home for evidence. It noted that, while Detective Souza testified that a surviving heir to family wealth is always a suspect, at the time of the search Ewell was viewed as a bereaved survivor. The court concluded that, under all the circumstances-including Ewell's being accompanied by an FBI agent who established his whereabouts at the time of the killings, and his offer of cooperation and lack of expression of a state of mind other than desire to have the perpetrator identified and apprehended-officers' conduct was objectively reasonable, and this was not a case involving mere silence and acquiescence on Ewell's part.

As an independent ground for denying the motion, the court found the doctrine of inevitable discovery to apply. The court determined that this was "one of the exceedingly rare cases where it can be said, with absolute confidence, that no

magistrate or judge anywhere . . . would not have immediately issued a search warrant."

**2. Analysis**

A federal district court cannot grant habeas corpus relief on the ground that evidence was obtained by an unconstitutional search and seizure if the state court has provided the petitioner with a "full and fair opportunity to litigate" the Fourth Amendment issue.  Stone v. Powell, 428 U.S. 465, 494 (1976); Moormann v. Schriro, 426 F.3d 1044, 1053 (9th. Cir. 2005); Woolery v. Arvan, 8 F.3d 1325, 1326 (9th Cir. 1993).  Petitioner claims that his claim falls outside of the bounds of Stone because the state appellate court's application of United States Supreme Court law was "wholly unreasonable."  (Mem. P. & A., 14.)  However, the only inquiry this Court makes is whether Petitioner had a fair ***opportunity*** to litigate his Fourth Amendment claim, not whether the court correctly decided the claim or even whether Petitioner actually litigated the claim.  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996); see also, Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990) (holding that because Cal. Penal Code § 1538.5 provides an opportunity to challenge evidence, dismissal under Stone was necessary even when the petitioner never moved to suppress).

The policy behind the Stone court's analysis is that the exclusionary rule is applied to stop future unconstitutional conduct of law enforcement.  Stone, 428 U.S. at 492.  However, excluding evidence that is not untrustworthy creates a windfall to the defendant at a substantial societal cost.  See Stone, 428 U.S. at 489-90; Woolery, 8 F.3d at 1327-28.  Thus, the Ninth Circuit has described the rationale for this rule by saying:

> The holding is grounded in the Court's conclusion that in cases where a petitioner's Fourth Amendment claim has been adequately litigated in state court, enforcing the exclusionary rule through writs of habeas corpus would not further the deterrent and educative purposes of the rule to an extent sufficient to counter the negative effect such a policy would have on the interests of judicial efficiency, comity and federalism.

Woolery. 8 F.3d at 1326; see also Stone, 428 U.S. at 493-494.

Petitioner claims that Stone is no longer good law after the enactment of AEDPA.  As authority for this proposition, Petitioner cites Carlson v. Ferguson, 9 F.Supp.2d 654, 656 (S.D.W.Va. 1998) (hereinafter Carlson II) and Lawhorn v. Haley, 323 F.Supp.2d 1158, 1185 n.4 (N.D.Ala.

1  2004), *overturned in part by* <u>Lawhorn v. Allen</u>, 519 F.3d 1272 (11th. Cir. 2008).  (Mem. P. & A.,

2  10.)  Resting on this authority alone, Petitioner argues that the Court should abandon the well

3  established rule in <u>Stone</u>.

4          In <u>Carlson v. Ferguson</u>, 993 F.Supp. 969 (S.D.W.Va. 1998) (hereinafter <u>Carlson I</u>) the

5  petitioner's Fourth Amendment habeas claim was denied when the district court found that

6  "[n]othing in the record indicates that [the] [j]udge [] in any way impeded Petitioner's opportunity to

7  adjudicate his Fourth Amendment claims," and that the judge's decision did not "contravene[]

8  Supreme Court precedent or reflect[] and unreasonable determination of the facts as presented at the

9  hearing."  <u>Id.</u> at 973. The respondent then filed a Federal Rule of Civil Procedure 59(e) motion

10  arguing that, pursuant to <u>Stone</u>, the court "should have ended its inquiry with the 'full and fair

11  opportunity' finding" and not gone on to consider whether that litigation was unreasonable under

12  clearly established Supreme Court precedent.  <u>Carlson II</u>, 9 F.Supp.2d at 655.  While the district

13  court maintained its analysis of first deciding "whether there was a state court adjudication on the

14  merits," and second, examining "the decision reached in that adjudication" for unreasonable

15  application of clearly established Supreme Court law, <u>id.</u> at 656, it also noted that it did not find that

16  AEDPA took the place of <u>Stone</u>.  <u>Id.</u> The court specified that it "did not hold that <u>Stone v. Powell</u>'s

17  prudential underpinnings are no longer applicable to Fourth Amendment claims on collateral review

18  under the AEDPA.  In fact, the Court specifically found that the AEDPA extends the [<u>Stone</u>]

19  deference rational beyond the Fourth Amendment to include all federal claims that were adjudicated

20  on the merits in state court."  <u>Id.</u>  Furthermore, the Tenth Circuit was not persuaded by a similar

21  argument that <u>Carlson II</u> did away with <u>Stone</u>, explaining that by enacting AEDPA Congress did not

22  intended "to expand in any way a habeas petitioner's right to overturn a state court decision."

23  <u>Herrera v. Lemaster</u>, 225 F.3d 1176, 1178 (10th Cir. 2000), *aff'd on this point en banc*, 301 F.3d

24  1192, 1195 n.4 (10th Cir. 2002).  While it appears that <u>Carlson I</u> and <u>Carlson II</u> may have tried to

25  meld <u>Stone</u> and AEDPA together, Petitioner is misguided in arguing that these cases hold <u>Stone</u>

26  inapplicable after the passage of AEDPA.

27          In <u>Lawhorn</u>, the district court found that Petitioner's Fourth Amendment claim was not bared

28

by <u>Stone</u> because the court was "not being asked to second guess the factual findings of the State courts, but, rather, to determine if they have made a mistake regarding the application of clearly established federal law. . . ." <u>Lawhorn</u>, 323 F.Supp.2d at 1185 n.2.  In affirming the position that the petition was not barred by <u>Stone</u>, however, the Eleventh Circuit conducted a reasoned analysis applying <u>Stone</u> as well settled Supreme Court law and found that the petitioner did not have a full and fair opportunity to litigate his claim.  <u>Lawhorn v. Allen</u>, 519 F.3d 1272, 1286-88 (11th Cir. 2008).  As the Eleventh Circuit clearly still considers <u>Stone</u> to be good law, this case does not advance Petitioner's argument.

The Court finds further support for its decision not to uproot <u>Stone</u>'s longstanding Supreme Court precedent in that the Ninth Circuit, along with several other circuits, has continued to apply <u>Stone</u> after the enactment of AEDPA.  <u>See</u>, <u>e.g.</u>, <u>Fairchild v. Wright</u>, Slip Op., 2010 WL 236728, *2 (9th Cir. 2010); <u>Matthews v. Workman</u>, 577 F.3d 1175, 1194-95 (10th Cir. 2009); <u>Ben-Yisrayl v. Buss</u>, 540 F.3d 542, 552 (7th Cir. 2008); <u>Chavez v. Weber</u>, 497 F.3d, 801-02 (8th Cir. 2007); <u>Moreno v. Dretke</u>, 450 F.3d 158, 167 (5th Cir. 2006); <u>Marshall v. Hendricks</u>, 307 F.3d 36, 81-82 (3d Cir. 2002).  As the Court finds no precedent holding that <u>Stone</u> is no longer applicable and found an abundance of precedent that continues to apply <u>Stone</u> as good law, this Court will continue to apply <u>Stone</u> to Fourth Amendment claims brought in petitions for writ of habeas corpus.

Accordingly, there is nothing in the record which demonstrates that Petitioner was denied a full and fair opportunity to litigate his claim.  Not only did Petitioner  raise these issues and have them ruled on in the Superior Court, but on direct review the appellate court conducted a thorough fourteen page analysis of the search warrant issue.  <u>See</u> <u>Ewell</u>, 2004 WL 944479, at *26-40.  Thus, pursuant to <u>Stone</u>, the Court cannot grant habeas relief as to Ground One.

**B.  <u>Ground Two</u>**

Petitioner claims that his Federal statutory privacy rights and his Fourth Amendment rights were violated when the police intercepted the electronic communications he sent to Radovcich's pager.  <u>See</u> Mem. P. & A., 21.

**1. Background**[7]

[8]"On September 4 and September 6, 1996, respectively, Ewell and Radovcich moved to quash various search warrants and to suppress evidence. [ ] In conjunction with his motion, Ewell presented a detailed statement of facts setting out, among other things, the post-homicide surveillance on Ewell and Radovcich.

"[L]aw enforcement surveillance began on Ewell's house in Fresno on June 25, 1992. Surveillance on Radovcich commenced on February 1, 1993. During this time, Radovcich was observed making a number of calls from pay telephones. At least some appeared to be long distance, given the amount of money Radovcich put into the telephones. Law enforcement officers attempted to eavesdrop on some of Radovcich's conversations.

"On April 8, 1993, law enforcement officers obtained a search warrant to seize digital pager information from Radovcich's account with Pagenet Pager Company and Communications Headquarters Company. On April 12, 1993, law enforcement officers obtained a search warrant to get a "clone" (duplicate) pager, to allow them to receive the pages Radovcich was receiving. On April 22, 1993, they obtained a second search warrant, after Radovcich had his pager number changed. Surveillance continued; Radovcich was observed making more long distance calls from pay telephones. On at least four separate occasions, intercepted pages led surveilling officers to Ewell.

"Both [appellants] moved to suppress the clone pager evidence and any evidence gathered as a result of or derived therefrom. The People opposed the motions, arguing (1) a pager which transmits only numbers does not "intercept" the contents of a communication and so does not fall within 18 United States Code section 2510 et seq. (hereafter Title III or the Act); [ ](2) a digital pager constitutes a "tone-only paging device" which is specifically exempted from Title III; and (3) even if Title III applies, no exclusion is warranted under United States v. Leon (1984) 468 U.S. 897 ( Leon ). Both [appellants] disagreed with regard to the application of federal statutes to this case, in addition to which Ewell argued that the municipal court judge who signed the search warrants lacked jurisdiction to issue Title III warrants . . . .

"The trial court issued its written ruling on November 27, 1996. After an extensive review of state and federal law, the trial court determined that digital pagers are not exempt from federal law as

_____

[7]The facts are derived from the procedural history set forth by the California Court of Appeal, Fifth Appellate District, in its opinion of May 4. These facts are presumed correct pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1). See People v. Ewell, No. F031391, 2004 WL 944479, at *41-46 (Cal. Ct. App. May 4, 2004).

[8]The following facts were adopted by the appellate court from the same court's prior opinion on The People's interlocutory appeal of the trial court's suppression hearing. See People v. Ewell, No. F031391, 2004 WL 944479, at *4-441 (Cal. Ct. App. May 4, 2004).  The full interlocutory appeal, People v. Superior Court (Ewell), F27396, F27534, F27543 (July 10, 1997) (hereinafter "Ewell Interlocutory Opinion"), can be found in the Clerks Transcript, volume 10, pages 2889-2981.

"tone-only" pagers and that the transmission of telephone numbers through a digital pager constitutes a "communication" under federal law. The court found various violations of Title III. The court also found it apparent, from the face of the warrants, that they were issued as routine warrants and not under Title III or corresponding California law (Pen.Code, § 629 et seq.). The court determined that California law was inapplicable at the time the warrants were issued; hence, whether issuance was lawful had to be determined pursuant to federal law. The court further held that Leon's good faith exception does not apply when there is a complete unexplained and unjustified failure to comply with the provisions of Title III in obtaining the warrant . . .

"[Pursuant to Penal Code section 1538.5,] [t]he trial court suppressed evidence derived from use of the clone pager [for failure to comply with 18 United States Code section 2518(10) ].[⁹] [ ] [However, it denied the motions to suppress other search and arrest warrants, finding sufficient probable cause for issuance thereof after deletion from the affidavits of the information obtained by use of the clone pager.]

"The People subsequently moved for reconsideration pursuant to Code of Civil Procedure section 1008. The People asked to present testimony by Detective Souza relating to the issue of good faith. Ewell and Radovcich both opposed the request.¹⁰ [The superior court denied the motion for reconsideration.]"

[We end our quotation from our prior opinion.]

In our opinion, we first reviewed the relevant statutory scheme, i.e., Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520). [Ewell Interlocutory Opinion at pp. 30-33.] We then turned to the parties' contentions with respect to Title III. In this regard, the People claimed that Title III provided no statutory suppression remedy for interceptions of electronic communications obtained in violation of the Act; hence, admissibility was governed by Fourth Amendment principles, including Leon. The People further argued that there was no expectation of privacy in the telephone numbers a person dialed or in the numbers transmitted to a pager. Last, the People contended the good faith exception of Leon applied to the circumstances of this case. Appellants countered that the availability of suppression under Title III was not presented in the trial court and so could not be raised on the appellate level. They also argued that some requirements under the Act were strictly statutory, while others embodied Fourth Amendment principles. They conceded that 18 United States Code section 2518(10)(c) limited remedies for nonconstitutional violations of Title III with respect to electronic communications, but claimed a full range of statutory and Fourth Amendment remedies were available for violations of constitutional magnitude. They further argued that Leon does not override an exclusionary remedy enacted by Congress, and, in any event, does not excuse objectively unreasonable violations of the Fourth Amendment. [Ewell Interlocutory Opinion at pp. 33-35.]

---

⁹ Section 2518(10) of 18 United States Code provides who may move for suppression (18 U.S.C. § 2518(10)(a)) and what remedies and sanctions are available regarding the interception of electronic communications (18 U.S.C. § 2518(10)(c)).

¹⁰Here ends the section that the appellate court copied directly from its own interlocutory appeal.

We first determined that the People could properly argue the issue of Title III's statutory suppression remedy to this court since the issue was "'at least in the air'" by virtue of their argument that Leon was applicable; construction of a statute and its applicability present questions of law; the underlying facts were uncontroverted; and appellants pointed to no evidence which could have been introduced on the issue. Hence, we concluded, appellants were not prejudiced by the People's failure expressly to rely on the theory below. [Ewell Interlocutory Opinion at pp. 35-36.]

We next turned to the substantive issues.  (Footnote omitted.) Insofar as is relevant to the current appeal, we determined:

• Title III governs interceptions of communications involving the clone pager used in this case, and most of its requirements were not met with respect to the warrants at issue. [Ewell Interlocutory Opinion at pp. 37-40.]

• Some of the violations were merely statutory, while others were of constitutional magnitude; insofar as interceptions of electronic communications are concerned, violations of Title III which are not of constitutional magnitude will not result in suppression of evidence unless the particular statute violated contains its own specific suppression remedy, but if the violation rises to a level of constitutional magnitude, suppression is available under the Fourth Amendment and a determination must be made whether Leon applies. [Ewell Interlocutory Opinion at pp. 40, 43-46.]

• A specific suppression remedy is contained in 18 United States Code section 2518, which, at all times pertinent, provided in part:

"(8)(a) The contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions.... The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom...."
[Ewell Interlocutory Opinion at p. 47.]

• Insofar as the record showed, the clone pager utilized in the present case had no capability to permanently record or store the numbers received; since 18 United States Code section 2518(8)(a) applies only when the contents of the intercepted communication can be recorded on tape or wire or other mechanical device, no statutory suppression remedy was available to appellants under Title III. [Ewell Interlocutory Opinion at pp. 48-51.]

• Ewell's Fourth Amendment rights were not violated by the interception of numbers he dialed on a telephone; since there was no Fourth Amendment violation and no suppression remedy available to him under Title III, the trial court erred by suppressing the clone pager and derivative evidence as to him. [Ewell Interlocutory Opinion at pp. 51-56, 61-66.]

. . . .

• The warrants violated the requirements of 18 United States Code sections 2518(1)(c) and 2518(3)(c) with respect to necessity/investigatory exhaustion, but the affidavit was sufficient to allow the issuing magistrate reasonably to conclude that reasonable efforts to succeed without use of a clone pager had been tried and failed, so there was no Fourth Amendment violation. [Ewell Interlocutory Opinion at pp. 57-59.]

• The search warrants contained no temporal limits on use of the clone pager, nor did the affidavits explain why open-ended interception was needed or that probable cause exited for an unspecified length of time; this violation of the particularity requirement was of constitutional magnitude. [Ewell Interlocutory Opinion at pp. 59-60.]

• Leon's good faith exception to the Fourth Amendment's exclusionary rule applied, as (1) there was no suggestion the magistrate who issued the warrants abandoned his detached and neutral role [Ewell Interlocutory Opinion at p. 81]; (2) there was no issue before us concerning false affidavits (ibid.); (3) despite violation of the particularity requirement, the warrants at issue were not so facially deficient under the Fourth Amendment (as opposed to under Title III) that executing officers could not reasonably presume them to be valid (id. at pp. 81-84); (4) the affidavits provided probable cause for the magistrate to issue a warrant authorizing use of a clone pager for some reasonable period of time, and the magistrate's failure to determine what constituted a reasonable duration was judicial error for which the law enforcement officer should not be penalized (id. at pp. 84-86); (5) whether the officer's failure to realize Title III was applicable could be objectively reasonable, under Leon, was irrelevant as it erroneously merged what are separate issues (id. at p. 87); and (6) under the circumstances of this case and as a policy matter, the exclusionary remedy should not be extended to cover a situation where, as here, there was an unintentional failure to comply with applicable statutory requirements (id. at pp. 87-88).

**2. Analysis**

In its interlocutory decision, the California Court of Appeal determined that the communications sent by Petitioner to Radovcich's pager should not be excluded under Title III because it was *not possible* for those communications to be recorded. Petitioner argues that this factual determination is erroneous in the face of new evidence which Petitioner sought to present to the appellate court on direct appeal. Petitioner claims that an affidavit sworn by FBI Agent Iverson, (hereinafter "Iverson Affidavit") proves conclusively that it was possible to record electronic communications sent to digital pagers at the time of the investigation. The appellate court did not discuss the Iverson Affidavit in its opinion on direct appeal.

**a. Title III Claim**

Petitioner claims that the state appellate court's interlocutory decision reversing the trial court's suppression of the cloned pager evidence was erroneous because the government obtained the

1    wiretaps in violation of Title III.

2          Not every asserted error of law will prompt habeas relief. [Citation omitted.] Where
           the error is neither jurisdictional nor constitutional, the appropriate inquiry is whether
3          the error is "a fundamental defect which inherently results in a complete miscarriage
           of justice," or "an omission inconsistent with the rudimentary demands of fair
4          procedure," and whether the error "present[s] exceptional circumstances where the
           need for the remedy afforded by the writ of habeas corpus is apparent."
5
6    Lord v. Lambert, 347 F.3d 1091, 1094 (9th Cir. 2003) (quoting Hill v. United States, 368 U.S. 424,

7    428 (1962)).  A claim is not cognizable on habeas review if "the claim does not involve an 'error of

8    the character or magnitude' to justify habeas relief."  Lord, 347 F.3d at 1094 (quoting Hill, 368 U.S.

9    at 428); see also Key v. Walker, C 06-4199 CRB, 2009 WL 3878080 at *31 (N.D. Cal. 2009)

10   (holding "there is no clearly established Supreme Court precedent holding that a violation of [Title

11   III] may result in a due process claim cognizable in federal habeas corpus").

12         In Lord, petitioner sought habeas relief in the Ninth Circuit, claiming the government had

13   intercepted communications from his cordless phone.  The district court had found that (1) the claim

14   was "not cognizable upon federal habeas review because any error by the state court did not result in

15   a complete miscarriage of justice," Lord, 347 F.3d at 1093 (internal quotation marks omitted); and

16   (2) "even if Lord had stated a cognizable habeas claim, he has not demonstrated that the decision by

17   the [state] courts (that there was no Title III violation) was contrary to, or involved an unreasonable

18   application of clearly established federal law," Id. at 1093-94.  In affirming, the Ninth Circuit agreed

19   that Lord had received a full and fair opportunity to present his claim to the state courts and as such,

20   any error was not "inconsistent with the rudimentary demands of fair procedure." Id. at 1095

21   (quoting Hussong v. Warden, 623 F.2d 1185 (7th Cir 1980)).  Because petitioner had received a full

22   and fair opportunity to litigate the Title III issue, the Ninth Circuit found Lord's claim to be

23   noncognizable on federal habeas review.

24         Unlike Lord, Petitioner seeks to present new evidence that was not available during the

25   original suppression hearing.  In Lord, the petitioner "fully argued the merits of his suppression claim

26   before the trial court, which held two separate evidentiary hearings." Id.   In the instant case,

27   Petitioner asked for an evidentiary hearing at trial, which was denied.  Petitioner did not discover the

28   Iverson Affidavit until after the trial had concluded and sought to introduce it on direct review.  The

1  appellate court did not consider the Iverson Affidavit in its opinion, presumably because it was not

2  properly brought before that court.

3       In habeas section 2254 proceedings, a determination of factual issues made by the state court

4  shall be presumed correct and can only be rebutted by clear and convincing evidence.  28 U.S.C. §

5  2254(e)(1).  The habeas court shall not hold an evidentiary hearing unless (1) the petitioner's claim

6  relies on a new rule of constitutional law or "factual predicate that could not have been discovered

7  though the exercise of due diligence" and (2) the petitioner can show that "the facts underlying the

8  claim would be sufficient to establish by clear and convincing evidence that, but for constitutional

9  error, no reasonable fact-finder would have found the appellate guilty of the underlying offense." 28

10  U.S.C. § 2254(e)(2).

11       Petitioner complains that he was never afforded a full and fair opportunity to present the

12  Iverson Affidavit to the state court.  There are two main avenues by which Petitioner could have

13  presented the Iverson Affidavit, see Lodged Doc. 1 Ex. 1, to the state court.  Petitioner could have

14  filed a motion to augment the record on direct review or filed a petition for writ of habeas corpus in

15  the California Superior Court.  See Charles Bonneau, ET AL., Appeals and Writs in Criminal Cases §

16  9.37 (3d ed. 2010) (standing for the proposition that habeas corpus in conjunction with an appeal is

17  the appropriate way to raise an issue wholly absent from the appellate record, such as claims of

18  newly discovered evidence).  However, Petitioner did not move to augment the record on appeal or

19  file a state habeas petition, nor does he point to evidence of any other means utilized in an attempt to

20  properly put the affidavit before the state court.

21       In deciding whether a petitioner was afforded a full and fair opportunity to litigate a claim,

22  the Court looks only to whether the petitioner was given the opportunity, not whether the claim was

23  decided correctly nor whether the petitioner actually litigated the claim.  Ortiz-Sandoval, 81 F.3d at

24  899.  Here, Petitioner points to no evidence that he was hindered from properly presenting the

25  Iverson Affidavit to the state court.  Because Petitioner had the opportunity to proceed correctly

26  before the state court but failed to do so, the Court finds that he was afforded a full and fair

27  opportunity to litigate the suppression issue.  As this case analogous to Lord in that Petitioner

28

1  received a full and fair opportunity to litigate.  Thus, Petitioner's Title III claim is not cognizable on

2  habeas review.

3         Regardless of whether Petitioner's claim is cognizable on federal habeas review, it still fails

4  on the merits. Petitioner claims that the state appellate court erred in its interlocutory decision

5  reversing the trial court's suppression of the cloned pager evidence because the government did not

6  seal and record the intercepted electronic communications and the government did not present a

7  "satisfactory explanation" for these failures.

8         Title III of the Federal Omnibus Control and Safe Streets Act of 1968, section 2518(8)(a),

9  mandates that:

10         The contents of any wire, oral, or electronic communication intercepted by any means
           authorized by this chapter shall, if possible, be recorded on tape or wire or other
11         comparable device. The recording of the contents of any wire, oral, or electronic
           communication under this subsection shall be done in such a way as will protect the
12         recording from editing or other alterations. Immediately upon the expiration of the
           period of the order, or extensions thereof, such recordings shall be made available to
13         the judge issuing such order and sealed under his directions . . .  The presence of the
           seal provided for by this subsection, or a satisfactory explanation for the absence
14         thereof, shall be a prerequisite for the use or disclosure of the contents of any wire,
           oral, or electronic communication or evidence derived therefrom under subsection (3)
15         of section 2517.

16  18 U.S.C. § 2518(8)(a) (1998).  If the authorities fail to record or seal the communication pursuant to

17  the statute, the communication shall be suppressed unless the government can produce a "satisfactory

18  explanation" as to why such failure occurred.  U.S. v. Ojeda Rios, 495 U.S. 257, 265 (1990)

19  (holding, *inter alia*, that (1) the government must produce a "satisfactory explanation" if recordings

20  are not sealed immediately after the expiration of the Title III warrant; and (2) a "satisfactory

21  explanation" must include a reason why the delay occurred as well as why the delay is excusable).

22  However, if it is not possible to record the communication, the sealing requirement does not apply.

23  U.S. v. Suarez, 906 F.2d 977, 983 (9th Cir. 1990).

24         Here, in its interlocutory opinion, the state court found that the cloned pager at issue "had no

25  capability to permanently record or store the numbers received," and thus did not fall within section

26  2518(a)(1).  (CT, Vol. 10, 2936;) see also Ewell, 2004 WL 944479, at *45.  Upon direct review,

27  Petitioner tried to proffer new evidence, which only became known to him after the interlocutory

28

1    decision.  This new evidence was meant to show that recording information sent to a digital pager

2    device was possible at the time of the investigation.  However, the state appellate court invoked the

3    "law of the case" doctrine and did not consider the evidence further.  Petitioner now asks this Court

4    to consider that same evidence.

5         The first piece of evidence is an affidavit that was sworn by an agent of the Federal Bureau of

6    Investigation (FBI) working on the "North Beach" case in San Francisco at the same time that the

7    investigation of Petitioner's case was taking place.  See Lodged Doc. 1 Ex. 1 (hereinafter "Iverson

8    Affidavit.")  The Iverson Affidavit meticulously describes the procedure used by the FBI at that time

9    to record information sent to digital pagers.  The second piece of evidence that Petitioner asks the

10   Court to consider is U.S. v. Hermanek, 289 F.3d 1076 (9th Cir. 2002), where the Ninth Circuit relied

11   on the Iverson Affidavit in holding that, "[b]ased on this record, we conclude that the district court

12   erred by concluding that recordation through the use of pager receivers was not possible."  Id. at

13   1089.

14        In Hermanek, agents from both the FBI and Drug Enforcement Agency (DEA) "conducted

15   extensive electronic surveillance of [a large scale cocaine operation]."  Hermanek, 289 F.3d at 1082.

16   Before trial, the defendants moved to suppress wiretap evidence, charging that the government failed

17   to comply with the record and seal requirements of § 2518(8)(a).  Id. at 1083.  The district court

18   denied the motion and suppressed the evidence.  Id.  On direct appeal appellants produced the

19   Iverson Affidavit to prove that pager receivers were being used by the very same FBI office to record

20   electronic communications from digital pages during the time of the investigation.  The Ninth Circuit

21   discussed the new evidence as follows:

22        When properly programmed, the pager receiver is tuned to the frequency of a pager
          and receives a data stream from the pager company containing the digital display
23        message, the date and time of the message and a code relating to the pager.  The
          receiver has the capacity to store the data streams in an "archive" file on its hard drive
24        that can be printed or transferred to a storage device such as a floppy disk.  Although
          pager receivers were a relatively new technology in 1994, appellants offered
25        undisputed evidence that they were employed effectively by the San Francisco office
          of the FBI–the same office leading the Flowers[11] investigation–in its so-called "North
26

27        ───────────────
            [11]Anthony Flowers was the center of the cocaine operation, while Hermanek was one of his suppliers.  As Flowers
28   was the authorities' primary target of the investigation, the entire case is referred to using his name by the Ninth Circuit.

1   Beach" investigation both before and during the Flowers and Lacy investigations.
    Agents in that investigation reliably intercepted pager messages, printed the contents
2   of the archive file and sealed them in accordance with § 2518(8)(a).

3   Id. at 1089.  The Ninth Circuit disagreed with the district court's finding that "recordation through the

4   use of pager receivers was not possible," Id. at 1089, but ultimately upheld the suppression because

5   the government offered a "satisfactory explanation" as to why it did not use a pager receiver, namely

6   "because the government's belief that pager receivers were not recorders within the meaning of §

7   2518 was objectively reasonable." Id. at 1090.

8       In this case, Petitioner claims that the state appellate court's decision holding that it was not

9   possible to record the electronic communications is an objectively unreasonable determination of the

10  facts in light of Hermanek.  Petitioner further claims that an evidentiary hearing is warranted

11  because, unlike in Hermanek, the government in this case has never been asked to give a

12  "satisfactory explanation" as to why it failed to record those communications.  The Court finds that

13  the state appellate court's reversal of the trial court's suppression of the cloned pager evidence is not

14  an objectively unreasonable determination of the facts because the Iverson Affidavit was not

15  available for the interlocutory appeal and was never properly put before the state appellate court on

16  direct review.

17      In its decision on direct appeal, the state appellate court invoked the "law of the case"

18  doctrine holding that Hermanek did not set forth any new law and deferred to its analysis of the

19  suppression issue in the interlocutory decision.  The "law of the case" doctrine "is exclusively

20  concerned with issues of law and not fact," In re Pratt, 69 Cal.App.4th 1294, 1316 (Cal. Ct. App.

21  1999) thus, the court may only defer to its previous decision when not presented with new facts.  In

22  this case, Petitioner sought to present new facts to the state court, which would seem to prohibit the

23  court from invoking the law of the case doctrine on this issue.  However, upon examination of the

24  record, it is clear that Petitioner did not attempt to avail himself of any of the proper procedural

25  methods of presenting new evidence to the state court; instead he simply attached the Iverson

26  Affidavit to his brief on direct appeal.   As discussed above, Petitioner neither filed a motion to

27  augment the record on appeal, nor did he file a petition for writ of habeas corpus with the state

28

-U.S. District Court
E. D. California

39

courts.  As the appellate court was not *properly* presented with new facts, this court cannot consider

them for the first time on habeas review.  Holland v. Jackson, 542 U.S. 649, 653 (2004); see also

Pinholster v. Ayers, 590 F.3d 651, 666 (9th Cir. 2009) (stating that AEDPA restricts a habeas

petitioner's ability to introduce new evidence on federal collateral review when the petitioner has not

been diligent in seeking to develop the new evidence on the state record).

Petitioner asks the Court to consider the Iverson Affidavit in conjunction with the Ninth

Circuit's factual finding in Hermanek and order an evidentiary hearing on the issue of whether the

government can offer a "satisfactory explanation" for its failure to record the electronic

communications sent to Radovcich's pager.  See Pet., 16.)

When a petitioner has failed to develop the factual basis for a claim in the state court, a

federal habeas court cannot hold an evidentiary hearing on the undeveloped claim unless the

petitioner shows that:

> (A) the claim relies on . . .
> > (ii) a factual predicate that could not have been previously discovered
> > though the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and
> convincing evidence that but for constitutional error, no reasonable fact-finder would
> have found the applicant guilty of the underlying offense."

28 U.S.C. § 2254(e)(2).  By the terms of the opening clause of the statute, only a petitioner "who has

failed to develop the factual basis of a claim in State court" falls within § 2254(e)(2).  Williams v.

Taylor, 529 U.S. 420, 430 (2000).  A petitioner has "failed to develop a factual basis for a claim" if

he did not act diligently in pursuit of that claim at the state court level." Id. at 432.  "[O]nly a

[petitioner] who has neglected his rights in state court need satisfy" the conditions of § 2254(e)(2).

Id. at 435.

Because Petitioner failed to properly bring the Iverson Affidavit before the appellate court, he

must meet the requirements of §2254(e)(2) in order to obtain an evidentiary hearing.  Accordingly,

the Court can only order an evidentiary hearing on the issue of whether the government can produce

a "satisfactory explanation" for its failure to record the electronic communication if Petitioner can

(1) show that he could not have previously discovered the evidence set forth in the Iverson Affidavit

through the exercise of due diligence; and (2) show that the new evidence is sufficient to establish by

1    clear and convincing evidence that, but for the alleged constitutional error, no reasonable fact-finder

2    would have found Petitioner guilty of the murders for which he was convicted.

3         Assuming the Iverson Affidavit could not have been discovered though the exercise of due

4    diligence until it was discussed by the Ninth Circuit in Hermanek, Petitioner must establish by clear

5    and convincing evidence that, but for the alleged constitutional error of the state appellate court to

6    suppress the pager communications, no reasonable fact-finder would have found Petitioner guilty of

7    the underlying offenses.

8         As an initial matter, the Court notes that a Title III suppression error most likely fails to

9    present a constitutional error as required by section 2254(e)(2)(B).  As Petitioner's claim focuses on

10   the alleged violation of the statutory provisions of Title III as opposed to a constitutional err, the

11   error is not of the magnitude to which section 2254(e)(2)(B) applies.  See Lord, 347 F.3d at1094 (for

12   the proposition that, by alleging a Title III violation, Lord does not appear to have "made a

13   substantial showing of the denial of a constitutional right").  Because Petitioner does not claim

14   constitutional error in this instance, he is foreclosed from obtaining an evidentiary hearing under

15   section 2254(e)(2).

16        However, even assuming the alleged statutory violation does rise to the level of constitutional

17   error, the Court finds that Petitioner has not satisfied his burden to prove by clear and convincing

18   evidence that, but for the alleged constitutional error, no reasonable fact-finder would have found

19   Petitioner guilty of murder.  First, even if Petitioner had been able to properly present the Iverson

20   Affidavit before the state courts, it likely would have been too far attenuated from the investigation

21   of Petitioner's case to be taken as proof that the local Fresno authorities had the knowledge and

22   ability to record digital pager communications at that time.  The Iverson Affidavit was sworn by a

23   San Francisco FBI agent whose office had the full resources of the federal government to keep up

24   with the latest technology.  Furthermore, as can be seen in Hermanek, other units at the same San

25   Francisco FBI office, who were conducting similar investigations at the same time, were not even

26   aware that they could be using pager receivers in their investigations.  Petitioner has presented no

27   evidence to convince the Court as to why the local Fresno authorities should have been expected to

28

1    know about and use pager receivers when not even all FBI offices were using them regularly at the

2    time.  Petitioner has not met his burden to prove to the Court by clear and convincing evidence that,

3    had the government been forced to give a "satisfactory explanation" as to why it did not use the pager

4    receiver, the explanation would have been found unsatisfactory, the wiretap evidence would have

5    been suppressed, and Petitioner would have been acquitted.

6         Additionally, there is evidence apart from the intercepted electronic communications on

7    which a reasonable fact-finder could rely in finding Petitioner guilty of the underlying crimes.  Most

8    notable is Ponce's testimony that Radovcich confessed the crime to him.  The fact-finder could also

9    rely on the inheritance Petitioner stood to gain upon the death of his family, Petitioner's angry

10   reaction when he found out he would not be able to collect his full inheritance immediately, and the

11   fact that Petitioner and Radovcich were living together in Petitioner's family's house after the

12   murders and spending money in suspect ways.  Further evidence consists of witnesses testifying to

13   Petitioner's obsession with wealth, Poindexter's testimony that Petitioner bragged that the authorities

14   would never solve the crime and were "dummies," and testimony as to Petitioner's reaction to the

15   news that Radovcich was a suspect.  Petitioner has not shown by clear and convincing evidence that,

16   even if the wiretap evidence was suppressed, a reasonable jury would have found him "not guilty" in

17   light of all of the other evidence.

18        In sum, Petitioner has not shown by clear and convincing evidence that, but for the alleged

19   constitutional error, a reasonable fact-finder would have failed to find him guilty of the underlying

20   offenses.

21        For the same reasons set forth above, expansion of the record is not permitted in this case.

22   "Rule 7 of the Rules Governing § 2254 cases allows the district court to expand the record without

23   holding an evidentiary hearing." Libberton v. Ryan, 583 F.3d 1147, 1165 (9th Cir. 2009) (quoting

24   Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005)).  However, in order to supplement

25   the record with new evidence, "a petitioner must meet the same standard that is required for an

26   evidentiary hearing" set forth in 28 U.S.C. §2254(e).  Libberton, 583 F.3d at 1165 (citing

27   Cooper-Smith, 397 F.3d at 1236.)  As discussed above, Petitioner does not meet the standard

28

1    required for an evidentiary hearing; thus, the Court cannot expand the record.

2           In conclusion, the Court finds that Petitioner's Title III claim is not cognizable on habeas

3    review because Petitioner was given a full and fair opportunity to present his claims to the State

4    courts but failed to properly present evidence to show the communication could have been recorded

5    as shown in the Iverson Affidavit.  Regardless of cogniziability, Petitioner's claim also fails on the

6    merits because he does not prove a constitutional error nor does he meet the statutory requirements

7    for an evidentiary hearing.

8           ***b. Fourth Amendment Claim***

9           Petitioner claims that his Fourth Amendment rights were violated by the authorities' use of

10   the cloned pager.  (Mem. P. & A., 32.)

11          As discussed in Ground One, federal habeas relief is not available for Fourth Amendment

12   claims unless the petitioner did not have a "full and fair opportunity to litigate" those issues in the

13   state court.

14          The State court invoked the Law of the Case Doctrine and declined to revisit the cloned pager

15   issue.  Thus, the Court must look to the state appellate court's opinion on interlocutory appeal to

16   determine whether Petitioner was given a full and fair opportunity to litigate the Fourth Amendment

17   issue.  See CT, Vol 10, 2889-2980.

18          The threshold issue to claim a Fourth Amendment violation is whether the individual holds a

19   reasonable expectation of privacy in the information that has been intercepted.  See Kyllo v. U.S. 533

20   U.S. 27, 34 (2001) (upholding the Katz v. U.S., 389 U.S. 347 (1967) test–"whether the individual

21   has an expectation of privacy that society is prepared to recognize as reasonable").  The state

22   appellate court, through a thorough analysis in its interlocutory opinion, found that Petitioner did not

23   meet this threshold and therefore, there was no Fourth Amendment violation.  See CT, Vol. 10,

24   2939-2944 (citing to Katz, 389 U.S. 347 and Smith v. Maryland, 442 U.S. 735 (1979) for the rule

25   that Petitioner must possess subjective and objective expectation of privacy).  The appellate court

26   found that Petitioner did not have a subjective expectation of privacy in numbers he transmitted to a

27   digital pager over which he had no control and that, even if he did harbor such an expectation,

28

society was not prepared to recognize it as reasonable.   See CT, Vol. 10, 2942-43 (quoting U.S. v. Meriwether, 917 F.2d 955 (6th Cir. 1990) for the proposition that petitioner "fails to show that he has sought to preserve a message as private by transmitting it into a paging receiver over which he has no control).)  The court recognized that by using a pay telephone, Petitioner may have been trying to keep his identity a secret, but found that this did not evidence a reasonable expectation of privacy because "[b]y using a public telephone to send a telephone number to a pager, [Petitioner] ran the risk that he would be seen, that he telephone company would reveal the number he dialed, or that the pager message would be obtained by someone for whom it was not intended."  See CT, Vol. 10, 2943.

Petitioner argues that he did not receive a full and fair opportunity to litigate the Fourth Amendment issue because "[t]he state appellate court simply ignored countervailing facts," namely that, in enacting the Electronic Communications Privacy Act of 1986, Congress "enacted a law which subjects a party who unlawfully intercepts a pager communication to imprisonment and a duty to pay damages to *both* the sender and receiver of the communication."  See Mem. P. & A., 32. Petitioner also cites to Rakas v. Illinois, 439 U.S. 128, 144 n.12 (1978) for the proposition that a petitioner meets the Fourth Amendment threshold where "a defendant's subjective expectation of privacy has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understanding that are recognized and permitted by society.'" Presumably, Petitioner is arguing that, because Congress set forth damages to be paid to both the sender and receiver of an illegally intercepted communication, society has recognized an equal expectation of privacy for both parties.   However, Petitioner points to no authority in support of his argument that statutory damages equate to a constitutional interest, nor does he point to authority that contradicts the state appellate court's determination that Petitioner did not have a reasonable expectation of privacy in the messages he sent to a pager over which he had no control.  Finally, Petitioner's argument does not go to the "fullness and fairness of his opportunity to litigate the claim, but to the correctness of the state court resolution, an issue which Stone v. Powell makes irrelevant." Siripongs v. Calderon, 35 F.3d 1308, 1321 (9th Cir. 1994) citing Gordon v. Duran, 895 F.2d 610,

613-14 (9th Cir. 1990)).

Petitioner fails in his burden to show that he did not receive a full and fair opportunity to litigate the Fourth Amendment issue in state court.  Thus, pursuant to Stone v. Powell, this claim is not cognizable on federal habeas review.  Because the state appellate court found that there was no Fourth Amendment violation this Court will not consider Petitioner's argument contending that the appellate court's use of the U.S. v. Leon, 468 U.S. 897 (1984) "good-faith" exception to the exclusionary rule was incorrect.  Accordingly, Petitioner is not entitled to habeas relief as to Ground Two.

**C. Ground Three**

Petitioner claims that his Sixth Amendment right to confrontation was violated when the State's witness, Ponce, violated the Bruton rule and the trial court's ruling.  (Mem. P. & A., 36.)

**1. Background**[12]

Prior to trial, the People successfully resisted appellants' motions for separate trials. The People subsequently sought admission against Ewell of statements made by Radovcich to Ponce, in part on the grounds they were declarations against interest and coconspirator statements. Ewell strenuously objected. Following a hearing, the trial court issued a detailed written decision concerning the admission of hearsay statements. It examined 136 statements which Ponce could testify were made by Radovcich, and issued a tentative ruling thereon. (Footnote omitted.) In pertinent part, the court ruled:

Statement No. 32 ("He said it had to do with eight million dollars and he and the other guy were going to split it in half. He was saying reasons for the homicides"): admissible against Radovcich only, pursuant to sections 1220 and 1230; "and he and the other guy were going to split it in half" was redacted as not being in furtherance of a conspiracy or an admission against penal interest, and as being violative of Ewell's Sixth Amendment rights.

Statement No. 33 ("He said we were going to assume the throne"): admissible (presumably against Radovcich, although the court did not specify) for a limited purpose under section 1250 as a statement of intent and motive, but not under section 1223 or section 1230; it did not sufficiently refer to Ewell so as to require redaction.

Statement No. 60 ("Did Joel tell you why he committed this murder? Yes, to split the inheritance"): admissible against both appellants under section 1223.

Statement No. 61 ("Did he tell you how much he believed the inheritance to

---

[12]  The facts are derived from the factual summary set forth by the California Court of Appeal, Fifth Appellate District, in its opinion of May 4, 2004, and are presumed correct pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1).  People v. Ewell, No. F031391, 2004 WL 944479, at *73-78 (Cal. Ct. App. May 4, 2004).

be? Yes, eight million dollars"): admissible against both appellants under section 1223.

Statement No. 62 ("Who did he say he was going to split the money with? Dana Ewell"): inadmissible as to both appellants pursuant to section 352; Ewell's Sixth Amendment objection sustained.

Statement No. 69 ("He said that Dana had proved to him there was that much money there to be split and it had been proved through liquid assets that he'd shown Joel"): inadmissible under sections 1223 and 1230; excluded pursuant to section 352.

Statement No. 81 ("Did Radovcich tell you when he expected to be able to collect his half of the proceeds or the inheritance, at what age? When Dana turned twenty-five"): admissible against Radovcich under sections 1220 and 1250; inadmissible against Ewell under sections 1223 and 1230; more probative as to Radovcich's state of mind, plan, intent, and motive than prejudicial to Ewell under section 352.

Statement No. 82 ("Joel explained there was a stipulation in the will that he wasn't to receive a large part of the money until he was 25 years old"): admissible against Radovcich under sections 1220 and 1250; inadmissible against Ewell under sections 1223 and 1230; more probative as to Radovcich's state of mind, plan, intent, and motive than prejudicial to Ewell under section 352.

Statement No. 114 ("Now, you said Joel told you that he had a deal, there was going to be something like 8 million dollars and a 50/50 split, is that right? Yes"): the court's tentative ruling is unclear. The court first found the statement admissible under section 1223, assuming there was prima facie evidence of a conspiracy and that the statement was made in furtherance thereof, and section 1230. In the very next portion of the ruling, however, the court determined that statement No. 114 and statement No. 132 ("Joel told you that they would get the money when Dana turned twenty-five? Yes") would be highly prejudicial to Ewell due to deprivation of his Sixth Amendment rights, and were "admissible against neither party" pursuant to section 352.

In conclusion, the court rejected Ewell's contention that much of what Radovcich told Ponce was inadmissible, assuming presentation of prima facie evidence of a conspiracy. The court further found that, upon prima facie evidence of a conspiracy and a threshold showing of trustworthiness, Radovcich's statements against penal interest would become statements made in furtherance of the conspiracy "in the context of an intent to induce silence and noncooperation with law enforcement by Ponce who already knew how the gun was obtained, modified, and later disposed of.... While coordinating alibis or advising co-conspirators to keep quiet alone may not be in furtherance of an alleged conspiracy, securing Ponce's silence by informing him of all the details of a triple homicide in which he was an aider and abetter [sic] or accessory, and holding out the attainment of a part of the inheritance by Joel's confiding in him, are admissible under 1223. But it would be a strained interpretation to include references to Dana Ewell that were clearly not offered to enhance the goal, but under 1223 because they are not inculpating as to Radovcich are otherwise admissible under Evidence Code section 1223 and 1230 with appropriate redaction."

Renewed motions to sever were denied. This court upheld the denials based on the showing made as of that point, but noted that the propriety of the trial court's

preliminary rulings concerning the 136 statements was not before us and, hence, we made no determination whether those rulings were correct. The trial court subsequently reiterated its belief that, while not all of the 136 statements would be admissible under section 1223 or survive scrutiny under Aranda Bruton, appropriate evidentiary rulings-involving redaction or exclusion-could be made so as to protect Ewell's Sixth Amendment rights. The court also reiterated its understanding of the law that a declaration against penal interest was independently admissible against both defendants if it met the guarantee of trustworthiness, and was not excludable as hearsay under the Sixth Amendment because it was a firmly rooted exception which satisfied the confrontation clause.

During his opening statement to the jury, the prosecutor asserted, without objection:

"Jack Ponce also tells us about what Joel Radovcich said about why he committed these murders. He-Joel Radovcich says he committed the Ewell murders in order to split the $8 million inheritance: Admissible only against Joel Radovcich. He stated that he expected to collect his half of the proceeds when Dana turned 25 due to a stipulation in the will.

"Finally, against both, admissible against both, Joel Radovcich tells Jack Ponce, 'We were going to assume the thrown [*sic*].' And he tells him, 'I hope there is no God, because, if there is, I'm screwed.'"

In his opening statement on behalf of Ewell, Kinney returned to the concept of splitting the inheritance, and stated:

"Two, the evidence will show that Joel and Dana were good friends. Did you notice a few minutes ago, the Prosecutor started to bring up promissory notes? That's correct, promissory notes. They got the case, and material, and all this money turned over. You heard the evidence that Mr. Ponce is going to say. Mr. Ponce is going to say that Joel's going to get four million bucks of the $8 million estate. A man who is going to get $4 million has to sign promissory notes to Mr. Businessman, Dana Ewell, to repay back $16,000. Think of that in your inferences and in your evidence. That's why he wanted to bring it up now.

"Yes, there was some money given to him. He made him sign promissory notes, the man that has $4 million coming."

Kinney also discussed the statement concerning assuming the throne, and argued it was "ludicrous," because Ewell "was already on the thrown [sic] in the apex of life. He was already on the thrown [sic]."

Prior to Ponce's testimony, the court stated that its view concerning admissibility of Radovcich's statements to Ponce had not changed. It found a prima facie showing that a conspiracy existed and was continuing at the time of the conversation at the beach, and that the statements were in furtherance of the conspiracy by way of assuring Ponce's lack of cooperation with law enforcement and his misstatements to the police before he himself was arrested. The court noted, however, that those statements which specifically related to Ewell were not in furtherance of the conspiracy.

During direct examination, Ponce testified to a conversation he had with Radovcich during a drive they took on a particular evening. The prosecutor elicited the following:

"Q During the course of that evening's activities, ... did [Radovcich] make any other statement with respect to his possible involvement?

"A Yes, he did.

"Q And what, if anything, did he say?

"A He said, 'We were gonna assume the throne.'

"Q Do you remember how that came up?

"A It-it came up when-he was saying the reason for what happened.

"Q What did he say with respect to the reason for what happened?

"A He stated a sum of money.

"Q What sum did he mention?

"A Eight million dollars.

"Q Was his statement something to the effect that it had something to do with eight million dollars?

"A Yes, that's correct."

Later during direct examination, Ponce testified to the conversation he had with Radovcich at the beach. This took place:

"Q Did-did Joel Radovcich tell you why that he had committed these murders?

"A Yes, he did.

"Q What did he say?

"A He said to split $8 million.

"Q I'd like to show you exhibit-referring you to item number 60. (Footnote omitted.) I'd like you to read that for just a second.

"A Uh-huh.

"Q And does that refresh your recollection?

"A Yes, it does.

1    "Q Okay. I will reask the question. [¶] ... [¶] And the question
     would be, 'Did Joel Radovcich tell you why he committed this
2    murder'?

3         "A Yes, he did.

4         "Q And what was the answer?

5         "A It was to split the inheritance.

6         "Q And then did he tell you how much he believed the
     inheritance to be?
7
          "A Yes, he did.
8
          "Q And how much?
9
          "A Eight million dollars.
10
          "Q Did Joel Radovcich tell you when he expected to be able to
11   collect any money?

12        "A He expected to be able to collect it when Dana turned 25
     years old.
13
          "Q And did he say anything about-
14
          "THE COURT: Just a moment. Just a moment. I've ruled that
15   to be inadmissible. The jury is admonished to disregard it.

16        "MR. OPPLIGER:[13] (Negative headshake.)

17        "THE COURT: Oh, yes.

18        "MR. OPPLIGER: No, you didn't.

19        "THE COURT: That's the Court's ruling now.

20        "And it's to be disregarded, ladies and gentlemen. I'm not
     implying that counsel did anything wrong, but ... it's to be disregarded
21   for rulings that I've previously made. Maybe I didn't make that one
     clear, but it's clear that the law makes it inadmissible and the jury's
22   admonished to disregard it.

23        "MR. OPPLIGER: My next question also concerns-possibly
     concerns a change in the Court's ruling. Should I wait?
24
          "THE COURT: Well, no. Just proceed according to the-we've
25   spent a great deal of time to save the jury time on pretrial rulings, and
     they stand. And let's proceed.
26

27   _____

28        [13]Mr. Oppliger was an attorney for the prosecution.

1    "MR. OPPLIGER: Okay.

2    "Q Did Mr. Radovcich say anything about, um, a stipulation in a will?

3

4    "A Yes, he did.

     "Q And what, if anything, did he state?

5

6    "A There was an age stipulation in the will.

     "Q And what was that?

7

8    "A That the-

     "THE COURT: Let's see.... [¶] ... [¶]

9

10   "MR. OPPLIGER: Item 81-82.[¶] ... [¶]

11   "THE COURT: Well, it is a question that I ruled on that it was admissible with respect to ... Mr. Radovcich was at the time he, Mr. Radovcich, expected to receive any money, not ... relating to anyone else.

12

13   "So you can elicit that question by ... a carefully phrased question, you may proceed. If you can't carefully phrase it, then follow the Court's rulings.

14

15   "BY MR. OPPLIGER: Q Did-did Mr. Radovcich state to you that he expected to receive his money at a point in time when-let's see. Strike that.

16

17   "Did he-Mr. Radovcich state his understanding that there was a stipulation in the will-

18

19   "THE COURT: The-if you cannot frame them the way I've ruled ... then go on to another subject and we'll take it up at the next recess. [¶] ... [¶] Yes, Mr. Ponce, did Mr. Radovcich say at what time, what age he, Mr. Radovcich, expected to receive the money? If he didn't, why, that's....

20

21

22   "THE WITNESS: He said how long he had to wait for the money, Your Honor-oops.

23   "THE COURT: All right. Let's go ahead.

24   "BY MR. OPPLIGER: Q And how long was that?

25   "A It was approximately three years."

26   Outside the jury's presence, the court clarified that testimony Radovcich said they would receive the money when Ewell turned 25 was admissible as to Radovcich's expectations under sections 1230 and 1250, but the objection was sustained as to Ewell's expectations as it would be highly prejudicial to Ewell because

27

28

of his Sixth Amendment rights, and so the testimony was inadmissible as to either defendant. The court accepted responsibility for any uncertainty in the ruling, but noted it had expected the testimony would concern Radovcich responding as to when he expected to receive the money, without any reference to Ewell. Recognizing the ambiguity, the court proposed to give a limiting instruction. While Ewell stated he was not asking for one at that point, he later changed his mind, as he wanted to cross-examine Ponce on the subject because Ponce had testified, at the preliminary hearing, that he could not recall when Radovcich made the statement. Ewell asked that the instruction be given if and when such evidence came in.

During Kinney's[14] cross-examination of Ponce, this took place:

> "Q Now, ... did you testify to the jury the other day, according to you, that you had heard, from Joel, about splitting some money? Is that correct?
>
> "A That's correct.
>
> "Q Look-and you said half of something? Half of some figure?
>
> "A That's correct.
>
> "Q At page 30, when they asked you about any split or deal, did you say, 'I guess it was a 50-50 split'?
>
> "A That's correct. I said that.
>
> "Q Now-(Pause)
>
> "THE COURT: All right. Ladies and Gentlemen, the last several questions pertaining to splitting some money is received only with respect to Mr. Radovcich. It is not received and may not be considered by you with respect to or against the Defendant Dana Ewell. Do not consider this evidence in any way against the Defendant Dana Ewell."

Kinney subsequently questioned Ponce about his testimony that Radovcich had said he would receive some money in about three years, and his statements on the subject at the preliminary hearing. The court told the jury that the same limitation applied the evidence was received only with respect to Radovcich, and it could not be considered with respect to Ewell.

## 2. Analysis

The Confrontation Clause of the Sixth Amendment "guarantees the right of a criminal defendant 'to be confronted with the witnesses against him.'  The right of confrontation includes the right to cross-examine witnesses. [Citation omitted.]  Therefore, where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing

---

[14]Mr. Kinney was an attorney for Petitioner, Ewell.

1  defendant takes the stand."  Richardson v. Marsh, 481 U.S. 200, 206 (1987); see also Mason v.

2  Yarborough 447 F.3d 693, 395 (9th Cir. 2006) (citing Bruton v. Untied States, 391 U.S. 123, 135-36

3  (1968) for the proposition that "the admission of a non-testifying codefendant's 'powerfully

4  incriminating extrajudicial statement' violates a defendant's Sixth Amendment right to confront his

5  accuser").

6       ***a. Incriminating Statements***

7       Petitioner complains that the confrontation clause was violated when Ponce testified that

8  Radovcich told him that he (Radovcich) committed the murders in order to split an eight million

9  dollar inheritance that he expected to collect "when [Petitioner] turned twenty-five years old."  See

10  Mem. P. & A., 36.  Because Radovcich chose not to testify, Petitioner never had an opportunity to

11  cross examine him; thus, the statement was made in violation of the confrontation clause.

12       The trial court recognized the error and immediately instructed the jury to disregard the

13  statement and continued to admonish it on this point throughout the remainder of the trial.  Ewell,

14  2004 WL 944479, at *76.  Petitioner argues that, despite the court's order to disregard, the statement

15  was so prejudicial that, in light of the "practical and human limitations of the jury system," limiting

16  jury instructions could not adequately cure the error.  See Mem. P. & A., 37-39 (quoting Bruton, 391

17  U.S. at 135-136).)  The state court agreed with Petitioner that the fact that the statement was put

18  before the jury, even with limiting instructions, constituted constitutional error.  However, the court

19  went on to conclude that the error was harmless beyond a reasonable doubt.  Ewell, 2004 WL

20  944479, at *82.  As the State court's finding of error is not unreasonable under Bruton, the Court

21  will discuss the issue of harmless error below.

22       Petitioner argues that the State court "refused to acknowledge other portions of the

23  Radovcich statements that also violated Bruton, namely, those that merely referenced splitting the

24  inheritance as the motive for the killings."  See Mem. P. & A., 39.  Petitioner claims that, even

25  though these other statements do not directly name Petitioner, once Petitioner's name was used "in

26  connection with splitting the inheritance, *all* of the Radovcich statements about splitting money, and

27  inheritance, and a stipulation in a will no longer inferentially, but explicitly, incriminated" Petitioner.

28

1   Id.  To be clear, Petitioner is not asking the Court to look at these other statements as inferentially

2   incriminating statements, see Richardson, 481 U.S. at 208 (for the proposition that a jury is more

3   likely to follow a judge's limiting instructions with regards to inferentially incriminating statements

4   as opposed to explicitly incriminating statements), but as statements that, due to the taint of the

5   statement that referred to Petitioner by name, directly incriminate Petitioner on their face.  See id.

6   (citing Bruton 391 U.S. at 124, n. 1).

7        Richardson v. Marsh distinguishes between facially and non-facially incriminating out-of-

8   court statements by a non-testifying codefendant as such:

9        Specific testimony that "the defendant helped me commit the crime" is more vivid
         than inferential incrimination, and hence more difficult to thrust out of mind.
10       Moreover, with regard to such an explicit statement the only issue is, plain and
         simply, whether the jury can possibly be expected to forget it in assessing the
11       defendant's guilt; whereas with regard to inferential incrimination the judge's
         instruction may well be successful in dissuading  the jury from entering onto the path
12       of inference in the first place, so that there is no incrimination to forget.  In short,
         while it may not always be simple for the members of a jury to obey the instruction
13       that they disregard an incriminating inference, there does not exist the overwhelming
         probability of their inability to do so that is the foundation of Bruton's exception to
14       the general rule.

15  Richardson, 481 U.S. at 208.

16        The appellate court found the original statement to be "substantially (or 'powerfully')

17  incriminating because it linked Radovcich's motivation for the killings to Ewell's receipt of the

18  inheritance."  Ewell, 2004 WL 944479, at *79.[15]  Due to the incriminating nature of this statement,

19  the jury would likely have equated further testimony of Radovcich discussing the split of an eight

20  million dollar inheritance to Petitioner's eight million dollar  inheritance.  When Ponce testified that

21  Radovcich told him that Radovcich committed the murders in order to split an eight million dollar

22  inheritance that he expected to collect when Petitioner turned twenty-five years old, all of the

23  subsequent Radovcich statements that mentioned eight million dollars or inheritance were taken past

24  the point of being merely inferentially incriminating to being associated with the original facially

25

26        [15]  The court notes that the state court did not make specific findings on whether the statements
     also facially incriminated Petitioner.    This does not change the court's standard of review under 28
27   U.S.C. § 2254(d) because "determining whether a state court's decision resulted from an unreasonable
     legal or factual conclusion does not require that there be an opinion from the state court explaining the
28   state court's reasoning."  Harrington v. Richter, – U.S. – , 2011 WL 148587 at 9 (2011).

1  incriminating statement.  While the admission of all of these statements was in error due to the taint

2  from the original statement, if the error relating to the original statement is harmless, then so too

3  must any error associated with the later statements.

4       ***b. Harmless Error***

5       In assessing the prejudicial impact of federal constitutional error in a state court criminal trial,

6  the district court must ask whether the error had a substantial and injurious effect or influence in

7  determining the jury's verdict.  Fry v. Pliler, 551 U.S. 112, 119-122 (2007) (citing Brecht v.

8  Abrahamson, 507 U.S. 619, 623 (1993)) (holding that Brecht standard of review "subsumes" the

9  harmless error tests of AEDPA and Chapman v. California, 386 U.S. 18 (1967), and thus is the

10  appropriate harmless error standard to use on federal habeas review.)  In finding the error harmless,

11  the State court used the "harmless beyond a reasonable doubt" standard articulated in Chapman.

12  Therefore, this Court must conduct its own harmless error analysis under Brecht.  The Court finds

13  that the error did not have a substantial and injurious effect or influence in determining the jury's

14  verdict because a reasonable jury could have found Petitioner guilty based on the plethora of other

15  evidence presented at trial even if the statement naming Petitioner had never been uttered.

16       As set forth in the factual background, Radovcich implicated himself to Ponce.  In that

17  statement, Radovcich also implicated another person.  The jury was apprised *inter alia* of the

18  following information independent of the Radovcich statements made to Ponce: (1) Petitioner's

19  family had been murdered; (2) The approximate age of Petitioner at the time of the murders; (3)

20  Petitioner expected to inherit around eight million dollars due to his family's death; (4) The age

21  stipulation in Petitioner's parents' will that did not allow Petitioner to receive the bulk of the estate

22  until he reached the age of twenty-five; (5) Petitioner's anger upon finding out about the age

23  stipulation; (6) Petitioner and Radovcich knew each other; (7) Radovcich was living for some time

24  with Petitioner at the house where Petitioner's family was murdered; (8) Petitioner and Radovcich

25  engaged in clandestine communication after the murder; (9) Petitioner reacted angrily to the news

26  that Radovcich was a suspect; and (10) Radovcich confessed to Ponce that he murdered the Ewell

27

28

1  family and did so to split an eight million dollar inheritance.[16]  Given all of those facts, it is likely

2  that any reasonable jury would have made the connection on its own that the eight million dollar

3  inheritance for which Radovcich killed Petitioner's family was the same eight million dollar

4  inheritance that Petitioner expected to collect as a result of the death of his family members.  (See

5  Ewell, 2004 WL 944479, at *82.)  Because a reasonable jury could have reached the same

6  conclusion had the statement specifcally naming Petitioner never been uttered, the error is harmless.

7      The reasoning is the same when deciding whether the erroneous admission of Radovcich's

8  other statements is harmless.  The crux of Petitioner's argument is that, because Ponce testified that

9  Radovcich told him that he killed the Ewell family in order to collect half of an eight million dollar

10  inheritance when Petitioner reached the age of twenty-five, every other statement made by

11  Radovcich, as testified to by Ponce, regarding money or inheritance, facially incriminated Petitioner

12  due to the taint of the original statement.  Conversely, the issue becomes whether a reasonable jury

13  could have inferred that Petitioner was Radovcich's accomplice even if Ponce had never testified to

14  the statement that specifically named Petitioner.  Had Petitioner never been named, the content of

15  these other statements would be unobjectionable and would have had a substantial effect on the jury.

16  These statements were substantial to the jury even if Petitioner had not been named because, when

17  taken into consideration with all of the other evidence presented at trial, they continue to paint a

18  vivid picture of Radovcich and Petitioner killing Petitioner's family in order to receive the

19  inheritance.  Because the statements could reasonably have been relied on by the jury in finding

20  Petitioner guilty even if there were no impermissible inferences to be made, the Sixth Amendment

21  violation is harmless.

22      Petitioner argues that "the prosecutor emphasized the inadmissible testimony in his closing

23  argument."  See Mem. P. & A., 41; U.S. v. Kojayan, 8 F.3d 1315, 1323 (9th Cir. 1993) (citing U.S.

24  v. Sherlock, 962 F. 2d 1349, 1362 (9th Cir. 1989) for "holding prosecutor's improper use of

25  testimony barred by Bruton in closing argument 'significantly prejudiced' defendant").  Petitioner's

26  argument is that the curative instructions given by the court cannot overcome the prejudice brought

27

28      [16] See supra p. 42 (Statements 60 and 61 admissible against both appellants).

1  about by the prosecution's reference to the incriminating statements in closing arguments.  In light of

2  the fact that the Court's harmless error analysis is premised on the fact that, had the facially

3  incriminating statement never been uttered, a reasonable jury still could have found Petitioner guilty

4  based on the other evidence proffered, this argument is unpersuasive.

5       Finally, Petitioner argues that "the jury did not find the evidence against [Petitioner]

6  overwhelming, as it announced a deadlock on the issue of his guilt."  (Mem. P. & A., 42.) Petitioner

7  claims that because the jury was deadlocked, and allegedly only reached a verdict after listening to a

8  certain tape recording, the evidence presented at trial is insufficient to support a conclusion that,

9  independent of the incriminating statement, the jury would have still found Petitioner guilty.  As will

10  be discussed more fully in Ground Five, the Court does not agree with Petitioner's contentions

11  regarding the tape recording and does not find the fact that the jury was deadlocked at one point

12  dispositive of the weight of the evidence admitted at trial.

13       The Supreme Court gives the Court guidance in deciding whether a constitutional error is

14  harmless to the effect that "[w]hen a federal judge in a habeas proceeding is in grave doubt about

15  whether a trial error of federal law had 'substantial and injurious effect or influence in determining

16  the jury's verdict,' that error is not harmless."  O'Neal v. McAninch, 513 U.S. 432, 436 (1995).  In

17  light of all of the independent evidence that was available to the jury linking Petitioner's inheritance

18  to the eight million dollars for which Radovcich killed the Ewell family,[17] this Court has no grave

19  doubt in finding any constitutional error with regard to Radovcich's statements harmless.  If the

20  facially incriminating statement was harmless, then it follows that the taint was harmless as well.

21  Because all constitutional errors regarding Radovcich's statements, as testified to by Ponce, are

22  harmless, Petitioner cannot be granted habeas relief with regards to Ground Three.

23  **D.  Ground Four**

24       Petitioner claims his Fourth Amendment rights to due process and a fair trial were violated

25  when the trial court permitted the State to introduce character evidence in the form of lay opinion

26  testimony.  (Mem. P. & A., 46.)

27  _____

28       [17]See supra p. 51

**1. Background**[18]

Prior to trial, Ewell made a number of in limine motions. In pertinent part, he sought to exclude, pursuant to section 352, evidence concerning his claims, as reported in a 1990 San Jose Mercury News article and the 1990 Santa Clara University yearbook, of being a self-made millionaire, together with any similar personal representations to others. He also sought to exclude testimony portraying him as greedy or obsessed with money, or that he tried to start an investment business when he was in high school.

In response, the People argued that evidence concerning Ewell's obsession with money and riches was relevant to show motive, and asserted that Ewell's desire to be rich was the sole motive posited by the People for the killings. The People alleged that Ewell's obsession with money led him to create a false persona whereby he presented himself as a self-made millionaire, and claimed that "[a]ny witness who knows Dana will state he is obsessed with becoming rich." The People further asserted that Ewell's love of money carried little danger of collateral prejudice and was central to the prosecution's theory of the murders, and would be highly probative to overcoming concerns of whether a son could kill his family. Ewell countered that the evidence sought to be introduced was neither immediate nor specific, and that the proffered evidence simply did not establish a motive to kill several years later. (Footnote omitted.)

During the hearing on the motion, the prosecutor acknowledged that evidence of claims of being a self-made millionaire to some extent crossed over into character and veracity, which could not be addressed until it was determined whether Ewell would testify. The prosecutor confirmed that Ewell's desire to be rich was the only motive being offered by the People, and told the court: "[T]he reason why this crime occurred is this obsession of Mr. Ewell's with money and his desire not to only to [ sic ] have it but to look like he has it, to live this fantasy that he lived for four years, this fantasy that in all likelihood was going to have to come to an end upon his graduation and his being removed from the lap of luxury, so to speak, that was his college years. [¶] So this, to us, is probably one of our main evidences of motive evidence [ sic ]." The prosecutor claimed he was not offering evidence of greed per se, but instead the proffered evidence was "more focused on obsession with money and the various opinions and/or statements that focus on an obsessive love of money." He conceded he was "essentially admitting that this is character evidence," but argued that-because it constituted evidence of motive-it was admissible as an exception, under section 1101, to the general prohibition against character evidence. The prosecutor contended Ewell planned the homicides while he was a sophomore in college-hence, his high school days were not in the distant past-and noted that Ewell's holding himself out as a millionaire carried over into college, as shown by the yearbook and newspaper article. According to the prosecution's theory, Ewell succeeded in defrauding everyone into thinking he was a millionaire, thereby creating a fantasy which he did not have the means to sustain. However, in his mind, if he could obtain the fortune he was set to inherit, he could reinvest it and make more money, and be able to live the fantasy. The prosecutor again emphasized that he was "talking about character in terms of motive . . . ."

---

[18] The facts are derived from the factual summary set forth by the California Court of Appeal, Fifth Appellate District, in its opinion of May 4, 2004, and are presumed correct pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1). People v. Ewell, No. F031391, 2004 WL 944479, at *58-67 (Cal. Ct. App. May 4, 2004).

The court recognized that, particularly in homicide cases, motive is highly relevant and may be a dispositive issue. However, it questioned whether the People could present the issue of a desire for money through other evidence, without resorting to articles in which Ewell held himself out as a self-made millionaire. The court noted that there appeared to be substantial evidence, apart from what seemed to show a character trait, to demonstrate that someone committed or arranged for multiple homicides, and observed that a lot of people try to make themselves more important than they are. The prosecutor acknowledged that everyone has a desire to be rich and that self-aggrandizement is not unusual, but argued he could prove Ewell's love of money and fantasy of being rich were so obsessive and unusual that Ewell was not like anyone else, and that the obsession was so great as to overcome the basic human instinct that one does not kill one's parents. The prosecutor argued motive was critical to the People's case, as the People had to overcome jurors' normal disinclination to believe someone could kill his or her parents.

The court recognized that preoccupation with success and money could constitute evidence of motive in a homicide case, but was wary of getting into collateral issues concerning personality defects. It assumed the People would have considerable other evidence that would be relevant to motive, such that the probative value of the self-made millionaire claim would be diminished. Accordingly, it granted the motion in limine that there be no reference to the evidence in opening statement; however, it gave the People permission to reraise the issue outside the jury's presence if, during their case-in-chief, they felt themselves so lacking in evidence of motive that this evidence became highly probative.

The court then turned to the prosecution's desire to present evidence of Ewell's alleged obsession with money, which the court assumed would be in the form of lay opinions. The prosecutor argued that the only other evidence of motive, aside from what the court had just addressed, was that persons who knew or grew up with Ewell were of the personal opinion that he was obsessed with money. He argued that the most probative means of proving a person's obsession with money was the opinion of that person's associates, but acknowledged the need to establish that the witness(es) possessed a sufficient foundation to render such an opinion. The court observed that, depending on the evidence, obsession with money could be an opinion on someone's state of mind, based on that person's declarations, or it could be an opinion as to a character trait. The court ruled that the prosecutor would be permitted to present his witness(es) outside the jury's presence, at the appropriate time, in order to establish the necessary foundation. (Footnote omitted.)

The subject of Ewell's representation that he was a self-made millionaire, as well as his having held himself out as an owner of his father's business, was revisited during trial. The prosecutor contended that, contrary to Ewell's representations, there was no corporation called "Ewell & Company"; while Ewell owned some stocks, the value of his portfolio was well under $100,000; there was no business whereby student funds were pooled and invested with profitable results; and Ewell did not attempt to sell aircraft through his father's business and only became extensively involved after the murders. The court found that if Ewell held out his father's business as his own, such evidence would be relevant to a motive to acquire that business. When it questioned the probative value of the other evidence, the prosecutor responded that the critical point was the extent to which Ewell would go in order to fulfill his dream. Within the Santa Clara college community, he argued, Ewell was the successful businessman he desired to be, as he had created a false persona and was accorded the status of that persona by the community in which he then lived. That persona would end with graduation, however, unless Ewell obtained "a whole lot of

money quickly," either by legitimate or illegitimate means. The prosecutor asserted that what mattered was not so much Ewell's desire to have his father's business, but his "unbridled desire" to be rich and, beyond that, to be accorded the status and power that comes with money. He reiterated that killing one's parents "is an incredibly unusual act," and argued that in order to prove it, he needed to establish an unusually strong, unique motive. He pointed to Ewell's unbridled love of money and desire to succeed financially, as well as the false persona which demonstrated the intensity of Ewell's focus on money and need to be rich. The prosecutor went on to argue that, to the extent Ewell was the same as other people (for example, successful Wall Street traders), his desire for money still had probative value, but no prejudicial effect. The prosecutor recognized that creation of the false persona carried collateral prejudice in that it showed a character trait for lying or exaggeration, but pointed out that motive evidence often has collateral prejudice. He argued that, given the critical nature of the motive evidence, the prejudicial effect "simply pale[d]" in comparison to the probative value. The prosecutor asserted that if he was not permitted to present motive evidence in his case-in-chief, the fact Ewell's parents were generous with him and he was well-off could be used by the defense to argue lack of motive, as the jury would be left with a false impression of the true state of affairs. Radovich joined the People's motion.

The court recognized that relevant motive evidence was admissible, but questioned whether it was relevant to motive that Ewell had "a character trait for the need to be admired for financial success achieved by prevarication, exaggeration, and just fiction as to his accomplishments[.]" Ewell responded that the prosecution had presented nothing new since the issue was addressed in limine, "at that 352 hearing." He agreed that a different issue would arise were he to testify, but claimed the evidence in question was extremely prejudicial and noted that evidence showing he was a liar was impeachment evidence. He conceded that greed was an arguable motive, but contended the People could present it through other evidence, without having "to delve into highly speculative psychological profiles . . . ." Ewell offered to stipulate that he wanted to be rich and that he was the sole heir, but contended that "all this other highly speculative, highly prejudicial, psychological type evidence, which we've already talked about and dealt with . . . is irrelevant and . . . should not be admitted." He went on to assert that any probative value was marginal at best and was totally outweighed by the prejudicial effect.

After further argument, the court ruled that evidence concerning Ewell's purported acquisition of an aircraft dealership and holding himself out as having developed his father's dealership or owning it could be presented, as it constituted evidence of a potential anxiety to acquire that dealership either by inheritance or otherwise. As such, it was relevant to motive and more probative than prejudicial. The court subsequently permitted the People to introduce a portion of Ewell's résumé, which, although undated, he submitted with his application to Santa Clara University. In the résumé, Ewell claimed to own Western Piper Sales. The court found it relevant to show long-standing motive. The court also overruled Ewell's objection to a box of materials Ewell had collected, which included copies of various financially-oriented magazines and articles on very wealthy people. Despite Ewell's concern the materials would be argued more as character evidence than as evidence of motive-the character trait being obsession with or passion for money-the court ruled the People would be permitted to argue that there was a mindset or focus on being successful in business and becoming a very wealthy person through business, and that the materials constituted circumstantial evidence of a desire to succeed in the same path as those profiled in the articles. The court found no prejudice in someone having a very focused interest in billionaires and how they accumulated their money.

1

2          When the prosecution sought to call Francisco Reinoso as a witness, Ewell
objected on the grounds of relevance, foundation, hearsay, and minimal value.
3    (Footnote omitted.) After a foundational hearing, the court ruled it would allow
Reinoso to testify that, based on conversation, Ewell had a definite interest in money
4    and business, business was something he loved, and he talked about having a
company. The court also stated that the prosecutor could lay the groundwork for
5    bringing in the witness who conducted the interview, who could testify that Ewell
talked about owning an aircraft company in Fresno, which detail Reinoso was unable
6    to recall. The court found the evidence to bear on motive to achieve the family
business. The prosecutor subsequently elicited, over the same objections, testimony
7    from Michael Dibono that Ewell told him that he had bought a Piper company which
was in bad shape, turned it around, and then sold it, making $2-$3 million in the deal;
8    and that Ewell said his father was a vice president for Shearson and Lehman, a major
stock brokerage company.

9
           Outside the presence of the jury, Ewell argued that evidence permitted under
10   the court's rulings, concerning claims of being a self-made millionaire, was now
becoming cumulative and very prejudicial, and requested that the court hold hearings
11   before allowing any more such witnesses. The court observed that the conversation
related by Dibono did not characterize anyone as being preoccupied with money, but
12   instead was a statement from Ewell himself instead of someone else's conclusion or
opinion. Ewell then filed a motion reiterating the various rulings on the subject and
13   setting out his concern the prosecutor, in the guise of motive evidence, was seeking to
present evidence that Ewell was a liar. (Footnote omitted.) He moved to exclude the
14   yearbook article as cumulative or for specification of precisely which portions would
be allowed into evidence, and he requested that a hearing on this motion be held prior
15   to the testimony of Alicia Williams, the person who interviewed him for the article.

16         Alicia Williams ultimately testified, without a foundational hearing, that in the
course of her studies as a journalism student at Santa Clara University, she profiled
17   Ewell, who was then a freshman, for the yearbook. Ewell told her that he was an
aircraft salesman and president of his own aircraft dealership, and that he owned the
18   company. He stated that his company was so successful, he was thinking of starting a
new dealership in San Jose. Williams authenticated a photocopy of the article she
19   wrote, as well as the photograph which accompanied it and which was provided to her
by Ewell. However, beyond Ewell's statements, she did not testify as to the contents
20   of the article other than to say it accurately reflected his statements.

21         Ewell subsequently objected that, pursuant to the court's previous ruling, only
statements he was an aircraft salesman and president of his own aircraft dealership
22   were to have been elicited. The court agreed and pointed out that the ruling did not
cover testimony about the success of Ewell's business or his starting a new dealership.
23   The court explained, however, that it did not intervene sua sponte because the
testimony was not far removed from the ruling, and it noted defense counsel could
24   have objected by simply referring to the in limine ruling.

25         Later, the prosecutor sought to call Shelby Grad, a reporter who interviewed
Ewell for the 1990 article in the San Jose newspaper. According to the article, Ewell
26   and his investors purchased a bankrupt airplane dealership in Fresno and built it into
what Ewell described as "'the Cal Worthington of planes,'" worth more than $4
27   million when he sold it in 1990. The article also related that when Ewell was head of
the dealership, he had to "'shuttle'" between Fresno and Santa Clara to take care of
28   business. Ewell objected that the proffered evidence was cumulative and anything
about an airplane business that was not his father's fell outside the court's prior
rulings. When the court pointed to the inference that Ewell had in mind his father's

business and stated it found nothing prejudicial or cumulative about the proffered evidence, Ewell argued that the asserted motive was "bologna" and contended it was "all a guise by the D.A . . . to get in character." The court determined it could be inferred that the business Ewell was describing was, in fact, his father's business, and that the trier of fact could find Ewell's prior comments in the yearbook interview were not isolated or casual statements, but that he truly did "have a mindset on coveting his father's aircraft business, not 25 years from now, when one might normally expect to inherit, but right then." Accordingly, it found the evidence relevant to the issue of motive, more probative than prejudicial, and not cumulative. Grad subsequently testified in conformity with the article's contents.

Ewell subsequently objected to the People calling Sean Shelby, a friend of his in junior high school, and he also raised issues with respect to Michael Poindexter. During argument about whether the People could present Shelby's opinion concerning Ewell's greed or obsession with money, the prosecutor observed that he had interpreted the court's prior rulings to mean he could not go into specific acts, but could simply present an opinion. On behalf of Ewell, Attorney Kinney stated that was also his understanding.[19] The court disagreed, explaining that someone's opinion about someone else's state of mind was a conclusion, and that what the person said or did was what was relevant. As a result, the prosecutor decided not to schedule Shelby or Poindexter until a later time, in order to allow the attorneys to assess those witnesses' interviews in terms of specific acts.

The prosecutor then sought clarification of the court's rulings with respect to whether the People could offer opinion evidence by individuals who knew Ewell well as a means of establishing the proffered motive of Ewell's unusually strong passion for money and desire to be wealthy. The court responded that it was trying to find out "what specifically the witness is going to say about the foundational matters for the opinion they're going to express." Kinney stated he understood the ruling to be that the prosecution would have to establish the foundation for the witness's testimony; prejudicial matter would be excluded, but the witness then would be permitted to state Ewell had a lust for money. He asked that the matter be deferred to permit the attorneys to examine the witnesses' statements, and the trial court agreed to defer a foundational hearing.

Later, the prosecutor announced that, with respect to prospective witnesses Poindexter and Goolkasian, he and the defense attorneys were attempting to negotiate an agreement whereby the prosecution would not be presenting specific acts, but simply the personal opinions of the witnesses. The court was agreeable to such an arrangement if it could be worked out. Still later, the prosecutor stated that with respect to prospective witnesses Tapia, Goolkasian, and Poindexter, he and Ewell had agreed that specific facts or instances concerning Ewell's passion for money would not be presented, but only the witnesses' opinions or reputation evidence. Shelby would not be called to testify. Kinney responded, "Generally what Mr. Oppliger said is correct as to those witnesses." He then clarified that if the prosecutor made an offer of proof as to what the witness would say and the court found it sufficient, the matter would not need to be gone into in front of the jury and the witness could give his or

---

[19]At trial, Ewell was represented by Attorneys Jones, Castro, and Kinney. Radovcich was represented by Attorney Cherney, while the People were represented by Attorneys Oppliger and Hammerschmidt. While the appellate court usually refers to appellants as raising points which were actually raised by their attorney(s), the appellate court stated it would refer to an attorney by name if the appellate court found it appropriate to differentiate between counsel.

her opinion. The prosecutor agreed with the court's observation that that did not sound like a stipulation, so he and defense counsel agreed to consult further.

At the beginning of the court session in which Poindexter, Tapia, and Goolkasian were scheduled to testify, the prosecutor stated that he and Kinney had agreed on what was going to be admissible in the way of opinion evidence, and that they had decided to limit their foundational issues to the state of knowledge or the state of closeness between individuals as opposed to acts which supported the opinion, because there were specific acts about which the defense did not want the prosecution to elicit testimony. Kinney did not dispute the representation, but, following Cherney's argument about Radovcich's ability to inquire into prior bad acts by Ewell and his statement that he was not party to any agreements between Oppliger and Kinney, Kinney replied, "We haven't got any agreements, counsel ."

Bettina Goolkasian subsequently testified that she had known Ewell since they were in kindergarten. Based on her relationship with Ewell over the years, Goolkasian had formed an opinion concerning his interest in money. She stated, "I have never known anybody like Dana in the respect that when one judges their life's worth or life's value, nobody has come close to Dana, in the people that I have come in contact with and have been friends with, to where money has been the most-the single most important determining factor of one's value." On cross-examination, Ewell elicited that the witness's earliest recollection of his having an interest in money was in third grade.

Prior to the testimony of Mario Tapia, Ewell secured a limitation, pursuant to section 352, concerning post-homicide contact between Tapia and Ewell, and Tapia's opinion of Ewell's state of mind at that time. Tapia then testified concerning how long he had known Ewell and the closeness of their relationship. When asked whether he had formed an opinion with respect to Ewell's interest in money, Tapia began to recount a course Ewell took concerning stocks and how he wanted to start his own small mutual fund. The prosecutor stopped him and asked if he had an opinion as to Ewell's interest in money, compared to other people Tapia had known. (Footnote omitted.) Tapia responded, "It was a very large motivation for him. Uhhm, he was very ambitious. Uhhm, he-he wanted to, uh-I think he wanted to be successful in life. And, uh, he tried very hard at it. Uhhm, I guess academically, you know, he wanted to get into an Ivy League school, so he studied very hard in high school and to get into one. But I think at the end he didn't get into one. [¶] But he majored in finance. And I think money kind of revolved around him." When Tapia then testified to seeing Ewell handing out $100 bills during his freshman year, the testimony was stricken as nonresponsive and the jury was admonished to disregard it. When the prosecutor asked Tapia to compare the relative degree of Ewell's interest in money to other people Tapia knew, Tapia responded, "Like, uhhm, scale of one to ten, it was like an 11. To him it was, uh-I don't know-he didn't feed on it. It was just a high-a big interest in him. Like money makes things go round. And people-you know, money won't necessarily make you happy. But it can buy you the Porsche you want; it can buy you the ski lodge that you want. And, uh-and, I don't know, to him-I think money made him very happy, uhhm, or the impression that he had a lot of money." On redirect examination, the prosecutor elicited, over objection that it was an opinion, Tapia's statement to investigators that some people say money makes the world go round, and he thought that to Ewell, money did make the world go round.

Before Poindexter testified, Ewell clarified that he was not to be questioned concerning, inter alia, Joe Hunt, the Billionaire Boys Club, Ivan Boesky, or Michael

1   Milken-type material. Poindexter subsequently testified that he first met Ewell in fall
of 1984, during their first year of high school. During high school, he and Ewell were
2   best friends. After they went to different colleges, they continued to maintain contact.
On direct examination, Poindexter testified, in part, as follows:

3

4           "Q Now, based on this association with Mr. Ewell over these
years, did you have an occasion to come to an opinion as to what
his-strike that. Were you in were you in a position to be able to
5   determine what his interest or degree of interest in money or wealth
was?

6

7           "A Yes, I was.

8           "Q In your own words, could you describe the degree of Dana
Ewell's interest in-in money as compared to other people?

9           "A He's the greediest person I've ever met in my life.

10          "Q In your opinion, or based on your observations, did Mr.
Ewell seek to convey a position of money or being from money?

11

12          "A Oh, yes. He wanted to be very flashy with his money.

13          "Q Did you ever describe that character as Dana Ewell wanting
you to think that he was as rich as God?

14          "A Rich or richer.

15          "THE COURT: Just a moment. That's not an admissible
personal-that's not an admissible opinion.

16

17          "MR. KINNEY: Also leading, suggestive.

18          "THE COURT: The objection is sustained.

19          "MR. KINNEY: Mr. Oppliger is testifying.

20          "THE COURT: Being a witness is not a forum for going
beyond what the Evidence Code allows.

21          "MR. OPPLIGER: Q How-would you describe Mr.
Ewell's-when you used the word 'flash'-'flashy' with money, how
22   would you describe it in your own words.

23          "A Well you'd want to show everyone how much money you
have, talk about money, dress in the nicest clothes, make sure everyone
24   knows you've got the expensive car, the expensive house, come from a
well-to-dofamily, let people know you always have cash. It would be
25   completely in line to say you would always pay with big bills, because
it makes you look like you have more money when you go to buy a
26   candy bar, 'Can you break a hundred? That's the smallest I have.' That
was the type of flashiness."

27

Oppliger subsequently asked how Poindexter would characterize Ewell's motivation for money based on Poindexter's knowledge of Ewell from 1984 to 1994. Poindexter replied, "I think that he would do anything he can to acquire more money."

The next day, when Ewell complained about the "richer than God" testimony, the court reminded the parties that it was not receiving character evidence, but only personal opinion evidence concerning the focus on money.

During his opening argument to the jury, the prosecutor talked at length about motive. He suggested that everyone dreamed of being rich, but that for most people, it was merely an idle and harmless fantasy. By contrast, Ewell "wanted to be rich like no one that has come before him or no one who will come again." The prosecutor asked, rhetorically, "What it is that made Mr. Ewell tick?" He then argued that the People had tried to present Ewell's friends-those who were in a position to know him best in high school and college-and argued that these people held no grudges against Ewell and their testimony was uncontradicted. He recapped the testimony of Tapia, Goolkasian, and Poindexter, (footnote omitted) then reviewed Ewell's collection of magazine articles concerning wealthy people and suggested it showed Ewell was obsessive about his passion for money. The prosecutor also noted the various articles and testimony concerning Ewell being a self-made millionaire and turning around a bankrupt aircraft company. He then told the jury:

"So what happens here with all this scheming? Dana Ewell finds himself kind of the toast of the town there in Santa Clara, running around in his suits and driving his gold Mercedes.

". . . Have you ever seen how very, very rich people, men, get treated by their-by their fellow men? Have you ever seen that? It's-I know not all of us treat them that way, but there is a great deal of power, admiration, respect, even sexual attraction that is accorded to ... the so-called rich. All these things come to the person perceived to be-or actually be wealthy.

"That's picture number one. I would like you to think about in this community how the college students are treating Dana Ewell based on the false persona.

"Picture number two is I would like you to kind of think or picture what you have come to know about Mr. Ewell. How do you think Dana Ewell, with his character that we've learned, how do you think he felt about this new-found position?

"Really the point being that Dana Ewell was no longer just the son of a rich man at San Joaquin Memorial. He was now in Santa Clara, his own man, rich, successful, and powerful. I submit or venture to say that you'd have to actually see him strut around campus and savor that attention to really appreciate his love of this position.

"So there he is at Santa Clara, living this life all based on fantasy, all based on a situation where you're in control, in essence, of your environment because nobody knows your history. But as you're in college, college comes to an end, as you know. And with his devotion

to-to money and flashing money, graduation must have posed a significant dilemma to him. I mean, graduation, the real world loomed. And I submit that it looked distressingly real.

"To this person, this person that I've just described, I'd like you to add something that you can see in this article. You can see it and hear it on the tape that I played for you. And I submit that Dana Ewell was fully convinced that he was gifted. All you had to do for Mr. Ewell was give him a stake, and he could go out and turn it into millions and millions. After all, for Dana Ewell, the competition in the financial world were mere mortals compared to his abilities.

"I submit to you that based on what you have seen and heard, that he had no bones about right and wrong. And I bet you that even Michael Milken or Ivan Boesky wouldn't go as far in making a buck as to go for murder.

"I submit to you that based on what you have heard and known, that the guy behind me here is absolutely ill when it comes to his-his love of money.

"I submit to you that his love of money knows no bounds and it is perverted in the sense that one can love money, but one cannot love money to the extent that it becomes a perversion. His perversion is the motive behind these crimes.

"When you come back to that question, 'Who could kill their own parents?' Well, not the man that you've come to know through this trial. He is the manipulator: The mastermind. But that brings us to the question of who in the world could have their parents killed? And I submit to you that that would be a spoiled, perverted, obsessive man, who has tasted the trappings of wealth and will not give them up.

"To top off this section on motive, I think that you need only go to his reactions to the reading of the will . . .

"He knew and expected to come into his own at age 25. And, when it came to the reading of the will, and in a typical will by a rich man, where it sets out stages, Mr. Dana Ewell simply could not contain himself. His well-planned, rehearsed reaction to post-murder events simply failed in the face of the bitterness of this news."

On behalf of Ewell, Kinney countered the prosecutor's argument with his own, essentially ridiculing the prosecutor's references to Michael Milken and Ivan Boesky and labeling the prosecution's assessment of motive as "garbage." He also reminded the jurors that questions asked by the attorneys were not evidence and could not be used to imply evidence, and gave as an example the prosecutor asking if Ewell wanted to be richer than God. Kinney noted that the court excluded that evidence, but argued: "You think that wasn't a planned question? [¶] No, not going to be richer than God; but he's going to be richer than Moses or something. He's not going to have that kind of an answer. Part of that garbage evidence. Throw it against the wall and see what sticks."

The trial court subsequently instructed the jury, in pertinent part, that statements made by the attorneys are not evidence; that questions are not evidence and not to assume to be true any insinuation suggested by a question; and not to consider for any purpose any evidence that was stricken by the court, and to treat it as if they never heard it. In addition, the jury was instructed: "Certain evidence has been admitted for a limited purpose. At the time this evidence was admitted, you were instructed that it could not be considered by you for any purpose, other than the limited purpose for which it was admitted. Do not consider this evidence for any purpose, except the limited purpose for which it was admitted." The jury was further instructed: "Evidence has been introduced relating to Dana Ewell's statements concerning his success in business while in high school. This evidence, if believed, may not be considered by you to prove that Dana Ewell is a person of bad character. It may be considered by you only for the limited purpose of determining, if it tends to show, the existence of intent or motive."  (Footnote omitted.)

**2. Analysis**

Petitioner makes two complaints about the government's use of character evidence.  First, Petitioner claims that the evidence was inadmissable under California evidence law.  Second, Petitioner claims that the use of character evidence rendered his trial fundamentally unfair.

Generally, the admissibility of evidence is a matter of state law and is not reviewable in a federal habeas corpus proceeding.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  A federal habeas court's "review of [state] evidentiary rulings is confined to 'determining whether the admission of evidence rendered the trial so fundamentally unfair as to violate due process.'" Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008) (quoting Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998)); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) (holding that a petitioner has been denied due process when "the admission of evidence so fatally infected the proceedings as to render them fundamentally unfair"); see also Estelle, 502 U.S. at 72 (habeas relief may be granted for the admission of prejudicial evidence if the admission rose to the level of a denial of due process); Pulley v. Harris, 465 U.S. 37, 41 (1984) (same).   However, failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  Jammal 926 F.2d at 919-20.

***a. California Evidence Code***

Petitioner begins by arguing that the evidence in question was inadmissible under California

1   evidence law.  The state appellate court conducted a thorough analysis of whether the evidence in

2   question constituted inadmissible character evidence and concluded that the evidence was relevant to

3   prove motive and, therefore, admissible.  Ewell, 2004 WL 944479, at *68-69.  As federal habeas

4   courts are bound by a state's interpretation of its own law, Estelle, 502 U.S. at 68, this Court declines

5   to consider whether the admission of this evidence violated California law.

6           **b. Due Process**

7           It is not clear whether the admission of the character evidence violated state law at all, since

8   California evidentiary rules expressly allow the admission of the defendant's other bad acts for

9   purposes of proving intent or motive, as occurred here.  See Cal. Evid. Code § 1101(b).  Regardless

10  of whether the evidence was admissible under California evidence law, character evidence, "which a

11  defendant contends is unduly prejudicial, will violate due process only when 'there are no

12  permissible inferences the jury may draw from the evidence.'"  Windham v. Merkle, 163 F. 3d 1092,

13  1103 (9th Cir. 1998) (quoting Jammal, 926 F.2d at 920).

14          In this case, the prosecution offered evidence of Petitioner's "obsessive love of money" to

15  prove motive.  Ewell, 2004 WL 944479, at *59.  Petitioner contends that admitting evidence of his

16  single-mindedness with regard to wealth was not relevant to the murders in question because it

17  necessitated that the jury draw impermissible inferences that Petitioner had a greedy character and

18  that it only was proffered as a means of prejudicing the jury.  However, the prosecutor argued that it

19  was imperative that he prove this motive in order to overcome the jury's "normal disinclination to

20  believe someone could kill his or her own parents."  Id.

21          A piece of evidence is relevant if it tends to make any fact of consequence more or less

22  probable.  McKinney v. Rees, 993 F.2d 1378, 1380 (9th Cir. 1993).  The prosecution sought to prove

23  that Petitioner was capable of killing his entire family for an eight million dollar inheritance.

24  Offering evidence that Petitioner's pathological lust for wealth was such that he would literally do

25  anything for money tends to make that scenario more probable.

26          The Ninth Circuit has noted "[a] rich man's greed is as much a motive to steal as a poor

27  man's poverty.  Proof of either without more, is likely to amount to a great deal of unfair prejudice

with little probative value." U.S. v. Mitchell, 172 F.3d 1104, 1108-09 (9th Cir. 1998).  As the state

appellate court discussed at length, the prosecution sought to show something more than mere greed.

The prosecution did not proffer this evidence to show that Petitioner was greedy and therefore a bad

man in general, Ewell, 2004 WL 944479 at *71, rather it was offered to answer the inevitable

question, "why would a seemingly well adjusted young man kill his own family?"  The appellate

court noted that "'There is a distinction between an interest, in the sense that it is in anyone's interest

to be richer rather than poorer, and an inclination.'"  Id. at *70 (quoting Mitchell, 172 F.3d at 1109.)

The state court found that the prosecution took great care in distinguishing between Petitioner's

general character and his motive and found that "the evidence went well beyond showing a mere

interest in having money, which the prosecutor candidly recognized is shared by virtually everyone."

Ewell, 2004 WL 944479 at *70.

The state appellate court also recognized that "any danger the jury might rely on the evidence

for an improper purpose. . . was minimized by the trial court's giving of a limiting instruction." Id.

at *71.

Petitioner argues that the Ninth Circuit has held that "evidence and argument of greed of

defendant is character evidence, not uncharged bad-act evidence admissible under Fed. R. Evid.

404(b)."  See Mem. P. & A., 52 (citing U.S. v. Derington, 229 F.3d 1243, 1247 (9th Cir. 2000).

Derrington has little bearing on the case at hand.  Initially, the Court notes that the passage on which

Petitioner relies is merely dicta:

> The exception enumerated to character evidence are not relevant here.  The
> prosecutor's argument to the jury highlighting Derington's greed touches on a trait of
> character.  As evidence was inadmissible to prove Derington was greedy, and
> argument based on his greed should not have been made.  No objection, however, was
> taken to the argument.

Derington, 229 F.3d at 1247.  The court specified that the prosecution's argument concerning

Derington's greed was not an issue which was being appealed.  Also, the court made no further

analysis than the language quoted above. At no point did the court hold that greed may never be

admitted as proof of motive.  Furthermore, Derington is distinguishable from the instant case

because the greed to which the prosecution referred was circumstantial; namely "his intent to take as

1    much timber as he could take while the market's there." Id. at 1246.  Evidence that Derington

2    wanted to capitalize on the opportunity to exceed the limits on logging that his permit allowed for is

3    a far cry from the type of pathological greed that the prosecution in the instant case sought to

4    establish to show motive.  Petitioner's reliance on Derington is unpersuasive.

5          The Ninth Circuit has recognized that greed is a motive for which character evidence may be

6    used to prove.  See U.S. v. Meling, 47 F.3d 1546, 1557 (9th Cir. 1995) (finding that the district court

7    did not abuse its discretion by admitting evidence of petitioner's character to prove his

8    motive–greed).  From the evidence in question, the jury could have reasonably drawn the permissible

9    inference that Petitioner had a pathological lust for money that motivated him to commit the

10   murders.  Because the evidence was relevant to proving motive, it was not admitted "contrary to

11   firmly established principles of Anglo-American jurisprudence," McKinney, 993 F.2d at 1380-81,

12   and did not render Petitioner's trial fundamentally unfair.  As the admission of evidence pertaining to

13   Petitioner's greed and obsession with money as a means to prove motive does not rise to the level of

14   a due process violation, the Court finds that the state appellate court did not engage in an

15   unreasonable application of clearly established federal law.  Thus, habeas relief cannot be granted as

16   to this claim.

17   **E.  Ground Five**

18         Petitioner claims his Fifth, Sixth, and Fourteenth Amendment rights to "the assistance of

19   counsel, due process, and a trial by an impartial jury" were violated when, "without notice to the

20   defense, [the court] provided a tape recorder to the jury after it had announced that it was deadlocked

21   with respect to one of the two codefendants . . ., the jurors then listened to a tape recording, the

22   greatest part of which had not been admitted into evidence, and, thereupon, convicted [Petitioner]."

23   See Pet., 39.

24   //

25   //

26

27

28

**1. Background**[20]

As set out in the statement of facts, ante, law enforcement officers conducted lengthy surveillance of appellants, which included attempts to overhear and, if possible, record, appellants' side of various telephone conversations. Prior to trial, Ewell moved to exclude, pursuant to section 352, the contents of various telephone calls, including those of May 14, 1993. He asserted that "[b]oth the recollected versions of the officers who were privy to co-defendant Radovcich's statements and the intelligible portions of tape recordings made of the conversations are too fragmentary to be meaningful or reliable." He further objected to any references in which Radovich spoke to his attorney about Jennifer Nunnikhoven McDonald taking a lie detector test, or in which he attempted to convince her not to take such a test. Radovcich joined in Ewell's motion, and also objected to admission of any communications between himself and his then-attorney, E. Terrence Woolf, as well as polygraph references.

A fairly lengthy argument was held with respect to the tape recordings. In part, appellants argued that the recordings were very hard to understand and could be quite misleading because of how fragmentary some of the sentences were, and that the People could not establish Radovcich was speaking to Ewell. Ewell reserved the issue of the May 14 telephone calls, as his position was that if the other calls were admitted into evidence, he also wanted the May 14 calls admitted.

The court sustained Radovcich's objection to the introduction of any portion of monitored conversations in which he had discussions with his attorney. The court also barred any reference to a polygraph examination, but denied the motion to exclude the various telephone calls, subject to a foundational hearing to determine the quality of the taped conversations. The court commented that the tapes varied in quality, and that in some places, they were "absolutely unintelligible" so that only "fragmentary parts of the conversation" could be discerned. The court stated that if a tape was of such poor quality that it would lead the jury to speculate as to what was said, such would be the basis for not receiving the tape into evidence.

In his opening statement, the prosecutor candidly admitted to the jury that many of the tape recordings were of poor quality. Nevertheless, he gave his view of what he expected the May 14 tape to show.[21] Kinney also discussed the May 14 tape, disputed the prosecutor's assertion that only one telephone call was involved and claimed instead there were four calls, and told jurors the evidence would show that only the first of the calls involved Ewell.

During trial, the court brought up the issue of the tapes outside the jury's presence. It wanted the tapes subjected to any foundational hearings, and to deal with any objections based on quality, as soon as practicable "so we don't end up with a jury in the jury room and an objection to the quality of the tape." Ewell reiterated his

---

[20] The facts are derived from the factual summary set forth by the California Court of Appeal, Fifth Appellate District, in its opinion of May 4, 2004, and are presumed correct pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1).  People v. Ewell, No. F031391, 2004 WL 944479, at *94-102 (Cal. Ct. App. May 4, 2004).

[21] As the parties focus on the tape of May 14, the Court will do the same except when necessary for a complete procedural history.

position that the various tapes should be excluded, but only if the conversations, as recalled by the officers, also were excluded.

Later, an issue arose with respect to the April 1 tape. The prosecution intended to present testimony from the detectives who overheard the conversations on that date, while Radovcich sought to play the tape recording itself to show a discrepancy between what one of the detectives said he heard and what the tape contained. The prosecution did not dispute the defense's right to play the tape, even if it was unintelligible, given the purpose for which it was being presented. Ewell agreed with that position. Cherney stated he wanted to have the tape played. When asked by the court about the other tapes, he replied, "Well, I think that that's the critical tape, as far as I'm concerned, because there are alleged statements in there that I don't think happened . . . . [¶] . . . [¶] But later on, I believe that the quality of the tapes may be-are very good. And you can hear exactly what's being said. [¶] I don't think there are any more that are going to be in controversy. And if there are, I certainly will let the Court know. But I don't think that any of the transcripts of those are materially in controversy." The court then noted it had recently read a case from the Ninth Circuit Court of Appeals which determined it was error to send tapes into the jury room, and that "what should be done is the way we do it, is to have the jury come back into the room and have what they want replayed."

Cherney later informed the court that he had no objections to the other tapes, "other than what Mr. Jones has already outlined and we've done in previous 402 hearings." He felt that most of the conversations on the tapes had "no meaning," and that the only ones of import were the April 1 conversation and the ones concerning Nunnikhoven and Woolf, upon which the court had already ruled. When Jones inquired about the tapes of May 14 and other dates, the prosecutor stated his intent to produce the overheard conversations by way of live testimony and leave it up to defense counsel whether to utilize the tapes for impeachment purposes.

The prosecutor did, in fact, have various detectives testify concerning what they overheard on different dates, including May 14. With respect to the April 1 surveillance, Cherney had the entire tape played for the jury and established that various statements, which the surveilling officer testified hearing, were not audible on the tape. That tape (court's exh. O) was subsequently received into evidence, with the understanding, as stated by the court, "that if the jury wants it replayed, they will have to-it will be done in the courtroom."

Later during trial, Sheriff's Sergeant Dadian testified that on May 14, 1993, he was involved in surveillance. One call was made earlier that day from the Irvine Ranch Market at Irvine and Mesa. Another call was made about 5:30 that evening from the 7-Eleven at Bristol and Baker. The prosecutor then interrupted Dadian's testimony to call Detective Souza, who testified to receiving information on the clone pager, at approximately 5:30 that evening, from a pay telephone at the Airport Holiday Inn in Fresno. He notified Detectives Dadian, Knight, Mosier, and Jones.

The prosecutor next called Sergeant Mosier, who was also involved in surveillance on May 14. Mosier testified that after receiving information about the page from Souza, he located Radovcich's vehicle at the market at Irvine and Mesa. He relayed the information to other detectives and asked them to respond to the location with surveillance equipment. Mosier directed Detective Knight, who was wearing a wire, to approach Radovcich at the pay telephone. She did so, while Mosier moved to a listening post. Mosier was able to receive transmissions from Knight's wire, but did

not record them or attempt to take notes. He believed surveillance began a little before 6:00 p.m. Detective Jones tape-recorded the transmissions from the wire, as did Sergeant Dadian.

The prosecutor next called Detective Knight. Knight testified that she received information sometime after 5:30 p.m. on May 14, 1993, to proceed to the Irvine Ranch Market at Irvine and Mesa. She actually arrived at the telephone at 6:00 p.m. She was wearing a wire and placed herself at a telephone around the corner from, but within three feet of, Radovcich, who was already on the telephone when she arrived. In part, Knight testified:

"Q Were you able, your own self, to hear the conversation that was occurring?

"A I heard only small patches of conversation, because we're near the John Wayne Airport, and we're right under the jet take-off flight path. So I heard parts of the conversation, but small parts.

"Q This was a-based on what you've mentioned, this was a particularly difficult location to overhear conversation.

"A Terribly difficult, yes.

"Q You have, later on in your efforts in this case, you have listened to the various tape-recordings that were made from the body wire that you were wearing?

"A Yes. I've gone over both tapes.

"Q And this was in an effort to attempt to reconstruct above and beyond the matters that you placed in your report?

"A That is correct.

"Q And . . . how were those tapes, Detective Knight?

"A They're Excedrin headache No. 10. It's two hours of buzzing, with a few words in between.

"Q The jets come across fairly nicely, don't they?

"A The jets sound quite well.

"Q All right. Okay. Now, in respect to the portions-well, let me ask you this. Are-having listened to the tapes and having been there in person, are there-are there matters that you were able to hear in person that you cannot hear on the tapes?

"A Yes. [¶] . . . [¶]

"Q . . . Were you able to hear more than one conversation that Mr. Radovcich was involved in?

1

"A Yes, I did.

2

"Q And what do you base that on in terms of either hearing or observations that you make?

3

4

"A Well, I didn't get to see very much, but it's on hearing. I heard a telephone hang up and another number dialed. And two times during that hour I heard the phone hang up and another number being dialed.

5

6

"Q And so that led you to believe that there was more than one phone call that you were dealing with.

7

8

"A That, and the change in the tone of voice and the manner in which he was carrying on a conversation."

9

Knight then related what she recalled from the three conversations. She testified that she subsequently listened to the tapes, one of which had an introduction by Detective Jones and the other by Detective Dadian. She was able to hear a few more words than were in her report, and there were some portions of her report which reflected parts of conversations she overheard that were not in the transcript prepared from the tapes.

10

11

12

Outside the jury's presence, Cherney clarified that Knight did not overhear anything which she believed to be a conversation between attorney and client. During his cross-examination of Knight, Cherney asked for, and was granted, permission "to play a very short portion of the tape [exhibit 633] just before what sounds like a hang-up." The parties stipulated that the court reporter need not attempt to take down the part played.

13

14

15

16

At this point, the record becomes somewhat murky concerning how much of the tape was played for the jury, and what was admitted into evidence. The minutes of March 10, 1998, show exhibit 633 (the tape of May 14, 1993) and exhibit 634 (excerpts of that tape) marked for identification only. The reporter's transcript for March 10 shows that after Cherney received permission to play a portion of the tape, he questioned Knight further before doing so. This ensued:

17

18

19

"Q [by Cherney] If I play this for you, maybe it will refresh your recollection [concerning differences between the two tapes to which Knight previously listened].

20

21

"May I do that, your Honor?

22

"A [by Knight] Yes, it will help.

23

"THE COURT: All right. The exhibit number of the tape is-

24

"MR. CHERNEY: It hasn't been marked, your Honor. [¶] ... [¶]

25

"THE COURT: 633. It will be marked as 633.

26

"(Exhibit No. 633, Tape-recording, marked for identification and received into evidence.)

27

28

1          " (Tape marked as Exhibit 633 played for the jury)

2          "MR. CHERNEY: Let me stop right there.

3          "Q Is that you? Do you recognize that voice?

4          "A It sounds like my voice, but I can't tell you what I said.

5          "Q I was actually playing the other side of the tape. That would be tape A-or side A.

6          "Were you carrying on a made-up telephone conversation?

7          "A At some points I was, yes. The people behind me in line were not happy I was at the phone booth an hour.

8

9          "(Laughter)

10          "Q This would be side B, the end-the end of the tape."

11 (Tape marked Exhibit 633 played for jury)  (Italics added.)

12          Upon further examination by Cherney, Knight testified that the quality of the two May 14 tapes was poor. Radovcich could clearly be heard at the end of one tape,

13 saying, " 'I love you,'" and there were other places a few words could be discerned. During his cross-examination of Knight, Jones used exhibit 634, which he described

14 as excerpts of Detective Jones's tape recording. The reporter's transcript reflects that tape being played on four occasions, with questioning in between, but does not show

15 whether the entire exhibit was played. Knight mentioned that when she listened to the tapes, she wore earphones and had a tape recorder that would slow down the tape,

16 making for better listening conditions. Jones also played portions of exhibit 634 during his cross-examination of Detective Jones.

17

18          Outside the presence of the jury, Jones noted that the defense had received three tapes from the prosecution concerning this single surveillance, and that he felt

19 the varying length of the tapes and discrepancies in time were important as far as reassembling what happened, how many conversations took place, and what

20 statements fell within each. He observed: "The only thing I can suggest to accomplish that is play some very long, loud, offensive tape-recordings for the jury and then try

21 and stop it at certain points and replay certain sounds so that the jury knows we're not playing hide the ball . . . . [¶] And I hesitate to sit down by the tape player for-for

22 almost two and a half, three hours, and play what for the great majority of that time would be what we're hearing, loud, offensive and irritating sounds, but I don't know

23 any other way around it unless we can reach some stipulations regarding that-that information." Cherney pointed out that playing the tape to the jury provided jurors

24 with the opportunity to hear tape recordings that were unclear. Eventually, the parties submitted a document with respect to exhibit 633 which bore Detective Dadian's

25 name, transcribed his introduction of the tape (which set forth the date and place of recording and the parties thereto), and then stated the remainder of the recording was

26 not subject to a complete literal transcription because many sections were inaudible or unintelligible, together with the parties' stipulation that transcriptions need not be

27 prepared.

28          During a further discussion of transcription of exhibit 633, Oppliger asked the

1    court whether it was contemplated that the various tapes would be provided to the
     jury. The court replied: "Well, certainly they've heard them. And the tapes they've
2    heard will be in evidence. But if they wish them replayed, the procedure is to
     have-even during deliberations, to have them come into the courtroom and have them
3    replayed . . . in the courtroom."

4         On March 25, 1998, the following occurred:

5         "MR. CHERNEY: I've got a real quick [matter of law and
          procedure] here. We've got an agreement signed by all parties as to the
6         very beginning of the transcript, which is . . . Exhibit 633 in this case,
          which has been marked. I'm not sure if it's been admitted. But I . . . it's
7         been signed by all the parties, and I'm submitting it to the Clerk now.

8         " (Exhibit No. 633, previously marked for identification,
          received into evidence.)
9
          "THE COURT: Okay. [¶] . . . [¶] Let's see. 633.
10
          "MR. CHERNEY: It's Dadian's tape of May 14, 1993, Cynthia
11        Knight overhearing conversation.

12        "THE COURT: Yes. Do you show it as being received, Miss
          Perez? 633?
13
          "THE CLERK: No, I don't show it as being received.
14
          "THE COURT: The stipulation is-all right. Then it will be
15        received as 633." (Italics added.)

16        During his summation to the jury, Kinney discussed the May 14 surveillance
     at length. At one point, he told jurors, "Listen to those tapes, if you have them." At
17   another point, he stated, "[Knight] said she reviewed the tape, you check it out in the
     evidence, and the word 'political' was in the second call. You can listen. She could
18   hear the hang-ups, the same call that 'She's about ready to burst.'" In his summation,
     Cherney also told jurors they were welcome to listen to the tape that had been
19   provided in evidence.

20        In pertinent part, the trial court instructed the jury to determine the facts from
     the evidence received in the trial and not from any other source.[22] The court further
21   instructed that if jurors had a question or request during deliberations, it should be
     addressed to the court on a form which would be provided, and that counsel would be
22   contacted before a response could be formulated. The court warned that it might take
     time to provide a response, and instructed jurors to continue deliberating until they
23   were called back into the courtroom. Jurors were also told they could have most of the
     exhibits brought in to them, upon request.
24
25        Outside the jury's presence, the court discussed the matter of the exhibits with
     counsel. Kinney requested that the exhibits all be sent in. When Castro suggested
26   sending in the exhibits without an exhibit list and letting jurors request such a list if

27   ─────────────

28   [22]This was at least the third time jurors had heard this admonition, as the court also gave it to all prospective jurors,
     and to the sworn jurors and alternates at the commencement of opening statements.

desired, Cherney stated that procedure was fine with him. The prosecutor voiced no objection.

Deliberations began on April 28, 1998. That same day, the clerk informed the court and counsel that the jurors had all of the exhibits, except for a box the contents of which the bailiff was checking.

On the morning of May 12, the jury sent out a note stating they had reached a verdict as to one defendant, but were unable to reach a verdict concerning the other one. With the parties' concurrence, the court decided to have the foreperson seal in an envelope the verdicts that had been reached, after which the court would make standard inquiries concerning the potential deadlock with respect to the remaining defendant. This ensued:

"THE BAILIFF: May I approach, Your Honor?

"THE COURT: Yes, sure.

"(Conference held between the bailiff and the Court, not reported.)

"THE COURT: All right. All counsel are present ... and the defendants are present.

"There's one thing I would like to mention to the parties, that ... shortly after receiving the note from the jury, they did ask for a tape recorder, which was sent in to them. And I propose to inquire of the foreperson as to whether the written message they gave us is still the status of their deliberations."

The court asked the bailiff to bring in the jurors, but was told they wanted a few minutes as they were still filling out some forms. Court stood in recess from 11:00-11:40 a.m., at which time the trial court and counsel took up a new note from the jury, which asked a question about one of the firearm enhancement allegations. The trial court instructed the jury on the point, then asked whether the tape recorder that was sent in had functioned properly. The foreperson replied that it had, whereupon the court inquired whether the jury was still engaged in deliberations or whether the first message represented its status. The foreperson replied that they needed to return to the jury room. Jurors returned to the jury room to resume deliberations at 12:05 p.m.

The jurors returned to the courtroom at 12:10 p.m., stating they had reached a verdict as to both defendants. Radovcich's verdicts were dated May 11, while Ewell's were dated May 12. Kinney subsequently asked the court to ascertain the numerical division as of the time the jury appeared to have been deadlocked with respect to the one defendant. The court denied the request, as the jurors had not been discharged and penalty phase remained, but told Kinney he could renew it at the conclusion of penalty phase.

On June 5, during penalty phase deliberations, the court was informed of, and inquired of jurors concerning, potential juror misconduct. That same day, the jury declared itself hopelessly deadlocked. As a result, a mistrial was declared and the jury discharged. The court did, however, ask the foreperson to remain for a matter of law and procedure.

1

During the ensuing hearing, the foreperson was asked whether, during guilt phase deliberations, there was a change in the vote pertaining to one of the defendants between the time of the two notes. This occurred:

2

3

"JUROR NUMBER 32 [jury foreperson]: Okay. Contrary to what seems to be the prevalent thought, we did not take a vote until eight days into deliberations. [¶] . . . [¶] We were concerned about the length of the trial, how many witnesses, how much testimony. Some of us had two binders worth of notes.

4

5

6

"Uhhm, the very first day was, with all due respect, was a venting day, where people were able to speak their mind and their problems and their concerns and those things.

7

8

"The second day was basically a less-focused day of expressing concerns and opinions and things like that.

9

"And the third day . . . we decided that it was in the best interest to review the entire testimony.

10

11

"As we were proceeding through the testimony, . . . everybody was reading. If there was any discrepancy or any discussion, we would then review that to determine whether we needed to come back to court and have it read or whether we all understood. It was not whether each one necessarily believed it, but that that was the testimony.

12

13

14

"We did that. I think it was a Friday that we took a vote. And that was right before we went home. That was more of a straw vote to get an idea where we stood, where we needed to go, and what more it would take.

15

16

"We had some concerns that we gave you about wanting to see Mr. Ponce's testimony. [¶] . . . [¶] The purpose in that was not any more than it was such a long period of time and we wanted to make sure that we had everything down properly.

17

18

19

"Uhhm, that being done, . . . we then proceeded to other testimony and other points of interest.

20

"We had another one or two votes. Still not . . . any one person.

21

22

"It came down to there at the end, and we had the impression that the juror-that there was, yes, only one holdout. Everyone was very respectful of that juror. So we felt that any more pressure, any more discussion, probably would not be productive. And, in essence, we decided to return it to the Court, that we had a situation where we couldn't make a decision.

23

24

25

"But as the note was being passed to the Bailiff, the juror in question said that, no, he was not that comfortable with his vote, and if he could have a little more time to talk, that it appeared through his conversation that he was not comfortable with his vote.

26

27

"So we decided that we'd take whatever time he wanted.

28

"And what it basically amounted to was he, we, needed to listen to a tape. We listened to that tape. We had some more discussion. And that individual decided that that individual wanted to change his vote.

"However, at that time we had more discussion to make sure that-we didn't want that-the individual to feel that they had to change their vote. It was very important to all the jurors. So we asked specifically, on five different times, whether that was his 'conviction' or his 'acquiescence.' And we wanted to make sure that was very clear before we came back with a verdict. And then we came back with a verdict."

After a discussion of what went on during penalty phase, the attorneys were permitted to question the foreperson. Kinney elicited that the initial votes on Ewell were in the range of nine to three. This ensued:

"MR. KINNEY: Just one more. I'm not asking for any names at all, but was it-there is something-when it was 9 to 3, would it be correct that . . . it was a situation where we had one male and two females?

"JUROR NUMBER 32: Uh, yes. Can I . . . explain something about that, too, if I may, your Honor?

"THE COURT: Certainly. Go right ahead.

"JUROR NUMBER 32: The other two involved, which, as you pointed out, were female, . . . the problem was that in their heart they could not render a guilty verdict, and that was very hard for them to overcome. And no one pressured them to overcome it. But that was really in those two cases where that came from. It's just trying to be as honest as I can to explain that.

"I'm not so sure personally that . . . they had a change of verdict, as more realization-the law was very important in that room. I was very proud of everybody. They-the jury instructions must have been reread 50 times in different parts, to make sure no one was making a mistake and no one was doing something that was not in accordance with the law.

"And they had a lot of problems with that portion of it, removing that sympathy. And that was hard for them to overcome. And it was on their own. It was not . . . the rest of the jurors doing it.

"MR. KINNEY: One last question. When you listened to a tape, was that Dana's statement? Or was that a phone record?

"JUROR NUMBER 32: No. Uhhm, we asked at one point to have all the evidence brought in. And when we said, 'We don't believe this is all the evidence,' we were informed it was. We only had one tape. And that was a telephone conversation. We did not have any other tapes.

1          "MR. KINNEY: Do you recall which telephone conversation
     that was? April 1st?

2          "JUROR NUMBER 32: No. I don't believe so. I think it
3     was-the 14th, I think. I-in all honesty, I'm not sure I could tell you right
     now. It's-but it was a telephone conversation. It was the one that was
4     very noisy, involved the three to four different phone calls that were in
     exchange there. It was that phone call."[23]

5     **2. Analysis**

6          "Jury exposure to facts not in evidence deprives a defendant of the rights of confrontation,

7     cross-examination and assistance of counsel embodied in the Sixth Amendment." Eslamini v.

8     White, 136 F.3d 1234, 1237 (9th Cir. 1998) (citing Dickson v. Sullivan, 849 F.2d 403, 406 (9th Cir.

9     1998)).  However, not all constitutional errors are grounds for reversal.  Eslamini, 136 F.3d at 1237

10    "On collateral review, we must determine whether the constitutional error 'had substantial and

11    injurious effect or influence in determining the jury's verdict.'" Id. (quoting Brecht, 507 U.S. at 627).

12         The state appellate court found that, because the trial court had assured the parties on several

13    occasions that any playback of the tapes would take part in open court with all parties present, failure

14    of the court to follow that procedure constituted constitutional error.  Ewell, 2004 WL 944479 at

15    *103.  However, the appellate court then found that Petitioner had failed to object and thereby

16    waived the error.[24]  Id. at *104.  The court went on to find that the entire May 14 tape had been

17    properly admitted into evidence thereby precluding any argument that the jury had engaged in

18    misconduct by reviewing extrajudicial information.  Id. at *108.  The court concluded its analysis on

19    the issue by holding that, even assuming the tape had not been admitted into evidence and that error

20    had occurred, the error was not prejudicial.  Id. at *110.

21         As the state court assumed error in order to move on to the issue of prejudice, this Court will

22    determine whether the state court unreasonably applied the clearly established federal harmless error

23

24    _____

25         [23]That was, in fact, the May 14 tape, as the parties have addressed in their briefs.

26         [24] This Court need not take up the issue of waiver, however, because procedural default is an affirmative defense
     that must be raised by Respondent, and in this case, Respondent failed to raise the issue.  In fact, Respondent's one and one
27    half page analysis of Ground Five seems to be predicated on a different case entirely.  See (Answer, 46-47 (where Respondent
     argues that "the evidence was undisputed that the deaf victim was particularly vulnerable and suffered serious bodily injury
28    from the sexual assault).)

standard as set forth in <u>Brecht</u>, when it found that, with regards to the jury listening to the entire tape

recording, "assuming error occurred, no cause for reversal has been shown." <u>Ewell</u>, 2004 WL

944479 at *102.  As such, Petitioner's arguments relating to whether the jury improperly listened to

the tape need not be discussed.

Petitioner argues that, because the jury was deadlocked before they listened to the tape and

unanimous in finding Petitioner guilty after listening to the tape, the tape must have been the

deciding factor in changing the holdout juror's mind.  The Court disagrees.  The state court listened

to the tape in question and found it "painfully inaudible and unintelligible."  <u>Id.</u> at *110.  This

finding is supported by the record in that most of the debate over the May 14 tape is centered around

the fact that the tape mostly consists of "loud, offensive and irritating sounds."  <u>Id.</u> at *98.  In fact,

the parties came to an agreement not to play the tape in its entirety for the jury nor to transcribe the

tape because so many sections were completely inaudible or unintelligible.  <u>Id.</u>  The Court agrees

with the appellate court that Petitioner's argument of prejudice would be much more convincing if

the tape actually "contained audible prejudicial material."  <u>Id.</u>

Besides the fact that the tape at issue contained no "audible prejudicial material," the record

also indicates that the holdout juror was in the process of changing his mind even before the tape

recorder was brought to the jury.  The jury foreman testified that "as the note was being passed to the

Bailiff, the juror in question said that, no, he was not that comfortable with his vote, and if he could

have a little more time to talk, that it appeared through his conversation that he was not comfortable

with his vote."  <u>Id.</u> at *100.  This evidence weakens Petitioner's argument that the sole factor that

changed the holdout juror's vote was the content of the tape.

Petitioner relies on <u>Eslaminia v. White</u>, 136 F.3d 1234 (9th Cir. 1998), as authority to support

his position that "jury exposure to facts not in evidence deprives a defendant of the right

confrontation, cross-examination and assistance of counsel . . . ." (Mem. P & A, 62.)  In <u>Eslaminia</u>

the jury listened to a tape recording that had been admitted into evidence and then listened to the

flip-side, which had not been admitted into evidence.  <u>Eslaminia</u>, 136 F.3d at 1237.  The comments

that the jury heard for the first time upon listening to the flip-side of the tape bolstered the reliability

of some of the prosecution's witnesses and also impugned the character of a defense witness.  Id. at

1238.  The court found constitutional error and further found that "[i]n a trial that, in essence, was a

credibility contest between prosecution witness and Eslaminia, such impeachment may be decisively

prejudicial." Id.  Eslaminia is distinguishable from the case at hand because the Eslaminia court

could point to specific statements on the recording that were prejudicial, see id. at 1237-38, whereas,

in this case, Petitioner merely claims that the recording was of such low quality that the jury would

have speculated as to what was being said beneath all the background noise.  The Eslaminia jury

listened to specific statements that clearly prejudiced the petitioner.  In this case, Petitioner points to

no such  prejudicial statements.  Here, the jury listened to what basically amounted to background

noise that could have led the jury to speculate as to what Radovcich was saying on the phone.  The

Court finds that the possibility of speculative inferences, as argued by Petitioner, does not rise to the

level of the concrete prejudice that occurred in Eslaminia.

        Petitioner also relies on U.S. v. Brown, 832 F.2d 128 (9th Cir. 1987), where the court found

prejudice when, at the request of the judge's court clerk, a federal marshal, i.e. "case agent," who had

sat at the prosecution's table during the trial, played back recordings to the jury that had previously

been played to them during trial without the presence of counsel or the judge.  Id. at 128-129.  The

case agent submitted a sworn affidavit "that he replayed only the portions of the tape that had been

played at trial, and that he did not interact in any way with the jury (except for his response to the

jury's request to replay the relevant portions of the tape.)"  Id. at 129.  Petitioner relies heavily on the

following quote from Brown:

> [a]ny number of prejudicial events might have taken place when the
> case agent replayed the tape for the jury.  In the absence of the
> protection afforded by the presence of defendants, and their counsel,
> the only evidence suggesting harmlessness was the affidavit of the case
> agent himself, which fails to convince us beyond a reasonable doubt
> that no prejudicial contact occurred.

See Mem. P & A, 59 (quoting Brown, 832 F.2d at 130).  When this excerpt is read by itself it seems

to support Petitioner's contention that this Court should find the error prejudicial simply because

something prejudicial could have taken place when the jury listened to the tape in absence of

counsel.  However, when one reads further, it becomes clear that the potentially prejudicial events in

Brown were possible misconduct on the part of the case agent, not the jury:

> Such contact could be very subtle, such as a nod at a significant portion of the tape.  It might have been unintended, or even unnoticed by the case agent himself.  Furthermore, we cannot say that the case agent is the sort of neutral observer in this controversy, whose uncorroborated affidavit should convince us beyond any reasonable doubt that the. . . . violation was harmless.

Brown, 832, F.2d at 130.  In this case, no agent of either party or the court was present at the time of

playback.  Thus the type of possible prejudicial events feared by the Brown court are simply not a

consideration.

"[R]eversible error commonly occurs where there is a direct and rational connection between the extrinsic material and a prejudicial jury conclusion, and where the misconduct relates directly to a material aspect of the case."  Lawson v. Borg, 60 F.3d 608, 612-13 (9th Cir. 1995) (quoting Marino v. Vasquez, 812 F.2d 499, 506 (9th Cir. 1987)).  Petitioner has failed to convince the Court of a rational connection between the unintelligible contents of the tape and the jury's guilty verdict.  The mere fact that the verdict changed after the tape was played is insufficient to persuade the Court that the state court's analysis was an unreasonable application of federal law.  Petitioner argues that "lengthy deliberations preceding the misconduct followed by the quick verdicts [sic] returned afterward" is more probative to the issue of prejudice than the "absence of 'audible prejudicial material' on the tape."  See Mem. P & A, 69.  The Court recognizes that a purely temporal analysis suggests that the tape may have been a deciding factor for the holdout juror.  However, Petitioner fails to make a showing as to how, when the tape contained no "audible prejudicial material," the tape recording could have possibly had a "substantial and injurious effect or influence in determining the jury's verdict."  In light of the factual finding by the state court that the tape contained no "audible prejudicial material," and the fact that the holdout juror's resolve was wavering even before the tape was played, the state court's finding that any constitutional error that may have occurred when the jury listened to the May 14 tape during deliberations was not prejudicial and was not objectively unreasonable under the federal harmless error standard.

1    Petitioner claims that the factual finding upon which the state court's analysis of prejudice is

2    based, that the tape contained no "audible prejudicial material," is objectively unreasonable.   See

3    Mem. P & A, 69.   In section 2254 proceedings, "a determination of a factual issue made by a state

4    court shall be presumed to be correct.   The [petitioner] shall have the burden of rebutting the

5    presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1).

6    Accordingly, unless Petitioner can prove otherwise, this Court will presume that the state court's

7    factual finding that the May 14 tape contained no "audible prejudicial material" is correct.   Petitioner

8    provides no evidence in the form of citation to the tape's transcript or the tape itself that shows

9    audible prejudicial material.   Petitioner's argument is that the tape recording was of such poor quality

10   that "it necessarily invites jury speculation and unsupported interpretations as to what was being

11   said," see Mem. P & A, 63, and that "[t]he prejudice was inherent in the quality, or lack thereof, of

12   the recording."   Id at 62.   This argument is unconvincing because the state court agreed that the tape

13   was of poor quality, so much so that it was wholly unintelligible and thus contained no "audible

14   prejudicial material."   Petitioner has failed to meet his burden to show that the state court's factual

15   finding was unreasonable in light of the evidence presented at the state court proceeding.

16   **F.   Ground Six**

17   Petitioner claims that he is "entitled to habeas relief as a result of the cumulative effect of the

18   cited errors." (Mem. P & A, 71.)  Respondent asserts that Petitioner did not raise this claim with the

19   California Supreme Court and because the claim has not been exhausted, habeas relief is not

20   available.  (Answer, 48.)  Petitioner did not address this issue in his traverse.  (See Traverse.)

21   **1. Exhaustion**

22   A petitioner who is in state custody and wishes to collaterally challenge his conviction by a

23   petition for writ of habeas corpus must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1).  The

24   exhaustion doctrine is based on comity to the state court and gives the state court the initial

25   opportunity to correct the state's alleged constitutional deprivations.  Coleman v. Thompson, 501

26   U.S. 722, 731 (1991);  Rose v. Lundy, 455 U.S. 509, 518 (1982); Buffalo v. Sunn, 854 F.2d 1158,

27   1163 (9th Cir. 1988).

28

1    A petitioner can satisfy the exhaustion requirement by providing the highest state court with a

2    full and fair opportunity to consider each claim before presenting it to the federal court.  Duncan v.

3    Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276 (1971); Johnson v. Zenon, 88

4    F.3d 828, 829 (9th Cir. 1996).  A federal court will find that the highest state court was given a full

5    and fair opportunity to hear a claim if the petitioner has presented the highest state court with the

6    claim's factual and legal basis. Duncan, 513 U.S. at 365 (legal basis); Kenney v. Tamayo-Reyes, 504

7    U.S. 1(1992) (factual basis).  More specifically, "a cumulative error claim must be clearly identified

8    in a petitioner's brief before a state court to be exhausted."  Wooten v. Kirkland, 540 F.3d, 1019,

9    1026 (9th Cir. 2008) (citing Solis v. Garcia, 219 F.3d 922 (9th Cir. 2000)).

10    The Court's examination of the petition for review filed with the California Supreme Court

11    shows that Petitioner did not raise cumulative error in his petition to that court.  Because Petitioner

12    failed to raise this claim with the state supreme court, the claim remains unexhausted and thus,

13    habeas relief cannot be granted.

14    **2. Cumulative Error**

15    However, even if this issue had been exhausted in state court, Petitioner's claim of

16    cumulative error would fail on the merits.

17    A defendant may prove that he has suffered prejudice based on the cumulative effect of

18    errors. Kyles v. Whitley, 514 U.S. 419, 421-22, 440-41 (1995) (in determining whether exculpatory

19    evidence suppressed by state is sufficiently material to violate Due Process Clause, court is required

20    to assess "cumulative" or "net" effect of all suppressed evidence and commits legal error if it only

21    conducts piecemeal analysis of each item of suppressed evidence); O'Neal v. McAninch, 513 U.S.

22    432, 435-36 (1995) (accepting lower court's assumption that "confusion arising out of a trial court

23    instruction about the state of mind necessary for conviction combined with a related statement by a

24    prosecutor" required habeas corpus relief if "combined" error was not harmless); Fuller v. Roe, 182

25    F.3d 699, 704 (9th Cir. 1999) ("cumulative effect of several errors may prejudice a defendant to the

26    extent that his conviction must be overturned"); Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th Cir.

27    1978) (concluding cumulative effect of alleged errors may demonstrate prejudice).

28

1    In this case, however, none of the claims raised by Petitioner are meritorious.  Accordingly,

2  Petitioner cannot demonstrate prejudice resulting from the cumulative effect of the errors, because

3  there are no errors affecting the verdict to accumulate.  Villafuerte v. Stewart, 111 F.3d 616, 632,

4  (9th Cir.1997) (*per curiam*).  The claim must be rejected.

5                                              **CONCLUSION**

6    For the foregoing reasons, Petitioner's petition for writ of habeas corpus is DENIED.

7                                  **CERTIFICATE OF APPEALABILITY**

8    A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

9  district court's denial of his petition, and an appeal is only allowed in certain circumstances.  Miller-

10  El v. Cockrell, 537 U.S. 322, 336-37 (2003).  The controlling statute in determining whether to issue

11  a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

12          (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
         district judge, the final order shall be subject to review, on appeal, by the court
13          of appeals for the circuit in which the proceeding is held.

14          (b) There shall be no right of appeal from a final order in a proceeding to test the
         validity of a warrant to remove to another district or place for commitment or trial
15          a person charged with a criminal offense against the United States, or to test the
         validity of such person's detention pending removal proceedings.

16          (c)      (1) Unless a circuit justice or judge issues a certificate of appealability, an
17                appeal may not be taken to the court of appeals from–

18                    (A) the final order in a habeas corpus proceeding in which the
                  detention complained of arises out of process issued by a State
19                    court; or

20                    (B) the final order in a proceeding under section 2255.

21          (2) A certificate of appealability may issue under paragraph (1) only if the
         applicant has made a substantial showing of the denial of a constitutional right.

22
23          (3) The certificate of appealability under paragraph (1) shall indicate which
         specific issue or issues satisfy the showing required by paragraph (2).

24    If a court denies a petitioner's petition, the court may only issue a certificate of appealability

25  "if jurists of reason could disagree with the district court's resolution of his constitutional claims or

26  that jurists could conclude the issues presented are adequate to deserve encouragement to proceed

27  further." Miller-El, 322 U.S. at 338 (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  While the

28

-U.S. District Court
E. D. California

1   petitioner is not required to prove the merits of his case, he must demonstrate "something more than

2   the absence of frivolity or the existence of mere good faith on his . . . part." Id.

3         In the present case, the Court finds that Petitioner has made the required showing with regard

4   to Ground Two and Five.  Accordingly, the Court hereby GRANTS a certificate of appealability on

5   the question of whether prejudicial constitutional error occurred when the appellate court denied

6   Petitioner's motion to suppress the cloned pager evidence and when the jury was allowed to listen to

7   the May 14 tape recording outside of the presence of counsel and the judge.  A certificate of

8   appealability is DENIED with respect to Grounds One, Three, Four, and Six.

9                     **ORDER**

10         Accordingly, it is hereby ORDERED that:

11         1) The petition for writ of habeas corpus is DENIED in full; and

12         2) Certificate of appealability is GRANTED with regards to Grounds Two and Five;

13         3) Certificate of appealability is DENIED with regards to Grounds One, Three, Four, and Six;

14         and

15         4) Clerk or the court is DIRECTED to enter judgment for Respondent.

16

17   IT IS SO ORDERED.

18   Dated:    February 3, 2011                                   

19                                CHIEF UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28